UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LARRY FREUDENBERG Individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>    -v-<br><br>E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN, and ROBERT SIMMONS,<br><br>            Defendants. | Case No.: 07-cv-8538<br><br>ECF CASE |
| WILLIAM BOSTON, Individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>    -v-<br><br>E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN, and ROBERT SIMMONS,<br>            Defendants. | Case No. 07-cv-8808 |
| ROBERT D. THULMAN, Individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>    -v-<br><br>E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN, and ROBERT SIMMONS,<br><br>            Defendants. | Case No. 07-cv-9651 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THE MOTION OF STATE TEACHERS RETIREMENT SYSTEM OF OHIO FOR THE CONSOLIDATION OF ALL RELATED ACTIONS; TO BE APPOINTED LEAD PLAINTIFF AND FOR APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 4

I.    RELATED ACTIONS SHOULD BE CONSOLIDATED ............................................... 9

II.    THE STRS SHOULD BE APPOINTED AS LEAD PLAINTIFF FOR THE CLASS IN THE CONSOLIDATED ACTION .................................................................. 10

    A.    The Procedures Required By The PSLRA .......................................................... 10

    B.    STRS Satisfies The Lead Plaintiff Provisions Of The PSLRA .......................... 11

        1.    STRS Has Complied With The Procedural Retirements of the PSLRA .... 11

        2.    STRS Has The Largest Financial Interest In The Relief ............................. 12

        3.    STRS Otherwise Satisfies Rule 23 ............................................................. 12

            (a)    The Claims Of The Proposed Lead Plaintiff Are Typical Of The Claims Of The Class ........................................................................... 14

            (b)    The Proposed Lead Plaintiff Will Fairly And Adequately Represent The Interests Of The Class ................................................... 15

III.    THIS COURT SHOULD APPROVE STRS' CHOICE OF LEAD COUNSEL .............. 15

CONCLUSION ........................................................................................................................ 16

## **TABLE OF AUTHORITIES**

**Cases**

*In re Bausch & Lomb Inc. Sec. Litig.*,
    244 F.R.D. 169 (S.D.N.Y. 2007) ..................................................................................3

*In re Crayfish Co. Sec. Litig.*,
    00 Civ. 6766, 2002 U.S. Dist. LEXIS 10134, 2002 WL 1268012
    (S.D.N.Y. June 6, 2006) ................................................................................................13

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992) ...................................................................................14, 15

*In re eSpeed, Inc. Sec. Litig.*,
    232 F.R.D. 95 (S.D.N.Y. 2005) ...................................................................................13

*In re Olsten Corp. Sec. Litig.*,
    3 F. Supp. 2d 286 (E.D.N.Y. 1998) .............................................................................13

*Johnson v. Celotex Corp.*,
    899 F.2d 1281 (2d Cir. 1990) .......................................................................................10

*Lax v. First Merchs. Acceptance Corp.*,
    No. 97 Civ. 2715, 1997 U.S. Dist. LEXIS 11866, 1997 WL 461036
    (N.D. Ill. Aug. 11, 1997) ...........................................................................................3, 12

*Montoya v. Mamma.com Inc.*,
    No. 05 Civ. 2313, 2005 U.S. Dist. LEXIS 10224, 2005 WL 1278097
    (S.D.N.Y. May 31, 2005) ..........................................................................................3, 12

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*,
    229 F.R.D. 395 (S.D.N.Y. 2004) ..............................................................................2, 15

*Weinberg v. Atlas Air Worldwide Holdings, Inc.*,
    216 F.R.D. 248 (S.D.N.Y. 2003) .................................................................................13

*Weltz v. Lee*,
    199 F.R.D. 129 (S.D.N.Y 2001) ..................................................................................11

*Werner v. Satterlee, Stephens, Burke & Burke*,
    797 F. Supp. 1196 (S.D.N.Y. 1992) ............................................................................10

**Statutes**

15 U.S.C. §78u-4 .............................................................................................................2, 3, 9, 14

Fed. R. Civ. P. 23(a) ...........................................................................................................13

Fed. R. Civ. P. 42(a) ..........................................................................................................2, 9

**Treatises**

Rep. No. 104-98 (1995),
    *reprinted* in 1995 U.S.C.C.A.N. 679 ................................................................................2


H.R. Conf. Rep. No. 104-369 (1995)
    *reprinted* in 1995 U.S.C.C.A.N. 730……………………………………………..1

**PRELIMINARY STATEMENT**

State Teachers Retirement System of Ohio (hereinafter, the "STRS")[1] respectfully submits this memorandum pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), for entry of an order: (i) consolidating all related class actions; (ii) appointing STRS as the Lead Plaintiff in the consolidated action and any subsequently filed related cases, and (iii) approving its selection of Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier") as Lead Counsel for the Class.

