**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LARRY FREUDENBERG Individually and on behalf of all others similarly situated, | Case No.: 07-cv-8538 (RWS) |
| Plaintiff, | |
| -v- | ECF CASE |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN, and ROBERT SIMMONS, | |
| Defendants. | |
| WILLIAM BOSTON, Individually and on behalf of all others similarly situated, | Case No. 07-cv-8808 (RWS) |
| Plaintiff, | |
| -v- | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN, and ROBERT SIMMONS, | |
| Defendants. | |
| ROBERT D. THULMAN, Individually and on behalf of all others similarly situated, | Case No. 07-cv-9651 (RWS) |
| Plaintiff, | |
| -v- | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN, and ROBERT SIMMONS, | |
| Defendants. | |

| | |
|---|---|
| WENDY M. DAVIDSON,<br>    individually and on behalf of<br>    all others similarly situated,<br><br>                          Plaintiff,<br><br>   -v-<br><br><br>E*TRADE FINANCIAL CORPORATION,<br>MITCHELL H. CAPLAN and ROBERT J.<br>SIMMONS,<br><br>                    Defendants. | Civil Action No. 07-cv-10400 (UA) |
| JOSHUA FERENC, individually and<br>    on behalf of all others<br>    similarly situated,<br><br>                          Plaintiff,<br><br>   -v-<br><br><br>E*TRADE FINANCIAL CORPORATION,<br>MITCHELL H. CAPLAN, and ROBERT J.<br>SIMMONS,<br><br>                    Defendants. | Civil Action No. 07-cv-10540 (SHS) |

## DECLARATION OF PROFESSOR FRANK PARTNOY

I, FRANK PARTNOY, SWEAR AS FOLLOWS:

    1.    I am a Professor of Law at the University of San Diego School of Law, and a

graduate of Yale Law School.  Since 1997, I have taught various courses in the areas of

corporate and securities law, corporate finance, financial market regulation, and derivatives, and

I am the author of several dozen articles in these areas, as well as two books on derivatives and a

co-authored corporate law casebook, which covers, among other topics, derivatives.

2.      Before 1997, I practiced law at Covington & Burling, and worked on the derivatives trading desks at Morgan Stanley and CS First Boston. I have degrees in mathematics and economics, and I passed the Series 3, 7, and 63 registered securities, options, and futures licensing examinations. I am a member of the New York and District of Columbia bars, and am co-chair of the American Bar Association Subcommittee on Futures and Derivatives Litigation. I also am chair-elect of the Business Associations Section of the Association of American Law Schools. A copy of my resume is attached as Exhibit A.

3.      A list of trial and deposition testimony I have given as an expert, including testimony during the previous four years, is attached as Exhibit B. I also have submitted reports to regulators as an expert on various financial and securities matters, including comments to the Securities and Exchange Commission, and I have given sworn expert testimony on issues related to derivatives before committees of both the United States Senate and House of Representatives.

4.      I have been retained as an expert in this matter by Abbey Spanier Rodd & Abrams, LLP, counsel for State Teachers Retirement System of Ohio ("STRS"), and am being compensated at my standard rate of $650 per hour. Exhibit C lists the documents I have reviewed in preparing this declaration. I have personal knowledge of the facts stated in this declaration, and if called as a witness could competently testify to them. My work on this matter is ongoing, and I reserve the right to modify or expand my opinions based on additional information that becomes available during this litigation.

5.      I make this declaration to respond to the claim by the Kristen-Straxton Group that it has the "largest financial interest" in this action and is the "most adequate plaintiff" under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In particular, I am responding to the assertion that the members of the Kristen-Straxton Group lost more than $133 million trading

"in E*Trade Financial Corporation securities during the alleged Class Period."[1] My understanding is that the Kristen-Straxton Group is composed of two investment companies organized under the laws of the British Virgin Islands and one individual investor who resides in London, England.[2]

6.     The documents I have reviewed in this matter do not show that the Kristen-Straxton Group purchased or sold any shares of E*Trade Financial Corporation ("E*TRADE"). Instead, the group members appear to have entered into private derivative transactions known as Contracts for Differences ("CFDs"). CFDs are not shares. They do not carry the same ownership rights as shares. Instead, they are offshore side bets on shares, and are comparable to other offshore contracts, such as spread betting. Like spread betting, CFDs are illegal in the United States.

7.     In particular, CFDs raise unique and complex issues that are not associated with more straightforward purchases and sales of shares. Because the terms of CFDs can vary, it is impossible to understand all of these issues in a particular case without examining the underlying contracts and confirmations for the relevant CFD trades. Moreover, because CFDs frequently are paired with trades in related shares or other derivatives, so that a loss on CFDs is offset by a gain on related trades, it is important to analyze other trades related to the same underlying variables to ascertain the size of a CFD trader's financial interest.

---

[1] See Declaration of Elizabeth A. Schmid Esq. in Support of the Motion of the Kristen-Straxton Group for Consolidation of All Related Cases, Appointment of Lead Plaintiff and Approval of the Selection of Lead Counsel ("Schmid Decl."), at ¶ 3; see also Schmid Decl., Exhibit B, Consolidated Schedule of Transactions and Losses of the members of the Kristen-Straxton Group in E*Trade Financial Corporation securities during the alleged Class Period (stating a "Combined Net Loss" of $133,415,508).

[2] Memorandum of Law in Support of the Motion of the Kristen-Straxton Group for Consolidation of All Related Cases, Appointment of Lead Plaintiff and Approval of the Selection of Lead Counsel, at 7 ("Kristen-Straxton Group Memo.").

8.     The three-page summary table of the Kristen-Straxton Group's trades that allegedly caused its losses is misleading and inaccurate, as I describe in detail below. That summary table leaves open important questions about the nature and scope of the Kristen-Straxton Group's trades and alleged losses, and the trading in CFDs raises unique and complex issues that the group would have to address in this litigation. It is thus impossible to conclude that the Kristen-Straxton Group has the "largest financial interest" in this action or would be the "most adequate plaintiff" under the PSLRA.

