# EXHIBIT A

© 2004 International Monetary Fund

April 2004
IMF Country Report No. 04/92

### British Virgin Islands – Overseas Territory of the United Kingdom:

### Assessment of the Supervision and Regulation of the Financial Sector
### Volume I—Review of Financial Sector Regulation and Supervision

This review of financial sector regulation and supervision in the **British Virgin Islands** in the context of the offshore financial center assessment program contains technical advice and recommendations given by the staff team of the International Monetary Fund in response to the authorities of **the British Virgin Islands'** request for technical assistance. It is based on the information available at the time it was completed in **February 2004.** The staff's detailed assessment of the observance of standards and codes can be found in Volume II. The views expressed in these documents are those of the staff team and do not necessarily reflect the views of the government of the **British Virgin Islands** or the Executive Board of the IMF.

The policy of publication of staff reports and other documents by the IMF allows for the deletion of market-sensitive information.

**To assist the IMF in evaluating the publication policy, reader comments are invited and may be sent by e-mail to publicationpolicy@imf.org.**

Copies of this report are available to the public from

International Monetary Fund ● Publication Services
700 19th Street, N.W. ● Washington, D.C. 20431
Telephone: (202) 623 7430 ● Telefax: (202) 623 7201
E-mail: publications@imf.org ● Internet: http://www.imf.org

Price: $15.00 a copy

### International Monetary Fund
### Washington, D.C.

ASSESSMENT OF THE SUPERVISION AND REGULATION OF THE
FINANCIAL SECTOR



VOLUME I: Review of Financial Sector Regulation and
Supervision

# British Virgin Islands

FEBRUARY 2004

- 2 -

The contents of this report constitute technical advice and recommendations given by the staff of the International Monetary Fund (IMF) to the authorities of a member country in response to their request for technical assistance. With the written authorization of the recipient country's authorities, this report (in whole or in part) or summaries thereof may be disclosed to IMF Executive Directors and their staff, and to technical assistance providers and donors outside the IMF. Disclosure of this report (in whole or in part) or summaries thereof to parties outside the IMF other than technical assistance providers and donors shall require the written authorization of the recipient country's authorities and the IMF's Monetary and Financial Systems Department.

- 3 -

Contents                                                                        Page

Glossary ...................................................................................................4

Preface....................................................................................................6

Executive Summary ................................................................................8

I. Financial System and Offshore Overview................................................14
    A. Background ....................................................................................14
    B. Financial Institutions and Markets ......................................................17
    C. Regulatory Framework, Oversight, and Market Integrity Arrangements ..............20

II. Strengths and Vulnerabilities in the Financial Regulatory and Supervisory
    Arrangements...................................................................................25
    A. Summary Assessment of Compliance with the Basel Core Principles for
       Effective Banking Supervision .......................................................25
    B. Summary Assessment of Implementation of the IOSCO Objectives and
       Principles of Securities Regulation ...................................................32
    C. Summary Assessment of Compliance with the International Association of
       Insurance Supervisors (IAIS) Insurance Core Principles ...................................38
    D. Summary Assessments of Compliance with the FATF Recommendations for
       Anti-Money Laundering and Combating the Financing of Terrorism................43

III. Regulatory Arrangements of Particular Concern in the OFC Context ..............51
    A. Oversight of Companies and Trusts Service Providers (CSP)................................51
    B. Cross-Border Cooperation and Information Sharing .............................................53

Tables
1.     Summary of Findings, Follow-Up Action Plan, and Response of Authorities,
       Including Possible TA Needs, Regarding Financial Sector Supervision................11
2.     Recommended Action Plan to Improve Compliance of the Basel Core Principles.....30
3.     Recommended Actions to Improve Implementation of the IOSCO Objectives and
       Principles of Securities Regulation .......................................................36
4.     Recommended Action Plan.................................................................42
5.     Recommendations and Actions.............................................................49

- 4 -

## GLOSSARY

| | |
|---|---|
| AGC | Attorney General's Chambers |
| AML | Anti-Money Laundering |
| AMLCP | Anti-Money Laundering Code of Practice |
| ARA | Association of Registered Agents |
| BTCA | Banks and Trust Companies Act, 1990 |
| BCP | Basel Core Principle for Effective Banking Supervision |
| BIS | Bank for International Settlements |
| BVI | British Virgin Islands |
| CA | Companies Act, 1885 |
| CFT | Combating the Financing of Terrorism |
| CJIC | The Criminal Justice (International Cooperation) Act |
| CMA | Companies Management Act, 1990 |
| CSP | Companies and Trusts Service Providers |
| EU | European Union |
| FATF | Financial Action Task Force |
| FIA | Financial Investigative Authority |
| FS(IC)A | Financial Services (International Cooperation) Act, 2000 |
| FT | Financing of Terrorism |
| FCO | Foreign and Commonwealth Office |
| FSC | Financial Services Commission |
| FSCA | Financial Services Commission Act, 2001 |
| FSD | Financial Services Department |
| GOB | Government-Owned Bank |
| GTL | General Trust License |
| IAE | Independent AML/CFT Expert |
| IA | Insurance Act, 1994 |
| IR | Insurance Regulations, 1995 |
| IBCA | International Business Companies Act, 1984 |
| IOSCO | International Organization of Securities Commissions |
| JAMLACC | The Joint Anti-Money Laundering Coordinating Committee |
| KYC | Know Your Customer |
| MD | Managing Director of the Financial Services Commission |
| MFD* | Monetary and Financial Systems Department |
| MF Act | Mutual Funds Act, 1996 |
| ML | Money Laundering |
| MLAT | Mutual Legal Assistance Treaty |
| OECD | Organization for Economic Cooperation and Development |
| OFC | Offshore Financial Center |
| OGBS | Offshore Group of Bank Supervisors |
| Police FINU | Police Financial Investigations Unit of the Royal Virgin Islands Police Force |
| PCCA | The Proceeds of Criminal Conduct Act |

- 5 -

RA          Reporting Authority
RCA         Registry of Corporate Affairs
STR         Suspicious Transaction Report


*The IMF's Monetary and Exchange Affairs Department (MAE) was renamed the Monetary and Financial Systems Department (MFD) as of May 1, 2003. The new name has been used throughout the report.

