58.    Changes in control are subject to prior regulatory approval. Current laws and regulations do not include specific limitations as to acquisitions and investments.

*Prudential Regulation and Requirements (Core Principles 6–15)*

59.    The BVI generally lacks detailed formal prudential regulation regarding capital, credit policies, reserves, large exposures, connected lending, market risk, liquidity, interest rate risk, and country risk. The FSC administratively requires the general license banks, and most restricted license banks, to comply with an 8 percent risk-based capital requirement.

60.    Through the recently implemented on-site visits program, the FSC has begun to monitor how the various institutions manage their risk. Detailed questionnaires used during on-site visits cover the more relevant risks, including credit, foreign exchange, and liquidity risks. The prudential visits also include detailed questions relating to the corporate governance structure, including a specific section on the internal audit function. The current questionnaires do not cover certain issues, including country risk and connected lending.

61.    The lack of clear regulatory requirements, coupled with the lack of detailed testing, results in a relatively weak prudential regulation framework. However, this deficiency is mitigated by the fact that the banking system is almost entirely composed of foreign banks subject to adequate consolidated supervision.

62.    The FSC has adopted adequate AML policies that promote high ethical and professional standards in the financial sector to prevent the banking system from being used by criminal elements. No detailed on-site testing is yet being performed to ascertain that banks policies and procedures are in effect and are functioning properly.

*Methods of Ongoing Banking Supervision (Core Principles 16–20)*

63.    In order to acquire a thorough understanding of banks' safety and soundness, bank supervision includes the combination of on-site and off-site procedures.

64.    The FSC receives a balance sheet and income statement on a quarterly basis with additional memorandum information, and a maturity analysis of assets and liabilities. The regulatory reports are highly summarized and do not include sufficient detail (for example, levels of delinquency) to make detailed qualitative judgments or assessments of the institutions.

65.    The FSC began its current limited on-site visits program in 2001. These visits consist of a meeting with top management to discuss the operations, performance, and management of the institutions. The FSC uses its "Bank Prudential Visit Questionnaire" as a basis to analyze the bank. The questionnaire includes inquiries as to the bank's management of credit risk, liquidity, foreign exchange risk, interest rate risk, and AML. The questionnaire also covers multiple general management issues, including the evaluation of management, evaluation of the internal audit function, and information technology.

66.    The level of detailed questioning, analysis and follow-up only provide a very broad-level perspective of the institution. Due to the lack of detailed analysis and detailed testing, the supervisor does not have sufficient independent verification of the bank management representations or of the banks off-site regulatory reports.

*Information Requirements (Core Principle 21)*

67.    The FSC requires the banks to file audited financial statements. The FSC accepts audited financial statements in accordance with the standards of a bank's country of origin.

68.    The FSC does not require the branches to file audited financial statements. In addition, neither the FSC nor the banking industry publishes detailed information on the financial condition of the banks.

*Remedial Measures and Exit (Core Principle 22)*

69.    The FSC has adequate legal powers to take corrective action when deemed necessary. However, due to the shortfall in the on-site and off-site supervision and weaknesses in the prudential standards, in practice, the remedial actions do not always occur on a timely basis. As the FSC strengthens its prudential standard regime and its on-site and off-site supervisory program, any weakness in the banking system should be detected on a timely basis for early corrective action.

*Cross-Border Banking (Core Principle 23–25)*

70.    Currently, there are no banks incorporated in the BVI with foreign subsidiaries or foreign branches. The FSC has taken an active approach in establishing and maintaining communication with the home country supervisor of its banks.

71.    The BTCA and regulations do not establish different standards for foreign banking entities. In practice, various prudential requirements for foreign branches are implemented by the consolidated supervisor, rather than the FSC.

**Staff commentary**

72.    The BVI has been progressively implementing legal and administrative changes gradually to improve its supervision and oversight of the banking system.

73.    The relatively recent enactment of the Financial Services Commission Act greatly improved the independence of the licensing, regulatory and supervisory procedures, and provided adequate resources for supervision. In 2001, the FSC implemented its on-site visits program. Through the on-site visits, the FSC obtains an understanding of the banks operations and monitor each bank's risk-management practices.

74.    The authorities represent that the GOB will be placed under the full regulatory and supervisory powers of the FSC. The team strongly encourages the authorities to implement this change as soon as possible, as the GOB has exhibited multiple weaknesses.

75.    The FSC intends to issue guidance notes during the coming months that should address a wide variety of prudential requirement issues, including capital requirements, large exposures, connected lending, and related-party transactions. The FSC also expects to implement a more comprehensive on-site supervision module during the second half of 2003. Furthermore, the FSC is in the process of modifying its off-site reporting package to include detailed information on: (i) exposures to central governments; (ii) income and expense statements; (iii) securities subdivided by different categories (debt vs. equity and trading vs. investment/held to maturity); (iv) past-due loans and other assets; (v) repricing maturities; (vi) off-balance sheet items; (vii) derivatives; and (viii) risk-based capital calculation.

76.    In relation to the guidance notes to be implemented in the future, the FSC may consider implementing broad prudential requirements, which require the board of directors and management of its banks to establish detailed policies and procedures addressing corporate governance, and risk management and prudential limits, subject to the approval of the FSC. Such types of regulations may provide the flexibility to the industry to operate under prudential standards akin to those in their home country, while maintaining the FSC's prerogative of obliging more stringent prudential policies and procedures to safeguard the local public interest.

77.    The assessment team has not reviewed the proposed legislative changes, the proposed guidance notes, or the future on-site supervisory procedures. However, the changes as outlined by the authorities, including the combination of strengthening the regulatory framework and the off-site reporting requirements with the implementation of an in-depth, on-site examination program, should significantly enhance the supervisory effectiveness.

78.    The FSC should consider establishing greater coordination with the consolidated supervisors to be adequately abreast of the dynamics of the consolidated banking organization and ascertain that the supervisory procedures and consolidated controls are applied appropriately in the BVI. Also, through close coordination, the FSC may be able to coordinate joint examinations of local operations and hence reduce the need for local supervisors.

79.    In implementing on-site examination procedures, the FSC may wish to consider utilizing external auditors or other professionals to assist in performing certain regulatory detailed testing.

Table 2. Recommended Action Plan to Improve Compliance of the Basel Core Principles

| Reference Principle | Recommended Action | Response of Authorities |
|---|---|---|
| Legal framework for bank supervision(CP 1.3) | Place the Development Bank under the full authority of the FSC. | To be implemented by end-2003 or early 2004. |
| Prudential Standards (CP 5,6,7,8,9,10,11,12,13) | Implement prudential standards consistent with international standards and in manner to protect the safety and soundness of the system and the interests of depositors and creditors. | See comments below. |
| Internal Control and Audit (CP 13) | Implement Corporate Governance Standards and formal requirements for internal audit. | See comments below. |
| On-site and off-site supervision (CP 16,18) | Implement on-site supervisory program and implement changes to off-site supervisory reporting and analysis. | To be implemented. |
| Information Validation (CP 19) | As part of the implementation of on-site supervision, include the verification of regulatory reporting with bank records. | To be implemented. |
| Off-site supervision (CP 18) | Design methodology and add resources for effective and comprehensive understanding and analysis of audit and regulatory reports. Should continuously coordinate with home supervisor. | To be implemented. |
| Cooperation with Other Supervisors (CP24) | The FSC may consider increasing interaction with home country supervisors to increase understanding of the consolidated entity, risks assumed and effectiveness of on-site/off-site supervision. | To be implemented. |

**Authorities' response**

80.    The FSC has recently signed off on the Fiduciary/Company Management On-site Monitoring Program and the Banking On-site Monitoring Program is expected to be signed off on shortly. Although the FSC has not had a formal on-site inspection program, because of the size and nature of the banking business in the BVI, the Bank Prudential Visit Questionnaire has proven to be a good source of gaining adequate insights into the banks' operations. A new Bank Prudential Visit Questionnaire will allow the FSC to assess banks assets quality amongst other things.

