# EXHIBIT C

**FSA**

## FSA proposes greater disclosure of 'Contracts for Difference'

FSA/PN/114/2007
12 November 2007

The Financial Services Authority (FSA) has today published a consultation paper proposing greater disclosure of significant 'economic interests' in a company's shares held through derivatives such as Contracts for Difference (CfDs).

The consultation paper sets out thorough and detailed analysis of evidence, which shows how potential market failures could occur from using CfDs on an undisclosed basis to influence corporate governance and build up stakes in companies. These failures, although not widespread, need to be addressed to ensure market confidence and efficiency are maintained.

The paper proposes two alternative approaches to securing greater disclosure.

The first approach would strengthen the current disclosure regime by requiring a disclosure of any CfDs written in reference to 3% or more of total voting rights attached to a company's shares unless it was clear that:

- the CfD holder could not exercise or seek to exercise voting rights and had made a clear statement to that effect; and
- there were no arrangements or understandings in relation to the potential sale of the underlying shares by the CfD holder.

The majority of CfDs are expected to fall within this 'safe harbour', removing the need for disclosure.

In addition, this proposal would enable companies to request a notification if they believed a CfD holder had an economic interest of 5% or more of the company's shares regardless of 'safe harbours'. It would also make clear the responsibilities of a CfD holder to ensure that any statements made about voting rights in a company are clear and not misleading. The proposals would also make it harder for CfD holders to build up significant stakes in companies without disclosure. The cost of implementing such targeted disclosure is expected to be minimal.

The alternative approach is a general disclosure regime which would achieve the same objectives by requiring CfD holders to reveal all economic interest of stakes of 5% or more in a company's shares. This would be broadly equivalent to extending the Takeover Panel's current regime in an offer period. The total direct cost of implementation could be about £20-50 million with potential wider costs to the CfD and equity market as a whole. While this regime would cost more it would entail simpler rules.

Sally Dewar, FSA Director of Markets, said:

"This is not a clampdown on CfDs but a means, following extensive research, of addressing the concerns about their use on an undisclosed basis. While the behaviour that concerns us is not widespread, it is important enough to require a tightening of the existing regime to ensure fair and orderly markets.

"Our goal is to provide an effective and proportionate disclosure regime that works for all involved, and sustains market confidence and efficiency."

Any rule changes would only apply to CfDs relating to UK shares admitted to trading on a regulated or prescribed market. This includes shares admitted to the regulated markets of UK Recognised Investment Exchanges and the Alternative Investment Market (AIM).

The paper also details how the proposed changes would work with existing Takeover Panel rules on disclosure.

The consultation period will last for 3 months and end on 12 February 2008.

### Notes for editors

1. CP07/20: Disclosure of Contracts for Difference - is available on the FSA's website.

2. A CfD is a contract between two parties where the buyer will receive from (or pay to) the seller, the difference between the value of a company's share at expiry and its value at the time of the contract. The buyer could also have the option to buy the shares at the later date although the CfD does not confer a right to buy them. The holder of a CfD on a company's shares has an economic interest in the company, without direct ownership of shares in the company.

3. CfDs currently fall outside the scope of the FSA's disclosure and transparency rules (DTR) unless they give access to voting rights attached to shares held as hedge by a CfD holder or a legal right to acquire the shares on expiration of the contract.

4. The Takeover Panel's current regime requires that if, during an offer period, a person has an interest, including an economic interest, in 1% or more of any class of relevant securities of a company, then all dealings in any relevant securities (including long derivatives and options) of that company by that person must be publicly disclosed.

5. In 2006, the FSA consulted on the Transparency Directive for listed companies and explained that responsibility for overseeing the Major Shareholders Notification Regime (MSN) would move from the (then) Department for Trade and Industry to the FSA. The FSA also said at the time that the (then) Companies Bill would give it powers to extend the regime beyond the disclosure of 'ownership' of significant equity positions to requiring more disclosure.

6. The FSA regulates the financial services industry and has four objectives under the Financial Services and Markets Act 2000: maintaining market confidence; promoting public understanding of the financial system; securing the appropriate degree of protection for consumers; and fighting financial crime.

7. The FSA aims to promote efficient, orderly and fair markets, help retail consumers achieve a fair deal and improve its business capability and effectiveness.

More **Press releases**:

2007    2006    2005    2004    2003    2002    2001    2000    1999

Legal information | Freedom of information | Privacy policy | Data protection | Contact us

© Financial Services Authority | Page last updated 12/11/07

Consultation Paper

# 07/20 ***

Financial Services Authority

# Disclosure of Contracts for Difference

## Consultation and draft Handbook text

November 2007



# Contents

| 1 | Overview | 3 |
| 2 | CfDs on UK Equities | 11 |
| 3 | Potential Market Failures | 20 |
| 4 | Market Failure Analysis – The Evidence | 27 |
| 5 | Overall conclusions and policy options | 40 |

**Annex 1:** Cost Benefit Analysis of the proposals set out in the Consultation Paper

**Annex 2:** Literature Review on the effects of Major Shareholder Notification

**Annex 3:** Study on Major Shareholder Notifications

**Annex 4:** Survey of leading investment banks and CfD market participants

**Annex 5:** CFD Trading Activity during offer periods

**Annex 6:** List of Questions

**Annex 7:** Compatibility Statement

**Appendix 1:** Draft handbook text – amendments to the Disclosure and Transparency Rules

© The Financial Services Authority 2007

The Financial Services Authority invites comments on this Consultation Paper. Comments should reach us by 12 February 2008.

Comments may be sent by electronic submission using the form on the FSA's website at (www.fsa.gov.uk/Pages/Library/Policy/CP/2007/cp07_20_response.shtml).

Alternatively, please send comments in writing to:

Simon Cottee
Policy – Primary Markets
Financial Services Authority
25 The North Colonnade
Canary Wharf
London E14 5HS

Telephone:   020 7066 2248
Fax:              020 7066 2249
E-mail:         cp07_20@fsa.gov.uk

It is the FSA's policy to make all responses to formal consultation available for public inspection unless the respondent requests otherwise. A standard confidentiality statement in an e-mail message will not be regarded as a request for non-disclosure.

A confidential response may be requested from us under the Freedom of Information Act 2000. We may consult you if we receive such a request. Any decision we make not to disclose the response is reviewable by the Information Commisioner and the Information Tribunal.

Copies of this Consultation Paper are available to download from our website – www.fsa.gov.uk. Alternatively, paper copies can be obtained by calling the FSA order line: 0845 608 2372.

# 1 Executive summary

## 1. Overview

### Background and purpose

1.1.    In our March 2006 Consultation Paper on the implementation of the Transparency Directive[1] (TD), we explained that responsibility for overseeing the Major Shareholders Notification regime (MSN) would pass from the (then) DTI to us. This meant the (then) Companies Bill would give us powers to extend the regime beyond the disclosure of 'ownership' of substantial equity positions to require the disclosure of substantial 'economic interests' in shares held through derivatives such as Contracts for Difference (CfDs). We invited respondents to consider the issue of derivative disclosure with a view to a longer-term discussion.

1.2.    As we noted in Policy Statement 06/11, there was no consensus among respondents on the need for disclosure. However, the majority encouraged us to investigate further. Given this, and the anecdotal nature of the evidence we had received, we undertook to carry out further analysis to explore possible market failures arising from the current position of (generally) non-disclosure, and the potential costs and benefits of addressing them. This paper sets out the results of our analysis and our proposals for addressing the market failures that we have identified.

