4.9.   Using standard event study methodology we measured abnormal price effects both on the trading date and the disclosure date for purchases and sales to evaluate whether these abnormalities were statistically significant. Finding statistically significant price effects on either or both of these dates would provide evidence that trade information and/or MSN disclosures are of value to the market

4.10.  The principal findings of this study are set out in Box 3 below, with more detailed results in Annex 3.

---

### Box 3: Major Shareholder Notification study

#### Scope

- In order to better understand the information content of Major Shareholdings Notifications (MSNs) the study examined the impact on share prices of a sample of MSN announcements in the period January 2006-August 2006, looking at separate event windows both before and after the trade, and before and after the announcement.

- The detailed study sought to measure the price movements around the time of disclosure, and measure their statistical significance compared to price movements around the transaction time. Incidence of significant price movement around the disclosure would provide evidence that the disclosure contained information valuable to the market.

- The initial sample contained over 2,700 notifications, which included data such as transaction date, information on shareholder type, size of transaction and total shareholding after the transaction.

#### Findings

**Is information contained in MSNs valuable to the market in terms of price formation?**

- The results suggest that MSNs are of some value to the market and contain information that investors use in pricing issuers' shares.

- The study's results demonstrate significant price movements around the public disclosure date, in addition to any movement around the transaction date. The direction of price movements is in line with theoretical expectations. Large purchases that result in significant shareholdings indicate positive price movements and similarly large sales result in negative price movements.

- This conclusion holds after taking into account possible impacts on prices as a result of specific types of trade (e.g. block trades), or trades by specific market participants (e.g. hedge funds or private equity).

- In some cases the marginal value of disclosure was found to be lower where there was a large interval between the transaction and disclosure dates. This suggests that there is information in the transaction itself which it takes the market a little time to absorb, and that the longer the gap to the disclosure of the major shareholder notification, the less additional information such a disclosure will contain.

**Do particular types of announcement have more value than others?**

- Particular types of announcement appear to have more value, for example block trades or announcements related to particular types of shareholders (although it is to be noted that sample sizes for these specific types of announcement are quite small, and therefore the results need to be treated with caution).

- Some types of announcement showed price movements of up to +1.76% around purchase announcements and -2.20% around sale announcement.

**How do the answers to these questions apply to disclosure of CfDs?**

- The results generally demonstrate the value of MSN disclosures. It is difficult to link them directly to the case for CfD disclosures, but if the market makes a causal link between CfD holdings and ownership, there could be a case for expecting CfD disclosures also to have value to the market.

- Whether CfD disclosure would convey similarly valuable information to the market as MSN disclosures might depend on whether CfD holders also indirectly have access to voting rights (i.e. whether there is an actual link to the voting rights in underlying shares, or an ability to acquire those shares, and therefore the votes, or the market has a perception that such a link is likely).

## Survey of market participants

4.11.   The conclusions of both our literature review and our study of the impact of MSN disclosures suggest that disclosure may also bring benefits in the case of CfDs, but only to the extent where:

- CfD positions are closed out with the underlying stock, and/or

- CfD writers vote on behalf of CfD holders where they hedge their positions with the underlying stock.

4.12.   To establish more accurately the extent to which these conditions exist, we engaged PricewaterhouseCoopers to carry out a survey of the leading players in the derivatives market as to the market practices relating to CfD trading. The survey, which targeted thirteen firms (eight investment banks and five other market participants) most active in CfD training, was structured in two parts: an initial paper-based survey, followed by a more in-depth interview.

4.13.   The scope of the survey was to explore:

- how CfDs work in practice;

- the motivation behind CfD trading and its potential role in influencing voting rights, stake building and impact on price formation, and

- what the participants thought of the adequacy of the current regimes for market transparency and of the case for introducing a disclosure regime for economic interests.

4.14.    The key findings are set out in Box 4 below, with more detailed results in Annex 4.

## Box 4: Survey of Market Participants

### Client base and their reasons for trading

- Holders of CfD contracts were typically hedge funds, other financial institutions and other investment banks.

- Leverage, avoiding stamp duty and the ability to pursue long/short trading strategies, were given as the main reasons why clients entered into CfD trades rather than buying the underlying stock.

- All participants but one had documented policies covering controls and procedures on CfD trading, including the approach to the exercise of voting rights.

- CfD trading volumes generally increased around corporate events including profits announcements and takeovers.

### Hedging practices

- All participants hedged their CfD exposures but using different methods. Some banks used more than one method depending on circumstances. Nearly all banks hedged some of the time with the underlying asset and about half sometimes used offsetting derivative positions.

### Practices in relation to settlement of CfD contracts

- All participants said that their standard CfD sale documents did not provide for settlement of the contract in the underlying stock; some said that there had been instances where terms had been amended to include such provisions and/or where side agreements had been entered into containing an option to acquire the underlying hedge.

- Over half said that CfD positions were never closed out with physical delivery of the underlying stock, and the remainder said that this happened 1-20% of the time (although our understanding is that the true figure is at the lower end of this range).

- All participants except one said they would not enter into pre-arrangements in relation to selling the underlying assets to the CfD holder.

