been acquired). The information required is not constrained by any specified threshold in terms of the amount of interest. There is no further definition of 'reasonable grounds for belief', but if the requirement to provide information is 'frivolous or vexatious' (s795 (2)) the person to whom it is sent is not required to comply with it. The information required must be given within a 'reasonable' time as specified by the company issuing the requirement and the company is required to provide whatever information it receives available to its members and also to make it publicly available.

5.37. To the extent that CfDs do not comply with the proposed safe harbours outlined above (including the exclusion of any ability on behalf of the CfD holder to exercise influence on voting rights and the absence of any agreement or understanding to acquire shares), they would need to be disclosed. However, the company may still need to verify claims or other comment or speculation about any economic interest held in that company by a CfD holder if the CfD complies with the safe harbours, but still (later on) could give access to voting rights or be used to exercise influence over the company. The Companies Act provisions described above would not necessarily fill this gap. We are proposing, using the Companies Act provision as a model, to provide issuers with the ability to establish in certain circumstances who, over specified thresholds, holds economic interest in their shares. We propose that a CfD holder will be required to make a notification in response to a reasonable request from an issuer in relation to any CfD related to the issuer's shares over a specified threshold (see below for more detail on the thresholds).

5.38. We have considered the need to prevent indiscriminate or unjustified use of this provision by issuers and propose to set out what constitutes a reasonable request. A reasonable request would be one where the issuer knows or has reasonable cause for believing that a person has an economic interest in the issuer's shares and is not vexatious or frivolous. 'Reasonable cause' would include (but not be limited to):

(a) a direct or indirect approach by the CfD holder attempting to influence the issuer's management, claiming to have access to or control over voting rights in the company; and

(b) the issuer being aware of significant press speculation or market rumour (not instigated by the issuer itself) identifying the person to whom the request is sent as potentially interested in the shares or voting rights, or in gaining access to or control over voting rights, and the issuer has taken reasonable steps to satisfy itself that the speculation or rumour is not frivolous or vexatious.

5.39. To reinforce our intention that this provision should not be used indiscriminately, we propose to add a rule to the effect that issuers must document the grounds on which they are making a request for a notification. This could be done in a standard form that we will make available on our website. This documentation of the grounds for the notification, along with any notification from the CfD holder to the issuer, will be required to be disseminated to the market. An issuer's request is unlikely to be reasonable if the issuer has already sent a request to the same person and there has been no material change in the circumstances to warrant a further request. For example, multiple requests in a relatively short space of time based on substantially

similar press speculation or market rumour may indicate that the issuer does not have reasonable cause to issue a further request.

> Q8:    Do you agree that there should be a 'notification to issuer on reasonable request' provision?

> Q9:    Do you agree with the proposed guidance on what constitutes reasonable grounds, and that issuers should be required to include these in the notification request?

### (iii) Aggregation and Thresholds

5.40.   Under the Transparency Directive (TD) significant shareholders of a company are required to notify the issuer when its holdings cross specified thresholds. These are set at 5% point intervals from 5% to 30% and thereafter at 50% and 75%. Our implementation of the TD through the DTRs retained the previous Companies Act thresholds of 3% and every 1% thereafter.

5.41.   The DTRs require that shares and other qualifying financial instruments (as set out in DTR 5.3.1) should be aggregated for the purpose of notification (see DTR 5.7.1 and List!14[6]).

5.42.   This approach raises the issue of how CfDs should be aggregated and the thresholds at which they should be notified, both in respect of the disclosure of CfDs that do not benefit from the safe harbours and of the thresholds at which the notification to issuer provision should operate.

5.43.   As we have made clear earlier, our overall objectives are to prevent the use of CfDs to assist unsubstantiated approaches to management and/or stakebuilding on an undisclosed basis, and to increase market transparency. Our proposed approach to the issue of aggregation and thresholds flows from these objectives. We are seeking to implement a regime that is effective and workable, and that sits within the scope of the TD and our powers. We are also seeking to avoid the disclosure of misleading or valueless information; inconsistent treatment of comparable situations; and of opportunities for 'regulatory arbitrage' so that investors with similar access to voting rights (whether through shares or other financial instruments) should have similar disclosure requirements. Finally, we also want to avoid creating loopholes.

5.44.   We therefore propose that CfDs that do not comply with the safe harbours should be aggregated with instruments currently within the scope of the DTRs (i.e., shares and qualifying financial instruments in DTR 5.3.1, including CfDs that carry a formal agreement to deliver underlying shares). This should be done on the basis that these CfDs effectively provide access to voting rights and should be treated in the same way as shares and other instruments that provide this access. Aggregates of these holdings should be subject to the existing DTR disclosure thresholds (both where holdings increase over a threshold, and where they decrease below a threshold). CfDs that comply with the safe harbour provisions should be aggregated separately along with other comparable financial instruments that similarly comply. Because they do not carry actual or presumed access to voting rights there should be no aggregation of this

---

6   http://www.fsa.gov.uk/pubs/ukla/list14_apr07.pdf

category with the first category. These would not be disclosed except in response to the notification to issuer provision. This is set out in Table 3 below.

