*Benefits*

22. This proposal would allow companies to verify claims by hedge funds and would support the disclosure of non 'safe harbour' CfDs. We understand from companies that they are being approached by individuals claiming to have an economic interest in their shares. At present, there is no way for companies to verify such claims. This proposal would allow companies to make appropriate enquiries into such claims and then disseminate the conclusions to the market. We believe that introducing such a verification process will reduce the number of misleading statements being made in respect of significant holdings. Moreover, because there is no way of verifying whether an individual has an economic interest in the shares of a company, an individual may be tempted to make a misleading statement about such a holding. This proposal should deter individuals from making such statements as there will now be a process to check the veracity of such claims. Finally, onward disclosure to the market of any positive notification may help allay market rumour and speculation. This should promote market confidence.

*Effects on quality/quantity of products offered*

23. We have considered whether there will be any effects on the supply of and demand for CfDs and take the view that any effects will be minimal. A request for notification would only be triggered by a person making claims to the company to have an economic interest in the shares. Accordingly, this proposal should also have minimal impact on the supply of and demand for CfDs.

*Costs to the FSA*

24. The costs to the FSA will be minimal as this proposal is primarily a mechanism for information exchange between companies and persons claiming to have an economic interest in the shares of the company. Accordingly, there should be limited need for FSA resources.

## Option 3: General Disclosure Regime

25. Option 3 proposes a general disclosure regime whereby all positions would be disclosed to the market above the Transparency Directive's thresholds (i.e. 5%, 10%, 15%, etc.). In contrast to Option 2 disclosures have to be made irrespective of the holder's intention. Option 3 thus is another way of tackling the lack of disclosure of voting rights, by providing more general transparency about economic interests to the market. However, on a pure CBA basis, Option 3 seems to be less proportionate than Option 2.

*Compliance costs*

26. Compliance costs to firms and issuers are the most substantial costs that would be incurred under the new regime. These would fall under two broad categories: up front costs involved in setting up or updating systems in order to calculate and aggregate CfD holdings with holdings in securities and qualifying financial instruments. A cost of processing additional disclosures and notifications.

*Assumptions and sensitivities*

27.  There are a number of different constituents of the CfD holder population, including investment banks, hedge funds, and other investors. In order to estimate the size of the population, we used a combination of data from the responses to the PwC survey and reporting data from our SABRE system. We have used cost estimates from the survey response, and from our dialogue with market participants, as the basis for calculating costs across the whole population of CfD holders.

28.  When looking at the expected level of disclosure of CfDs and comparable financial instruments, we considered that using the thresholds contained in the Transparency Directive would be an appropriate starting point. We have estimated that the increase in announcements (over the number required under the existing MSN regime) if the threshold was set at those contained in the Transparency Directive would be around 20%. This is based on data from the recent regulatory changes in the Swiss regime, and from figures taken from the Takeover Panel regime. There is a possibility that the increase in announcements could be higher, and at the high end the increase might represent a doubling of the existing MSN announcements.

29.  The costs involved in a full disclosure regime will depend upon the thresholds at which disclosures are required. The costs given are based on the assumption that we use the disclosure thresholds contained in the Transparency Directive. However these costs could be reduced if the thresholds were set at a higher level.

*Upfront costs*

30.  The upfront costs to CfD holders could be substantial. The most significant cost in this would be systems costs, which might vary widely across the population of CfD holders. One category of CfD holders are CfD writers. Some of the CfD writers are also significant CfD holders. These firms are mostly large banks. An indication for their systems costs can be obtained from the estimates for replicating the Takeover Panel regime given to us by CfD writers in the survey carried out by PwC (see Annex 4). Three firms actually gave cost estimates for this systems upgrade, which ranged from minimal to £5m-10m per firm. We expect only a small number of firms (i.e. less than 10) to fall into this category. Thus for these CfD holders, we would expect total system costs to be between £15m and £30m.

31.  Systems requirements for other CfD holders might be different. Based on data we have of CfD activity during offer periods, we would expect hedge funds to be the most significant players in the market. They would thus be responsible for the majority of CfD disclosures. A large hedge fund gave us an estimate for upfront costs ranging from £100k to £500k. Of the estimated 300 hedge funds active in the UK, we estimate only 10-15% would be likely to be significant CfD holders and thus would have to upgrade their systems to meet the disclosure requirements. We expect that smaller CfD holders are unlikely to incur significant systems costs. Therefore the total upfront costs for other CfD holders would be somewhere between £3m and £20m. Overall, therefore, we expect the total 'up-front' cost for complying with the regime to be between £20m and £50m.

32.  We would not expect to see a significant reduction in the upfront costs, even with a higher disclosure threshold, as if CfD holders have to implement system changes, these costs would not be significantly different, even if there were a lower number of disclosures. However a significant reduction in new disclosures (i.e. disclosure only over, e.g. 10%) may lead to firms opting to report manually rather than by updating reporting systems.

33.  For CfD writers and issuing companies, we would not expect significant upfront costs.

*Ongoing costs*

34.  CfD holders and companies would also face additional ongoing costs as a result of a new disclosure regime. For holders this would be the cost of analysing/monitoring positions and making disclosures to ensure compliance with the regime. For companies this would be the cost of processing and making additional disclosures to the market. There are no additional requirements for CfD writers.

