We document the difference between transaction date and disclosure date in Figures 2A and 2B for buys and sells, respectively. The figures suggest that disclosures for buys happen slightly sooner than that for sales: buy disclosures happen on average 2.8 days after the actual transaction, while sales disclosures occur on average 4.3 days subsequent to the trade.

**Figure 2 A (Buys: Date of Disclosure − Date of Transaction)**



**Figure 2 B (Sells: Date of Disclosure − Date of Transaction)**



This gap in transaction and disclosure date are on average within the MSN requirements. The requirements give a limit of 3 days for the shareholder to disclosure to the issuer (or 4 days in case of non-UK shareholder). The issuer has a further day (or 2 days in case of non-UK issuer) to disclose this to the market. So a total of 4-6 days difference between transaction and announcement date is not uncommon. Most of our data points lie within this band, and in many cases the announcement to the market is much faster. The few outliers could either be the result of incorrect coding of transaction date or they could be cases of non-compliance.

*Shareholder Type*

Our announcement data contain information on shareholder type, which facilitates analysis of market responses based on key shareholder classifications: investment banks, asset managers and alternative investors (includes hedge funds and private equity firms). Not surprisingly, investment banks and asset management companies make up the majority of announcements (see figure 3).

## Figure 3: Breakdown of announcements by shareholder type



We also have information on total shareholding at the time of announcement and cases where the shareholder falls below the 3% threshold and therefore no longer has a significant stake in the issuer. This information may prove useful in evaluating the marginal information content of MSNs at different ownership thresholds.[16] In some cases the announcements also contain information on the size of the trade, allowing us to separate block trades from non-block trades. We looked specifically at trades where more than 0.5% of the company's shares were either bought or sold in a single transaction.

*Sample Biases*

We should mention here possible sample biases. While we look at the entire sample in the first instance, we are unable to breakdown the entire sample into buy and sells as not all announcements carried this information. We noticed that particular announcers report in a certain format and do not reveal the buy and sell. So potentially the sample is biased, as in almost all cases it does not include separate announcements by these particular issuers into buys and sells. As discussed earlier, some of these announcements get filtered out, which poses the possibility of sample bias. There are two further possible biases when we look at transaction dates. Firstly, as above, not all announcements data contained transaction dates. Again these were announcements by specific shareholders, which could result in selection bias. Secondly, in many cases the transaction date is not clear from the announcements. Sometimes it is very clearly delineated as the date of transaction, in other cases the announcement states: "We have received a letter dated 20 March 2007 from shareholder X…" or in other cases it will state "As of 20 March 2007, shareholder X has 10% shareholding…" While in

---

16   While we did not undertake a thorough analysis of this type as part of our work, we did look at whether and how the market reacted to announcements at the 3% and 5% thresholds. The results are discussed later.

the latter case, it may be more clear that 20 March is the transaction date in the former it is less clear and so we are also forced to exclude the former announcements. These biases should be kept in mind when interpreting the results.

## 4. Methodology

### Event Study

We tested the hypothesis that MSNs are used by investors, using standard event study methodology. Very simply, this approach allows us to measure abnormal price effects both on the trading date and the disclosure date for purchases and sales and to evaluate whether these abnormalities are statistically significant. Finding statistically significant price effects on either or both of these dates would provide evidence that trade information and/or MSNs are of value to the market. The concepts behind such an event study are set out in detail in FSA's research papers on market cleanliness.[17]

We followed an accepted calculation methodology (described in detail in the Annex) to examine abnormal price movements around the announcement date. This methodology is similar to that followed on FSA's research papers on market cleanliness. The methodology allows us to isolate the effects of announcements from normal market or sector movements. It allows us to see the 'abnormal' price movements compared to normal or expected returns.

To identify whether stock returns are abnormal, we used a statistical (market) model of normal or 'expected' returns. The abnormal returns on any day are the difference between expected returns from this model and the actual return. By adding together abnormal returns over time, we calculate the CARs.

To provide some sense for how to interpret CARs, let's take the example of an MSN announcement made by an issuer to the market that a private equity firm has taken control of 10% of its shares. One interpretation is that if this announcement is considered good news (and only becomes known to the market at that time) about the potential future performance of the firm, the stock price will most likely increase, everything else being equal. This gives rise to a positive post-announcement CAR.

