*Views on the introduction of disclosure*

| Q36 How much time would you estimate your organisation currently spends on monitoring and ensuring compliance with the existing Takeover Panel disclosure rules? | Comments: The time estimated spent on ensuring compliance with the Takeover Panel disclosure rules ranged from 3 - 80 man-hours per week. |
|---|---|
| <ul><li>On average 1-2 hours per day</li><li>Approximately **3 hours per week**</li><li>We have a team of 4 covering Panel disclosures but they also have other disclosure responsibilities. The proportion of time on Panel disclosures will vary according to the number of Panel deals where our group is connected.</li><li>We employ one full time resource dedicated to monitoring and complying with the existing Takeover Panel Disclosures Regime. There is also regularly an additional reliance on control room headcount for support.</li><li>Because we currently enjoy an exemption from the Takeover Panel rules, our time spent would be limited to approximately 1 hour per week. This time is spent corresponding with the Takeover Panel on queries regarding our client's positions.</li><li>Extended man hours globally, 1 hour daily for each country and 1-4 hours daily reporting dependant on volume</li><li>Daily requirement - processing and preparing reports, reviewing report, dealing with queries and issues and ongoing monitoring. 10man hours a week</li><li>2 compliance staff, 20%</li><li>1 person, about half a day each business day.</li><li>Not taking into account the considerable development time needed to comply with the requirements one person spends all their time complying with the disclosure requirements on a daily basis</li><li>Compliance with the Takeover Panel disclosure rules is a function performed by the Control Room. At a minimum this is a **full time role for 2 people** however depending on deal flow this number can increase.</li><li>Approximately 2-3 hours per day</li></ul> | |

31

*Views on the introduction of disclosure*

| Q37 What would you estimate the approximate cost of the existing Takeover Panel disclosure regime to be for your business? | Comments: |
|---|---|
| <ul><li>Difficult to quantify. It is not a significant burden.</li><li>Employees and associated costs for a Compliance Executive's 3 hours per week. IT costs will be deemed "sunk costs" as they have already been incurred.</li><li>Difficult to determine as there were resource costs for setting up the procedures as well as technical work in automating some of the processes.</li><li>Approximately one million pounds annually (excluding initial system outlay.)</li><li>Approximately £10,000 per year (three times)</li><li>Cost of two staff as indicated and necessary reporting infrastructure</li><li>We have provided a cost analysis, as we are spending a lot of time focusing on other major projects, such as the implementation of MiFID. We have limited our response to confirming that it would be extensive</li><li>Difficult to take in isolation as cover EMEA region but systems, data processing and storage, and personnel costs probably up to £250,000 per annum.</li><li>Approx £20,000 per annum</li></ul> | Most estimates were around £10,000 to £20,000 per annum, however there were £1 million and £250,000 estimates as well. |

32

*Views on the introduction of disclosure*

Q38 If the existing disclosure rules were expanded to include a requirement to disclose economic interests at the same levels as those currently required by the Takeover Panel rules on voting interests, what would you estimate the incremental cost of this to be for your business?

- It really depends on how the rules are framed and whether systems can be created/amended to automatically calculate the levels of interest. There will be initial costs of systems redevelopment but the ongoing costs should not be significant subject to the ability to automate the process.

- Minimal

- Difficult to estimate incremental costs as it would not be a matter of just extending the process for the Panel disclosures. To extend to all UK stocks would require significant technology resource to examine data feeds, covering all products and rewrite monitoring systems to ensure positions could be calculated and reported correctly. In addition there would be headcount costs for the additional work in monitoring, verifying disclosable positions and making the relevant disclosures.

- It is impossible to provide a precise estimate. The upfront costs would be in the range of 5 to 10 millions pounds taking into consideration manpower, systems and education costs. There would also be ongoing annual costs associated with ensuring compliance with the expanded rules.

- The workload would more than double

- Additional ongoing costs would be approximately doubled.

- Unlikely to be marginal

- Main cost would be changing system to automate this requirement.

- Systems have been developed re reporting of this information which would need amendments – there would be initial setup costs and additional ongoing monitoring and reporting Additional ongoing costs would be approximately doubled.

- Approx 3 times the current cost £300,000 -

Comments:

The main costs would be systems related. The highest cost estimate was £5 million to £10 million Workload and ongoing costs were mostly estimated to double.

