**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LARRY FREUDENBERG, Individually And On Behalf of All Others Similarly Situated, | Civil Action No. 07-cv-8538 (RWS) |
| Plaintiff, | |
| vs. | CLASS ACTION |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |
| WILLIAM BOSTON, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No. 07-cv-8808 (RWS) |
| Plaintiff, | |
| vs. | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |
| ROBERT D. THURMAN, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No. 07-cv-9651 (RWS) |
| Plaintiff, | |
| vs. | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |

| | |
|---|---|
| WENDY M. DAVIDSON, individually and on behalf of all others similarly situated, | Civil Action No. 07-cv-10400 (UA) |
| Plaintiff, | |
| vs. | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |
| JOSHUA FERENC, individually and on behalf of all others similarly situated, | Civil Action No. 07-cv-10540 (SHS) |
| Plaintiff, | |
| vs. | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |

**MEMORANDUM OF LAW IN REPLY TO THE OPPOSITIONS TO THE MOTION OF THE KRISTEN-STRAXTON GROUP FOR  APPOINTMENT OF LEAD PLAINTIFF**

## TABLE OF CONTENTS

A.    The Kristen-Straxton Group Is The
Presumptive Lead Plaintiff ...................................................................................1

B.    The Presumption In Favor Of The
Kristen-Straxton Group Has Not Been Rebutted.................................................1

C.    The Other Movants Fail To Otherwise
Meet The Requirements Of Rule 23 ...................................................................10

Conclusion ...................................................................................................................10

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Affiliated Ute Citizens v. United States*, 406 U.S. 12 (1972) ................................................8

*Aguilar v. International Longshoremen's Union Local #10*, 966 F.2d 443
(9th Cir, 1992) .....................................................................................................................1

*Andrada v. Atherogenics, Inc.*, No. 05-cv-0061, 2005 U.S. Dist. LEXIS
6777 (S.D.N.Y. Apr. 18, 2005) ..........................................................................................2

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ...............................................................6, 10

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ...........................................3

*Burstein v. Applied Extrusion Technologies, Inc.*, 153 F.R.D. 488
(D. Mass. 1994) ...................................................................................................................8

*Caiola v. Citibank N.A., New York*, 295 F.3d 312 (2d Cir. 2002) ........................ 2, 3, 4, 5

*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) ...............................................................10

*Danis v. USN Commun's., Inc.*, 189 F.R.D. 391 (N.D. Ill. 1999) ........................................7

*In re Electro-Catheter*, No. 87-cv-0041, 1987 U.S. Dist. LEXIS 13500 (D.
N.J. Dec. 3, 1987) ...............................................................................................................6

*Epifano v. Boardman Business Products, Inc.*, 130 F.R.D. 295 (S.D.N.Y.
1990) ....................................................................................................................................9

*Falkowski v. Imation Corp.*, 309 F.3d 1123 (9th Cir. 2002) ...............................................3

*In re Frontier Insurance Group, Inc. Securities Litigation*, 172 F.R.D. 31
(E.D.N.Y. 1997) ..................................................................................................................9

*Gary Plastics Packaging v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ...............................................................................................5

*Handweger v. Ginsberg*, No.73-cv-4832, 1975 U.S. Dist. LEXIS 14546
(S.D.N.Y. Jan. 2, 1975) .......................................................................................................2

ii

*Harrison v. Great Springwaters of America, Inc.*, No. 96-cv-5110, 1997
U.S. Dist. LEXIS 23267 (E.D.N.Y. June 18, 1997) ........................................9

*In re Independent Energy Securities Litigation*, 210 F.R.D. 476 (S.D.N.Y.
2002) .........................................................................................................9

*Kline v. Wolf*, 702 F.2d 400 (2d Cir. 1983)..........................................7, 9, 10

*In re Livent, Inc., Noteholders Securities Litigation*, 211 F.R.D. 219
(S.D.N.Y. 2002).............................................................................................2

*In re Microstrategy Inc. Securities Litigation*, 110 F. Supp. 2d 427
(E.D. Va. 2000)..............................................................................................6

*Nursing Home Pension Fund v. Oracle Corp.*, No. 01-cv-0988-MJJ, 2006
U.S. Dist. LEXIS 94470 (N.D. Cal. Dec. 20, 2006) .....................................8

*In re Oxford Healthcare Securities Litigation*, 191 F.R.D. 369 (S.D.N.Y.
2000) .............................................................................................................6

*Pirelli v. LaBranche & Co.*, 229 F.R.D. 395 (S.D.N.Y. 2004)..........................6

*Reeves v. Ernst & Young*, 494 U.S. 56 (1990) ..................................................5

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ...................................................3

