# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LARRY FREUDENBERG, Individually And On Behalf of All Others Similarly Situated, | Civil Action No. 07-cv-8538 (RWS) |
| Plaintiff, | |
| vs. | CLASS ACTION |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |
| WILLIAM BOSTON, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No. 07-cv-8808 (RWS) |
| Plaintiff, | |
| vs. | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |
| ROBERT D. THURMAN, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No. 07-cv-9651 (RWS) |
| Plaintiff, | |
| vs. | |
| E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS, | |
| Defendants. | |

| | |
|---|---|
| WENDY M. DAVIDSON, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      vs.<br><br>E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS,<br><br>      Defendants. | Civil Action No. 07-cv-10400 (UA) |
| JOSHUA FERENC, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      vs.<br><br>E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN AND ROBERT J. SIMMONS,<br><br>      Defendants. | Civil Action No. 07-cv-10540 (SHS) |

## DECLARATION OF PROFESSOR THOMAS L. HAZEN

I, Thomas L. Hazen, hereby declare under penalty of perjury, follows:

1.    I am over 18 years of age, and I am competent to testify to the matters set forth herein.

2.    I am the *Cary C. Boshamer Distinguished Professor of Law* at the School of Law at the University of North Carolina at Chapel Hill where I teach securities law and corporate law.

3.    I am a graduate of Columbia College of Columbia University (A.B. 1969) and Columbia Law School (J.D. 1972), where I was an editor of the Law Review and a Harlan Fiske Stone Scholar in each of my three years of law school.  I am also a member in good standing of the New York Bar.

4.    I have written a number of books on securities regulation and broker-dealer regulation, including, for example, a six volume treatise on Securities Regulation (Thomson-West 5th ed. 2005) (updated twice a year), a two-volume treatise on Broker-Dealer Regulation (Thomson-West 2d ed. 2003) (co-authored with Professor Jerry W. Markham) (updated annually), a three-volume treatise on Derivatives Regulation (co-authored with former CFTC Chairman Philip McBride Johnson) (Aspen Law & Business 2004) (successor to Commodities Regulation (3d ed. 1998)) (updated annually), and a monograph on securities law commissioned by the Federal Judicial Center for distribution to all federal judges (2d ed. 2003).

5.    More comprehensive detail regarding my background, education, publications and experience is set forth on my *curriculum vitae* attached hereto as Exhibit 1.

## RETENTION

6.    I have been retained as a consultant to Kristen Management Limited ("Kristen"), Straxton Properties Inc. ("Straxton"), and Javed Fiyaz ("Fiyaz") (collectively, the "Kristen-Straxton Group") in this Action.

7.    In connection with this declaration, I have reviewed parts of the record in this case including submissions of the Kristen-Straxton Group and the State Teachers Retirement System of Ohio ("STRS"), the Declaration of Professor Frank Partnoy dated December 20, 2007 ("Partnoy Decl.") offered in support of STRS's motion to be appointed, the Declaration of Roger Hambury dated December 19, 2007 ("Hambury Declaration") and declarations of Vincent de Cannière on behalf of Kristen and Straxton and Mr. Fiyaz offered in support of the Kristen-Straxton Group's motion to be appointed, and various other documents referenced in various of

the filings made in this case. I offer this declaration to respond, as appropriate, to the factual

contentions and legal conclusions offered by Professor Partnoy.

8.    Based on my review of the record in this case as referenced in the forgoing

paragraph, my research to date, and my experience, it is my opinion that:

a.    E*Trade Financial Corporation ("E*Trade") Contracts for Difference

("CFDs") purchased by members of the Kristen-Straxton Group as described in the

Hambury Declaration ("E*Trade CFDs") were securities by virtue of the definition of a

"security" under Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. § 78c(a)(10);

b.    CFDs, though not currently sold in this country, are not inherently illegal

instruments under the laws of the United States and could be sold in the United States,

assuming a market for such securities exited here and assuming the sellers (*i.e.*, broker-

dealers) and purchasers (*i.e.*, customers) of those securities satisfy the necessary

regulatory requirements to effect such purchases and sales; and

c.    As CFDs are securities under Section 3(a)(10) of the Exchange Act,

purchasers of CFDs have claims under Section 10(b) of the Exchange Act, 15 U.S.C §

78j(b), that are identical to the claims of purchasers of other securities of a publicly

traded company, including purchasers of common stock.

d.    The answer to the question before the Court is much simpler than STRS

and Professor Partnoy would have this Court believe. As explained below, the E*Trade

CFDs are securities as defined by the Exchange Act. Even if Professor Partnoy's

uncertainty was well grounded such that the CFDs could be deemed securities-based

swap agreements, the result is the same; as securities-based swap agreements, CFDs are

3

as much subject to the anti-fraud provisions of the Exchange Act as E*Trade common stock. In either case, the Kristen-Straxton Group's claims are the same as those belonging to purchasers of E*Trade common stock.

9.    In addition, STRS[1] and Professor Partnoy offer several conclusions based on arguments about the manner in which the E*Trade CFDs were sold and performed and offer various theories about what the members of the Kristen-Straxton Group might or might not have done with respect to their E*Trade CFDs investments. Based on my review of the record, as discussed below, I find no factual basis for these conclusions, and I believe that, even if supported by the factual record here, those conclusions would not render the claims of the members of the Kristen-Straxton Group under the Exchange Act arising from their E*Trade CFD transactions to be any different than the claims of purchasers of E*Trade common stock or provide a defense to those claims that is any different than defenses applicable generally in this Action to the purchasers of E*Trade common stock.

## BACKGROUND AND ATTRIBUTES OF CFDS

10.    I have researched CFDs, and I am familiar their attributes. CFDs for securities are cash-settled, over-the-counter derivative contracts directly priced at the same price as the underlying exchange-traded security. For example, as demonstrated from the Hambury Declaration, the E*Trade CFDs were priced on a per share of E*Trade common stock basis at

---

[1] *See* State Teachers retirement System of Ohio's Memorandum of Law In Further Support of Its Lead Plaintiff Motion and In Opposition To All Other Lead Plaintiff Motions ("STRS Memo").

the exact same price paid for corresponding shares of E*Trade common stock purchased and sold on the NASDAQ in the United States in response to Straxton's E*Trade CFD orders.[2]

11.    Based on the foregoing description of the E*Trade CFDs, Straxton bore the entire economic risk with respect to the price movement of the underlying E*Trade common stock. If E*Trade's stock price had appreciated when Straxton ordered the sale of the E*Trade CFDs, as the Hambury Declaration testifies, the underlying E*Trade common stock held to cover the E*Trade CFDs would first be sold on the NASDAQ, and Straxton would receive the profit based on the actual sale price of the underlying E*Trade common stock. If E*Trade common stock declined in value (as it did in this case), upon the sale of the E*Trade CFDs (based on the prices received on the corresponding sale on the NASDAQ of the underlying E*Trade common stock), Straxton was obligated entirely for the difference between the purchase price of the CFDs and the ultimate sale price of the underlying shares of E*Trade common stock.

12.    Stock option contracts traded on U.S. exchanges, such as for E*Trade, are sold in single contracts each representing the right to buy or sell 100 shares of the underlying common stock. CFDs, such as the E*Trade CFDs, are also contracts, but each CFD represents a corresponding share of the underlying common stock (*e.g.*, here the number of shares of E*Trade common stock represented by each E*Trade CFD).[3] CFDs are cash-settled instruments. A CFD

---

[2]  Mr. Hambury's description is also consistent with the descriptions of the workings and pricing of CFDs set forth in various City Index publications. *See, e.g.,* City Index, "CFD Terms" (1 Nov. 2007), available at http://www.cityindex.co.uk/terms_and_policies.aspx.; City Index, "General      Terms"      (1      Nov.      2007),      available      at http://www.cityindex.co.uk/terms_and_policies.aspx; and City Index, "Margining Terms" (1 Nov. 2007), available at http://www.cityindex.co.uk/terms_and_policies.aspx; City Index, "CFD Market      Information      Sheet"      (1      Nov.      2007),      available      at http://www.cityindex.co.uk/cfd.marketinformation.aspx.

