# EXHIBIT B

Mark K. Schonfeld
Regional Director (MS-2798)

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, New York 10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

          -against-

SONJA ANTICEVIC, DAVID PAJCIN, EUGENE
PLOTKIN, STANISLAV SHPIGELMAN,
NICKOLAUS SHUSTER, JUAN C. RENTERIA, JR.,
HENRY SIEGEL, ELVIS SANTANA, MONIKA
VUJOVIC, MIKHAIL PLOTKIN, PERICA
LOPANDIC, BRUNO VERINAC, ZORAN SORMAZ,
ILIJA BORAC, ANTUN DILBER, ANTO KRSIC,
and JASON C. SMITH,

                        Defendants.

05 Civ. 6991 (KMW)

FOURTH AMENDED
COMPLAINT



RECEIVED
AUG 3 0 2006
U.S.D.C. S.D. N.Y.
CASHIERS

---

       Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against Defendants Sonja Anticevic ("Anticevic"), David Pajcin ("Pajcin"), Eugene Plotkin

("Plotkin"), Stanislav (aka "Stan") Shpigelman ("Shpigelman"), Nickolaus Shuster ("Shuster"),

Juan C. Renteria, Jr. ("Renteria"), Henry Siegel ("Siegel"), Elvis Santana ("Santana"), Monika

Vujovic ("Vujovic"), Mikhail Plotkin, Perica Lopandic ("Lopandic"), Bruno Verinac

("Verinac"), Zoran Sormaz ("Sormaz"), Ilija Borac ("Borac"), Antun Dilber ("Dilber"), Anto

Krsic ("Krsic"), and Jason C. Smith ("Smith") (collectively, the "Defendants"):

**SUMMARY**

1.       This case involves a widespread and brazen international scheme of serial insider trading orchestrated by Plotkin, a former Associate in the Fixed Income Research division at Goldman Sachs Group ("Goldman Sachs"), and Pajcin, a former analyst at Goldman Sachs, resulting in at least $6.8 million of illicit gains.  Beginning in late 2004, Pajcin and Plotkin engaged in a conspiracy with several individuals to surreptitiously obtain confidential non-public information from a variety of sources, including investment banks, financial publications, and a federal grand jury.  Pursuant to this conspiracy, Pajcin and Plotkin developed, organized, and participated in, at least three separate insider-trading schemes (collectively, the "Insider Trading Schemes").  Pajcin and Plotkin agreed to share all proceeds from their fraudulent enterprises.

2.       In the first scheme, Pajcin and Plotkin recruited Shpigelman, a Mergers and Acquisitions Analyst at Merrill Lynch & Co., Inc. ("Merrill Lynch"), to provide them with information about pending mergers and acquisitions deals on which Merrill Lynch was working, prior to the time such information became public (the "Merrill Lynch Scheme").  As part of this scheme, Plotkin and Pajcin promised to compensate Shpigelman with a percentage of the profits they made from trades entered into on the basis of the insider information Shpigelman provided. Pursuant to this scheme, from late 2004 to the summer of 2005 (the "Relevant Period"), Shpigelman provided Pajcin and Plotkin with non-public information concerning at least six mergers or acquisitions that Merrill Lynch was working on prior to the time the deals became public, including mergers or acquisitions involving Reebok International Ltd. ("Reebok"), Eon Labs, Inc. ("Eon Labs"), Cinergy Corp. ("Cinergy"), Celgene Corp. ("Celgene"), The Gillette Company ("Gillette"), and LabOne, Inc. ("LabOne").

3.      In the second scheme, Plotkin and Pajcin recruited two individuals, first Shuster, and later Renteria, to obtain employment at Quad/Graphics, Inc. ("Quad"), one of the four printing plants that print BusinessWeek magazine, for the sole purpose of stealing copies of the magazine before it was distributed to the public (the "BusinessWeek Scheme"). Pursuant to this scheme, Shuster and Renteria were hired at Quad, repeatedly obtained copies of the upcoming edition of BusinessWeek, and then called Pajcin and Plotkin and read them key portions of the "Inside Wall Street" column – a widely-read column that generally moves the price of the securities of companies mentioned in it – prior to the time the column was made available to the public. Collectively, Shuster and Renteria provided Pajcin and Plotkin with material non-public information concerning at least twenty companies that were featured in the "Inside Wall Street" column.

4.      In the third scheme, one of Pajcin's longstanding friends, Smith, told Pajcin and Plotkin that he was sitting on a federal grand jury in the District of New Jersey that was convened to investigate, among other things, potential accounting fraud at Bristol-Myers Squibb Co. ("Bristol-Myers"). Smith then leaked information about the grand jury proceedings to Pajcin and Plotkin in order to enable them to trade on non-public information (the "Grand Jury Scheme"). As part of this scheme, Smith communicated to Pajcin and Plotkin that it appeared as if one of Bristol-Myers' then-current high-ranking executives would be indicted, and based on that information, various of the Defendants purchased put options in Bristol-Myers or shorted Bristol-Myers stock in an attempt to profit on the negative information. Later, a day before the announcement of a deferred prosecution agreement with Bristol-Myers in which the high-ranking executive was not indicted, Smith told Pajcin that the grand jury did not return an

3

indictment against the high-ranking executive.  Based on this tip, each of the Bristol-Myers

traders liquidated or covered his position in an attempt to avoid losses.

5.      After obtaining the material non-public information stemming from the Insider

Trading Schemes, Pajcin first executed trades based on such information through an account in

his own name, and later through accounts in the name of Pajcin's aunt, Anticevic, and Vujovic,

an exotic dancer whom Pajcin and Plotkin met at a gentleman's club.  Pajcin and Plotkin also

tipped several individuals in Europe, including Lopandic and Verinac – two Croatian nationals

residing in Germany – and several individuals in the United States, including Plotkin's father,

Mikhail Plotkin, about the Merrill Lynch deals, the companies mentioned in BusinessWeek, and

the information obtained in the secret grand jury proceedings.  Lopandic and Verinac, in turn,

tipped various other individuals residing in Europe about the confidential non-public

information.  Pajcin and Plotkin had arrangements with the individuals in the United States and

with Lopandic and Verinac in Europe to be paid a percentage of all profits made on the basis of

the information provided pursuant to the Insider Trading Schemes.  Lopandic and Verinac, in

turn, had arrangements with other Europeans to share in the profits made on the basis of this

confidential information.  Smith provided Pajcin with money to help fund the Insider Trading

Schemes.  In exchange, Pajcin and Plotkin agreed to provide Smith with a percentage of Pajcin's

trading profits related to Smith's contribution to the Insider Trading Schemes.  Pajcin and

Plotkin had an agreement among themselves to share equally in the profits from the Insider

Trading Schemes.  As a result of the inside-information gleaned from the Insider Trading

Schemes, the Defendants collectively garnered at least $6.8 million in illicit profits.

6.      By this action, the Commission seeks, among other things, an order providing for:

permanent injunctive relief against all of the Defendants, the repatriation of all profits realized

from the unlawful insider trading activity set forth herein currently held abroad, and disgorgement of all profits realized from the unlawful insider trading activity set forth herein, along with civil monetary penalties.

## JURISDICTION AND VENUE

7.    Venue lies in this Court pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa.  Certain of the acts, practices, transactions and courses of business alleged herein occurred within the Southern District of New York.  For example, certain of the common stocks referred to herein are traded on the New York Stock Exchange, located in New York, New York, and several of the option contracts referred to herein are traded on the American Stock Exchange, located in New York, New York.  Defendants Pajcin and Plotkin engaged in several meetings in furtherance of the illegal trading schemes set forth herein in New York, New York, and Shpigelman, the source of much of the information that served as the basis for many of the trades discussed herein, worked at Merrill Lynch in New York, New York during the Relevant Period.

8.    Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

9.    **Anticevic**, age 63, is a Croatian national residing in OMIS, Croatia.  Anticevic, a retired seamstress, is Defendant Pajcin's aunt.  During the Relevant Period, certain of the securities referred to herein were traded through the following accounts held in Anticevic's name: an account at CyberTrader, Inc. ("CyberTrader"), account number 19660984 (the

"Anticevic CyberTrader Account"), and an account at Saxo Bank A/S ("Saxo Bank"), a bank located in Copenhagen, Denmark, account number 66855INET (the "Anticevic Saxo Bank Account"). In addition, during the Relevant Period, Anticevic held at least one account in her name at Direktanlage.at AG ("Direktanlage"), a bank located in Salzburg, Austria, account number 658-73351-0007 (any and all such accounts, the "Anticevic Direktanlage Account"). Anticevic gave Pajcin permission to execute trades through the various accounts in her name, and Pajcin executed trades through the various Anticevic accounts discussed herein.

10.    **Pajcin**, age 29, was, during the Relevant Period, a resident of Clifton, New Jersey. Pajcin was formerly associated with several broker-dealers, including Goldman Sachs. Pajcin obtained a degree in Economics from the University of Notre Dame in 2000. During the Relevant Period, Pajcin traded certain of the securities referred to herein through an account held in his name at OptionsXpress Holdings, Inc. ("OptionsXpress"), account number 5AL93N1 (the "Pajcin Account").