This motion advances one of the primary goals of Congress in enacting the PSLRA (15 U.S.C. §78u-4(a)(3)) – to encourage institutional investors to serve as lead plaintiffs in class actions brought under the federal securities laws. The Conference Committee's explanatory report expressly states that:

> The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief is the "most adequate plaintiff."...
>
> The Conference Committee believes that...in many cases the **beneficiaries of pension funds – small investors – ultimately have the greatest stake in the outcome of the lawsuit.** Cumulatively, these small investors represent a single large investor interest. Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake.

H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted* in 1995 U.S.C.C.A.N. 730, 733 (emphasis added). Similarly, the Senate Report on the PSLRA states in pertinent part:

---

[1] The federal securities laws specifically authorize class members, regardless of whether they have filed a complaint, to move for appointment of lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B). The STRS certification setting forth its transactions in E*TRADE common stock during the Class Period (defined below) is attached as Exhibit B to the Declaration of Judith L. Spanier ("Spanier Decl.) submitted herewith.

1

> The Committee believes that increasing the role of institutional investors in class actions will ultimately benefit the class and assist the courts. Institutions with large stakes in class actions have much the same interests as the plaintiff class generally.

Rep. No. 104-98, at 11 (1995), *reprinted* in 1995 U.S.C.C.A.N. 679, 690.

The first steps in a securities class action are consolidation of related actions, appointment of a lead plaintiff and approval of the lead plaintiff's selection of lead counsel. Consolidation is appropriate pursuant to Fed. R. Civ. P. Rule 42(a) because all of the actions raise common issues of law – all allege claims pursuant to the Exchange Act and are governed by the PSLRA. The claims all arise from the same core facts relating to statements made by defendant E*TRADE Financial Corporation ("E*TRADE" or the "Company") and certain of its officers and directors in filings with the Securities and Exchange Commission, press releases and conference calls. The consolidation of similar securities class actions is a prerequisite to the appointment of lead plaintiff and approval of lead counsel, and is routinely done in these types of cases. "Accordingly, the PSLRA amends the Exchange Act, by among other things, setting forth a procedure governing the appointment of lead plaintiff or plaintiffs in 'each action arising under the [Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 403 (S.D.N.Y. 2004).

After consolidating the cases, the Court should appoint the "most adequate plaintiff" to serve as lead plaintiff in the action. 15 U.S.C.§§ 78 u-4(a)(3)(B)(i). The "most adequate plaintiff" is the movant with the "largest financial interest" in the relief sought by the Class that has made a *prima facie* showing that it meets the adequacy and typicality requirements of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). 15 U.S.C.§§ 78u-4(a)(3)(B)(iii)(I).

Although the PSLRA does not define the term "largest financial interest," courts in this

2

Circuit have utilized a four factor test that examines: (1) the number of shares of the subject securities purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended by the plaintiff during the class period; and (4) the approximate losses suffered by the plaintiff during the class period. *See, e.g., In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 172 (S.D.N.Y. 2007); *Montoya v. Mamma.com Inc.*, No. 05 Civ. 2313, 2005 U.S. Dist. LEXIS 10224 at *4, 2005 WL 1278097 at *1 (S.D.N.Y. May 31, 2005); *Lax v. First Merchs. Acceptance Corp.*, No. 97 Civ. 2715, 1997 U.S. Dist. LEXIS 11866 at *17, 1997 WL 461036 at *6 (N.D. Ill. Aug. 11, 1997).[2]

During the Class Period, STRS purchased 3,185,000 shares of E*TRADE common stock, with net purchases of 1,357,500 shares. STRS made net expenditures of $29,211,633.56 to acquire those securities and lost approximately $22,745,443.00 under a first-in, first-out ("FIFO") analysis and approximately $22,712,225.23 under a last-in, first-out ("LIFO") analysis. Under each of the *Lax* factors, the STRS has a very large financial interest in the relief sought in this litigation and believes it may have the largest financial interest of any movant.