9.     The remainder of this Declaration is in two parts. First, I describe some background and history of CFDs. Second, I analyze the information the Kristen-Straxton Group has provided about its trading.

I.     **Background and History of CFDs**

10.     CFDs are not shares. Instead, they are private contracts in which two parties bet on whether some underlying variable will go up or down.[3] CFDs are part of a broad class of financial instruments known as derivatives, because their value is "derived" from the price of some underlying instrument or index.[4] CFDs may be based on virtually any underlying variable. The values of many CFDs are derived from the share prices of publicly traded companies. CFDs based on share prices do not involve the purchase or sale of shares. Instead, such CFDs are side

---

[3] See Financial Services Authority, *Annex A, Amendments to the Glossary of Definitions*, at 2, http://fsahandbook.info/FSA/handbook/LI/2007/2007_64.pdf.

[4] See Frank Partnoy, *Adding Derivatives to the Corporate Law Mix*, 34 GA. L. REV. 599, 604-05 (2000); Frank Partnoy, *ISDA, NASD, CFMA, and SDNY: The Four Horsemen of Derivatives Regulation?*, in BROOKINGS-WHARTON PAPERS ON FINANCIAL SERVICES (Brookings Institution Press 2002, Robert E. Litan and Richard Herring, eds.); Frank Partnoy, INFECTIOUS GREED: HOW DECEIT AND RISK CORRUPTED THE FINANCIAL MARKETS (2003).

bets on changes in share prices. It is unclear whether CFDs fall under the definition of "security" in Section 3(a)(10) of the Securities Exchange Act of 1934 or "security-based swap agreement" in Section 10(b) of the Securities Exchange Act of 1934.[5]

11.  In a typical CFD contract, the "long" CFD party agrees to pay the "short" CFD party the amount of any decline in the price of the underlying variable, whereas the "short" CFD party agrees to pay the "long" CFD party any increase in price. For example, suppose two parties enter into a CFD based on a single share of a publicly traded company. Assume that at the time the parties execute the trade, the price of that share is $30. If the price subsequently declines to $20, the "long" CFD party would owe the "short" CFD party $10. If the price increases to $40, the "short" CFD party would owe the "long" CFD party $10. If the CFD were based on one million underlying shares, instead of just one share, the amount owed would be one million times the difference in prices from the start of the contract until the end, or $10 million.

12.  The "long" CFD party typically does not pay the full value of the underlying variable upfront. Instead, the "long" CFD party posts a smaller "margin" payment, a percentage of the value of the underlying variable. CFDs are not subject to the same margin requirements that apply to other securities. Indeed, CFDs permit offshore investors, like the Kristen-Straxton Group, to obtain much greater leverage than would be permitted in the United States, as much as 10-to-1 or even 100-to-1.

13.  Mechanically, here is how a CFD works: the "long" CFD party makes an upfront payment to the "short" CFD party equal to a percentage of the value of the underlying variable at the time the parties enter into the CFD. For example, the "long" CFD party might pay ten

---

[5] See, e.g., Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002) (addressing question of whether synthetic instruments based on equity securities meet the definition of "security" under Section 3(a)(10)).

percent of the value of the underlying variable.[6] The "long" CFD party then would pay finance charges during the life of the CFD based on the value of the underlying variable and the amount of margin. When the CFD is terminated, the parties would make or receive payments based on the change in the value of the underlying variable since they entered into the CFD.

14.    The diagram below depicts the payments on a typical CFD. As the arrows show, the parties make or receive payments at two times: (1) initially, when the "long" CFD party posts margin, and (2) at the close of the contract, when the parties exchange an amount that depends on the price change of the underlying variable. Note that the CFD transaction (the top half of the diagram) occurs offshore, even if the underlying variable (the bottom half of the diagram) is based on the price of securities traded in the United States.



_____

[6] Anyone trading E*TRADE shares in the United States would not be permitted to post margin of just ten percent.

15.    Historically, CFDs were illegal in most jurisdictions, as were all "difference contracts" based on the future prices of shares.[7]  In the United States, all difference contracts, forwards, and futures based on shares were illegal until 2000,[8] when the Commodity Futures Modernization Act of 2000 permitted limited trading in certain "security futures."[9]  However, CFDs are not "security futures," and therefore CFDs remain illegal in the United States.[10]

16.    Although CFDs are now legal in some offshore jurisdictions, including the United Kingdom, their use offshore has a complex history and has led to significant regulatory challenges.  The CFD market was established in London during the 1990s, and the growth of CFD trading since then has been driven by the fact that CFDs are not subject to the same tax and margin requirements as other trades.  In particular, CFDs have become popular among short-term traders as a way to avoid both restrictions on borrowing and the United Kingdom's stamp tax.  Indeed, CFDs trades usually are short-term, and typically are outstanding for no more than

---

[7] See, e.g., Edward J. Swan, BUILDING THE GLOBAL MARKET: A 4000 YEAR HISTORY OF DERIVATIVES (2000), at 144 ("In about 1541, the government of the Netherlands banned contracts for 'differences.'"); *Greenland v. Dyer*, 6 Law J. Rep. KB 345 (Jun. 19, 1828), at 345-46 (stating that a contract for differences under England law would be unenforceable).

[8] Unlike "forward" contracts, difference contracts or futures contracts do not call for actual delivery of shares at a specified maturity date. See Frank Partnoy, *The Shifting Contours of Global Derivatives Regulation*, 22 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 421 (2001); Thomas Lee Hazen, *Disparate Regulatory Schemes for Parallel Activities: Securities Regulation, Derivatives Regulation, Gambling, and Insurance*, 24 ANN. REV. BANKING & FIN. L. 375 (2005).

[9] Security futures are jointly regulated by the Securities and Exchange Commission and the Commodity Futures Trading Commission, which have promulgated joint regulations and guidance regarding the listing and trading of security futures products. See http://www.cftc.gov/industryoversight/ contractsandproducts/sfpfederalregister.html.  Regulations do not permit the trading of CFDs.  See http://www.cftc.gov/foia/fedreg01/foi011101a.htm.