## PREFACE

At the request of the authorities, an IMF team conducted a Module 2 Offshore Financial Center (OFC) assessment[1] of the British Virgin Islands (BVI) during the period November 11–22, 2002. The mission undertook an assessment of the BVI's regulatory and supervisory arrangements with respect to internationally accepted standards and evolving good practices. The mission completed separate assessments of the BVI's observance of five standards and evolving good practices:

(1)     The Basel Core Principles for Effective Banking Supervision (BCP);

(2)     The Insurance Core Principles of the International Association of Insurance Supervisors (IAIS Insurance Core Principles);

(3)     The Objectives and Principles of Securities Regulation of the International Organization of Securities Commissions (IOSCO Principles) (primarily with respect to the regulated mutual fund sector);

(4)     The Methodology for Assessing Compliance with Anti-Money Laundering and Combating the Financing of Terrorism Standards (AML/CFT Methodology);[2] and

(5)     Good practices for company and trust service providers in the context of the September 6, 2002, draft statement of Best Practice of the Offshore Group of Banking Supervisors (OGBS Good Practices).

The assessment team consisted of Mr. Richard Gordon (Mission Chief, Monetary and Financial Systems Department); Ms. Pramita Moni Sengupta (Deputy Mission Chief, Legal Department); Mr. Joseph O'Neill (Banking Advisor); Mr. Tomas Power (Insurance Advisor); Ms. Tanis MacLaren (Securities Advisor); Mr. Hermann Krull (Company and Trust Services Advisor); and Ms. Marie-Christine Dupuis (AML/CFT Financial Sector Advisor), and Mr. Simon Quin (STA). Mr. Atle Roaldsøy, Norwegian Ministry of Justice, participated in the mission as an independent AML/CFT expert (IAE).

To conduct the assessments, the mission held discussions with the Governor of the BVI, the Honorable Chief Minister and Minister of Finance, senior management (including the Managing Director, Deputy Managing Director, and directors) and regulators of the BVI Financial Services Commission (FSC), the Attorney General of the BVI, the Financial

---

[1] The program of assessments is based on the paper presented to the IMF Board "Offshore Financial Centers—the Role of the IMF."

[2] As endorsed by the FATF in October 2002 and by the Fund's Executive Board in November 2002.

Secretary of the BVI, the Commissioner of Royal Virgin Islands Police, and a very broad range of representatives of the financial services industry.

The team is very grateful for the cooperation and hospitality received from the BVI authorities and from private sector representatives. The team is especially grateful for the FSC's efforts in making all necessary logistical arrangements for the mission.

- 8 -

## EXECUTIVE SUMMARY

**Sectoral supervisory issues**

The BVI has most of the essential elements for a suitable framework for financial supervision. Primary legislation provides the FSC with adequate independence and authority to license and supervise covered financial services, which include banking,[3] insurance, securities (mutual funds, their management, and investors), and trust and company service providers, whether onshore or offshore, and implementation has largely been good. In particular, the professionals who staff the FSC, led by senior management and directors, are dedicated and experienced professionals with a clearly articulated goal of maintaining and, where possible, improving the framework and implementation of financial services supervision in the BVI. While there are several weaknesses in the framework, the FSC and the BVI Government have indicated that they are keenly interested in addressing those weaknesses, and in many cases have already taken steps to that end.

While all indications are that the FSC acts in a fully independent and professional fashion, there are some changes to the FSCA that would further ensure that it continue to be independent and professional in the future, including with respect to selection of and term of the managing director, and the method of selecting board members.

There is a weakness with respect to onsite supervision of banking, insurance, and securities sectors. While there is often detailed and well-executed off-site inspection of relevant documents in the course of granting both initial licenses and license renewal (as well as on an *ad hoc* basis), there is currently no regular and comprehensive examination and compliance program in operation, and no on-site inspections of regulated entities/providers (regulated persons) other than trust and company service providers. However, the authorities, with KPMG's assistance, are implementing a comprehensive examination methodology and plan to start on site inspections in 2003. While there has been an increasing and dedicated effort to engage in consultations with industry, particularly with respect to education, this needs to be regularized and deepened, especially with respect to feedback from the regulated persons. Finally, in order to implement the proposed plan for on-site inspections, there is also a need to increase human resources, which the authorities are now undertaking with the help of, inter alia, international headhunting firms. In addition to these shortcomings that apply throughout all sectors, there are a number of issues specific to each of the banking, insurance, securities, and trust and company services provider sectors.

With respect to the **banking sector**, virtually all banks are subsidiaries or branches of high-quality banking institutions subject to effective consolidated supervision by the home country supervisor. However, there are few key weaknesses. While the FSC has requested that banks confirm that their policies and procedures are in compliance with relevant Bank

---

[3] The Development Bank is not subject to the FSC's authority.

- 9 -

for International Settlements (BIS) papers, prudential standards such as guidance and parameters for assuming and managing risk have not been issued. The Government-Owned Bank (GOB),[4] which operates in the local retail and commercial market, but which appears to have multiple weaknesses including high levels of nonperforming loans and outdated financial statements, is not currently under any outside prudential supervision, although this is planned to be introduced in 2003. In the past the FSC has in effect required an 8 percent risk-weighted capital requirement for subsidiaries (although such a requirement has been imposed as a matter of administrative discretion rather than by law or regulation) and the FSC imposed a 14 percent capital assignment for one of the three branches. A proposed amendment to the BTCA provides for a 12 percent risk-weighted capital requirement.

With respect to the **insurance sector**, all insurance companies insuring domestic risk are subsidiaries or branches of high-quality institutions subject to effective consolidated supervision, and most captives have single U.S.-based parents whose structure and operations have been vetted by the U.S. Internal Revenue Service., This, when combined with the FSC's supervision, has resulted in a well-supervised sector. However, a weakness can be found in a lack of guidelines for corporate governance and internal controls, which is of particular importance to supervision of managers of captives. Such guidelines are, however, planned to be introduced in early 2003. There is no compulsory errors and omissions, fidelity and surety and broad-form professional liability insurance for all providers, although this is also planned.

With respect to the **securities sector,** the FSC has generally done a good job of supervision. However, a few weaknesses include that the FSC needs to set out the prospectus disclosure requirements applicable for public funds, and generally the disclosure obligations of mutual funds need to be enhanced. In addition, business conduct rules and requirements for books and records, internal controls and risk management systems for mutual fund managers and administrators should be strengthened, and all managers, administrators and other mutual fund functionaries, such as custodians, should be required to segregate client assets effectively. Most of these issues, however, are addressed in a draft code of practice, expected to come into force in early 2004, while the remaining are expected to be addressed in proposed regulations for mutual funds.