81.     The FSC follows a risk based approach to supervision, which has led it to concentrate its supervisory work on, asset liability management, financial performance, capital adequacy requirements and management of credit risk.

82.     With regards to concentration and liquidity risks, draft guidelines developed along international standards are currently with the banking industry for consultation. The proposed standards for credit policies and large exposure were developed to be consistent with the BCP. Although no specific rules have been set for banks' loan, investment policies and practices, since these are considered management responsibilities, the FSC expect banks to identify, monitor and control credit risk. Clear and precise rules with regards to large exposure have been developed. No specific loan classification or provisioning rules have been issued but the FSC expects banks to have internal policies that are consistent with international best practice.

83.     Banks are required by the FSC to take reasonable care to establish and maintain systems and controls as appropriate to the nature and scale of their operations. BIS papers on Internal Controls and Operational Risks were issued to the banks as well as Interest Rate Risk. The nature of the banking systems in the BVI is such that there is an independent internal audit function conducted by either head office or parent bank. The quality of banks systems and controls and internal audits will be tested on an ongoing basis when the FSC commences on-site inspections.

84.     Country risk is not significant for BVI banks as most loans are to domestic companies or individuals. Where there are country risks exposures, the exposures are to OECD and G10 countries. Connected lending is monitored from the prudential returns through the sections titles Related Party Deposits and Related Party Loans and Advances. All banks licenses have been approved and granted on the explicit understanding that the banks would be regulated according to the BIS standards.

85.     The FSC now requires all branches to file audited financial statements commencing end of financial year 2003. A proposed amendment to the BTCA will require all banks to publish financial statements in the local press.

86.     Prudential guidelines on the following are being drafted and are due to be implemented by end-2004: bank licensing; large exposures (completed); liquidity management (completed); credit concentration limits; risk weighted capital adequacy ratio; credit classification for provisioning purposes and income recognition; general principles for maintenance of accounting and other records and internal control systems; internet banking; corporate governance; related party transactions; relationship between financial institutions and external auditors; public disclosure of information; interest rate risk; country risk; market risk; code of practice for banks; and prudential returns (completed).

**B.  Summary Assessment of Implementation of the IOSCO Objectives and Principles of Securities Regulation**

**General**

87.    This assessment covers the BVI securities sector. The main objectives of the assessment are to determine levels of observance of the IOSCO principles and to suggest areas where further development may be appropriate. The assessment was undertaken as part of the IMF Module 2 for Offshore Financial Centers. The conclusions of this report are based on an initial self-assessment of the authorities, supplemented by additional discussions between the team and the authorities. This assessment was prepared by Ms. Tanis MacLaren.

**Information and methodology used for assessment**

88.    The assessment was based on interviews with staff of the FSC and individual industry members, a review of the laws, the rules, the guidance, and the procedures with respect to the securities regulatory regime, the draft Code of Practice, and the self-assessment provided by the FSC. The assessor used the IMF and World Bank Guidance Note for Assessing Implementation of IOSCO's Objectives and Principles of Securities Regulation.

89.    The regulation of securities in the BVI was introduced with Mutual Funds Act, 1996, as amended (the MF Act) which was implemented in January 1998. The MF Act provides for the registration of public mutual funds and recognition of private and professional funds. It also governs the licensing of mutual fund managers and mutual fund administrators operating in or from the BVI.

90.    The FSC was created as a single independent supervisory agency under the Financial Services Commission Act, 2001 (the FSCA). The functions and powers of the Authority under the FSCA establish the FSC as the financial supervisor for the territory. The act gives the FSC authority to administer, enforce, carry out and give effect to the provisions of the laws related to the financial services in the BVI. The FSC has the responsibility and authority to grant and revoke the licenses of banks, insurance companies, mutual fund managers and administrators, trust companies and company service providers, and to grant and revoke certificates of recognition and registration. It also is the authority responsible for the incorporation of companies under both the Companies Act and the International Business Companies Act, 1984. The FSCA authorizes the Commission to conduct examinations of financial institutions, regulated persons and corporations, to impose levies, and to impose and collect fees. The legal system in the BVI operates under common law principles.

91.    The FSCA and the MF Act provide the main legal framework for the supervision of securities activities in the BVI. This legislation is supplemented by the Financial Services (International Cooperation) Act, 2000 (FS(IC)A), which sets out detailed requirements for information sharing with foreign regulators and law enforcement agencies.

92.    The BVI is a major jurisdiction for the incorporation of mutual funds. At the end of September 2002, a total of 2,606 mutual funds had been registered or recognized in the BVI,

up from 2,346 at the end of 2001, an increase of more than 11 percent in nine months. About 8 percent of these are public mutual funds that may be sold by prospectus to any investor. The rest are either professional funds (sold to sophisticated purchasers only) or private funds, where offers to the public are prohibited and the number of investors must be fewer than 50.

93.     The FSC, under the MF Act, also licenses mutual fund administrators and managers operating in or from the jurisdiction. As at the end of September 2002, 490 licenses had been granted, although this number does not reflect the total number of active licenses. One fund administration and 75 fund management licenses were granted during the first nine months of 2002. Mutual funds are not required to have managers or administrators that are licensed by the FSC. Very few of the licensed managers or administrators are physically located in the territory. The legislation in the BVI presently gives the FSC no authority to regulate other market participants, such as portfolio managers, broker-dealers or underwriters and there is no data on the extent of this business that might be carried on in the BVI at this time.

94.     There is no stock exchange in the BVI, nor is there any facility for the issue of securities other than mutual funds. There is no retail market for securities of any kind in the jurisdiction. The BVI Association of Mutual Fund Practitioners, a trade association, was formed in late 2001. There are no self-regulatory organizations in the territory.

**General preconditions for effective securities regulation**

95.     The general preconditions for effective securities regulation in the BVI appear to be present. There are no significant barriers to entry and exit for market participants. Competition is encouraged and foreign participation is welcomed. The legal system supports the operations of the FSC and effective regulation of mutual funds and their administrators and managers. The bankruptcy legislation in the jurisdiction is outdated. However, a much more modern Insolvency Act has been drafted and it is to be introduced to the legislature shortly. The regulator has legally enforceable powers of decision and action. The legal and accounting resources available to market participants do not pose constraints. The taxation framework is supportive to the operations of the industry in or from the jurisdiction.

**Main findings—summary**

96.     **The Regulator (Principles 1–5).** The responsibilities of FSC are clear and objective. It is operationally independent and publicly accountable to the government and to the administrative courts in the exercise of its functions. The staff of the FSC meet high expectations of professionalism in their work. The processes followed are clear and consistently applied. All of the laws that FSC administers are publicly available, at least within the BVI. The FSC might also want to consider additional transparency regarding the processes followed, particularly regarding its consultation process. The consultation process might benefit from being made more open and inclusive in order to get input from the public, not just local market participants. However, it should be noted that local counsel normally responds on behalf of the offshore community, and that the Mutual Funds Advisory Committee is active in representing both on and offshore investors.

97.    The FSC does not have authority over the full range of securities activities and regulation covered by the IOSCO Principles. There are gaps, but these are in areas where there are no evident activities in the BVI at the present time. Should this situation change, the authority given to the FSC under the FSCA and other financial services legislation would have to be expanded accordingly.