### Scope

1.3.    The main focus of this paper is on CfDs. However, we are conscious of the need to ensure that any measures we introduce are framed so that they cover other financial instruments that raise the same issues. At the moment, CfDs are the instrument most widely used for holding an economic interest. The discussion in this paper is therefore presented in terms of CfDs, but this should be understood as shorthand for other derivative instruments which may have the same effect.

1.4.    We are concerned here solely with CfDs referenced to UK shares admitted to trading on a regulated or other prescribed market. This includes UK shares admitted to the

---

1    CP 06/4 *Implementation of the Transparency Directive and Investment Entities Listing Review.*

regulated markets of UK Recognised Investment Exchanges and to UK shares admitted to the LSE's AIM market. This is the group of shares for which we implemented MSN rules that are super-equivalent to the TD. For non-UK shares, we have implemented only the minimum MSN rules.

1.5.  We have not brought issues relating to a person voting equities they have borrowed within the scope of this paper. Those stock borrowing and lending issues are currently under consideration by a number of bodies, including the European Commission and, in the UK, the Takeover Panel. We shall be following these discussions closely.

1.6.  This paper focuses on long CfD positions, that is CfDs where the holder gains from a rise in the underlying share price. While we recognise that not all CfDs are structured this way, it is long CfDs that may be hedged by the underlying equity, and that are most likely to provide a link to voting rights.

## The CfD market and the UK regulatory framework

1.7.  The CfD market in the UK has grown significantly in the last five years. Current estimates suggest that about 30% of equity trades are in some way driven by CfD transactions referenced to the underlying shares. CfD holders cite leverage, the ability to go short, the avoidance of stamp duty and anonymity amongst the prime reasons for using them.

1.8.  Despite the growth in the market, CfDs mostly remain outside the regulatory framework governing disclosure. This framework exists primarily to provide to the public accurate, comprehensive and timely information about changes in major shareholdings in companies issuing shares. The current disclosure requirements are therefore referenced to direct and indirect control of voting rights attaching to a share. In the UK we have kept the previous Companies Act 1985 disclosure thresholds of 3% and every 1% thereafter in our Disclosure and Transparency Rules (DTRs). CfDs fall outside the scope of the DTRs unless specific contracts explicitly give access to the voting rights attached to shares held as hedge by the CfD writer or access to the shares themselves on expiry of the contract.

1.9.  Since November 2005 the Takeover Panel has required disclosure during an offer period of long interests, including economic interest (such as CfDs and other interests arising from derivatives) of 1% or more in the securities of a target company.

## Concerns of market participants

1.10.  Issuers and investors have raised various concerns relating to the lack of disclosure, including:

- that the lack of transparency with respect to substantial economic interests allows the use of those interests as a means of exerting influence over, or to gain control of, the voting rights attaching to the underlying shares;

- that issuers are unable to know who has significant economic exposure to their shares, and the scope that provides for potential abuse, or misleading representation, of access to voting rights; and

- that hedge funds may outflank traditional institutional investors by using economic interests to influence companies, and that some investors may be disadvantaged by investing in a market where others may have better information, such as who holds significant undisclosed economic interests.

1.11.   CfD writers and holders have been concerned that increased disclosure could make the market less efficient by introducing excessive or contradictory information. This could also damage liquidity in CfDs and therefore ultimately in the underlying equities as holders might seek to limit their holdings to avoid disclosure.

## Analysis of potential market failures

1.12.   In analysing these concerns further, we have identified three potential market failures which might arise from non-disclosure of CfDs, relating to:

- inefficient price formation;

- distorted market for takeovers; and

- diminished market confidence.

1.13.   These failures could arise for two reasons. First, they may arise because the pure economic interests that are inherent in CfDs are not disclosed. This would be most likely to result in inefficient price formation. Second, these failures could arise if there is a link between the (undisclosed) economic interests of the CfD and the voting rights that are attached to the underlying shares (which are covered by the existing MSN regime).

1.14.   We have undertaken several strands of analysis to assess whether these market failures arise in practice. These comprise:

- an evaluation of the market efficiency case for requiring disclosure of the pure economic interest of CfDs;

- a review of the literature on Major Shareholding Notification (MSN) disclosure and its theoretical impact on price formation;

- an empirical study of the actual impact of MSN disclosures on price formation;

- an extensive survey of the practices of the some of the most active CfD-writing banks and other market participants, conducted for us by PricewaterhouseCoopers (PwC) to help assess the extent to which CfDs might be substitutes for the underlying shares, and

- a study of the patterns of CfD trading inside and outside of takeover periods for selected stocks.

1.15.   We have considered a number of recent cases where CfDs have, or appear to have, been used in order to gain access to voting rights or to influence companies' corporate governance on an undisclosed basis. We have also considered the assessment made by the Takeover Panel of the changes it made to its own disclosure regime in November 2005, and regulatory developments in jurisdictions outside the UK which will require greater disclosure of derivative positions.

### Conclusions of our analysis

1.16. The main conclusions that we draw from this analysis are as follows.

#### (i) Disclosure of economic interests

1.17. Information about pure economic interests may, if disclosed, influence the pricing of the reference share. That could be the case if either (i) it was clear that holders of large CfD positions could, by virtue of their economic position, exercise similar influence over an issuer's management as the holders of votes, or (ii) the disclosure of a large position by a particular market participant was used by the market to price the shares. However, we would generally expect equity market prices to reflect information on market trades, including those in both the underlying equity and perhaps in the CfDs themselves. Overall, we conclude that the evidence that the non-disclosure of pure economic interests can create problems of inefficient price formation is mixed.

#### (ii) Voting rights: theory and practice

1.18. In relation to voting rights, our review of the academic evidence suggests that MSN disclosures are of value to the market. The literature suggests they are particularly important in the context of takeover situations, where lack of disclosure of significant holdings can discourage other potential bidders from entering a contest. Our empirical analysis of recent UK MSN data also finds that disclosures have an impact on prices.

1.19. In applying these conclusions to the issue of CfD disclosure, the key question is whether CfDs are in effect a substitute for shares so that disclosure of CfD positions would bring the same benefits to price formation, takeover situations and market confidence as MSN disclosures. This would be the case where:

- CfD positions are closed out with the underlying stock;

- and/or CfD writers vote on behalf of CfD holders where they hedge their positions with the underlying stock.

1.20. The survey carried out for us by PwC suggests that the policies and practices of investment banks writing CfDs do not generally operate in these ways. But it also demonstrates that despite the stated – and implemented - policies of investment banks, holders of CfDs do sometimes approach the writers seeking to exert influence on an undisclosed basis over voting rights attached to stock held as hedge against those contracts (it should be noted that the general policy of investment banks is not to vote shares in accordance with CfD holders' wishes).

1.21. In addition it is clear to us from a number of recent cases that CfDs have been used to exert influence and/or build up stakes in companies on an undisclosed basis and that increasingly there is a general acceptance in the market that this can be achieved through CfDs.

#### (iii) CfD activity before and during takeover periods

1.22.   Our review of trading volumes of CfDs referenced to the stock of an issuer that is the subject of a takeover bid shows that there does not appear to be a significant difference in the number of contracts written in the run-up to the offer and the number written in the one month after the offer period starts. Nor does there appear to be a significant build up of CfD activity in the months ahead of an offer period. However, the value of CfD activity does increase substantially once an offer period starts (i.e. the average size of the CfDs written goes up). On this basis, the changes the Takeover Panel introduced in 2005 appear to have addressed disclosure concerns for the most important time period.

### (iv) Regulation outside the UK

1.23.   There is some move towards greater disclosure of derivatives positions in some jurisdictions outside the EU, largely driven by concerns over takeover situations or the exercise of voting rights more generally. Some of these moves are too recent to draw any conclusions about their consequences. The experience of those regulators that have had disclosure regimes for some time does not suggest that disclosure of CfDs has had a negative effect on market growth or liquidity.