*Policy on the exercise of voting rights*

- All participants said that they did not accept client instructions on how to vote hedged stock even if the sale documents did not specifically exclude this possibility.

- 15% said that there had been instances where the sale documents had been amended to include agreements on exercising the voting rights in accordance with the client's instructions. This would make the holding disclosable under the DTRs.

- Most CfD writers said that they did not exercise the voting rights attaching to hedged stock unless it was in their economic interest to do so.

- Two-thirds said that clients sometimes tried to exert influence over voting rights attached to stock held as hedge.

*Extension of disclosure*

- A third of participants said that increased disclosure of economic interests would be beneficial to the market, to clarify whether positions were being held as hedge, to enhance market transparency or to show who held an economic or a voting interest.

- Two-thirds did not support increased disclosure, citing as reasons confusion, costs, multiple counting and the sufficiency of the measures recently introduced by the Takeover Panel.

## CfD activity before and within offer periods

4.15.    The survey of market participants suggests that there is some evidence that holders of CfDs use them, or seek to use them, in ways that may give rise to some of the concerns expressed by issuers. But the responses also suggest that these practices are not widespread.

4.16.    We have also conducted some transaction analysis to see if there were clear signs of covert stake building through the use of CfDs in the lead-up to a takeover announcement and specifically to establish whether significant CfD activity could be identified outside the scope of the Takeover Panel regime. If so, this would support at least the consideration of further regulatory measures to address possible market failures.

4.17.    To do this we carried out a study of CfD trading volume levels where the CfD was referenced to an underlying share of an issuer subject to a takeover bid. This study, using data from the FSA's transaction reporting system, considered monthly CfD activity in a sample of firms that were subject to takeover bids in 2005 and 2006. To consider the potential effects of the Panel's regime, we evaluated CfD activity referenced to shares in companies involved in takeover bids in three distinct periods: a period well before the Panel regime was extended (January-March 2005), a period just before (May-August 2005) and a period after the extension of the Panel regime (July-September 2006). The first 50 takeover bids in each of these periods were

examined. The reported results, however, combine all 2005 data as we did not identify a difference between the two periods. We also identified that not all companies involved in a takeover bid had a CfD product written on them. For instance in 2006, of the 50 firms considered 39 had CfD activity.

4.18.    The key findings of this study are set out in Box 5 below, with more detailed results in Annex 4.

---

### Box 5: CfD Trading Activity

**Is CfD activity during the offer period for the stocks surveyed similar to the level of activity before the offer period?**

- There is no evidence of any systematic increase in the number of CfD contracts extant as the offer period gets closer (i.e. in the 'run up' to takeover bids).

- There is little difference between the number of CfD contracts extant before the offer period compared to the one month after the offer period starts.

- However, there is a significant change in the value of the contracts, which more than doubles in the month after the offer compared to the month before the offer.

- The figures indicate substantial usage of CfDs during offer periods, even following the Panel's broadening of its disclosure requirements.

- To analyse whether CfDs might be used for (covert) stake-building prior to the launch of a formal takeover, we looked at the top 5% of takeovers in our sample in terms of the value of the CfDs traded. This does not reveal any systematic build-up in the use of CfDs in the run-up to offer periods, and in turn does not suggest the significant use of CfDs as a means of stake-building before the offer period.

**Has there been any impact on CfD activity following the introduction of the Takeover Panel regime?**

- Our analysis also shows that, compared to 2005, there was little change in the value of CfD contracts in 2006, suggesting that the introduction of the Takeover Panel's enhanced disclosure regime in November 2005 has had little effect on CfD trading activity.

---

### Review of Takeover Panel's disclosure rules

4.19.    The disclosure rules of the Takeover Panel ('the Panel') as they were extended in 2005 are described in chapter 2. The key change was to amend Rule 8.3 to provide that long derivative and option interests count in the same way as shareholdings towards the 1% trigger threshold for the disclosure of dealings.

4.20.    In 2007 the Panel undertook a review of the new rules and concluded that they had achieved their main objectives without imposing undue burdens on market

participants and, accordingly, that they were a proportionate regulatory response to the increasing use of derivatives during bids.

4.21. The following points arising from the Panel's review should be noted:

- the new disclosure rules increased the number of Rule 8.3 disclosures by around 19.3% over the disclosures already required by the existing regime;

- the overwhelming majority of disclosures under the new regime involve dealings or positions in single stock CfDs;

- the Code Committee had no evidence to suggest that there had been a decline in market liquidity in bid stocks since November 2005; and

- 90% of the respondents said they were in favour of the new disclosure regime.

4.22. In addition the Panel said that it would consider three further issues raised by respondents:

- whether securities borrowing and lending transactions should be treated as dealings and, accordingly, should be disclosable;

- whether Rule 8.3 dealing disclosure requirements should be extended to persons with significant short positions; and

- whether there should be disclosure at the start of an offer period by those with an interest in shares over 1%, rather than waiting for disclosure triggered by dealing within the offer period.