**Table 3**

| | Currently caught holdings | | | Aggregation under new regime |
|---|---|---|---|---|
| 1 | Shares | | Currently aggregated under existing DTRs | These will all be aggregated under the new regime (Option 2) |
| 2 | Qualifying financial instruments | (e.g. call option) | | |
| 3 | CfD with formal agreement to deliver the underlying | (very rare, if at all, but effectively embedded call option) | | |
| | **Newly caught holdings** | | | |
| 4 | CfDs that are silent on access to shares [or fail to meet all the criteria for a safe harbour] | Constructive access to voting rights based on new rules | | |
| 5 | CfDs Benefiting from the safe harbour | No voting rights associated so not generally disclosable | May be disclosable to an issuer making a notification request. | These will be treated as a separate 'category' under the new regime |
| 6 | Other comparable financial instruments | Treated in the same way as the instrument to which they are comparable. | | Treated in the same way as the instrument to which they are comparable. |

5.45.   We have considered whether the same thresholds should apply for the notification to issuer provision as apply within the DTRs currently. Our view is that, as a principle, CfDs that comply with the safe harbour should generally not be disclosable. However, there are circumstances in which an issuer may need to be able to establish whether a possible CfD holder does actually hold economic interest. This is particularly important where there is significant suspicion or belief that attempts are being made to build a significant stake in the issuer through the use of CfDs on an undisclosed basis, and so, despite the presence of the safe harbour, there are grounds for considering that the CfDs may be being used to provide access to voting rights. Consistent with our objective of avoiding the disclosure of misleading information, we propose that the initial threshold for disclosure of economic interest in response to a reasonable request should be set at 5%, following the TD. After that, further disclosures should be required (again, in response to a further reasonable request) only when further TD thresholds are crossed (i.e. at 10%, 15%, etc, or when economic interests fall beneath the thresholds; for the situation where an economic interest falls below 5% the response from the CfD holder would be 'no notifiable

interest). It is possible that the notification to the issuer may be a confirmation that in effect the position is the same (i.e. the holding of economic interest is in the same band as previously, even if it has moved over a threshold and subsequently fallen back to the same band).

5.46.   We have considered whether in responding to a reasonable request from an issuer a CfD holder should include all economic interest across the two categories of instruments, whatever form it takes (i.e. shares, CfDs that do not comply with the safe harbours as well as 'pure economic' CfDs). We think that the notification to issuer provision should apply only to 'pure economic' interests. Holdings of shares and CfDs that are silent on any of the provisions constituting the safe harbour ('silent CfDs') will be disclosable under the new rules, and aggregation across the categories would lead to double-counting.

5.47.   This approach to aggregation and thresholds is illustrated through some examples set out in Table 4 below (assuming a notification to issuer threshold of 5%).

**Table 4**

| | Disclosable holdings | Safe harbour holdings | Disclosure Obligation |
|---|---|---|---|
| Example 1 | 2% Shares | 2% Economic interest CfD | No disclosure obligation. |
| Example 2 | 2% shares 2% silent CfD | None | 'Silent' CfDs deemed to have access therefore aggregated. Disclosure of 4%. |
| Example 3 | 2% shares 2% silent CfD | 3% Economic interest CfD | Disclosure only of 4% (aggregated shares and silent CfD). |
| Example 4 | None | 6% Economic interest CfD | Disclosure of 6% only in response to issuer notification request. |
| Example 4a | | 6% Economic interest CfD (already disclosed under issuer notification request) Plus 2% Economic interest CfD | Response to issuer notification request would reveal no further disclosure. |
| Example 4b | | 6% Economic interest CfD (already disclosed under issuer notification request) Plus 5% Economic interest CfD | Disclosure of 11% only in response to issuer notification request. |
| Example 5 | 2.5% silent CfD | 6% Economic interest CfD | Disclosure of 6% only in response to issuer notification request. |
| Example 5a | 2.5% shares | 6% Economic interest CfD | Disclosure of 6% only in response to issuer notification request. |
| Example 6 | 2.5% silent CfD | 4% Economic interest CfD | No disclosure (both holdings below threshold). |

> Q10    Do you agree with our proposed approach to aggregation
> and thresholds for Option 2?

### (iv) Disclosure of purpose

5.48.    We have also considered the possibility of adding a new rule to DTR to the effect that a CfD writer that acquires shares to hedge a CfD contract (or disposes of shares upon closing out the CfD position) should make a disclosure in relation to the hedged shares stating that the purpose of the acquisition (or disposal) was to hedge a derivative contract. This could give issuers more knowledge as to what percentage of their shares is being held as a hedge at any one time.

5.49.    However, the costs for investment banks in complying with this rule could be high, as generally their systems are not configured to capture the underlying rationale for individual transactions and to identify those which have been carried out for the specific purpose of hedging CfDs. In addition, feedback from issuer stakeholders has been that such a provision would in fact be of limited value to them. So we have decided not to take this forward.

### (v) Effect of new rules

5.50.    We set out in Table 5 below a number of scenarios to illustrate the way in which we intend the provisions set out above to operate.