35.  Based on disclosure requirements in line with the existing disclosure thresholds in the Transparency Directive, we expect an increase of about 20% in the total number of disclosures. We have based this estimate on the experience of the introduction of the Takeover Panel regime and the recently implemented disclosure requirements for CfDs in Switzerland. If the threshold was set higher (say disclosures at 10% and every 5% thereafter), we would expect to see some reduction in these ongoing costs. However, we also provide cost estimates for a scenario where the new disclosures required could match the existing level of major shareholder notification disclosures (effectively a 100% increase).

36.  In the table below we provide an estimate for the total additional ongoing costs for the industry. This is based on estimates for the costs of disclosure and allowing for time to process the notifications. There might also be additional costs for training, to make compliance staff aware of the new requirements. However, we think engaging into an estimation of this cost is not proportionate. In the baseline scenario (20% increase in disclosures) ongoing costs are estimated to be approximately £1.5m. As these costs are linked to the notifications (processing and disclosure costs), these costs would rise in line with the additional increase in disclosures. For the scenario with a 100% increase in disclosures we would therefore expect ongoing costs to be between £6 and £7.5m.

| £Million | CfD Holders | Companies | Total |
|---|---|---|---|
| Ongoing (20% increase in disclosures) | 1.3 | 0.2 | 1.5 |
| Ongoing (100% increase in disclosures) | 6.3 | 1.0 | 7.3 |

Annex 1

### Costs to the FSA

37. For the FSA, we would not expect significant upfront costs. We would expect slightly increased ongoing costs, consisting of monitoring the additional announcements and monitoring compliance with the regime. The estimate would be around £25-£50,000 per year.

### Indirect costs

38. One of the difficulties of producing a robust CBA in this area is the possible variations of the indirect costs. These costs, which can manifest themselves in a large variety of ways, are often difficult to predict and can be impossible to quantify. This section aims to highlight those costs, which could be more significant than the direct costs.

### Costs to hedge funds and market efficiency

39. Increased disclosure of all significant CfD positions potentially has impacts on the activity of hedge funds and other investors who seek to profit from undertaking research and exploiting arbitrage opportunities. New disclosure requirements could influence investment strategy, causing hedge funds to take holdings below the disclosable thresholds in order that other investors do not observe and copy their investment decisions and strategies. This could reduce hedge fund activity and profitability. More importantly this could reduce the incentives of market participants such as hedge funds to undertake research and arbitrage activities. In turn this could have a negative impact on market efficiency. This is because the research and arbitrage activities of hedge funds generally improve market efficiency.

40. An alternative negative consequence of requiring hedge funds to disclose their derivative positions would be to create an incentive for hedge funds to move their activities outside of the UK, either because they think this might exempt them from complying, or because they wish to move their focus away from the UK market to what they perceive to be a less regulated market.

### Costs for CfD writers

41. The requirement to make disclosures may alter the way CfDs are used. E.g. CfD holders may choose to enter only into CfDs below the disclosure threshold. Thus there could be a drop in the number of CfDs being written, especially the larger CfDs. This could reduce income for the banks that write CfDs.

### Costs to issuers

42. A drop in demand for CfDs may reduce demand for the underlying shares. This could in theory reduce liquidity in the underlying share and therefore increase the cost of capital. However the limited information we have from other jurisdictions does not suggest that disclosure of CfDs would have a negative effect on market growth or liquidity.

### Costs to market participants

43.   Market participants could face increased cost of monitoring a higher number of disclosures for meaningful information. This could require systems upgrades, or increased analysis time, or reduce the quality of the analysis as it had to take account of more disclosures carrying different informational value. Moreover, academic literature shows that excessive information can reduce liquidity. However, by setting the disclosure threshold at 5%, we would expect this impact to be manageable.

### Benefits

44.   In general Option 3 would target the same problems in the market (described in some detail in the body of this paper) as Option 2. Our starting point, therefore, is that the benefits of Option 2 and Option 3 are similar. However, there is one reason why the benefits of Option 3 may be lower than those of Option 2 and one reason why the benefits may be higher.

45.   The benefits of Option 3 may be lower than those of Option 2 because in contrast to Option 2 there will be no indication whether the CfD holder has access to voting rights or only has an economic interest. As pointed out in our review of the academic literature, the potential value of increased CfD disclosure is linked to information about access to voting rights. This is also true for issuers, which are predominantly interested in CfD holders with access to voting rights. Under the disclosure regime of Option 3 it is difficult to disentangle which disclosures provide information about voting rights and which do not.

46.   A possible benefit of Option 3 relative to Option 2 is that full disclosure of economic interests may give more certainty to CfD holders about their responsibilities under the disclosure regime. Once in place this might be easier for market participants to understand and comply with than Option 2, where disclosure is dependent on the particular legal structure of specific contracts, and the intention of parties involved. This could contribute to a high level of compliance. However, it is not possible to conclude that compliance with Option 3 will be higher than compliance with Option 2 because Option 3 will require more compliance activity from firms than Option 2 overall.