## 5. Results

The results are reported for two different techniques. Before discussing these results we describe each of these techniques.

Firstly, we estimated a regression model[18] to understand the key factors that drive these price movements (CARs) that we have computed i.e. is it the shareholder type

---

17  See Occasional Paper 23, Measuring market cleanliness, FSA, http://www.fsa.gov.uk/pubs/occpapers/op23.pdf and Occasional Paper 25, Updated measurement of market cleanliness, FSA, http://www.fsa.gov.uk/pubs/occpapers/op25.pdf

18  An ordinary least squares (OLS) procedure is used to estimate an equation of the form:

$CARs = \alpha + \beta_1 Assetmgr + \beta_2 Bank + \beta_3 Initialtrade + \beta_4 Sizeoftrade + \varepsilon$ .

where Assetmgr is a dummy where the announcement was made by an asset management firm; Bank is a dummy where the announcement was made by a bank; Initial trade is a dummy for the first announcement by a shareholder in the firm; Size of trade is a continuous variable that measures the size of the trade that resulted in the disclosure. Specifications involving additional variables such as total holdings after the announcement and the first or last time an announcement in made in a particular issuer were also tested. These were insignificant and are therefore, not reported in the final specification. The results were broadly robust to their inclusion and exclusion.

or the size of the trade that significantly affects the abnormal price movements. It also helps to explain the marginal or incremental effects of these other factors in explaining CARs. This helps us control for all other factors that may be affecting CARs. The regression analysis is reported only around the -2,+2 window (2 days before and 2 days after the announcement), although the results do not change for the -1,+1 window.

As a second robustness check, CARs are also compared across different cuts of the sample. Once we have obtained CARs for each disclosure, not only do we summarise the average CAR for the entire sample, we also use different cuts of the sample which are described below:

1   For the entire sample (All); only those announcements which were the first time a particular shareholder had acquired stake in the firm (Initial Trade) – we used this because it was possible that the market may only move then and not at subsequent times; only those announcements where there was an announcement in a particular issuer for the first time (First Firm) and finally those announcements where there was an announcement in an issuer for the final time in our dataset (Last Firm).

2   For unique trade types such as block trades;

3   For transactions by unique shareholder types (Alternative investors including hedge funds and private equity; Bank and Asset Manager);

4   For cases where the shareholder held less than 5% stake in the company. For sales transactions, we expanded the analysis and looked at the reactions in cases where the transaction resulted in shareholder ownership below the 3% threshold.

These are reported in Table 2 in the Annex.[19] The reason for reporting these sample splits in addition to the regression analysis is because the sample splits provide further information about the sample characteristics.

5.1 Does Disclosure Matter? (see Tables 1 & 2 in the Annex)

For disclosure to have value, the CARs we have calculated should be statistically significant. Both Tables 1 and 2 (see Annex) show the CARs to be statistically significant. The results in Table 1 show that there are price movements that are statistically different from zero, when announcements are made by particular shareholders; when the announcement relates to a trade that is 'initial' (see our definition of 'initial' above) or if a large block trade is carried out.

Table 2 also provides similar support to these conclusions. For overall trades, there are significant abnormal price movements (CARs) but these are mostly driven by the sell announcements which are also separately statistically significant. We find small price reactions in almost all cases for buy transactions.

The direction of abnormal price movements is in line with theoretical expectations. Large purchases that result in significant shareholdings may indicate positive information about the firm, resulting in positive price movements and similarly large sales should result in negative price movements.

---

19   The same sample cuts are also used in Tables 3-4.

The results were broadly robust across the two event windows (-2,+2 and -1,+1).

Therefore both results from two different methods reported in Tables 1 & 2 show that there are some significant abnormal price movements at the time of disclosure. It is possible though that some of the significant results for disclosure are in fact due to the market moving to the transaction which took place a few days ago rather than the actual disclosure. In the next section we try to determine the marginal impact of MSNs beyond the transaction effects.

### 5.2 Does disclosure have marginal value? (see Tables 3 & 4 in the Annex)

The analysis shows MSNs do result in significant price movements. However, given that the time period between the disclosure and transaction date is small, it is possible that the results are due to market movements around transaction dates.