33

*Views on the introduction of disclosure*

> £400,000 development costs as front-end booking systems would need to be enhanced as well as compliance disclosure systems developed to enable us to accommodate increased monitoring of positions.

34

# pwc.com

© 2007 PricewaterhouseCoopers LLP. All rights reserved. "PricewaterhouseCoopers" refers to PricewaterhouseCoopers or, as the context requires, the PricewaterhouseCoopers global network or other member firms of the network, each of which is a separate and independent legal entity. The firms of the PricewaterhouseCoopers global network (www.pwc.com) provide industry-focused assurance, tax and advisory services to build public trust and enhance value for clients and their stakeholders. More than 140,000 people in 149 countries across our network share their thinking, experience and solutions to develop fresh perspectives and practical advice.

Designed by Design & Production, FS, Assurance (920071)

# CfD activity during takeover offer periods

### Does CfD activity differ between takeover periods and non-takeover periods?

In this Annex we report on a comparison of substantial CfD transactions before a company goes into a takeover bid with CfD activity inside offer periods. Finding a significant and systematic increase of CfD activity in the months leading up to a takeover period may be consistent with 'covert stake building'.[29] High CfD activity could in theory be associated with significant shareholdings of over 1%, but our analysis is unable to directly link the CfD activity to size of shareholdings.

In 2005 the Code Committee of the Takeover Panel (the Panel) decided that the provisions of the Takeover Code were insufficient to address the issues arising from dealings in derivatives and options and so it amended the Takeover Code. Accordingly, under the amended Code a person is required to disclose dealings in derivatives and options, including CfDs, once a takeover bid is announced, also known as the "takeover" or "offer period". We also examined statistics on CfD activity to assess whether the introduction of the Panel regime has affected CfD activity more broadly.

This study considers the level of CfD activity per month in a sample of firms that were subject to takeovers between 2005 and 2006. Two key issues were considered:

– Is CfD activity observed during the offer period similar to the CfD activity which occurred prior to the company going into offer?

– Has there been a change in CfD activity following the introduction of the Panel regime?

The analysis shows that a significant proportion of CfD activity is concentrated during the takeover period. Although the number of CfD contracts is not very different between pre and post takeover periods, the value of CfD contracts is much greater inside the takeover period. The analysis does not indicate significant covert stake building through CfDs in the run-up to the takeovers we analyse. (Such stake building could result in a lack of competition in a takeover situation (i.e. market failure)). We also specifically considered the patterns in CfD activity for takeovers

---

29  On their own however, results from that analysis would not be sufficient to conclude that covert stake bulding is occuring

which were in the top 5% in terms of CfD activity. Even in such cases, there was no identifiable pattern suggesting covert stake building. Finally there were no significant effects visible of the introduction of the Panel regime.

*Methodology*

The FSA's transaction reporting system was used to examine information on the number and value of CfD contracts in a sample of firms that have been subject to a takeover bid since 2005. Table 1 summarises the number of firms and time periods considered in our sample. To consider potential effects of the Panel regime, we evaluated activity in three distinct periods: Period A – a period well before the Panel regime (January-March 2005), Period B – a period just before the Panel regime (May-August 2005) and Period C – a period after the Panel regime (July-September 2006). Companies involved in the first 50 takeover bids in each of these periods were examined. The reported results, however, combine all the Period A and B data (i.e. all the 2005 data) as we did not notice a difference between the two periods. We also noticed that not all firms involved in a takeover bid had activity in CfDs. For instance in 2006, of the 50 firms considered 39 had CfD activity.

### Table 1 – Summary of Sample Analysed

|  | Total Takeover Bids | Takeovers with CfD Activity |
|---|---|---|
| Period A: January – March 2005 | 50 | 36 |
| Period B: May – August 2005 | 50 | 46 |
| Period C: July – September 2006 | 50 | 39 |

We obtained data on the 39 firms showing some CfD activity for up to 13 months prior to the start of the offer period. We believe that this period provides an adequate control period to examine and benchmark CfD activity outside the takeover period. The exception was with respect to Period A – the January – March 2005 period, where data were only available to a maximum of 6 months prior to the start of the offer period. We believe this shorter sample should form an adequate control period, although in a small number of cases where offer periods are preceded by several months of speculation and negotiations, it may not be entirely adequate. We keep this caveat in mind.