*Saddle Rock Partners, Ltd. v. Hiatt*, No. 96-cv-9474, 2000 U.S. Dist.
LEXIS 11931 (S.D.N.Y. Aug. 21, 2000).....................................................6, 9

*Savino v. Computer Credit, Inc.*, 164 F.3d 81 (2d Cir. 1998)..........................10

*In re Scientific-Atlanta Securities Litigation*, No. 01-cv-1950-RWS, 2007
U.S. Dist. LEXIS 66282 (N.D. Ga. Sept. 7, 2007) .......................................9

*Seidman v. American Mobile System*, 157 F.R.D. 354 (S.D.N.Y. 1994)..........6

*In re Select Comfort Corp. Securities Litigation*, 202 F.R.D. 598 (D.
Minn. 2001)...................................................................................................7

*In re Sunbeam Securities Litigation*, No. 98-cv-8258, 2001 U.S. Dist.
LEXIS 25703 (S.D. Fla. July 3, 2001)..........................................................7

*Taubenfeld v. Career Education Corp.*, No. 03 C8884, 2003 U.S. LEXIS
4363 (N.D. Ill. Mar. 22, 2004).....................................................................6

iii

*Tcherepnin v. Knight*, 389 U.S. 332 (1967)...........................................................................5

*Telecommunication Technology Services, Inc. v. Siemen Rolm Commun's.,*
    *Inc.*, 172 F.R.D. 532 (N.D. Ga. 1997).......................................................................10

*United Housing Foundation v. Forman*, 421 U.S. 837 (1975) .............................................5

*In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124
    (2d Cir. 2001).................................................................................................................10

*Walzer v. Diebert & Co. Inc.,* No. 05-cv-3680, 2007 U.S. App. LEXIS
    7859 (3rd Cir. 2007)..........................................................................................................8

The Kristen-Straxton Group ("KSG") submits this reply to the oppositions of the State Teachers Retirement System of Ohio ("STRS") and Skandia Life Insurance Company Ltd.

## A.    The Kristen-Straxton Group Is The Presumptive Lead Plaintiff

The indisputable fact is that KGS lost over $133,000,000 trading in E*Trade securities during the Class Period. Based on any theory or known method for calculating losses in a PSLRA case, KSG, not STRS, has the largest loss among the movants.[1]

## B.    The Presumption In Favor Of The Kristen-Straxton Group Has Not Been Rebutted

KSG is the presumptive lead plaintiff. The burden is now on STRS to rebut that presumption. Instead of providing "proof," facts, or evidence as required by the PSLRA, as demonstrated below and in the accompanying Declaration of Professor Thomas L. Hazen,[2] a leading authority on securities regulation, STRS, in its memorandum and through the Declaration of Professor Frank Partnoy ("Partnoy" or "Partnoy Decl."),[3] offers only factually and legally incorrect and/or irrelevant arguments that do not rebut the PSLRA presumption in KSG's favor.

Partnoy's lengthy, but lopsided discourse on CFDs, cannot detract from KSG's typicality. CFDs are equity derivatives. While they are not issued by the underlying company, *see* Partnoy Decl. ¶17, that is also true of call options, and those option traders are routinely certified to represent both common stock and derivatives purchasers. *See* KSG Resp. Mem. at 12-15 (and

---

[1] STRS claims that it has the "largest financial interest" among the lead plaintiff movants. *See* STRS's Memorandum of Law in Further Support of Its Motion And In Opposition To All Other Lead Plaintiff Motions ("STRS Mem."), at 2-4. STRS makes this erroneous claim by simply refusing to acknowledge KSG's losses. *See, e.g., id.*, at 3 (STRS's purported comparative loss chart that omits KSG).

[2] *See* Third Declaration of Elizabeth A. Schmid In Reply To The Oppositions To The Kristen-Straxton Group's Motion For Appointment Of Lead Plaintiff ("Third Schmid Decl."), Ex. A ("Hazen Decl.").

[3] While Partnoy asserts that his declaration is made "on personal knowledge," *see* Partnoy Decl. ¶4, it is obvious that can not be true. Instead, Partnoy invents "facts" not present here, and then offers unsupported legal conclusions based on those fictional "facts." For instance, Partnoy repeatedly makes conclusory Rule 23 determinations, *see id.* ¶¶8, 26; however, such findings are the sole province of the Court. This is neither "proof" as required by the PSLRA, nor even a proper expert declaration. *See, e.g., Aguilar v. Int'l Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir, 1992) ("matters of law for the court's determination . . . [are] inappropriate subjects for expert testimony."). And, even if offering such opinions was proper, Partney has no alleged expertise in Rule 23.