[3]  *See* fn. 2, *supra* (City Index, CFD Terms, §6).

does not provide for a right to acquire the actual corresponding share; rather, a CFD provides the opportunity to profit or lose as determined from the exact movement of the price of the underlying exchange-traded stock.

13.    CFDs are investment vehicles commonly used outside the United States.  For instance, the United Kingdom's Financial Services Authority ("FSA") has estimated that over 30% of transactions on the London Stock Exchange ("LSE") are related to CFD transactions.[4] The LSE is one of the world's largest, most well-developed public securities exchanges.  CFDs are also traded over-the-counter in Belgium, Norway, Spain, the Netherlands, Denmark, Hong Kong, Germany, Switzerland, Italy, Singapore, South Africa, Canada, New Zealand, Sweden, and in the United States to non-U.S. residents.[5]  CFDs are exchange traded in Australia, and plans exist to exchange trade them on the Philippine Stock Exchange[6]

14.    CFDs have several advantages to foreign investors that may not be of interest to U.S. investors.[7]  For instance, it is my understanding that CFDs sold in London permit purchasers to avoid the UK stamp tax on stock purchases (essentially a value added tax). Legitimate tax avoidance is a common investment goal.  There is no U.S. equivalent tax on domestic purchases of U.S. exchange traded securities.  As I understand it, CFDs also permit greater leverage (*i.e.*, margin) in the UK than typically permitted for other investments in that

---

[4]  FSA publication: Disclosure of Contracts for Difference: Consultation and Draft Handbook (2007), available at http//www.fsa.gov.uk/pubs/cp/cp07_22.pdf.

[5]  "Contracts for Difference: Introduction," available at http://www.contracts-for-difference.com/contracts-for-differences.html.

[6]  *See id.*

[7]  See, e. g., Cantor Fitzgerald Europe, "Contracts for Difference," available at http://www.cantor.com/sales_and_trading/equity_capital_markets/contracts_for_difference/8544 597.html

country and permit lawful hedging strategies not otherwise permitted under UK investment rules. Those hedging strategies can already be effectuated in the U.S. through other existing instruments or methodologies. Finally, and perhaps most importantly, CFDs permit foreign investors access to U.S. exchange-traded securities without the need to open a U.S. brokerage account.

15.    CFDs, like most derivatives such as call and put options, are not issued by the underlying issuer of the securities upon which they are derived. The E*Trade CFDs differ from traditional options, equity swap agreements and spread-bets because, like common stock, they have no fixed expiration and can be held for as long or short a period as an investor chooses. Additionally, unlike options, swap agreements and spread-bets, CFDs pay dividend equivalents to their holders passed through from the payment of dividends on the underlying common stock. Whereas the pricing of options typically factors in expected dividends, CFDs credit their holders not only with expected dividends, but, like common stock, with unexpected dividends.

16.    CFDs are regulated in the UK.[8] CFDs are also the subject of further evolving regulation in the UK.[9] Regulators in both the UK and the U.S. have taken the position that the ownership of CFDs where the CFD provider purchases corresponding shares of the underlying common stock is a form of beneficial ownership of the underlying common stock for the purposes of reporting and enforcement under their respective national securities laws.[10]

---

[8]  CFDs are regulated in the UK by the UK's FSA in accordance with the UK Financial Services and Markets Act of 2000. All CFD transactions are reported daily to the FSA and regulated firms must have sufficient financial resources to support the volume of their CFD trading at all times.

[9]  *See* fn. 4, *supra.*

[10]  *See* fn. 4, *supra* §5.15, pp. 41-42 ("What does the evidence tell us?...CfDs essentially share the same character and are used the same way as shares, which do carry voting rights...so CfDs

17.    CFDs are best characterized as a variety of "synthetic stock." As such they are an investment vehicle used to secure an investment in the underlying exchange-traded security. As described in the Hambury Declaration and in City Index documents, the bid/ask on CFDs does not differ from the bid/ask on the underlying exchange-traded common stock at the time the CFDs are priced. Accordingly, the pricing of the E*Trade CFDs was not affected by any information different than the information that affected the price of the underlying exchange-traded E*Trade common stock. CFDs like those purchased by members of the Kristen-Straxton Group are as liquid as the underlying shares of the issuer's exchange-traded common stock. This is because, upon the order to purchase or sell the E*Trade CFDs, matching shares of E*Trade common stock were purchased or sold on the NASDAQ; therefore, to the extent there was the availability of a price on the NASDAQ for E*Trade common stock, there was availability of a price for the E*Trade CFDs. It follows that the E*Trade CFDs were as liquid and efficiently priced exactly the same as the underlying exchange-traded E*Trade common stock was liquid and efficiently priced.

18.    CFDs are also not "gambling" contracts as that phrase is typically understood. CFDs are not the same as spread-betting and they have no resemblance to traditional sports or casino gaming. For example, in the UK and Australia, where CFDs, spread-betting, and sports gaming are all legal, both the UK and Australian tax laws treat CFD trading as investment

should be subject to the same disclosure requirements."); *see also* SEC Rules 10b5-1 and 16a-(3)(g).

activities subject to those countries' capital gains tax regimes rather than as gambling subject to separate regulations governing the taxation of gambling income.[11]

## OPINIONS

### A.   CFDs Are Securities

19.    Based on the record I have reviewed, my research to date, and my experience, it is my opinion that E*Trade CFDs purchased by members of the Kristen-Straxton Group are securities by virtue of the definition of a "security" under Section 3(a)(10) of the Exchange Act.

20.    Section 3(a)(10) of the Exchange Act provides that:

The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of

---

[11] *Compare* CFM13068 – Taxing Derivative Contracts: Contracts for Differences, http://www.hmrc.gov.uk/manuals/cfmmanual/CFM13068.htm; CFM15702 – Schedule 26 FA 2002: Derivative Contracts and Relevant Contracts, http://www.hmrc.gov.uk/manuals/cfmmanual/CFM15702.htm; Corporation Tax: A New Approach to the Taxation of Derivatives Based on Property and Share Values; CFM11110a – Understanding Derivative Contracts: Regulating Derivatives, http://www.hmrc.gov.uk/manuals/cfmmanual/popup/cfm11110a.htm; HM Revenue & Customs: CGT/FS1 Capital Gains Tax; A Quick Guide, available at http://www.hmrc.gov.uk/leaflets/cgtfs1.htm; CFM800 – Corporate Finance Manual: Glossary, available at http://www.hmrc.gov.uk/manuals/cfmmanual/glossary/cfm800.htm; IFX Markets Ltd Trading as City Index, Combined Financial Services Guide & Product Disclosure Statement: Contracts for Difference and Binary Options, at p. 26 (Sep. 10, 2007), available at http://www.cityindex.com.au/file_download/491 (citing Australian Commissioner of Taxation Ruling, TR 2005/15), *with* UK Gaming Act of 2005.

issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

21.    The E*Trade CFDs fall within the above definition of a security.  A "security" is an "...investment contract...or privilege on any security [*i.e.*, on a stock]... including any interest [in a stock] or based on the value [of a stock]."  A CFD is an "investment contract" and it is one based on the "value" of a stock.  Moreover, where, as here, a matching share of common stock is purchased to underlie the CFD, the CFD is also a "privilege on [a stock]" that includes "an interest [in a stock]" and that is based "on the value [of a stock]."