11.    **Plotkin**, age 27, was, during the Relevant Period, a resident of Brooklyn, New York and Airmont, New York. Plotkin was employed at Goldman Sachs from July 2000 until May 25, 2006, when he was terminated after the Commission announced charges against him and after he was arrested in a parallel criminal action. Plotkin held several positions at Goldman Sachs and was most recently an Associate in the Fixed Income Research division. Plotkin holds Series 7 and Series 63 securities licenses. Plotkin obtained a Bachelor of Arts degree in Economics from Harvard University in 2000.

12.    **Shpigelman**, age 23, was, during the Relevant Period, a resident of Brooklyn, New York. Shpigelman was employed as a Mergers and Acquisitions Analyst at Merrill Lynch from July 2004 until his termination on May 5, 2006. On April 11, 2006 the Commission

announced charges against him and he was arrested in a parallel criminal case. Shpigelman holds Series 7 and Series 63 securities licenses. Shpigelman obtained a Bachelor of Science degree in Business Management from the School of Management at Binghamton University in 2004. Shpigelman was the source of the confidential non-public information, and a tipper, in the Merrill Lynch Scheme.

13. **Shuster**, age 25, was, during the Relevant Period, a resident of Newark, New Jersey, Hartford, Wisconsin, and, most recently, Lexington, Tennessee. Shuster was employed at Quad from approximately October 11, 2004, to approximately January 6, 2005, when he was terminated. Shuster was, along with Renteria, a source of the confidential non-public information, and a tipper, in the BusinessWeek Scheme.

14. **Renteria**, age 21, is a resident of Milwaukee, Wisconsin. Renteria began working at Quad on or about May 15, 2005, where he was employed until April 11, 2006, when the Commission announced charges against him and he was arrested in a parallel criminal case. Renteria was, along with Shuster, a source of the confidential non-public information, and a tipper, in the BusinessWeek Scheme.

15. **Siegel**, age 56, is a resident of Pomona, New York. During the Relevant Period, Siegel traded certain of the securities referred to herein through an account held in his name at Charles Schwab & Co., Inc. ("Charles Schwab"), account number 71780879. Siegel was a tippee of Pajcin and Plotkin in the Merrill Lynch and BusinessWeek Schemes.

16. **Santana**, age 23, is a resident of Brooklyn, New York. During the Relevant Period, Santana traded certain of the securities referred to herein through an account held in his name at OptionsXpress, account number 05AV-3ET1. Santana was a tippee of Pajcin and Plotkin in the Merrill Lynch and BusinessWeek Schemes.

17.    **Vujovic**, age 24, is a resident of New York, New York.  During the Relevant Period, certain of the securities referred to herein were traded through an account held in Vujovic's name at Ameritrade, Inc. ("Ameritrade"), account number 782-827190 (the "Vujovic Account").  Vujovic gave Pajcin permission to execute trades through the Vujovic Account, and Pajcin executed trades through the Vujovic Account as discussed herein.

18.    **Mikhail Plotkin**, age 50, is a resident of Palo Alto, California and the father of Plotkin.  During the Relevant Period, Mikhail Plotkin traded certain of the securities referred to herein through an account jointly held in his name and in the name of his wife, at OptionsXpress, account number 5AT5-X01.  Mikhail Plotkin was a tippee in the Merrill Lynch and BusinessWeek Schemes.

19.    **Lopandic**, age 39, is a German and Croatian national, with a residential address in Reinbek, Germany.  During the Relevant Period, Lopandic traded certain of the securities referred to herein through an account held in his name at Saxo Bank, account number 67316INET, and/or in account number 056-01490 at Lehman Brothers International Europe ("LBIE"), which was the executing broker for Lopandic's Saxo Bank account (the two accounts collectively, the "Lopandic Account").  During the Relevant Period Lopandic was also a co-signatory on at least two brokerage accounts at Direktanlage, account number 400091887, held in the name of Borac, and account number 400083752, held in the name of Krsic, through which certain of the securities referred to herein were traded.  Lopandic was both a tipper and a tippee in the Merrill Lynch and BusinessWeek Schemes.

20.    **Verinac**, age 37, is a Croatian national, with a residential address in Hamburg, Germany.  During the Relevant Period, Verinac was a co-signatory on at least one brokerage account at Direktanlage, account number 400058634, held in the name of Dilber, through which

certain of the securities referred to herein were traded. Verinac was both a tipper and a tippee in the Merrill Lynch and BusinessWeek Schemes.

21.    **Sormaz**, age 41, is a Croatian national with a residential address in Zagreb, Croatia. During the Relevant Period, Sormaz traded certain of the securities referred to herein through an account held in his name at Saxo Bank, account number 67247INET, and/or in account number 056-01490 at LBIE, which was the executing broker for Sormaz' Saxo Bank account (the two accounts collectively, the "Sormaz Saxo Bank Account"). Upon information and belief, during the Relevant Period Sormaz also held at least one brokerage account at Direktanlage (any and all such accounts, the "Sormaz Direktanlage Account"), through which certain of the securities referred to herein were traded. Sormaz was a tippee in the Merrill Lynch and BusinessWeek Schemes.

22.    **Borac**, age 51, is a Croatian national with a residential address in Zagreb, Croatia. During the Relevant Period, Borac traded certain of the securities referred to herein through an account held in his name at Saxo Bank, account number 66374INET, and/or in account 056-01490 at LBIE, which was the executing broker for Borac's Saxo Bank account (the two accounts collectively, the "Borac Saxo Bank Account"). During the Relevant Period Borac also held at least one brokerage account at Dirketanlage, account number 400091887 (any and all such accounts, the "Borac Direktanlage Account"), through which certain of the securities referred to herein were traded. Lopandic was a co-signatory on the Borac Direktanlage Account. Borac was a tippee in the Merrill Lynch and BusinessWeek Schemes.

23.    **Dilber**, 67, is a Croatian national with a residential address in Pula, Croatia. During the Relevant Period, Dilber held at least one brokerage account at Direktanlage, account number 400058634 (any and all such accounts, the "Dilber Direktanlage Account") through

which certain of the securities referred to herein were traded. Verinac was a co-signatory on the Dilber Direktanlage Account. Dilber was a tippee in the BusinessWeek and Merrill Lynch Scheme, and, upon information and belief, in the Merrill Lynch Scheme.

24.    **Krsic**, 62, is a Croatian national with a residential address in Zupanja, Croatia. During the Relevant Period, Krisic held at least one brokerage account at Direktanlage, account number 400083752 (any and all such accounts, the "Krsic Direktanlage Account"), through which certain of the securities referred to herein were traded. Lopandic was a co-signatory on the Krsic Direktanlage Account. Krsic was a tippee in the BusinessWeek Scheme, and, upon information and belief, in the Merrill Lynch Scheme.

25.    **Smith**, age 30, is a resident of Jersey City, New Jersey. During the Relevant Period, Smith was employed as a letter carrier for the United States Postal Office. On May 11, 2006 the Commission announced charges against Smith and he was arrested in a parallel criminal case. Smith was the source of the confidential non-public information, and a tipper, in the Grand Jury Scheme, as well as a participant in the Insider Trading Schemes.

## RELEVANT ENTITIES

26.    **Merrill Lynch** is a Delaware corporation, with headquarters in New York, New York. It is one of the world's leading financial management and advisory companies with offices in 36 countries and territories. Its Global Markets & Investment Banking Group is a leading global strategic advisor to corporations, governments, institutions and individuals worldwide, that routinely works on large mergers and acquisitions between public corporations. During the Relevant Period, Merrill Lynch served as a financial advisor on transactions between, among others, The Proctor & Gamble Company ("P&G") and Gillette; Novartis AG ("Novartis")

and Eon Labs; Duke Energy ("Duke") and Cinergy; Quest Diagnostics, Inc. ("Quest") and LabOne; and Reebok and adidas-Salomon AG ("Adidas").

27.    **BusinessWeek** is a weekly financial news magazine owned and published by The McGraw-Hill Companies, Inc. ("McGraw-Hill"), with headquarters in New York, New York.

28.    **Quad** is a privately-held, employee-owned, Wisconsin corporation that operates and owns several printing plants, including a plant in Hartford, Wisconsin, that serves as one of four plants that prints BusinessWeek magazine.

29.    **Direktanlage** is a Salzburg, Austria, based subsidiary of Direkt Anlage Bank AG, which is headquartered in Munich, Germany. On November 19, 2001 Direktanlage acquired volksbankdirekt.at (a/k/a "vbankdirekt.at"). For purposes of this Complaint, references to "Direktanlage" accounts includes accounts opened at volksbankdirekt.at that were subsequently acquired by Direktanlage. Direktanlage operates as a discount broker. Direktanlage's trades are cleared by Merrill Lynch, which otherwise acts as an agent for Direktanlage, through an omnibus account number 34401046 (the "Direktanlage Omnibus Account"). Upon information and belief, during the Relevant Period, the individuals trading the securities referenced herein through the Direktanlage Omnibus Account were Lopandic, Verinac, Sormaz, Borac, Dilber and/or Krsic, hereinafter referred to as the "Direktanlage Traders."