In addition, the STRS also meets the adequacy and typicality requirements of Rule 23, as demonstrated below. With assets in excess of $75 billion, STRS is one of the nation's largest premier retirement systems, serving more than 400,000 active, inactive and retired Ohio public educators. STRS has extensive experience discharging its fiduciary duties as a lead plaintiff or co-lead plaintiff, having served in such capacity in the *Exxon Mobil, Freddie Mac, Fannie Mae, Scottish Re* and *Global Crossing* securities litigations. Thus, STRS has the requisite experience and motivation to appropriately and vigorously represent the Class in this action. In addition, the

---

[2] *Lax v. First Merchs. Acceptance Corp.* originally articulated these four factors, now commonly referred to as the "*Lax* factors."

Attorney General of Ohio, through his office, has the authority to bring this action and represent STRS and will actively oversee the prosecution of this action.

Pursuant to the PSLRA, the lead plaintiff selects lead counsel, subject to the Court's approval. The Court should approve the STRS's choice of Abbey Spanier as lead counsel. As set forth in the firm's resume (Spanier Decl., Ex. D), Abbey Spanier has extensive experience, has successfully litigated these types of cases, and has been appointed as lead counsel in numerous class actions.

## STATEMENT OF FACTS

This is a federal class action brought on behalf of all persons or entities who purchased the securities of E*TRADE during the period from December 14, 2006 to November 9, 2007 (the "Class Period"), pursuing remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. E*TRADE trades on the NASDAQ under the symbol ETFC. As of August 3, 2007, there were 423,629,118 shares of E*TRADE common stock issued and outstanding. Prior to 2003, E*TRADE specialized in electronic trading and substantially all of its income was derived from commissions charged to customers using E*TRADE's self-trading accounts. In 2003, E*TRADE changed its name from E*TRADE Group, Inc. to E*TRADE Financial Corporation, and expanded its business into new markets. Among the additional markets E*TRADE entered was the mortgage market.

The above-captioned actions allege that defendants knowingly, or with recklessness, issued materially false and misleading statements that misrepresented and failed to disclose that: (a) the Company was experiencing a rise in delinquency rates in its mortgage and home equity portfolios; (b) the Company failed to timely record an impairment on its mortgage and home equity portfolios; (c) the Company's securities portfolio, which includes assets backed by mortgages, was materially

4

overvalued; and (d) based on the foregoing, defendants' positive statements about the Company's earnings and prospects were lacking in a reasonable basis at all relevant times.

E*TRADE is both an originator and purchaser of mortgage loans. During 2006, E*TRADE's real estate loan portfolio increased by $7.5 billion. By at least the end of the third quarter of 2006, E*TRADE would have been aware of the deterioration of the mortgage market, an increase in the default rates of its loans and the probability that it would sustain substantial losses in the value of its mortgage portfolios. Despite the foregoing, E*TRADE failed to disclose its mortgage loan loss exposure. In fact, on December 14, 2006, the start of the Class Period, E*TRADE falsely reassured investors that it was poised for an outstanding 2007 fiscal year and continued to mislead investors throughout the proposed Class Period concerning the seriousness of E*TRADE's financial problems.

On December 14, 2006, E*TRADE announced its 2007 earnings guidance of $1.65 - $1.80 per share on total net revenue of $2.75-$3.0 billion. E*TRADE's Chief Executive Officer, Mitchell H. Caplan ("Caplan"), touted E*TRADE's prospects and provided an optimistic outlook for the year.

On January 18, 2007, the Company held a conference call to discuss its fourth quarter 2006 financial results. Caplan reported:

> With respect to lending, this year we launched the intelligent lending optimizer, an online tool that allows customers to evaluate their credit alternatives, including margin and mortgage products. We continue to make substantial strides as we re-engineer our lending origination platform. Realignment of this business will further our ability to originate more first-lien mortgage loans to put on our balance sheet.
>
> During the quarter, we continued to add high-quality margin and mortgage assets to the portfolio. With growth of over $3 billion in the fourth quarter, our loans as a percentage of interest earning assets now stand at 65%, up from 62% at the end of Q4 2005.