[10] Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000) (codified as amended at 7 U.S.C. 1); see also Frank Partnoy, *Multinational Regulatory Competition and Single-Stock Futures,* 21 NORTHWESTERN JOURNAL OF LAW AND INTERNATIONAL BUSINESS 641 (2001).

two months.[11] The cost of the stamp tax, which does not apply to CFDs, is relatively higher for short-term traders, who cannot amortize the cost over a long period of time. If a party has a longer time horizon than two months, it typically can find an alternative to CFDs that is subject to the stamp tax but nevertheless is less expensive, because the amortized cost of the stamp tax over a longer period of time is less than the expected financing and other costs associated with CFDs.

17.    Unlike shares, CFDs are not issued by a company. Instead, they are private side bets. CFDs do not involve the purchase of shares, even if the bet underlying a CFD is based on shares. More specifically, the party taking a "long" position in CFDs does not buy shares, and is not considered a purchaser of shares. CFDs based on the value of shares do not give the "long" CFD party the right to vote, receive dividends, or any other rights typically associated with share ownership.

18.    Because of the unique and unusual qualities of CFDs, they recently have become the subject of regulatory inquiries in the United Kingdom. (Regulators in the United States have not shared these concerns, because CFDs are illegal here.) The fact that CFDs do not carry the same ownership rights as shares has generated particular concern. Unlike shares, CFDs do not have the same incentives or abilities to monitor corporate governance or implement corporate governance measures. Academics, regulators, and practitioners also have expressed concerns

---

[11] After approximately two months, it becomes more economical for parties to replicate the bets associated with CFDs using other derivatives trades, particularly in the United Kingdom. In simple terms, as the maturity of the contract increases, the relative cost of financing charges from CFDs becomes greater than the benefit associated with avoiding the United Kingdom stamp tax.

about the complex relationship between CFDs and trades in other financial instruments, particularly when the underlying instruments are shares of publicly traded companies.[12]

19.    In assessing CFDs, it is particularly important to examine actual records. Trading strategies involving CFDs can be complex and it is easy to make mistakes in calculating gains and losses. Without examining actual records, one cannot confirm a trader's overall losses, because CFDs frequently are part of complex trading strategies involving derivatives and/or other related securities. In particular, the money a trader loses on "long" CFD trades might be offset, partially or entirely, by gains from countervailing short positions. Indeed, if a trader's gains from short positions were greater than its losses from CFDs, the trader might appear to have a large "financial interest" in litigation, whereas it actually would have made money overall from the decline in the underlying share price. This problem is not merely theoretical: in some recent cases, parties initially have asserted in litigation that they had one financial position only to have it emerge, after discovery, that their actual financial position was the opposite.[13]

20.    Some commentators and regulators have analogized CFDs to spread betting, the practice of gambling on various instruments, primarily in the United Kingdom. Indeed, the line between CFDs and spread betting increasingly has become blurred. For example, The London Stock Exchange lists both CFDs and spread betting together as trading strategies that do not

---

[12] See, e.g., See Shaun P. Martin & Frank Partnoy, *Encumbered Shares*, 2005 UNIVERSITY OF ILLINOIS LAW REVIEW 775 (2005) (describing complexities associated with trading in both shares and derivatives based on shares); Ashurst, *Investment Banking Briefing: Use of CFDs in Public M&A*, May 2004, at 2, http://www.ashurst.com/doc.aspx?id_Content=926 (noting that "[t]here is scope to use CFDs for illegitimate purposes. This is why regulators are closely monitoring the recent increase in their use.").

[13] See Jeffrey D. Bauman, Alan R. Palmiter & Frank Partnoy, CORPORATIONS LAW AND POLICY: MATERIALS AND PROBLEMS 484-90 (6th ed. 2007); *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067 (Del.Ch. 2005),

involve the purchase of shares.[14]  Online trading and betting platforms, such as "Intrade, the Prediction Market," permit offshore trading in difference bets based on a range of financial and non-financial variables.  For example, Intrade.com lists bets on financial instruments and indices alongside bets on sporting events, political elections, the weather, and even current events and entertainment, such as the weekly outcome of voting on the television program American Idol.[15]  Overall, difference bets pose unique challenges that do not apply to the straightforward buying and selling of shares.

## II.    Trading by the Kristen-Straxton Group

21.    As noted above, I have reviewed the December 3, 2007, submissions by the Kristen-Straxton Group related to its alleged trading "in E*Trade Financial Corporation securities."[16]  My understanding is that the Kristen-Straxton Group has not produced any contracts, confirmations, or brokerage records for its trades related to E*TRADE.  Instead, the group has submitted a three-page summary table of its alleged trading.[17]  That summary table is misleading and inaccurate, and sets forth inconsistent information about the trading activities of the members of the group.

---

[14] See http://www.londonstockexchange.com/en-gb/pricesnews/education/firsttimeinvestors/ investmentfactsheets/whyinvestinshares/investotherstock.htm.

[15] See http://www.intrade.com.  For example, on December 14, 2007, Intrade was offering difference bets ranging from the level of the Dow Jones Index to whether the XM-Sirius merger would receive regulatory approval to when Osama Bin Laden would be captured to which Supreme Court Justice would be next to depart the Court.  All of these bets were listed together on the same trading platform.  There was even a bet on whether E*TRADE would officially announce its bankruptcy on or before June 30, 2008 (the cost of a potential $100 payoff in the event of a bankruptcy before that date was $12).

[16] See Schmid Decl. at ¶ 3.

[17] Schmid Decl., Exhibit B.

22.    Some of the information in the summary table suggests that the members of the Kristen-Straxton Group actually purchased and sold shares of E*TRADE. Indeed, the summary table seems designed to suggest that the group's losses were incurred from trading shares. In particular, the summary table contains columns labeled "Price Per Share," and "(Cost)/Proceeds." For example, the first line of the summary table, for June 6, 2007, includes the following data for Kristen Management Limited: "Price Per Share" of $25.5777 and "(Cost)/Proceeds" of $12,788,850.[18] That line is reproduced below:

| Trade Date of Purchase/Sale | Purchased (P)/ Sold (S) | # of Shares Per CFDs* | Price Per Share | (Cost)/Proceeds | Net Gain/(Loss) |
|---|---|---|---|---|---|
| 6/6/07 | P | 500,000 | $25.5777 | ($12,788,850) | ($12,788,850) |

23.    The information from the fourth and fifth columns suggests that Kristen Management Limited paid $12,788,850 for E*TRADE shares at a price per share of $25.5777. The column setting forth the number of shares says "500,000," which also suggests that Kristen Management Limited actually bought 500,000 E*TRADE shares on June 6, 2007. The cost of 500,000 E*TRADE shares at a price per share of $25.5777 would have been $12,788,850.