With respect to **international business companies** the regime for registering and maintaining IBCs in the territory meets or exceeds most best practices; this is largely because IBCs have to be registered (incorporated) by registered agents who are themselves subject to regulation supervision (see below). A draft amendment to the (International Business Companies Act, 1984 (IBCA) is planned to require that the registered agents keep information on IBC directors in the territory. Amending legislation to the IBCA is currently being finalized to implement the immobilization of bearer shares. This requirement appears

---

[4] The Development Bank of the Virgin Islands.

to satisfy concerns of the Financial Action Task Force (FATF) and (Organization for Economic Cooperation and Development) OECD, among others.

With respect to the **trust and company services provider sector**, all CSPs are subject to regulation and supervision by the FSC. Such oversight largely meets industry best practices as provided in the OGBS Statement of Best Practices. However, particularly in view of very large IBC client base and, in particular, the need to assess compliance with the OGBS statement of best practice (including that action can be taken where there is evidence of noncompliance); there is a need to complete inspections of all CSPs, and to draft a regular compliance and on-site inspection program. Also, inspections could be more detailed and structured. Greater contact and consultation by the FSC and the BVI Association of Registered Agents would also be helpful.

### Framework for anti-money laundering/combating the financing of terrorism

The legal framework for AML/CFT measures in the BVI is generally compliant with international standards. Sufficient legal means and measures are in place for criminalization of (money laundering) ML and (financing of terrorism) FT, to facilitate international cooperation in ML and FT matters, and to provide for confiscation and forfeiture of assets associated with ML and FT. Although the Attorney General's Chambers (AGC) appear to be well versed to handle complex matters, few prosecutions have taken place in the BVI, and any increase in the number of prosecutions would impose a heavy burden on the AGC's Commercial Crimes Unit. Required measures for FT, including criminalization and freezing/confiscation of FT assets have been fully integrated into the legal framework. The BVI has taken a pragmatic approach to establishing the supervisory framework for AML/CFT measures and applying due diligence requirements to all regulated persons. Money remitters are not yet subject to licensing or prudential supervision, although this is contemplated under a proposed law, which authorities expect to be enacted in the first half of 2003. The FSC is carefully building its staff to cover the range of its mandates, by enhancing the staff for AML/CFT compliance, including filling vacancies in the Legal and Enforcement Division; such staff will have a significant role in implementing the legal and supervisory framework under the AMLCP and the guidance notes.

While the legal and supervisory frameworks are adequately structured, the implementation of the full range of AML/CFT supervisory measures has not yet been fully achieved. Verification of AML/CFT must be an essential part of these examination procedures and manuals. Specific file review and transaction testing are also needed as the supervisory measures are implemented. Nevertheless, the mission notes significant progress in the FSC's development of necessary supervisory measures the supervisors have kept abreast of the concerns of the financial sector and have provided extensive training and guidance to the financial intermediaries to aid in establishing adequate internal compliance measures.

### Cross-border information exchange and cooperation

Cross-border information exchange and cooperation has been excellent in all areas.

- 11 -

Table 1. Summary of Findings, Follow-Up Action Plan, and Response of Authorities,
Including Possible TA Needs, Regarding Financial Sector Supervision[5]

| Issues of General Applicability | | |
|---|---|---|
| **Findings** | **Action Plan** | **Response of Authorities and Follow Up TA Needs** |
| Executive Council not required to disclose grounds for removal of board members. | Amend FSCA to require executive council to disclose grounds for removal. | FSC Board to consider. |
| Conflicts policy for FSC board members could be made more detailed and specific. | Amend board Code of Conduct. | FSC Board to consider amending Code of Conduct. |
| MD does not have fixed-term appointment.<br><br>FSC board not required to disclose grounds for removal. | Amend FSCA to provide for fixed-term appointment and disclosure of grounds for dismissal. | FSC Board to consider. |
| Vacancies in directorships of Legal Department, Policy Planning Department, anticipated vacancies in at least one other department. | Fill vacancies. | Legal Department vacancy filled, search for head of Policy Planning in effect using international headhunters. |
| Need for additional trained regulatory staff.<br><br>Specialized consultants and/or requiring external auditors not used to perform and certify certain compliance testing. | Recruit additional regulatory staff for each directorate.<br><br>Provide training of new staff.<br><br>Consider using consultants. | Recruitment in process.<br><br>Training plan drafted. |
| Detailed reasons for all non-routine decisions not always provided unless requested. | Amend guidelines to require that reasons for all non-routine decisions be provided. | FSC board to consider amending guidelines. |
| No regular and comprehensive audit and compliance program.<br><br>No on-site inspections.<br><br>No manual for inspections. | Prepare plan and procedures for audit and compliance program.<br><br>Begin on-site inspections.<br><br>Complete manuals.<br><br>Train staff. | Training for KPMG's computer based on-site inspection program was recently completed for implementation 1st quarter 2004.<br><br>On-site inspections to begin 1st quarter 2004.<br><br>Computer based procedures manual completed by KPMG.<br><br>Job description questionnaire for inspection coordinator completed with vacancy to be filled shortly using international headhunters. |

[5]A summary of findings for AML/CFT is reported separately below.

- 12 -

| | | Technical assistance in conducting inspections and in related capacity-building programs. |
|---|---|---|
| Accounting standards for financial statements not detailed; allowed to use home jurisdiction standards. | Clarify the accepted accounting standards based on International Accounting Standards (IAS) or a combination of IAS and U.S. GAAP. | Draft legislation pending. |

| Summary of Issues Relevant to the Banking Sector | | |
|---|---|---|
| **Findings** | **Action Plan** | **Follow Up/TA Needs** |
| GOB not subject to the prudential supervision of the FSC. | Amend legislation to subject GOB to supervision by FSC. | Draft legislation pending. |
| No risk based capital requirement in law or regulations for subsidiaries. No capital allocation for branches. | Consider issuing regulation establishing adequate capital requirements consistent with international standards. | Draft legislation that includes requiring a 12 percent risk based capital pending.<br><br>Branches will be required to have an assignment of capital by Q2 2004 |
| No specific prudential regulations on credit concentration, credit reserve requirements, connected lending, liquidity requirements, and country risk limitations. | Consider prudential regulations based on internationally recommended standards tailored to the local circumstances, discuss with banks; promulgate appropriate standards. | The FSC has drafted Large Exposure, Liquidity Policy and a Code of Banking Practice to be adopted by Q1 2004. |
| The FSC requires audited financial statement of the subsidiaries, but not of branches. | Amend guidelines to require audited financial statement of branches. | Branches are now required to submit audited financial statements. |