98.    **Self-Regulation (Principles 6–7)**. There are no self-regulatory organizations in the BVI. Given the current industry structure and activities, this is not inappropriate.

99.    **Enforcement (Principles 8–10)**. The FSC has a comprehensive array of inspection, investigation, surveillance and enforcement powers. There are some limitations placed on when these powers may be exercised (such as needing a suspicion of a breach of the law before an examiner may be appointed) that could be eliminated, although the Division is of the belief that suspicion is a sufficiently low bar. The monetary penalties that may be imposed for a breach of the law may not be an effective deterrent and should be reexamined. The most serious issue arises from the fact that the FSC has not implemented an effective system to exercise its powers in these areas. There is not yet a comprehensive system of on-site or off-site inspections and enforcement activities are undertaken on an ad hoc basis. A new computer based audit and inspection program is being developed for implementation in 2003, as are regular reporting requirements for fund managers and administrators, which will improve activities in this area. The most pressing problem is the need for significant additional resources to implement an effective system of oversight of fund managers and administrators and of the mutual funds themselves. Also, the FSC's investigation and enforcement abilities are limited by the lack of staff.

100.    **Cooperation in Regulation (Principles 11–13)**. The FSC has very broad authority to share information with its domestic and foreign counterparts. There are no significant practical impediments to providing assistance to foreign regulators that need to make inquiries in the course of carrying out their regulatory activities. The relevant provisions in the legislation dealing with information sharing and providing assistance should be conformed so that there are no artificial constraints on what can be shared and with whom. For example, the definitions used in the FSCA should be revised to ensure they do not limit the ability of the FSC to share information with other regulators, where those regulators are making inquiries in the exercise of their jurisdiction over securities activities over which the FSC has no corresponding authority, such as market manipulation.

101.    **Issuer Regulation (Principles 14–16)**. There are no primary market issues of securities in the BVI, other than mutual funds and no market for corporate control. Therefore, the fact that the FSC has no statutory authority in this area is not a weakness. Nevertheless, it is worth noting that the accounting and auditing standards applied are high and of an internationally acceptable quality, although the processes for approving an auditor and recognizing a jurisdiction for the purposes of the MF Act would be better if they included an assessment of the quality of the accounting and auditing standards to be applied.

102.    **Mutual Fund Regulation (Principles 17–20).** Entry standards for fund managers and administrators are generally satisfactory. The rules governing conflicts of interest between fund managers, their related companies and the funds that they manage need to be addressed more comprehensively. Requirements regarding business conduct rules and requirements for books and records, internal controls and risk management systems for mutual fund managers and administrators should be strengthened. In particular, there should be an express requirement applicable to all market participants that mutual fund assets must be segregated from the assets of the fund manager, custodian or other service providers. The initial disclosure (prospectus) requirements for public mutual funds should be set out in a regulation and the continuous disclosure obligations of mutual funds need to be improved; in particular, the public disclosure of material changes should be more timely. These matters are to be addressed in the draft Code of Practice. The FSC should establish a supervision program for fund managers and administrators, which would combine periodic receipt and review of financial information and other reports and on-site visits.

103.    **Market Intermediary Regulation (Principles 21–24).** At the present time, market intermediaries are not subject to regulation in the BVI. As there does not appear to be any retail securities intermediation activities being carried on, this gap does not appear to be serious. We did note that the Commission has recommended that the government introduce legislation to govern the activities of all persons carrying on investment business in the BVI, and the draft Investment Business Act should adequately address these issues.

104.    **Secondary Markets Regulation (Principles 25–30).** The FSC has no authority to oversee the activities of securities exchanges, other trading systems or clearing and settlement systems. However, as there is no organized market in securities in the BVI nor any trading or clearing and settlement system operating in or from the BVI, this poses no particular issue. The FSC does not expect that any of these facilities will be established in the BVI in the foreseeable future.

- 36 -

**Recommended action plan and authorities' response**

Table 3. Recommended Actions to Improve Implementation of the
IOSCO Objectives and Principles of Securities Regulation

| Reference Principle | Recommended Action | Response of Authorities |
|---|---|---|
| Principle 2 | Consider amending the legislation to require the FSC to give reasons for all non-routine decisions even when not requested.<br><br>Consider developing a more detailed conflicts policy for board members. | Under consideration. |
| Principle 3 | Increase staff resources for ongoing supervision and enforcement. | To be implemented. |
| Principle 4 | Make the detailed licensing and approval processes and requirements publicly available.<br><br>Enhance the breadth and the transparency of the consultation process. | Forms, specific requirements and checklists are made available (though not on the website) to the public. In addition, training is open to all members of the local regulated population. It is the intention to include more information on the website . Consultation process is being enhanced and a more rigorous consultation with the Mutual Funds Advisory Committee is already taking place. Consideration is being given to including application forms and the public register on the FSC website. |
| Principle 9 | The fines that may be imposed under the FSCA and Ensure that sanctions are set at a level to be an effective deterrent. | Under consideration. |
| Principle 10 | Take all necessary actions to increase staff resources for inspections and enforcement.<br><br>The completion and implementation of the new audit and compliance program should also be expedited. | Appropriate actions to be undertaken.<br><br>The audit and compliance program is finalized but cannot be implemented until the Code of Practice is issued (against which firms will be measured). Expected to be implemented end of Q1 2004. |

- 37 -

| Reference Principle | Recommended Action | Response of Authorities |
|---|---|---|
| Principle 11 | The legislative language relating to information sharing should be broadened to eliminate any need for the foreign regulator to be exercising powers and duties corresponding to those granted the FSC under the listed BVI financial services legislation. | Under consideration. |
| Principle 16 | FSC should make an assessment of the quality of the accounting principles and auditing standards applicable in a jurisdiction before approving an auditor or recognizing a jurisdiction under the MF Act. The standards and principles should be equivalent to those of the IAS. | Agree, expected end of Q1 2004. |
| Principle 17 | Mutual fund conflicts of interest should be dealt with more comprehensively. All of the relationships between the managers, administrators, other functionaries and service providers should be required to be disclosed.

Mutual funds, managers and administrators should be required to file annual audited financial statements with the FSC. Managers and administrators should also be required to file other regulatory reports.

Institute a program of regular inspections of all of these entities. | This will be a formal requirement under the prospectus requirements in proposed public fund regulations. However, currently informally a requirement through the application vetting process. Other conflicts are also dealt with in the draft Code of Practice. Reporting (financial and other) requirements are included in the draft Code of Practice. Public mutual funds are required to prepare annual accounts though not to file them; these will be a requirement in the proposed public fund regulations. Expected end of Q1 2004 (Code of Practice) and end of Q2 2004 (Proposed Public Funds Regulations). |
| Principle 18 | Impose specific requirements regarding books and records and asset segregation requirements that apply to all functionaries (managers, administrators, custodians and any other service providers) who hold BVI registered public mutual fund assets. | Agree, these are predominantly covered for managers and administrators in the draft Code of Practice. FSC has no remit over custodians or other functionaries. Expected end of Q1 2004. |

| Reference Principle | Recommended Action | Response of Authorities |
|---|---|---|
| Principle 19 | Issue prospectus regulations for public mutual funds.

Require public mutual funds to make immediate disclosure of any material changes and to make these changes known to investors in a timely fashion.

Statutory liability for misrepresentations in a mutual fund prospectus should be extended to all parties involved in preparing or authorizing the prospectus. | Agree, to be included in proposed public fund regulations, expected end of Q2 2004.

Agree, though already a requirement to notify FSC of any material changes to that information supplied at time of application, expected end of Q2 2004.