1.24.   Taking these conclusions together we take the overall view that CfDs are not in effect a substitute for the shares on a systematic basis. But there are some instances of CfDs being used in ways which the intention of the current regulatory regime is designed to catch, and that while this only happens occasionally, it is not fully caught by the requirements of the Takeover Panel regime. Specifically, we conclude that CfDs are sometimes being used, firstly, to seek to influence votes and other corporate governance matters on an undisclosed basis and, secondly, to build up stakes in companies, again without disclosure. We have therefore decided that we should take action now to address these failures. We propose to do this through increasing the disclosure requirements on CfDs either in specific circumstances or as a general requirement.

### Policy options

1.25.   The options we have been considering are to:

Option 1 – Leave the current disclosure regime as it stands;

Option 2 – Strengthen the current regime by requiring the disclosure of substantial economic interests unless the holder has taken specific steps to preclude himself from exercising influence over the underlying shares; or

Option 3 – Introduce a comprehensive regime, similar to the major shareholder notification regime, which would require disclosure by all holders of substantial 'economic interests in shares'.

1.26.   In considering these options, we have been guided by three key propositions:

* We are not against the use of CfDs to influence corporate actions and governance matters provided it is on the basis of disclosure (as would be the case for shares held directly);

- We do see some specific 'failures' of the current regime where lack of disclosure appears to be the underlying difficulty, but these are not systematic in nature; and

- Given these failures are not systematic, our preference should be for proportionate solutions that address as far as possible the more significant concerns and do not lead to requiring the disclosure of excessive or unnecessary information. We have decided that Option 1, as raised in PS 06/11, of maintaining the current regime unchanged, is not appropriate.

1.27.    On this basis, we propose a two-part response:

– first, a clear restatement of the existing regulatory regime, which we believe will make clear the extent to which certain behaviours that are causing concern are already caught by our rules; and

– second, measures designed to achieve greater disclosure of CfD positions in those circumstances where CfD holders are seeking to influence a company's management and strategy, or seeking to use CfDs as a basis for engaging in stakebuilding. To achieve that goal, we are putting forward two separate options for consultation: a package of specific targeted measures which would strengthen the application of the existing regime, and lead to enhanced disclosure in specific circumstances (we label this 'Option 2' in what follows); and a generalised disclosure regime (which we label 'Option 3').

### (i) Option 2: strengthening the existing regime

1.28.    We believe we can strengthen the existing regime in a targeted and proportionate way that would deliver precise tools for issuers to use in the specific circumstances that are of most concern to them. Option 2 would deem CfDs to have access to voting rights, and therefore require disclosure unless stringent safe harbour requirements are met, namely:

- The agreement with the CfD writer explicitly precludes the holder from exercising or seeking to exercise voting rights;

- the terms of the agreement excludes further arrangements or understandings in relation to the potential sale of the underlying shares; and

- there is an explicit statement by the holder that they do not intend to use their CfDs to seek access to voting rights.

1.29.    Interests in CfDs which do not meet the safe harbour would be aggregated with shares and other instruments which provide access to voting rights, and the combined total would be disclosable above a threshold of 3%, as is the case now for instruments with access to voting rights.

1.30.    In recognition of the fact that an issuer may want to know of a significant CfD position, even if it currently meets the legal requirements of the safe harbour, Option 2 will in addition provide a mechanism for issuers, with similar effect to s793 of the Companies Act 2006, to 'flush out' holders of economic interests above 5% in a targeted and precise way – this threshold would operate separately to that for interests

with voting rights. This should make it more difficult for a CfD holder to gain access to management on the basis of an undisclosed economic interest, and also to build a significant stake with no disclosure.

1.31.   By focussing on addressing the issues surrounding the use of CfDs to access or influence voting rights we believe that market confidence generally will be enhanced. We believe that the costs of this option would not be significant.

### (ii) Option 3: a general disclosure regime

1.32.   The alternative approach is to introduce a regime that would require the disclosure of all economic interests above a 5% threshold held through CfDs and other derivatives. This threshold would operate separately from the threshold for shares and qualifying financial instruments. There would be no aggregation across the two sets of instruments. The scope would be consistent with the scope of requirements of the Takeover Panel regime, and as a 'one size fits all' approach would be relatively simple to comply with. The direct initial costs of Option 3 could be of the order of £20m-50m. There could also be wider indirect costs, for example to the liquidity of the market in CfDs and of the underlying equity market.

1.33.   Both approaches would have the benefit of providing greater transparency for issuers and for the market at least in terms of who holds economic interest in them and therefore who their potential shareholders are. They would also potentially help reduce some of the price volatility that may be caused by information asymmetries. The balance of argument between additional measures to strengthen the existing regime and introducing a general disclosure regime is a fine one. We believe that Option 2 is proportionate and targeted, and would prevent CfD holders from seeking to exert influence over companies without disclosing their positions, either because the terms of the safe harbour would thereby be breached, or because issuers would have reasonable grounds for forcing disclosure. As we note above, Option 3 is an alternative approach to achieving the same objectives as Option 2. This option is supported by a number of stakeholders who would prefer to see a general disclosure regime. We are therefore proposing draft rules for consultation on both options. In theory it would also be possible to have a combination of Option 2 and Option 3. But we think, in practice, this would be of limited value and would cause potential confusion and greater cost. We are therefore consulting on the basis of a clear choice between Option 2 and Option 3.

### Interaction with Takeover Panel rules

1.34.   A key issue is how these rules would interface with those of the Panel during offer periods. We have discussed this with the Panel. Our objective is to avoid duplication of disclosure for firms. This could be achieved in two ways. Either we could state in our rules that the notification requirements do not apply if the transaction has already been disclosed pursuant to the Panel's rules or we could 'turn off' our rules when an offer period starts. Our preference is for the former, and this is the basis on which the rules for Option 2 and Option 3 have been drafted.

### Outline of Paper

- Chapter 2 gives factual **market background** on the UK market for CfDs and the **current regulatory framework**, including the requirements of the Transparency Directive, Market Abuse Directive and those of the Takeover Panel;

- Chapter 3 sets out the **views of stakeholders** (issuers, investment banks and holders of CfDs) and the **possible market failures** they might raise;

- Chapter 4 summarises the **evidence for these market failures**, sets out a number of case studies, considers the approach to CfD disclosure in other jurisdictions and sets out the rules of the Takeover Panel in relation to disclosure;

- Chapter 5 sets out the **overall conclusions** we draw from the analysis we have carried out, the extent to which they highlight market failures, and, in this overall light, our **policy proposals**.

## Who should read this paper?

- Investors in equity and equity derivative markets and their advisers

- Issuing companies

- Banks and their advisers

- Brokers

- Intermediaries

# 2 CfDs on UK Equities

2.1.  In this chapter we describe some of the key features of the UK CfD market, including the key characteristics of a CfD, and the growth of the use of CfDs as a financial instrument. We also set out the current regulatory framework governing disclosure.

## What is a CfD?

2.2.  A CfD on a share is a derivative product that gives the holder an economic exposure, which can be long or short, to the change in price of a specific share over the life of the contract. Contracts are normally open-ended, and can be closed out by the CfD holder on demand. The contract does not give the holder either ownership of the referenced shares or any ownership rights, such as voting rights. Nor, since the contract is normally cash-settled, does it usually create any right to take delivery of the shares in place of cash settlement. However, CfD contracts usually provide for adjustments related to dividend payments and share issues (synthetic dividends and adjustments) that take place during the life of the contract.