## Regulatory approach in other jurisdictions

4.23. As noted above, some concern has been expressed by CfD writers and holders that increased disclosure requirements could damage market liquidity and also harm the UK's competitive position. To assess the potential impact of CfD disclosure we have looked at the experience of other regulators, including those who have recently introduced new disclosure requirements, to assess the risk that more disclosure requirements could affect the competitive position of the UK markets. In all the jurisdictions which have introduced derivative disclosure rules, the requirements are part of overall disclosure regimes rather than having effect solely in takeover situations.

### The European Union

4.24. We contacted a number of EU Member States to establish their current disclosure requirements. All said that they are closely following the Transparency Directive (TD). Accordingly, they require disclosure of holdings in 'financial instruments that result in an entitlement to acquire, on such holder's own initiative alone, under a formal agreement, shares to which voting rights are attached' (Art. 13 para. 1 TD). None said that they were planning to widen this rule in order to demand disclosure of cash settled derivatives. It should be noted that the Committee of European Securities Regulators (CESR) recently issued a Call for Evidence on the Transparency Directive, which included as a possible issue for discussion the

disclosure of derivative products. The response period closed in September, and CESR is now prioritising topics for discussion based on the replies.

## Non-EU jurisdictions

4.25.   For the most part, jurisdictions outside the EU do not provide exemptions similar to those in the TD in relation to market-making and trading book holdings. So, more major shareholdings tend to be disclosed to the market than is the case in the EU.

4.26.   **Hong Kong** has probably the most far-reaching regime for the disclosure of major shareholdings. This was initially introduced in 1988. Since then a number of more stringent measures designed to increase market transparency have been implemented. These include:

- reducing the initial substantial shareholding disclosure threshold from 10% to 5%;

- shortening the disclosure period from five to three days; and

- requiring disclosure of changes in the nature of an interest even if the level of shareholding remains unchanged (e.g. on exercise of an option).

4.27.   In 2001 the regime was further extended to require disclosure of all types of equity derivatives (as opposed solely to physically settled derivatives which was the scope of the earlier regime).

4.28.   The current regime therefore captures a wide variety of derivatives, provided that the investor has the right to acquire or sell the shares or a right to a payment if there is a change in the share price. This means financial instruments such as options, warrants, convertible bonds, ADRs and stock futures are all covered. A person holding, writing or issuing derivatives is taken to be interested in the underlying shares and these interests, calculated on a gross basis (i.e. there is no netting between long and short positions), must be aggregated with physical holdings to determine a disclosure obligation.

4.29.   The Securities and Futures Commission in Hong Kong has not carried out any statistical analysis of the effect of these rules on the market. However, it does not appear that either the equity or derivative markets have experienced any significant negative impact, as both have continued to expand in recent years. Banks writing CfDs have raised a number of concerns in relation to the process for disclosures rather than the principle itself (although the requirements may have encouraged market participants to develop instruments that do not have to be disclosed).

4.30.   **Switzerland** introduced a new regime for the disclosure of major holdings in cash settled derivatives on 1 July 2007 and has recently consulted on a further expansion of its regime with effect from 1 December 2007. The previous regime required disclosure of major holdings in certain derivatives if the agreement provided or allowed for physical settlement. This provision was reviewed in the light of a number of corporate takeovers using cash-settled call options. The following points should be noted:

- The regime applies both inside and outside of offer periods and requires aggregation by connected persons.

- The new regime (since 1 July 2007) requires disclosure of a purchase or sale of rights convertible into shares or rights to acquire shares (particularly call options) and the writing of rights to sell shares (particularly put options), irrespective of the way of settlement. Additionally, holdings in the underlying stock have to be added to holdings in derivatives when establishing whether thresholds have been crossed.

- Reactions to the new regime have been mixed. Some market participants expressed the concern that the new requirements would decrease rather than increase the value of information available in the market. Others said that the new rules would go further than the TD requirements within the EU and, accordingly, be detrimental to the Swiss finance sector. Issuers, however, welcomed the changes.

- Switzerland is planning to introduce further changes, expected to come into force in December 2007. The new rules require disclosure of all instruments that have been entered into with a view to a takeover. A detailed description of which financial instruments fall under this rule, as well as the suggested changes regarding stock lending, have been delayed until 2008.

4.31. **Australia** requires disclosure of substantial holdings in shares or interests in a listed company. 'Relevant interest' is defined in section 608 of the Corporations Act 2001 and includes the power to exercise, or control the exercise of, a right to vote attached to the securities. It is understood that purely cash settled derivatives generally do not fall within the definition of 'relevant interest', while the disclosure obligation in such a case would lie with the investment bank holding the hedge.

4.32. The Australian Takeover Panel recently outlined its plans to prohibit the use of equity derivatives to mask the ownership of takeover targets, in response to several high-profile cases. The Panel said it had developed the draft guidance over two years following numerous instances where controlling interests had used equity derivatives to hide 'substantial holdings'. The central proposition is that for control and substantial holding disclosure purposes long equity derivatives (cash settled or deliverable) should be treated in the same way as physical holdings of the relevant securities. These proposals would apply to all derivative holdings, not just in takeover situations.