**Table 5**

| Scenario | New Rule | Effect |
|---|---|---|
| 1) A CfD Holder enters into a CfD with CfD writer for 5% of the shares of Company A. At this point the holder meets all the requirements for the safe harbour. At a future point in time they decide to try and get hold of the underlying shares from the CfD writer, passing through some or all of the following stages:<br>• The holder thinks about whether they would like to acquire the underlying shares<br>• The holder contacts the CfD writer to explore the possibility of acquiring the underlying shares<br>• The holder decides they will try to acquire the underlying shares<br>• The holder, relying on its long term relationship with the CfD writer, is confident of being able to acquire the shares if he asks<br>• The holder asks the writer to deliver the underlying stock on or shortly after close out of the CfD | Safe harbour requiring declaration of intention not to acquire | At **each bulleted stage of the process** the holder should be asking themselves the question whether their genuine intention, not to acquire, or otherwise obtain access to shares in the issuer continues to be valid. If they no longer have the intention not to acquire, **they must think about making a disclosure.** |
| 2) CfD Holder enters into a CfD with CfD writer for 5% of the shares of Company A. The holder is aware that the CfD writer is likely to hedge this by buying 5% of the shares. CfD Holder wishes to buy the shares at the expiry of the CfD. There is nothing in the contract giving CfD Holder the right to do this, but nothing preventing it either. Currently CfD Holder would not have to disclose its interest under 5.3.1. | **Disclosure of CfDs, which are assumed to have access to voting rights, unless the contract meets the safe harbour requirements** | Under the new rules on disclosure of non-'safe harbour' CfDs, the CfD Holder would have to disclose to Company A that it had entered a CfD for 5% of the shares of Company A, unless the terms of the CfD met the criteria for a 'safe harbour'. |
| 3) A CfD Holder calls up Company A claiming to have a significant interest in the company through CfDs. The CfD Holder wants to talk to the senior management at the company to discuss strategy. Company A currently has no way of checking whether the CfD Holder has a real interest and how big it is. | **Investor triggers disclosure** | If the CfD Holder does have a CfD, then if it is currently a purely economic interest it may still be within the safe harbour, and not need to be disclosed. However, by approaching Company A, it gives the company a reasonable basis to ask the holder whether it has an economic interest in Company A, and the CfD Holder would have to disclose to that company, and through the company to the market. |
| 4) There is significant press speculation that a hedge fund holds a large interest in a company through a CfD holding. The interest may benefit from the safe harbour rules, and appears not yet to be disclosable. Currently the company has no real information about the nature and size of the holding. | **Investor triggers disclosure** | Under the new rules on Notification to issuer, Company A would be able to formally ask the alleged CfD holder whether it has an economic interest in Company A, and CfD Holder would have to disclose to that company, whether or not he has any economic interest in the shares, and what percentage of the voting rights that economic interest would represent. The company would then disclose to the market. |

### Option 3: General Disclosure regime

5.51. We believe that the measures in Option 2 represent a targeted and effective response to the specific issues that we are seeking to address. Indeed, in comparison to the Option 2 we set out last October, we are in fact going further than had been envisaged. We are introducing new requirements for disclosure of CfDs, and giving issuers new tools to 'flush out' notifications by holders of economic interest in their shares in specific circumstances.

5.52. However we recognise that some stakeholders would prefer to see a general disclosure regime whereby all positions of economic interest would be disclosed to the market above a specified threshold, irrespective of the holder's intention. In effect, this would be the equivalent of extending the Takeover Panel's current regime, which requires disclosure (above a 1% threshold) of (long) interests in derivatives and options in respect of or referenced to securities during an offer period.

5.53. In a recent survey of some (mainly FTSE 250) 70 UK quoted companies[7] the Investor Relations Society found very strong support for an extension of this sort (96% supported the amendment of DTR 5 to include CfD positions). In addition, we note the consultation document on best practice standards[8] of the Hedge Fund Working Group (HFWG) in relation to shareholder conduct and derivative positions. In particular:

*'The HFWG acknowledges that companies have a right to know who owns them or who has an ability to easily obtain significant voting power. Indeed, members of the HFWG would welcome higher levels of disclosure.*

*However, the voluntary adoption of enhanced disclosure requirements by hedge fund managers (or any other particular sector of the market) would cause distortions in the market place because they would not apply to all market participants but merely to hedge funds.*

*Therefore, the HFWG recommends that regulators take action to introduce a regime (similar to that of the Takeover Panel in the United Kingdom applicable during takeover offer periods) requiring notification of 'economic' interests in shares held via instruments such as CfDs.'*

*(i) Benefits*

5.54. The possible benefits of such a regime would be:

- greater transparency for issuers: companies would have a clearer idea of who holds key interests in them and therefore who their potential shareholders are, leading to more effective communication with investors, shareholders and the market;

- greater provision of information to the market overall, leading to less asymmetry of information, reduced volatility and lower cost of capital;

---

7   http://www.rdir.com/survey/survey.html?SurveyID=164123&ReportID=-1&pw=d786
8   The Hedge Fund Working Group, chaired by Sir Andrew Large, was established in June 2007 'to review existing standards for the hedge fund industry and make recommendations for strengthening where appropriate'. Its report can be found at: http://www.hfwg.co.uk/sites/10085/files/HFWG%20Paper%20Part%202%20Final.pdf p47

- relative simplicity: the disclosure requirements would be more general in scope and nature and so easier to comply with than specific rules set out in Option 2 based on the structure of individual contractual arrangements and the underlying intentions of the parties involved; and

- clearer alignment with the Takeover Panel regime

5.55.    As we have set out above, we are not persuaded that there is a strong justification based on clear market failure for the greater provision of information about CfDs to the market as an end in itself. However, a general disclosure regime could be an alternative approach to the specific problems that we have identified in relation to the exercise of influence and undisclosed stake building, provided it could be implemented on a proportionate basis. We are therefore putting this Option for consultation alongside the consultation for Option 2.

5.56.    This Option raises a number of questions. First, where should the thresholds for disclosure be set? Second, as with Option 2, how should different CfDs be aggregated and should economic interest be aggregated with existing holdings subject to the current DTRs? Third, should the specific proposals outlined above for Option 2 be maintained alongside a general disclosure regime?