Annex 1

# Literature Review: Effects of Major Shareholding Disclosures

## Introduction

One of the underlying rationales for the dissemination of information about the identity of major shareholders[9] in companies admitted to trading on a regulated market is the theory that such information should help protect minority shareholders, help make markets operate more efficiently and thus improve market confidence.

Although very little economic literature directly addresses the issue of MSN, there is a vast body that examines the role of information in markets. That literature explores the possible impact of information and disclosure on (a) price efficiency of securities markets, (b) takeovers and (c) investor protection and corporate governance.

### I Price Efficiency of Securities Markets

A transparent market is one which allows market participants to observe order flow and the trading process (see, for example, O'Hara, 1995). The academic literature in the field of market microstructure[10] highlights the importance of transparency in general for improving the process of price discovery and hence leading to more informative prices.

#### (i) Mechanics of information disclosure and value of disclosure

We set out below the key arguments in the academic literature that support mandatory disclosure. Most of this academic literature does not directly address the issue of MSN, but more broadly examines the value of disclosure in securities trading. Accordingly, in this section "information" means information related to past trades with buyer and seller identification.

Without regulation, the extent to which any valuable information becomes available to all participants depends on the costs of acquiring, processing and verifying such information as well as the attendant benefits that users/suppliers of such information derive. If these costs are low, relative to a given level of benefits, it is more likely that this information will be widely distributed amongst market participants.

---

9    These are referred to as Major Shareholding Notifications (MSN).

10   Market microstructure refers to the manner in which securities are traded and the impact on the behaviour of traders, volumes and prices.

– Mandatory disclosure of information eliminates the duplication of costs of individual acquisition of information. Accordingly, *there is an argument that originators of information should be required to distribute the information* (Gilson and Kraakman, 1984).

– *Individuals may be unable to acquire valuable information because it is held only by informed traders.* Because such undisclosed information is not incorporated into prices an adverse selection may be created in the market, i.e., only those traders with undisclosed information ("informed traders") will trade, while uninformed traders will prefer to wait for a public announcement or for more information from the market. Ultimately, any benefits of a reduction in information asymmetry derived from public announcements will depend on the speed with which the undisclosed information of the informed traders is incorporated into prices. There are two competing theories here:

  o Information is only partially revealed over time (Kyle, 1985): In a market with a single informed trader, the trader trades (a public event) in a gradual manner so that the information on which his trades are based is incorporated very slowly into prices. As a result, the depth of the market remains relatively constant over time. The implication is that the market does not incorporate the private information into prices, staying away from the efficient equilibrium.[11] Accordingly, there is some merit to the argument for mandatory public disclosure as it would benefit price efficiency

  o Information is fully revealed: The second theory is that undisclosed information is fully revealed and, incorporated into prices as a result of aggressive trading (Holden and Subrahamanyan, 1992).[12] This theory only holds if all the traders have similar information. For example, if all traders believe that a security is undervalued due to some undisclosed information, they may all trade aggressively and this trading will then be reflected in prices for the security. In other words how quickly prices adjust to this information will depend on the volume of trades.[13] However, in a real-world scenario, where even informed traders may hold diverse information, there can in fact be poor informativeness of prices when multiple traders are present (Admati and Pfleiderer, 1988). This more realistic situation, as a result, would be supportive of public disclosure of information on trades.

– In some cases mandatory disclosures may not result in a price response unless the information is very costly or wholly unavailable to the market. This is not because the disclosure is irrelevant (or the information is of no value), but instead its direct impact may be on reducing the cost of acquiring and verifying information.

---

11    See Kyle 1985

12    Holden and Subrahamanyan (1992) consider the case where multiple informed traders exist in the market. They show that aggressive competition between traders causes all the private information to be incorporated into prices immediately, leading to a strongly efficient market.

13    Therefore, frequently, informed traders in an effort to avoid dissipation of their private information will trade at lower levels without altering market depth as suggested by Kyle (1985).

– There may be costs of disclosure as too much information can reduce liquidity, because traders are unwilling to reveal their intentions to trade.

The above analysis of the wider benefits of information about past trades and buyer and seller identification suggests that there can be benefits from disclosure in relation to price efficiency. These conclusions are also supported by empirical analyses that study abnormal price movements at the time of public announcements of insider trades (see, for example, Korczak and Lasfer, 2005).

(ii) Relevance for Major Shareholding Notifications

While there is no theoretical analysis of the value of MSN, an empirical study by Mikkelson and Ruback (1985) supports the idea that MSN announcements have an impact on prices. The authors examine Schedule 13D filings from 1978-1980. Schedule 13D (which is an SEC requirement similar to the DTR 5 requirement) requires disclosure of ownership of more than 5% in a class of securities to be reported within 10 days of purchase of the shares. Initial announcements that are not part of a takeover are associated with a statistically significant, positive, price increase for both the issuer and filing firms. This result also extends to firms that are taken over.

This empirical analysis would suggest that MSN may provide valuable (new) information. This information may be valuable because it could provide an indication of shareholder interests or which shareholders potentially have power (voting rights) to exert influence over the company. If this information is not completely incorporated into prices at the time of the trade, then mandatory disclosure would result in greater price informativeness.