For example, Korczak and Lasfer (2005)[20] find significant price movements on insider trades around transaction dates as well as disclosure times. Gemmill (1996)[21] in a study for the OFT found that disclosure of block transactions (or a delay in disclosure) did not have any significant price impacts. Instead, the market reacts at the time the block transaction takes place. One word of caution is that the latter study considers large block trades which are more likely to move the market as opposed to the announcements in our data – these may not necessarily have been a result of a single block trade.

To analyse this issue we look specifically at events in our sample where the event transaction and disclosure date are more than two days apart. In order to create completely non-overlapping periods around the transaction and disclosure dates we would need a gap of between 3-5 days between these dates (which can in fact exceed the regulatory requirements). The problem is that this gap reduces total events to a small number, which makes sense given that the maximum (prescribed) gap between announcements and disclosure is 4-6 days. We therefore only consider a 2 day separation for both event windows.

We have considerably fewer observations than those in Table 1 because we had very little data on the transaction date. Table 3 indicates that some CARs (related to asset managers) still remain statistically significant around disclosure time, although other significant effects have disappeared.

There are more statistically significant price movements around the transaction time (see Table 4).[22] However, the results seem to indicate that both disclosure and the transaction generate significant abnormal price movements. Not all disclosures generate abnormal price movements, because not necessarily all of them carry price sensitive information. One conjecture is that that the increased gap between trade and disclosure date that is used for this sample may be confounding the results. It is

---

20   Adriana Korczak and Amezaine Lasfer, 2005, Insider trading and international cross listing, working paper.

21   Gemmill, Gordon, 1996, Transparency and liquidity: A study of block trades on the London Stock Exchange under different publication rules, Journal of Finance 51, 1765-1790.

22   Separate analysis was also carried out for buys and sells. We find some significant abnormal returns in the case of sells. We did not find any significant abnormal returns around disclosure time for buys. This may be because of the reduced sample size. We therefore, report the results for the entire sample.

possible that full instantaneous disclosure may have more value than disclosure which happens a few days afterwards and our results could possibly be reflecting this. We tried to validate this conjecture by using regression analysis. However, our results are inconclusive.

## 6. Robustness checks and caveats

Several robustness checks such as through regression analysis have been carried out to conclusively establish these results. While, some of the robustness checks have yielded similar results, others will require further work.

For example, the analysis in Tables 3-4 indicates that disclosure continues to have value once the transaction effects have been considered. However, the regression exercise which controls for all other factors is not able to validate this. This does not necessarily indicate a rejection of earlier conclusions because choice of estimation procedure may be affecting the results.

The event window used to measure the effects of disclosure also includes 1 or 2 days before disclosure. It may be more appropriate to consider only the post-disclosure period, as we are assessing only the impacts of the actual announcement. While most academic papers do not follow this approach, as a robustness check we do consider this revised event window. Using this, we continue to find some cases where disclosure results in significant abnormal price movements. These are, however, fewer compared to the wider event window i.e. the main impact happens at the time of transaction and there is a smaller resultant impact at the time of disclosure.

This paper computes abnormal returns using an OLS estimated market model. However, it is possible that the assumptions required for this simple model may not hold in the underlying data.[23]

Finally, the limited time-frame of the study and small sample must be considered while interpreting the results.

## 7. Conclusion

We have looked at average CARs around announcements of MSNs and the actual transaction date. Key findings and their implications are as follows:

5   There are some significant price effects around the public disclosure date. While the results do not indicate all disclosures to be valuable, these findings would also be in line with other published academic literature (see for e.g. Korczak and Lasfer, 2005) which finds disclosure on shareholdings to convey information (see for e.g. Korczak and Lasfer, 2005; Mikkelson and Ruback, 1985).[24] Our finding of significant price movements continues to hold even after separating out possible impacts on prices as a result of the trade, although the main effect is at the time of the trade.

---

23   The variance of daily abnormal returns may change over returns (heteroscedasticity) and abnormal returns on nearby days may not be independent (serial correlation). To control for the first of these problems an Autoregressive Conditional Heteroscedasticity (ARCH) may be needed.

24   Mikkelson, Wayne H. and Richard S. Ruback, 1985, An empirical analysis of the interfirm equity investment process, Journal of Financial Economics 14, 523-553.