### Figure 1 – Period of Analysis



Figure 1 summarises the time-line used. Monthly activity in CfDs is considered in each of the pre-offer period months and compared with the activity in the month after the start of the takeover offer period. The two measures of CfD activity analysed are: median number and value of CfD contracts per company which is subject to a takeover bid. The analysis is on a per takeover basis and so is not affected by the variation in the number of takeovers in our sample which have CfD activity.

*Results*

### CfD Activity Over Time: Effects of the Takeover Panel Regime

We compared the value of CfDs in Periods A and B (2005) with those in Period C (2006), and saw little change i.e. there were no significant effects visible of the introduction of the Panel regime. However, in fact there was more CfD usage (possibly in lower value amounts) in Period C (2006). For example, in the one month after the offer period starts the typical number of CfD contracts was 38 in Periods A and B (2005) and 77 in Period C (2006). This would suggest that the introduction of the Panel regime has not reduced the use of CfDs, especially in the offer period where disclosures have to be made.

### Activity in Takeover versus Non-Takeover Periods

As indicated, we aggregated the results across all three of our sampled periods since there did not appear to be any significant effects on CfD activity of the introduction of the Panel regime.[30] Figures 2A and 2B summarise the median monthly number and value of for all companies in the sample. There is little change in the <u>number</u> of CfD contracts pre-offer period compared to the 1 month after the offer period starts. Nor does there appear to be any systematic increase in the number of CfDs in the run-up to an offer period starting. However, there *is a significant change in the* <u>value</u> of the CfD contracts which more than doubles in the month after the offer compared to the month prior to the offer. The figures indicate substantial usage of CfDs during the takeover period which is already subject to disclosure requirements. Outside the takeover period the median value of CfDs per takeover per month is much lower and ranged between 0.5 million-1 million shares in most cases. It is difficult to say from this whether this size of activity would be sufficient to allow CfD holders to garner significant equity holdings in the firm.

---

30  We find the same results from the separate analysis for each time period as the aggregated analysis.



Figure 2 A: CFD Activity
(median number of CFD contracts per takeover per month)



Figure 2 B: CFD Activity
(median value of CFDs per takeover per month)

The increase observed in CfD activity once a company is in an offer period would be consistent with investors seeking to reap trading gains in such a company. To assess this further we considered trends in spread bets, which do not carry the possibility of being closed out further with the underlying equity. We also found a similar increase in value of spread bet contracts once the company is in a takeover situation (see figures 3 A & B). These findings suggest that the announcement of an offer period spurs more activity in these derivative products as investors seek to take positions on the outcome of the takeover.


Figure 3 A: Comparison of CFD versus Spread Bet Activity (2006)
(median number of contracts per takeover per month)

Figure 3 A: Comparison of CFD versus Spread Bet Activity (2006)
(median number of contracts per takeover per month)

## High CfD Activity Cases

So far the results have considered the typical takeover. It is nonetheless possible that even if CfDs are not generally used to secretly build up stakes in companies, they may nevertheless be used for this purpose in a small number of cases, which could have economic costs. We analysed the top 5% of the takeovers as measured by the value of CfDs that were traded. Again, there was no systematic build up in the use of CfDs. Only in Period C (2006 sample), we found a dramatic increase in the value of CfDs 10-11 months prior to the start of the offer and again in the 6th month before the offer. However, it is unclear whether these spikes should be seen as purely stake-building because they could also be due to non-takeover related voting events or an anomalous data point.

*Implications*

The transaction level analysis of CfD activity does not indicate any systematic increase in the period usage of CfDs in the period leading up to a takeover offer. Higher value CfD contracts prior to the offer period, which would also allow firms to engage in covert stake building are not visible in the sample of takeovers that we analysed. Moreover, there was no strong indication of covert stake building even in a small sample of high CfD activity takeovers.

A significant increase in the value of CfDs takes place once the firm is in an offer period. There is also a similar increase in spread bet activity during the offer period, which would suggest that most activity is related to investors seeking trading gains.

It is possible that investors may be engaged in significant CfD activity around other, non-takeover related shareholder votes. Our analysis does not shed light on these types of activities.

# List of Questions

Q1  Do you agree that we have identified the concerns of issuers and market participants correctly?

Q2  Do you agree that we have identified the right market failures? If not, what other potential market failures do you think we should consider?

Q3  Do you agree with our analysis of the evidence set out in this chapter? Is there further evidence that you think we should consider?

Q4  Do you agree with our conclusion that action should be taken to increase disclosure of CfDs?