cases cited therein); *accord Handweger v. Ginsberg*, No.73-cv-4832, 1975 U.S. Dist. LEXIS 14546, at **5-6 (S.D.N.Y. Jan. 2, 1975) (finding "no substantial difference between the claims of the debenture holders and the shareholders…difference in rights in the event of insolvency cannot prejudice the separate and independent rights of redress for fraud.").[4]    Indeed, given the widespread use of CFDs in the world financial markets, *see* Hazen Decl. ¶5, trading in this equity derivative can hardly be characterized as "unique."[5]   Moreover, not only were KSG's E*Trade CFDs purchased in London through large, well-established brokerage firms, but matching shares of E*Trade common stock were purchased through an NASD member over the NASDAQ in the United States. *See* Second Schmid Decl. Ex. B, ¶¶4, 8.

While Partnoy may find "it is unclear whether CFDs fall under the definition of 'security' in Section 3(a)(10) of the [ ] Exchange Act [ ], or 'security-based swap agreement' in Section 10(b) of the [ ] Exchange Act [ ]," Partnoy Decl. ¶10, CFDs are securities under the federal securities laws subject to the protections of the Exchange Act, and, therefore, KSG's members have claims here that are common with purchasers of other types of E*Trade securities. *See* Hazen Decl. ¶¶8, 19-23, 27-30. "The definition of security is construed in a 'flexible' manner, so as to 'meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits'…." *Caiola v. Citibank N.A., New York*, 295 F.3d 312, 325 (2d Cir. 2002); (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)).   Section 3(a)(10) of the

---

[4]   The cases cited by STRS are inapposite.  In *Andrada v. Atherogenics, Inc.*, No. 05-cv-0061, 2005 U.S. Dist. LEXIS 6777, at *14-15 (S.D.N.Y. Apr. 18, 2005), the court found the complex pricing of options might give rise to a "unique defense."  Here, none of the complications raised by the *Andrada* court concerning the pricing of option -- short-term interest rates, competition for the options, volatility -- are present, because the E*Trade CFDs were priced at the same price quoted for the common stock on the NASDAQ.  Thus, no different or separate analysis would ever be needed to determine whether the CFD's prices were efficiently set.  *See* Hazen Decl ¶¶25-26, 36-37, 39.  Similarly, unlike the debt instruments in *In re Livent, Inc., Noteholders Sec. Litig.*, 211 F.R.D. 219, 222 (S.D.N.Y. 2002), whose prices did not move in tandem with the company's common stock, CFDs do not have their own trading market, but are priced dollar-for-dollar to the price of the underlying common stock.  *See* Hazen Decl. ¶10, 38-39.

[5]   Partnoy uses pejorative phrases wherever possible to make the non-controversial sound controversial.  For instance, he basically characterizes the UK's capital market as an "off-shore" betting parlor.  In fact, trading CFDs is officially designated in the UK as investing, not gambling.  *See* Hazen Decl. ¶¶18, 35-36. Moreover, all investments are a "gamble."  *See id.*¶ 45.  Indeed, presumably STRS was also "betting" that E*Trade's share prices would appreciate.

Exchange Act defines a "security" as including, *inter alia*, an "…investment contract…or privilege on any security [*i.e.*, on a stock]… including any interest [in a stock] or based on the value [of a stock]." *See* Hazen Decl. ¶21 (quoting 15 U.S.C. § 78(c)(10)). CFDs fall well-within each of these descriptions. *See also id.* ¶¶19-23.[6]

The SEC has also taken the position that, for the purposes of the federal securities laws, purchasing CFDs is the same as purchasing the underlying common stock. In *SEC v. Sonja Anticevic et al.*, 05 Civ. 6991 (KMW) (S.D.N.Y.), *see* Third Schmid Decl., Ex. B, an insider trading action where the defendants purchased both common stock and CFDs, the SEC, alleging violations of Section 10(b) and Rule 10b-5 with respect to both securities, explained that:

> At least some of ***the trades in securities*** … ***were executed through contracts for difference ("CFD Contract"),*** which are contracts designed to make a profit or avoid a loss by reference to movements in the price of an underlying item. With respect to these trades, the customer purchased a CFD Contract and Saxo Bank hedged the trades by buying the underlying security on the New York Stock Exchange. ***As the customers appeared to purchase the CFD Contracts at the price at which the underlying security was then trading, for purposes of this Fourth Amended Complaint, purchases of CFD Contracts are referred to as purchases of common stock.***

*See id.* ¶85 (emphasis added). Given the position of the U.S.'s primary securities regulator that, for the purposes of enforcing the anti-fraud provisions of Section 10(b), the purchase of CFDs is the same as purchasing the underlying common stock,[7] there can be no dispute that KSG