22.    The plain language of Section 3(a)(10) of the Exchange Act makes it clear that a "security" includes, but is not limited to, an exchange-traded security.  Therefore, over-the-counter securities, like the E*Trade CFDs, are covered by the definition of a "security" in Section 3(a)(10) of the Exchange Act.  Furthermore, the definition of a "security" is not limited to an instrument that trades or is tradable in the United States.  Any instrument that falls within the definition of a "security" under Section 3(a)(10) is a "security," whether it is purchased or sold in the United States or abroad.  Thus, any instrument that falls within the definition of a "security" under Section 3(a)(10) of the Exchange Act is a "security" whether or not that security could have been legally traded in the United States.

23.    Thus, E*Trade CFDs purchased by the members of the Kristen-Straxton Group were securities.  Indeed, the ownership of the E*Trade CFDs had more attributes of the ownership of E*Trade common stock, and they perform more like the underlying exchange-traded E*Trade common stock, than did exchange-traded options available on E*Trade shares, which options are indisputably securities under the Exchange Act.  Satisfying this economic

10

realty test separately confirms that the E*Trade CFDs were securities under Section 3(a)(10) of the Exchange Act.[12]

**B.**    **The Legality of the E\*Trade CFDs**

24.    There is no dispute that E*Trade CFDs purchased by members of the Kristen-Straxton Group were legally purchased and sold in London under UK law. It is also my opinion that the E*Trade CFDs would not be illegal in the United States if sold in accordance with applicable U.S. rules and regulations.

25.    I agree with Professor Partnoy that the E*Trade CFDs were not "securities futures." However, that fact is irrelevant to whether the E*Trade CFDs are legal in the United States. The E*Trade CFDs were securities under the definition of a "security" in the Exchange Act. That the E*Trade CFDs did not provide for delivery of the underlying security (like a securities future) does not impact their legality. There are a number of investments legally available in the United States that are difference contracts. The fact that CFDs are difference contracts does not render them *per se* illegal in the United States. For instance, it is clear that publicly traded over-the-counter, cash-settled stock options, where actual delivery is neither required nor contemplated, are the same as difference contracts. Such instruments are securities and legal in the United States.[13] However, unlike over-the-counter, cash-settled options, CFDs are priced, dollar-for-dollar, the same as the underlying common stock and their value fluctuates dollar-for-dollar with the price fluctuations of the underlying common stock. This distinguishes CFDs, akin to common stock, from stock options, the value or price of which are commonly determined based on the variables employed by the Black-Scholes formula.

---

[12] *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 325 (2d Cir. 2002) (and cases cited therein).

[13] This issue was also settled in this Circuit in *Caiola,* 295 F.3d at 325-28.

26.     For instance, as described in the Hambury Declaration, the price of the E*Trade CFDs did not fluctuate based on any information different than that which caused the value of the underlying E*Trade shares to fluctuate; instead, the fluctuations of each - the E*Trade CFDs and E*Trade common stock trading on the NASDAQ – moved exactly in tandem.  As such, the market for E*Trade common stock as traded on the NASDAQ set the exact price of the E*Trade CFDs at any given moment in time.  Thus, unlike some over-the-counter investment contracts, the price of the E*Trade CFDs were not privately negotiated, but, rather, as described in the Hambury Declaration, set, on a per share basis, at the same price as the price of shares of E*Trade common stock set by the market and quoted on the NASDAQ.

## C.    Claims Under the Exchange Act Attributable to the E*Trade CFDs Are Identical to Those Attributable to E*Trade Common Stock

27.     Professor Partnoy states that it is not clear whether CFDs are a "security" or a "security-based swap agreement."  *See* Partnoy Decl. ¶10.  It is my opinion that the E*Trade CFDs here were securities.[14]  It is moreover my opinion that, for the purposes of asserting a claim in this case under Section 10(b) of the Exchange Act, whether the E*Trade CFDs were a "security" or a "securities-based swap agreement," the alternatives offered by Professor Partnoy, there is no difference between the two types of instruments.

28.     Section 10(b) of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

---

[14]  My opinion that the E*Trade CFDs are securities, and not securities-based swap agreements, is further confirmed by the Gramm-Leach-Bliley Act, which excludes "any ... privilege on any security ... including any interest therein or based on the value thereof" from the definition of "swap agreements," because I believe that the E*Trade CFDs also fall within the description of a "privilege on" the underlying E*Trade shares. *See* ¶ 21, *supra*.

a.

    1.    To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

    2.    Paragraph (1) of this subsection shall not apply to security futures products.

b.    To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements (as defined in section 206B of the Gramm-Leach-Bliley Act) to the same extent as they apply to securities. Judicial precedents decided under section 17(a) of the Securities Act of 1933 and sections 9, 15, 16, 20, and 21A of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements (as defined in section 206B of the Gramm-Leach-Bliley Act) to the same extent as they apply to securities.

29.    As demonstrated above, the anti-fraud provisions of Section 10(b) of the Exchange Act apply identically to purchasers of securities and purchasers of securities-based swap agreements. Therefore, purchasers of a security on a securities exchange, such as a common stock on the NASDAQ, and purchasers of a security-based swap agreement having a value based on that common stock, will have identical claims under the Exchange Act and need to prove identical legal theories and factual elements to prevail on the merits of such a claim. As a result, it is also clear that Section 10(b) of the Exchange Act permits an action against a corporate issuer of securities by purchasers of derivatives of those securities even though those

13

derivative securities were not issued by the corporation. Hence, whether the E*Trade CFDs were securities or securities-based swap agreements do not make the claims of the members of the Kristen-Straxton Group any different that those of purchasers of E*Trade common stock under Section 10(b) of the Exchange Act.

30.      Furthermore, claims under Section 10(b) of the Exchange Act are not limited to exchange-traded securities or securities-based swap agreements. Indeed, the reach of the protections of the statute include, but are not limited to, instruments that trade on national exchanges. Section 10(b) applies equally to exchange and over-the-counter instruments. Likewise, the application of Section 10(b) is not limited to instruments issued or sold in the United States or even to instruments that can be lawfully issued or sold in the United States. Again, the statute makes clear that its reach includes violations committed through the use of the means of "interstate commerce," but it is not limited to interstate commerce. This would extend the coverage of Section 10(b) to extraterritorial and international commerce.

31.      Finally, there is no limitation to the protections of Section 10(b) of the Exchange Act to citizens of the United States or solely to securities transactions that occurred in the United States. Rather, foreign investors may properly seek relief in the courts of the United States under Section 10(b) of the Exchange Act for purchases and sales of covered instruments that occurred entirely abroad. Whether or not a defendant can be sued in this country will turn on issues of personal jurisdiction, but there is no impediment based on subject matter jurisdiction for a foreign investor, where such an investor purchased securities of a United States company in a foreign country, seeks recovery from that United States resident-defendant under Section 10(b) of the Exchange Act.

14

**D.**    **Additional Matters Raised by STRS and Professor Partnoy**

32.    In addition, STRS, in its memorandum, and Professor Partnoy, in his declaration, offer several possible scenarios regarding what members of the Kristen-Straxton Group might or might not have done relating to their claims under Section 10(b) of the Exchange Act and relating to their purchases and sales of E*Trade CFDs. Based on the record I have reviewed, I have found that these propositions lack a factual basis, and neither STRS nor Professor Partnoy has offered any factual support to substantiate these propositions.