30.    **Saxo Bank** is a bank based in Copenhagen, Denmark. Saxo Bank is also an online trading bank.

31.    **LBIE** is a London-based affiliate of Lehman Brothers Inc., a subsidiary of Lehman Brothers Holdings Inc. LBIE is an investment firm and a broker-dealer, and is regulated by the Securities and Futures Authority in the United Kingdom. In addition, LBIE is a member

11

of several European stock exchanges. LBIE acts as an agent for certain trades that Saxo Bank places in the United States securities markets.

FACTS

32.     Pajcin and Plotkin met and became friends in 2000 when they were both working at Goldman Sachs. Beginning in or about mid-2004, they began to devise a series of schemes whereby they could obtain confidential non-public information from a variety of sources in order to enable them to profit from trades made on the basis of such information. Among the schemes undertaken by Pajcin and Plotkin were: (i) a scheme to obtain confidential non-public information from a variety of investment banks about pending mergers and acquisitions transactions; (ii) a scheme to obtain confidential non-public information from business periodicals before publication; and (iii) a scheme to obtain confidential non-public information from a federal grand jury investigating Bristol-Myers. As part of their effort to obtain confidential non-public information, Pajcin and Plotkin placed a series of online job advertisements and met with a number of individuals, including individuals employed at various investment banks who, Pajcin and Plotkin believed, might provide them with confidential non-public information concerning pending mergers and acquisitions; a number of exotic dancers who, Pajcin and Plotkin believed, might garner information from individuals employed on Wall Street; and a number of individuals who, Pajcin and Plotkin believed, would be able to steal copies of a periodical before it was distributed to the public.

33.     Ultimately, Pajcin and Plotkin consummated at least three different schemes: (i) the Merrill Lynch Scheme, whereby Pajcin and Plotkin obtained from Shpigelman confidential non-public information about pending mergers and acquisitions originating from Merrill Lynch; (ii) the BusinessWeek Scheme, whereby Pajcin and Plotkin obtained from

12

Shuster and Renteria confidential non-public information about the contents of the "Inside Wall Street" column in upcoming editions of BusinessWeek; and (iii) the Grand Jury Scheme, whereby Pajcin and Plotkin obtained from Smith confidential non-public information about developments before a federal grand jury investigating Bristol-Myers. Plotkin booked travel for Pajcin and Pajcin traveled to Europe to meet with Lopandic and Verinac, and to Milwaukee to investigate the feasibility of the BusinessWeek Scheme.

### The Merrill Lynch Scheme

34.    Plotkin initially met Shpigelman when Shpigelman was in college, and assisted Shpigelman in preparing for interviews at Wall Street firms. Shpigelman ultimately obtained summer internships at Merrill Lynch during the summers 2000 through 2002. Shpigelman eventually joined Merrill Lynch as a Mergers and Acquisitions Analyst in July 2004.

35.    Shpigelman and Plotkin re-established contact towards the end of 2004. Shortly thereafter, Pajcin and Plotkin met with Shpigelman at Spa 88, a "day spa and Russian Sauna" located in downtown Manhattan. Pajcin and Plotkin recruited Shpigelman to participate in a scheme whereby Shpigelman would provide Pajcin and Plotkin with confidential non-public information concerning pending mergers and acquisition transactions being handled by Merrill Lynch.

36.    Pajcin and Plotkin told Shpigelman that they would pay him a percentage of all profits they made as a result of the non-public information Shpigelman provided them.

37.    Shpigelman agreed to provide Pajcin and Plotkin with non-public information about the Merrill Lynch deals. In doing so, he knowingly violated confidentiality agreements he had with Merrill Lynch to maintain the confidentiality of information he obtained in the course of his employment, and knowingly violated the federal securities laws prohibiting insider

trading. Shpigelman's knowledge of the pertinent laws prohibiting insider trading is reflected in an e-mail he sent from his Merrill Lynch e-mail account, dated October 20, 2004, in which he responded to a question whether information he was discussing in connection with a deal he worked on was public by stating: "Yes, the offer is public. I would not be telling you, especially via email, unless I wanted to chill with Martha in Connecticut for a little while." In a separate e-mail, Shpigelman discussed a criminal insider trading case brought by federal prosecutors against a desktop publishing contractor for Merrill Lynch who profited from confidential merger information he learned while preparing documents for Merrill Lynch.

38.    In addition to the compensation agreement Pajcin and Plotkin made with Shpigelman, Pajcin and Plotkin also made agreements with several of the other Defendants, whereby the other Defendants would pay Pajcin and Plotkin for providing them with information Pajcin and Plotkin obtained from Shpigelman. Thus, Siegel and Santana each agreed to pay Pajcin and Plotkin a percentage of all profits they made from trades based on such information; Vujovic agreed to pay Pajcin and Plotkin a percentage of the profits Pajcin made by trading through the Vujovic Account; and Lopandic and Verinac agreed to pay Pajcin and Plotkin a percentage of the profits made by themselves as well as by Borac, Sormaz, Dilber, and/or Krsic based on such information. Pajcin and Plotkin agreed to split the profits from Pajcin's trading, along with all proceeds they collected from the other Defendants, evenly between themselves. Smith provided Pajcin with some money to fund the various Insider Trading Schemes, and, as a result, Pajcin and Plotkin also agreed to provide Smith with a percentage of the profits from Pajcin's trading activity related to Smith's contribution to the Insider Trading Schemes. Smith knew or was reckless in not knowing that the money he was providing Pajcin was going to be used to engage in fraudulent insider trading.

14

39.    At their initial meeting at Spa 88, Shpigelman began providing Plotkin and Pajcin

with information about deals that Merrill Lynch was working on as a financial advisor.  Over the

course of the next several months, Shpigelman provided Pajcin and Plotkin with information

about the following transactions before their public announcement:

(a)    On January 27, 2005, P&G announced that it was acquiring
Gillette (the "Gillette Transaction").  Merrill Lynch served as
P&G's financial advisor during the negotiations leading up to the
transaction;

(b)    On February 21, 2005, Novartis announced that it would
commence a cash tender offer to purchase the outstanding public
shares of Eon Labs (the "Eon Labs Transaction"). By the time the
tender offer period expired on July 20, 2005, Novartis had acquired
approximately 97% of the total outstanding shares of Eon Labs.
Merrill Lynch served as Eon Labs' financial advisor during the
negotiations leading up to the transaction;

(c)    On May 9, 2005, Duke announced that it was acquiring Cinergy
(the "Cinergy Transaction").  Merrill Lynch served as Cinergy's
financial advisor during the negotiations leading up to the
transaction;

(d)    On August 8, 2005, Quest announced that it was acquiring LabOne
(the "LabOne Transaction").  Merrill Lynch served as Quest's
financial advisor during the negotiations leading up to the
transaction; and

(e)    On August 3, 2005, Reebok announced that it had agreed to be
acquired by Adidas (the "Reebok Transaction").  Merrill Lynch
served as Adidas' financial advisor during the negotiations leading
up to the transaction.

40.    In addition to these deals which were consummated, Shpigelman also informed

Pajcin and Plotkin during the summer of 2005 that Celgene was the target of a takeover or

merger by another company in another potential transaction (the "Celgene Transaction").

Merrill Lynch served as Celgene's financial advisor during these negotiations.  Information

concerning the merger negotiations was not publicly available at the time Shpigelman disclosed

it to Pajcin and Plotkin. Although the Celgene Transaction never closed, as discussed below, certain of the Defendants actively traded Celgene securities during July 2005, based on Shpigelman's disclosure of the merger negotiations. In addition, Shpigelman also provided Pajcin and Plotkin with non-public information concerning MedImmune, Inc., MCI, Inc. and Central Parking Corp., based on information he learned during the course of his employment at Merrill Lynch.

41.     Shpigelman obtained this non-public information through his employment at Merrill Lynch. For example, Shpigelman was staffed on the Eon Labs Transaction, and worked on that transaction prior to its public announcement. Shpigelman highlighted his efforts on the Eon Labs Transaction on his resume. Similarly, Shpigelman traveled to Cincinnati to deliver documents related to the Gillette transaction, and lobbied to get a "deal toy" (a token gift typically distributed to investment bankers and others after the completion of a significant transaction) for his having made the trip. Shpigelman learned about the other transactions through fellow Merrill Lynch employees who were either working on such transactions or were otherwise aware of such transactions. For example, in an e-mail dated July 31, 2005, Shpigelman asked a colleague if he had been at work all night on "Atlantic," the code name assigned to the Reebok Transaction. As noted above, the Reebok Transaction was announced on August 3, 2005. Shpigelman also made frequent attempts to learn about pending transactions that other Merrill Lynch employees were working on in order to provide Pajcin and Plotkin with the pertinent information.