\* \* \*

> While maintaining a relatively flat net interest spread quarter over quarter, the increase in net interest income was generated through continued growth in the

5

balance sheet, with average interest earning assets up 7%. *We grew the balance sheet while adhering to our strict discipline with respect to credit quality.* This discipline has led us to reduce our exposure to unsecured consumer lending products, *particularly as we build out and expand our mortgage origination platform, which will focus on high quality, first-lien products to hold on balance sheet.*

\* \* \*

The other point I would make, and you are right, is that when you look at our charge-offs, they increased from about 17 basis points to about 22 basis points in the quarter. What we believe is that there are two things happening. One is sort of the seasonality associated with the mortgage product -- I mean, the seasoning of the mortgage portfolios, so as we add in mortgages and heloc [Home Equity Line of Credit], and the other is the seasonality. If you go back and look at the same quarter last year, you typically have a spike in your consumer portfolio in Q4 around seasonality, which typically reverses as you move through Q1.

*I think it would be impossible for us to believe that we are not immune or that we are immune to what is happening on a macroeconomic level. Clearly macroeconomically, credit is getting worse. I think we believe that we are significantly insulated because of the kind of products we have, the way in which we focus on FICO and LTVs [Loan-to-Value ratios] and debt-to-income.*

*I think at a high level, I would tell you that one of the things that we look at is our first-lien position mortgages still continue to be about a basis point. Our heloc and heils [Home Equity Installment Loan] are somewhere in the neighborhood of anywhere from 6 to 26, so your blended portfolio in net charge-offs for mortgage is about 11 basis points against a reserve out there of still about, I don't know, 26.* (emphasis added)

On July 25, 2007, E*TRADE issued a press release in which it announced its results for the second quarter 2007. The Company reported net income of $159 million, or $0.37 per share, and total net revenue of $664 million. Caplan made the following statement regarding E*TRADE's results for the quarter:

> "Our second quarter results demonstrate the strategic and economic success we have achieved through investments in product, service and marketing over the past several years," said Mitchell H. Caplan, Chief Executive Officer, E*TRADE FINANCIAL Corporation. "We delivered record performance in the quarter while improving the overall quality of revenue and earnings through continued growth and engagement led by our high-value, target segment accounts."

6

On August 16, 2007, the Company issued a press release announcing the credit quality of its mortgage and securities portfolios. The press release stated:

> E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) released supplemental disclosures today related to the composition and funding sources for its balance sheet. The Company provided a presentation containing additional information to its June 30, 2007 quarterly results, including expanded transparency on the credit quality of its mortgage and securities portfolios....In addition, the Company stated that it has seen no material changes to date with respect to the availability, pricing or margin on its wholesale funding sources, including repurchase agreements. Management maintains that it does not believe that the current market capitalization accurately reflects the financial strength and performance of the business.

On September 17, 2007, E*TRADE announced plans to realign its balance sheet and streamline business operations to focus on its retail growth opportunity. The Company said that it was exiting or restructuring non-core businesses that lack a direct and strategic connection with its retail customers. In addition, the Company reported that it was "increasing the provision for loan losses due to charge-offs expected as a result of the disturbance in the credit markets." As a result of these actions, E*TRADE revised its 2007 earnings guidance. For the full year 2007, E*TRADE said that it expected GAAP net income of between $450 million and $500 million, and earnings per share of between $1.05 and $1.15 per share, a decrease from its previous range of $1.53 to $1.67 per share.

The September 17, 2007 press release further reported:

> <u>Increased allowance for loan losses</u>. Given the significant deterioration in the mortgage market in August and particularly the pace of change in the performance of home equity loans in August, the Company expects charge-offs of $95 million and total provision expense of $245 million in the second half of 2007. The majority of this provision is expected to be recorded in the third quarter. With this additional reserve, allowance for loan losses as a percentage of non-performing loans is expected to increase to 75 percent based on assumptions for the second half of the year, up from 45 percent on June 30, 2007. Within home equity loans, where the Company and the marketplace have seen the most significant stress, the coverage will be approximately 100 percent, up from 51 percent as of June 30, 2007.
>
> <u>Potential for securities impairments</u>. Embedded in the Company's modified guidance is an assumed securities impairment of up to $100 million in the second half

7

of 2007. The expected impairments in the guidance are predominantly related to deterioration in the performance of asset-backed securities comprised of second lien loans and CDOs (collateralized debt obligations).