24.    However, other information from the summary table, including a footnote, suggests that members of the group did not purchase or sell E*TRADE shares. The third column is entitled "# of Shares Per CFDs*" and an asterisked footnote on the first page of the summary table indicates that "CFD" refers to "Contracts for Difference."[19] This information suggests that Kristen Management Limited traded in CFDs, not E*TRADE shares. The summary table contains similar information for the other two group members.

---

[18] Id. at 1.

[19] Id.

25.    Because the Kristen-Straxton Group actually traded CFDs, not E*TRADE shares, the information in the fourth and fifth columns of the summary table is misleading and inaccurate. For example, in trading CFDs based on an underlying variable of 500,000 E*TRADE shares on June 6, 2007, Kristen Management Limited would not have incurred a cost of $12,788,850, as the fifth column of the above table states. It would not have paid a price per share of $25.5777 or actually have purchased 500,000 shares of E*TRADE. Instead, Kristen Management Limited would have incurred just a fraction of the cost listed (perhaps ten percent) and it would not have actually purchased any shares of E*TRADE. The Kirsten-Straxton Group's trade confirmations would set forth the actual "(Cost)/Proceeds" for each trade.

26.    CFD contracts can have varying features that affect the pricing of trades or the amount of losses. Moreover, various CFD contract provisions likely would raise unique defenses applicable to the Kristen-Straxton Group, including the presence of arbitration clauses, choice of law provisions, liability or suitability disclaimers, or other limitations.

27.    Because Kristen-Straxton Group traded in CFDs, not shares, the summary table is incomplete. For example, there is no way to calculate how much margin any of the members of the group posted for any of the trades. No financing charges or brokerage fees are listed for any of the trades, even though "long" CFD parties typically incur such costs. Nor is it clear whether any of the sales were forced as a result of margin calls.

28.    Finally, in arguing that the Kristen-Straxton Group satisfies the typicality and adequacy requirements of Rule 23, counsel for the group asserted that its members paid prices for E*TRADE securities "set by the market as quoted on the National Association of Securities

Dealers Automated Quotation system."[20]  That assertion is false.  The CFDs traded by the

Kristen-Straxton Group would not have been issued by E*TRADE and would not have had

prices quoted on the National Association of Securities Dealers Automated Quotation system.

Indeed, any E*TRADE CFDs would have been privately traded offshore, not in the United

States.  CFDs generally are not listed on major stock exchanges, and typically do not trade in any

secondary market.  Unlike shares, CFDs are not liquid financial instruments with large secondary

trading volumes.  Accordingly, the CFDs the Kirsten-Straxton Group traded would not have

been quoted on a United States exchange.


I swear under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed this 20th day of December 2007, at San Diego,

California.

FRANK PARTNOY

---

[20] Specifically, counsel stated that "The Kristen-Straxton Group satisfies the typicality requirement, because its members: (i) purchased or otherwise acquired E*Trade securities; (ii) paid prices for those securities set by the market as quoted on the National Association of Securities Dealers Automated Quotation system that were allegedly artificially inflated by Defendants' alleged violations of the federal securities laws; and (iii) suffered damages thereby." Kristen-Straxton Group Memo. at 14.

# EXHIBIT A

### EXHIBIT A -- RESUME OF FRANK PARTNOY

Professor Frank Partnoy
5998 Alcalà Park, San Diego, CA 92110-2492
619-260-2352 ● fpartnoy@sandiego.edu

### Education

| | |
|---|---|
| Yale Law School | J.D., 1992.<br>Thurman Arnold Prize, Potter Stewart Prize. |
| University of Kansas | B.A. mathematics, 1989, *summa cum laude.*<br>B.S. economics, 1989, *summa cum laude.* |

### Employment

University of San Diego School of Law, San Diego, CA, 1997-.
Professor, 2001-; Associate Professor, 1999-2001; Assistant Professor, 1997-99.
Founder and Director, Center on Corporate and Securities Law.

| | |
|---|---|
| Courses: | Corporations, Corporate Finance, Deals, Emerging Financial Markets, International Finance (at University of Paris I), Latin American Financial Markets, White Collar Offenses. |
| Awards: | Herzog Endowed Scholar, 2003-04.<br>Thorsnes Prize for Excellence in Teaching, 1998-99. |
| Service: | Chair, Appointments Committee (2001-2003); Chair, Faculty Colloquium Committee (2000-2001); Chair, Junior Faculty Roundtable (1997-2001); Director, Law Alumni Board of Directors (1999-2001); Treasurer, Law Alumni Faculty Golf League (1997-2001); Member, Self-Study Committee (2004-05); Member, Appointments Committee (2004-07); Member, Evening Program Committee (2007); Member, Curriculum Committee (2000-2006); Member, Development Committee (1998-2001); Member, Graduate Programs Committee (1997-1999). |

Rady School of Management, University of California, San Diego, San Diego, CA
Visiting Professor, 2005.

Course: Regulation and Innovation.

Covington & Burling, Washington, DC, 1995-97.

Derivative Products Group, Morgan Stanley & Co., New York, NY, 1994-95.

Emerging Markets Derivatives, CS First Boston, New York, NY, 1993-94.

Law Clerk, Hon. Michael B. Mukasey, U.S. District Judge, SDNY, New York, NY, 1992-93.

## Publications

### BOOKS

THE MATCH KING (Profile Books forthcoming 2008).

CORPORATIONS LAW AND POLICY: MATERIALS AND PROBLEMS (Thomson West 2005 Supp. and 2006 Supp., 6th Ed. 2007, with Jeffrey D. Bauman and Alan R. Palmiter).