| Issues Relevant to the Insurance Sector | | |
|---|---|---|
| **Findings** | **Action Plan** | **Follow Up/TA Needs** |
| Lack of guidelines on the operations of insurance managers and other intermediaries on corporate governance and internal control procedures. | Assess the suitability of applicable IAIS Guidance notes; discuss with intermediaries and other stakeholders; promulgate appropriate standards. | In process, to be completed in 2003. |
| Errors and Omissions, Fidelity and Surety and Professional Liability insurance not required for all insurance managers, compliance officers and insurance agents and brokers based on a sliding scale of level of exposure to various hazards. | Determine appropriate types of insurance necessary; discuss with industry; assess appropriate levels of exposure; issue guidance requiring coverage. | In process, to be completed in 2003. |

| Issues Relevant to the Securities Sector | | |
|---|---|---|
| **Findings** | **Action Plan** | **Follow Up/TA Needs** |
| Mutual fund conflicts of interest not dealt with comprehensively. | Issue formal requirement (under either the prospectus requirements in proposed public mutual funds regulations or in draft Code of Practice) for disclosure of all of the relationships between the managers, administrators, other functionaries and service providers. | To be included in proposed public mutual funds regulations (end of Q2 2004) and draft Code of Practice (end of Q1 2004). |

- 13 -

| No requirement of mutual funds, managers and administrators to file annual audited financial statements with the FSC, or of managers and administrators should also be required to file other regulatory reports. | Issue guidelines in draft Code of Practice and Mutual Funds Amendment Act. requiring filing annual audited financial statements, including regular inspections. | To be included in draft Code of Practice (end of Q1 2004) and Mutual Funds Amendment Act (end of Q4 2003) |
|---|---|---|
| No specific requirements regarding books and records, or that assets be segregated. | Except for custodians and others over whom the FSC has no jurisdiction, issue detailed guidelines on keeping of books and records and on asset segregation applying to all functionaries who hold BVI registered public mutual fund assets. | To be included in proposed public mutual funds regulations (end of Q2 2004) and draft Code of Practice (end of Q1 2004). |
| No guidelines for issuing prospectuses of public mutual funds.<br><br>Requirement for public mutual funds to make immediate disclosure of any material changes to be expanded. | Issue guidelines in the proposed Public Funds Regulations and Mutual Funds Amendment Act regarding prospectuses for public mutual funds. | To be included in proposed public mutual funds regulations (end of Q2 2004) and Mutual Funds Amendment Act (end of Q4 2003). |
| No rules on public mutual fund asset valuations and related disclosure provisions.<br><br>No prohibition on public mutual funds from ceasing to redeem its securities without the permission of the FSC. | Issue guidelines in the draft Code of Practice on asset valuations and related disclosure provisions.<br><br>Issue guidelines in the proposed public mutual funds regulations requiring public mutual funds to notify the FSC before ceasing to redeem its securities. | To be included in the draft Code of Practice (end of Q1 2004).<br><br>To be included in proposed public mutual funds regulations (end of Q2 2004). |

| Issues Relevant to the IBC and Trust and Company Service Provider Sectors | | |
|---|---|---|
| **Findings** | **Action Plan** | **Follow Up/TA Needs** |
| Ensure continuing and enhanced compliance with current draft of OGBS Statement of Best Practice. | Monitor and measure Bank & Fiduciary Services Division policies and implementation against OGBS Draft Methodology Document. | After finalization and acceptance of OGBS Draft Methodology Document, follow-up audit to be undertaken by MFD of the Division's findings |
| More detailed and structured on-site inspection of CSPs needed to be able to take action where there may be evidence of noncompliance. | Introduce a staff secondment program with the local CSP industry and auditing firms. | FSC to liaise with the local CSP industry and auditing firms<br><br>Computer based inspection to be implemented Q1 2004 |
| Increased input form industry needed in respect of supervisory processes. | Increase contact and consultation with the BVI Association of Registered Agents. | FSC to establish a closer working relationship with the Association of Registered Agents by Q1 2004. |

- 14 -

## I. FINANCIAL SYSTEM AND OFFSHORE OVERVIEW

### A. Background

**Setting**

1.      The BVI is a British Overseas Territory of 153 square kilometers in size and comprising over 40 islands, islets and cays, with a population of around 21,000. About two-thirds of the population lives on the island of Tortola (53 square kilometers) and another 15 percent on the island of Virgin Gorda (21 square kilometers), with the remainder on a few of the other larger islands. The BVI's annual per capita income is about $37,000 and the median income about $11,000 (although the cost of living is high). While the territory has virtually no unemployment and a relatively high level of other social indicators, some small pockets of relative poverty do remain. The BVI is highly dependent on both tourism and the offshore financial sector (both approximately 40 to 45 percent of GDP), although exact figures are difficult to estimate. However, it is these sectors on which the future prosperity of the territory is likely to depend.

2.      The BVI is subject to a number of constraints on the development of its economy. The BVI is a small jurisdiction with a limited stock of office and hotel space (including convention facilities) and has a relatively small airport that cannot accommodate wide-body planes. These limitations are due in part to the physical nature of the islands, which are small, mostly volcanic, and extremely steep, thereby limiting the amount of land suitable for construction of new or improved facilities. The government has also adopted policies designed to preserve the charm, beauty, and environmental quality of the islands, including size and number restrictions on new construction. This lack of suitable office and hotel space has constrained the development of both the tourism and financial services sector. In addition, the relatively small population, the lack of superior onshore secondary education facilities, and labor and immigration laws have contributed to a relative dearth of available human capital, especially with respect to sophisticated financial services. Currently, approximately 40 percent of the labor force comes from outside the territory.

**Government**

3.      The BVI enjoys a large measure of self-government as an internally-governing overseas territory of the U.K. The governor, who is appointed by the U.K. Foreign and Commonwealth Office (FCO), retains direct responsibility for external affairs, the terms and conditions of public service, and the administration of justice, including the police and the courts. He also appoints the (nonpolitical) attorney general, who typically comes from outside the Islands. All other executive functions are exercised by the executive council, which consists of the chief minister (analogous to the U.K. prime minister) and four other ministers, all of whom are elected members of the legislative council, and the attorney general (ex officio). The governor normally chairs sessions of the council. The legislative council consists of 13 members elected for a term not exceeding four years. The judicial branch includes a high court with two resident judges and a single magistrate. The appeal

- 15 -

court and high court are associated with the Organization of Eastern Caribbean States (OECS).

4.      A well-compensated professional civil service operates the various government departments in the U.K.-style, and generally has a high reputation, although there is a need for additional human resources in many cases. In addition, there are also a number of statutory bodies with authority independent of the ministries, including the Tourist board and the FSC, which hire their own staff and which, while not subject to the same civil service rules, are also well compensated and generally maintain a high reputation. In particular, the administration of justice, including AGC, police, and courts, is a key element in minimizing reputational risk, and all have excellent reputations both within and without the territory.