Disagree, will be difficult to determine who is responsible; ultimately the directors of the fund are responsible. |
| Principle 20 | Enact binding rules on mutual fund asset valuations and related disclosure provisions.

Prohibit public mutual funds from ceasing to redeem its securities without notification to the FSC. | Agree, for public mutual funds only; these will be included in proposed public fund regulations, expected end of Q2 2004.

Partially agree, would be prudent to require notification of any cessation as could be an indication of problems with the fund, expected end of Q2 2004. |

### C.  Summary Assessment of Compliance with the International Association of Insurance Supervisors (IAIS) Insurance Core Principles

**General**

105.    The assessment of the FSC's compliance with the IAIS Insurance Core Principles was based on: (1) a self-assessment against IAIS Core Principles; (2) relevant laws and regulations; (3) analysis of FSC practices and procedures, and (4) discussions with supervisory staff of the FSC. This ROSC was prepared as a part of the Offshore Financial Center assessment of the territory. This assessment was prepared by Mr. Tomas Power.

106.    The *IAIS Core Principles Methodology* was the standard used by the mission. The legal framework for the British Virgin Islands insurance sector is based on the Financial Services (International Cooperation) Act, 2000, (FSC Act). There is also a sector-specific law and regulations (The Insurance Act of 1994 and the Insurance Regulations of 1995). Supervision of the sector is performed by the office of the director: Insurance Business within the FSC. The supervisory staff of the FSC, especially the insurance director and his staff, cooperated extensively in the assessment by preparing a self-assessment against IAIS Core Principles and by making themselves available to meet with mission members at every opportunity.

**Institutional and market structure-overview**

107.    The latest available data indicate that there are 293 insurance companies licensed in the BVI. There are a total of 263 captive insurers and 241 of the captives are organized to insure U.S.-based risks.[12]

108.    The domestic insurance activity generated approximately US$40 million in premium, while the captive industry wrote over US$400 million. Approximately 95 percent of the captive business is written by single-parent captives.

109.    There are 13 insurance agents, 11 insurance brokers, 12 insurance managers, and 7 loss adjusters.

110.    The need or opportunity for business corporations to utilize risk-financing or risk management mechanisms alternative to the traditional commercial insurance markets has created the demand for jurisdictions that will authorize formation of captive insurers under "user friendly" standards. The organizer of the captive gains the advantages to his business or his tax status that may arise from his own jurisdiction's laws and the BVI gains licensing revenue and creates jobs. The availability of a captive insurer facility also adds as to the attractiveness of the BVI for other Offshore Financial Center operations. There has been a steady growth of captives world-wide in the recent past of approximately 10 percent annually. The growth rate of the BVI captives closely tracks this global growth. It was noted in discussions with the private sector (as well as by the FSC professionals) that the fixed costs applicable to a BVI-based captive offer significant savings compared to other jurisdictions seeking captives. Also, some of the major market players offering management services to captives are beginning to establish a presence in the territory. This signals a likely increase in the number of captives and not a battle for market share.

**General preconditions for effective insurance supervision**

111.    Since the beginning of formalized insurance regulation (undertaken in the nineteenth century by Elizur Wright in Massachusetts in the United States) the major concern of insurance regulation has been protection of policyholders. While such concerns are certainly important in the twenty-first century, the nature of the insurance mechanism and the

---

[12] A captive insurer is one that is organized and operated primarily to insure the other business risks of the founders of the firm. Insurance is not sold to the public at large. Often, groups of similar businesses, presumably with similar risk exposures, will organize such insurers. Captive insurers generally have comparatively low capitalization requirements compared to standard commercial insurance companies. In some jurisdictions, capital does not have to be paid in but can consist of letters of credit or other types of instruments.

business of insurance have undergone fundamental changes in both scope of services and breadth of markets.

112.    The International Association of Insurance Supervisors has recognized the preconditions for effective insurance supervision through the promulgation of the Core Principles. We have undertaken a comprehensive discussion and assessment of each of the Core Principles and we have noted the conformance of the BVI to them.

113.    Generally, effective insurance supervision requires the existence of an agency charged clearly with the regulation of the business of insurance, such agency having sufficient independence and professional staff and resources in order to undertake its obligations. The mission of the insurance supervisory agency is the monitoring of the financial condition of insurers in order quickly to detect situations that may, presently or prospectively, prove hazardous or injurious to policyholders or the public; monitor compliance with applicable laws; and maintain an orderly, transparent and competitive marketplace. This organization also requires a statutory mandate clearly delegating to it such powers as are necessary to execute its mission ably and rapidly. The agency must have appropriate standards for licensing of those involved in the broad insurance industry and ongoing monitoring of the fitness and capacity of market players. There must be prudential standards governing the actual operations and financial condition of insurance firms and opportunity for the supervisory authority to assess the performance of the various firms and take swift remedial actions where appropriate. The business of insurance being in many ways an international enterprise, there must be concerted efforts of the supervisor to cooperate with and share information with other organizations.

**Effective supervision of captive insurers**

114.    Prudential rules for captive insurers often differ in material respects from those applicable to insurers marketing for the general public. However, these differences ordinarily pertain only to recognizing the fundamental differences between the two types of organizations and not to the necessity for monitoring solvency and assuring that proper care is taken in monitoring investments, asset and liability matching, and sufficiency of reserves.

115.    At first glance, the need for regulatory oversight of captives may seem unnecessary in view of the fact that the "policyholder" is also the owner of the firm and the person whose interests are at stake. However, in many cases, the type of coverage applicable is liability insurance. In liability insurance, even though the tortfeasor, for example, is the insured and the obligation of the insurance company is to indemnify the insured for his losses (for example, having to pay a liability judgment) there is always a third-party beneficiary—the person damaged by the act of the insured.

116.    While insurance attorneys may argue about the duty that an insurer owes to a third-party beneficiary, the duty of the insurance regulator clearly is to adopt standards that will maintain confidence that insurance companies can be expected to have the ability to meet their contractual obligations, irrespective of the ownership of the insurer. Also, being covered

by particular types of liability insurance is often a prerequisite to practicing a profession or trade. If the liability insurance being offered to meet that requirement is within the control of the insured through the mechanism of a captive insurer, sound public policy dictates that insurance regulators have an affirmative duty to exercise the same degree of care in supervising those types of entities that they have in supervising commercial insurance firms.

**Main findings**

117.    The BVI has enacted a modern and comprehensive statute—The Financial Services (International Cooperation) Act, 2000, (FSC Act). The sector-specific law and regulations (The Insurance Act of 1994 and the Insurance Regulations of 1995), however, have not been amended to add additional standards. While the BVI is dominated by so-called captive insurers, there is still substantial insurance business for the risks resident, located or to be performed in the BVI. The current state of the insurance law and regulations does not provide precise protections for these policyholders in establishing a formal dispute resolution mechanism. However, there is an informal system of investigating complaints and when the inspection process begins, this weakness will be addressed.

118.    The BVI does not meet all of the IAIS Core Principles, having deficiencies in Internal Controls, Corporate Governance, and On-Site Inspections. Also, the staff of the FSC charged with the responsibility of supervising the business of insurance is quite small. The director, however, is a seasoned insurance professional who has demonstrated strong capacity-building and institution-building results with admittedly limited resources. Except for the two most senior persons, the staff has limited training in insurance regulation and supervision. Recruiting and retention of qualified staff has been a problem. However, senior management of the FSC is aware of all of these deficiencies and is the process of addressing all of these issues. Moreover, the senior staff are currently training the more junior members, particularly in the area of on-site inspections. This effort, when completed, will likely address most of the material weaknesses noted because the knowledge of the industry that on-site inspections will take place, in itself, acts as an effective enforcement tool and will prompt compliance in the areas of corporate governance and internal control procedures.