2.3.  One of the basic characteristics of a CfD is that the investor is able to take an economic exposure to a movement in the referenced share at a small fraction of the cost of securing a similar exposure by acquiring the shares themselves. CfD contracts generally require the investor to lodge an initial margin payment of no more than 5%-10% with the CfD provider. So, in a case where a 10% margin is required, an investor putting up an initial deposit of £100 may be able to enter into a CfD (long) position referenced to shares with a value (at the outset) of £1,000. However, since the writer of the CfD often hedges its risk by taking a corresponding position in the shares underlying the contract, it also needs to recover the financing charges it incurs (to support purchases that hedge a long CfD). The financing charge is typically calculated on a LIBOR + x basis.

2.4.  Although entities that provide CfDs (usually investment banks) generally hedge their risk by acquiring or selling short a corresponding number of underlying securities at around the reference price, some banks may offset the risk by entering into matching derivative positions. We discuss hedging practices in more detail in chapter 3. When the parties close out the CfD, it is likely that the hedge will also be unwound. While generally the investor receives cash from or pays cash to the issuer, in the case of a

CfD relating to shares, the parties may occasionally prefer to settle the CfD physically. The investor would then take delivery of the shares that had been held as a hedge by the CfD provider.

2.5.   There are a number of different reasons for entering into a CfD contract. Our research includes a survey of a number of market participants, including investment banks and brokers, (the findings of which are set out in more detail in chapter 3 and Annex 4). It indicates that the main reasons for entering into a CfD relate to the scope to gain leverage, the ability to pursue long/short strategies and the scope to acquire an interest without being subject to stamp duty. Other reasons cited include the ability to stake build without disclosure, as well as facilitating trading positions that are otherwise difficult to achieve. For example, short CfDs can facilitate a number of strategies, including pairs trading, merger arbitrage and a variety of hedges to protect existing long positions. For instance, by entering into a short CfD on the FTSE index, an investor can protect his long position in a particular FTSE stock against general market movements.

## Box 1: Reasons for trading in CfDs

Market participants tend to give the following reasons for entering into a CfD rather than buying (or selling) the underlying stock:

- Leverage: trading on margin enables an investor to enter into a position on a leveraged basis without having to fund the full purchase price. The investor is required to provide initial collateral at between 5%-10% of the nominal value when the contract is opened. So a small percentage change in the share price can result in a large percentage gain (or loss) on the deposit or margin required to open the CfD.

- Ability to go short: The ability to enter into CfDs geared to falling as well as rising prices allows investors to benefit from a fall in the price of an underlying stock (in exactly the same way as going short in the shares themselves but without needing to be responsible for purchasing shares for delivery).

- Stamp Duty: investors in UK equities are currently subject to stamp duty of 0.5% on every transaction. As CfDs are a derivative product there is no stamp duty payable (and where hedging is conducted by a recognised intermediary (persons recognised under Stamp Duty and Stamp Duty Reserve Tax intermediary and stock lending relief legislation), the hedging activity is also likely to be exempt from stamp duty).

- Greater market opportunities: CfDs allow investors to gain exposure, at relatively low cost, to a very wide range of stocks, market indices, currencies and other assets.

- Maintaining secrecy and anonymity: as few jurisdictions require disclosure of purely economic interests, some investors value CfDs as a means of taking substantial positions without public disclosure of their trading strategies.

### Growth of the CfD market

2.6.  Over the past five years the growth of the CfD market has been significant. Some commentators believe that between 20% and 40% of turnover in the cash equities market is now driven by activity in related derivative products. In bid situations, this is likely to be nearer the top end of the scale.

2.7.  The most significant drivers behind this recent trend are investors wanting higher leverage when seeking exposure to equity price movements and demand for new ways to short stocks. In addition, the evolution of the internet and electronic trading platforms has reduced transaction costs involved in undertaking CfD transactions.

2.8.  The financial markets make almost no disclosure of CfD trading activity, and as a result there is only limited availability of data which depicts the recent growth of the CfD sector. The charts below are based on a sample of data obtained from a group of major CfD providers in the UK and relate to their sterling denominated equity products only. They provide a broad indication of the considerable growth in CfD trading activity that has taken place since 2001.

2.9.  Chart 1 captures the growth in the number of quarterly CfD transactions over the last six years and shows that the CfD market has grown at a particularly high rate since 2003. Although the trend depicted in Chart 2, relating to the total value of CfD transactions since 2001, includes a slight decline during 2006, this illustrates a significant growth in the CfD market as well. Chart 3 (based on London Stock Exchange data) shows the corresponding growth in the value of domestic equity transactions, and highlights the relative growth of CfDs from around 10% of equity value in 2001 to around 35% in 2007.

### Chart 1



Chart 2



Chart 3



## Regulatory Framework

2.10.   The Disclosure and Transparency Rules (DTRs), which now govern the disclosure of major shareholdings, do not require the disclosure of economic interests in shares. However, holders of CfDs are not completely outside the scope of regulatory requirements. CfDs may be disclosable under the DTRs if CfD holders have formal or contractual rights to exercise voting rights, or acquire underlying shares. And since November 2005 the 'City Code on Takeovers and Mergers' (Takeover Code) has required the disclosure of economic interests in certain circumstances (see below, paragraphs 21-25) In this section we set out the UK's current notification and disclosure requirements for investors and companies respectively outside offer periods. We also note the obligations that flow from the Market Abuse Directive (MAD) and the Financial Services and Markets Act 2000 in relation to representations made about CfD positions. Finally, we describe the Takeover Panel's disclosure rules as they apply to dealings in CfDs.

### Disclosure and Transparency Rules

2.11.   The UK has had a notification and disclosure regime for major interests in shares for several decades. Until 2007 oversight of the UK's major shareholding regime lay with the Department of Trade and Industry (DTI) under Part VI of the Companies Act 1985. With the implementation of the Transparency Directive (TD) in January 2007 responsibility for overseeing major shareholding disclosures passed from the DTI to the FSA. We have implemented the requirements of the TD through the DTRs. It should be noted that FSMA section 89A(3)(b), together with 89F(1)(c), gives us powers to extend our rules to include instruments with a similar economic effect to financial instruments that give a legal entitlement to acquire shares.

### Benefits of disclosure

2.12.   The TD is one of the building blocks of the European Commission's Financial Services Action Plan (FSAP). The overall objective of the FSAP is to promote the competitiveness of the European economy. Sufficient transparency and disclosure are seen as key preconditions to liquid and efficient markets that, in turn, should lower the cost of capital for companies and deliver benefits for investors.

2.13.   In particular, the purpose of transparency rules, as stated in the TD is that *'the disclosure of accurate, comprehensive and timely information about security issuers builds sustained investor confidence and allows an informed assessment of their business performance and assets. This enhances both investor protection and market efficiency.'* The rules are aimed at disseminating relevant information to all interested shareholders as quickly as possible. In relation specifically to major shareholdings, *'the public should be informed of changes to major holdings in issuers whose shares are traded on a regulated market situated or operating within the Community. This information should enable investors to acquire or dispose of shares in full knowledge of changes in the voting structure'.*

2.14.   Articles 9-12 of the TD therefore require significant shareholders of a company with securities traded on a regulated market to notify both the issuer and its Competent Authority when its holdings cross certain thresholds. For UK issuers we have retained the thresholds set by the Companies Act 1985 of 3% and every 1% after that, subject to certain exceptions, as the triggers for these notifications.