4.33. **New Zealand** requires disclosure of 'relevant interests' in 5% or more of the voting securities of a public issuer. According to article 5 of the Securities and Markets Act, a person has a 'relevant interest', amongst other criteria, if that person: (i) has the power to exercise (or control) any right to vote attached to the security; (ii) has the power to acquire or dispose the security, or (iii) has the power (or may at any time have the power) under an arrangement, to exercise any right to vote attached to the security, to acquire or dispose of the security. The courts have taken a broad approach to what represents a possible future power to acquire shares.

4.34.   The United States large shareholder disclosure regime sets as a basic requirement disclosure at the time of acquisition of beneficial interests above 5% held directly or indirectly. Voting rights can be held through any contract, arrangement, understanding or relationship. Beyond this basic requirement there are a number of different treatments for specific types of firms:

a) some institutional investors who hold stock in their ordinary course of business and without the intent to influence control, are allowed to make an end-year report instead of at the time of acquisition;

b) institutional money managers (this would include hedge funds) must disclose holdings (over $100 million) at the end of each quarter, and

c) officers, directors and 10% shareholders (based on beneficial ownership) must disclose a broad range of other economic positions held, including options, warrants, equity swaps and other equity derivatives, whether cash or physically settled.

4.35.   This brief survey of other regulatory approaches indicates that there is some move towards greater disclosure of derivatives positions in some jurisdictions outside the EU, largely driven by concerns over takeover situations or the exercise of voting rights more generally. Some of these moves are too recent for it to be possible to draw any conclusions as to their consequences. The experience of those regulators which have had disclosure regimes for some time does not suggest that disclosure of CfDs has had a negative effect on market growth or liquidity. In addition the widespread move towards general disclosure would seem to suggest that there is no reason to believe that additional disclosure requirements would significantly harm the UK's competitive position.

> Q3:   Do you agree with our analysis of the evidence set out in this chapter? Is there further evidence that you think we should consider?

# 5 Overall conclusions and policy options

## Introduction

5.1.  In this chapter we set out the overall conclusions that we draw from the analytical work described and summarised in the previous chapters. We also give some options for addressing the issues identified.

5.2.  Our overall objectives in the work that we have carried out over the last year have been to use firm evidence to assess the extent to which the non-disclosure of CfDs causes market failures, and to consider whether and how those failures can be addressed in practice.

5.3.  We have tried to make this assessment in as rigorous and open-minded a way as possible. As we said last October, in relation to the responses received to CP06/4, 'there was little consensus on the extent or significance of [these] market failures or to the potential costs and benefits of a disclosure regime. We have been provided with anecdotal evidence in support of stakeholder views but it has been more difficult to identify clear-cut empirical evidence which support the arguments cited.'

5.4.  So we have considered the issues from several different perspectives. We have gone back to the theoretical principles that underpin market disclosure to understand what the potential benefits and costs might be of CfD disclosure. We have gathered some of our own empirical evidence to test the validity of these theoretical principles in practice. As part of this, and to ensure we understand the underlying concerns and objectives of all stakeholders, we have sought the views of a wide range of market participants, including issuers and investors, investment banks and hedge funds as well as those responsible for the Takeover Panel and Companies Act regimes. We have also taken particular note of recent market developments and a number of situations that have been reported publicly where the use of CfDs has been, or appears to have been, of particular significance.

5.5.  We have summarised this work in this paper, and have included our own analytical work and other evidence as Annexes to this paper.

5.6.  Last year we set out in PS 06/11 the three broad options that we saw as open to us in addressing any market failures that were identified. These were to maintain the current regime unchanged, strengthen the regime, or introduce a general disclosure regime.

5.7.    These remain the broad options for consideration and it is against these that we have been assessing the evidence from the analysis carried out and discussions since last October. As they involve new rules, we need to be able to justify our proposals with evidence of the market failures caused by the current position, and clear and rigorous cost-benefit analysis. This analysis needs to consider not just direct costs on all market participants but also indirect costs. The potential costs of extended disclosure are in particular difficult to quantify. Again, we are setting this analysis out as fully as we can, together with the underlying assumptions. We fully recognise that the underlying assumptions are broad, so the outturns in terms of total costs could vary significantly. We would welcome alternative quantitative analysis on the costs and benefits of an extended disclosure regime.

## Analytical framework

5.8.    Given the complexity of the issues that have been considered, it is helpful to briefly repeat the overall framework that we have followed in assessing the evidence.

5.9.    In chapter 3 we set out the possible market failures that could arise from the non-disclosure of CfDs (inefficient price formation, distorted market for corporate control, and diminished market confidence).

5.10.   In order to propose new rules we need to be able to demonstrate that some or all of these market failures occur on a sufficient scale and in ways that are not caught by the current disclosure requirements.

5.11.   As we noted in chapter 3, these failures could arise for two reasons. First, they may arise because of the economic interest that is inherent in CfDs that are not disclosed. This could lead to inefficient price formation. Second, these failures could be caused by the possible link that could be made between the economic interest of the CfD (again, when not disclosed) and the voting rights that are attached to the underlying shares. In the context of the broad policy options that we have open to us, we would as a starting point consider a general disclosure regime to be justifiable in cost-benefit terms either if there was clear evidence that not disclosing economic interest led to inefficient price formation, or if, even in the absence of market failures caused by the non-disclosure of economic interest, such a regime would be a proportionate and effective response to any market failures caused by the link between undisclosed economic interest and access to voting rights.