*(ii) Thresholds*

5.57.    We consider that as far as possible the treatment of CfDs in a general disclosure regime for threshold and aggregation purposes should follow the same principles as set out above for Option 2. In relation to thresholds, our objective remains to position any disclosure requirement such that only significant positions are caught and unnecessary 'noise', which could lead to market confusion, is avoided. On this basis, we propose again to follow the TD thresholds, i.e. for disclosure where holdings of economic interest cross thresholds (both where holdings increase past a threshold, and where they decrease below a threshold) set at 5%, 10%, 15% etc. Although we propose setting the initial threshold at 5%, it could be set higher, for example at 10% or even 15%.

*(iii) Aggregation*

5.58.    In relation to aggregation, we would propose a broadly similar approach as set out for Option 2. In other words, there would be two separate 'categories' for disclosure. However, because the focus of Option 3 would be on economic interest, there would be no need to differentiate between those CfDs that do exclude access to voting rights and those that do not. So (nearly) all CfDs would be aggregated in one category, separate from shares, qualifying financial instruments (and those CfDs with an embedded option on the delivery of the underlying shares). Consistent with the approach set out for Option 2, there would be no aggregation across the categories, as the existing DTR requirements would continue to operate.

> Q11:    Do you agree with our proposed approach to aggregation and thresholds for Option 3?

### (iv) Interaction with Option 2

5.59.   The third issue is whether, if Option 3 were implemented on the basis proposed, the Option 2 measures put forward to strengthen the existing regime should also be maintained so that CfDs not complying with the safe harbours should continue to be disclosed if they cross the DTR thresholds and issuers should have the ability to request a notification from a CfD holder over a 5% threshold. Our view, and the basis on which we are consulting, is that Option 2 and Option 3 should be self-standing alternatives. A combination of Option 2 and Option 3, which would entail disclosures at different thresholds, would in our view be confusing and disproportionate.

5.60.   In fact, the substantive difference between Option 2 and Option 3 (at a 5% threshold) is relatively limited, as Table 6 below illustrates. If the Option 3 disclosure regime were adopted, there would only be a gap - as indicated in the shaded line below - in respect of CfD holdings between 3% and 5% not complying with the safe harbours. The loss of this information, disclosable under Option 2, would seem an acceptable response to avoid requiring disclosure of all purely economic 'safe harbour' interests between 3 and 5%.

### Table 6

| CfD that would meet the Option 2 criteria of a Safe Harbour | Percentage holding | Disclosure required under Option 2 | Option 2 Potential notification to issuer? | Disclosure required under Option 3? | Comment |
|---|---|---|---|---|---|
| Yes | 0-3% | No | No | No | Below threshold in any case |
| Yes | 3-5% | No | No | No | No notification to issuer below 5% |
| Yes | 5%+ | No | Yes | Yes | Automatic general disclosure in Option 3 |
| No | 0-3% | No | No | No | Below all thresholds |
| No | 3-5% | Yes | Yes | No | Possible disclosure gap at 3%-5% level in Option 3 |
| No | 5%+ | Yes | Yes | Yes | |
| | | | | | |

### (v) Costs of Option 3

5.61.   However the key issue in relation to Option 3 is whether it is in fact a proportionate response to the issue of voting rights. We summarise here our analysis of the potential costs of Option 3 – more detailed cost-benefit analysis for both Options 2 and 3 is set out in Annex 1.

5.62.   In assessing the potential costs for a general disclosure regime we have considered the direct costs to CfD holders, principally banks and hedge funds, and others (CfD

writers, issuing companies and the FSA) in terms of one-off (systems set-up etc) and on-going costs. There will also be indirect costs for these market participants. We have made a number of assumptions, principally in relation to the disclosure threshold (5%), and the increase in the number of disclosure that would be required (about 20%, taking into account the experience of the Panel regime, and also the impact of extensions of the disclosure regime in Switzerland).

5.63.   Using this broad framework, we estimate that the direct set-up costs to banks and hedge funds would be of the order of £20-50million, and on-going costs would be about £1.5million annually. The potential indirect costs of a general disclosure regime are extremely difficult to quantify. Requiring disclosure of all significant CfDs could in particular have a very significant impact on their business model and strategy with consequent effects on their profitability and even their choice of business location. In addition, increased disclosure requirements could lead to a reduction in the numbers written, and/or the imposition of artificial limits on position to avoid disclosure. This could damage liquidity both for CfDs and for underlying shares, with consequent effects on the ability of companies to raise capital.

## Comparison of Option 2 and Option 3

5.64.   We believe that Option 2 allows us to strengthen the existing regime in a targeted and cost-effective way that would deliver precise tools for issuers to use in the specific circumstances that are of most concern to them. Requiring disclosure of CfDs that do not meet stringent safe harbour requirements, including explicit preclusion of the holder from exercising or seeking to exercise influence would make it significantly more difficult for holders of CfDs to claim the ability to access voting rights when they do not have that ability. In addition, any CfD holder who has or develops the intention to use their CfDs to build up a substantial stake in a company would be forced to disclose their interest at any level above 3%. And providing a mechanism equivalent to s793 of the Companies Act 2006 would allow issuers to 'flush out' holders of economic interest in a targeted and precise way. By focussing on addressing the issues surrounding the use of CfDs to access or influence voting rights we believe that market confidence generally will be enhanced.