However, there may also be costs of disclosure as too much information can reduce liquidity, because traders are unwilling to reveal their intentions to trade. Therefore, traders may for instance wish to reduce acquisition to just below the notification thresholds to avoid having to disclose their trading intentions to the market.

(iii) Other arguments for shareholder disclosure

Disclosure requirements are also associated with more developed stock markets. A cross-country study by La Porta, Lopez-de-Silanes and Shleifer (2006) examines the variation in stock market development in countries which have strong shareholder notification requirements relative to countries which do not. The key finding is that disclosure requirements, including disclosure of information regarding shareholders and inside ownership are positively related to measures such as number of listed firms, Initial Public Offering to GDP ratio and market capitalisation to GDP ratio.

(iv) Summary and implications

- The benefits of any disclosure depend on the extent to which undisclosed information does not already become incorporated into prices. Aggressive trading on undisclosed information should mean that the information becomes reflected into prices, i.e. prices are efficient.

- Empirical studies indicate that disclosures of insider holdings (e.g. directors' holdings) and MSN do have price impacts. This implies that prices do not adjust

fully as a result of the actual transaction, and disclosure has some role to play in revealing information that (uninformed) traders value. Moreover, while prices may account for the extent of the trading in a particular company, it is unclear whether important information about the identity of the trader (unless voluntarily disclosed) would become incorporated into prices. This information could also be valuable as different types of traders may have different investment strategies.

- One caveat remains. While information that reflects the motivations of traders can have a significant effect on asset prices (Forster and George, 1992), it can also be misleading – as shown in a theoretical model by Fishman and Hagerty (1992). For example, looking at disclosure of insider trades, the authors highlight that since only insiders know whether their trades are information – or liquidity motivated, disclosure can mislead other traders and can allow insiders to manipulate prices to their advantage. Therefore, the extent to which disclosure leads to a more informationally efficient market depends on the degree to which this disclosure can (or cannot) mask the trading intentions of the market participants.

- Too much information can also reduce liquidity, because traders are unwilling to reveal their intentions to trade. This is a cost of disclosure.

## II *Takeovers*

The analysis of MSN in the context of takeovers presents some of the strongest arguments for the costs and benefits of disclosure. It is natural that large acquisitions of shares in a company can serve as a prelude to a takeover. Therefore, disclosure can serve as an important means of identifying takeover targets.

### (i) Inefficient disclosure

It is suggested that regulation involving shareholder notifications can result in an inefficient transfer of wealth from informed bidding shareholders to other shareholders of target firms. This is because the strategic information of bidders will be revealed to other shareholders, creating a transfer of wealth from the former to the latter.

For there to be an active market for takeovers there should be sufficient incentives for the acquirer to put in an offer for the company and to recover his research costs in the form of an appreciation of the acquired equity investment, after gaining control. If there are constraints that prevent acquirers from profiting, there will be a disincentive for investors to engage in takeovers (Fischel, 1978). On the basis of this, it is argued that making private information public knowledge (through regulation) can actually *create* a regulatory failure i.e. by resulting in investors becoming more unwilling to engage in the market.

A study of MSN in Australia finds that these announcements do provide information to the market and result in an upward revision in share price that takes into account the probability of a synergistic takeover bid in the company (Bishop, 1991). The authors believe that this revision is related to the threat of a takeover and is not a permanent revaluation of the target that would result if substantial

shareholders improved monitoring of management, and thus enhanced a company's long term value. This increase in the share price means that the cost of subsequent acquisition of shares increases, which reduces the gains that the bidder anticipates after the change in ownership of shares (Bishop, 1991). This represents a cost of a disclosure requirement and can possibly reduce takeover activity.

Pagano, Panunzi and Zingales (1998) similarly argue that there exists a trade-off between protection of minority shareholders and having an effective market for takeovers. Disclosures of shareholdings mean that potential acquirers are unable to gain a sufficient 'toehold' prior to the bid. Having to disclose the shareholdings much before the actual bid, means that the toehold and the profit for the bidder will be smaller (Ferrarini, 2002).

### (ii) Disclosure encourages competitive bidding

Having a pre-bid ownership stake or toehold could be an effective strategy for a shareholder who would like to acquire the company. In this case, the acquirer has an incentive to bid even more aggressively because the bidding price is not only a price for the rest of the shares, but also an offer price for the toehold (Bulow, Huang and Klemperer, 1999). However, toeholds also discourage potential bidders from contesting the takeover, as they are at a competitive disadvantage relative to a bidder which already has a toehold. This is because the bidder has more of an incentive to stay in the bidding longer than if the bidder did not have any ownership stake (Bulow, Huang and Klemperer, 1999). Betton and Eckbo (1998) carry out an analysis of 1353 tender offer contests in the United States between 1971 and 1990. They find that the presence of a toehold increases the likelihood of having a single bidder, with bidders without a toehold being unlikely to revise their bid after an initial round. Therefore, theoretically speaking one would expect that disclosure, by discouraging toeholds, would not necessarily reduce corporate contestability and could, in fact, improve it. There is little empirical literature that directly tests this hypothesis.