6   These results have been independently refereed by an academic. We are aware of more sophisticated regression methodologies that can be used to check robustness of the findings. Moreover, more complete reporting data on MSN will allow us to carry out more refined statistical analysis. This will help sharpen the estimates of the value of disclosure. However, the key message which we do not expect to change is that MSN announcements appear to contain some information which is used by the market in pricing securities.

7   While it is difficult to relate these results directly to CFDs, given that we find some types of disclosure have value, it is possible that CFD disclosure could also be of value to the market. However, as the disclosures we studied in this paper relate to shareholding stakes, the role of CFD disclosure could also depend on whether CFD holders also indirectly have access to voting rights.

Annex 3

## Calculation Methodology

We follow MacKinlay (1997)[25] and calculate expected returns by estimating a statistical relationship between the stock and the market as in equation 1 below:

$$R_{it} = \alpha_i + \beta_i R_{Mt} + \varepsilon_{it} \qquad (1)$$

Where $R_{it}$ is the actual return on the security for firm i at day t (computed using daily stock prices as $\ln(P_{i,t}/P_{i,t-1})$) and $R_{Mt}$ is the daily return on the FTSE All Shares Index.

We estimated the parameters $\alpha_i$ and $\beta_i$ in equation 1 using an OLS regression of the returns on a constant and returns on the market index. The model was estimated using daily data on stock returns and the FTSE all share index over 240 trading days ending 10 days before the announcement. The parameter $\beta$ captures the extent to which the stock's return depends on the market return over that period, while $\alpha$ represents the expected value of the daily return to that stock in addition to any market-driven movements.

After estimating (1) using the 240-day period that excludes MSN announcements (i.e., a benign or normal period), we compute the abnormal price movements over an event window using equation 2, where $AR_{it}$ is the abnormal returns for firm i at day t. and the expected return is represented the expression in (2) (estimated from (1)).

$$AR_{it} = R_{it} - (\hat{\alpha}_i + \hat{\beta}_i R_{Mt}) \qquad (2)$$

$$CAR_i(\tau_1, \tau_2) = \sum_{t=\tau_1}^{\tau_2} AR_{it} \qquad (3)$$

These abnormal returns in (2) are added up to generate cumulative abnormal returns (CARs) over an event window ($\tau$1, $\tau$2). This is set out in equation 3. The event window spans the period of time over which it is believed that information content could be released to the market and is the period over which CARs are calculated. It encompasses the event or events in question, which in our case includes shareholder trades and MSN disclosure dates. The selection of an appropriate event period is important and a decision which reflects a number of factors. The longer the window, the more difficult it is to detect statistically significant returns.

We used two event windows from day -2 ($\tau$1) to day +2 ($\tau$2) and day -1 ($\tau$1) to day +1 ($\tau$2) to compute the CARs, so as to determine whether the results are sensitive to choice of event window. 2 days before the announcement period are included as some information may leak out into the market just prior to official announcement. However, we deliberately keep the event window small to see the market reaction up to 2 days after the disclosure. The -1,+1 event window is also used in literature testing impacts of such disclosure. These choices are also consistent with the previous information regarding the timing of MSNs that showed that they typically

25    Mackinlay, A. Craig, 1997, Event studies in economics and finance, Journal of Economic Literature 35, 13-39.

occur within 3 days of the transaction date.) Moreover, it is recognised that new information is incorporated into stock prices relatively quickly and so a maximum of two-day post-event window should suffice.

To test whether these abnormal price movements are statistically significant and different from zero, we estimate the Z-statistic as follows[26]:

$$ASPE_t = \frac{1}{N} \sum_{i=1}^{N} \frac{AR_{it}}{S_{it}} \qquad (3)$$

$$Z - statistics = \frac{\sqrt{N}}{\sqrt{T_2 - T_1 + 1}} \sum_{t=T_1}^{T_2} ASPE \qquad (4)$$

Separate models are run around the transaction date and disclosure date. Finding that the abnormal price movements are statistically significantly different from zero around the disclosure date would provide evidence that MSNs are of value, consistent with the notion that investors use such information in pricing an issuers' securities. Similarly, finding statistically significant abnormal returns around the transaction date would suggest that the market finds information on the trade itself useful in pricing issuers' securities.