Q5  Do you agree that our proposed definition of comparable financial instrument, taken together with our guidance on 'similar economic effect', will effectively capture all instruments that could potentially otherwise be used to build stakes or exert influence on an undisclosed basis? If not, are there any instruments that a) should be caught but will not be, or b) will be caught but should not be?

Q6  Do you agree that CfDs not complying with a safe harbour should be disclosed?

Q7  Do you agree with the specific conditions we have proposed for the safe harbour, and that, as necessary, they can practically be incorporated into the agreements between the parties to a CfD contract?

Q8  Do you agree that there should be a 'notification to issuer on reasonable request' provision?

Q9  Do you agree with the proposed guidance on what constitutes reasonable grounds, and that issuers should be required to include these in the notification request?

Q10  Do you agree with our proposed approach to aggregation and thresholds for Option 2?

Q11  Do you agree with our proposed approach to aggregation and thresholds for Option 3?

Q12  Do you agree with our analysis of the relative costs and benefits of Option 2 and Option 3?

Q13  Which option do you think would best address the identified market failures?

Q14   Do you agree with our view on what information should be disclosed to the issuer, and how that information should be disseminated?

Q15   Do you agree with our proposal that we should seek to avoid as far as possible duplication of disclosure?

Q16:  Do you agree with our approach that disclosures pursuant to the Code would negate the need for additional disclosures under the proposed CfD disclosure regime?

# Compatibility with the FSA's general duties as the UK Listing Authority

1. This Annex sets out our assessment of the compatibility of the proposals set out in this Consultation Paper (CP) with the general duties conferred upon the FSA under section 73 of the Financial Services and Markets Act 2000 (FSMA) in its capacity as the UK Listing Authority (UKLA).

   *The need to use our resources in the most efficient and economic way*

2. The proposals are consistent with an efficient and economical use of FSA resources.

   *The principle that a burden or restriction which is imposed on a person should be proportionate to the benefits, considered in general terms, which are expected to arise from the imposition of the burden or restriction*

3. We have undertaken a cost benefit analysis to help inform this consultation (cf. Annex 1). The CBA sets out the costs and benefits of our proposals. We have pre-consulted with the market to ensure as far as possible that the burdens and restrictions imposed on issuers and other stakeholders are proportionate to the benefits.

4. Stakeholders may have different views over the nature and extent of some of the impacts we have covered. We would therefore welcome the input from respondents of any additional information that would help us quantify these impacts.

   *The desirability of facilitating innovation in respect of listed securities*

5. Our requirement for disclosure of CfDs should not have an impact on possible future innovation in respect of listed securities.

   *The international character of capital markets and the desirability of maintaining the competitive position of the UK*

6. Our proposal reflects global development in CfD disclosure, and should not harm the UK's competitive position. However, we are keeping an open mind, and would welcome responses from readers on this.

The need to minimise the adverse effects on competition of anything done in the discharge of the FSA's functions

7. The cost benefit analysis undertaken (see Annex 1) does not suggest there to be any adverse effects on competition.

The desirability of facilitating competition in relation to listed securities

8. Not required.

Appendix 1

# Appendix 1 – Final Handbook Text (effective September 2008)

FSA 2007/xx

# OPTION 2

## DISCLOSURE AND TRANSPARENCY RULES (DISCLOSURE OF ECONOMIC INTERESTS) INSTRUMENT 2008

**Powers exercised**

A. The Financial Services Authority makes this instrument in the exercise of the following powers and related provisions in the Financial Services and Markets Act 2000 ("the Act"):

    (1)    section 73A (Part 6 Rules);
    (2)    section 89A to 89G (Transparency obligations); and
    (3)    section 157(1) (Guidance).

B. The rule-making powers listed above are specified for the purpose of section 153(2) (Rule-making instruments) of the Act.

**Commencement**

C. This instrument comes into force on [September] 2008.

**Amendments to the Handbook**

D. The Disclosure Rules and Transparency Rules sourcebook (DTR) is amended in accordance with the Annex to this instrument.

**Citation**

E. This instrument may be cited as the Disclosure and Transparency Rules (Disclosure of Economic Interests) Instrument 2008.


By order of the Board
[ ] 2008

## Annex A

### Amendments to the Glossary of definitions

In this Annex, underlining indicates new text.