---

[6] STRS attempts to rely on *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975), for the proposition that CFD purchasers lack standing under the Exchange Act. *See* STRS Mem. at 8. STRS's limited view of what constitutes a security is incorrect. "[The] seminal case of the Supreme Court interpreted these provisions: The holders of puts, call options and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b-5, not because of a judicial conclusion that they were similarly situated to 'purchasers' or 'sellers,' but because the definitional provisions of the 1934 Act themselves grant them such a status." *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1129 (9th Cir. 2002) (quoting *Blue Chip Stamps*). As a result, the Second Circuit has rejected definitions of a security that would exclude "instruments whose use is prevalent in contemporary financial markets." *See Caiola,* 295 F.3d at 325.

[7] Indeed, under Section 3(a)(11) of the Exchange Act, Congress empowered the SEC to designate any instrument it deemed appropriate as an "equity security" to enforce the federal securities laws, and as demonstrated in the *Sonja Anticevic* case, the SEC has so designated CFDs. This designation also reflects economic reality, because the E*Trade CFDs were tied to matching shares of common stock (as in *Sonja Anticevic*), resting the entire economic risk for the over 12,700,000 shares of E*Trade common stock on KSG. This position is also consistent with that of the UK's FSA, which regulates CFDs. *See* Hazen Decl. ¶10. The FSA is currently in its own rule-making process to

purchased E*Trade *securities* and that those purchases give rise to claims under Section 10(b) that are identical to those of purchasers of E*Trade common stock. *See also* Hazen Decl. ¶¶8(a) & (c).

The SEC's position in *Sonja Anticevic* is also consistent with the Second Circuit's decision (cited, but not discussed by STRS) in *Caiola*, 295 F. 3d 312. Since a CFD, like an option, *see id.*, at 327 n. 7, is a contract "based on the value of a security," it is a "security" under Section 3(a)(10). That a CFD is traded over-the-counter, rather than over an exchange, and that it is cash-settled, rather than requiring delivery of the underlying stock, does not alter its status as a "security" under Section 3(a)(10), or the application of Section 10(b)'s protections to CFD purchasers. *See Caiola*, 295 F. 3d at 325-27. *See also* Hazen Decl. ¶¶10-12, 29-30.

Moreover, even if Partnoy's alternate theory that CFDs may be "equity-based swap agreements," *see* Partnoy Decl. ¶ 10, were correct, KSG's standing to bring this Action and the typicality of its members' claims remain unchanged. *See* Hazen Decl. ¶¶8(d), 27-30, 45-48. The anti-fraud provisions of Section 10(b) expressly extend to purchasers of "securities-based swap agreements." *See* 15 U.S.C. §78j(b). Thus, under any theory espoused by Partnoy, purchasers of CFDs have the same protections, and, consequently, the same claims under the Exchange Act as purchasers of E*Trade common stock. *See Caiola,* 295 F. 3d at 327-28 ("synthetic stock transactions ... covered under *Rule 10b*.") (italicized in original.)

Furthermore, the fact that CFDs are not sold in the U.S. does not diminish the ability of those who lawfully purchased them abroad to pursue claims under the Exchange Act. *See* Hazen Decl. ¶¶30-31, 40. As *Caiola* demonstrates, claims for violations of Section 10(b) do not need to be predicated on an exchange-traded security, 294 F.3d at 325-26, and Rule 10b-5 actions are routinely pursued in U.S. courts for securities that were not sold in the U.S. *See, e.g.,* KSG Resp.

---

require increased disclosure by CFD holders, *see* Second Schmid Decl., Ex. C, p. 41-42, because the FSA views CFDs as a beneficial ownership interest in an issuer sufficiently equivalent to ownership of the issuer's common stock to require comparable reporting to regulatory authorities.

Mem., 9-10, n. 4 (citing cases appointing foreign lead plaintiffs who purchased only "ordinary shares" that were not traded in the U.S. and/or certifying classes that included such investors).[8]

Further, the purchase of CFDs cannot give rise to a "unique defense" in this case. A "unique defense" is a "defense" that a defendant will raise against a plaintiff that is not applicable to a significant number of other class members that will significantly detract from the resolution of the common questions in the action. *See Gary Plastics Packaging v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). Since E*Trade itself provides CFDs, *see* Sec. Schmid Decl., Ex. D (and, no doubt, provided E*Trade CFDs to its customers), the E*Trade defendants cannot seriously argue that CFD purchases give rise to any defense against them here. *See Caiola,* 295 F.3d at 325 ("the economic reality approach [to the definition of a [security] 'permits the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities [laws] by creating new instruments that would not be covered by a more determinate definition.") (quoting *Reeves v. Ernst & Young,* 494 U.S. 56, 63 n.2 (1990)). *See also United Hous. Found v. Forman*, 421 U.S. 837, 848 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967).[9]

Partnoy argues that CFDs are favored by short-term investors;[10] however, investment strategies, such as how long to hold an investment, are irrelevant in a fraud-on-the-market action.