33.    Additionally, even if the hypothetical issues raised by STRS and Professor Partnoy were supported by the factual record here, I believe that those issues would still be irrelevant to any substantive issue relating to claims under the Exchange Act in general, or to the claims of the Kristen-Straxton Group asserted in this Action in particular. Further, based on the circumstances of their purchases of E*Trade CFDs, none of the matters raised by STRS or Professor Partnoy would affect the of application of the fraud-on-the-market doctrine to claims of the Kristen-Straxton Group under Section 10(b), or require that those claims be treated under that doctrine any differently than those of purchasers of E*Trade common stock.

34.    Professor Partnoy provides a flow chart in his declaration, *see* Partnoy Decl. ¶14, that purports to delineate how CFD transactions relating to U.S. stocks occur outside the United States while being priced based on the shares traded in the United States. As discussed in paragraphs 30 and 31, above, and 35, below, that the E*Trade CFDs were traded outside the United States is irrelevant to any question before the Court. I fail to see how this chart has any application to the claims of the members of the Kristen-Straxton Group in this Action.

35.    STRS asserts that investments in CFDs are "high risk, foreign wagers." STRS Memorandum, at p. 6. As the prices of the E*Trade CFDs matched, exactly, the prices of the

15

underlying E*Trade common stock, investments in the E*Trade CFDs were no more "high-risk" than investment in underlying E*Trade common stock. That the E*Trade CFDs were purchased abroad – *i.e.*, in London -- would not make them any riskier than purchases of the underlying E*Trade common stock in the United States on the NASDAQ. Thus, this contention by STRS is factually incorrect. Professor Partnoy and STRS also repeatedly refer to CFDs as "off-shore" investments, apparently using the term "off-shore" to describe any investment made anywhere in the world other than in the United States. *See, e.g.*, Partnoy Decl. ¶ 12. Since, as discussed above, the applicability of the Exchange Act is unaffected by where the investment in question took place, I believe these statements are irrelevant to any issue in this Action.

36.    Similarly, STRS's and Professor Partnoy's descriptions of investments in CFDs as "side bets," *see* STRS Memo. at p.8; Partnoy Decl. ¶¶17, 19, 27, ignore the fact that all investments in derivatives are arguably a form of "side bet" to the extent they mean by that phrase not purchasing the underlying security. However, where, as with the Kristen-Straxton Group's purchases and sales of E*Trade CFDs, matching shares of the underlying common stock are purchased contemporaneously with the CFDs, the CFD investment ceases to be a "side bet" because the trades in the CFDs are accompanied by trades in the actual underlying security. Therefore, here, the Kristen-Straxton Group's E*Trade CFD trades were, from the points of view of economic reality and risk allocation, investments in the underlying shares themselves.

37.    STRS posits that the Kristen-Straxton Group's CFD transactions may have been driven by information different than that available to other class members. STRS Memo. at p.8. I have seen nothing in the record (and certainly nothing provided by STRS or Professor Partnoy) to support that assertion. There is no evidence in the record (and neither STRS nor Professor Partnoy provide any) to support a contention that any member of the Kristen-Straxton Group

16

purchased E*Trade CFDs on non-public or inside information; indeed, the size of their E*Trade losses would indicate the opposite. Therefore, since the E*Trade CFDs were valued at the exact same price as the underlying E*Trade common stock traded on the public securities exchange (the NASDAQ), absent evidence of inside information, there would have been no "different information" than that available to the market in general to influence the value of the E*Trade CFDs.

38.    STRS also argues that purchasers of CFDs are not entitled to invoke the fraud-on-the-market doctrine. *See* STRS Memo., at p.9. No proof has been offered for this proposition, and, based on the manner in which the E*Trade CFDs were priced, that proposition is incorrect. In this respect, as discussed above, the price of no other security could more closely parallel the price of E*Trade common stock listed on a national exchange than the E*Trade CFD. Unlike traditional options, which are generally priced based on a formula (Black-Scholes), and seek to project variables such as price, volatility, interest rates, expiration dates and the competitive market for the securities themselves, the E*Trade CFDs were priced at exactly the same price quoted for the underlying E*Trade common stock trading on the NASDAQ. Like the E*Trade common stock, the E*Trade CFDs had no expiration date or other variations from the E*Trade common stock that would result in a divergence of their price from that of the price of the E*trade common stock. Thus volatility of the price of the E*Trade CFDs was identical to the volatility of the price of the underlying E*Trade common stock. There is no independent or separate competitive CFD market; the availability of the E*Trade CFDs was limited only by the number of E*Trades common shares available on the NASDAQ to be purchased to match CFDs. As a result, by design, the price of the E*Trade CFDs matched identically the price of the underlying exchange-traded common stock. For this same reason, STRS's statement that the

17

E*Trade CFDs were priced through private negotiation, see STRS Memo., at p.9, is incorrect as a matter of fact; the price was set by the market for E*Trade shares traded on the NASDAQ. Therefore, to the extent the price of the underlying exchange-traded E*Trade common stock was set by an efficient market, the price of the E*Trade CFDs was also be the product of that same efficient market process.

39.    As a matter of economics, the efficient market hypothesis is unaffected by whether it is applied to a common stock traded on an exchange or a derivative with a price derived directly from the price of an exchange-traded security; assuming the underlying security's price is efficiently set, the prices of both securities will be efficiently set. Therefore, since, as I have stated above, the members of the Kristen-Straxon Group have claims under the Exchange Act with respect to their E*Trade CFD purchases that are identical to those claims under the Exchange Act belonging to the purchasers of E*Trade common stock, I disagree with STRS's proposition that the fraud-on-the market doctrine would not apply to the claims of the Kristen-Straxton Group's E*Trade CFD purchases. Rather, I believe that it does.

40.    STRS is correct that a CFD does not give the purchaser ownership rights in the underlying security. *See* STRS Memo., at p.9. This is true, by definition, of most derivatives. For example, American Depository Receipts are a proxy for the underlying shares of a foreign company whose actual common, or "ordinary," shares do not trade in the United States. However, as discussed above, contrary to STRS's argument, *see id.*, CFD holders do receive the value of any dividends issued to common stockholders.

41.    Professor Partnoy points out that CFDs are subject to a contract with the broker-dealer that executes the subject transactions. That is correct. This is also generally true of over-the-counter option transactions. Moreover, it is my understanding that the common practice is

18

for broker-dealers to have contracts with their customers that define their relationship. It is also common practice that these customer agreements with broker-dealers in the United States have both arbitration and choice of law clauses applicable to disputes between the customer and the broker-dealer. National Association of Securities Dealers and Financial Industry Regulatory Association regulations also require its members to arbitrate a dispute with a customer if the customer so desires even without such an agreement, and to arbitrate all disputes between its members. As none of these situations exist in this case, however, I cannot discern how the terms of the Class members' brokerage agreements, including those of the members of the Kristen-Straxton Group, could be relevant to their claims under the Exchange Act against E*Trade and its officers and director in this Action.

42.    Professor Partnoy also discusses at length the ability to use margin to purchase CFDs. The use of margin is a common practice among investors. Margin is simply borrowing from the broker through whom one transacts a securities purchase in exchange for a finance charge. The Federal Reserve Bank and the Securities and Exchange Commission sets margin requirements with respect to investment accounts in the United States. Regulatory authorities in other countries determine the margin requirements, if any, for their citizens or those trading within their borders. Professor Partnoy does not state (nor is their anything in the record here) that members of the Kristen-Straxton Group exceeded the permissible level of margin financing applicable to them under UK margin rules with respect to any of their investment in E*Trade CFDs. Indeed, based on Professor Partnoy's discussion of the ability of UK investors to leverage purchases of CFDs, it appears that he concedes that the Kristen-Straxton Group lawfully complied with their margin obligations.