42.     After receiving the tips from Shpigelman concerning each of the above-described Merrill Lynch transactions, Pajcin initially traded through the Pajcin Account, which he held in

his own name. Plotkin and Smith provided Pajcin money to fund the Pajcin Account in order to enable Pajcin to make illicit trades.

43.    Subsequently, beginning in approximately June 2005, in order to avoid detection, Pajcin ceased trading in the Pajcin Account, and began trading through the Anticevic CyberTrader Account, the Anticevic Saxo Bank Account and the Vujovic Account. Pajcin assisted Anticevic and Vujovic in opening these accounts, and Anticevic and Vujovic authorized Pajcin to execute trades through their respective accounts. In exchange, Pajcin gave Anticevic at least 30,000 Euros to open the accounts in her name in order to enable him to execute trades through them, and Pajcin promised Anticevic further proceeds from the trading. Pajcin and Plotkin agreed to pay Vujovic a percentage of all profits Pajcin made from trading through her account.

44.    In addition to executing trades himself based on the non-public information provided by Shpigelman, Pajcin, along with Plotkin, tipped Defendants Lopandic, Verinac, Siegel, Santana, and Mikhail Plotkin with the information concerning certain of these transactions. Mikhail Plotkin used a phone that was not in his name to receive stock tips from Plotkin and Pajcin. Lopandic and Verinac, in turn, tipped Defendants Sormaz and Borac, and, upon information and belief, Defendants Dilber and/or Krsic with the information concerning certain of these transactions. Specifically:

- Pajcin traded in his own account based on the information provided by Shpigelman relating to the Gillette, Cinergy, and Eon Labs Transactions; traded in the Anticevic CyberTrader Account based on the information provided by Shpigelman relating to the Celgene and Reebok Transactions; traded in the Anticevic Saxo Bank Account based on the information provided by Shpigelman relating to the Celgene, LabOne and Reebok Transactions; and traded in the Vujovic Account based on the information provided by Shpigelman relating to the Reebok Transaction;

17

- Pajcin and Plotkin tipped Lopandic and Verinac about certain of the Merrill Lynch transactions, including at least the information provided by Shpigelman relating to the Gillette, Eon Labs, Cinergy, Reebok, LabOne, and Celgene Transactions; Lopandic and Verinac, in turn, tipped Borac about certain of the Merrill Lynch transactions, including the information relating to the Cinergy, LabOne, Reebok, and Celgene Transactions, tipped Sormaz about certain of the Merrill Lynch transactions, including the information relating to the Reebok and Celgene Transactions, and, tipped the Direktanlage Traders about certain of the Merrill Lynch transactions, including the information relating to the Cinergy, Eons Labs, Reebok, and Celgene Transactions; and

- Pajcin and Plotkin tipped Siegel about certain of the Merrill Lynch transactions, including the information provided by Shpigelman relating to the Reebok, LabOne and Celgene Transactions; tipped Santana about certain of the Merrill Lynch transactions, including the information relating to the Reebok and Celgene Transactions; and tipped Mikhail Plotkin about certain of the Merrill Lynch transactions, including the information relating to the Reebok and LabOne Transactions.

45. As a result of the information provided by Shpigelman, the Defendants made at least $6.46 million in illicit gains from the Merrill Lynch Scheme, based on trading in the securities of the following companies as outlined below:

| ISSUER | NAME OF ACCOUNT HOLDER THROUGH WHICH SECURITIES TRADED | APPROXIMATE PROFITS AND NUMBER OF SECURITIES TRADED |
|---|---|---|
| Gillette | Pajcin | Approximate profits of $94,581.42 on the purchase and sale of 346 call options and 3,000 shares |
|  | Direktanlage Traders | Approximate profits of $64,348.39 on the purchase and sale of 13,719 shares |
|  | **Approximate Total Profits: Gillette:** | **$158,929.81** |
| Eon Labs | Pajcin | Approximate profits of $29,292.20 on the purchase and sale of 50 call options and 9,000 shares |
|  | Direktanlage Traders | Approximate profits of $56,181.09 on the purchase and sale of 25,003 shares |
|  | **Approximate Total Profits: Eon Labs:** | **$85,473.29** |
| Cinergy | Pajcin | Approximate profits of $112,468.94 on the purchase and sale of 645 call options |
|  | Borac (excluding Direktanlage trades) | Approximate profits of $30,260 on the purchase and sale of 15,000 shares |
|  | Direktanlage Traders | Approximate profits of $57,775.73 on the purchase and sale of 22,727 shares |
|  | **Approximate Total Profits: Cinergy:** | **$200,504.67** |

18

| Reebok | Anticevic | Approximate profits of $2,044,160.96 on the purchase and sale of 1,997 call options and 240 shares |
| | Siegel | Approximate profits of $1,242,378.34 on the purchase and sale of 1,180 call options and 8,000 shares |
| | Santana | Approximate profits of $463,279.58 on the purchase and sale of 465 call options and 520 shares |
| | Direktanlage Traders | Approximate profits of $104,275.15 on the purchase and sale of 7,545 shares |
| | Vujovic | Approximate profits of $313,402.08 on the purchase and sale of 455 call options |
| | Mikhail Plotkin | Approximate profits of $63,064.95 on the purchase and sale of 60 call options and 120 shares |
| | Borac (excluding Direktanlage trades) | Approximate profits of $693,325.80 based on the purchase and sale of 50,000 shares |
| | Sormaz (excluding Direktanlage trades) | Approximate profits of $511,052 on the purchase and sale of 40,000 shares |
| | Lopandic (excluding Direktanlage trades) | Approximate profits of $735,192.00 on the purchase and sale of 55,000 shares |
| | **Approximate Total Profits: Reebok:** | **$6,170,130.86** |
| | **Approximate Grand Total Profits: Merrill Lynch Deals:** | **$6,615,038.63** |

46.    In addition to the trades set forth above, based on the information provided by Shpigelman, Pajcin also traded in the securities of LabOne and Celgene through the Anticevic Saxo Bank Account; Borac, the Direktanlage Traders, Siegel, and Mikhail Plotkin traded in the securities of LabOne; and Siegel, Santana, Sormaz, Borac, Lopandic, and the Direktanlage Traders traded in the securities of Celgene.

47.    In general, the Defendants purchased securities in the target company in each of these transactions shortly before the public announcement of the transaction, and then liquidated their positions immediately following the public announcement of the transaction, so as to lock in a profit resulting from the rise in the stock price generated by the public announcement. The details, including trade dates and number of securities traded, of the Defendants' trading in the

19

securities relating to the Merrill Lynch Scheme are set forth in the annexed Exhibit A, which is incorporated herein by reference.

48.    As discussed above, Shpigelman was promised a percentage of all profits from the Merrill Lynch Scheme and received payments from Pajcin and Plotkin for the confidential non-public information he provided them before the Commission brought this action.

49.    Pajcin and Plotkin also met with a series of individuals employed at various other investment banks in an attempt to get them to participate in similar illegal trading schemes. Pajcin and Plotkin helped certain individuals obtain jobs at investment banks, hoping that doing so would help recruit them to provide material, non-public information to Pajcin and Plotkin. Pajcin and Plotkin also contemplated various schemes involving exotic dancers, including having them garner information from bankers while dancing, and using them to induce investment bankers to provide Pajcin and Plotkin with information.

**The BusinessWeek Scheme**

**BusinessWeek's "Inside Wall Street Column" and Related Policies of Confidentiality**

50.    BusinessWeek is printed on Wednesday evenings and is distributed to the public only after the close of the major stock exchanges on Thursdays (after 5:00 p.m. Eastern Standard Time), at which time it becomes available via the Internet, and then becomes available in hard copy at newsstands on Friday mornings before the stock exchanges open.  The hard copy of BusinessWeek is dated two Mondays, or 11 days, after its contents first become publicly available via the Internet.  Accordingly, for purposes of this Fourth Amended Complaint, references to a particular publication date refer to the issue of BusinessWeek that is dated 11 days later.

20

51.    Each issue of <u>BusinessWeek</u> contains a column titled "Inside Wall Street," often written by Gene Marcial, which provides commentary on publicly-traded companies. The favorable mention of a company in the column generally has a positive effect on the market price of that company's securities. Accordingly, the contents of the "Inside Wall Street" column constitute material information.