<u>Exiting and restructuring non-core businesses</u>. The Company will exit its wholesale mortgage operations and will streamline its direct mortgage lending business to focus on its retail franchise. In addition, the Company will restructure its institutional sales trading business in a manner to better align it with retail activity. Total severance, restructuring and other exit charges are estimated to be approximately $32 million, the majority of which will occur in the fourth quarter.

In conjunction with the September 17, 2007 press release, Caplan assured the public that E*TRADE was putting any issue regarding the Company's mortgage portfolio behind it. He was quoted as stating: "We want to get this issue behind us and put the focus solely back on our core retail customer." He stressed that despite the recent issues, the Company did not have a liquidity problem and it was releasing detailed information about its current financial picture. Over the next six days of trading, the price of E*TRADE's stock fell $2.32 per share, or over 15%, as the market digested this news.

On November 9, 2007, after the market closed, E*TRADE disclosed that there were yet further declines in the fair value of its $3.0 billion asset-backed securities portfolio, predominantly within ABS CDO and second-lien securities. The Company said that the total exposure to ABS CDO and second-lien securities at September 30, 2007 was approximately $450 million in amortized cost, including approximately $50 million of "AAA" rated asset-backed CDOs that were downgraded to below investment grade. The Company also said that the SEC has started an investigation into the Company loan and security portfolio.

On November 12, 2007 (the first trading day after the write-down was announced), the Company's stock fell $5.04 per share, or 59 percent, to close at $3.55 per share on heavy trading volume. As a result of the decline in E*TRADE's stock price that occurred as the Company's true

financial condition began to be revealed to the marketplace, STRS and other members of the Class have been damaged.

## I.  RELATED ACTIONS SHOULD BE CONSOLIDATED

The PSLRA, among other things, provides for consolidation of related actions brought under the federal securities laws. Section 21D(a)(3)(B)(ii) of the Exchange Act addresses the issue of consolidation of similar actions filed under the PSLRA:

> If more than one action on behalf of a class asserting substantially the same claim or claims arising under this title has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the determination [of appointment of lead plaintiff under §21D(a)(3)(B)(I)] until after the decision on the motion to consolidate is rendered.

15 U.S.C. §78u-4(a)(3)(B)(ii). Rule 42(a) of the Federal Rules of Civil Procedure provides as follows:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed. R. Civ. P. 42(a).

Consolidation is appropriate when, as here, there are actions involving common questions of law or fact. Each of the above-captioned actions asserts class action claims on behalf of class members who purchased or otherwise acquired E*TRADE securities during the Class Period. The STRS believes consolidation is appropriate for the related actions filed in this Court because they involve common questions of law and fact and allege the same or similar claims under the federal securities laws on behalf of the same or similar plaintiff class. *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196, 1211 (S.D.N.Y. 1992) (consolidation appropriate in securities actions

9

where complaints are based on the same public statements and reports and there are common questions of law and fact). In addition, all actions will involve similar issues regarding class certification, and will involve identical discovery of the parties and of non-parties. Accordingly, these actions should be consolidated for all purposes in the interest of judicial economy and overall efficiency. *See, Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990) ("[C]ourts have taken the view that considerations of judicial economy favor consolidation.").

The STRS therefore requests that the Court consolidate the above-captioned actions and any subsequently filed related actions.

## II. THE STRS SHOULD BE APPOINTED AS LEAD PLAINTIFF FOR THE CLASS IN THE CONSOLIDATED ACTION

### A. The Procedures Required By The PSLRA

Section 21D of the Exchange Act sets forth the procedure for the selection of lead plaintiff to oversee class actions brought under the federal securities laws. Specifically, §21D(a)(3)(A)(i) provides that within 20 days after the date on which the first class action is filed under the PSLRA, the plaintiff shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice informing class members of the action and its right to file a motion for the appointment of lead plaintiff.