INFECTIOUS GREED: HOW DECEIT AND RISK CORRUPTED THE FINANCIAL MARKETS (Henry Holt/Times Books 2003).
| | |
|---|---|
| Editions: | Paperback (Henry Holt/Owl Books 2004); Australian, British, Hong Kong. |
| Translations: | Korean, Spanish. |
| Reviews: | New York Times Book Review, Washington Post Book World, Wall Street Journal, London Times, Financial Times, several dozen others. |

F.I.A.S.C.O.: BLOOD IN THE WATER ON WALL STREET (W.W. Norton 1997).
| | |
|---|---|
| Editions: | Paperback (Penguin 1999); Australian, British, Hong Kong. |
| Translations: | Chinese, Japanese, German, Korean, Portuguese, Russian. |
| Awards: | Finalist, Financial Times/Booz-Allen Global Business Book Award, 1997. |
| | San Diego Union Tribune Author of the Year, 1997. |
| Reviews: | New York Times Book Review, Los Angeles Times Book Review, London Times, Financial Times, several dozen others. |

### BOOK CHAPTERS

*Gap Filling, Hedge Funds, and Financial Innovation*, in NEW FINANCIAL INSTRUMENTS AND INSTITUTIONS: OPPORTUNITIES AND POLICY CHALLENGES (Brookings Institution Press 2007, Yasuyuki Fuchita and Robert E. Litan, eds.) (with Randall Thomas).

*How and Why Credit Rating Agencies Are Not Like Other Gatekeepers*, in FINANCIAL GATEKEEPERS: CAN THEY PROTECT INVESTORS? (Brookings Institution Press 2006, Yasuyuki Fuchita and Robert E. Litan, eds.).

*Enron and the Derivatives World*, in ENRON: CORPORATE FIASCOS AND THEIR IMPLICATIONS (Foundation Press 2004, Nancy B. Rapoport and Bala G. Dharan, eds.).

*ISDA, NASD, CFMA, and SDNY: The Four Horsemen of Derivatives Regulation?*, in BROOKINGS-WHARTON PAPERS ON FINANCIAL SERVICES (Brookings Institution Press 2002, Robert E. Litan and Richard Herring, eds.).

*The Paradox of Credit Ratings*, in THE ROLE OF CREDIT REPORTING SYSTEMS IN THE INTERNATIONAL ECONOMY (Kluwer Academic Publishers 2002, Richard M. Levitch, Giovanni Majnoni, and Carmen Reinhart, eds.).

### PUBLISHED ARTICLES

*Hedge Fund Activism, Corporate Governance, and Firm Performance,* forthcoming JOURNAL OF FINANCE (with Alon Brav, Wei Jiang, and Randall Thomas).

*The Promise and Perils of Credit Derivatives*, 75 UNIVERSITY OF CINCINNATI LAW REVIEW 1019 (2007) (invited symposium) (with David A. Skeel, Jr.).

*Second-Order Benefits from Standards*, 47 BOSTON COLLEGE LAW REVIEW 169 (2007) (invited symposium).

*Alternative Structures and Strategies for Investors*, 1 JOURNAL OF BUSINESS & TECHNOLOGY LAW 84 (2006) (invited symposium).

*Financial Innovation and Corporate Law*, 36 JOURNAL OF CORPORATION LAW 799 (2006) (invited symposium).

*Encumbered Shares*, 2005 UNIVERSITY OF ILLINOIS LAW REVIEW 775 (2005) (with Shaun P. Martin).

*Synthetic Common Law*, 53 UNIVERSITY OF KANSAS LAW REVIEW 281 (2005).

*Strict Liability for Gatekeepers: A Reply to Professor Coffee*, 84 BOSTON UNIVERSITY LAW REVIEW 365 (2004) (invited symposium).

*A Revisionist View of Enron and the Sudden Death of "May,"* 48 VILLANOVA LAW REVIEW 1245 (2003) (invited symposium), reprinted in ENRON AND WORLD FINANCE: A CASE STUDY IN ETHICS (2006).

*Multinational Regulatory Competition and Single-Stock Futures*, 21 NORTHWESTERN JOURNAL OF LAW AND INTERNATIONAL BUSINESS 641 (2001) (invited symposium).

*Barbarians at the Gatekeepers?: A Proposal for a Modified Strict Liability Regime*, 79 WASHINGTON UNIVERSITY LAW QUARTERLY 491 (2001) (invited symposium).

*The Shifting Contours of Global Derivatives Regulation*, 22 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 421 (2001) (invited symposium).

*Why Markets Crash and What Law Can Do About It*, 61 UNIVERSITY OF PITTSBURGH LAW REVIEW 741 (2000).

*Adding Derivatives to the Corporate Law Mix*, 34 GEORGIA LAW REVIEW 599 (2000) (invited symposium).

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies*, 77 WASHINGTON UNIVERSITY LAW QUARTERLY 619 (1999), reprinted at 33 SECURITIES LAW REVIEW 161 (2001).

*Financial Derivatives and the Costs of Regulatory Arbitrage*, 22 JOURNAL OF CORPORATION LAW 211 (1997).

<u>WORKING PAPERS</u>

*Shapeshifting Corporations*

*Finance and Patent Length*

ESSAYS AND OTHER PUBLICATIONS

*Markets Abhor the Vacuum Left by Derivatives*, FINANCIAL TIMES, Aug. 10, 2007, at 11.

*A Gamekeeper Turns to the Poachers*, FINANCIAL TIMES, Jun. 6, 2007, at 15.

*Credit Derivatives Play a Dangerous Game*, FINANCIAL TIMES, Jul. 17, 2006, at 17.

*The Malignant Side of Corporate Voting Culture*, FINANCIAL TIMES, May 17, 2006, at 17.

*Take Away the Credit Rating Agencies' Licenses*, FINANCIAL TIMES, Mar. 13, 2006, at 13.

*When Disney Wishes upon a Pixar ...*, FINANCIAL TIMES, Jan. 24, 2006, at 21.

*Investing in Fantasy Land*, FINANCIAL TIMES, Dec. 28, 2005, at 13.