5.      Overall, BVI governance has generally been quite good. The presence of a governor largely beyond local political influence, who is both privy to all executive council deliberations and who directly oversees the terms and conditions of public service and the administration of justice appears to have a beneficial effect on the territory's reputation for probity. The recent AGC prosecution of the former financial secretary for corruption related to the recent airport expansion indicates that the various checks and balances are robust.

**Overview of financial services**

6.      Commensurate with its small population, the BVI has a small domestic market for financial services. As a general matter, there are no separate regulatory schemes for financial services offered to the domestic market and those restricted to nonresidents ("offshore"), although there is for company registration (see below). There is a very limited offshore banking sector, which is insignificant when compared to well-developed offshore centers. The BVI has made a policy determination of only allowing highly reputable institutions subject to effective consolidated supervision to engage in onshore or offshore banking. The offshore insurance sector is restricted to captive insurers and to their managers. The offshore securities sector is limited to mutual funds, their managers, and administrators.

7.      By far, the largest offshore activity is the registration of IBCs. The IBCA, which was enacted in 1984, sets out a separate corporate regime for IBCs, which are prohibited from carrying on business with BVI residents or of owning real property in the BVI, although BVI residents may hold shares or other securities in the IBC. In exchange, IBCs are exempt from certain duties of domestic companies, including, inter alia, holding annual shareholders meetings, publicly maintaining certain records (including a registry of shareholders) and paying income, stamp, or other taxes. The BVI was the only Caribbean Oversees Territory identified by the European Union (EU) as not conforming with its Code of Conduct on Business Taxation because of the ring-fencing nature of the IBC tax regime. For this reason, the chief minister recently stated that the government would combine the IBCA and the Companies Act, 1885 (CA into a single law by end-2003, and move to a zero rate of income tax by 2005.

- 16 -

8.    Low registration and license fees, coupled with an exceptionally efficient registration system and low reputational risk contributed to the significant growth of this sector. In 1989, the government sent a delegation to Hong Kong, then a British Crown Colony, to promote the use of IBCs to hold assets in anticipation of the 1997 return of the colony to Chinese sovereignty. This visit was followed by a significant increase in the registration of IBCs by Hong Kong residents, and it is estimated that a significant number of IBCs continue to be formed by residents of Hong Kong, now a Special Administrative Region of China. The FSC and the private sector estimate that there are approximately 350,000 active IBCs registered in the BVI, which is assumed to dominate the world IBC market with an estimated 45 percent share. The IBCs are also used as vehicles for captive insurance companies and for mutual funds. The large number of IBCs incorporated in the BVI makes the importance of effective AML/CFT policies at the company service provider sector particularly important.

9.    Under the IBCA, an IBC must be incorporated by and, at all times, maintain a registered agent. Registered agents are subjected to prudential licensing and supervision requirements and to AML/CFT duties. While incorporation duties provide the bulk of fees for registered agents, they also provide other services, such as IBC directors and nominee shareholders. In addition, those with general licenses may provide trustee services and other trust management services.

10.    In recent years, the number of IBCs being registered has begun to level off or even decline, while the number of companies being struck from the register (typically due to nonpayment of license fees or, less commonly, formal winding-up) has increased. This appears to be a worldwide trend, due in part to increased regulatory and AML/CFT standards, as well as to the fact that a title to a significant percentage of personal wealth has already been transferred to IBCs. This has led to concerns on the part of the registered agent community, and an even greater interest in moving beyond what has largely been the "commodity" production of registering companies, toward the provision of more sophisticated (and higher value added) financial services. However, this effort has been hampered by a number of causes, the most important being a lack of sophisticated international banking services and of qualified personnel. The government has begun to look into how these problems can be rectified without sacrificing the quality of life in the territory.

**Budgetary considerations**

11.    The BVI Government revenues are dependent on the offshore sector and, in particular, on fees for the registration and licensing of IBCs. Last year, these fees accounted for approximately 55 percent of total government revenues of US$187,476,000. Other key sources of revenue include personal and corporate income tax at 17 percent, and import duties at 10 percent of total revenues. As noted, revenues from registration and licensing of IBCs are expected to remain relatively flat, and the chief minister has announced that, to eliminate the ring fencing nature of the IBC regime, the government intends to move to a zero rate of income tax by 2005. Finally, import duties are relatively inelastic due to the small retail sector and the common practice of individuals of bringing in goods duty free

- 17 -

from the U.S. Virgin Islands and Puerto Rico, and to the large number of politically popular exemptions, particularly certain nonprofit entities.

12.     Government expenditures, however, are expected to continue to rise. The BVI's recurring revenues have traditionally run a surplus of a few percentage points over recurring expenditure, and capital projects have traditionally been funded from this surplus and from sources like the Caribbean Development Bank and the European Investment Bank. Currently, public debt stands at around US$46 million or less than 25 percent of annual government revenues, and government guaranteed debt of state-owned enterprises and others at a more or less equal amount.[6] However, two new and costly capital projects have been approved recently by the legislative council, an 80-bed hospital and a new sewage treatment plant. Together, these projects are estimated to cost around US$160 million, to be financed primarily through additional borrowing. The costs of these projects are expected to create additional pressure on the budget.

13.     Even if the government does not go ahead with its current plans to eliminate the income tax, the expected flattening and even reduction of registration and license fees from IBCs, plus the increase in debt service costs from the new capital projects, is expected to result in a tight budgetary situation for the foreseeable future.

## B.   Financial Institutions and Markets[7]

**Banks**

14.     The banking sector of the BVI is quite small—composed of 11 banks: 6 general, 4 restricted licensees, and 1 state-owned bank. The general license banks are authorized to engage in banking business within and outside the BVI. The restricted license banks may only engage in banking business outside the BVI, with certain exceptions. All banks (other than GOB bank) of any significance are subsidiaries or branches of foreign banking groups.

15.     The GOB was created with a special mandate to promote the development of the BVI. The GOB is authorized to accept local deposits and engages primarily in lending to the consumer, mortgage, and small business, tourism, and government sectors.

**Insurance**

16.     The local insurance market is relatively small, at about US$40 million in annual premium. The 30 firms licensed to write direct insurance on personal and commercial risk in the territory are primarily well-established firms that are well regulated in their home

---

[6] Public borrowing must first be approved by the FCO.

[7] Unless otherwise stated, data is as of end-September 2002.

jurisdictions. There are also 13 licensed insurance agents, 11 licensed insurance brokers, and 7 loss adjusters. The market appears to be stable.