119.    The main findings of the mission may be described as follows:

- The sector-specific law and regulations (The Insurance Act of 1994 and the Insurance Regulations of 1995) have not been amended to add additional standards. However, a re-draft of the law and regulations is in progress and will result in a full harmonization of those with the broad powers under the Financial Services Act.

- While the BVI is dominated by so-called captive insurers, there is still substantial insurance business for the risks resident, located, or to be performed within the BVI. The current state of the insurance law and regulations does not provide precise protections for these policyholders in establishing a formal dispute resolution mechanism. However, there is an informal system of investigating complaints and when the inspection process begins, this weakness will be addressed.

- 42 -

- The BVI does not meet all of the IAIS Core Principles—Internal Controls, Corporate Governance, and On-Site Inspections.

- The FSC should require comprehensive errors and omissions (E&O), fidelity and surety, and professional liability insurance for all intermediaries.

**Recommended action plan and authorities' response**

Table 4. Recommended Action Plan

| Findings | Follow-Up Action Plan | Response of the Authorities |
|---|---|---|
| Need for implementation of the on-site inspection process and continue training of staff. | Manuals have been completed; train staff on use; field-test; possible technical assistance in conducting initial inspections and in other capacity-building programs. | Ad hoc on-site inspections of insurance managers have taken place in the second half of 2003, focusing on specific individual and groups of companies.

An on-site inspection program for Insurance Managers has been designed. Training is being provided to Insurance Division staff. The program will be introduced in the first quarter 2004. |
| Need for rules governing the operations of managers and other intermediaries that will strengthen the corporate governance and internal control procedures standards applicable in the BVI. | Assess the suitability of various IAIS Guidance notes; discuss with intermediaries and other stakeholders; and then promulgate appropriate standards. | Draft guidance notes consistent with IAIS standards to be issued. |
| Require compulsory Errors and Omissions, Fidelity and Surety and Professional Liability insurance for insurance managers, compliance officers and insurance agents and brokers based on a sliding scale of level of exposure to various hazards. | Determine appropriate types of insurance necessary; discuss with industry; assess appropriate levels of exposure; promulgate requirements. | A current proposed amendment to the Insurance Act, 1994 includes the requirement that the Insurance Manager, Agent, Broker or Insurance Intermediary have in force Professional Indemnity insurance, for such amount as may be prescribed in the Regulations. |
| Revise the Insurance Act and Regulations in order to harmonize them with the increased authority of the FSC. | Prepare appropriate draft language and explanations; submit to legal council; table law. | Draft amendments to the Insurance Act, 1994 and Insurance Regulations, 1995 have been prepared. They are currently being further amended to ensure harmonization with the Insolvency Amendment Act, 2003. It is expected that the amendments will take effect in the first half of 2004. |

- 43 -

### D. Summary Assessments of Compliance with the FATF Recommendations for Anti-Money Laundering and Combating the Financing of Terrorism

**Introduction**

120.    This Report on the Observance of Standards and Codes for the FATF 40 Recommendations for AML and 8 Special Recommendations Combating the Financing of Terrorism was prepared by a team composed of Pramita Moni Sengupta, Legal Department, IMF, Marie-Christine Dupuis, United Nations Global Program Against Money Laundering, and Atle Roaldsøy, Ministry of Justice, Norway, an independent AML/CFT assessor (IAE), who was responsible for the assessment of the effectiveness of criminal justice measures and effectiveness of implementation of preventive measures in financial sectors that are vulnerable to money laundering but are not macro-relevant.

121.    The report provides a summary of the level of observance with the FATF 40+8 Recommendations and provides recommendations to strengthen observance. The views expressed in this document are those of the assessment team and do not necessarily reflect the views of the Government of the BVI or the Executive Board of the IMF.

**Information and methodology used for the assessment**

122.    The assessors reviewed the relevant AML/CFT laws and regulations, and supervisory and regulatory systems, in place to deter money laundering and financing of terrorism among banking, insurance and securities, as well as for trust and company service providers, which in the BVI are macro-relevant and vulnerable to money laundering. The IAE reviewed the effectiveness of implementation for lawyers, accountants, and money remitters that are vulnerable to money laundering but not macro-relevant, as well as the capacity and implementation of criminal law enforcement systems.[13] The assessment is based on the information available at the time it was completed in November 2002.

**Main findings**

123.    As a major financial center and dominant place of registration for international business companies, and as a possible transshipment corridor for the trafficking of cocaine from producer countries to the south and consumer countries to the north, the BVI is vulnerable to ML and FT.

124.    An adequate legal framework has been established to criminalize ML and FT, to facilitate international cooperation in ML and FT matters, and to provide for confiscation and forfeiture of assets associated with ML and FT. The Proceeds of Criminal Conduct Act (PCCA) is the primary instrument for criminal provisions and confiscation. International

---

[13] Aspects of the assessment for which the IAE is responsible are marked in *italics*.

cooperation in criminal matters is encompassed by the Criminal Justice (International Cooperation) Act (CJIC) and the Financial Services (International Cooperation) Act (FSIC). Financing of Terrorism is addressed by Two Statutory Instruments No. 3366 in 2001, The Terrorism (United Nations Measures) (Overseas Territories) Order, and No. 1822 in 2002, the Anti-Terrorism (Financial and Other Measure) Overseas Territories), which address the major requirements for FT under the 1999 United Nations Convention for the Suppression of Financing of Terrorism.

125.    The BVI ML criminal provisions are generally consistent with the Vienna and Palermo Conventions, and FT is criminalized consistent with the International Convention for the Suppression of the Financing of Terrorism. The criminal provisions for ML are not extensively used for prosecution because most ML evidence is provided for foreign prosecutions where, frequently, the cases are stronger and there are more resources to conduct complex investigations and prosecutions.

126.    Confiscation of proceeds from criminal conduct, including direct and indirect benefit derived from money laundering, and provisional measures for freezing of assets are adequate. However, the forfeiture provisions applying to property laundered and instrumentalities of ML are not clearly defined in the law outside of the context of narcotics, and a relatively short list of relevant crimes. There are specific provisions for the freezing, restraint and forfeiture of assets used to finance terrorism or intended to be used to support terrorist activities, but the law does not provide specifically for forfeiture of all property laundered and instrumentalities associated with an ML offense.

127.    The PCCA established the Reporting Authority (RA) as the FIU responsible for the receipt and processing of disclosures of suspicious financial transactions that are received in the form of Suspicious Transaction Reports (STRs). The RA is a statutory body with limited primary powers to receive STRs and to disseminate these to law enforcement both locally and abroad. The RA mainly derives its financial intelligence and investigative powers from its members, who are the managing director of the Financial Services Commission, the head of the Police Financial Investigations Unit of the Royal Virgin Islands Police Force (Police FINU)[14] and a Senior Crown Council from the AGC. It appears that the main financial intelligence analysis and subsequent investigations required are conducted on an integrated basis by the Police FINU. The structure, while clearly working at present, is not formalized and the scope of the RA's mandate is therefore somewhat unclear, particularly how the tasks and powers are divided between the RA and the Police FINU. *The lack of a clear distinction between the responsibilities and mandates of the RA and Police FINU may pose some problems, as more STRs are generated. Although the blurring of functions might have its practical advantages, it could be argued that the present arrangement might interfere with principles of independence and professional secrecy.*

---

[14] The acronym FINU is used to avoid confusion with Financial Intelligence Units or FIUs.