2.15.   The Companies Act 1985 defined the disclosure obligation as extending to interests of 'any kind whatsoever in [the] shares'. Specifically, it brought within scope contracts and other arrangements, such as call options, warrants and other types of options that enabled a person to acquire or to exercise control over the rights conferred on a shareholder. Similarly, it included instances when a person was obliged to take delivery of shares, for example, as the result of writing a put option. However while the statutory definition of interest was wide, it was never interpreted to extend to arrangements whereby a person held an interest in a share that was purely economic (i.e. without the entitlement to exercise any right conferred by the holding of such a share). Thus a holder of a CfD who was not entitled to any rights in the underlying share was not required to disclose when they acquired or disposed of a contract (or contracts) in aggregate equivalent to 3% or more of a class of shares.

2.16.   The DTRs, which follow the provisions and definitions in the TD, are therefore referenced to direct and indirect control of voting rights attaching to a share, as opposed to the concept of notifiable 'interests in shares' established under the Companies Act 1985. They also require (DTR 5.3.2R) disclosure of entitlements to acquire voting rights resulting from holding certain financial instruments, including transferable securities and options, futures, swaps, forward rate agreements and any other derivative contract referred to in Section C of Annex 1 of the Market in Financial Instruments Directive (MiFID). Accordingly, major positions in physically settled call options have to be disclosed to the market, while positions in CfDs generally fall outside the scope of the DTRs, unless the contracts explicitly give a right to acquire, or give access to the voting rights attached to, shares held as a hedge by the CfD writer.

2.17.   The DTRs allow a number of other exemptions from disclosure. In practice, these are likely to make it more difficult to identify market activity in cash equities that come from the origination and termination of CfDs. There are two main exemptions. First, shares held by a market maker need not be disclosed until they reach a 10% threshold (5.1.3R(3)), on condition that the market maker does not intervene in the management of the issuer concerned. And second, shares held by a credit institution or investment firm within its trading book are exempt from disclosure until they reach a 5% threshold, provided that the firm ensures that the voting rights attached to those shares are not exercised (5.1.3R(4)). If market makers and investment firms do not meet these conditions, they are required to make notifications at the 3% threshold in the usual way.

### Market Abuse Directive

2.18.   The UK's implementation of the MAD came into effect on 1 July 2005. The Code of Market Conduct, which is part of our Handbook, sets out the types of behaviour which could constitute market abuse under the terms of the MAD. This includes (Market Abuse Rules 1.8.1) 'the dissemination of information by any means which gives, or is likely to give, a false or misleading impression as to a [qualifying investment] by a person who knew or could be reasonably expected to have known that the information was false or misleading'.

2.19.   Transactions entered into with the intention of circumventing the current disclosure obligations, e.g., with respect to stake building, could, in some circumstances, possibly fall foul of the rules designed to prevent market abuse.

### Financial Services and Markets Act 2000

2.20.   The Principles for Businesses set out in our Handbook apply to authorised persons. For example, we would regard any authorised firm misrepresenting its position as potentially failing to conduct its business with integrity and/or not observing proper standards of market conduct.

### Takeover Panel rules

2.21.   Although the DTRs apply the main shareholding disclosure regime, the UK Takeover Code makes some additional disclosure requirements during takeover bids. With effect from November 2005, the Takeover Panel adopted new dealing

disclosure rules that extend dealing disclosure obligations to persons with economic interests in the shares of the offeror or offeree company.

2.22.   In summary, the rules now require that if, during an offer period, a person directly or indirectly has an interest, including an economic interest, in 1% or more of any class of relevant securities of an offeror or of the offeree company, or as a result of any transaction will have an interest in 1% or more, then all dealings in any relevant securities of that company by that person (or any other person through whom the interest is derived) must be publicly disclosed.

2.23.   Under the Panel's rules, a person will be treated as having an interest in securities if they:

- own or control them;

- have a call option or written put option in respect of them; or

- have a long derivative referenced to them.

2.24.   Dealing includes any action which results in an increase or decrease in the number of securities in which a person is interested, or in respect of which he has a short position, including:

a) acquiring or disposing of securities;

b) taking, granting, acquiring, disposing of, entering into, closing out, terminating, exercising or varying an option in respect of securities;

c) subscribing or agreeing to subscribe for securities;

d) exercising or converting any securities carrying conversion or subscription rights;

e) acquiring, disposing of, entering into, closing out, exercising any rights under or varying a derivative referenced to securities; and

f) entering into, terminating or varying the terms of any agreement to purchase or sell securities.

2.25.   When putting forward its proposed rule changes, the Panel noted that:

- persons with long derivative or option positions may, through the securities held by their counterparties, exercise a significant degree of control over the securities the derivative is referenced to or that are subject to the option;

- persons dealing in derivatives and options may be dealing with a view to helping one of the parties to the offer, with the result that they should be considered to be acting in concert with the party;

- the disclosure of dealings in derivatives and options would enable shareholders to understand better the forces at work in the market and, in particular, the reasons why the prices of offeror or offeree company securities may be moving in a particular direction; and

- in the context of a bid, a derivative investor or option holder with a purely economic, rather than strategic, motivation is still likely to want to influence the way in which the holder of underlying shares acts in respect of an offer for the company.

*Companies Act 2006*

2.26.    Section 212 of Companies Act 1985 gave a public company the power to investigate the ownership of its shares. Companies did this by sending a written notice (the '212' notice) to any person or company whom they had reasonable cause to believe had, or had had, an 'interest' (for example by owning, controlling or holding certain rights over shares) in their relevant share capital at any time during the three years immediately preceding the date of issue of the '212' notice. This provision has been carried forward to the Companies Act 2006 and is now set out in section 793 of the Act.

2.27.    Table 1 summarises these various regulatory and legislative provisions. It highlights that, in a number of important respects, some of the behaviours that are causing issuers and investors concern are already caught by our, and others', rules.

**Table 1**

| Current Legislation | What the rules say | How they might apply |
|---|---|---|
| **FSA Handbook – High Level Standards** | *Applies to authorised firms* | |
| **PRIN 2.1.1 R** | 1. A *firm* must conduct its business with integrity.<br>5. A *firm* must observe proper standards of market conduct. | Any firm misrepresenting its interest held through CfDs, or its access to voting rights, may be falling short of standards required by authorised firms. |
| **Disclosure and Transparency Rules** | *Applies to listed companies (for issuers) and persons holding voting rights for MSNs* | |
| **DTR 5.1.2** | A person must notify the issuer if his holding of voting rights attached to shares exceeds 3% or exceeds of falls below one of the thresholds. | A person who buys a large amount of shares has a requirement to make a notification. |
| **DTR 5.1.3/5.1.4** | Shares held by a market maker, up to a holding of 10% [5.1.3R(3)], are not required to be notified to an issuer as long as the market maker **does not intervene in the management of the issuer.**[5.1.4R(1)(b)] | A CfD holder instructs the CfD writer, who holds shares in the company as a hedge that are exempt from disclosure, to vote the underlying shares in a certain way.<br>By exercising the votes on the instructions of the CfD holder the CfD writer would lose the disclosure exemption, and would have to disclose its interest in the underlying shares. |
| **DTR 5.1.3 (4)** | Shares held within the trading book of an investment firm or credit institution which do not exceed 5% of voting rights may be disregarded for notification purposes, provided that the voting rights...are not exercised or otherwise used to intervene in the management for the issuer. Again, any attempt to vote shares would negate the exemption and require a disclosure. | |