5.12.   Also, after identifying the reasons why and the extent to which any of these market failures do occur, we also need to take into account the effectiveness of the existing disclosure and regulatory regime as a whole. Assessing the extent and effectiveness of the existing regime as a whole is integral to deciding what would be a proportionate response to any market failure.

## What does the evidence tell us?

5.13.   Taking the disclosure of pure economic interest first, we see only limited evidence of market failure arising from this source. It is possible that arbitrage opportunities could provide possibilities for insider dealing if the identity of the CfD holder is not disclosed. But this situation would probably be caught by the Market Abuse regime. It is also

possible that uncertainty (as to the underlying intention) caused by the sale (or purchase) of stock to hedge CfD contracts could result in speculation and price volatility. But disclosure of intention is not covered by the existing MSN requirements. By the same token, a generalised disclosure regime would equally not reveal any information about the intention of the CfD holder in relation to their strategy.

5.14.    More generally, the main purpose of the MSN regime itself is not to ensure disclosure of trading strategies or portfolio positions. To the extent that these are revealed by the disclosure regime, it is as a by-product of rules designed to focus on corporate ownership and voting rights.

5.15.    In relation to voting rights, the hypothesis that our evidence should test would be broadly as follows:

   (i)   the current DTR (and Companies Act) regime is aimed at voting rights;

   (ii)  CfDs essentially share the same characteristics and are used in the same way as shares, which do carry voting rights; so

   (iii) CfDs should be subject to the same disclosure requirements.

5.16.    Our review of the academic evidence considering the effect of shareholder notifications on price formation suggests that MSN disclosures are of value to the market and contain information that investors use in pricing issuers' shares. This appears also to happen in practice, as shown by our analysis of MSN data. This is particularly important in the context of possible takeover situations, where lack of disclosure of significant positions built up in anticipation of a takeover (a 'toehold') can discourage other potential bidders from entering a contest. This is because the bidder with an existing toehold will have more incentive to see the bid through to a successful result. In applying these conclusions to the issue of CfD disclosure, the key question is whether CfDs are in effect a substitute for shares so that disclosure of CfDs would bring the same benefits to price formation, takeover situations and market confidence as MSN disclosures. This would be the case where:

   •   CfD positions are closed out with the underlying stock; and/or

   •   CfD writers vote on behalf of CfD holders where they hedge their positions with the underlying stock.

5.17.    The survey carried out for us by PwC does not suggest that the policies and practices of investment banks writing CfDs do operate in these ways. In particular:

   •   investment banks hedge their CfD contracts to varying extents rather than one-for-one;

   •   according to participants in our survey, contracts are only occasionally closed out by selling the underlying shares to the CfD holder; and

   •   the general policy of investment banks is not to vote shares in accordance with CfD holders' requests (although they are sometimes asked to).

5.18.    In addition, our review of trading volumes of CfDs referenced to the stock of an issuer which is the subject of a takeover bid shows that there does not appear to be

a significant difference in the number of contracts written in the run-up to the offer and the number written in the one month after the offer period starts. Nor does there appear to be a significant build-up of CfD activity in the months ahead of an offer period. However, the value of CfD activity does increase substantially once an offer period starts (i.e. the average size of the CfDs written goes up). On this basis, the changes introduced by the Takeover Panel in 2005 appear to have addressed disclosure concerns for the most important time period.

5.19.   But our survey of market participants also shows that despite the stated – and implemented – policies of investment banks, holders of CfDs do on occasion approach the writers seeking to exert influence on an undisclosed basis over voting rights attached to stock held as hedge against those contracts.

5.20.   In addition, we have followed a number of recent publicly reported situations where it appears that CfDs have been used to help build up significant stakes in companies without any prior disclosure, as would have been required by the DTRs for acquisitions of shares. It is reasonably clear to us from these situations that there is, at least to some degree, a general market acceptance that stock can be delivered by a CfD writer to a holder if requested, and that these requests are made, if not always agreed to by all CfD writers. That this is now an increasingly accepted part of market practice is also shown by financial press coverage of the CfD market[5]. This has the potential to impact on market confidence.

5.21.   Overall we conclude that CfDs are not in effect a substitute for the shares on a systematic basis. But there are a few instances in which they are, or might be perceived as being such. In those cases, CfDs are being used in ways which the intention of the current regulatory regime is designed to catch. Specifically, we conclude that CfDs are sometimes being used firstly, to seek to influence votes and other corporate governance matters on an undisclosed basis, and secondly, to build up stakes in companies, again without disclosure.

5.22.   We have therefore concluded that we should seek to address these specific instances, which relate directly to the use of CfDs to access or influence the voting rights of the underlying shares. In other words, we have concluded that leaving the current regime as it stands is not desirable. Some action is needed.

> Q4:   Do you agree with our conclusion that action should be taken to increase disclosure of CfDs?