5.65.   The framework of rules to deliver this may on the surface appear to be more complex than for a general disclosure regime. But this should not be over-estimated, especially as we anticipate that most CfD writers and holders will want to embed their current practice into the contractual arrangements in order to take advantage of the safe harbour, while the remaining 'notification on issuer's reasonable request' provision is of itself no more complex than the existing s793 power in the Companies Act 2006.

5.66.   In contrast to the potential costs of a general disclosure regime, Option 2 would carry minimal direct and on-going costs and may not risk the more far-reaching negative market effects carried by Option 3.

5.67.   The alternative approach is to introduce a regime that would require the disclosure of all economic interest above a specified threshold in shares held through CfDs and other derivatives. To be consistent with our objective of capturing the more

significant instances we have suggested a threshold of 5% rather than 3% for such a regime and also propose that this threshold should operate separately from that for shares – i.e. there would be no aggregation across the two categories This would have the benefit of providing greater transparency for issuers and for the market at least in terms of who holds economic interest in them and therefore who their potential shareholders are. It would also potentially help reduce some of the price volatility that may be caused by information asymmetries. It would be consistent with the requirements of the Takeover Panel in terms of scope, and as a 'one size fits all' approach would be relatively simple to comply with.

5.68.   This approach would carry costs that need to be carefully evaluated. These are not just the direct initial and on-going costs for market participants but also, and perhaps as importantly, the indirect costs that could impact on all users of the market. Requiring all significant economic positions to be disclosed could damage the liquidity of the CfD market and therefore that of the underlying equity market. This could raise the cost of capital for issuers. The first question is therefore whether these costs are considered to be proportionate to the scale of the market failure that we have identified.

5.69.   There is another point that should be considered, particularly from the perspective of the issuers. While a 'one size fits all' approach would provide a greater breadth of information that would be delivered automatically to issuers and to the market and might be attractive from the point of view of relative simplicity, it would not be a specific tool that issuers could use at their discretion. In addition it would not provide any information about the underlying intention of holders' of economic interest.

5.70.   We nevertheless recognise that Option 3 is a valid alternative approach provided it was considered proportionate. We are therefore consulting on this an alternative to Option 2. We have considered whether a combination of Options 2 and 3 might be desirable, but for the reasons set out we do not believe that this would be effective or proportionate. We would therefore welcome the views of respondents on the balance of argument between Option 2 and Option 3.

> Q12:   Do you agree with our analysis of the relative costs and benefits of Option 2 and Option 3?
>
> Q13:   Which Option do you think would best address the identified market failures?

## Further issues applicable to both Option 2 and Option 3

5.71.   There are several other issues that apply equally to Options 2 and 3. These are covered below. Two of these relate to the integration of these Options into the current DTRs. Here the general principle that we are aiming to follow is that the requirements currently set out in DTR should as far as possible be used as the structure for incorporating these Options.

*(i) Information to be disclosed to issuer*

5.72.    DTR 5.8.2 sets out the information that should be notified arising from the holdings of certain financial instruments in accordance with 5.1.2. We intend that the notifications would be required for:

(a) CfDs not complying with the safe harbour and above the specified threshold (Option 2);

(b) notification to issuer on reasonable request (Option 2); and

(c) the general disclosure requirement in Option 3;

with the extra requirement that in the case of a notification to issuer on reasonable request the information should include the reasons given by the issuer for sending the request.

*(ii) Information to be disseminated*

5.73.    Similarly, we intend that notifications made to the issuer under any of these new rules should be disseminated in accordance with the provisions of DTR 5.8.12. But any response indicating that there was no notifiable interest would not need to be disseminated.

> Q14:    Do you agree with our view on what information should be disclosed to the issuer, and how that information should be disseminated?.

*(iii) Disclosure Exemptions for CfD Writers*

5.74.    The DTRs contain exemptions for voting rights attached to shares held on a trading book (5%) or a market maker account (10%). These voting rights can be disregarded for disclosure purposes under DTR 5.1.2R. It would be expected that many CfD writers (that is someone writing a CfD in a client serving capacity) will be able to take advantage of the trading book or market maker exemption for shares in one of two ways.

5.75.    First, those who write long CfDs and then hedge with the underlying stock will benefit from the DTR exemption by not having to declare long positions in the underlying stock below the exemption thresholds.

5.76.    Second, where a CfD writer writes a short CfD for a client, it effectively takes a long CfD position itself. Therefore a bank writing several short CfDs could find itself with a long CfD position, representing a potentially disclosable interest but because it would be treated as an indirect holding of the underlying voting rights, the trading book exemption may apply to such a bank acting in that capacity. This seems an appropriate outcome given that it is questionable as to whether the disclosure of the long CfD position by the short CfD writer provides valuable information to the market. The short position CfD holder may be taking the short position to hedge an underlying long equity position that may have already been disclosed. A second disclosure of the long CfD position could therefore lead to double disclosure.

5.77. In any case, this second situation should only be an issue under Option 3 as under Option 2 firms writing a short CfD (and therefore being left with a long CfD) in a client serving capacity would be able to take advantage of the safe harbour provisions, since there is no access to voting rights or underlying shares. In addition the thresholds for disclosure under Option 3 only starts at 5%. Also, under Option 3, CFDs will not be aggregated with instruments disclosable under existing DTR rules, which will mean that in practice there should not be a burdensome disclosure obligation.