However, there is a counter-argument here. With the exception of the study cited above, most empirical studies have contradictory findings: that in most takeover contests only a small proportion of the acquirers purchased a toehold prior to the bid (see for example, Bris, 2001; Bradley, Desai and Kim, 1988 and Jarrell and Poulsen, 1989). This finding would then suggest that potential bidders should not be discouraged from contesting a takeover and therefore the benefits of shareholder notifications, of discouraging toeholds, are limited. Most of these studies obviously examine direct equity interest. If for instance CfDs are commonly used to gain a toehold, which would not typically be accounted for in these studies, then the benefits of disclosure in this instance may remain. This issue is reviewed later.

Overall we believe that theoretically speaking, by minimising toeholds and providing information on impending takeovers, shareholding disclosures should improve the contestability of the market for takeovers. Thus, shareholding disclosures are an important tool for corporate governance (and market discipline) which benefits minority shareholders, who are less able to otherwise monitor managers (discussed in greater detail in the following section). However, they may also reduce probabilities of a takeover in itself by raising the costs of acquisition.

## III Corporate Governance / Investor Protection

The final area in which one would expect some impact of MSN would be in promoting good corporate governance. While major shareholding notifications may not be as relevant in the context (see Berle and Means (1932)) of the widely-held listed firm, the more recent picture suggests that firms are not necessarily widely-held. Firms can have large shareholders acquiring more than 3-5% stake in the firm. Lack of knowledge of the identity of these owners creates an information asymmetry between these insiders and minority shareholders, and a lack of transparency on who holds the significant voting rights. Minority shareholders with lesser information than the 'insiders' and large block-holders, may be able to form their own coalitions especially at times of key voting and to monitor large shareholders.

Poor disclosure can worsen the information asymmetry between large shareholders and minority shareholders. The exacerbation of these information asymmetries means that minority shareholders remain uninformed and unable to react to information on ownership of the company. They may for instance wish to sell stakes in a firm upon knowledge of large stake-building by insiders, but without this knowledge will be unable to act on this information. This effect has been shown in recent empirical work.

Empirical literature shows that the shareholder incentives are proxied by both size and type of large shareholders, both of which have significant impacts on equity prices (see for example Hotchkiss and Strickland, 2003, Lins, 2003). While most studies do not directly examine the relationship between shareholding disclosure and the reaction of equity markets, they do find that the form of ownership structure of a listed company does lead to reactions in a firm's equity prices as a result of the implications it holds for the governance of the firm.[14] If there is no disclosure on identity of the major shareholders, the large shareholder can not only trade on his insider information, but can also gain private benefits of control through voting rights. A recent study on Canadian firms indicates that information on the identities of significant owners has an impact on bid-ask spreads of the firm (Attig, Gadhoum and Lang, 2005). The authors find family ownership is associated with an increase in bid-ask spreads which reflects the higher information asymmetry associated with their transactions.

Lack of transparency on ultimate owners (as is the case in emerging economies where cross-holdings and pyramid schemes allow owners to have ultimate economic interest that is more than their cash-flow rights) encourages owners to extract private benefits at the expense of minority shareholders (see for example, Claessen, Djankov, Fan and Lang, 2002). This void has been found to be associated with value-discounts (Claessen, Djankov, Fan and Lang, 2002). There is some support, therefore, for the idea that shareholding disclosures provide effective corporate governance and minority shareholder protection. Bishop (1991) however, argues that while substantial shareholder notifications may be important in identifying the potential for monitors of a firm, their main role is in providing the market information on the probability of an impending takeover, as we discussed earlier.

---

[14] Alternatively, acquisition of large stakes can imply that these large shareholders can serve as external monitors for management and disclosure of this information may be viewed positively from a corporate governance perspective.

Voting rights have value because if a holder has significant votes, they may be able to have a significant role in making key decisions for the firm. Knowledge of vote buying by an insider can provide indications of whether the insiders are entrenching themselves further. Alternatively, control by outsiders may have positive repercussions for the firm in that they may positively influence governance especially if the firm is underperforming. Studies have provided evidence for these theoretical conjectures. In the US, studies have found that the average value of control can be around 2-4% of firm value (see for example, Zingales, 1995; Nenova, 2003), consistent with the idea that there is a market price for votes. Therefore, given that control is valuable, major shareholding notifications can be informative to the market and, in particular, minority shareholders, allowing them to take an informed view on the market for that company's shares. These notifications, then, reduce the risk of shareholder detriment.

The discussion above identified a possibility that greater shareholding disclosures could in fact reduce the probabilities of takeovers by making it costly for acquirers. This suggests a possible trade-off between good investor protection and having a market for corporate control. In some cases this trade-off does not really exist. In firms with large block-holders and controlling coalitions, there may be greater benefits from having a market for corporate control, in most other cases though, the benefits from greater investor protection through transparency may exceed any reduction in contestability of corporate control. In essence as argued by Ferrarini (2002) there is a distributional transfer as a result of disclosure requiring the regulator to place judgement on whether minority shareholder protection or having a market for corporate control has a greater weight in his welfare maximisation function.

## IV Relevance for CfDs

A CfD exposes the CfD holder to movements in prices of shares without the holder typically having to buy or sell the physical. The CfD allows exposure to the underlying for a fraction of the cost of buying the assets. In this section we consider whether any of the arguments above would also hold for CfDs.