## Table 1 – Regression on Cumulative Abnormal Returns (CARs)

The table below presents OLS regression results on cumulative abnormal returns [-2,+2] for entire sample, buys and sells. Absolute values of t-statistics are reported in brackets; ***, ** and * represent significance at the 1%, 5% and 10% levels.

|  | All | Buys | Sells |
|---|---|---|---|
| Asset Manager | -2.32 | -3.43 | -1.29 |
|  | [2.15]** | [2.28]** | [0.85] |
| Bank | -1.88 | -3.46 | -0.42 |
|  | [1.68]* | [2.24]** | [0.26] |
| Holdings <5% | -0.12 | 0.18 | -0.45 |
|  | [0.30] | [0.29] | [0.89] |
| Initial trade | -0.17 | 1.39 | -1.57 |
|  | [0.45] | [2.39]** | [3.25]*** |
| Size of trade | 0.05 | 0.03 | -1.75 |
|  | [0.69] | [0.30] | [1.82]* |
| Constant | 2.22 | 2.88 | 1.81 |
|  | [2.06]** | [1.92]* | [1.19] |
| Observations | 458 | 212 | 244 |
| R-squared | 0.01 | 0.05 | 0.07 |

---

26  ASPE=Average standardised prediction errors, where Sit is the estimated standard deviation of the prediction error; ARit as defined in equation 2 is computed within the event period of -2, +2; N is number of securities (events); T1 is beginning of event window (-2) and T2 is end of the event window (+2). We follow Tehranian, Hassan, Travlos, Nikolaos and James Waegelein, 1987, The effect of long-term performance plans on corporate sell-off-induced abnormal returns, Journal of Finance 42, 933-942.

**Table 2 – Cumulative Abnormal Returns (CARs) around disclosure:**

The table below summarises CARs for announcements, using the date of disclosure as the event date and 2 days before and after the event being included in the event period. N refers to number of events, *CAR* refers to cumulative abnormal returns and *Z-stat* is the statistics that tests for the significance of CAR i.e. whether they are different from zero. \*\*\*,\*\* & \* refer to significance at the 1%, 5% and 10% levels. *Initial* refers to first announcement by a shareholder in a particular issuer; *first firm* refers to first announcement in a particular issuer in the sample; *last firm* refers to final announcement in a particular issuer in the sample; *block trade* refers to announcements in trades of larger than 0.5% of the company's shares; alternative investors refers to announcements by hedge-funds or private equity firms; *bank and asset manager* refer to purchases made by each of these investors, respectively; *sell <3%* are announcements where holdings of shareholders fell below the 3% threshold; *holdings<5%* refers to announcements where the shareholder had less than 5% stake in the firm;

| | -2, +2 days  Around Disclosure Date | | | -1, +1 Around Disclosure Date | |
|---|---|---|---|---|---|
| | N | CAR | Z-Stat | CAR | Z-Stat |
| Overall | 2267 | -0.21% | -1.82* | -0.11% | -1.17 |
| Initial Trade | 948 | -0.32% | -2.49** | -0.23% | -2.50** |
| First Firm | 205 | -0.48% | -2.41** | -0.10% | -0.90 |
| Last Firm | 194 | -0.27% | -0.68 | -0.04% | -0.20 |
| *Trade Type* | | | | | |
| Block Trade | 131 | 0.09% | 0.27 | 0.24% | 0.75 |
| *Type of Shareholder* | | | | | |
| Alternative Investors | 53 | 0.27% | 0.02 | 0.26% | 0.39 |
| Bank | 998 | -0.17% | -0.73 | -0.05% | -0.15 |
| Asset Manager | 1128 | -0.27% | -1.74* | -0.18% | -1.49 |
| *Other* | | | | | |
| Holdings<5% | 873 | -0.18% | -1.16 | -0.27% | -1.69* |