Insert the following new definition in the appropriate alphabetical position:

| | |
|---|---|
| _comparable financial instrument_ | (in _DTR_): |

(i) a _transferable security_; or

(ii) an _option, future, swap, forward rate agreement_ or _derivative_ contract, as referred to in Section C of Annex 1 of _MiFID_,

having similar economic effect to a qualifying _financial instrument_ in _DTR_ 5.3.1 R(1) (but not including any such instrument) whether or not the _financial instrument_ having similar economic effect results in an entitlement to acquire _shares_.

2

**Annex B**

**Amendments to the Disclosure Rules and Transparency Rules sourcebook (DTR)**

In this Annex, underlining indicates new text and striking through indicates deleted text.

5.1.2  R  Subject to the exemption for certain third country *issuers* (*DTR* 5.11.6R), a *person* must notify the *issuer* of the percentage of its voting rights he holds as *shareholder* or through his direct or indirect holding of qualifying or *comparable financial instruments* falling within *DTR* 5.3.1R (or a combination of such holdings excluding *comparable financial instruments* notifiable solely upon an *issuer's* reasonable request) if the percentage of those voting rights:

    (1) reaches, exceeds or falls below 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10% and each 1% threshold thereafter up to 100% (or in the case of a non-UK *issuer* or a *person* holding a *comparable financial instrument* notifiable upon the reasonable request of an *issuer* on the basis of thresholds at 5%, 10%, 15%, 20%, 25%, 30%, 50% and 75%) as a result of an acquisition or disposal of *shares* or *financial instruments* falling within *DTR* 5.3.1R or, where relevant, as at the date of receipt of an *issuer's* reasonable request (unless the notification would be the same as that following the last request).

    …

…

5.3.1  R  (1)  A *person* must make a notification in accordance with the applicable thresholds in *DTR* 5.1.2R:

    (a) in respect of any qualifying *financial instruments* which they hold, directly or indirectly, which result in an entitlement to acquire, on such holder's own initiative alone, under a formal agreement, *shares* to which voting rights are attached, already issued, of an *issuer*; or

[**Note:** article 13(1) of the *TD*]

    (b) unless (3) applies, in respect of any *comparable financial instrument* which, directly or indirectly, the *person* holds, in either of the following circumstances:

        (i) the *person* has received a reasonable request from an *issuer* relating to that *person's* holding (if any) of such an instrument;

        (ii) the non-disclosure conditions in (2) are not, or no longer continue to be, satisfied.

(2) The non-disclosure conditions referred to in (1)(b)(ii) are:

    (a) the terms of the *comparable financial instrument*, and any related agreements between the holder and the provider, in relation to

3

                *shares* in an *issuer* to which the instrument is in any way related or referenced, expressly:

                (i) preclude the holder from exerting any influence over the voting rights in the *issuer* to which the provider of the instrument has, or may at any time during the term of the instrument have, access; and

                (ii) acknowledge the absence of any arrangements or understanding, and contain an agreement not to enter into any arrangements or create or give rise to any understanding, anticipating the potential acquisition, by the holder, on, or shortly after, expiry of the instrument, of *shares*, or the benefit of *shares*, in the *issuer* which the provider of the instrument has acquired or otherwise obtained access to, or may do so, for any purpose in connection with the instrument;

        (b) the terms in (a) have not been breached and do not amount to misrepresentations (whether or not those provisions would be enforceable between the parties);

        (c) the instrument holder has declared in writing to the provider, on or before entry into the *comparable financial instrument*, a genuine intention, which continues to be accurate, not to acquire, or otherwise obtain access to, *shares* in the *issuer* which the provider of the instrument has acquired or otherwise obtained access to, or may do so, for any purpose in connection with the instrument.

(3) Paragraph (1)(b) does not apply if public disclosure has already been made of information regarding the same transactions (whether or not to the same level of detail) pursuant to the *Takeover Code*.

(4) For the purposes of *DTR* 5.3.1 R(1)(b)(i) a reasonable request is one which satisfies the following conditions:

        (a) it is based on the *issuer's* knowledge or reasonable cause to believe that the *person* has an interest in the *issuer's shares* by virtue of that *person's* holding (directly or indirectly) of a *comparable financial instrument* or has changed the level of the interest held;

        (b) an adequate explanation of the knowledge or reasonable cause to believe is set out in the request; and

        (c) it requests that the *person* either notifies the *issuer* of its holding in accordance with applicable thresholds or confirms to the *issuer* either that:

                (i) it does not have such a holding above the 5% threshold; or

                (ii) any such notification would be the same as that following

4