---

[8]   In fact, all over-the-counter, cash-settled options are essentially "difference contracts," s*ee id.*, and such contracts are clearly securities and legal in the U.S. under *Caiola. See* Hazen Decl..¶25, 45-47. Since CFDs are also over-the-counter, cash-settled instruments that are valued based on a security (*i.e.*, the underlying exchange-traded common stock), they too are securities and legal. *See id.* Thus, CFDs are not *per se* illegal in the U.S., and as Professor Hazen explains, assuming there was a market for them in the U.S., and if brokerage firms who wished to sell them complied with the applicable regulations, they could be sold here. *See id.* ¶¶8(b), 14, 24-25.

[9] Moreover, whether a CFD is a security is a question of law that, if even raised by defendants, would be quickly resolved by the Court, and could not become the type of distraction necessary to constitute a "unique defense."

[10]   Unlike puts and calls (but like common stock), CFDs have no expiration. *See* Second Schmid Decl., Ex. B, ¶5. Expirations puts and callss contracts can range from seconds to, generally, nine months. Thus, arguably all option investors are short-term investors. That has deterred courts finding such investors atypical and inadequate to represent longer-term investors, because, in a fraud-on-the-market action, trading strategies and motivations are irrelevant to an investor's claims. *See, e.g., In re Oxford Healthcare Sec. Litig.,* 191 F.R.D. 369, 375 (S.D.N.Y. 2000).

*See, e.g., In re Electro-Catheter*, No. 87-cv-0041, 1987 U.S. Dist. LEXIS 13500, at *12 (D. N.J. Dec. 3, 1987) (Rejecting argument that "speedy trading practices were atypical," holding "[t]hat one plaintiff may have decided to … buy and then quickly resell shares, does not make his or her case atypical. Indeed, where plaintiffs proceed on a fraud-on-the-market theory, all traders suffer equally from the alleged unlawful price inflation regardless of their trading strategy or degree of sophistication.").[11]  Moreover, if Partnoy's complaint is that short-term trading gives rise to a "unique defense," even a passing glance at STRS's E*Trade transactions demonstrates that it is guilty of that conduct.[12]  Thus, if Partnoy were correct, he has disqualified his own client.[13]

Partnoy also contends that KSG has not provided information that he claims is necessary to determine the amount of its losses, and speculates about what KSG's members may have done with respect to their E*Trade investments.  Not only are Partnoy's arguments incorrect and irrelevant, but they overlook the fact that STRS has also failed to provide that same information, and that, unlike KSG, STRS may actually have engaged in the alleged conduct.  For instance, Partnoy theorizes that KSG's members *may* have hedged their E*Trade security purchases with countervailing short sales, *see* Partnoy Decl. ¶¶19; this assumes that they did not list, as required,

---

[11]  Short term investors are routinely certified as class representatives. *See, e.g., Pirelli v. LaBranche & Co.*, 229 F.R.D. 395, 416-17 (S.D.N.Y. 2004) (cited STRS Mem. at 10) (certifying alleged day-trader); *In re Oxford*, 191 F.R.D. at 123-24 (certifying alleged day-traders); *Saddle Rock Partners, Ltd. v. Hiatt*, No. 96-cv-9474, 2000 U.S. Dist. LEXIS 11931, at *13-14, (S.D.N.Y. Aug. 21, 2000) (finding day-traders covered by the fraud-on-the-market doctrine); *accord Taubenfeld v. Career Educ. Corp.*, No. 03 C8884, 2003 U.S. LEXIS 4363 (N.D. Ill. Mar. 22, 2004) (PSLRA lead plaintiff decision rejecting argument that "day trader" could not rely on the integrity of the market).

[12]  For instance, STRS purchased 100,000 shares of E*Trade stock on August 16th only to sell a matching block the next day (August 17th).  *See* STRS Certification.  Similarly, STRS repeatedly sold large blocks of E*Trade stock during the Class Period only to repurchase those shares a few days later. *See id.*

[13]  Here, KSG's members purchased the vast majority of their E*Trade securities in June, 2007 at prices in the mid-$20s and sold out completely following a series of adverse disclosures concerning E*Trade in August 2007 at prices in the mid- to low- teens. *See* First Schmid Decl., Ex. B.  It is hard to know just how much longer Partney would prefer they have held their E*Trade investments (and, consequently, increased their losses), but their sales during the Class Period clearly do not affect their typicality. *See Seidman v. American Mobile Sys.* 157 F.R.D. 354, 362 n.12 (S.D.N.Y. 1994) ("the fraud-on-the-market theory assumes that the market will account for disclosed information regarding a company's prior poor performance and price the stock accordingly") (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 243-44 (1988)). *Cf. In re Microstrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 436 (E.D. Va. 2000) (cited STRS Mem. at 6) (rejecting lead plaintiff that sold before *any* adverse disclosure by the company).