19

43.    The use of margin, however, does not affect the price paid by an investor for a security purchased on a public exchange. The pricing of a security in an efficient, well-developed market is unaffected by how individual market participants privately finance purchases of that security. Therefore, the use of margin does not affect whether an investor pays more or less for a security. Rather, it affects an investor's collateral transaction costs. I am not aware of any defense to claims of the type made in this Action under the Exchange Act that could be premised on an investor's use of margin or how an investor otherwise privately finances the purchase of a security. Moreover, since the members of the Kristen-Straxton Group paid prices per share for their E*Trade CFDs on a post facto basis matched to the price of the shares of E*Trade's exchange traded common stock, I cannot conceive how margin could have any impact on the prices paid for the CFDs.

44.    Further, when an investor uses margin to finance an investment, if the value of that investment decreases, at the time the investment is closed, the investor is required to repay the broker (*i.e.*, the lender) the full difference between the purchase price of the security and the sale price (less the deposits made to keep the percentage of margin (borrowing) at permissible levels). Here, that means that when members of the Kristen-Straxton Group sold the E*Trade CFDs, they were required to pay the full amount of the difference between the purchase prices of the E*Trade CFDs and the sale prices (which were the same as the prices of the underlying E*Trade shares on the NADAQ) therefor. As a result, they did not incur, as Professor Partnoy suggests, "a fraction of the cost" listed on the Kristen-Straxton Group's members' PSLRA certification, *see* Partnoy Decl. ¶25, but, rather, they were obligated for the full amount of the purchase price less the sale price of the E*Trade CFDs, *i.e.*, their out-of-pocket loss.

45.    Professor Partnoy's use of the phrases "gambling," "betting," and the like throughout his declaration to describe the Kristen-Straxton Group's E*Trade CFD investments is essentially meaningless here.    Securities investing, derivatives transactions, insurance and gambling are all activities intended in one way or another to reap economic benefit.  In contrast to investing, hedging and insurance, gambling is not generally viewed as a productive activity or one that provides value to society beyond entertainment.  Over time and in various respects, investing, hedging, and insurance have been compared with gambling and, to varying degrees, distaste for gambling has been used as a rationale for regulation of these other activities.[15]  There are many similarities often perceived between gambling and legitimate investment, hedging, and insurance activities.[16]  One thing investing, hedging, insurance and gambling all have in common is that they each involve risk taking, while only the first three are generally seen as involving risk-shifting or other legitimate economic benefits.  Traditionally the law has been much harsher on transactions that are characterized as gambling.  One possible explanation for the difference in treatment focuses not so much on what the transactions are, but who the parties are and their

---

[15]  Our courts have long recognized the "gambling aspect to investing." *See Purdy v. Commodity Futures Trading Commission,* 968 F.2d 510 (5th Cir. 1992) (comparing investing to a form of gambling); *McNally v. Gildersleeve,* 16 F. 3d 1493, 1495-96 (8th Cir. 1993) (comparing investing to a form of betting); *Cromer Finance Ltd. v. Ernst & Young Int'l,* 205, F.R.D. 113, 129 n.19 (S.D.N.Y. 2001) (certifying a class of investors that were considered to be "betting" on the market price of the stock).

[16]  Indeed, the Supreme Court, in adopting the fraud-on-the-market doctrine, itself alluded to the gambling aspect of investing, explaining that: "'Who would knowingly roll the dice in a crooked crap game?'" *Basic, Inc. v. Levinson,* 485 U.S. 224, 247 (1988) (quoting *Schlanger v. Four-Phase Sys., Inc.,* 555 F. Supp. 535, 538 (S.D.N.Y. 1982).; *see also Leist v. Tamco Enter., Inc.,* No. 80-cv-4439-CLB, 1982 U.S. Dist. LEXIS 17389, at **7-8  (S.D.N.Y. Mar. 16, 1982) ("And no riverboat gambler would knowingly shoot craps with loaded dice. Sophistication or lack thereof plays no part in reliance or causation when the market quotations have been distorted by deception unknown to potential purchasers.").

motives.   As Ambrose Bierce wrote, "the gambling known as business looks with austere disfavor upon the business known as gambling."   Though gambling laws have traditionally created barriers to entry into that arena, there has been a dwindling of those barriers with increasing legalization.   Although some high-risk investment opportunities may be limited to sophisticated investors, there are no cognizable barriers to the investment markets generally thereby allowing access to legalized gambling.   Furthermore, the sophistication and wealth barriers to some investments do not protect against speculation and gambling, they simply foreclose opportunities to other investors.[17]

46.   What is permissible or not changes over time.   For example, Professor Partnoy notes that contracts for "differences" were illegal in the Netherlands in 1541 and unenforceable in England in 1828 because they were then considered gambling contracts.   This information hardly lends support to his arguments that CFDs are illegal today.   Indeed, if such historical facts were relevant to this Action, it could be noted that any charge on a debt over the amount of the principal (*i.e.*, interest) was forbidden throughout Christendom for the fifteen hundred years before the industrial revolution.[18]   Obviously, that rule has changed, as well.

47.   Moreover, contrary to Professor Partnoy's one-sided history lesson, the use of derivatives reaches back to the dawn of civilization.[19]   Today, formerly illegal difference

---

[17]   *See, generally*, Hazen, Thomas Lee, *Disparate Regulatory Schemes for Parallel Activities: Securities Regulation, Derivatives Regulation, Gambling, and Insurance*, 24 Ann. Rev. Banking and Fin. L. 375 (2005).

[18]   White, Andrew, *A History of Warfare of Science With Theology*, Appleton and Co. (New York: 1898), Ch. XIX, From Leviticus To Political Economy: "Origin And Progress of Hostility To Loans At Interest," available http://cscs.umich.edu/~crshalizi/White/economy/origin.html.

[19]   Dodd, Randall, *Backgrounder: Derivatives*, Initiative For Public Dialogue at Columbia University, available at http://www2.gsb.columbia.edu/ipd/j_derivatives.html.

contracts are legally transacted between sophisticated market participants. For example, institutional traders engage in synthetic stock transactions which consist of contracting with a counter-party to pay the difference on the price of the underlying stock over time.[20] This type of transaction is just one example of how the law permits sophisticated market participants to engage in transactions that would be improper if carried out by other market participants.[21] The test seems to be whether the synthetic stock transaction shifts the risk. With respect to CFDs, the risk remains with the CFD purchaser and not the broker-dealer, and, accordingly, investment in CFDs is not gambling.

48.    Finally, I am familiar with much of Professor Partnoy's writings and they evidence a pervasive concern for the potential negative impact of derivatives (particularly credit-based derivatives) on the capital markets. Indeed, I have written extensively on the subject. Derivatives are a 100 trillion market today.[22] Professor Partnoy has repeatedly written

---

[20] *See* fn. 13, *supra.*

[21] The Commodities Futures Modernization Act of 2000. (the "CFMA"), eliminated the former monopoly of the Commodities Future Trading Commission ("CFTC") over various forms of derivative instruments by permitting over-the-counter, and essentially unregulated, transactions between qualified market participants. *See id.* As Judge Easterbrook of the United States Court of Appeals for the Seventh Circuit has explained it: "Eligible contract participants" under the Commodities Exchange Act are the equivalent of "accredited investors" in securities markets; wealthy persons who can look out for themselves directly or by hiring experts." *Commodity Futures Trading Commission v. Zelener*, 373 F. 2d 861, 862-63 (7th Cir. 2004) (citing 7 U.S.C. § 1a(12); 15 U.S.C. § 77b(a)(15)). The CFMA also changed the designation process so that the CFTC no longer has responsibility for reviewing the economics underlying publicly traded derivatives.