52.    Since at least the early 1980's, <u>BusinessWeek</u>'s owner and publisher, McGraw-Hill, has taken extensive measures to secure the confidentiality of the contents of <u>BusinessWeek</u>, and the "Inside Wall Street" column in particular. Thus, for example, there is limited computer access to "Inside Wall Street" at <u>BusinessWeek</u>'s offices as the column is written and edited each week. The column can only be read by a few select editors at <u>BusinessWeek</u>, and its contents cannot be altered without the use of a computer password known only to the column's author and his immediate editor. The names of the companies discussed in the column are not inserted into the stock charts used in the column until 5:00 p.m. Eastern Standard Time on Wednesday, the day of printing. <u>BusinessWeek</u> staff have been notified in writing that <u>BusinessWeek</u>'s contents are off-limits to anyone outside <u>BusinessWeek</u> staff until after 5:00 p.m. Eastern Standard Time on Thursdays with no exceptions because the magazine's contents could affect stock prices. <u>BusinessWeek</u> staff are required annually to sign an affirmation to this effect.

53.    McGraw-Hill has instructed Quad, as well as <u>BusinessWeek</u>'s other printers, that <u>BusinessWeek</u> is not to be made available to the public until after 5:00 p.m. Eastern Standard Time on Thursdays, after the stock market has closed, unless specifically authorized by McGraw-Hill. Quad and the other printers have been instructed both in writing and verbally by McGraw-Hill that no one is to be given access to <u>BusinessWeek</u> without the explicit consent of

21

BusinessWeek executives. Quad has, in turn, directed its employees to maintain the confidentiality of information entrusted to its customers, including McGraw-Hill. Pursuant to Quad's written policies contained in the handbook distributed to all employees, Quad employees are prohibited from disclosing, removing or disseminating information contained in, or relating to, material submitted by its customers to be printed. Quad has warned its employees that violation of these policies could subject them to discharge and other penalties. Shuster and Renteria were informed of the need to keep confidential any and all information from materials submitted by customers to be printed.

### The Scheme to Obtain Advance Copies of the "Inside Wall Street" Column

54.     Pajcin was introduced to Verinac by a mutual acquaintance in 2004. Pajcin made at least one trip to Austria in early 2005 to meet with Verinac in person and at least one trip to Austria in mid 2005 to meet with Lopandic in person. Verinac and Lopandic outlined to Pajcin the terms of a scheme whereby Pajcin could arrange for the theft of copies of business publications in order to enable the three of them and others to trade on confidential non-public information contained therein. Verinac and Lopandic indicated that they had previously been involved in at least one such scheme.

55.     Following Pajcin's initial discussion with Verinac, Pajcin and Plotkin approached Smith and solicited him to participate in a scheme whereby Smith would gain employment at a printer and steal advance copies of business publications in order to enable Pajcin and Plotkin to trade on confidential non-public information contained therein. Smith indicated that he was not interested in obtaining employment himself, but, as alleged above, did express an interest in providing money to Pajcin and Plotkin to participate in the Insider Trading Schemes, and, in fact, did give Pajcin and Plotkin some money to fund the Insider Trading Schemes.

56.    In the summer of 2004, Pajcin and Plotkin placed online job listings seeking employees. In fact, the purpose of these listings was to enable Pajcin and Plotkin to find someone who would be willing to steal copies of BusinessWeek prior to their public release. Shuster responded to one of the online ads and met with Pajcin and Plotkin several times. Pajcin and Plotkin explained a scheme whereby Shuster would obtain employment at Quad, BusinessWeek's printing plant in Hartford, Wisconsin, and would inform Plotkin and Pajcin of the contents of the "Inside Wall Street" column prior to its publication. Pajcin and Plotkin agreed to pay Shuster a flat fee for each BusinessWeek issue on which he provided information. At the time Pajcin and Plotkin initially met with Shuster, Shuster was living in New Jersey, but he agreed to move to Wisconsin, where he filed an employment application with Staffing Partners, an employment agency sometimes used by Quad to find employees. Both Pajcin and Plotkin served as references on Shuster's employment application (under the pseudonyms "Jeff Dauzich" (Pajcin) and "Peter Jones" (Plotkin)).

57.    Shuster began working at Quad on or about October 11, 2004, as a forklift operator. Within two weeks of beginning work at Quad, Shuster began carrying out the scheme. On Thursday morning of each week he would steal a copy of the upcoming issue of BusinessWeek, and would call Plotkin and Pajcin and inform them of the contents of the "Inside Wall Street" column. Shuster provided Pajcin and Plotkin with information concerning the contents of the "Inside Wall Street" column with respect to the following companies on the following weeks: The Street.com and Biolase Technology, Inc. ("Biolase") (in the November 18, 2004 BusinessWeek publication), Curis Inc. ("Curis") (in the December 2, 2004 publication), SIPEX Corp. ("SIPEX") (in the December 9, 2004 publication), Alltel Corp., Inc. ("Alltel") (in the December 16, 2004 publication), Cornell Companies, Inc. ("Cornell") (in the January 6, 2005

23

publication), Spectrum Pharmaceuticals, Inc. ("Spectrum") (in the January 13, 2005 publication),

Arbitron Inc. ("Arbitron") (in the January 20, 2005 publication), IMAX Corp. ("IMAX") (in the

February 3, 2005 publication) and Impax Laboratories, Inc. ("Impax") (in the March 3, 2005

publication).

58.     Shuster was officially terminated from Quad on or about January 6, 2005.

However, he continued to gain access to the Quad facilities by sneaking in undetected wearing

his old uniform, and provided Pajcin and Plotkin with information concerning the non-public

contents of the "Inside Wall Street" column until approximately March 31, 2005, at which time

he was arrested on unrelated state charges of identity theft. Pursuant to Pajcin and Plotkin's

instructions, Shuster also placed job listing ads in the Milwaukee Sentinel and other local

newspapers in order to find a replacement for himself. The advertisement listed a number to

contact, which was Pajcin's. Pajcin then screened the applicants, and instructed Shuster to

interview some of them in person.

59.     Renteria ultimately replaced Shuster and entered into a similar agreement with

Pajcin and Plotkin, whereby he would provide them with information concerning the pre-release

contents of BusinessWeek in exchange for payments on a per issue basis. Renteria began

employment with Quad in or about May 2005. Pajcin served as a reference on Renteria's job

application under the name "Jeff Densorth." Before long, Renteria had picked up where Shuster

left off, and from June 2005 onward, provided Pajcin and Plotkin with non-public information

concerning the contents of the "Inside Wall Street" column with respect to Perficient, Inc.

("Perficient") and PriceSmart, Inc. ("PriceSmart") (in the June 9, 2005 publication), Alaska

Communications Systems ("Alaska Communications"), Casual Male Retail Group, Inc. ("Casual

Male") and FedEx Corporation ("FedEx") (in the June 16, 2005 publication), Energy Conversion

24

Devices, Inc. ("Energy Conversion") (in the June 23, 2005 publication), Progressive Gaming International Corp. (formerly known as Mikohn Gaming Corp.) ("Mikohn Gaming") (in the June 30, 2005 publication), Polycom, Inc. ("Polycom") (in the July 7, 2005 publication), Spectrum (in the July 14, 2005 publication) and Symbol Technologies, Inc. ("Symbol") (in the July 28, 2005 publication).

60.    With respect to the <u>BusinessWeek</u> Scheme, Pajcin and Plotkin had the same arrangements with Defendants Siegel, Santana, Anticevic, Vujovic, Lopandic, and Verinac that they had in connection with the Merrill Lynch Scheme, whereby Siegel, Santana, Anticevic, and Vujovic were to pay Pajcin and Plotkin a portion of their profits generated by trades they made based on the information provided by Pajcin and Plotkin, and Lopandic and Verinac were to pay Pajcin and Plotkin a portion of the profits generated by themselves as well as by Sormaz, Borac, Dilber, and/or Krsic based upon this information.  Similarly, Pajcin and Plotkin had the same agreement between themselves, whereby they were to split evenly all profits Pajcin made through his trades, as well as all proceeds collected from the other Defendants, and an agreement with Smith to provide him with a percentage of profits made from Pajcin's trading related to Smith's contribution to the Insider Trading Schemes.

61.    After receiving the tips from Shuster concerning the contents of the "Inside Wall Street" column, Pajcin traded in his own account, and, along with Plotkin, also tipped Lopandic and Verinac with certain of the information Shuster had provided Pajcin and Plotkin.  Lopandic and Verinac then tipped the other Direktanlage Traders with certain of the information Shuster had provided Pajcin and Plotkin.  After receiving the tips from Renteria concerning the companies mentioned in the "Inside Wall Street" column, Pajcin traded through the Vujovic and Anticevic Accounts, and, along with Plotkin, also tipped Defendants Lopandic and Verinac,

25

Siegel, Santana, and Mikhail Plotkin with the information concerning certain of these companies.