The PSLRA provides that within 60 days after the publication of the notice, any person or group of persons who are members of the proposed class may apply to the court to be appointed lead plaintiff. 15 U.S.C. §78u-4(a)(3)(A)(i)(II). Section 21D(a)(3)(B)(i) of the Exchange Act directs the Court to consider any motion by a plaintiff or purported class member to serve as lead plaintiff in response to any such notice within 90 days after the date of publication pursuant to §21D. If more than one action asserting substantially the same claims has been filed, and a motion to consolidate

has been made, the court must decide the consolidation motion before the lead plaintiff motion. The lead plaintiff motion is to be decided as soon as practicable thereafter. Under this section, the Court shall consider any motion made by a class member, and shall appoint as lead plaintiff the member or members that the Court determines to be most capable of adequately representing the interests of class members.

In determining the "most adequate plaintiff," the PSLRA provides that:

> §21D(a)(3)(B)(iii)(I). [T]he Court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that –
>
> (aa) has either filed the complaint or made a motion in response to a notice . . .;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

### B. STRS Satisfies The Lead Plaintiff Provisions Of The PSLRA

#### 1. STRS Has Complied With The Procedural Retirements of the PSLRA

The plaintiff in the first filed action caused a notice to be published on October 2, 2007 on BUSINESS WIRE, a widely circulated national business-oriented wire service. *See* Spanier Decl., Ex. A. BUSINESS WIRE has been found to be a suitable vehicle for meeting the statutory requirement that notice be published. *See, e.g, Weltz v. Lee*, 199 F.R.D. 129, 130 (S.D.N.Y 2001). The time period in which class members may move to be appointed lead plaintiff herein under 15 U.S.C. §78u-4(a)(3)(A) and (B) expires on December 3, 2007.

Pursuant to the PSLRA, and within the requisite time frame after publication of the required notice, the STRS is timely moving this Court to be appointed lead plaintiff on behalf of all members

11

of the Class. The STRS' motion includes its required certification setting forth, among other things, its transactions in E*TRADE securities during the Class Period; that William Neville, General Counsel of STRS, has reviewed the complaints filed in the actions; and that STRS is willing to serve as a representative party on behalf of the Class. *See* Certification, Spanier Decl., Ex. B. In addition, STRS has selected and retained experienced and competent counsel to represent it and the Class. *See* Spanier Decl., Ex. D.

### 2. STRS Has The Largest Financial Interest In The Relief Sought By The Class

The most adequate plaintiff is the person or group of persons that, in the determination of the Court, has the largest financial interest in the relief sought by the class. As noted above, the analysis central to appointing the Lead Plaintiff focuses on a four-part test: (1) the number of shares of the subject securities purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiff during the class period; and (4) the approximate losses suffered by the plaintiff. *See, e.g., Mamma.com Inc.*, 2005 U.S. Dist. LEXIS 10224 at *4, 2005 WL 1278097 at *1.

During the Class Period, STRS purchased 3,185,000 shares of E*TRADE, with net purchases of 1,357,500 shares. STRS made net expenditures of $27,595,858.28 to acquire those securities and lost approximately $22,745,443.00 under a FIFO analysis and approximately $22,712,225.23 under a LIFO analysis. Under each of the *Lax* factors, STRS has a very large financial interest in the relief sought in this litigation and believes it may have the largest financial interest of any movant. *See* Spanier Decl., Ex. C. STRS therefore is presumptively the most adequate plaintiff pursuant to the PSLRA. 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(bb).

### 3. STRS Otherwise Satisfies Rule 23

In addition to possessing the largest financial interest in the outcome of the litigation, the

PSLRA provides that the lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(cc). Rule 23(a) provides that a party may serve as a class representative if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. Rule 23(a).

Of the four prerequisites to class certification, only two – typicality and adequacy – directly address the personal characteristics of the class representative. Consequently, in deciding a motion to serve as lead plaintiff, the Court should limit its inquiry to the typicality and adequacy prongs of Rule 23(a), and defer examination of the remaining requirements until the lead plaintiff moves for class certification. *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003) (citing *In re Crayfish Co. Sec. Litig.*, 00 Civ. 6766, 2002 U.S. Dist. LEXIS 10134, 2002 WL 1268012 at *4 (S.D.N.Y. June 6, 2006)).

With respect to the qualifications of the class representative, Rule 23(a) requires that the claims be typical of the claims of the class and that the representative will fairly and adequately protect the interests of the class. At this stage of the action, STRS "need only make a preliminary showing that it satisf[ies] the typicality and adequacy requirements of Rule 23." *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 102 (S.D.N.Y. 2005) (quoting *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998)).