*The Case against Alan Greenspan*, EUROMONEY, Sept. 1, 2005, at 90.

*Must-Reads for Budding Fraudsters*, FINANCIAL TIMES, Aug. 10, 2005, at 11.

*A Serious Question for All the Overpaid Bankers*, FINANCIAL TIMES, Aug. 4, 2005, at 15.

*Congress Should Open Up Credit Ratings to Competition*, FINANCIAL TIMES, Jun. 29, 2005, at 13.

*Wall Street's Franchise Is Fading*, FINANCIAL TIMES, Apr. 6, 2005, at 13.

*Cautionary Tales of Internet Stocks*, FINANCIAL TIMES, Feb. 14, 2005, at 19.

*Road Rules for Hedge Funds*, NEW YORK TIMES, Dec. 14, 2004.

*Financial Engineering and Law*, FINANCIAL ENGINEERING NEWS, Nov./Dec. 2004.

*Why Nobody Mentioned Markets*, FINANCIAL TIMES, Oct. 20, 2004, at 17.

*A Man's Game in Need of Women*, FINANCIAL TIMES, Jul. 26, 2004, at 17.

*The Way to a Politician's Heart*, FINANCIAL TIMES, Jun. 14, 2004, at 13.

*The Case for Smarter Prosecutions*, FINANCIAL TIMES, Mar. 11, 2004, at 21.

*The Real Mutual Fund Problem*, SAN DIEGO UNION-TRIBUNE, Dec. 5, 2003, at B-7.

*Financial Risk Management*, TREASURY & RISK MANAGEMENT, Jul./Aug. 2003, at 44.

*Want to Vote?  Answer This ...*, NEW YORK TIMES, Jul. 28, 2003, at A17.

*The Wrong Way to Prosecute Fraud*, SAN DIEGO UNION-TRIBUNE, May 11, 2003, at G-3.

*A Comparative Political History of the CFMA and Sarbanes-Oxley,* FUTURES & DERIVATIVES LAW REPORT, Apr. 2003, at 4.

*Reaping a Bitter Harvest from the Years of Greed*, EVENING STANDARD, Apr. 23, 2003, at 34.

*Building a Library: Finance*, INDEPENDENT ON SUNDAY (LONDON), Apr. 20, 2003, at 13.

*Unsound Advice from the Sage of Omaha*, FINANCIAL TIMES, Apr. 3, 2003, at 19.

*The Rating Agency Paradox*, TREASURY & RISK MANAGEMENT, Dec./Jan. 2003, at 52.

*Enron and Derivatives*, FUTURES & DERIVATIVES LAW REPORT, 2002.

*Tracing the Roots of Enron's Downfall*, SAN DIEGO UNION-TRIBUNE, Jan. 27, 2002, at G3.

*What Dogs Can Teach Us About Securities Regulation: Why Fining Two Mutual Funds For "Window Dressing" Was A Mistake*, FINDLAW, Aug. 20, 2001, <http://writ.news.findlaw.com/commentary/ >.

*Some Policy Implications of Single-Stock Futures*, FUTURES & DERIVATIVES LAW REPORT, Mar. 2001, at 8.

*Derivatives on TV: A Tale of Two Derivatives Debacles in Prime-Time*, GREENBAG (2001) (with Kimberly D. Krawiec and Peter H. Huang), reprinted at 2 DERIVATIVES REP. 15 (2001).

*Stock Gambling on the Cheap*, NEW YORK TIMES, Dec. 21, 2000, at A39.

*Harassment on "The Street,"* THE READ, Jun. 22, 2000, <http://www.oxygen.com/read/>.

*Beating Regis: How to Win on "Who Wants to Be a Millionaire,"* FINDLAW, June 19, 2000, <http://writ.news.findlaw.com/commentary/ >.

*Strange New Math of Palm Inc.*, NEW YORK TIMES, Mar. 15, 2000, at A29.

*Decoding Greenspan*, OPEN COURT, AMERICAN LAWYER MEDIA, Apr. 1999 <http://www.lawnewsnetwork.com/opencourt/>.

*Comments on Proposed Bulgarian Pass-Through Bonds and Mortgage Bonds Act*, CENTRAL AND EAST EUROPEAN LAW INITIATIVE (CEELI), Feb. 9, 1999.

*Betting on Suing*, OPEN COURT, AMERICAN LAWYER MEDIA, Dec. 1998. <http://www.lawnewsnetwork.com/opencourt/>.

*Do You Know Where Your Money Is Now?*, MAIL ON SUNDAY, Oct. 25, 1998, at 45.

*Playing Roulette with the Global Economy*, NEW YORK TIMES, Sep. 30, 1998, at A17.

*High-Finance Fiction*, LOS ANGELES TIMES BOOK REVIEW, Feb. 8, 1998, at 16.

*Riding the Rap*, WORTH, Feb. 1998, at 113.

## Invited Talks and Panels

*Hedge Fund Activism, Corporate Governance, and Firm Performance*, Fordham Law School, New York, NY, Oct. 19, 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance*, Brooklyn Law School, New York, NY, Oct. 18, 2007.

*The Promise and Perils of Credit Derivatives*, American Law and Economics Association, Harvard Law School, Cambridge, MA, May 12, 2007.

*Legal and Ethical Issues in Trading*, University of Kansas School of Business, Advanced Portfolio Management Seminar, Lawrence, KS, Mar. 5, 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance,* University of Kansas School of Business, Finance Department, Lawrence, KS, Mar. 2, 2007.

*Derivative Investment Risks, Conflicts-of-Interest, and Self-Regulation of the Exchanges*, Directors Forum 2007, San Diego, CA, Jan. 22. 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance,* Annual Meeting, Association of American Law Schools, Securities Regulation Section, Washington, DC, Jan. 5, 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance,* Vanderbilt University Law School, Nashville, TN, Oct. 13, 2006.

*Financial Innovation and Corporate Law*, Georgetown University Law Center, Washington, DC, Oct. 2, 2006.

*Gatekeepers Revisited*, Columbia University School of Law, New York, NY, Sep. 29, 2006.