17.    The BVI is a major and growing market for captive insurers, which number 263, approximately 95 percent of which are single-parent captives, and all but 22 of which are organized to insure U.S.-based risks, and have been certified by the United States Internal Revenue Service under applicable U.S. tax laws. This represents about 9 to 10 percent of the world market for captive insurers. None is allowed to underwrite third-party insurance on a direct basis. The insurance premia of the single-parents' captives is typically under US$500,000 (due to the exemption requirements of the U.S. Risk Retention Act). A small percentage of the captives have an in-house business in property casualty with premia that exceeds US$1 million. While statistics are not kept, it is estimated that captive premia for 2002 will exceed US$400 million. The sector is growing at a rate of about 10 percent per year.

18.    There are also 12 licensed insurance managers who manage the captives and who act as agents and all of which are required to have physical presence in the territory; most of the captive business is managed by subsidiaries of large and well established multinationals.

**Securities (mutual funds)**

19.    There is no stock exchange in the BVI, nor is there any facility for the issue of securities other than mutual funds. There is no retail market for securities of any kind in the jurisdiction.

20.    The BVI is a major jurisdiction for the incorporation of mutual funds. A total of 2,606 mutual funds had been registered or recognized in the BVI. The rate of growth of funds is over 14 percent per year. About 8 percent of the total number of funds is public mutual funds that may be sold by prospectus to any investor. The rest are either professional funds (sold to sophisticated purchasers only) or private funds, where offers to the public are prohibited and the number of investors must be fewer than 50. The BVI regulator does not collect data on the size of mutual funds authorized in the jurisdiction, but estimates the total assets of all public, private, and professional funds under management as exceeding US$55 billion. However, with the advent of the FSC's planned Policy, Research, and Statistics Division, the collection of such data would be possible.

21.    Around 490 licenses for mutual fund administrators and managers have been granted (this number does not reflect cancellations). There has been a growth in the granting of licenses of nearly 20 percent per year. Very few of the licensed managers or administrators are physically located in the territory. Mutual funds are not required to have managers or administrators that are licensed by the FSC. The BVI legislation presently does not give the FSC the authority to regulate other market participants (e.g., portfolio dealers or underwriters) and there is no data on the size and operations of these other participants. However, the draft Investment Business Act would do so.

**IBCs and trust and company service providers**

22.    The FSC and industry representatives estimate that there are around 350,000 IBCs in the BVI, which represents around 45 percent of the total world market. Most IBCs appear to be used as holding companies for shares, trust property, and other assets, while a smaller but still significant number appear to be used for private investment activity. On balance, the IBCs client base tends to come from the Far East, Europe, and Latin America.

23.    All IBCs must be registered in the BVI by a registered agent and, at all times, the IBCs must have an office maintained in the British Virgin Islands by the company or its registered agent, and have a registered agent at all times. Therefore, the registered agent is the key to the registration of IBCs and to any information about IBCs not included in registration documents.

24.    Registered agents can be licensed either under the Companies Management Act, 1990 (CMA) or the Banks and Trust Companies Act, 1990 (BTCA) to carry on the business of company management, defined as the registration of companies under the CA or the IBCA, the provision of registered agent services for companies incorporated under the IBCA, the provision of registered office services for companies incorporated under the CA or the IBCA. However, this also includes the provision of directors or officers for companies, and the provision of nominee shareholders of companies. All registered agents are required to establish a physical presence in the BVI at the time of licensing.

25.    Also, a registered agent who is licensed under the BTCA is also automatically licensed to conduct trust business, which is defined as acting as a professional trustee, protector, or administrator of a trust or settlement; managing or administering any trust or settlement; and company management as defined in the CM Act.

26.    A license to conduct trust business is referred to as a General Trust License (GTL). Not all GTL holders are registered agents, however. The holder of a Restricted Trust License may not conduct the business of company management, and can therefore not be a registered agent. In addition, it may only act as a professional trustee, protector, or administrator of a trust or settlement, and manage or administer any trust or settlement (i.e., trust business as defined, excluding company management), up to a maximum of 25 trusts (proposed to be increased to 50), all of which have to be listed in the original license application. Any addition or change to the list of trusts in the original license application requires a new application, and a subsequent reassessment of the applicant is undertaken.

27.    All licenses are valid until December 31 of the year in which they are issued, and are renewable during January of the next year. Currently, there are 20 licenses for Company Management Services under the CMA; 96 licenses for Restricted Trust Business under the BTCA; and 92 licenses for General Trust Business under the BTCA. Forty-nine of the 92 General Trust Business license holders, and 20 subsidiaries of General Trust Business license holders, have also been registered as registered agents, bringing the total number of registered agents (including the 20 licenses under the CMA) to 89.

28.    No CSP is a provider of banking, accounting, or legal services, but a number of them have connected-entity relationships with law firms, banks, and accounting or other financial service firms. All CSPs are required to maintain a principal office in the BVI.

### C.  Regulatory Framework, Oversight, and Market Integrity Arrangements[8]

**Legal structure**

29.    The Financial Services Commission Act (FSCA), which came into effect in January 2002, establishes the Financial Services Commission (FSC) as an independent statutory body.

30.    The FSC has responsibility and authority to grant and revoke licenses of all covered financial services, including banking, insurance, securities, and trust and company service provider sectors, whether onshore or offshore, and to supervise the operations of such persons.[9] The FSC also has responsibility for registering domestic companies, IBCs, and limited partnerships, and for overseeing compliance of those companies with the terms of the CA and the IBCA. Other functions of the FSC include monitoring, detecting, and assisting in the prosecution of financial crime, maintaining contact with foreign regulators, public education, and advising the executive council on needed changes in legislation. There is also a provision for an independent appeals board with jurisdiction to consider appeals of any FSC action except the refusal to grant a license.

31.    The FSCA was enacted in response to a key recommendation of the Review of Financial Regulation in the Caribbean Overseas Territories and Bermuda prepared by KPMG (KPMG Report) that the BVI's existing regulatory framework, which included the then main licensing and supervisory authority, the financial services department (FSD) of the finance ministry, be turned into an independent regulatory body, and that other powers relating to licensing and supervision exercised by the governor in council, the ministry of finance, and individual regulators, be transferred to the new independent body. Also following the recommendations of the KPMG Report, the promotional duties previously performed by the FSD were transferred to a new financial services marketing unit within the BVI Government.

32.    The FSCA (as supplemented by other authority found in sector-specific laws and regulations) provides the FSC with a broad arsenal of specific regulatory, supervisory, and enforcement powers. These include the powers to:

---

[8] See Appendix 1 for a detailed description of the FSC.