- 45 -

128.    Suspicious transaction reporting is a voluntary/defensive requirement under the PCCA, i.e., a regulated person can file an STR as a defense against a charge of ML, which may be the reason for the relatively low numbers of STRs filed for the size of the financial sector. The RA has no systematic contact with the reporting institutions, but they do attend a number of meetings and issue alerts from time to time on scams or attempted fraud schemes. While the current system has been sufficient for generating STRs for obviously suspicious transactions and activities, there may be some gaps in filing of reports for which the situation is questionable, but the reporting party has refused the transaction rather than file an STR. On a systemic level, opportunities for detecting suspicious or unusual activities in this vein may be lost. The law does not provide for the RA or other competent authority to order blocking or freezing of transactions administratively when an STR is filed.

129.    The absence of detailed statistics that are adequately broken down makes it difficult for the authorities to derive information of either a more general nature or with more strategic value. Thereby, the authorities lose a possibility for feedback to the reporting institutions, and they are also hampered with regard to identifying areas of concern and potential improvement in connection with the reporting system. The BVI authorities have been satisfied with the implementation and effectiveness of the voluntary reporting of suspicious transactions. The number of reports—and information given on their use—might indicate that there is a need for a mandatory reporting system, wherein the law and regulations would mandate STRs' filing when certain objective criteria are met. Mandatory reporting, established by statute, is generally regarded as an important measure for protecting the financial industry from being misused for money-laundering purposes.

130.    *As a general matter, the Police FINU has responsibility for investigating all financial crimes, including money-laundering offences.* Reports on the financing of terrorism are to be reported to the governor, who provides the information to the AGC for action. The AGC are vested with prosecutorial responsibility and for providing mutual legal assistance from formal international requests and mutual legal assistance treaties (MLAT)s.

131.    *Because of the BVI's dominant role in the formation of international business companies, the Police FINU spends considerable time in executing mutual legal assistance.* As a consequence, domestically initiated investigations are few. Doubtlessly, the AGC and the Police FINU are well capable of conducting money-laundering investigations, but resources are scarce and the number of domestic cases very limited. The number of staff clearly puts limitations to the possibility of undertaking in-depth investigations both in relation to domestic and international cases. The investigative powers available seem generally adequate. The authorities are currently reviewing the legal framework to possibly enhance the scope and effectiveness of investigative tools. Targeted statistics related to law-enforcement activities, including freezing, seizing, and confiscating of the proceeds of crime, should be developed.

132.    *Some statistics on law-enforcement activities in this area is available, but they are not comprehensive. Some statistics on seizures are developed by the FINU for internal purposes. According to information provided by the authorities, BVI has assisted foreign authorities in*

*the freezing of substantial values over the last decade. The substantial number of requests for assistance strongly indicates that the present staffing of the FINU is not sufficient to take on a more active approach with regard to ML/FT cases. The nature of these crimes is inherently concealed, and sufficient, and qualified manpower, as well appropriate technical means, are crucial in order to successfully reveal, investigate, and prosecute the cases.*

133.    The authorities have taken positive step in proposing the formation of the Financial Investigative Authority (FIA), which is expected to be a separate agency staffed from members seconded from the Police FINU, customs, tax, and civil service and the AGC. As part of the FIA, there will be a need for some *ad hoc* powers to bring in expertise, such as forensic accounting, as necessary for deeper investigations. The proposal envisages that FIA will be independently funded and internally controlled, but with a steering committee from the parent agencies and the governor's office. It is expected that the FIA will have powers of the police and customs, and other powers as may be necessary. *These powers should be expressly delineated in the enabling legislation forming the FIA. Although the proposed FIA will be a hybrid of financial intelligence analysis and investigative functions, there should be clear procedures for distinguishing the financial intelligence analysis and the transformation of the intelligence into investigative evidence that is admissible in court proceedings. At minimum, the FIA's internal procedures should have provisions to reduce potential conflicts of interest among the various bodies. An important dimension is the autonomy and integrity of the new unit. The relationship between the RA and the FIA must be clearly regulated, taking into account their partially different tasks and the need for limiting access to certain types of agency-specific information.*

134.    International cooperation and provision of mutual legal assistance appear to function effectively. The BVI authorities have taken the need for provision of mutual legal assistance seriously and have implemented a number of efforts for enhanced international law enforcement cooperation. The BVI laws allow for broad exchanges of information, both for investigations and prosecutions, and for regulatory matters, although requiring dual criminality for the provision of evidence and records. The PCCA specifically provides for the enforcement of external confiscation orders for money laundering. Amendments to mutual legal assistance laws are contemplated, in order to widen the scope of assistance and to authorize the police to interrogate witnesses directly under a mutual legal assistance request. *There are a substantial number of requests for assistance from foreign counterparts, as reflected in the available statistics. The statistics compiled are limited to the number of requests in different categories and do not highlight the efforts put into their execution. Many of the requests are handled by the police themselves (company enquiries and checks). Work connected to requests for assistance occupies a major part of the capacity of the Police FIU. The Head and staff of the unit, as well as the AGC, seem very competent in this field and have accumulated considerable experience.*

135.    There is some strain on the limited number of staff to thoroughly follow up all mutual legal assistance requests in desired detail. The importance of BVI as a financial center strongly suggests that the number of requests for mutual assistance in criminal matters will remain at a high level. As money-laundering operations often will involve several

- 47 -

jurisdictions, the BVI's role must be considered to be of great significance in the global efforts to fight money laundering and the financing of terrorism.

136.    The general framework for AML compliance is contained in the Anti-Money Laundering Code of Practice (AMLCP) and the guidance notes that provide for customer due diligence measures (KYC), record keeping, ongoing monitoring of relationships and transactions, suspicious transaction reporting, and imposing minimum requirements for internal procedures, controls, and audit. The AMLCP specifically incorporates the guidance notes as a requirement for which sanctions apply, thus making these mandatory. The AMLCP and guidance notes provide sufficiently detailed legal requirements and clear instructions for reporting persons to establish effective internal controls and achieve compliance. The AMLCP and guidance notes apply consistently across a broad number of financial intermediaries that includes banks and trust companies, insurance businesses, mutual funds and mutual fund managers, company managers (either registered agents or trust companies), money remitters, and any activities in which money belonging to a client is held or managed by an attorney or accountant. Of ongoing concern is that the Development Bank of the British Virgin Islands is not subject to the AML/CFT requirements in the AMLCP and guidance notes, despite accepting deposits.

137.    The FSC is the supervisory authority vested with the responsibility for ensuring adherence to the AMLCP and the guidance notes. The FSC has direct prudential supervisory authority, including assessment of fit-and-proper tests for management of banks and trust companies, insurance, mutual funds and mutual fund managers, and administrators. Currently, money remitters are not licensed and supervised. The FSC has on-site inspection powers as well as broad powers for approval of compliance officers. The FSC is in the process of completing the necessary inspection manuals and procedures needed to exercise its full range of supervisory functions. The Joint Anti-Money Laundering Coordinating Committee (JAMLACC) is the committee charged with promoting AML guidance, training, and education, and is comprised of a cross-section of public and private sectors' representatives. The JAMLACC played a key role in the enactment of the AMLCP and prescribed the guidance notes, but it is not active at present.

138.    With respect to implementation, the most important tool, on-site supervision, has not been fully implemented, although there are visits to regulated persons, and questionnaires for compliance are required as part of these visits. The relatively slow implementation is a notable weakness and is evidenced in the minimal implementation of AML/CFT measures in nonprudential sectors of trust and company service providers, *money remitters, lawyers, and accountants.* Even in the prudential sectors of banking, insurance, and mutual funds and mutual fund managers, transaction testing and file verification are not fully implemented. The progress in implementation in the trust and company service provider sector, and for attorneys and accountants, is a concern that requires accelerated action by the FSC. *The failure to address money remitters in the supervisory measures is also of serious concern.* The FSC recognizes these issues and is actively engaged in various projects that are intended to address the identified weaknesses and gaps.