| Current Legislation | What the rules say | How they might apply |
|---|---|---|
| **DTR 5.3.1** | A holder must make a notification if it holds, directly or indirectly, certain financial instruments which result in an entitlement to acquire, on the holder's own initiative alone, issued shares to which voting rights are attached. | Where someone buys a call option over shares which would give access to a notifiable level of voting rights, they would have to make a disclosure. Likewise if a CfD holder had a right under the contract to buy the shares at closure of the CfD, it would also have to make a disclosure. |
| Market Abuse Rules | *Applies to all market participants* | |
| MAR 1.8.1 Market abuse (dissemination) | Market abuse [includes] 'the dissemination of information by any means which gives, or is likely to give, a false or misleading impression as to a qualifying investment by a person who knew or could reasonably be expected to have known that the information was false or misleading.' | Any firm misrepresenting its position publicly by claiming an interest through CfDs that they do not possess, which could have an effect on the market, could be in breach of the Market Abuse Rules. |
| Companies Act | *Applies to public companies and people with an interest in shares* | |
| s.793 | A public company has the power to investigate the ownership of its shares by sending a written notice to any person or company whom they had reasonable cause to believe had, an 'interest' in its shares. | If a person who holds a CfD, through which they can acquire shares or exercise votes, receives a request from an issuer whether or not they hold an interest in shares, they must confirm or deny the fact, and, if the former, disclose certain information about the interest. |
| Takeover Code | *Applies to persons dealing in an offer period* | |
| 8.3(a) | During an offer period, a person holding 1% or more of any class of relevant securities of an offeror or of the offeree company must disclose any transactions in shares or financial instruments (including CfDs) relating to those companies. | A person or firm has built up a significant economic interest in a company, by holding a large CfD position. The company is then involved in a takeover. If the person later deals during the offer period, either in shares or in derivatives, they will have to disclose all their interests including their CfD positions. |

# 3 Potential Market Failures

3.1. In this chapter we first summarise the issues which have been raised in our discussions with a range of issuers, investors and other market participants. Some, but not all of these issues, suggest that there may be potential market failures associated with non-disclosure of CfD positions. The second part of this chapter summarises what these market failures may be.

## Views of issuers and investors

3.2. Discussions, both academic and in the media, of the possible issues caused by the absence of CfD disclosure are often covered as part of wider analysis of what is sometimes termed 'new' forms of voting. We have taken into account a number of these discussions in our evaluation of the evidence. It is worth noting that in some of the instances given by market participants as examples of problems, the use of CfDs on an undisclosed basis is not the main underlying issue.

3.3. This said, we have taken into account a number of cases in the public domain where non-disclosure of CfDs is held to have undermined market efficiency or the positions of other investors, and others where the evidence remains more circumstantial. From these it is clear that CfDs have sometimes been used on an undisclosed basis as a platform for establishing significant equity stakes, or as a means of seeking to exercise influence over issuers' corporate governance.

3.4. Some share issuers argue that in the absence of disclosure of large CfD positions market transparency is impaired and effective communication between companies and their shareholders is significantly hampered. Their concerns can be grouped under three broad headings:

### a) Asymmetry of information

- The market (that is, all investors) needs to know who a company's significant shareholders are, and CfD holders gain an advantage over 'traditional' long holders of shares by not having to disclose their significant holdings;

- For the duration of the CfD it is only the CfD holder and the CfD writer who know the holder's identity, intentions and the relevant time-horizon. This creates an information asymmetry that can lead to imperfect pricing in the market;

- This lack of transparency is increased by CfD writers hedging their positions with the underlying shares which may be held and registered in several different accounts, including their proprietary trading or their market-making account. Issuers and the market more generally may therefore be unable to determine whether large positions are being taken for hedging or proprietary trading purposes. This could cause speculation in the market, which could in turn lead to increased volatility and a consequent increase in the cost of capital for issuers;

- Block trades can cause further lack of transparency if the underlying shares are held as hedge against CfDs. For example, it is possible that a CfD writer might acquire the underlying shares for use as a hedge. This position would not be disclosed if the hedge stock was held in an account exempted under the DTRs. When the CfD contract is closed out, the shares could be sold in a block trade, without any transparency as to the identity of the seller. The market could then see a large sale, and wrongly assume it was a major long term shareholder on the share register disposing of shares. This could cause market speculation and possible damage to the valuation of the company.

### b) Exercise of influence on management

3.5. Holders of CfDs can approach the management of an issuer company wanting to influence corporate decisions. In these situations, as there has been no disclosure of the CfD position, the company may not be able to verify the level of economic interest (if any) held through the CfD, or whether the CfD holder has any access to voting rights. The company therefore has to decide whether or not to enter into discussions with the CfD holder with no knowledge of the CfD holder's true position.

### c) Undisclosed stake-building

3.6. Finally, CfDs can be used to build up large economic positions in a company prior to a possible takeover without any transparency to the company or to the market. If the CfD holder has an informal agreement to take delivery of the shares on closing out the contract, or even knows that they are in a strong position to acquire the hedge, the disclosure requirements set out in the DTRs are effectively circumvented, as there is no legal entitlement to acquire. In this case, a potential acquirer can target a firm by entering into a CfD contract with a bank. The bank will buy the target's equity as a hedge. The acquirer will then close the CfD position, buy the equity which the bank is holding, thereby surprising both the issuer and the market by suddenly owning a large stake in the company. This strategy takes advantage of the fact that the bank is likely to enjoy an exemption from disclosing the hedge shares until its interest in the shares reaches 10%. Also, the bank will have strong incentives to sell the equity to the CfD holder if the acquirer wants it because a large equity position may otherwise be difficult to unwind.

3.7.   Institutional investors have expressed a broadly similar range of views, particularly regarding the exercise of influence over companies by CfD holders who claim to have access to voting rights and with regard to operating in a market where others may have better information.

## Views of CfD writers/holders

3.8.   In our discussions with writers and holders of CfDs (mainly hedge funds) the view was expressed that increased disclosure of CfD positions could make the market less efficient by:

- confusing the investor community and companies;

- creating complex situations of 'potential' shareholdings which could create a 'false' feeling of interest in the market, and

- increasing volatility in the market.

3.9.   In addition, investment banks in general suggested that their internal policies would be not to accept voting instructions from a CfD holder on how to vote hedged stock. They also said they did not close out a cash-settled derivative with the underlying shares and would only subsequently sell the underlying shares to the CfD holder in very specific circumstances (and not directly before a significant corporate event).

3.10.  Hedge funds all argued that if they wanted to exert control then they would buy physical stock and they did not expect banks to vote at their request. In addition, their motivations for buying CfDs were most often unrelated to stake building but driven by tax considerations, leverage and/or the scope offered for taking short positions.

3.11.  Some hedge funds shared the view of the investment banks that increased disclosure would make the market less efficient (although some smaller funds (reflecting their size) felt that it would not be a specific issue for them). Several argued that what is seen as a lack of transparency is in effect a legitimate factor underlying hedge funds' trading strategies. In addition the concern was expressed that higher disclosure requirements would result in less liquidity in the market as firms would limit their holdings to avoid disclosure or the extra compliance burden, and more fundamentally that this would threaten their business models. But some shared the view of issuers that more information would result in better price formation.

## Possible market failures

3.12.  These discussions suggest there are two distinct sets of issues. The first relates to transparency when there is access, or potential access, to voting rights. The second relates to the wider question of whether there should be greater disclosure of economic interests generally. In both cases, the key question is whether the absence of transparency amounts to a market failure and, if it does, whether there is proportionate action that could produce an improvement to the market (i.e. where the benefits exceed the costs). In the rest of this section, we consider some of the adverse consequences of the lack of disclosure indicated by issuers and investors.

3.13.   Out of the concerns raised by issuers and investors, we identify the following possible market failures. We then go on to test the extent to which they actually occur.