## Policy Framework

5.23.   But as outlined above this still leaves us with a wide range of potential responses. In formulating what point along this range is appropriate we believe we should be guided by three key propositions:

- first, we are not against the use of CfDs to influence corporate actions and governance matters provided it is on the basis of disclosure (as would be the case for shares held directly);

---

5    For example, *The Business* September 2007 commented that '*the brokers and investment banks that provide CfDs also go into the market to buy or sell shares that underpin them. If they own the shares then, in turn, they own the voting rights. It may be possible to conduct a separate transaction that bestows the voting rights to the CfD investor. Alternatively, the broker may be willing to sell some actual stock to the CfD investor*'.

- second, we do see some specific 'failures' of the current regime where lack of disclosure appears to be the underlying difficulty, but these are not systematic in nature; and

- third, given these failures are not systematic, we would prefer proportionate solutions that address as far as possible the more significant concerns and do not lead to excessive 'noise' or to inconsistencies in how any new requirements are implemented.

5.24.   On this basis, we propose a two-part response:

(a) first, a clear restatement of the existing regulatory regime, to make clear the extent to which certain behaviours are already caught by our rules; and,

(b) second, measures designed to require greater disclosure of CfDs in those circumstances where CfD holders are seeking to influence a company's management and strategy, or seeking to use CfDs as a basis for engaging in stakebuilding. Here, we are putting forward two separate options for consultation: a package of specific targeted measures which would strengthen the application of the existing regime, and lead to enhanced disclosure in specific circumstances (we label this 'Option 2' in what follows); and a generalised disclosure regime (which we label 'Option 3').

5.25.   We have made an informed and careful evaluation between Option 2 and Option 3. We believe that we can deliver our desired outcomes through the former. But we recognise that there is an important discussion about the merit of going beyond these measures, and we address this option further below.

5.26.   In the rest of this chapter we cover the following issues:

(a) **Restatement of the existing regime** (paragraphs 27-28)

(b) **Scope and definitions of new rules** applicable to both Options 2 and 3 (paragraphs 29-31)

(c) **Option 2:** proposed new rules, aggregation and threshold issues, scenarios to illustrate impact of new rules (paragraphs 32-50)

(d) **Option 3:** potential benefits, aggregation and threshold issues, interaction with Option 2, potential costs (paragraphs 51-63)

(e) **Comparison of Option 2 and Option 3** (paragraphs 64-70)

(f) **Issues applicable to both Options 2 and 3:** information to be disclosed to issuers, information to be disseminated to the market, disclosure exemptions for CfD writers, interaction with Takeover Panel requirements (paragraphs 71-84)

## The existing regime

5.27.   In our October 2006 statement we said that we would consider ways in which we could more aggressively enforce the existing regime. We believe that the starting point for this should be a clear re-statement for the benefit of all market participants – issuing companies, writers and holders of CfDs – of the current regime and the

intentions behind it. We summarised in chapter 2 the main elements of this regime. Table 2 below sets this out in more detail, together with illustrations showing how the current regime already bites on a number of different situations which have been held out as raising problems.

5.28.   The FSA continues to view combating all forms of market abuse as a key priority. We aim to maintain clean markets and to deter abuse through a combination of preventative measures and enforcement action. As part of this, it is important that the market does receive the information it needs on an accurate and timely basis. In this context we will continue to monitor proactively compliance with the DTRs. Since taking on the oversight of the major shareholdings regime in January 2007 we have been working with market participants – issuers, investors and their respective advisers and agents – in ensuring reporting obligations are understood and followed. We have previously commented that we would take a risk based approach in monitoring compliance. As with any breaches of FSA rules, failures by firms or individuals to comply with the DTRs, either in their existing or a strengthened form, could lead to appropriate enforcement action. We will also be prepared to take action under the market abuse regime against false or misleading announcements.

## Table 2

| Current Legislation | What the rules say | Examples of how they apply |
|---|---|---|
| FSA Handbook – High Level Standards | Applies to authorised firms. | |
| PRIN 2.1.1 R | 1. A firm must conduct its business with integrity.<br>5. A firm must observe proper standards of market conduct. | Any firm misrepresenting its position by claiming a larger interest through CfDs that they possess or falsely claiming or implying that they have access to voting rights, or having access to voting rights without making a disclosure, where these actions were considered to be carried out in connection with a regulated activity, would be falling short of standards required by authorised firms. |
| Disclosure and Transparency Rules | *DTR 5 applies to persons holding voting rights in shares admitted to trading on a regulated or prescribed market* | |
| DTR 5.1.2 | A person must notify the issuer if their holding of voting rights attached to shares exceeds 3% or exceeds of falls below one of the thresholds. | A person buys a large amount of shares, with voting rights attached. If the voting rights attaching to the shares do not benefit from an exemption, (From 5.1.3R) such as trading book, or market maker, there is a requirement to make a notification. |