5.78. It should be noted that under rule 8.3(d) of the Takeover Code, the dealing disclosure requirements of rule 8.3 (a)-(c) do not apply for *"recognised intermediaries acting in a client-serving capacity"*. Note 9 on rule 8 makes it clear that if a recognised intermediary (RI) *"deals in relevant securities other than in a client-serving capacity"* that is, on its own account, it must where appropriate disclose the relevant interests. This rule makes sense for offer periods, as otherwise trades done in a client serving capacity and proprietary trades would potentially have to be disclosed together. However under Option 3, interests would only be disclosable when voting rights cross the relevant thresholds (at 5%, 10% etc.). Therefore the number of disclosures required should be much lower, and there is no need for a general RI exemption.

*(iv) Interaction with the Takeover Panel regime*

5.79. A key issue for market participants will be the interaction of these proposed rules with those of the Takeover Panel during offer periods. We believe that market participants would want to avoid as far as possible the risk of duplicative disclosure requirements that may arise for firms having to comply with two sets of rules during such periods.

5.80. There are broadly two ways of achieving this 'dove-tailing'. The first would be to state in our proposed new rules that the (DTR) requirements do not apply if the information regarding the same holdings or dealings has already been publicly disclosed pursuant to the Panel's rules even if to a different level of detail (see below). The second would be to 'switch off' the DTRs when an offer period begins. Our preference would be for public disclosure pursuant to the Takeover Code to be sufficient to mean that compliance with the DTRs was not necessary, as we believe that this would be easier for firms to comply with.

5.81. In terms of the detailed information that would be disclosed, there are a number of differences between the Panel's requirements and those set out in DTR (5.8.2), some where the DTR requirement goes further than the Panel's, and some where the Code requires more disclosure. These differences would result for either of the approaches noted above. The main differences where the DTRs would require disclosure that is not required under the Code are:

(a) notification of the resulting holding in terms of voting rights, so in an offer period an investor/issuer would need to work out the holding itself from the public information and the DTR information already notified;

(b) disclosure of the chain of controlled undertakings through which the instruments are held (under the Panel's rules the focus is simply on the owner/controller and the person dealing).

5.82.   One other difference would be the denominator used to calculate the percentage of voting rights. The DTRs, based on the TD, require use of the disclosure by the issuer, (to be made by the issuer at the end of each month in which the number of voting rights change). The Code requires use of the voting rights in existence at the time of the dealing. We do not believe this would present a real problem, and instances of this are rare. In any case, where there would be a difference, the denominator required by the Code would provide accurate information on the percentage of voting rights held.

5.83.   As noted above, our preference would be for effective dove-tailing of the DTR and Panel requirements. We do not consider that having slightly different disclosures during an offer period above would significantly impact our overall objectives and that this would be preferable to imposing a dual reporting regime on firms. In stating this preference we emphasise that no implication should be inferred that the Takeover Panel would in any way be responsible for monitoring compliance with our rules, or for initiating or taking any enforcement action in respect of any non-compliance with them.

5.84.   It would also of course be possible to leave the two sets of requirements operating alongside each other, as is already the case in relation to shares. We would welcome the views of market participants on whether this would be practicable.

> Q15:   Do you agree with our proposal that we should seek to avoid as far as possible duplication of disclosure?
>
> Q16:   Do you agree with our approach that disclosures pursuant to the Code would negate the need for additional disclosures under the proposed CfD disclosure regime?

## Conclusion

5.85.   We have set out in this Paper the background to the current CfD market, the ways in which CfDs are being used to meet a wide range of market needs and the regulatory framework that governs disclosure requirements. Taking the concerns of issuers and investors as a starting point we have described a number of potential market failures that might arise when CfDs are used without disclosure. These are principally inefficient price formation, an ineffective market for corporate control and diminished market confidence. In theory, these could be linked either to the 'pure' economic interest attached to CfDs or to the link between CfDs and the voting rights that attach to the shares to which the CfDs are referenced.

5.86.   One of our key objectives has been to move away from the largely anecdotal nature of the discussion that has taken place to date. We have done this by carrying out a number of projects to try to establish the extent to which the theoretical market failures can and do occur in practice, and why. In particular we have sought to answer the following questions:

- What is the evidence that the *'pure' economic interest* of CfDs causes market failure?

- In relation to voting rights, what does the theory tell us about the potential impact of MSN disclosure on price formation, takeover situations and corporate governance?

- What does the empirical evidence tell us about what happens in practice, and how far can these lessons be applied to the issue of disclosure of CfD positions?

- How far do the policies and practices of CfD writers allow scope for the sorts of concerns that the issuers have raised, and the market failures that these suggest, to occur in practice?

- To what extent are the failures that do occur caught by the existing regulatory regime, including in particular that of the Takeover Panel?

5.87.   The broad conclusions that we draw from this analysis are that:

- lack of CfD disclosure would be a cause of market failure if CfDs are in effect a substitute for shares; and

- the evidence that we have collected suggests that the overall this is not the case, but even so it is clear that there are some elements that are 'slipping through the net', specifically with regard first to seeking to influence on an undisclosed basis corporate decisions or governance through claimed access to voting rights and second to building up significant stakes in companies through CfDs, again without disclosure.

5.88.   We have therefore concluded that we should take action now to address these failures. We propose to do this through increasing the disclosure requirements on CfDs either in specific circumstances or as a general requirement.