### (i) Price Efficiency

From the perspective of price efficiency, there may be a natural extension for the disclosure of information on identity of CfD holders in improving the informativeness of prices of the securities. This argument, however, only holds to the extent that CfDs are often closed out with the underlying share (or CfD issuers vote on the instructions of the CfD holders) and that knowledge of the identity of major CfD holders has similar implications as the identity of a major shareholder. CfDs can also be a route through which informed traders can undertake strategic trading to prevent the release of information that would otherwise be revealed through MSN. If, however, informed traders (of equities and CfDs) have similar beliefs, then aggressive trading will automatically reveal information into prices, minimising the significance of mandatory disclosure.

Annex 2                                                                                          7

If there is little voting on behalf of CfD holders, then benefits of mandatory disclosure of the identity of the CfD holder from the perspective of market efficiency are limited. It may be argued that, even if CfDs are only used to provide exposure to a sector or stock, knowledge of major CfD stake-building may still serve to provide important information to the market on trading interest. But the case for this is certainly weak.

Similarly though, there is always a risk of too much transparency in the market as discussed above. While leverage and ability to go short/long are the most important reasons for entering into CfDs (based on the PwC survey), stake building without disclosure was also cited as a reason for entering into CfDs. Therefore, given that the anonymity afforded by CfDs is not the most significant reason for entering into CfDs, disclosure may cause only small market liquidity declines in this respect. Moreover, there has not been a reduction in CfD usage or change in liquidity as a result of the Takeover Panel regime either. Of course other indirect effects of transparency such as costs of compliance could have stronger liquidity effects on the market. We do not explore these here.

(ii) **Market for corporate control**

Given the significance of MSN in providing the market information on possible takeover targets, one should expect the same argument to be significant in the case of CfDs. It is argued that CfDs can also be used as a tool to build stakes in quoted companies, avoiding the need for making the disclosures that are necessary when shares are purchased. The lack of notification allows stake-builders to gain sufficient toehold in the firm which can be converted into direct equity interest when they acquire the physical from the CfD issuer who is holding these shares as a hedge. As discussed earlier then, by providing notifications on CfD stake-builders, it can help to make takeovers more competitive which should benefit shareholders.

## *Does disclosure prior to bid-period provide value to the market?*

What is the value of *additional* disclosure given that the Takeover Panel regime already requires trading in major CfD positions to be disclosed during the bid-period, which should help to make takeover contests more competitive? One method to identify takeover targets is through monitoring of trading in shares of the relevant company. Share trading in a firm should increase as potential bidders try to accumulate shares, either directly by buying shares outright or indirectly through CfD positions. In this case, without disclosure there will be information asymmetries in the market.

However, the economic benefits from disclosure will only emerge if most acquirers have a sufficient toehold in the company before launching a takeover bid. This would be contrary to most of the research we reviewed in earlier sections which did not find a large number of toehold cases in firms that were taken over. Moreover, full disclosure to the market may reduce the appetite for takeover as it reduces the gains to the bidder.

### (iii) Corporate Governance / Investor Protection

CfDs *(if we assume that CfD issuers are willing to vote on behalf of CfD holders)* are in essence a form of 'hidden ownership', a term coined by Hu and Black (2007). This may be viewed both positively and negatively. On the positive side, hidden ownership can be a tool for hedge funds to have an influence on the governance of firms that are underperforming. Literature finds that monitoring by institutional shareholders can improve firm performance (see for example, Black, 1992; Monks and Minnow, 2004), although the same benefits should remain if the monitoring is carried out by a disclosed large owner (hedge fund).

On the negative side, CfD holders may use their votes (to the extent they can access the voting rights through the CfD issuer holding the underlying equity as a hedge) for objectives that are not necessarily aligned with those of the minority shareholders. This problem is exacerbated if there are undisclosed voting rights (Hu and Black, 2007). If these are disclosed, investors will accordingly adjust the price they wish to pay for the shares to account for this effect. However, if hidden votes are undisclosed and possibly change over time, investors may expect an adverse selection effect and discount (or alter) the price they pay for all shares (Hu and Black, 2007).

If eventually the shares fall into the hands of the CfD holder when the contract is closed out, the holding in the company must be disclosed under MSN rules and thus adverse selection and information asymmetry are reduced. Therefore, information asymmetry problems are highest during the period when the CfD is held – but only if banks vote on the instructions of the CfD holder. Therefore, in order for CfD disclosure to be beneficial in economic terms, there must be a strong link with voting. There is incomplete evidence on this and information on whether most CfDs are purchased prior to important votes, and the length of period for which CfDs are held can provide some indication of the extent of these problems.[15]

---

15   Survey results discussed elsewhere in the CP suggest that CFD holders do not, in general, gain access to voting rights through the CFD issuer.

## References:

Admati, A. R. and P. Pfleiderer, 1988, A theory of intraday trading patterns, Review of Financial Studies 4, 443-481.

Ali, Ashiq, Durtschi, Cindy, Lev, Baruch and Mark Trombley, 2004, Changes in institutional ownership and subsequent earnings announcement abnormal returns, Journal of Accounting, Auditing and Finance 19, 221-248.