## Panel B

| | **BUYS** | | | | |
|---|---|---|---|---|---|
| | -2, +2 days  Around Disclosure Date | | | -1, +1 Around Disclosure Date | |
| | N | CAR | Z-Stat | CAR | Z-Stat |
| Overall  Buy | 319 | 0.07% | 0.61 | 0.05% | 0.43 |
| Initial Buy | 145 | 0.59% | 1.88* | 0.29% | 1.17 |
| *Trade Type* | | | | | |
| Block Trade | 120 | 0.30% | 0.92 | 0.33% | 1.16 |
| *Type of Shareholder* | | | | | |
| Alternative Investors | 14 | 1.76% | 0.87 | 1.34% | 1.11 |
| Bank | 88 | 0.18% | 0.85 | 0.21% | 0.7 |
| Asset Manager | 215 | -0.10% | -0.08 | -0.12% | -0.33 |
| *Other* | | | | | |
| Holdings<5% | 109 | 0.21% | 0.7 | 0.18% | 0.72 |

Panel C

| | SELLS | | | | |
| --- | --- | --- | --- | --- | --- |
| | -2, +2 days Around Disclosure Date | | | -1, +1 Around Disclosure Date | |
| | N | CAR | Z-Stat | CAR | Z-Stat |
| Overall Sell | 510 | -0.20% | -1.58 | -0.24% | -2.24** |
| Initial Sell | 227 | -0.63% | -3.10*** | -0.69% | -3.86*** |
| *Trade Type* | | | | | |
| Block Trade | 11 | -2.20% | -2.12* | 0.82% | -1.24 |
| *Type of Shareholder* | | | | | |
| Alternative Investors | 5 | 0.78% | 0.21 | 0.07% | -0.13 |
| Bank | 188 | 0.18% | 0.35 | -0.13% | -0.37 |
| Asset Manager | 300 | -0.39% | -1.88* | -0.22% | -1.74* |
| *Other* | | | | | |
| Sell < 3% | 178 | 0.22% | -1.29 | -0.19% | -1.13 |
| Holdings<5% | 281 | -0.36% | -1.91* | -0.27% | -1.69* |

## Table 3 Cumulative Abnormal Returns (CARs) around disclosure (events non-overlapping with transaction)[27]

| | -2, +2 days Around Disclosure Date | | | -1, +1 Around Disclosure Date | |
| --- | --- | --- | --- | --- | --- |
| | N | CAR | Z-Stat | CAR | Z-Stat |
| Overall Trade | 436 | -0.25% | -0.92 | -0.13% | -0.61 |
| Initial Trade | 195 | -0.20% | -0.97 | -0.08% | -0.85 |
| First Firm | 61 | -0.19% | -0.69 | -0.06% | -0.75 |
| Last Firm | 59 | -0.50% | -0.95 | -0.20% | -0.37 |
| *Trade Type* | | | | | |
| Block Trade | 31 | 0.66% | 1.01 | 0.49% | 1.11 |
| *Type of Shareholder* | | | | | |
| Alternative Investors | 10 | -0.37% | -0.06 | -0.51% | -0.47 |
| Bank | 317 | 0.02% | 0.57 | 0.04% | 0.75 |
| Asset Manager | 105 | -1.06% | -2.75*** | -0.55% | -2.04** |
| *Other* | | | | | |
| Holdings<5% | 198 | -0.06% | 0.10 | -0.12% | -0.40 |

## Table 4 Cumulative Abnormal Returns (CARs) around transaction (events non-overlapping with disclosure)[28]

| | -2, +2 days Around Transaction Date | | | -1, +1 Around Transaction Date | |
| --- | --- | --- | --- | --- | --- |
| | N | CAR | Z-Stat | CAR | Z-Stat |
| Overall Trades | 436 | 0.20% | 1.55 | 0.36% | 3.21*** |
| Initial Trade | 195 | 0.13% | 0.64 | 0.21% | 0.03 |
| First Firm | 61 | 1.03% | 2.09** | 0.95% | 1.51 |
| Last Firm | 59 | -0.33% | -0.56 | -0.33% | -0.81 |
| *Trade Type* | | | | | |
| Block Trade | 31 | 0.55% | 1.19 | -0.04% | 0.05 |
| *Type of Shareholder* | | | | | |
| Alternative Investors | 10 | 0.76% | 0.55 | -0.09% | -0.23 |
| Bank | 317 | 0.40% | 2.38** | 0.52% | 3.83*** |
| Asset Manager | 105 | -0.42% | -1.09 | 0.00% | 0.27 |
| *Other* | | | | | |
| Holdings<5% | 198 | 0.12% | 0.54 | 0.25% | 1.46 |

---

27   Separate analysis for buys and sells was also carried out and is available on request.
28   Separate analysis for buys and sells was also carried out and is available on request.