"all" of their "transactions" in E*Trade securities during the Class Period in their PSLRA Certifications. *See* 15 U.S.C. §78u-4(a)(2)(A)(iv).[14] In fact, they included all of their transactions, and they did not engage in any hedging or short-selling.[15] Further, Partnoy's speculation about what KSG *might* have done applies equally to what STRS *might* have done (and, consequently, the completeness of its Certification). *See* Third Schmid Decl., Exs. C, D (indicating that STRS's outside investment managers' hedge). Since it is impossible to know from the data submitted by STRS (or from any other publicly available source) what E*Trade transactions STRS actually engaged in, under Partnoy's erroneous theory, STRS has also failed to demonstrate it has any E*Trade losses.[16]

Partnoy's conjecture that KSG's losses *may* be smaller than claimed because they *may* have included brokerage commissions or margin interest in those calculations, *see* Partnoy Decl. ¶27, is also wrong. Since neither margin interest nor brokerage commissions are recoverable under Section 10(b), s*ee, e.g., Affiliated Ute Citizens v. United States,* 406 U.S. 12, 15 (1972) (defining the "correct measure of damage" in a Section 10(b) action), no such amounts are included in KSG's loss calculations. *See* Third Schmid Decl., Ex. E, ¶8-9; Ex. F, ¶8-9. Further,

---

[14] Even if the members of KSG had hedged their long E*Trade investments with short-sales, it would still be irrelevant to their typicality. *See, e.g. In re Select Comfort Corp. Sec. Litig.,* 202 F.R.D. 598, 607-08, n.12 (D. Minn. 2001) (certifying class including short sellers); *In re Sunbeam Sec. Litig.,* No. 98-cv-8258, 2001 U.S. Dist. LEXIS 25703 at *10-12 (S.D. Fla. July 3, 2001) (same); *Danis v. USN Commun's., Inc.,* 189 F.R.D. 391, 396-97 (N.D. Ill. 1999) (certifying plaintiff who, after initially shorting the stock, made covering share purchases during the class period on which he sustained a loss).

[15] Submitted herewith are declarations from Messrs. de Cannière and Fiyaz confirming that KGS's members did not "hedge" their E*Trade investments, and that the transactions listed on their PSLRA certifications were their only transactions in E*Trade securities. *See* Third Schmid Decl., Ex. E, ¶¶4-5; Ex. F, ¶¶4-5.

[16] Partnoy's argument that determination of which movant has the largest losses requires submission of the underlying brokerage confirmations and statements is again wrong. As is customary, both KSG and STRS have submitted only sworn PSLRA certifications annexing the transactional data required by the statute. The PSLRA does not require a lead plaintiff movant submit such underlying data to demonstrate losses and, if it does, STRS has similarly failed to demonstrate its losses since it has also not submitted any such source documentation.

how an investor finances the purchase of a security is irrelevant.[17]  Since any investor can, credit permitting, purchase securities on margin, and since it is likely a large segment of the Class used margin to finance their E*Trade investments, the use of margin supports KSG's typicality.[18] Similarly, virtually all investors pay brokerage charges;[19] even STRS's money managers and brokers are compensated for their services.  Thus, these speculative challenges to KSG fail.

Partnoy also makes the unsupportable argument that the presentation of KSG's losses in the attachment to their PSLRA certifications is somehow "misleading."  Partnoy Decl. ¶¶21-27. In fact, the column labeled "# of Shares Per CFDs*" is entirely accurate.[20]  Instead, Partnoy re-prints the headings of the attachments to certifications with the asterisk symbol, *see* Partnoy Decl. ¶22, but omits the text that accompanies the asterisk which states: "Contracts For Difference."  *See* First Schmid Decl., Exs. B-D, F.  It defies logic how this label could be misunderstood by anyone, and it certainly was not misunderstood by the competing movants here.[21]  Moreover, even if

---

[17]  *See, e.g., Walzer v. Diebert & Co. Inc.,* No. 05-cv-3680, 2007 U.S. App. LEXIS 7859, at **2-3 (3rd Cir. 2007) (plaintiff whose securities purchases were purely on margin properly brought claim under the Exchange Act); *Nursing Home Pension Fund v. Oracle Corp.,* No. 01-cv-0988-MJJ, 2006 U.S. Dist. LEXIS 94470, at **26-28 (N.D. Cal. Dec. 20, 2006) (plaintiff that traded on margin was not subject to unique defense); *Burstein v. Applied Extrusion Techs., Inc.* 153 F.R.D. 488, 490 (D. Mass. 1994) (refusing class discovery of margin information as not relevant to typicality or adequacy).