[22] *See* Partnoy, Frank, *The Shifting Contours of Global Derivatives Regulation*, U. San Diego Law & Econ., Research Paper No. 15 (Aug. 2001).

advocating more regulation in the area.[23]  I also have expressed some concerns regarding the

adequacy of regulatory approaches to derivatives.  I note that other commentators, including

former Federal Reserve Chairman, Alan Greenspan, has argued against such increased

regulation.[24]  This debate over what some think should be the case in the future, however, has no

relevance to the claims asserted in this action which assert the same factual and legal theories for

all purchasers of E*Trade securities, including the E*Trade CFDs purchased by the members of

the Kristen-Straxton Group and E*Trade common stock.

Executed this 7th day of January, 2008, at Chapel Hill, North Carolina.

_____
THOMAS L. HAZEN

---

[23]  *See, e.g.,* Partnoy, Frank, *Bitter Harvest From The Years Of Greed* (April 24, 2003), available at                    http://www.thisislondon.co.uk/news/article-4476303-details/Bitter+harvest+from+the+years+of+greed/article.do;  Partnoy,  Frank,  *Some Policy Implications of Single-Stock Futures,*. U San Diego Law & Econ Research Paper No. 10 (2001), available at http://ssrn.com/abstract=261896; *Fleeced,* Transcript of Frank Partnoy on The Paula Gordon Show (2007), available at http://www.paulagordon.com/shows/partnoy/index.html; Partnoy, Frank, *WHAT DOGS CAN TEACH US ABOUT SECURITIES REGULATION: Why Fining Two Mutual Funds For "Window Dressing" Was A Mistake* (Aug. 20, 2001), available at http://writ.news.findlaw.com/commentary/20010820_partnoy.html; Partnoy, Frank, *Investing in Fantasy Land* (December 27, 2005), available at http://us.ft.com/ftgateway/superpage.ft?news_id=fto122720051839141789; Testimony of Frank Partnoy, Professor of Law, University of San Diego School of Law, Hearings Before the United States Senate Committee on Governmental Affairs (January 24, 2002), available at http://www.senate.gov/~govt-aff/012402partnoy.htm.

[24]  Testimony of Chairman Alan Greenspan: The Regulation of OTC Derivatives Before The Committee on Banking and Financial Services, U.S. House of Representatives (July 24, 1998), available at http://www.federalreserve.gov/boarddocs/Testimony/1998/19980724.htm.

# EXHIBIT 1

**THOMAS LEE HAZEN**
*Cary C. Boshamer Distinguished Professor of Law*
University of North Carolina at Chapel Hill
School of Law
CB# 3380 Van Hecke-Wettach Hall
Chapel Hill, N.C. 27599-3380
(919) 962-8504

## CURRICULUM VITA

## PROFESSIONAL HISTORY

- 1980 - present:
  Cary C. Boshamer Distinguished Professor (1991-present), Professor (1980-1991)
  School of Law, The University of North Carolina at Chapel Hill

- 1974-1980:
  Professor, University of Nebraska College of Law (1979-1980),
  Associate Professor (1977-1979), Assistant Professor (1974-1977)

- 1972-1974:
  Associate, Kaye, Scholer, Fierman, Hays & Handler, New York, N.Y.

## PUBLICATIONS

### Books

*Treatises*

- **Treatise on the Law of Securities Regulation** (Thomson-West 5th ed. 2005) (six volume practitioner edition), updated annually; (4th ed. 2002 – four volumes) (3rd ed. 1995 - three volumes); (2nd ed. 1990-- two volumes); (1st ed. 1985).

- **Cox & Hazen on Corporations** [co-authored with J. Cox] (Aspen Law & Business 2d ed. 2003) (1st ed. 1995) (three volumes) (winner of Association of American Publishers' award for best new legal book of 1995), updated annually; (one volume student edition1997, 2d edition 2003).

- **Broker Dealer Operations and Regulation Under Securities and Commodities Law: Financial Responsibilities, Credit Regulation, and Customer Protection** [co-authored with J. Markham] (Thomson-West 2d ed. 2002) (1st ed. 1995) (two volumes) (updated annually).

♦ **Derivatives Regulation** [co-authored with P. Johnson] (2004, Aspen Law & Business) (three volumes) (updated annually); successor to **Commodities Regulation** (3rd ed. 1998, Aspen Law & Business; 2nd ed. 1989 Little, Brown & Co.).

*Casebooks*

♦ **Broker-Dealer Regulation: Cases and Materials** [co-authored with D. Ratner] (Thomson-West 2003).

♦ **Corporate Finance: Cases and Materials** [co-authored with J. Markham] (Thomson-West 2d ed. 2008, 1st ed. 2004).

♦ **Corporations and Other Business Enterprises Cases and Materials** [co-authored with J. Markham] (2d ed. Thomson –West 2006), (Thomson-West 2003).

♦ **Mergers, Acquisitions, and Other Corporate Combinations Cases and Materials** [co-authored with J. Markham] (Thomson-West 2003).

♦ **Securities Regulation: Cases and Materials** (Thomson-West 7th ed. 2006, annual supplements); (4th ed. 1991; 5th ed. 1996; 6th ed. 2002).

*Student Texts*

♦ **Hornbook on the Law of Securities Regulation** (Thomson-West revised 5th ed. 2006).

♦ **Principles of Securities Regulation** (Thomson-West 2d ed. 2006)

♦ **Cox & Hazen on Corporations** (Aspen Law & Business 2d ed. 2003).

♦ **Broker-Dealer Regulation in a Nutshell** (Thomson-West 2003).

♦ **Securities Regulation in a Nutshell** [co-authored with D. Ratner] (Thomson-West 9th ed. 2006) (Japanese version published by Nomura Securities).

*Monograph*

♦ **Federal Securities Law** (monograph for federal judges) (Federal Judicial Center 2d ed 2003) (1st ed. 1993) .

*Compilations*

♦ **Corporations, Other Limited Liability Entities, and Partnerships Selected Statutes** (with J. Markham) (Thomson-West 2005).

♦ **Securities Regulation, Selected Statutes, Rules and Forms** (Thomson-West; published annually).

## Articles

- Disparate Regulatory Schemes for Parallel Activities: Securities Regulation, Derivatives Regulation, Gambling, and Insurance, 24 Annual Review of Banking & Financial Law 375 (2005).

- Administrative Law Controls on Attorney Practice Before the Securities and Exchange Commission, 55 Admin. L. Rev. 323 (2003).

- Silencing the Shareholders' Voice, 80 N.C.L. Rev. 1897 (2002), reprinted in 45 Corporate Practice Commentator 153 (2003).

- The Myth of Full Disclosure: A Look at Organizational Communications During Crises (with Jeffrey B. Kaufmann and Idalene F. Kesner), 37 Business Horizons 29-39 (Issue 4 1994)

- Defining Illegal Insider Trading -- Lessons From the European Community Directive on Insider Trading, 55 J. L. & Contemp. Prob. 231-239 (1992).

- Rational Investment, Speculation, or Gambling? -- Derivative Securities and Financial Futures and Their Effects on the Underlying Capital Markets, 86 Nw U. L. Rev. 987-1037 (1992).

- *United States v. Chestman* -- Trading in Securities on the Basis of Nonpublic Information in Advance of a Tender Offer, 45 Brooklyn L. Rev. 595-617 (1991).