Lopandic and Verinac, in turn, tipped defendant Borac, and the other Direktanlage Traders with

the information concerning certain of these companies.  Specifically:

- Pajcin traded in his own account based on the information provided by Shuster relating to the contents of the "Inside Wall Street" column in the securities of The Street.com, Biolase, Curis, SIPEX, Alltell, Cornell, Spectrum, Arbitron, IMAX and IMPAX; traded through the Anticevic Saxo Bank Account based on the information provided by Renteria relating to the contents of the "Inside Wall Street" column in the securities of FedEx; traded through the Anticevic CyberTrader Account based on the information provided by Renteria relating to the contents of the "Inside Wall Street" column in the securities of Mikohn Gaming, Polycom, Spectrum and Symbol; and traded through the Vujovic Account based on the information provided by Renteria relating to the contents of the "Inside Wall Street" column in the securities of Symbol;

- Pajcin and Plotkin tipped Lopandic and Verinac with the information provided by Shuster relating to the contents of the "Inside Wall Street" column concerning the securities of at least TheStreet.com, Biolase, Curis, Spectrum, Cornell, SIPEX, Arbitron and IMPAX; and with the information provided by Renteria relating to the contents of the "Inside Wall Street" column concerning the securities of at least Casual Male, Energy Conversion, Mikohn Gaming, FedEx, Perficient, Spectrum and PriceSmart;

- Lopandic and Verinac tipped the Direktanlage Traders with the information provided by Shuster through Pajcin and Plotkin relating to the contents of the "Inside Wall Street" column concerning the securities of at least Arbitron, Biolase, Curis, Spectrum, Cornell, Impax, Sipex, and TheStreet.com, and with the information provided by Renteria through Pajcin and Plotkin relating to the contents of the "Inside Wall Street" column concerning the securities of at least Casual Male, Energy, Mikohn Gaming, and Spectrum; Lopandic and Verinac also tipped Borac with the information provided by Renteria relating to the contents of the "Inside Wall Street" column concerning the securities of at least FedEx, Mikohn Gaming, Perficient, and PriceSmart; and

- Pajcin and Plotkin tipped Siegel with the information provided by Renteria relating to the contents of the "Inside Wall Street" column concerning the securities of at least Perficient, Alaska Communications, Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom, and Spectrum; tipped Santana with the information provided by Renteria relating to the contents of the "Inside Wall Street" column concerning the securities of at least Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom, Spectrum and Symbol; and tipped Mikhail Plotkin with the information provided by Renteria relating to the

contents of the "Inside Wall Street" column concerning the securities of at least Perficient and Alaska Communications.

62.    As a result of the information provided by Shuster and Renteria, the Defendants made at least $275,000 in illicit gains from the BusinessWeek Scheme based on trading in the securities of the following companies as outlined below:

| ISSUER | NAME OF ACCOUNT HOLDER THROUGH WHICH SECURITIES TRADED | APPROXIMATE PROFITS AND NUMBER OF SECURITIES TRADED |
|---|---|---|
| TheStreet.com | Pajcin | Approximate profits of $2,586.47 on the purchase and sale of 6,000 shares |
| | Direktanlage Traders | Approximate profits of $279.44 on the purchase and sale of 500 shares |
| | **Approximate Total Profits: TheStreet.com:** | **$2,865.91** |
| Biolase | Pajcin | Approximate profits of $898.13 on the purchase and sale of 6,000 shares |
| | **Approximate Total Profits: Biolase:** | **$898.13** |
| Curis | Pajcin | Approximate profits of $4,325.86 on the purchase and sale of 10,000 shares |
| | Direktanlage Traders | Approximate profits of $68,924.55 on the purchase and sale of 155,065 shares |
| | **Approximate Total Profits: Curis:** | **$73,250.41** |
| SIPEX | Pajcin | Approximate profits of $2,551.32 on the purchase and sale of 8,500 shares |
| | Direktanlage Traders | Approximate profits of $10,132.10 on the purchase and sale of 80,000 shares |
| | **Approximate Total Profits: SIPEX:** | **$12,683.42** |
| Alltell | Pajcin | Approximate profits of $3,148.04 on the purchase and sale of 370 call option contracts |
| | **Approximate Total Profits: Alltell:** | **$3,148.04** |
| Spectrum (Jan. 13, 2005 issue) | Pajcin | Approximate profits of $2,653.95 on the purchase and sale of 17,000 shares |
| | **Approximate Total Profits: Spectrum:** | **$2,653.95** |
| Arbitron | Pajcin | Approximate profits of $802.76 on the purchase and sale of 3,500 shares |
| | Direktanlage Traders | Approximate profits of $4,622.34 on the purchase and sale of 18,400 shares |
| | **Approximate Total Profits: Arbitron:** | **$5,425.10** |
| IMAX | Pajcin | Approximate profits of $5,712.90 on the purchase and sale of 21,000 shares |
| | **Approximate Total Profits: IMAX:** | **$5,712.90** |

27

| | | |
|---|---|---|
| **IMPAX** | Pajcin | Approximate profits of $10,203.69 on the purchase and sale of 11,500 shares |
| | Direktanlage Traders | Approximate profits of $31,273.43 on the purchase and sale of 24,000 shares |
| | **Approximate Total Profits: IMPAX:** | **$41,477.12** |
| **Perficient** | Siegel | Approximate profits of $3,910.25 on the purchase and sale of 10,000 shares |
| | Mikhail Plotkin | Approximate profits of $1,544.83 on the purchase and sale of 4,500 shares |
| | Borac | Approximate profits of $559.10 on the purchase and sale of 2,345 shares |
| | **Approximate Total Profits: Perficient:** | **$6,014.18** |
| **PriceSmart** | Borac | Approximate profits of $2,930 on the purchase and sale of 5,000 shares |
| | **Approximate Total Profits: PriceSmart:** | **$2,930** |
| **Alaska Communications** | Siegel | Approximate profits of $1,589 on the purchase and sale of 10,000 shares |
| | Mikhail Plotkin | Approximate profits of $608.43 on the purchase and sale of 4,000 shares |
| | **Approximate Total Profits: Alaska Communications:** | **$2,197.43** |
| **Casual Male** | Siegel | Approximate profits of $4,284.30 on the purchase and sale of 21,000 shares |
| | Santana | Approximate profits of $243.56 on the purchase and sale of 2,035 shares |
| | Direktanlage Traders | Approximate profits of $10,873.58 on the purchase and sale of 40,200 shares |
| | **Approximate Total Profits: Casual Male:** | **$15,401.44** |
| **FedEx** | Siegel | Approximate profits of $7,900 on the purchase and sale of 130 call options |
| | Santana | Approximate profits of $4,418.23 on the purchase and sale of 50 call options |
| | Borac | Approximate profits of $1,818.98 on the purchase and sale of 2,200 shares |
| | Anticevic | Approximate profits of $3,530 on the purchase and sale of 8,000 shares |
| | **Approximate Total Profits: FedEx:** | **$17,667.21** |
| **Energy Conversion** | Siegel | Approximate profits of $18,169.80 on the purchase and sale of 9,000 shares |
| | Santana | Approximate profits of $6,103.66 on the purchase and sale of 3,235 shares |
| | Direktanlage Traders | Approximate profits of $40,025.35 on the purchase and sale of 22,053 shares |
| | **Approximate Total Profits: Energy Conversion:** | **$64,298.81** |
| **Mikohn Gaming** | Anticevic | Approximate profits of $1,997.38 on the purchase and sale of 5,336 shares |
| | Direktanlage Traders | Approximate profits of $8.51 on the purchase and sale of 7,000 shares |

| | Approximate Total Profits:<br>Mikohn Gaming: | $2,005.89 |
|---|---|---|
| Polycom | Anticevic | Approximate profits of $2,996.31 on the<br>purchase and sale of 16,091 shares |
| | Siegel | Approximate profits of $638 on the purchase<br>and sale of 10,000 shares |
| | Santana | Approximate profits of $983.83 on the<br>purchase and sale of 5,500 shares |
| | Approximate Total Profits:<br>Polycom: | $4,618.14 |
| Spectrum (July 14,<br>2005 issue) | Anticevic | Approximate profits of $1,639.50 on the<br>purchase and sale of 16,400 shares |
| | Siegel | Approximate profits of $7,214.69 on the<br>purchase and sale of 67,500 shares |
| | Direktanlage Traders | Approximate profits of $567.01 on the<br>purchase and sale of 13,700 shares |
| | Approximate Total Profits:<br>Spectrum: | $9,421.20 |
| Symbol | Anticevic | Approximate profits of $8,724 on the<br>purchase and sale of 36,500 shares |
| | Santana | Approximate profits of $122.93 on the<br>purchase and sale of 7,450 shares |
| | Vujovic | Approximate profits of $1,057.11 on the<br>purchase and sale of 45 call options |
| | Approximate Total Profits:<br>Symbol: | $9,904.04 |
| | Approximate Total Profits<br>BusinessWeek Stocks: | $282,573.32 |

63.    In addition to the trades set forth above, based on the information that was provided by Shuster and Renteria, Pajcin and the Direktanlage Traders also traded in the securities of Cornell; the Direktanlage Traders traded in the securities of Biolase; Siegel, Santana, and Borac traded in the securities of Mikohn Gaming; the Direktanlage Traders traded in the securities of Spectrum (in connection with the January 13, 2005 BusinessWeek issue), and Santana traded in the securities of Spectrum (in connection with the July 14, 2005 BusinessWeek issue).