Moreover, the PSLRA provides that the presumption in favor of the most adequate plaintiff may be rebutted only upon proof that the individuals or the group "(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff

13

incapable of adequately representing the class." 15 U.S.C. 78u-4(a)(3)(B)(iii)(II).

As detailed below, the STRS satisfies the typicality and adequacy requirements of Rule 23.

### (a) The Claims Of The Proposed Lead Plaintiff Are Typical Of The Claims Of The Class

The typicality requirement of Rule 23(a)(3) is satisfied when a named plaintiff: (a) has suffered the same injuries as the absent class members; (b) as a result of the same course of conduct by defendants; (c) and its claims are based on the same legal issues. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). The questions of law and fact common to the class members here, which predominate over questions that may affect individual claims, include: (a) whether the federal securities laws were violated by defendants' acts; (b) whether defendants' statements during the Class Period omitted and/or misrepresented material facts; (c) whether the defendants acted intentionally or recklessly; (d) whether the market price of E*TRADE stock was artificially inflated due to the activities complained of; and (e) the extent of damages class members sustained and the appropriate measure of those damages. The claims of STRS are typical of the claims of the members of the proposed Class. The STRS, as do all members of the class, alleges that certain of E*TRADE's directors and high ranking officers violated the Exchange Act by publicly disseminating false and misleading statements, and by failing to disclose material adverse facts about E*TRADE during the Class Period. Further, the STRS, as did all of the members of the proposed class, acquired E*TRADE stock at prices inflated by defendants' misrepresentations and omissions and were damaged thereby. The typicality requirement is satisfied here because the claims asserted by the STRS are based on the same legal theory and arise "from the same course of events, and each class member makes similar legal arguments to prove defendants' liability." *Drexel Burnham*, 960 F.2d at 291.

### (b) The Proposed Lead Plaintiff Will Fairly And Adequately Represent The Interests Of The Class

Under Rule 23(a)(4), the representative party must also "fairly and adequately protect the interests of the class." In order to satisfy the adequacy requirement of Rule 23(a), there should not be a conflict between the interests of the class and the named plaintiff, nor should there be collusion among the litigants; and the plaintiff's attorney must be qualified and experienced. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust*, 229 F.R.D. at 412.

The interests of the STRS are clearly aligned with the members of the proposed class. There is no evidence of any antagonism between the interests of the STRS and the proposed class members. As detailed above, the claims of STRS and the class involve substantially similar questions of law and fact, its claims are typical of those asserted by members of the class, and it is taking significant steps to advance this litigation. In addition, the STRS has amply demonstrated its adequacy to serve as the class representative by signing a certification affirming its willingness to serve as, and assume the responsibilities of, the class representative.

Finally, the STRS has selected and retained counsel highly experienced in prosecuting securities class actions. For these reasons, the STRS is entitled to the most adequate plaintiff presumption and should be appointed lead plaintiff in the consolidated action.

### III. THIS COURT SHOULD APPROVE STRS' CHOICE OF LEAD COUNSEL

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to court approval. See §21D(a)(3)(B)(v). The STRS has selected the law firm of Abbey Spanier to serve as lead counsel. Abbey Spanier has extensive experience in the area of securities litigation and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors. *See* Spanier Decl., Ex. D.

## CONCLUSION

For the foregoing reasons, the STRS respectfully requests that the Court: (i) consolidate all related cases (ii) appoint the STRS as lead plaintiff in the consolidated action; and (iii) approve its choice of Abbey Spanier as lead counsel.

Dated: December 3, 2007
New York, New York

Respectfully Submitted,

**ABBEY SPANIER RODD & ABRAMS, LLP**

By: /s/ Judith L. Spanier
Judith L. Spanier (JS 5065)
Jill S. Abrams (JA 1578)
Nancy Kaboolian (NK 6346)
212 East 39th Street
New York, New York 10016
jspanier@abbeyspanier.com
jabrams@abbeyspanier.com
nkaboolian@abbeyspanier.com
Tel: (212) 889-3700
Fax: (212) 684-5191

Proposed Lead Counsel for Proposed Lead Plaintiff State Teachers Retirement System of Ohio and Special Counsel to the Attorney General of Ohio