*Gap Filling, Hedge Funds, and Financial Innovation*, Brookings-Nomura Conference on Financial Services, The Brookings Institution, Washington, DC, Sep. 12, 2006.

*Credit Derivatives and Correlation Risk*, Rady School of Management Finance Department Seminar, University of California, San Diego, May 18, 2006.

*Hedge Funds and Corporate Governance*, University of Illinois Conference on Capital Markets and Corporate Governance, Chicago, IL, Apr. 25, 2006.

*Second-Order Benefits from Standards*, Boston College Law School, Boston, MA, Mar. 31, 2006.

*Corporate Voting and Corporate Governance*, UCLA School of Law, Los Angeles, CA, Mar. 20, 2006.

*Assessing the Current Oversight and Operations of Credit Rating Agencies*, Sworn Testimony before the before the United States Senate Committee on Banking, Housing, and Urban Affairs, Washington, DC, Mar. 7, 2006.

*Patents as Options*, Washington University in St. Louis Conference on Commercializing Innovation, Washington University School of Law, St. Louis, MO, Nov. 4, 2005.

*An Assessment of the Global Risks Associated with Synthetic Collateralized Debt Obligations*, Bayerische Hypo- und Vereinsbank AG Financial Institutions and Agency Funding Conference, Munich, Germany, Sep. 30, 2005.

*How and Why Credit Rating Agencies are Not Like Other Gatekeepers*, Brookings-Nomura Conference on Financial Services, The Brookings Institution, Washington, DC, Sep. 28, 2005.

*Financial Innovation and Corporate Law*, University of Iowa College of Law, Iowa City, IA, Sep. 9, 2005.

*Legislative Solutions for the Rating Agency Duopoly*, Sworn Testimony before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, U.S. House of Representatives Committee on Financial Services, Washington, DC, Jun. 29, 2005.

*Where Is the Risk?*, Euromoney Global Borrowers & Investors Forum, London, England, Jun. 23, 2005.

*Designing Groups: Voting Preferences and Path Dependence*, The Law and Society Association Annual Meeting, Las Vegas, NV, Jun. 2, 2005.

*Infectious Greed*, Wilson Lecture in Law and Business, Wake Forest University School of Law and Babcock School of Management, Winston-Salem, NC, Mar. 29, 2005.

*Encumbered Shares*, University of Kansas School of Law, Lawrence, KS, Feb. 28, 2005.

*Encumbered Shares*, Boalt Hall School of Law, Berkeley, CA, Jan. 24, 2005.

*Mutual Funds, Financial Innovation, and the Product/Service Distinction*, University of Maryland Law School, Baltimore, MD, Nov. 5, 2004.

*Encumbered Shares*, University of San Diego School of Law, San Diego, CA, Oct. 14, 2004.

*Director Ethics*, Corporate Directors' Forum, San Diego, CA, Oct. 6, 2004.

*Infectious Greed*, UCLA School of Law, Los Angeles, CA, Feb. 2, 2004.

*Are the Markets Out of Control?*, University of San Diego School of Law, San Diego, CA, Nov. 17, 2003.

*Recent Issues in Corporate Governance*, Keynote Address, Society of Actuaries Annual Investment Conference, Toronto, CA, Nov. 11, 2003.

*Corporate Voting and Encumbered Shares*, Washington University School of Law, St. Louis, MO, Oct. 21, 2003.

*Emerging Issues in Structured Finance*, Seoul National University College of Law, Seoul, Republic of Korea, Jun. 20, 2003.

*Structured Financial Products: Regulation, Law, and Policy*, Korean Securities Dealers Association, Seoul, Republic of Korea, Jun. 19, 2003.

*Credit Derivatives: Be Afraid, Be Very Afraid*, Grant's Interest Rate Observer Spring Investment Conference, New York, NY, Apr. 30, 2003.

*Financial Innovation and Accounting*, 57th Annual Conference of Accountants, University of Tulsa, Tulsa, OK, Apr. 29, 2003.

*Credit Derivatives and Insurance Regulation*, National Association of Insurance Commissioners National Meeting, San Diego, CA, Dec. 9, 2002.

*An Economic Reality Standard for Financial Market Regulation*, Goizueta Business School, Emory University, Atlanta, GA, Nov. 19, 2002.

*Research Studies of Individual Companies*, Conference on Field Study Methodologies in Legal Research and Teaching about Business, Georgetown Law School, Washington, D.C., Nov. 1, 2002.

*Enron and Derivatives*, George Washington University School of Law, Washington, D.C., Oct. 7, 2002.

*Enron and Derivatives*, Villanova Law School Symposium on Lessons from Enron, Villanova, PA, Oct. 5, 2002.

*Law and Finance*, Keynote Lecture, Courant Institute for Mathematical Finance, New York University, New York, NY, Oct. 3, 2002.

*Enron, Derivatives, and the Gatekeepers*, Thomas Jefferson School of Law, San Diego, CA, Feb. 26, 2002.

*The Fall of Enron: How Could It Have Happened?*, Sworn Testimony before the U.S. Senate Committee on Governmental Affairs, Washington, D.C., Jan. 24, 2002.

*The Next Stages of Financial Derivatives Regulation*, Brookings-Wharton Papers on Financial Services, Washington, D.C., Jan. 10-11, 2002.

*Terrorist Insider Trading, Enron, and Financial Derivatives*, Heller Ehrman White & McAuliffe, San Diego, CA, Dec. 5, 2001.

*The Paradox of Credit Ratings*, University of California at San Diego, San Diego, CA, Oct. 11, 2001.

*The Gatekeepers of Financial Markets*, Institute for Law and Economic Policy Conference on Corporate Accountability, Scottsdale, AZ, Mar. 10, 2001.

*The Paradox of Credit Ratings*, Conference on the Role of Credit Reporting Systems in the International Economy, Sponsored by The University of Maryland Center for International Economics, New York University Stern School of Business and The World Bank, Washington, D.C., Mar. 2, 2001.

*Financial Derivatives Regulation and Synthetic Common Law*, London Guildhall University Department of Law, London, England, Jan. 23, 2001.