[9] Plans are to bring the GOB under the FSC's authority; previously it had been assumed that the presence of government appointed directors rendered unnecessary the need for additional supervision.

- issue, with the approval of the executive council, necessary regulations for the conduct of regulated persons and officers, and agents of regulated persons;

- prescribe manuals of compliance procedures and codes of practice for regulated persons;

- require that every regulated person should appoint compliance officers and further describe the compliance officers' responsibilities and functions;

- require persons engaged in financial services business (or other connected persons) to furnish any relevant information (that is not a privileged communication) needed for the discharge of the FSC's functions, including applying for, and executing, search warrants;

- conduct compliance inspections of regulated persons;

- appoint investigating examiners, appoint advisers, issue cease-and-desist directives, revoke or suspend authorizations, to apply to the court for orders to protect the businesses or property of regulated persons;

- compound offenses under the act;

- to provide any information it has or is otherwise entitled to have to:

  - any high-ranking officer in an international organization or law enforcement authority in a jurisdiction approved by the board; and

  - any foreign regulatory authority in a jurisdiction approved by the board that discharges duties or has existing powers corresponding to those of the FSC.

**Books of account and budgetary issues**

33.    While the FSC is required to keep audited books of account, which, along with a report on its activities, must be tabled before the executive and legislative councils, such books and reports have not yet been prepared, since the FSC has only recently begun operation. The FSCA also provides for basic obligations on conflicts of interest, confidentiality, etc. These have been supplemented by additional rules and procedures adopted by the board. However, the rules on conflicts of interests could be made more specific.

34.    While the FSC has been provided a quasi-independent source of funding based primarily on a percentage of receipts of registration and license fees, the actual amount it is allowed to keep (not less than 7.5 percent or the previous year's allocation, and normally not more than 15 percent) is based on a negotiated agreement between the executive council and the FSC. The FSC currently estimates that it requires at least 10 percent of such fees which, given its current resource demands, especially for regulatory staffing, is conservative. It is

- 22 -

not yet clear if this level of funding will be achieved by negotiation; if not, the minimum threshold of 7.5 percent would be instituted. However, the general budgetary squeeze anticipated over the next few years, plus the place of registration and licensing fees as the main source of government revenue may result in additional pressures on this process in future. This could result in resource constraints for the FSC.

**Board of Commissioners**

35.    The Board of Commissioners is non-executive, with its activities limited to creating and appointing senior management (except for the managing director (MD)), establishing the general policy of the FSC and monitoring and overseeing policy implementation, including management of the FSC by MD. The MD is generally responsible for the operations of the FSC, creates and appoints FSC staff, subject to board approval, and coordinates and executes requests for assistance from foreign regulatory bodies.

36.    The Board is appointed by the Executive Council for a period not exceeding three years. The FSCA provides that the council determine terms of commissioners, with a goal of having one-third of board members come up to the end of their terms every year. Consideration is now being given to extending these terms. While the FSCA provides that the executive council can only remove a board member for cause, it does not require it to disclose grounds for removal. Consideration should be given to requiring such disclosure.

37.    The FSCA gives the Council, on recommendation for the Board, the power to appoint the MD under terms and conditions of employment as it sees fit. Because of the MD's statutory powers over the supervision of the FSC, it may be preferable to prescribe a term of service, perhaps five years. In addition, the Board should be required to disclose publicly any reasons for dismissal of the MD.

38.    The MD has long served as the highly qualified and respected head of the FSD, and his appointment as MD of the FSC was expected and fully appropriate. In practice, all Board members but one (who is statutorily required to be from outside the territory and whose name was put forward by the FCO) was selected from names put forward by the MD, although the Chief Minister did reject a number of the MD's suggestions. While the current Board appears familiar with the industry (it consists of primarily financial services industry personnel) and appears free from undue governmental and commercial pressures, it is possible that this could be due to in part to circumstances specific to the current government and MD. Consideration could be given to establishing a formal external advisory committee of experts publicly to consider and advise the executive council on board appointments and on appointment of the MD.

39.    The Board has adopted rules and procedures for the board (including *Procedures and Protocol Guidelines* and a *Code of Conduct*), the organization of the FSC and the terms and conditions for staff, and the *Guidelines for Operating Procedures for the Licensing and Supervisory Committee*, which includes the *Table of Authorized Levels of Decision-Making on Behalf of the FSC (Guidelines)*. These guidelines lay out, inter alia, those decisions that

are to be taken by the Board and those that are to be taken by the FSC; and the details of the allocations of responsibilities between Board, Committee, and directors is clear, well thought out, and logical.[10]

40.    The Board currently meets once a month, during which time it also reviews a memorandum prepared by the MD on the FSC's work for the previous month, including an overview of licenses granted, any advisories, and new initiatives. Decisions already taken by the Board include an order on approving jurisdictions for exchanges of information, codes of conduct for mutual funds, and a draft budget, which they are continuing to negotiate with the Executive Council though a subcommittee including the MD. However, there have been complaints from some in the private sector that there is a lack of transparency regarding the decision-making process of the board.

**Licensing and Supervisory Committee**

41.    The FSC 's main functions are vested in a licensing and supervisory committee, which includes the MD, the Deputy MD, directors of the commission's regulatory and supervisory divisions, including banking and fiduciary services (which includes trust and company service providers/registered agents), insurance, investment business (mutual funds), and legal and enforcement. The committee reviews and acts on all applications for licenses for regulated persons, and supervises such persons to ensure that they continue to satisfy fit-and-proper criteria.

42.    The guidelines adopted by the Board specify a process of peer review of committee decisions. They also require that all relevant documents, including recommendations for decisions, be first prepared by the relevant regulatory division and circulated a week prior to the meeting. This system appears to work well at ensuring quality and consistency of decisions. Under the guidelines, the committee need not provide written reasons for all of its decisions unless requested to do so. The guidelines could be amended to require written reasons for all denials, which could improve efficiency of the review process once appellate review of decisions becomes operational.

**Staffing and supervision**

43.    The FSC performs its day-to-day functions through the various regulatory directorates.[11] There are a few significant vacancies at the senior management level,

---

[10] Areas reserved for the Board include advising the Executive Council on any need governmental action (including with respect to the FSC budget); issuing directives, guidelines, codes of conduct, etc.; appointing advisory committees; preparation of the annual reports; approving jurisdictions for provision of assistance; granting or revoking exemptions from the FSCA, granting certain key changes in the terms of licensees; and any major enforcement actions, including the revoking of any licenses of a covered person.