- 48 -

139.    Nevertheless, in their outreach efforts, the FSC has found a high-level awareness and desire to achieve compliance across sectors, and that industries have been responsive to adopting internal controls policies and procedures, as well as adhering to KYC requirements. Of continuing concern is the reliance on eligible introducers to conduct KYC on behalf of BVI financial intermediaries. Verification is needed to ascertain whether the supervisory controls in place are sufficient to test whether the eligible introducers are meeting the statutory requirements to qualify under the AMLCP for performance KYC requirements. *Money remitters are not subject to licensing and supervision, so implementation through supervisory measures is not completed as to these entities.*

140.    Implementation must be completed and on-site inspections should be regularly used to verify the compliance programs for AML/CFT. Specific transaction testing should be implemented as part of both on-site inspection and as a requirement for internal audit testing by reporting persons. Supervisory controls should pay particular attention to adherence to KYC requirements by company service providers.

**Summary assessment against the FATF Recommendations**

141.    BVI has moved forward with a legal framework that is consistent with the FATF 40+8 Recommendations; however, implementation has been slower, particularly in the supervisory area.

Table 5. Recommendations and Actions

| Reference FATF Recommendation | Recommended Action |
|---|---|
| **40 Recommendations for AML** | |
| Provisional measures and confiscation (FATF 7) | The PCCA or other legislation should provide for a specific forfeiture provision that allows for forfeiture of all property laundered and instrumentalities associated with an ML offence.<br><br>Authorities should consider statutory authority for administrative bodies, such as the FSC or the RA, to identify or freeze assets that are suspected of being ML or FT assets for a short period a time. |
| General role of financial system in combating ML (FATF 8-9) | Regulation of independent money remitters should be completed, including licensing and supervision procedures. |
| Customer identification and record-keeping rules (FATF 10-13) | It is advisable that the FSC enhance on-site inspections, particularly in mutual fund, insurance, and banking to include file sampling for KYC and beneficial owner information . Inspection procedures and manuals should be completed. Special attention should be given to assessing whether beneficial ownership information is regularly obtained and sufficient, particularly when due diligence is being carried out by eligible introducers. |
| Increased diligence of financial institutions (FATF 14-19) | Consideration should be given to enacting a mandatory suspicious transaction reporting system.<br><br>Specific authority of the RA or FINU to obtain additional information after an STR is filed should be considered. Alternatively, consideration should be given to empowering the FSC to obtain additional information in support of STRs. |
| Measures to cope with countries with insufficient AML measures (FATF 20-21) | The FSC should issue specific guidelines on establishing relationships or transactions with countries with insufficient AML measures. |
| Implementation & role of regulatory and other administrative authorities (FATF 26-29) | Implementation of on-site inspections is required immediately. |
| Administrative Cooperation – Exchange of information relating to suspicious transactions (FATF 32) | The authority of the RA or the Police FIU to obtain additional information from financial institutions in follow-up to STRs should be specified by law or regulation.<br><br>There should be clear procedures for distinguishing the financial intelligence analysis and the transformation of the intelligence into investigative evidence that is admissible in court proceedings. |
| **Enforcement powers and sanctions** | Vacancies for positions with the FSC's Division for Legal and Enforcement should be filled as soon as reasonably practicable. Compliance levels within the financial sector cannot be properly monitored or ascertained until staffing is complete and staff is properly trained. Staffing therefore needs to be more robust to effectively implement the requirements of the AML/CFT legal framework. |
| **Integrity standards** | The fit-and-proper tests should be applied to mutual funds and mutual fund managers, and to money remitters, when the specific sectoral acts are amended/enacted. |

- 50 -

| Reference FATF Recommendation | Recommended Action |
|---|---|
| Suspicious transaction reporting | Consideration should be given to enacting a mandatory suspicious transaction reporting system.<br><br>The RA should keep statistics on STRs received, STRs analyzed and disseminated, STRs resulting in investigation, and prosecution or convictions. |

**Authorities' response**

142.    With reference to the recommended actions mentioned above, it is intended that they will to a large extent be fulfilled upon the enactment/amendment of key legislation as described below.

143.    **Provisional measures and confiscation.** The Proceeds of Criminal Conduct Act (PCCA) (1997) provides generally for the making of confiscation orders in relation to property that is income or profit derived from the proceeds of crime. There is no provision contemplated for the specific forfeiture of instrumentalities associated with a money laundering offence within the intended amendment to the PCCA.

144.    The Financial Investigation Agency Act 2004 does in fact provide for the Reporting Authority to identify and freeze assets for a short period of time (five days). The section, 4(2)(c), contemplates such action when it is as a result of a request from a foreign investigation agency or law enforcement authority including the Commissioner of Police.

145.    **General role of financial system in combating money laundering.** The proposed Money Services Act which would provide inter alia for the regulation, supervision and licensing along with the application of the relevant fit and proper tests should be enacted within the second quarter of 2004.

146.    **Increased diligence of financial institutions.** There are no specific statutory provisions which provide for a system of mandatory statutory reporting. The PCCA provides for a voluntary system. The recently enacted FIA Act however specifically provides (Section 20) that the FSC shall issue guidelines governing suspicious transaction reporting procedures.

147.    Section 4 (2) (b) of the FIA Act allows the agency to direct any person to refrain from completing a transaction for a period of seventy- two hours subsequent to the receipt of a disclosure. Whilst this section does not specifically state that additional information could be obtained, the wide powers of the Agency generally and the import of the subsection allow for further and more detailed information to be obtained.

148.    **Administrative cooperation—exchange of information relating to suspicious transactions.** FIA Act Section 4 (2) (d) allows for the Agency to require the production of any information that it considers relevant to the performance of its functions. This would

necessarily include the obtaining of additional information from financial institutions as a follow up to STRs.

149.    The FIA Act does not establish procedures for distinguishing between financial intelligence analysis and the transmittal of the intelligence into investigative evidence but such guidelines do in fact exist in practice and section 5 of the FIA Act provides for the issuing of directions as to the policy to be followed by the Agency in the performance of its functions.

150.    **Integrity standards.** The Mutual Funds (Amendment) Act has been drafted and has a time frame for enactment within the first quarter of 2004 and would provide for the relevant fit and proper tests to be applied.

### III.    REGULATORY ARRANGEMENTS OF PARTICULAR CONCERN IN THE OFC CONTEXT

#### A.    Oversight of Companies and Trusts Service Providers (CSP)

**IBCs**

151.    The regime for registering and maintaining IBCs in the territory meets and in many ways exceeds best practices, largely because IBCs have to be registered (incorporated) by registered agents who are subject to regulation supervision, including for fit-and-proper standards, by the FSC, and who have due diligence responsibilities under the AMLCP and guidance notes.

152.    As with most corporate legislation, there are no stated restrictions on who can beneficially own an IBC. Therefore, an IBC may ultimately be beneficially owned by the beneficiary or beneficiaries of a trust. However, the registered agent is subjected to customer due diligence policies, including identification requirements, under the AMLCP and guidance notes, including identification of beneficial owner.