### (a) Inefficient price formation

3.14.   Information asymmetries between informed CfD holders and uninformed 'ordinary' investors can result in price inefficiency in the market. Uninformed investors may be unable to acquire valuable information because it is held with informed traders. Valuable information in the context of CfDs which could affect pricing of the referenced shares could include information on those holders of large CfD positions who are able either currently or prospectively to exercise ownership rights over the reference shares, as described below.

   *(i) Banks voting on behalf of the CfD holders.* While other information can become incorporated into the market through the consequences of trading behaviour, if there is 'hidden' voting then this information asymmetry will not be addressed by the current Major Shareholder Notification (MSN) regime. If information on who holds voting rights is valuable but is not available to the market, prices will be inefficient as they will not reflect all the market information. For example, if the market had knowledge of a bank voting on behalf of an activist investor, prices may react to reflect that fact. Without public disclosure, prices may stray from efficient levels for longer periods of time. As we said in chapter 2, banks exercising voting rights lose the ability to benefit from the market maker and trading book exemptions.

   *(ii) Acquisition of the underlying equity hedge.* Another problem can arise if the CfD holder acquires the underlying equity upon or shortly after closing of the contract and surprises the market with the sudden acquisition of a large stake. Strictly speaking, this case is no different from the case where a market participant is able to buy the cash equities directly. However, the possibility of making such an acquisition through CfDs is more plausible, as it may be difficult to build up a large directly-held stake if an initial 3% holding had been made public (it would be difficult to find a seller who would for example sell 5% of a company). However, in both cases (unless the acquirer benefits from a DTR disclosure exemption) the existing MSN regime will ultimately require disclosure (upon acquisition of the equity), which limits the extent of the information asymmetry. We do note, however, that there is a greater possibility of surprising the market with a large ownership interest built through CfDs which could in some circumstances create speculation, price volatility and adversely impact existing shareholders.

3.15.   Both of these potential market failures in price formation relate to a lack of disclosure where a CfD holder can in practice, or is ultimately seeking to, influence voting rights. This leaves the question of whether non-disclosure of pure economic interests may contain information that might, if disclosed, influence the pricing of the reference share. That could be the case if either (i) it was clear that holders of large CfD positions could, by virtue of their economic position, exercise similar influence over an issuer's management as the holder of votes; or (ii) the disclosure of a large position by a particular market participant was used by the market to price the shares.

3.16.   We do not have clear evidence whether CfDs held as pure *economic interests* – i.e. with no intention to link to the voting rights - can create problems of inefficient price formation. We expect equity market prices to reflect information on market trades, including those in both the underlying equity and perhaps in the CfDs themselves. Where CfD writers hedge the contract, and buy the underlying equity at the time of a CfD sale, the market will price in the acquisition of those shares. Arbitrage opportunities should exist for only a short period of time and prices will converge to a new equilibrium that reflects all information, including information from the CfD market. Jayaraman, Frye and Sabherwal (2001) give evidence of this mechanism in the options market.[2] This suggests that information on the identity of the CfD holder, which will not be available to the market, can be important if CfDs are being used for insider trading. However, market abuse is already addressed through the relevant provisions of FSMA (Table 1 above). In other cases, the study suggests the identity of the owner is not significantly important to price formation, unless the owner has access to voting rights. So, with the exception of insider trading, the pure economic interest of CfDs does not appear to create a significant problem of inefficient price formation.

3.17.   Some have also argued that uncertainty, on whether substantial sales of equity are related to stocks hedged against CfD contracts, creates information asymmetries, resulting in price volatility. This problem would again relate to the operation of CfDs, irrespective of the voting rights issue. For example, a CfD involving a material number of shares may be closed by a CfD holder, and the CfD writer may, at the same time, sell the underlying stock that was originally bought to hedge the CfD. This type of transaction has the potential to result in a significant block trade, which the market may have difficulty in interpreting. That is, the market will see the block trade (in terms of the price and volume of the transaction in the market[3], and also through a possible disclosure through the MSN regime), but the true reason for the sale will not be available to the market (i.e. that it was for hedging). It is argued that this information asymmetry can create speculation in the market about the intentions behind the sale.

3.18.   However, lack of full information on intentions or reasons for purchase and sales is a fundamental element of markets. Lack of full information itself is not a market failure[4]. In no 'real world' markets do all participants have full information. All markets are imperfect to some degree. In order for us to apply the term 'market failure' the imperfections need to be large enough to suggest that regulatory intervention has a realistic prospect of improving market outcomes. Even in the case of MSN disclosures, the intention behind purchases or sales of large blocks is undisclosed, which can generate market speculation. Moreover, our analysis (see Annex 3 ) shows that on average there are no significant price movements when banks announce substantial sales of equity. Therefore, even if there is speculation (and volatility), it does not appear to create a systematic failure in the market that can be corrected through the use of regulation.

---

2    Jayaraman, N, Frye, M B and Sabherwal S (2001) *Informed Trading Around Merger Announcements: An Empirical Test Using Transaction Volume and Open Interest in Options Market, Financial Review* (May 2001)

3    Under MiFID, there is post-trade transparency for all transactions in shares admitted to trading on a Regulated Market.

4    Indeed it had been demonstrated that markets with perfect information are an impossibility (see Grossman SJ and Stiglitz JE, 1980). Perfect information is not a feature of any real world markets and indeed full disclosure mandated by regulators is probably undesirable (see Greenspan 2002).

### (b) Distorted market for corporate control.

3.19.   It is argued that CfDs can also be used as a tool to build stakes in quoted companies before a takeover period, avoiding the need to make MSN disclosures that are necessary when shares are purchased. The lack of notification allows stake-builders to gain enough of a 'toehold' in the firm which can be converted into direct equity interest when they acquire the physical from the CfD writer who is holding these shares as a hedge. 'Toeholds' could discourage other potential bidders from contesting the takeover, as they are at a competitive disadvantage relative to a bidder who already has a toehold. Therefore, toeholds, especially in the form of stealth stakes, may discourage competitive bidding and can reduce corporate contestability. Overall, these uncertainties may reduce the efficiency of the market for corporate control, and dissuade some parties from participation in the market.

### (c) Diminished market confidence / investor protection.

3.20.   A lack of disclosure can worsen the information asymmetry between large shareholders and minority shareholders. This means that minority shareholders may remain uninformed and unable to react to changes in ownership of the company. For instance they may wish to sell stakes in a firm if there is large stake-building by insiders, but without this knowledge will be unable to act. Alternatively, if CfD writers are willing to vote on behalf of CfD holders, CfDs can allow in essence a form of hidden voting. In this situation CfD holders could direct banks to vote differently from the way the banks may have voted themselves. Without disclosure, investors may be deterred from participating in the market if they feel uncertain about who the players are.

### (d) Information asymmetry for equity issuers

3.21.   There is also a possibility of informational imbalance whereby equity issuers do not have information on the true owners of the company. This again relates to hidden ownership and hidden voting, which means the true owners may not appear on the shareholder register. This information asymmetry may result in an inefficient use of issuer's resources whereby they have to spend resources to determine the ownership claims of CfD holders. This lack of information may result in a welfare loss to issuers.

3.22.   While this information problem is not primarily related to our objectives, there are some areas of overlap. In general, issues relating to the disclosure to companies of the identity of their owners fall within the remit of company law. In contrast, providing ownership information to the market falls primarily within the remit of the MSN regime (driven now ultimately by the Transparency Directive). There is of course overlap between these two remits. Ownership information is recorded on the shareholder registers, which are publicly available, and MSNs are disseminated to the market via the issuers. We are responsible for the MSN regime rather than the company law regime. To this extent, the consequences for issuers in terms of their ability to contact their true owners is not primarily a direct issue for us, although we recognise that the MSN regime indirectly supports the Companies Act provisions that relate to the shareholder register.