| Current Legislation | What the rules say | How they might apply |
|---|---|---|
| DTR 5.1.2 | CfD example 1 | CfD holder has (1) no access to voting rights for duration of contract and (2) contract is not physically settled. The CfD holder only has an economic interest and has no obligation to disclose. |
| DTR 5.1.2<br>DTR 5.2.1 | CfD example 2 | CfD holder has (1) access to voting rights but (2) contract is not physically settled. The CfD holder will have to notify the issuer at the point it enters into the CfD, where it fails under the requirements of DTR 5.2.1R. When the contract is settled, it will cease to have access to the voting rights and will have to make a further notification if it has crossed one of the thresholds for disclosure. |
| DTR 5.1.2 | CfD example 3 | CfD holder has (1) no access to voting rights for duration of contract and (2) contract is physically settled. If the CfD holder has a right under the CfD to have the underlying securities, the CfD holder will have to notify the issuer at the point it enters into the CfD, as it holds voting rights through a financial instrument. If there is no right to the underlying securities, there is no need for a notification until the CfD holder takes deliver of the underlying shares. |
| DTR 5.1.2 | CfD example 4 | CfD holder has (1) access to voting rights and (2) contract is physically settled. The CfD holder will have to notify the issuer at the point it enters into the CfD, where it falls under the requirements of DTR 5.2.1R. When the contract is settled, it may have to make further notification in accordance with DTR 5.7.1. |

| Current Legislation | What the rules say | How they might apply |
|---|---|---|
| **DTR 5.1.2** | CFD example 5 | CfD holder has (1) no access to voting rights for duration of contract and (2) contract is not physically settled. The Original contract is varied to either give access to voting rights or physical settlement or both. Initially there is no disclosure required. If the nature of the contract changes to become a financial instrument that gives the CfD holder access to voting rights then that would trigger a requirement to notify the issuer. |
| **DTR 5.1.3/5.1.4** | Shares held by a market maker, up to a holding of 10% [5.1.3R(3)], are not required to be notified to an issuer as long as the market maker **does not intervene in the management of the issuer** [5.1.4(1)(b)] | A CfD holder instructs the CfD writer, who holds shares in the company as a hedge in its trading book or market maker account, to vote the underlying shares in a certain way. By exercising the votes on the instructions of the CfD holder the CfD writer would lose the disclosure exemption, by effectively intervening in the management of the share issuer, and it would have to disclose its interest in the underlying shares. |
| **DTR 5.1.3 (4)** | Shares held within the trading book of an investment firm or credit institution which do not exceed 5% of voting rights may be disregarded for notification purposes, provided that **the voting rights...are not exercised or otherwise used to intervene in the management for the issuer.** Again, any attempt to vote shares would negate the exemption and require a disclosure. | |
| **DTR 5.3.1** | A holder must make a notification if it holds, directly or indirectly, certain financial instruments which result in an entitlement to acquire, on the holder's own initiative alone, issued shares to which voting rights are attached. | Where someone buys a call option over shares which would give access to a notifiable level of voting rights, it would have to make a disclosure. Likewise if a CfD holder had a right under the contract to buy the shares at closure of the CfD, it would also have to make a disclosure. |
| **Market Abuse Rules** | *Applies to all market participants* | |
| **MAR 1.8.1** Market abuse (dissemination) | Market abuse [includes] 'the dissemination of information by any means which gives, or is likely to give, a false or misleading impression as to a qualifying investment by a person who knew or could reasonably be expected to have known that the information was false or misleading' | Any firm misrepresenting its position publicly by claiming an interest through CfDs that they do not possess, which could have an effect on the market, could be in breach of the Market Abuse Rules. |

| Current Legislation | What the rules say | How they might apply |
| --- | --- | --- |
| Takeover Code | *Applies to everyone* | |
| 8.3(a) | During an offer period, if a person, whether or not an associate, is interested (directly or indirectly) in 1% or more of any class of relevant securities of an offeror or of the offeree company or as a result of any transaction will be interested in 1% or more, dealings in any relevant securities of that company by such person (or any other person through whom the interest is derived) must be publicly disclosed.<br>Relevant securities here includes CfDs. | A person or firm has built up a significant economic interest in a company, by holding a large CfD position. The company is then involved in a takeover. If the person later deals during the offer period, either in shares or in derivatives, they will have to disclose all their interests including their CfD |

### *Scope and definitions (Options 2 and 3)*

5.29.   We propose to add a new category of instrument to the existing DTR categories of shares and qualifying financial instruments. This would be a 'comparable financial instrument', which would be defined as a financial instrument having similar economic effect to a qualifying financial instrument.

5.30.   We would consider a comparable financial instrument to have 'similar economic effect' if its terms are related or referenced in whole or in part to an issuer's shares. We also intend that only gross long positions should be brought within the scope of the new rules. This is because our focus is on voting rights and/or the potential for holders of economic interest to acquire the underlying shares.

5.31.   The proposed new rules will apply to instruments referenced to shares that, as set out in DTR 5.1.1., are traded on a regulated or prescribed market. So the new rules will apply to CfDs relating to shares traded on PLUS (now a regulated market) and AIM (a prescribed market) as well as CfDs related to shares on the main market.

> Q5:    Do you agree that our proposed definition of comparable financial instrument, taken together with our guidance on 'similar economic effect', will effectively capture all instruments that could potentially otherwise be used to build stakes or exert influence on an undisclosed basis? If not, are there any instruments that a) should be caught but will not be, or b) will be caught but should not be?