5.89.   The key question is: what is the most effective and proportionate way of addressing this market failure arising from voting rights given that it occurs on a relatively limited basis and in specific situations? We believe that Option 2 meets our objectives of providing a proportionate and targeted response to the market failures that we have identified in a way that is consistent with the principle that CfDs are a legitimate way of exercising influence on a disclosed basis. But we would welcome the views of respondents on the relative costs ad benefits of the alternative of a general disclosure regime and on this basis have included draft rules to implement Option 3 as well if that is considered to be preferable to Option 2.

# Cost Benefit Analysis of the proposals set out in the Consultation Paper

## Introduction

1.  A cost benefit analysis (CBA) assesses the economic costs and benefits of a proposed policy. When proposing new rules or general guidance on rules, we are obliged (under section 155 of the Financial Services and Markets Act 2000) to publish a CBA, unless we think there will be no significant increase in costs. The CBA should contain an estimate of the costs and an analysis of the benefits, arising from the proposals. We seek to give quantitative estimates of the costs, where possible, unless the costs are of minimal significance.

## Baseline and Methodology

2.  The CBA is a statement of the differences between the baseline – the current position – and the position that would arise if the proposed changes to our rules and guidance are implemented.

3.  This CBA is informed by:

    a. a review of the literature on major shareholding notifications (MSN);

    b. an empirical study of the impact of MSN;

    c. an extensive survey of the practices of the some of the most active CfD issuing investment banks and other market participants; and

    d. a study of the level of CfD trading activity inside and outside of takeover periods for selected shares.

    In addition, we have already consulted certain market participants, including CfD writers and companies, trade bodies and other relevant market participants, on the proposals covered in the CBA.

4.  It should be noted that this CBA uses the term 'CfD' to refer to all derivative instruments whereby the contract holder has an economic interest in the underlying voting shares.

## Cost Benefit Analysis

5.  Our CBA evaluates the incremental impact of our proposed policy options – relative to the current regime – on the following key market participants:

    a. CfD writers;

    b. CfD holders;

    c. companies admitted to trading on a regulated market or a prescribed market ('companies'); and

    d. investors.

6.  In particular, it focuses on the incremental compliance costs that these parties may incur, as well as any other indirect costs or benefits that may arise under our proposals. It also highlights the direct costs to the FSA (e.g., of monitoring and enforcing) that arise under each option. Compliance costs are those necessary to ensure compliance with our rules and regulations. Incremental compliance costs derive from, for example, additional staff time or systems changes needed to satisfy new rules. Indirect costs and benefits relate to, among other things, the effects (positive or negative) on competition or prices in a market.

7.  As set out in chapter 5, this CP considers three principal policy options to address the problems relating to the non-disclosure of CfDs:

    a. maintain the content and application of the current regime;

    b. strengthen the application of the current regime and extend it to:

       i. require disclosure of CfDs that do not benefit from the 'safe-harbour' i.e., those CfDs (a) that allow the CfD holder to access the voting rights of the shares held in hedge by the CfD writer; or (b) that pre-arrange the sale of the underlying shares to the CfD holder; or (c) where the CfD holder forms a genuine intention to acquire or otherwise obtain access to the shares held in hedge ; and

       ii. require persons, on receiving a reasonable request from a company, to notify that company of any CfDs referenced to the company's shares above a specified threshold that they hold. The company will then be required to make public the response;

    c. extend the current regime to include the disclosure of all CfDs (i.e. Option 2(i) but without the 'safe harbour').

8.  The CBA below focuses on evaluating the incremental costs and benefits of Options 2 and 3.

## Option 2

9.  Option 2 places emphasis on strengthening the current regime through two distinct proposals. While each is evaluated separately below, Option 2 should be seen as an overall package.

### Option 2: Disclosure of CfDs with access to voting rights

10.   This consultation paper proposes that CfDs (at or above the 3% threshold) should be disclosed by the CfD holder unless (at the time the CfD is entered into) the CfD qualifies for 'safe harbour' status. To qualify for 'safe harbour' status, a CfD must (a) explicitly exclude access to voting rights by the CfD holder (i.e. the CfD writer will not take instructions from the CfD holder as to how the hedged shares should be voted); (b) the CfD writer and the CfD holder agree not to enter into pre-arrangements in relation to the sale of the hedged shares to the CfD holder; and (c) the CfD holder declares to the CfD writer that he has a genuine intention not to acquire the underlying shares from the CfD writer. If, after entering the CfD, the conditions for 'safe harbour' status are no longer met, i.e. the contract is varied to allow the CfD holder access to the voting rights or the CfD holder forms an intention to acquire the underlying shares, a disclosure obligation will be triggered. In accordance with the notification and disclosure regime currently set out in DTR 5, the new rule would require the CfD writer to make a notification to the company and the FSA and the company would then disclose the information contained in the notification to the market.

*Compliance costs*

11.   Since most CfDs currently do not provide access to voting rights or allow for pre-arrangements, we anticipate that few CfD holders will need to make disclosures under this rule. Moreover, the vast majority of CfD holders use CfDs solely to gain exposure to price movements of the underlying shares and accordingly would not have any intention to acquire any shares used to hedge. Accordingly, we estimate that there will be very few disclosures that will be made pursuant to the new rule. However, for those CfDs that do allow access to voting rights or allow for pre-arrangements, or where the CfD holder forms an intention to buy the underlying hedged shares, we believe the costs to CfD holders of making the requisite notifications will be small. This is because very few notifications will need to be made and accordingly they can be dealt with under manual reporting, without requiring any extensive systems changes. To make a notification, a CfD holder would use the TR-1 form in electronic format and would send it to both the FSA and the relevant company. Costs to CfD holders of having to use this form are expected to be minimal.