Attig, Najah, Gadhoum, Yoser and Lang, Larry H.P., 2003, Bid-Ask Spread, Asymmetric Information and Ultimate Ownership, http://ssrn.com/abstract=332020

Berle, Adolf A. and Gardiner C. Means, 1932, The Modern Corporation and Private Property. New York, Macmillan Publishing Co.

Betton, S. and B. Eckbo, 1998, State-contingent payoffs in takeovers: New structural estimates, University of Pennsylvania, mimeo.

Bishop, Steven R., 1991, Pre-bid acquisitions and substantial shareholder notices, Australian Journal of Management 16, 1-34.

Black, Bernard, 1992, Agents watching agents: The promise of institutional investor voice, UCLA Law Review 39, 811-893.

Bradley, Micheal, Desai, Anand and E. Han Kim, 1988, Synergistic gains from corporate acquisitions and their division between the stockholders of target and acquiring firms, Journal of Financial Economics 21, 3-40.

Bris, Arturo, 2001, When do bidders purchase a toehold?, Yale University, Working Paper, http://faculty.som.yale.edu/%7Eab364/toehold.pdf

Bulow, Jeremy, Ming Huang and Paul Klemperer, 1999, Toeholds and Takeovers, Journal of Political Economy 107, 427-54.

Claessens, Stijn, Djankov, Simeon, Fan, Joseph P. H. and Larry HP Lang, 2002, Disentangling the incentive and entrenchment effects of large shareholdings, Journal of Finance 57, 2741-2771.

Ferrarini, Guido A., 2002, Share Ownership, Takeover Law and the Contestability of Corporate Control, http://ssrn.com/abstract=265429 .

Fischel, Daniel R., 1978, Efficient capital market theory, the market for corporate control and the regulation of cash tender offers, Texas Law Review 1.

Fishman, Michael J. and Kathleen M. Hagerty, 1992, Insider trading and efficiency of stock prices, Rand Journal of Economics 23, 106-122.

Forster, Margaret M. and Thomas J. George, 1992, Anonymity in securities markets, Journal of Financial Intermediation 2, 168-206.

Foster, F. D. and S. Viswanathan, 1990, A theory of intraday variations in volume, variance and trading costs in securities markets, Review of Financial Studies 3, 593-624.

Gilson, Ronald J. and Reinier H. Kraakman, 1984, The mechanisms of market efficiency, Virginia Law Review 70, 549-644.

Holden, C. and A. Subrahmanyan, 1992, Long-lived private information and imperfect competition, Journal of Finance 47, 247-270.

Hotchkiss, Edith and Deon Strickland, 2003, Does shareholder composition matter? Evidence from the market reaction to corporate earnings announcements, Journal of Finance 58, 1469-1498.

Hu, Henry T. C. and Bernard Black, 2007, Hedge funds, insiders, and the decoupling of economic and voting ownership: Empty voting and hidden (morphable) ownership, Journal of Corporate Finance 13, 343-367.

Jarrell, Gregg A. and Annette B. Poulsen, 1989, Stock trading before the announcement of tender offers: Insider trading or market anticipation, Journal of Law, Economics and organization 5, 225-248.

Korczak, Adriana and Amezaine Lasfer, 2005, Insider trading and international cross-listing, Working Paper, http://www.fma.org/Stockholm/Papers/Korczak_Lasfer.pdf

Kyle, Albert S., 1985, Continuous Auction and Insider Trading, Econometrica 53, 1315-1335.

La Porta, Rafael, Lopez-de-Silanes, Florencio and Andrei Shleifer, 2006, What works in securities laws?, Journal of Finance 61, 1-32.

Lins, Karl, 2003, Equity ownership and firm value in emerging markets, Journal of Financial and Quantitative Analysis 38, 159-184.

Madhavan, Ananth, 1996, Security prices and market transparency, Journal of Financial Intermediation 5, 255-283.

Madhavan, Ananth, 2000, Market microstructure: A survey, Journal of Financial Markets 3, 205-258.

Mikkelson, Wayne H. and Richard S. Ruback, 1985, An empirical analysis of the interfirm equity investment process, Journal of Financial Economics 14, 523-553.

Monks, Robert and Nell Minnow, 2004, Corporate Governance, Blackwell Publishers, Oxford.

Nenova, Tatiana, 2003, The value of corporate voting rights and control: A cross-country analysis, Journal of Financial Economics 68, 325-351.

O'Hara, Maureen, 1995, Market Microstructure Theory, Blackwell Publishers, Cambridge, MA.

Pagano, Marcello, Panunzi, Fausto and Luigi Zingales, 1998, Osservazioni sulla riforma della disciplina dell'OPA, degli obblighi di comunicazione del possesso azionario e dei limiti agli incroci azionari, Rivista delle Societé, 1.

Zingales, Luigi, 1995, What determines the value of corporate votes, Quarterly Journal of Economics 110, 1047-1073

# Determining the effects of Major Shareholdings Notifications

## 1. Summary

In order to better understand the information content of Major Shareholdings Notifications (MSNs) we examined the impact on share prices of a sample of MSN announcements in the period January 2006-August 2006.