# Survey on Contracts for Difference by PricewaterhouseCoopers LLP for The Financial Services Authority

# Contents

Executive summary                                                  3

Purpose of survey                                                  3

Survey methodology                                                 5

Survey Results                                                     6

# Executive summary

*Key findings*

We have found that the selected respondents were not in favour of a new regime being introduced specifically for Contracts for Differences ("CFDs"), and did not agree that it would improve transparency or bring any benefit to the market.

The majority of them also thought that, should such a regime be introduced, it would increase confusion in interpretation of market movements, would lead to double counting, would not solve the initial problem and would increase costs and complexity without clear benefits.

Most participants said that they do not necessarily hedge their CFD positions by buying the underlying shares, but here we found significant differences in practices depending on the size and type of organisation.

All participants categorically stated that they would not vote under the instructions of any client, but reserve the right for themselves to vote in instances where it is in their interest as a bank or a group.

At the same time, most of them declared that parties which are beneficiaries of an interest through a CFD occasionally seek to exert influence over voting rights in the physical holdings in the underlying held by the bank or firm.

All participants except one said they would not enter into pre-arrangements in relation to selling the underlying assets to the CFD holder at the closing of the position.

Most participants enter into CFDs with hedge funds and selected "Leverage" as the key reason for their clients entering into CFDs. Most participants use CFDs with 3-6 months maturity, contracts varied from 648-120,000 per month and monthly average volumes ranged from £150K - £3billion.

# Purpose of survey

We have been engaged by the FSA to conduct focused market research on their behalf on CFDs to demonstrate to the market that proper analysis and consideration has been given to exploring the motivation behind CFD trading and its potential role in influencing voting rights, stake building and impact on price formation.

In addition our research was designed to explore how CFDs work in practice, what participants thought of the current regimes dedicated to market transparency and finally what the selected financial institutions thought of a disclosure regime for economic interest in shares to be introduced.

This survey is one of eight work streams dedicated by the FSA to explore the mechanism and impacts of CFDs on market transparency and its findings will feed into a wider Discussion Paper being prepared by the FSA.

4

# Survey methodology

*Questionnaire*

There were 38 questions in the survey designed to gather data against the suggested areas highlighted by the FSA in its statement of requirements. The questions were divided into five sections: the Client base, CFD portfolio, Hedging policy, Voting policy and Views on the introduction of disclosure.

*The interviews*

Besides the factual data gathered, we conducted interviews with the market participants to obtain understanding of the different reasons for trading CFDs, of their CFD related processes in practice and to explore their views and opinions on the status of market transparency in terms of CFDs and possible changes to the disclosure regime. At these interviews in most cases the companies were represented by the heads of their compliance teams, disclosure teams and business heads from the Derivatives/ CFD desks. (Appendix 1)

*Our analysis*

Our analysis was focused on the responses received from the survey, picking up determining themes coming out of the interviews, in search for a majority market view.

5

*Client base*

## Survey Results

| | |
|---|---|
| **Q1 The scope of questions apply to which part of the organisation?** | **Comment:** |
|  <br><br> 6 answered Cover whole organisation <br> 6 answered Only specific desk <br> 1 answered N/A | Half of the participants answered that the questions apply to the whole organisation. Those who answered "specific desk" listed the following: <br><br> • Equity Finance Desk <br> • Synthetic Products Group, Global Banking business which includes M&A and Legal <br> • Institutional equities business <br> • Prime Services Swaps Desk <br> • European Cash Trading Desk <br> • European Equity Brokerage Division <br> • CFD desk |
| **Q2 What type of clients do you enter in to CFDs with?** <br><br> Number of votes <br><br>  | **Comment:** <br><br> Most participants enter into CFDs with hedge funds, other financial institutions and corporate. Under others we found: <br><br> • 'Intermediate Customers including Expert Private Customers <br> • 'stockbrokers, futures brokers, spread betters <br> • Prime brokerage clients |
| **Q3 Of those listed please rank the top three in order of the volume of transactions they generate?** | The participants ranked hedge funds on the top, other financial institutions as second and investment banks as third. |