[18]  The ability of KSG's members to invest under UK law using up to 90% margin (while US investors may only use margin of between up to 50% for equities to 3% for futures), does not give rise to any unique defense or conflict. When the KSG members sold their E*Trade CFDs, they paid the full difference between the publicly quoted prices of E*Trade common stock on the days of their purchases and the days of their sales and thus sustained a full $133 million out-of-pocket loss.  That they have the wherewithal and/or credit to acquire over $308 million in E*Trade securities speaks volumes as to their substance, sophistication, and qualifications to serve as a lead plaintiff.

[19]  Likewise, whether or not KSG's brokerage agreements with the brokers from whom the CFDs were provided contain arbitration or choice of law clauses is a red-herring.  *See* Partnoy Decl. ¶26.  Most brokerage agreements contain such provisions; indeed, STRS's agreements with its money managers and brokers, no doubt, also contain such clauses.  Such provisions, however, only cover disputes between the customer and the broker and, thus, the E*Trade defendants are not beneficiaries of those provisions and they are inapplicable to this Action.  Further, if there was an issue regarding such contract provisions it would apply equally to every Class member who traded through a brokerage firm (*i.e.,* essentially every Class member), making it a common, not unique, question.

[20]  Partnoy also states that KSG's loss information is "inconsistent," Partnoy Decl. ¶21, but he never explains the basis of that bald statement.  As this statement is entirely unsupported, it too should be ignored.

[21]  STRS's and Skandia's responses prove that they fully understood what "CFDs" meant and that KSG's members purchased and sold CFDs.  This is not surprising since both STRS and Skandia have direct or indirect investments in CFDs.  STRS invests 25% of its funds abroad, *see* Third Schmid Decl., Ex. C, or in Partnoy's parlance, in "off shore

KSG's transaction lists were somehow deficient (*which they are not*) STRS's argument would still fail, because "attacks on the adequacy of the class representatives based on the representatives' ... credibility [is] rarely appropriate," *In re Frontier Ins. Group, Inc. Sec. Litig.*, 172 F.R.D. 31, 46 (E.D.N.Y. 1997), and "speculation and generalized attacks on credibility are insufficient to defeat class certification." *In re Indep. Energy Sec. Litig.*, 210 F.R.D. 476, 483 (S.D.N.Y. 2002) (citations omitted).[22]

Again attempting to invent an issue where none exists, Partnoy argues that KSG's statement that "its members paid prices for E*TRADE securities 'set by the market as quoted on the [NASDAQ],'" is somehow the same as stating that "the CFDs [KSG] traded [were] quoted on a United States exchange." *See* Partnoy Decl. ¶28. Not only does this argument require re-writing what KSG actually said, but it demonstrates a fundamental misunderstanding of the how CFDs are priced and why the fraud-on-the-market doctrine is applicable identically to CFDs as it is to the underlying common stock. *See* Hazen Decl., ¶¶17, 37-39. When KSG's members purchased and sold their CFDs they were priced at exactly the same open-market prices quoted at the time for the

---

bets." *See* Partnoy Decl. ¶6. While the specific foreign funds in which STRS invests are not disclosed in its published financial reports, several of its fund managers, as well as several of the individual companies in which it has direct investments, trade CFDs. *Compare* Third Schmid Decl., Ex. C *with* Exs. G-K. Similarly, Skandia trades CFDs through it proprietary mutual funds, *see id.*, Ex. L, and CFDs are actively traded in Sweden. *See* Hazen Decl., ¶13. Apparently neither STRS nor Skandia has any compunction about directly or indirectly profiting themselves from CFDs trading.