- The Short Term--Long Term Dichotomy and Investment Theory: Implications for Securities Market Regulation and For Corporate Law, 70 N.C.L. Rev. 137-207 (1991), reprinted in 1993 Securities L. Rev. 509-579.

- The Corporate Persona, Contract Failure, and Moral Values, 69 N.C.L. Rev. 273-318 (1991).

- Management Buyouts and Corporate Governance Paradigms, 25 Wake Forest L. Rev. 1-13 (1990).

- State Antitakeover Legislation -- The Second and Third Generations, 23 Wake Forest U.L. Rev. 77-120 (1988), reprinted in II, ABA Selected Articles on Federal Securities Law .

- Volatility and Market Inefficiency: A Commentary on the Effects of Options, Futures and Risk Arbitrage on the Stock Market, 44 Wash. & Lee L. Rev. 789-805 (1987), reprinted in 21 Securities Law Rev. 411 (1989).

- Corporate Directors' Accountability: The Race to the Bottom -- The Second Lap, 66 N.C.L. Rev. 171-182 (1987).

- Rumor Control and Disclosure of Merger Negotiations or Other Control Related Transactions: Full Disclosure or "No Comment" -- The Only Safe Harbors, 46 Md. L. Rev. 954-973 (1987).

- Contract Principles As a Guide for Protecting Intellectual Property Rights in Computer Software: The Limits of Copyright Protection, The Evolving Concept of Derivative Work, and the Proper Limits of Licensing Arrangements, 20 U.C.Davis L. Rev. 105 (1986), *reprinted in* 4 Milgrim on Trade Secrets, app. B-7, at B7-4.

- Capital Formation: Definition of "Security", 10 N.C.J. Int'l L. & Comm. Reg. 209-218 (1985).

- Simulation of Legal Analysis and Instruction on the Computer, 59 Ind. L.J. 195-222 (1984) [co-authored with M. Hazen].

- Taking Stock of Stock and the Sale of Closely Held Corporations: When is Stock Not a Security?, 61 N.C.L. Rev. 394-418 (1983).

- Breaches of Fiduciary Duty and the Federal Securities Laws, 61 N.C.L. Rev. 527-533 (1983).

- Corporate Insider Trading: Reawakening the Common Law, 39 Wash. & Lee L. Rev. 845-860 (1982).

- The Jurisdictional Provisions of the Federal Securities Acts, 60 N.C.L. Rev. 707-745 (1983), reprinted in 25 Corporate Practice Commentator 47-87 (1983).

- The Supreme Court and the Securities Laws, Has the Pendulum Slowed?, 30 Emory L.J. 5-34 (1981).

- Implied Private Remedies Under Federal Statutes: Neither a Death Knell nor a Moratorium -- Civil Rights, Securities Regulation and Beyond, 33 Vand. L. Rev. 133-186 (1980).

- Corporate Mismanagement and the Securities Acts' Antifraud Provisions: A Familiar Path With Some New Detours, 20 B.C.L. Rev. 819-856 (1980).

- Premiums in the Sale of Control, 11 Inst. Sec. Reg. 317-330 (1980).

- Administrative Enforcement: An Evaluation of the Securities and Exchange Commission's Use of Injunctions and Other Enforcement Methods, 31 Hastings L.J. 427-472 (1979), reprinted in 1 National L. Rev. Rep. 1277 (1980).

- The Decision to Incorporate, 58 Neb. L. Rev. 627-643 (1979).

- The Sale of Control: Towards a Three Tiered Approach, 4 J. Corp. Law 263-283 (1979).

- Models of Corporate Conduct: From the Government Dominated Corporation to the Corporate Dominated Government, 58 Neb. L. Rev. 100-135 (1979) [co-authored with B. Buckley].

- A Look Beyond the Pruning of 10b-5: Implied Remedies and Section 17(a) of the Securities Act of 1933, 64 Va. L. Rev. 641-689 (1978).

- Corporate Chartering and the Securities Markets: Shareholder Suffrage, Corporate Responsibility and Managerial Accountability, 1978 Wis. L. Rev. 391-439, reprinted in 1979 Corporate Counsels Annual.

- Transfers of Corporate Control and Duties of Controlling Shareholders -- Common Law, Tender Offers, Investment Companies -- And a Proposal for Reform, 125 U. Pa. L. Rev. 1023-1067 (1977), reprinted in 1978 Corporate Counsels Annual.

- The New Pragmatism Under Section 16(b) of the Securities Exchange Act, 54 N.C.L. Rev. 1-57 (1975).

## Book Reviews

- 61 N.C.L. Rev. 1256-1261 (1983).

- 54 Neb. L. Rev. 435-442 (1975).

## Other Publications

- Reins Tighten on SEC Rulemaking, Complinet, http://www.complinet.com/global/news/news/article.html?ref=83960# (Oct 30, 2006).

- In Memoriam Nelson Ferebee Taylor, 83 N.C.L. Rev. 1-4 (2004).

- Entry on "Securities Law" for the Oxford Companion to American Law (Oxford University Press 2002).

- Beware Differential Sales Commissions on Specific Stocks, Complinet, http://www.complinet.com/securities-na/dailynews/display.html?ref=34847 (May, 2, 2002).

- The Securities and Exchange Commission's *Market 2000 Report* : Harbinger of Radical Change or Simply Fine Tuning?, (symposium introduction) 19 J. Corp. L. 437-441 (1994).

- The Myth of Full Disclosure: A Look at Organizational Communications During Crises, 37 Business Horizons 29-39 (No. 4, July-Aug. 1994) (coauthored with J. Kaufmann & I. Kessler).

- Tribute, 69 N.C.L.Rev. 1081-1082 (1991).

- Commentary, 36 Cath. U. L. Rev. 987-997 (1987).

**Student Articles**

- Comment, The Effect of S.E.C. Injunctions in Subsequent Private Damage Actions, 71 Colum. L. Rev. 1329-1344 (1971).

- Recent Development, 70 Colum. L. Rev. 1460-1467 (1970).

**Computer Courseware**

- Exercise on Corporate Acquisitions -- simulated interview between senior partner and associate; written in HyperCard for Apple Mcintosh computers; written in HyperCard for Apple Mcintosh computers (Published by the Center for Computer Assisted Legal Instruction 1989, 1990).

- Exercise on Securities Regulation -- rudimentary expert system for analyzing the availability of exemptions from registration under the Securities Act of 1933 (Published by the Center for Computer Assisted Legal Instruction 1989, 1990).

**PRESENTATIONS, ETC.**

- Fundamentals of Securities Law (formerly "Securities Law for Non Securities Lawyers") (ALI-ABA two-day course, offered at least once a year; from 1988-present; co-chair since 2000).

- Panelist, "Broadening Corporate Board Diversity:  Earning a Board Seat" as part of the UNC School of Law Director Diversity Initiative (Chapel Hill, N.C., May 15, 2006).

- Recent Developments in Federal Securities Regulation, as part of the UNC Law School Festival of Learning (Chapel Hill, N.C., Feb. 2, 2007).

- 16th Annual Dan K. Moore Program in Ethics, "The Lawyer-Accountant Relationship After Sarbanes-Oxley," co-chair (Chapel Hill, N.C., Oct. 5, 2006).

- "The Corporation", interdisciplinary panel discussion sponsored by the Parr Center for Ethics (Chapel Hill, N.C., April 26, 2006).

- 15th Annual Dan K. Moore Program in Ethics, "The Lawyer's Role in Responding to Enforcement Actions Against a Corporate Client," co-chair (Chapel Hill, N.C., Oct. 7, 2005).