64.    Following the filing of the complaint in this action in August 2005, Pajcin fled the United States for the Dominican Republic.  Nevertheless, Plotkin continued to participate in the BusinessWeek Scheme.  Pursuant to the ongoing scheme, Renteria provided Plotkin with non-public information concerning the contents of the "Inside Wall Street" column with respect to

Check Point Software Technology ("Check Point"), in the September 29, 2005 BusinessWeek publication. Plotkin then tipped his father, Mikhail Plotkin, with this information, and, on the basis of this information, Mikhail Plotkin bought and sold 215 shares, garnering a profit of approximately $48.69.

65.     In general, the Defendants purchased securities in the companies mentioned in the "Inside Wall Street" column before the close of the market on the Thursday on which the column became available after the market close, and then sold the securities the following day, so as to lock in a profit resulting from the change in the stock price generated by the mention of the company in the "Inside Wall Street" column. The details, including trade dates and number of securities traded, of the Defendants' trading in the securities relating to the BusinessWeek Scheme are set forth in the annexed Exhibit B, which is incorporated herein by reference.

66.     Pajcin and Plotkin paid Shuster and Renteria on a "per issue" basis for the confidential non-public information Shuster and Renteria provided Pajcin and Plotkin through the BusinessWeek Scheme.

### The Grand Jury Scheme

### Grand Jury Secrecy

67.    Rule 6(e)(2) of the Federal Rules of Criminal Procedure ("Federal Rules") provides, in relevant part, that grand jurors "must not disclose a matter occurring before the grand jury." Generally, in accordance with this Rule, grand jurors are obligated to take an oath, which among other things, binds them to maintain the secrecy of the grand jury proceedings. This obligation of secrecy is generally reinforced by the presiding judge's charge to the grand jury, which similarly instructs grand jurors that they must maintain the secrecy of the grand jury proceedings. Similarly, the Handbook for Federal Grand Jurors, which is published by the Administrative Office of the United States Courts under the supervision of the Judicial Conference of the United States, states that:

> The law imposes upon each grand juror a strict obligation of secrecy. . . . The tradition of secrecy continues as a vital part of the grand jury system for many reasons. It protects the grand jurors from being subjected to pressure by persons who may be subjects of investigations by the grand jury or associates of such person. It prevents the escape of those against whom an indictment is being considered. It encourages witnesses before the grand jury to give full and truthful information as to the commission of a crime. It also prevents tampering with or intimidation of such witnesses before they testify at trial. Finally, it prevents the disclosure of investigations that result in no action by the grand jury and avoids any stigma the public might attach to one who is the subject of a mere investigation by the grand jury.

> Essentially, the grand jury may disclose matters occurring before it only to the attorneys for the government for use in the performance of their duties, but even attorneys for the government may not be informed of what took place during the grand jury's deliberations and voting. The only other time matters occurring before the grand jury may be disclosed to anyone is when disclosure is ordered by the court in the interests of justice. Disclosure of such matters may never be made to grand juror's friends or family, including a grand juror's spouse.

31

### Smith's Disclosure of Grand Jury Information

68.    Beginning in early 2005, Smith told Pajcin that he was serving on a federal grand jury in the District of New Jersey that was investigating potential fraudulent accounting at Bristol-Myers, stemming from the company's 2002 announcement of a large decline in its projected earnings due, in part, to wholesaler inventory levels. As a grand juror, Smith was subject to the grand jury secrecy obligations of Rule 6 of the Federal Rules. As a grand juror, upon information and belief, Smith also took an oath indicating that he would be bound by the provisions of Rule 6 of the Federal Rules, and that he would abstain from disclosing any matter occurring before the grand jury in violation of that Rule.

69.    In violation of Smith's duty of non-disclosure, Smith, along with Pajcin and Plotkin, set up a scheme whereby Smith would inform Pajcin and Plotkin of developments taking place before the grand jury in order to enable Pajcin and Plotkin to trade in Bristol-Myers securities. Pursuant to this scheme, in or about March 2005, Smith informed Pajcin and Plotkin that one of Bristol-Myers' then-current high-ranking executives had been called before the grand jury, and that it appeared the high-ranking executive would be indicted, which could, in turn, lead to a decline in Bristol-Myers' stock price.

70.    While in possession of the information provided by Smith, Pajcin sold short 8,800 shares of Bristol-Myers stock on March 18, 2005 through the Pajcin Account.

71.    Three months later, in or about June 2005, press reports projected that Bristol-Myers would end its legal problems through the payment of a fine. During this time, however, Smith informed Pajcin and Plotkin that the prosecutor had told the grand jury not to let press reports influence them, and Smith further informed Pajcin and Plotkin that it looked like the high-ranking executive would, in fact, be indicted.

72.    As a result of the confidential non-public information provided by Smith, on June 10, 2005 Pajcin sold Bristol-Myers stock short through the Anticevic Saxo Bank Account.

73.    In addition, Pajcin and Plotkin tipped Mikhail Plotkin and Siegel about the confidential non-public information provided by Smith concerning the possible indictment of Bristol-Myers' then-current high-ranking executive, and, as a result, on June 10, 2005 Mikhail Plotkin and Siegel purchased Bristol-Myers put option contracts.

74.    On or about June 14, 2005, Smith told Pajcin and Plotkin that he had learned that, in fact, the Bristol-Myers high-ranking executive would not be indicted.

75.    As a result of the new information Smith provided, in an attempt to avoid losses, on June 14, 2005 Pajcin covered his short position in Bristol-Myers securities in the Anticevic Saxo Bank Account, and Mikhail Plotkin and Siegel liquidated their positions in Bristol-Myers put option contracts. The details, including trade dates and number of securities traded, of the Defendants' trading in the securities relating to the Grand Jury Scheme are set forth in the annexed Exhibit C, which is incorporated herein by reference.

76.    On June 15, 2005, the day after Smith's disclosure that the then-current Bristol-Myers high-ranking executive was not going to be indicted, and the day after the above-referenced Defendants covered and/or liquidated their positions in Bristol-Myers securities, Bristol-Myers publicly announced that it had entered into a deferred prosecution agreement with the United States Attorney's Office, and that two of Bristol-Myers' former executives, Frederick Schiff and Richard Lane – both of whom had left the company over three years earlier – had been indicted. Pursuant to its agreement with the United States Attorney's Office, Bristol-Myers also agreed to make an additional payment of $300 million to a shareholder fund previously

established in connection with the company's settlement with the Commission announced in August 2004. Notably, no charges were brought against the then-current high-ranking executive.

77.    Smith, Pajcin, and Plotkin all knew that Smith was prohibited from disclosing information concerning the proceedings before the grand jury. As evidence of their knowledge, Smith, Pajcin, and Plotkin developed a system whereby Smith would be able to surreptitiously alert Pajcin and Plotkin directly from the courthouse about the latest developments taking place before the grand jury immediately after they transpired.

78.    With respect to the Grand Jury Scheme, Pajcin and Plotkin had the same arrangements with Defendants Siegel, Anticevic, and Smith that they had in connection with the Merrill Lynch and BusinessWeek Schemes, whereby Siegel was to pay Pajcin and Plotkin a portion of his profits generated by trades he made based on the information provided by Pajcin and Plotkin, Pajcin was able to execute trades through the Anticevic Saxo Bank Account, and Pajcin and Plotkin were to pay Smith a portion of Pajcin's trading profits. Similarly, Pajcin and Plotkin had the same agreement among themselves, whereby they were to split evenly all profits Pajcin made through his Bristol-Myers trades, as well as all proceeds collected from the other Defendants.

79.    On or about April 12, 2006, Smith and Pajcin had a telephone conversation that was recorded. During this call, Pajcin told Smith that Pajcin was considering cooperating with law enforcement authorities and that law enforcement authorities might ask Pajcin about the trading in Bristol-Myers stock which would lead Pajcin to tell the authorities about that "jury thing." In response, Smith indicated that he knew what Pajcin was speaking about. Pajcin also told Smith that it was possible that Smith would be questioned about his service on the Bristol-Myers grand jury, but that the authorities seemed to be interested in bigger trades (referring to

34

the Merrill Lynch Scheme). In response, Smith, among other things, expressed serious concerns

for himself, discussed possibly fleeing, and asked whether he (Smith) and Pajcin could just say

that they were just friends talking.

### Defendants' Payments to Pajcin and Plotkin

80. As a result of the non-public information provided through the Insider Trading

Schemes, Siegel paid Pajcin and Plotkin at least $16,000 and Lopandic paid Pajcin and Plotkin

more than $100,000.