*The Globalization of the Financial Derivatives Markets*, University of Pennsylvania School of Law, Philadelphia, PA, Jan. 19, 2001.

*The Future of Derivatives Regulation*, American Association of Law Schools Annual Conference, Section on Securities Regulation, San Francisco, CA, Jan. 6, 2001.

*Conference on Financial Derivatives* (Host and Moderator), University of San Diego School of Law, San Diego, CA, Nov. 10, 2000.

*Finance Entrepreneurs and Short-Duration Intellectual Property,* Law & Entrepreneurship Conference, Lewis & Clark Northwestern School of Law, Portland, OR, Oct. 20, 2000.

*Synthetic Common Law,* UCLA Second Annual Conference on Corporate Governance, UCLA Law School, Los Angeles, CA, Oct. 13, 2000.

*Synthetic Common Law,* University of North Carolina School of Law, Chapel Hill, NC, Oct. 5, 2000.

*Derivatives Regulation and the U.S. Thrift Industry,* Keynote Address, Office of Thrift Supervision West Region Annual Conference, Rohnert Park, CA, Aug. 29, 2000.

*Financial Derivatives and Popular Culture,* The Law & Society Annual Meeting, Miami, FL, May 27, 2000.

*Why Markets Crash and What Law Can Do About It,* Northeastern University School of Law, Boston, MA, Mar. 23, 2000.

*Rating Agencies: Substitute or Necessary Corollary to the Regulation of Debt Markets?,* Duke University Global Capital Markets Center Conference: Reexamining the Regulation of Capital Markets for Debt Securities, Washington, DC, Oct. 18-19, 1999.

*Adding Derivatives to the Corporate Law Mix,* University of Georgia School of Law Corporate Law Conference, Athens, GA, Oct. 15-16, 1999.

*Mark-to-Market for Publicly Traded Securities and Derivatives,* University of San Diego Tax Conference: Emerging Changes in Our Tax System? Exploring Potential Benefits and Problems, San Diego, CA, Mar. 19, 1999.

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies,* University of San Diego School of Law Faculty Colloquium, San Diego, CA, Jan. 15, 1999.

*Information Asymmetry, Suitability, and the Role of Derivatives Dealers,* Derivatives Strategy Derivatives Hall of Fame Conference, New York, NY, Feb. 9, 1998.

*The Culture and Economics of Derivatives Trading,* Keynote Address, North American Securities Administrators Association (NASAA), 80th Annual Conference, San Antonio, TX, Nov. 17, 1997.

Hundreds of media interviews, including The News Hour and NPR, 1997-date.

## Professional Licenses and Affiliations

Chair-Elect and Board Member, Association of American Law Schools, Section on Business Associations.

Board Member, Corporate Directors Forum.

Co-Chair, American Bar Association, Futures and Derivatives Litigation Subcommittee.

Co-Chair, Law and Finance Institute.

Board Member, Futures and Derivatives Law Report.

Advisory Board Member, Financial Services Policy Institute.

Research Fellow, Corporate Governance Institute

Series 3, 7, and 63 registered securities, options, and futures examinations.

Member, New York and District of Columbia bars.

# EXHIBIT B

**Exhibit B – Expert Trial and Deposition Testimony of Frank Partnoy,**
**Including Testimony from the Previous Four Years**

Trial and Deposition Testimony

*Rossco Holdings Inc., et al. v. Bank of America*, No. 1220031401 (JAMS Los Angeles County, CA)

*Tustin Nissan, et al. v. Bank of America*, No. 73 Y 181 00138 03 (AAA Orange County, CA)

*Body Perfection, Inc. v. Fitness Warehouse, Inc.*, Case No. GIC 800781 (Superior Court, San Diego County)

Trial Testimony Only

*United States v. Illya Bond*, CR-05-66-PA (Federal District Court, Central District of California)

*In re The Heritage Organization, L.L.P.*, No. 04-35574-SAF-11 (Federal Bankruptcy Court, Northern District of Texas)

Deposition Testimony Only

*Daehan Investment Trust Management Co., Ltd. and Daehan Global Bond II Investment (L) Limited v. J.P. Morgan Chase Bank*; No. 02 Civ. 12175 (Federal District Court, Southern District of New York)

*Federico Javier Duran Perez and Nora Franco de Duran v. Citibank, N.A.*, No. 02 Civ. 9793 (Federal District Court, Southern District of New York)

*R4 Holdings, LLC, and Hill International, Inc. v. General Atlantic Partners 46, L.P., et al.*, No. 02 CC 06740 (Superior Court, Orange County)

*SEC v. Todd et al.*, No. 03-CV-02330 K (Federal District Court, Southern District of California)

*Plumbers & Pipefitters National Pension Fund v. Cisco Systems, Inc.*, No. 01-20418 (Federal District Court, North District of California)

*City of Livonia Employees' Retirement System vs. Draper, et al.*, No. 05-04178 (Federal District Court, District of South Dakota)

*Basani and Basani v. Network Appliance, Inc.*, No. CV8003072 (Superior Court, Santa Clara County)

*Carpenters Health & Welfare Fund, et al. v. The Coca-Cola Company, et al.*, No. 1:00-CV-2838 (Federal District Court, Northern District of Georgia)

# EXHIBIT C

## Exhibit C – Documents Reviewed by Frank Partnoy

Declaration of Elizabeth A. Schmid Esq. in Support of the Motion of the Kristen-Straxton Group for Consolidation of All Related Cases, Appointment of Lead Plaintiff and Approval of the Selection of Lead Counsel, with Exhibits

Memorandum of Law in Support of the Motion of the Kristen-Straxton Group for Consolidation of All Related Cases, Appointment of Lead Plaintiff and Approval of the Selection of Lead Counsel

Declaration of Judith L. Spanier in Support of Motion by the State Teachers Retirement System of Ohio for the Consolidation of All Related Cases, Appointment as Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel, with Exhibits

Memorandum of Points and Authorities in Support of the Motion of State Teachers Retirement System of Ohio for the Consolidation of All Related Actions; to Be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel

Complaints filed in this matter

All other documents cited in the Declaration of Professor Frank Partnoy