- 24 -

including the director of legal and enforcement (the Deputy MD, a qualified lawyer, has been filling this role), although this position is expected to be filled soon with a former Attorney General. There are also as-yet- unimplemented plans for appellate review of decisions, for a policy and research department, and an insolvency services department, and the director of at least one department is expected to retire soon. The FSC is seeking to fill these vacancies as soon as possible and is undertaking a broad search employing the use of international headhunting firms.

44.     The FSC is staffed with approximately 75 professional employees, the vast majority of whom are involved with the relatively routine task of registration of IBCs in the Registry of Corporate Affairs. Of those assigned directly to the licensing and supervision of financial institutions, five are assigned to banking and fiduciary services; three to the insurance; and five to investment business.

45.     These numbers are likely to be inadequate to maintain and improve the FSC's operations, once full on-site inspections begin in 2003. Furthermore, some of the staff that are below the levels of management and director lack in-depth knowledge of the regulated persons, nor do they have extensive regulatory and supervisory experience. However, it should be noted that, even though the FSC largely took over the duties and staff of the FSD, it has been in existence only since the beginning of 2002, and therefore is still in a period of gearing up for full operation. The FSC is aware of its staffing needs and is undertaking a strenuous effort to recruit and train new staff, including through the use of headhunters. In addition, the local community college has also begun a program in financial services. It would be helpful, however, if human resource needs were clearly specified in a detailed 3- to 5-year recruitment and succession program to implement a long-term enhancement and deployment of skills-strategy.

46.     There is often detailed and well-executed off-site inspection of relevant documents in the course of the granting of initial licenses, and in the course of license renewal (as well as on an ad hoc basis) including, where necessary, background checks. However, the most serious issue arises from the fact that the FSC has not yet fully implemented a comprehensive system to exercise all of its supervisory powers through a comprehensive audit and compliance system, including on-site inspections outside of the CSP sector. In addition, enforcement activities are undertaken on a basis that is in part ad hoc. The FSC is well aware of this deficiency, and has engaged KPMG to assist in designing such an audit program. Manuals have already been prepared, and the audit program and on-site inspections are expected to begin in 2003.

47.     Another general weakness relates to the FSC's collection of information relating to the financial industry in general and of regulated persons in particular. Such information is

---

[11]Administrative functions are undertaken through the financial controller, operations manager, and human resources manager.

important to the efficient operations of all aspects of the FSC's work, including with respect to planning for improvements in supervision, adjustments to anticipated changes, and for the future needs of the industry; and the collection, analysis, and dissemination of such information should be improved. There has been an increasing and dedicated effort to engage in consultations with industry, including through considerable outreach efforts (particularly with respect to educating the industry and supervised persons as to new regulatory and supervisory requirements). However, the consultative process, whereby the FSC regularly consults with the industry, is in the process of becoming more regularized and deepened, especially with respect to feedback from the regulated persons. The FSC is consulting with industry on the design of a new prudential return, which is expected to be introduced at the end of 2003.

## II. STRENGTHS AND VULNERABILITIES IN THE FINANCIAL REGULATORY AND SUPERVISORY ARRANGEMENTS

**Observance of Financial System Standards and Codes: Reports on Observance of Standards and Codes (ROSCs)**

### A. Summary Assessment of Compliance with the Basel Core Principles for Effective Banking Supervision

**General**

48.    This report provides an assessment of the BVI's compliance with the BCPs. The assessment was undertaken as part of the IMF Module 2 for Offshore Financial Centers. The conclusions of this report are based on an initial self-assessment of the authorities, supplemented by additional discussions between the team and the authorities. This assessment was prepared by Mr. Joseph O'Neill.

**Market structure**

49.    There are 10 banks with total assets of US$2.71 billion in the BVI. They operate under the BTCA and are subject to the supervision of the FSC. Six of these have a general license and can do business within and outside the BVI and the remaining four have restricted license and can only do business outside the BVI, with certain exceptions. All of these banks are primarily subsidiaries or branches of foreign banking groups. In addition, there is a GOB, the Development Bank of the Virgin Islands, which operates pursuant to the Development Bank of the Virgin Islands Ordinance (1974). The GOB engages in retail and commercial banking with total assets amounting to US$56 million.

**General preconditions for effective banking supervision**

50.    The BVI banking system is composed almost entirely of subsidiaries and branches of international banking institutions, each of which appear to be subject to adequate consolidated supervision (and the quality of which can be analyzed primarily by examining

- 26 -

the supervision of the home jurisdiction). Accordingly, many of the deficiencies identified in this assessment are largely mitigated from a consolidated perspective. This assessment accepts that the FSC needs to balance the benefits that any additional regulatory burdens might bring to the safety and soundness of the system with the detriments caused by increased compliance costs. Detriments might include subsidiary or branch closings and fewer banking services for BVI residents.

51.    The Financial Services Commission (FSC) implemented its current, limited on-site supervisory visits program during 2001. The FSC is currently developing prudential regulations and more in-depth, on-site examination procedures that are expected to be implemented during 2003.

52.    The BVI generally complies with the BCPs relating to Objectives, Powers, and Resources and Licensing. While the BVI lacks specific prudential regulations and requirements, it has required banks to report their compliance with relevant BIS papers. Furthermore, the supervisory efforts currently are limited to high-level questionnaires and discussions with management. Accordingly, the overall supervision of the banking system by the BVI is weak.

53.    The GOB is currently not subject to prudential oversight. The authorities are in the process of proposing legislative amendments to have the GOB be fully subject to the FSC's supervision and regulation.

**Main findings**

*Objectives, Autonomy, Power and Resources (Core Principle 1)*

54.    Prudential supervision and regulation for banking activities is the responsibility of the FSC. The Financial Services Commission Act of 2001 (FSC Act) clearly establishes the FSC's objectives, autonomy, powers, and resources and provides broad rule making powers. The FSC also has broad powers to take action against banks not complying with the legislation.

55.    The head of the FSC currently has no fixed term for his appointment. Further, to enhance the FSC's autonomy, the BVI may consider establishing the position of the FSC's managing director subject to a fixed term.

56.    The Development Bank of the Virgin Islands currently is not subject to prudential supervision, even though it is engaged in local retail banking.

*Licensing and Structure (Core Principles 2–5)*

57.    The Bank and Trust Companies Act and the Bank and Trust Companies Regulations (1991), supplemented by the "Guidelines for Banking Licensing" (November 1993) establish adequate licensing requirements, consistent with the BCPs. The term "bank" is adequately limited to refer to entities engaged in the business of banking.