153.    The IBCs are permitted to issue both registered or bearer shares, and the registrar of corporate affairs is not able to give precise figures on how many IBCs do so. While bearer shares are often used for legitimate purposes, such as reducing difficulty and cost in transferring ownership of assets to heirs, and while other jurisdictions (including onshore jurisdictions) use bearer shares for legitimate purposes, the use of bearer shares by criminals to defeat attempts to trace beneficial owners of underlying assets has resulted in considerable criticism of the practice in international fora. For this reason, and after considerable consultation with the industry, amending legislation to the IBCA has been drafted to implement the immobilization of bearer shares. The IBCA will then require that bearer shares be deposited with *authorized custodians* or with *recognized custodians.* An amendment to the BTCA to define and establish *authorized custodians* will consequently have to be undertaken. *Recognized custodians* are persons not licensed under the BTCA and not resident in the BVI, but based in countries not subject to sanctions by the FATF, and will be subject to prudential and AML regulation. Industry representatives have largely accepted the rationale for introducing the proposed amending legislation, in part because there will be a

two-year phase-in period for existing companies. While it is not clear exactly how this will improve beneficial ownership identification (shares could still be held in trust by trustees in other jurisdictions not subject to the jurisdiction of the BVI), this requirement appears to satisfy concerns of the FATF and OECD, among others.

154.    Under the IBCA, a company must maintain a register of shareholders and may maintain a register of directors. Both the register of shareholders and, if it exists, the registrar of directors must be kept at the registered office. The IBCA allows for directors to be either individuals or companies; it also does not prohibit nominee directors, and the disclosure of information about the true identity of directors to the registrar is optional, although such information must be kept by the registered agent. If information about directors and officers is disclosed to the registrar, it is publicly available. Again, the registered agent has customer due diligence requirements under the AMLCP and guidance notes.

**CSPs**

155.    All CSPs are subject to regulation and supervision by the FSC. Such oversight largely meets industry best practices as provided in the OGBS Statement of Best Practices. An ongoing project of monitoring and measuring the division's policies against the methodology paper, issued by the OGBS as a follow-up to their statement of best practice, is currently underway in the division.

156.    Under the FSC Act, all CSPs are required to appoint a compliance officer, and the FSC has issued guidance notes for compliance officers. In addition, the AMLCP requires all CSPs to appoint a money-laundering reporting officer to receive and take appropriate action on internal suspicious transaction reports. Depending on the size of the CSP, the same person may undertake both these functions.

157.    The BVI, via the FSD, began exercising registration and surveillance functions over CSPs since the passage of the BTCA and CMA. Licenses must be renewed every year. In part because of the importance of the IBC sector to the territory, the BVI has made supervision of CSPs a priority. Unlike with respect to banking, insurance, and securities sectors, the FSC has been conducting on-site inspections of the CSPs for the past three years. These inspections have been based on detailed questionnaires and have included information on continuing to meet fit and proper requirements and on the soundness of financial position. A general overview of business has also been included to reach an overall judgment of the general quality and level of service and of the nature of clients. In addition, random checks of files have been undertaken, including to cover requirements under the AMLCP and guidance notes. CSPs covering over 70 percent of total business have been subject to such on-site inspections, which appear to be relatively well conducted.

158.    However, particularly in view of very large IBC client base, and in particular the need to assess compliance with the OGBS statement of best practice (including that action can be taken where there is evidence of noncompliance); there is a need to complete inspections of all CSPs, and to draft a regular compliance and on-site inspection program. Also, inspections

could be more detailed and structured. The staff in the Banking and Fiduciary Services Division of the FSC is well trained and largely abreast of activities in the industry, although there is a general need for additional consultation, but continued training and attendance by staff of international fora to keep abreast of pertinent regulatory developments is a high priority. All staff members have attended the available annual international seminars on company and trust services providers. In this regard, it should also be noted that the FSC is hosting a training seminar for the Caribbean Group of Banking Regulators in 2003. The Divisional budget for 2003 provides for the creation of two further regulators' posts, which will increase the staffing capacity. The Division also runs a summer internship program, which provides exposure and potential employment opportunities to BVI students. Industry representatives have expressed a high regard for the integrity and dedication of the Division in the execution of its statutory duties.

159.    The BVI Association of Registered Agents (ARA), which includes all but one registered agent (who is expected to join shortly) has issued a Code of Conduct to provide guidance on minimum standards that members should adhere to regarding the relationships with clients, relationships with the BVI authorities, and client acceptance procedures, transfer of clients between registered agents. There is also a peer review and disciplinary system to ensure compliance. Greater contact and consultation by the FSC and the ARA would be helpful. Consideration should be given to engage with the CSP's industry (perhaps through the offices of the ARA) and auditing firms, with a view to introducing a staff secondment program, both to and from the private sector. Although a modus operandi will have to be established to overcome potential conflicts of interest and confidentiality issues, the cross-pollination of skills and perspective will deepen the levels of understanding and cooperation, to the benefit of both the regulator and the industry.

160.    Although many CSPs have professional indemnity insurance it is not required. Such insurance should be required for licensing.

### B.    Cross-Border Cooperation and Information Sharing

161.    Section 29 of the FSC Act sets out restrictions on the disclosure of information disclosed to the FSC and its organs, and the circumstance in which these restrictions do not comply. By way of exception to the restrictions on disclosure of information by the FSC, section 29(2)(e) of the FSC Act allows disclosure when it is made for the purpose of enabling or assisting a foreign regulatory authority, including a trading or a security or exchange authority, in a country or jurisdiction approved by the FSC board in discharging duties or exercising powers corresponding to those under the FSC Act, any subsidiary legislation made there under, or any financial services legislation. The authority receiving the disclosure will, however, be required not to transmit any information, document, record, statement or thing disclosed to any other person except with the prior consent of the FSC board.

162.    These provisions allow the FSC and its organs to provide assistance to foreign regulatory authorities. As a matter of practice, the FSC makes a distinction between routine informal inquiries and more formal inquiries for legal or regulatory assistance, such as

requests for information or documents in connection with an investigation into regulatory or criminal violations. The latter are dealt with by the FSC and its organs in accordance with the provisions of the Financial Services (International Cooperation) Act, 2000 ("the FS(IC) Act") which sets out criteria to be taken into account by the FSC in deciding whether to exercise compulsory powers to obtain information or documents not in its possession, in order to provide the assistance requested. The FS(IC) Act also allows the FSC to require the foreign regulator to give certain written undertakings, such as to provide corresponding assistance when requested by a BVI authority, and to make a contribution toward the costs of the exercise of the compulsory powers. In addition, the FS(IC) Act prescribes the procedure for obtaining information by compulsion and provides certain safeguards in connection with the process. The Banking and Fiduciary Services Division, which carries out the day-to-day supervision of CSPs, has received and responded to 43 routine informal inquiries over the last two years form various foreign agencies. Most of the inquiries concerned IBCs, and not the CSPs themselves.

163.    The extent to which the BVI director of banking and fiduciary services can hold confidential information received from a regulating authority in another jurisdiction will depend on the law in that jurisdiction and the conditions attached by the foreign regulating authority sharing the information. In addition, section 29(1) of the FSC Act provides that any information and disclosures made to the FSC or any of its organs and representatives in the course of discharging any function or duty or exercising any power under applicable legislation, is privileged and must not be disclosed except as provided in the circumstances enunciated in section 29(2) of the FSC Act.

**Authorities' response**

164.    The results of the project of monitoring and measuring the FSC's policies against the OGBS Good Practices are that the FSC is compliant in all respect with the exception that the FSC does not require all CSP to have professional indemnity insurance and external auditors do not have the statutory authority and protections necessary to report to the competent authority. The FSC has since drafted a policy guideline requiring all CSP to have professional indemnity insurance and a draft amendment to the BTCA will place statutory responsibilities and provide protection to external auditors when reporting to the FSC.