### Conclusion

3.23.   There are several concerns which issuers and investors have raised about the consequences of non-disclosure of CfD positions. Consistent with our approach to regulatory interventions, we have assessed whether these consequences result in any market failures. We think that there are three possible market failures, in relation to:

– inefficient price formation;

– a distorted market for corporate control; and

– diminished market confidence.

3.24.   The next chapter summarises the analysis that we have carried out to establish the degree to which these three possible market failures are occurring in practice.

Q1:   Do you agree that we have identified the concerns of issuers and market participants correctly?

Q2:   Do you agree that we have identified the right market failures? If not, what other potential market failures do you think we should consider?

# 4 Market Failure Analysis – The Evidence

4.1.  In this chapter we set out the analytical work that we have carried out to find out the extent to which the market failures described in the previous chapter arise in practice. We have aimed to conduct our research in a systematic and rigorous way so we can base our discussion on empirical data as well as taking into account anecdotal information.

4.2.  We have carried out four main projects:

(a) A review of the literature that explores the impact of information and disclosure on the price efficiency of securities markets, the market for corporate control and investor protection and corporate governance. This has sought to answer the following questions:

- in theory, does disclosure of information about major shareholdings improve price formation?

- what are the costs of disclosure (can it be, for example, misleading or confusing)?

- does disclosure improve the market for corporate control and thus strengthen the push for good corporate governance which will in turn benefit minority shareholders?

- does disclosure in itself improve corporate governance and thus enhance investor protection?

- to what extent might the answers to these questions apply to the disclosure of CfD positions? In particular, to the extent that disclosure of actual shareholdings is beneficial for price formation, corporate control, and governance, how far would this also hold true for disclosure of CfDs?

(b) An empirical study of the impact of Major Shareholder Notifications (MSNs) on price formation. This has sought to answer the following questions:

- in practice, is information contained in MSNs valuable to the market in terms of price formation?

- do particular types of announcement have more value than others?

- how might the answers to these questions apply to disclosure of CfDs? In particular, if MSNs are valuable, in what circumstances would this support the case for CfD disclosure?

(c) An extensive study, carried out for us by PwC, of the practices of several of the most active CfD writers and other market participants. This has sought to provide the following information:

- the motivation behind CfD trading;

- policies and practices in relation to hedging, settlement and the exercise of voting rights, and the extent to which these may allow potential use of CfDs to substitute in some ways for ownership of the underlying shares; and

- views on the costs/benefits of extending the current disclosure regime.

(d) A study of the level and pattern of CfD trading inside and outside of offer periods for selected stocks. This has sought to answer the following questions:

- Is CfD activity during the offer period for the stocks in question similar to the level of activity before the offer period?

- Has there been any impact on CfD activity following the extension of the Takeover Panel regime?

4.3.    The key findings of each of these studies are summarised below and the studies themselves can be found in the Annexes to this paper.

4.4.    We have also analysed examples of trading situations where CfDs may have been a significant factor, and we have looked at the approach of other jurisdictions to CfD disclosure.

## Literature Review

4.5.    As described in chapter 2, an objective of the Transparency Directive is to give investors more information on major shareholders, or on those who have the ability to exercise material influence over an issuer. Although very little economic literature directly addresses the issue of disclosure of major shareholdings, there is a large body of literature that examines the possible impact of information and disclosure on (a) price efficiency of securities markets, (b) the market for corporate control and (c) investor protection and corporate governance. We have examined this literature and its possible implications for disclosure of CfDs.

4.6.    The principal findings of this review are set out in Box 2 below, with more detail in Annex 2.

## Box 2. Summary of findings of literature review on disclosure

**In theory, does disclosure of information about actual major shareholdings improve price formation?**

- Transparency in general is important for improving price discovery and formation, but this link depends on how information is distributed amongst participants.

- Mandatory disclosure ensures that private information is disclosed effectively and quickly into the market and is particularly important where traders have diverse information.

- By revealing new information, major shareholding disclosure should remove information asymmetries and result in lower variance in prices and higher volumes.

- However, requiring too much information may reduce liquidity, for example because traders restrict their holdings to below disclosure thresholds to avoid disclosure.

**Does disclosure improve the market for corporate control and thus strengthen the push for good corporate governance?**

- Disclosure of large acquisitions made as a prelude to a takeover (a 'toehold') can serve as an important means for the market of identifying potential takeover targets.

- But by driving up the price of subsequent acquisitions of shares disclosure can reduce the anticipated profit for the stake-builder and therefore could reduce takeover activity.

- Against this, toeholds can discourage other potential bidders from contesting a takeover because a bidder with an existing toehold will have more incentive to remain in the bidding.

- So disclosing toeholds could improve the market for corporate control.

**Does disclosure in itself improve corporate governance and thus enhance investor protection?**

- Poor disclosure can worsen the information asymmetry between large and minority shareholders. Minority shareholders will remain uninformed and unable to act on information on ownership of the company.

- Voting rights have value because they provide the holder of significant votes with influence in key decisions of the firm. Thus, knowledge on them is important.

- Lack of disclosure of the identity of major shareholders increases the risk of these shareholders trading on inside information and extracting benefits at the expense of minority shareholders.

- Knowledge of vote-buying by insiders (e.g. family owners) can provide indicators to outside shareholders or the market generally of further entrenchment.

- The value of control can be estimated and so disclosing major shareholdings can be informative to the market and particularly minority shareholders.

**To what extent do the answers to these questions apply to the disclosure of CfDs?**

- There may be a case for disclosure of information on major CfD positions as an extension of information on major holdings of voting rights in improving price formation. However, this is likely to be relevant only to the extent that CfD positions are closed out with the underlying stock and/or CfD writers, who have hedged with the underlying stock, vote on behalf of the CfD holders. If CfDs are rarely closed out with the underlying stock, and/or there is little voting on behalf of CfD holders, the benefits of mandatory disclosure would be limited.

- In relation to investor protection, CfDs could be used as a means of exercising undisclosed votes. Investors might not be aware of who else was exercising control of their company. However, CfDs would allow voting of undisclosed holdings only to the extent that CfD writers who have hedged with the underlying stock are willing to vote on behalf of the CfD holders.

- There may be a stronger case for disclosure in relation to the market for corporate control. By providing information on stake-builders who may use CfDs as a prelude to acquiring the underlying stock, disclosure could help to make takeovers more competitive and thus benefit shareholders.

- Overall economic arguments would suggest that, for CfD disclosure to be valuable, it needs to be strongly linked with having access to the voting rights.

## Impact of Major Shareholder Notifications (MSNs) on price formation

4.7.   As a step towards understanding the value of ownership disclosures in practice, we evaluated the information content of MSNs using a sample of MSN announcements made between January 2006 and August 2006. If the market values MSN disclosures, then any such announcements should result in significant abnormal price effects around the time of disclosure. However, if these disclosures do not convey any important information to the market, then there should not be any significant price movements at this time. Most of the price movements should instead be captured around the transaction date.

4.8.   To test the hypothesis, we collected data on all announcements related to MSN disclosures (i.e. holdings in company). Our initial sample included 2773 announcements for the eight months between 1 January 2006 and 30 August 2006. We employed a number of filters in arriving at our final sample (for example, if multiple announcements were made by a shareholder in an issuer on the same day, we took only the last announcement into consideration). We also separated out the data that did not include information on whether the announcement was the result of a sale or purchase. Out of the remaining 829 announcements, 473 included the date when the transaction actually took place. This information allowed us to evaluate the length of time between the transaction and announcement dates.