## Option 2: Strengthening the existing regime

5.32.   As indicated above we believe that there are several instances of CfDs being used in ways that the current regime does not explicitly capture. Greater disclosure has been strongly supported by issuers and investors and more recently has been recommended by the Hedge Funds Working Group (see paragraph 53 below). So we have considered some additions to the requirements contained in the DTRs to target

the specific situations we have noted above, and are proposing two measures now for consultation. The first will make it clear to issuers and holders of CfDs that access to voting rights should not be claimed misleadingly or untruthfully by requiring disclosure of CfD contracts that do not comply with a number of requirements that together form a 'safe harbour'. It will also make it more difficult for them to build significant stakes in companies through CfDs on an undisclosed basis. The second would broadly mirror s793 of the Companies Act 2006 by giving companies the ability to request information from a person they have reasonable cause to believe holds an economic interest in the company's shares. These measures are set out separately in more detail below.

### (i) Disclosure of CfD contracts

5.33.   We are proposing to add new rules to DTRs 5.1.2 and 5.3.1 and related provisions that will require CfD contracts above a specified threshold to be disclosed by the holder to the issuer (and by the issuer to the market) unless all of the following provisions constituting a safe harbour apply (CfDs that are silent on any of them will be treated as not complying with the safe harbour):

(a) The contractual arrangements of the CfD forbid the holder from exerting influence over related shares to which the CfD writer may during the term of the contract have access.

(b) The terms of the arrangements state there are, and will be, no arrangements or understandings in relation to the potential sale of the underlying shares (or the benefit of them) to the CfD holder on or shortly after the expiry of the contract. This would include any discussion simply about the possibility of such potential sale, and 'understanding' would include any formal or informal understanding including a clear or firm expectation arising out of the circumstances. The provision would be limited to arrangements or understandings in relation to underlying stock that the CfD writer had acquired in connection with the CfD, for example, as a hedge. Therefore they would not capture unrelated ordinary course of business dealings between the parties to the contract in shares held by the CfD writer for other purposes.

For both the above, the contractual arrangements may subsequently be varied to allow the holder influence over the voting rights in the issuer or the sort of arrangements set out in (b). If either occurs, this would remove the CfD from the safe harbour and it would need to be disclosed.

(c) The provisions set out in (a) and (b) have not been breached regardless of whether they are enforceable between the parties. So regardless of whether the parties would have an interest in or the ability to enforce the terms of the CfDs a breach would mean that the safe harbour falls away.

(d) In addition, the holder must declare in writing to the CfD writer at the time of entering the contract that he does not have any intention to acquire or obtain access to shares in the issuer that the CfD writer holds, or may at some point hold, in connection with the CfD. That intention must be genuine and remain

accurate for the safe harbour to be available. This means that if the holder subsequently changes their mind, a notification would have to be made as the original declaration would no longer continue to be accurate. Whilst this triggers a disclosure obligation because the safe harbour is no longer available, it may also raise questions about the reliability of the original declaration of intention in the absence of robust and convincing justifications regarding the change of intent. It may also cast doubt on the absence of an informal understanding or arrangements as to the potential scope for acquiring underlying shares from the CfD writer.

5.34.   We would expect that most CfD contracts will be constructed so they qualify for the safe harbour, at least at the start of the contract, given the information we have about the purpose for which most CfD contracts are used. CfDs which do qualify for the safe harbour would not be disclosable under this provision. However, the proposed rules requiring disclosure of CfD contracts that do not comply with the provisions of the safe harbour set out above will make it more difficult for holders of CfDs to claim access to voting rights on a false or misleading basis and/or to build up significant stakes on an undisclosed basis.

> Q6:   Do you agree that CfDs not complying with a safe harbour should be disclosed?
>
> Q7:   Do you agree with the specific conditions we have proposed for the safe harbour, and that, as necessary, they can practicably be incorporated into the agreements between the parties to a CfD contract?

### (ii) Notification to issuer on reasonable request

5.35.   Although we expect most CfDs to comply with safe harbour, even where they do comply, there may be circumstances where issuers may need a supplementary tool to help them verify the identity of holders of economic interest in their company and the extent of any such economic interest.

5.36.   The Companies Act 2006 already contains provisions that allow companies to seek information from persons who the company believes may be interested in its shares. Specifically, s793 enables a public company to require any person whom the company knows or has reasonable cause to believe to be interested in the company's shares (or to have been interested in the previous three years) to confirm whether or not this is the case and, if it is, to provide further information relating to the interest. These provisions also allow shareholders of the company, who together hold 10% or more of the company's shares, to require the company to issue such a request. The underlying intention is to allow minority shareholders to require the company to provide them with information in situations where the directors are not exercising their powers, where the shareholders' interests may not be fully aligned with that of the company's management, for example in a takeover. The information required to be disclosed can include (s824) whether there is an agreement between parties to acquire shares or agreement or arrangement relating to the exercise of voting rights (but this applies (s824 (2) (b)) only where the shares have subsequently