12.   There will also be small incremental costs to companies that receive notifications from CfD holders (about CfDs in excess of the 3% threshold that do not qualify for 'safe harbour' status). In this case, companies will be required to make disclosures to the market about the CfDs of which they have been notified. However, the costs to companies is expected to be minimal as the number of notifications they would receive is, based on our understanding of market practices, expected to be small. In addition, they will be able to use existing systems to make disclosures to the market. As with existing shareholder notifications, we are not proposing to mandate the format in which issuers should submit notifications to a Regulatory Information Service ('RIS'). Therefore, the options available to an issuer upon receipt of a major shareholding notification include:

a. forward the TR-1 form to a RIS;

b. forward the information on an electronic version of the TR-1 form, possibly obtained from their chosen RIS provider; and

c. make the announcement in a free-text format.

13. The cost of making a RIS announcement ranges from £12.50 to £50. We expect that the vast majority of CfDs will be able to take advantage of the 'safe harbour' and thus will not be disclosable. We anticipate that the number of CfDs that will not be able to take advantage of the 'safe harbour' will number around 10 a month, at the very most. Accordingly, the direct costs of the new rule should be minimal – i.e. in the region of £6,000 a year for the notification costs. In addition, processing of this information will require compliance departments to spend additional time on this. We estimate this to be 1-2 hours per announcement. Staff in compliance departments might also need some training to correctly apply the new rules although we do not expect these costs to be substantial. Therefore we would not expect the total annual cost to exceed £20,000.

14. We also expect that the vast majority of CfD writers and holders will want to enshrine current practice into the contracts in order to ensure that the contracts are able to take advantage of the 'safe harbour' status. We expect that the cost to CfD writers and holders of including in CfDs clauses regarding access to voting rights and pre-arrangements will be minimal.

*Benefits*

15. The proposal will help address the practice of CfD writers voting on behalf of CfD holders to the limited extent that this occurs. Requiring disclosure of CfDs that allow access to voting rights may benefit market confidence by reducing uncertainty as to whether CfD writers vote on behalf of CfD holders. Thus, to the extent that a particular CfD will allow the CfD holder access to the voting rights or a sale of the underlying shares is intended, subject to informal understanding or arrangement, the market will be informed of the CfD. This should reduce the market speculation that currently exists regarding the motivations of CfD holders. Additionally, the proposal may prevent side-stepping of the existing requirements.

16. While this proposal should provide greater market certainty on voting practices through CfDs, it will not prevent CfD holders from accessing voting rights either (a) during the CfD contract; or (b) upon closing out the contract with physical settlement or going directly to the market to buy the underlying shares. In all cases a disclosure will be required with access to votes through route (b) being disclosed under the existing MSN regime.

*Effects on quality/quantity of products offered*

17. We have considered whether there will be any effects on the supply of and demand for CfDs and take the view that any effects will be minimal. The vast majority of CfDs would not need to be disclosed and accordingly, there should be no effects on the range of CfDs offered by CfD writers. There may be a small effect on the

purchase of CfDs by holders. This is because currently, a very small percentage of CfD holders regard CfDs as instruments with which they can build up a stake in the company through stealth. However, the proposed rule will mean that such stake-building will have to be disclosed. This may mean that CfDs become less attractive to such investors. However, since the vast majority of CfD holders do not purchase CfDs for such purposes, the overall effect on the CfD market will be minimal.

*Costs to the FSA*

18.  We anticipate that the costs of monitoring compliance with the proposed rule will be minimal.

### Option 2: Notification on reasonable request to issuer

19.  The 'notification on reasonable request' proposal allows companies to verify any claims by a hedge fund or other market participant of having an economic interest in the shares. Under the proposed rule, a company will be able to send a request to a person whom the company knows (or has 'reasonable cause to believe') to have a CfD referenced to the company's shares. The request will ask the person to confirm whether or not it has a CfD referenced to more than 5% of the company's shares (irrespective of whether the CfD is non-disclosable, i.e. it is able to take advantage of the 'safe harbour'). The company will have to set out, in the request, the grounds for its knowledge or reasonable belief that the person owns referenced CfDs. Guidance will be added to the rule setting out that a company may have 'reasonable cause to believe' if the person were to approach the company claiming to have access to voting shares or there was substantial press speculation or market rumour identifying the person as having significant CfDs referenced to the company's shares. A person, upon receiving such a request, would have to disclose to the company, whether or not they have a referenced CfD above a 5% threshold. Upon receiving a response to the request for confirmation (i.e. a notification), the company would have to inform the market of the contents of the notification together with the company's 'reasonable cause to believe'.

*Compliance costs*

20.  The compliance costs to companies would be limited as they would incur these costs of their own accord which would include making the request to the alleged CfD holder and forwarding the notification to the market. Costs to CfD holders would normally arise only in the event that a CfD holder made a claim to the company of having an economic interest in the shares. In any case, we feel the costs to persons receiving requests for notification would be minimal as they would only involve a confirmation or denial of an economic interest and the relevant threshold.

21.  We have also limited this power to situations where the company knows or has reasonable cause to believe that the person has an economic interest in the shares. This will avoid indiscriminate enquiries/fishing expeditions by companies, which would result in costs to other market participants.