The results suggest that MSNs are of some value to the market and contain information that investors use in pricing issuers' shares. The findings also indicate that market responses are asymmetric in most cases, with sales inducing statistically significant price falls while purchases show insignificant price rises. Announcements by other potentially passive investors like asset managers may also have significant market impacts but this is not conclusively established.

When we try and separate the effects of the transaction itself and the subsequent announcement, we find significant price movements around the time the actual transaction takes place. However, disclosure also has some further impact on price, suggesting disclosures contain some valuable information. The results should be interpreted carefully in light of our study's limited timeframe and sample size. Further work using more sophisticated methodologies must be undertaken to deal with some of these caveats.

While the results generally demonstrate that MSNs have some information value, it is difficult to link this conclusion directly to the case for CFD disclosures. MSNs may convey valuable information about ownership, voting structure and trading interest in an issuer. For this also to be the case for CFDs, the link with the right or ability to acquire shares or influence voting rights would need to be made.

## 2. Background

Under the UK's implementation of the Transparency Directive (TD) any shareholder (or those with rights to acquire shares) of an issuer traded on a regulated or exchange-regulated market (such as AIM and Plus Markets) is required to simultaneously inform the issuer and the FSA of changes to major holdings in that issuer's shares. MSNs are required when the shareholder reaches, exceeds or falls below specified thresholds. The key notification threshold is 3%, below which

MSNs are not required. Above 3% a shareholder must make disclosures at every 1% threshold that is breached. For example, in case of share purchases, a shareholder must disclose to the issuer and FSA upon crossing 3%, 4%, 5% and so on. The same requirements hold when stocks are sold and the shareholdings falls below specified thresholds as a result.

The process for MSN announcements is that shareholders are required to notify the issuer within 3 days (4 days if it is a non-UK shareholder) whenever they breach the specified thresholds. The issuer in turn has 1 day (2 days if it is a non-UK issuer) to announce this information to market.

CP 06/04 on the implementation of the Transparency Directive argued that these disclosures ensure that investors and issuers can accurately determine the voting structure of an issuer's capital, enhancing transparency of ownership interests and potentially important capital movements.

This study seeks to examine the effect of the announcement of shareholdings to the market. A measure of price movements over the period where information from disclosure would be released known as the Cumulative Abnormal Return (CAR) is derived. This allows us to see how market prices react to information about large shareholders of the firm. We derive first a model of normal or 'expected' returns. The details of this model are in the Annex. The abnormal return on a given day is the difference between the expected return from our model and the actual return. By adding together abnormal returns over a specific time period (e.g. from 1 day before up to 1 day after disclosure) we calculate the CAR.

The underlying hypothesis is that if the market values MSN disclosures, then any such announcements should result in *statistically significant* price movements around the disclosure time. However, if these disclosures do not convey any important information to the market, then there should not be any (statistically significant) price movements at this time. Most of the price movements should instead be captured around the transaction date.

There may be other market impacts of MSNs which may not be picked up in our study. Therefore, a finding of insignificant price movements may not necessarily suggest that disclosure has no value. For example, one view is that shareholding disclosures should only confirm market expectations and hence do necessarily result in a movement in prices. Therefore, while they may still be of value, our methodology will not be able to pick up these effects as it relies on movements in prices.

## 3. Data

We have collected data on all announcements related to MSNs (i.e. changes in shareholdings that crossed the disclosure thresholds). Our initial sample included 2773 announcements for the eight month period from 1 January to 30 August 2006. This period was the latest period for which data was available at the time of initiation of the study.

## Data Filtering

We employed a number of filters in arriving at our final sample of announcements. First, we dropped announcements relating to issuers for whom we could not find stock prices in Bloomberg (presumably due to a takeover or no trading activity). Second, in cases where multiple announcements are made by a shareholder in an issuer on the same day, we only took the last announcement into consideration. Avoiding this double counting of multiple announcements, we were left with 2267 disclosures.

**Figure 1: Number of Announcements by Month (2006)**



A significant proportion of the data does not include information on whether the announcement is a result of a sale or purchase. An example of announcements which do not carry this information is as follows: "On 9 September 2006, we have received notification that firm X and its subsidiaries are interested in 3.8% of ordinary shares of company Z". Therefore, without making ad-hoc assumptions, it is difficult to glean from such announcements whether the resultant 3.8% is because the firm has disposed of shares or acquired more shares. Given the possibly diametrically opposite effects of a sale relative to a purchase, taking all these announcements together could confound the results. Therefore, we separately examined announcements that could be clearly linked to a purchase or sale and analysed these as separate and distinct events. There are 829 announcements which allow us to separate buys and sells. Figure 1 shows the monthly breakdown for our sample of MSN announcements.

## Disclosure versus Transaction Times

Out of these 829 announcements, 473 included the date when the transaction actually took place. This information allows us to evaluate the length of time between the transaction and announcement dates. A large share of MSN announcements occur within 3 days of the transaction date, while the majority seem to occur within 5 days of that date. This is true for both purchases and sales. In a limited number of cases, this delay can be over 5 days; however, delays over 10 days are uncommon.