6

*Client base*

| Q4 Do you offer CFDs to only certain clients? | Comment: |
|---|---|
|  10 answered Yes<br>3 answered No | 77% said Yes<br><br>23% said No |
| Q5 If yes, please explain in the box below:<br><br>• We do not deal with Private Customers. Clients are subject to appropriate credit checks and limits are placed on their activities.<br><br>• Only to Intermediate Customers and Market Counterparties.<br><br>• The institutional business does not offer CFDs to private clients.<br><br>• Depending on their sophistication and following suitability criteria set out in the Global Suitability Policy.<br><br>• We currently do not accept private clients. We only accept intermediate clients, private expert opt ups, or market counterparties.<br><br>• Only Professional clients.<br><br>• We only deal with institutional investors.<br><br>• They must have experience of very active share trading or contingent liability risk<br><br>• We enter in CFD contracts pursuant to the negotiation of both an ISDA agreement and a specific CFD agreement.  In addition specific credit checks are undertaken and we will only enter into CFD contracts once the relevant documentation and the appropriate credit checks are in place. | Comment:<br><br>Although "easy usage for clients" has been named as one of the key attributes of CFDs some level of sophistication is necessary.<br><br>Based on the interviews:<br><br>The smaller pure brokerage companies seem to have more private clients than the big sophisticated investment banks, whose clientele consists of mainly other big corporates.<br><br>Credit risk and size seem to be the driver behind the selection of clients. The smaller brokerage companies said they prefer many smaller (private) clients rather than fewer big ones, as they can only take limited credit risk in one transaction and with one client due to their own size. |

7

*Client base*

| Q6 What reasons do your clients express for entering into a CFD rather than buying the underlying stock directly? (please select that all that apply) Number of votes | Comment: Most participants selected Leverage as the reason for their clients entering into CFDs. Ability to go sort/long came second and avoiding stamp duty came third. Additional reasons have been mentioned as: |
|---|---|



Comment:

Most participants selected Leverage as the reason for their clients entering into CFDs. Ability to go sort/long came second and avoiding stamp duty came third. Additional reasons have been mentioned as:

- Ease of Execution

- CFDs are entered into via broker, so not normally    expressed

- We are a brokerage institution and we do not have any responsibility for the discretionary management or advising clients in relation to their portfolios. Therefore there are no formal ongoing discussions whereby clients express their reasons

- The rationale for entering into a CFD is not always given however we do not enter into cash settled CFD positions if the intention of the client is to stake build as 1) this would put our Exempt Principal Trader status at risk and 2) the instrument only gives economic exposure to the security in question, not the legal right to the underlying security

**Q7 What is the primary reason your clients express for entering into CFDs? (please select main reason)**

5 said They don't ask, are unaware
4 said Leverage
1 said Operation efficiency
1 said Ability to go short/long
1 said Avoid stamp duty
1 said Stake building?

Comment:

Most participants selected Leverage as the main reason clients enter into CFDs.

**Q8 Does the answer to the previous question differ based on the type of client?**

5 said Yes
8 said No

Comment:

Those who said yes explained as follows:

- Anonymity from other market participants is an important factor for hedge funds.

- 'The primary reason will vary depending on the clients' use of CFDs

- 'It depends on the client's strategy and on the significance of the leverage

- We believe that other financial institutions mainly represent underlying clients who are

*Client base*

| | likely to be most attracted to CFDs for leverage opportunity. The hedge fund community will have more diverse reasons depending on the nature of the fund and its objectives |
|---|---|

9

*CFD Portfolio*

| Q9 Do you have a specific trading desk entering into CFDs with the external market? | Comment: |
|---|---|
| 

10 said Yes
3 said No | 77% said Yes

23% said No |
| Q10 If no please indicate which desks undertake CFD trading? (XY has been used to hide the company names in the answers)

- XY Direct
- XY Securities
- General Brokerage
- XY Touch CFDs

These are all operating divisions within XY Financial

CFD trading is undertaken by the Equity Distribution European Sales Trading Desk and by the European Cash Desk | Comment

Those who indicated that they do not have a specific CFD trading desk, mainly use their securities, brokerage or other trading divisions for that activity. |