[22] Minor errors in a PSLRA certification have been repeatedly held insufficient to challenge adequacy. *See*, e.g., *Pirelli*, 229 F.R.D. at 407 (adequacy of the PSLRA certificate held not a determinative factor in selecting the lead plaintiff.); *In re Scientific-Atlanta Sec. Litig.*, No. 01-cv-1950-RWS, 2007 U.S. Dist. LEXIS 66282, at *43 (N.D. Ga. Sept. 7, 2007). Rather, class certification will be denied on credibility grounds only when the proposed representative has been dishonest regarding an issue central to the case. *See, e.g., Harrison v. Great Springwaters of Am., Inc.*, No. 96-cv-5110, 1997 U.S. Dist. LEXIS 23267, at **25-27 (E.D.N.Y. June 18, 1997) (rejecting credibility attack to adequacy of plaintiff); *Saddle Rock Partners*, 2000 U.S. Dist. LEXIS 11931, at *16-17 (court found apparent discrepancies between two depositions of same plaintiff relating to the number of shares of the defendant corporation he purchased did not warrant denial of class certification); *Epifano v. Boardman Bus. Prods., Inc.*, 130 F.R.D. 295, 301 (S.D.N.Y. 1990) (distinguishing *Kline v. Wolf*, 702 F.2d 400 (2d Cir. 1983), on grounds that "the issue on which defendants find [plaintiff] not credible is one that goes neither to his claims nor to any defense."). Here, nothing has been offered to call into question the credibility of KSG's members, and certainly nothing approaching the extreme situations in the cases cited by STRS (STRS Mem. at 10), where the proposed class representatives clearly misrepresented matters critical to their underlying claims. *See Kline*, 702 F.2d 400 (plaintiff testified relied in purchasing stock on a report *not in existence* at the time); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (Plaintiff repeatedly changed his position regarding receipt of notice that was required to file a claim).

underlying common stock. Hence, the prices paid or received by KSG's members for their E*Trade CFDs were prices set by the market as quoted for the underlying shares of E*Trade common stock on the NASDAQ. *See* Second Schmid Decl., Ex. B, ¶4.[23] Thus, not only is the statement in KSG's brief precisely correct, but the forgoing demonstrates that the prices KSG paid for the CFDs were set by an efficient market for securities to the same extent as the underlying shares of common stock. *See, e.g., Basic,* 485 U.S. at 242-47. In turn, to the extent the prices of E*Trade's publicly traded common stock were distorted by misrepresentations or omissions, the prices of the CFDs were identically distorted, and purchasers of both securities have identical claims. *See* Hazen Decl. ¶¶38-39.[24]

## CONCLUSION

Based on the foregoing, KSG respectfully requests that this Court: (1) consolidate all of the related actions; (2) appoint KSG lead plaintiff in the consolidated action; (3) approve KSG's selection of Brower Piven, A Professional Corporation, as lead counsel; and grant such further and other relief as the Court deems appropriate.

---

[23] Partnoy also states that CFDs are not generally listed on major stock exchanges, do not pay dividends, and are not liquid instruments. *See* Partnoy Decl. ¶3. These contentions are wrong. *See* Hazen Decl. ¶¶13, 15. Indeed, since CFDs are inextricably matched to underlying exchange-traded stock, CFDs will be as liquid as the stock. *See id.,* ¶17.

[24] While the other movants have failed to rebut the presumption that KSG should be appointed lead plaintiff, STRS faces barriers to being appointed lead plaintiff here. STRS now admits its motivation for bringing this suit is not limited to recovering the losses of Class members, but to effectuate unspecified "corporate governance" changes at E*Trade. *See* STRS Mem. at 9. However, Class members, like KSG, who no longer own E*Trade securities have no such interest; rather their sole interest is in recovering the largest amount obtainable from the E*Trade defendants. In this Circuit, under Rule 23(a)(4), "a district court must determine whether plaintiff's interests are antagonistic to the interest of other members of the class." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 142 (2d Cir. 2001). "Antagonistic interests are not only those which directly oppose one another, but also are those which may be … unharmonious such that one party's interest may be sacrificed for another's …. In challenging the representatives' adequacy, the defendant does not have to show *actual* antagonistic interests; the *potentiality* is enough." *Telecomm Tech. Servs., Inc. v. Siemen Rolm Commun's., Inc.* 172 F.R.D. 532, 544-55 (N.D. Ga. 1997). STRS's side agenda may necessitate it to trade off part of a larger financial recovery in exchange for those corporate governance changes. This places STRS's political interests in conflict with the financial interests of other Class members. Further, STRS touts its fee arrangement with its counsel. KSG also has an agreement with its counsel setting certain caps on any future fee request. Such arrangements, however, are not relevant to the selection of lead plaintiff. *See, e.g., In re Cavanaugh,* 306 F. 3d 726, 733 (9th Cir. 2002).

Dated:  New York, New York
        January 7, 2008

Respectfully submitted,

**BROWER PIVEN**
  A Professional Corporation

By: /s/ *David A.P. Brower*

David A.P. Brower
Elizabeth A. Schmid
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

**BROWER PIVEN**
  A Professional Corporation
Charles J. Piven
Marshall N. Perkins
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300

*Proposed Lead Counsel for
the Kristen-Straxton Group
and the Class*

11