- The North Carolina Business Corporation Act: A Retrospective (panelist and co-presenter), 2005 North Carolina Bar Association Business Law Section Annual Meeting (Pinehurst, N.C., Feb. 17, 2005).

Hazen vita
12/30/2007
page 7

- Developments in Broker-Dealer and Mutual Fund Sales Practices, as part of the (UNC Law School Festival of Learning (Chapel Hill, N.C., Feb. 18, 2005.).

- "Corporate and Non-Profit Boards: The Best of Both Worlds," (panelist and co-presenter), 2004 Statewide Conference of the N.C. Center for Nonprofits (Research Triangle Park, N.C., Oct. 28, 2004).

- 14th Annual Dan K. Moore Program in Ethics, "New Challenges in Ethics and Governance for Corporate Lawyers," co-chair (Chapel Hill, N.C., Oct. 8, 2004).

- 13th Annual Dan K. Moore Program in Ethics, "Regulation of Lawyer Conduct: New Federal and State Tensions," co-chair and presenter (Chapel Hill, N.C., Oct. 3, 2003).

- Broker-Dealer Sales Practices, Investment Adviser Regulation, SEC Lawyer Conduct Rules, as part of the ABA's Back to the Fundamentals Program on Financial Services (Miami Beach, Fla., Feb. 17, 2003).

- Broker-Dealer Sales Practices, as part of the UNC Law School Festival of Learning (Chapel Hill, N.C., Feb. 7, 2003).

- Administrative Law Controls on Attorney Practice Before the Securities and Exchange Commission, Symposium sponsored by the American Bar Association, American University (Washington, D.C., Jan. 31, 2003).

- The Art of Advising a High Technology Company, co-chair (Chapel Hill, N.C., Nov. 8, 2002)

- 12th Annual Dan K. Moore Program in Ethics, "Lawyer Liability and Responsibility in a Post-Enron World," co-chair (Chapel Hill, N.C., October 4, 2002).

- Broker-Dealer Sales Practices, as part of the ABA's Back to the Fundamentals Program on Financial Services (Washington DC, Nov. 9, 2001).

- Overview of Regulation D, as part of the UNC Law School Festival of Learning (Chapel Hill, N.C., Feb. 2001).

- Ethical Issues in Corporate and Securities Representation, as part of the UNC Law School Festival of Learning (Chapel Hill, N.C., Feb. 2000).

- Developments in Insider Trading, as part of the UNC Law Festival of Learning (Chapel Hill, Feb. 1998).

- The New North Carolina NonProfit Corporation Act (with Professor James D. Cox), as part of the UNC Law Festival of Learning (Chapel Hill, N.C., Feb. 1995)

- U.S. Securities Law for Canadian Lawyers, sponsored by CLE of British Columbia (Vancouver, B.C., June 1991).

- Small Issue Exemptions from Securities Registration, as part of the Nebraska Institute of Estate Planning (Lincoln, Neb., May 1991).

- Small Issue Exemptions from Securities Registration, UNC CLE program (Chapel Hill, N.C., May 1991).

- Management Buyouts, Wake Forest Law Review Business Law Symposium (Winston-Salem, N.C., March 1990).

- Foreign Corporations Under the North Carolina Business Corporation Act (North Carolina Bar Association, Winston-Salem, N.C., Nov. 17, 1989).

- Issues Relating to Director Liability and Indemnification, Wake Forest Law Review Business Law Symposium (Winston-Salem, N.C., March 31, 1989).

- Copyright Issues Relating to Videodisc Repurposing, presented to the Association for the Development of Computer Based Instructional Systems (Washington, D.C., Nov., 1988).

- State Anti-Takeover Legislation, Wake Forest Law Review Business Law Symposium (Winston-Salem, N.C., March 1988).

- "Copyright Infringement: Look and Feel" -- Implications for Software Development," presented to the Association for the Development of Computer Based Instructional Systems (San Francisco, Cal., Nov. 12, 1987).

- "The Law of Insider Trading," presented to the Sixth Annual Corporate and Banking Law Institute sponsored by the State Bar of Georgia (Oct. 24, 1987).

- "Defining Intellectual Property Rights in the Distribution of Software" (presented to the Association for the Development of Computer Based Instructional Systems, Washington, D.C., Nov. 11, 1986).

- Co-Director, First through Sixth Annual Southeastern Conferences on Corporate and Securities Law (Chapel Hill, N.C., 1982-1987).

- Acting Director, J. Nelson Young Fifth and Sixth Annual Tax Institutes (Chapel Hill, N.C., 1986-1987).

- "Corporate Mismanagement," presented at the American Law Institute-American Bar Association Annual Program on Fraud and Fiduciary Duty (Washington, D.C., April 11, 1980).

- "Sale of Corporate Control," presented at the Practising Law Institute 11th Annual Institute on Securities Regulation (New York, N.Y., Nov. 9, 1979).

Hazen vita
12/30/2007
page 9

- "Corporate Fiduciary Duties After Santa Fe Industries, Inc. v. Green" and "Sale of Corporate Control," presented at the American Law Institute-American Bar Association Postgraduate Course in Securities Law (Madison, Wis., June 27-28, 1979).

- Co-Director, Planning for the Purchase or Sale of a Business (Lincoln, Neb., Sept. 15-16, 1978).

- Director, Institute on Corporate Finance and Securities Distribution (Lincoln, Neb., May 12-13, 1977).

- "Securities Transactions Subject to or Exempt From Registration," presented at the Lincoln Bar Association (Lincoln, Neb., Jan. 26, 1976).

- "Selected Issues Concerning Cattle Ranchers' Standing to Sue for Downstream Price Fixing", presented at the Mid-America Red Meat Marketing Conference (Lincoln, Neb., Jan. 17, 1975).

## MISCELLANEOUS

- Board of Editors, Futures and Derivatives Law Report (Glasser LegalWorks), 2006-present

- Editorial Advisory Board, Wall Street Lawyer (Glasser LegalWorks), 2006-present

- Faculty advisor to the North Carolina Law Review, 1987-present.

- Board of Advisors, University of North Carolina School of Law Center for Banking and Finance, 2002-present.

- North Carolina Children's Hospital Board of Visitors, 2005-present (chair 2006-2008).

- North Carolina Medical Foundation, Board of Directors, 2002-2005.

- Carolina Club, Board of Directors, 2007-present.

- Member, Subcommittee of North Carolina Bar Authorized Practice Committee, 2005 (dealing with securities-related matter).

- Member, Drafting Committee for North Carolina's Partnership Act, 1998-2003.

- Member, Drafting Committee for North Carolina's Business Corporation Act, 1986–1989.

- Treasurer and Council Member, North Carolina Bar Association Section on Commercial, Corporate and Banking Law, 1985-1990.

- Member, Drafting Committee for North Carolina's Nonprofit Corporation Act, 1983-1985; 1989 –1991.

- Member, Board of Directors, Center for Computer Assisted Legal Instruction, 1988-1992.

- Developer of two computer assisted exercises on securities regulation, published by CALI 1989, 1990.

- Advisor to the UNC client counseling team, 1981-1987.

## COURSES TAUGHT

Currently teaching: Business Associations, Securities Regulation

Previously taught: Business Planning, Client Counseling, Contracts, Mergers and Acquisitions, Torts, Unfair Competition (including: copyright, trademarks and patent law).

## EDUCATION

J.D., Columbia University, 1972
    Law Review
    Harlan Fiske Stone Scholar 1969-70, 1970-71, 1971-72.

B.A., Columbia University, 1969.

## ADMITTED TO PRACTICE

Nebraska (inactive), New York.

## PERSONAL DATA

Born September 6, 1947, New York, N.Y.