### Defendants' Attempts to Conceal the Frauds or Otherwise Evade Justice

81. After the filing of the initial complaint in this action in August 2005 and after

learning that the Federal Bureau of Investigation was investigating suspicious trading in Reebok,

Plotkin, Pajcin, and Smith destroyed laptop computers on which Pajcin and Plotkin had stored

information relating to the Merrill Lynch and BusinessWeek Schemes. Plotkin, Pajcin, and

Smith also destroyed certain cellular phones they had used during the course of their insider

trading. Shortly thereafter, Pajcin traveled to the Dominican Republic in order to evade law

enforcement. While abroad, Pajcin communicated with Plotkin by phone and e-mail, and

discussed, among other things, how to evade law enforcement. Plotkin gave money to Smith to

deliver to Pajcin so that Pajcin could remain abroad, and Smith met Pajcin in Cuba and provided

him with the money. Mikhail Plotkin knew that Plotkin and Pajcin were attempting to evade law

enforcement. As indicated above, Mikhail Plotkin continued to trade on at least one of Plotkin's

tips after he was told of the involvement of law enforcement authorities. While Pajcin was still

abroad, Plotkin retained an attorney to represent Pajcin in this action, in order to try to get some

of the assets that were subject to the asset freezes ordered by this Court unfrozen. Pajcin – who

had been in default in this action for months – then returned to the United States to, among other

things, appear for a deposition in this action. Prior to his deposition, Plotkin and Pajcin met and conjured up false explanations for the purchases of Reebok securities at issue in this case for Pajcin to use during his deposition. Pajcin testified as to these false explanations at his deposition, and throughout the course of the deposition, repeatedly lied, and denied any involvement with insider-trading.

82.    After Pajcin's deposition, he was arrested for his role in the <u>BusinessWeek</u> Scheme. <u>U.S. v. David Pajcin</u>, 05 Mag. 1953.

### Location of the Foreign Defendants' Trading Proceeds

83.    Upon information and belief, trades through the accounts held by Anticevic, Sormaz, Borac and Lopandic at Saxo Bank are executed and cleared through account number 056-01490 at LBIE. Accordingly, the proceeds from these foreign accounts' trades in the securities discussed herein currently physically reside either in each of the respective accounts at Saxo Bank, located in Denmark, or in the LBIE executing and clearing account number 056-01490, located in the United Kingdom.

84.    The Direktanlage Traders traded through account 34401046 at Direktanlage. Account 3441046 appears to be an omnibus trading account at Direktanlage, meaning that it encompasses trades in several individual accounts held at Direktanlage, including trades executed through the Sormaz Direktanlage Account, the Borac Direktanlage Account, the Dilber Direktanlage Account, and the Krsic Direktanlage Account. Upon information and belief, the proceeds from the trading in certain of the securities referred to herein through account number 34401046 at Direktanlage are currently held at Merrill Lynch in an account referenced as Direktanlage Account number 34401046 (the "Merrill Lynch Direktanlage Account").

85.    At least some of the trades in securities in the Anticevic Saxo Bank, account number 34401046 at Direktanlage, and the accounts held by Sormaz, Lopandic and Borac at Saxo Bank referenced herein were executed through contracts for difference ("CFD Contract"), which are contracts designed to make a profit or avoid a loss by reference to movements in the price of an underlying item. With respect to these trades, the customer purchased a CFD Contract and Saxo Bank hedged the trades by buying the underlying security on the New York Stock Exchange. As the customers appeared to purchase the CFD Contracts at the price at which the underlying security was then trading, for purposes of this Fourth Amended Complaint, purchases of CFD Contracts are referred to as purchases of common stock ("shares").

## CLAIMS FOR RELIEF

86.    By virtue of the foregoing, and as set forth below, Defendants Anticevic, Pajcin, Plotkin, Shpigelman, Shuster, Renteria, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Sormaz, Borac, Dilber, Krsic, and Smith, in connection with the purchase or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which would operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

87.    Defendants Anticevic, Pajcin, Plotkin, Shpigelman, Shuster, Renteria, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Sormaz, Borac, Dilber, Krsic, and Smith engaged in the conduct described above knowingly or with recklessness.

88.    By reason of the foregoing, Defendants Anticevic, Pajcin, Plotkin, Shpigelman, Shuster, Renteria, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Sormaz, Borac,

37

Dilber, Krsic, and Smith violated, and unless enjoined, will continue to violate Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

89.    By virtue of the foregoing, and as set forth below, Defendants Anticevic, Pajcin,

Plotkin, Siegel, Mikhail Plotkin, and Smith, in connection with the offer or sale of securities,

have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by

means of untrue statements of material fact or omissions to state material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading; and (c) engaged in transactions, practices and courses of business which would

operate as a fraud or deceit upon the purchaser.

90.    Defendants Anticevic, Pajcin, Plotkin, Siegel, Mikhail Plotkin, and Smith

engaged in the conduct described above knowingly or with recklessness.

91.    By reason of the foregoing, Defendants Anticevic, Pajcin, Plotkin, Siegel, Mikhail

Plotkin, and Smith violated, and unless enjoined, will continue to violate Section 17(a) of the

Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)].

### COUNT I
**(Trading in Gillette Securities in Violation of Section 10(b) of the Exchange Act and Rule
10b-5 thereunder as to Defendants Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, and
the Direktanlage Traders)**

92.    Paragraphs 1 through 91 are realleged and incorporated herein by reference.

93.    Prior to the public announcement of the acquisition of Gillette by P&G on

January 27, 2005, information relating to the offer to acquire Gillette was material, non-public

information. This information also was considered confidential by Merrill Lynch, and was

intended solely for internal corporate use on behalf of its client, P&G.

94.    Shpigelman learned of the material, non-public information concerning P&G's

offer to acquire Gillette in the course of his employment at Merrill Lynch. Shpigelman further

knew, or was reckless in not knowing, the fact that he owed Merrill Lynch a fiduciary duty to maintain such information in confidence until it was publicly disseminated.

95.    In breach of a fiduciary duty or similar relationship of trust or confidence owed to Merrill Lynch, Shpigelman misappropriated material, non-public information about P&G's offer to acquire Gillette, and, while in possession of this information, communicated this information, directly or indirectly, to Plotkin and Pajcin, while expecting to benefit from his disclosure.

96.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about Gillette from Shpigelman was material and non-public, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Gillette securities or tip others so that they could purchase or sell any Gillette securities while possessing such information.

97.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase Gillette securities and the profits from those purchases would be shared between them. As described above and in connection with this agreement, Pajcin purchased Gillette securities while in possession of this misappropriated, material, non-public information, as set forth on the annexed Exhibit A, which is incorporated herein by reference.

98.    Also in violation of their respective obligations, Plotkin and Pajcin tipped Lopandic and Verinac to trade in Gillette securities while expecting to benefit from the disclosure. Plotkin and Pajcin also agreed to share kickbacks received from Lopandic and Verinac for providing this information.

99.    Lopandic and Verinac knew, or were reckless in not knowing, that the information they learned about P&G's offer to acquire Gillette from Plotkin and Pajcin was material and non-public, and had been misappropriated and/or disclosed in violation of a

fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Gillette securities or tip others so that they could purchase or sell any Gillette securities while possessing such information.

100.    Notwithstanding their obligations, Lopandic and Verinac tipped the Direktanlage Traders to trade in Gillette securities while expecting to benefit from their disclosure.

101.    The Direktanlage Traders knew, or were reckless in not knowing, that the information they learned about P&G's offer to acquire Gillette from Lopandic and Verinac was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any Gillette securities while possessing such information.

102.    Notwithstanding their obligations, as described above, the Direktanlage Traders purchased Gillette securities while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

103.    By the conduct described above, Defendants Shpigelman, Plotkin, Pajcin, Lopandic, Verinac, and the Direktanlage Traders directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

104.    Shpigelman, Pajcin, and Plotkin are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Pajcin's trading in Gillette securities. Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, and the Direktanlage Traders are jointly and severally liable for the disgorgement of all ill-gotten profits realized through the Direktanlage Traders' trading in Gillette securities.

## COUNT II

**(Trading in Eon Labs Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, and the Direktanlage Traders)**

105.    Paragraphs 1 through 104 are realleged and incorporated herein by reference.

106.    Prior to the public announcement that Novartis would commence a cash tender offer to purchase the outstanding public shares of Eon Labs on February 21, 2005, information relating to this transaction was material, non-public information. This information was also considered confidential by Merrill Lynch, and was intended solely for internal corporate use on behalf of its client, Eon Labs.

107.    Shpigelman learned of the material, non-public information concerning the tender offer for Eon Labs in the course of his employment at Merrill Lynch. Shpigelman further knew, or was reckless in not knowing, the fact that he owed Merrill Lynch a fiduciary duty to maintain such information in confidence until it was publicly disseminated, and that he owed Eon Labs shareholders a duty to abstain from disclosing this information for the purpose of obtaining personal gain.

108.    In breach of these fiduciary duties or similar relationships of trust or confidence owed to Merrill Lynch and Eon Labs shareholders, Shpigelman misappropriated material, non-public information about the tender offer for Eon Labs, and, while in possession of this information, communicated this information, directly or indirectly, to Plotkin and Pajcin, while expecting to benefit from his disclosure.

109.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about the tender offer for Eon Labs from Shpigelman was material and non-public, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Eon Labs

41