securities or tip others so that they could purchase or sell any Eon Labs securities while possessing such information.

110.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase Eon Labs securities and the profits from those purchases would be shared between them. As described above and in connection with this agreement, Pajcin purchased Eon Labs securities while in possession of this misappropriated, material, non-public information, as set forth on the annexed Exhibit A, which is incorporated herein by reference.

111.    Also in violation of their respective obligations, Plotkin and Pajcin tipped Lopandic and Verinac to trade in Eons Labs securities while expecting to benefit from the disclosure. Plotkin and Pajcin also agreed to share kickbacks received from Lopandic and Verinac for providing this information.

112.    Lopandic and Verinac knew, or were reckless in not knowing, that the information they learned about the tender offer for Eon Labs from Plotkin and Pajcin was material and non-public, and had been misappropriated and/or disclosed in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Eon Labs securities or tip others so that they could purchase or sell any Eon Labs securities while possessing such information.

113.    Notwithstanding their obligations, Lopandic and Verinac tipped the Direktanlage Traders to trade in Eon Labs securities while expecting to benefit from their disclosure.

114.    The Direktanlage Traders knew, or were reckless in not knowing, that the information they learned about the tender offer for Eon Labs from Lopandic and Verinac was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of

42

trust or confidence, and that they could not purchase or sell any securities while possessing such information.

115.    Notwithstanding their obligations, as described above, the Direktanlage Traders purchased Eon Labs securities while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

116.    By the conduct described above, Defendants Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, and the Direktanlage Traders directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

117.    Shpigelman, Pajcin, and Plotkin are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Pajcin's trading in Eon Labs securities. Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, and the Direktanlage Traders are jointly and severally liable for the disgorgement of all ill-gotten profits realized through the Direktanlage Traders trading in Eon Labs securities.

## COUNT III
**(Trading in Eon Labs Securities in Violation of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder as to Defendants Shpigelman, Pajcin, and Plotkin )**

118.    Paragraphs 1 through 117 are realleged and incorporated herein by reference.

119.    By February 17, 2005, Novartis had taken a substantial step or steps to commence a cash tender offer to purchase the outstanding public shares of Eon Labs.

120.    Beginning on or about February 17, 2005, Shpigelman, Pajcin, and Plotkin had engaged directly or indirectly in fraudulent, deceptive or manipulative acts or practices in connection with the tender offer for Eon Labs' stock by (i) purchasing or causing to be purchased the securities of Eon Labs while in possession of material, non-public information related to the tender offer, which information they knew, or were reckless in not knowing, was obtained

directly or indirectly from the companies involved in the transactions or a person acting on behalf of one or more of the companies; or (ii) communicating to others material non-public information relating to the tender offer for Eon Labs' stock, under circumstances in which it was reasonably foreseeable that such communications were likely to result in the purchase or sale of the securities of Eon Labs.

121.    By reason of the foregoing, Shpigelman, Pajcin, and Plotkin directly and indirectly, violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

**COUNT IV**
**(Trading in Cinergy Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, Borac, and the Direktanlage Traders)**

122.    Paragraphs 1 through 121 are realleged and incorporated herein by reference.

123.    Prior to the public announcement of the acquisition of Cinergy by Duke on May 9, 2005, information relating to the offer to acquire Cinergy was material, non-public information. This information also was considered confidential by Merrill Lynch, and was intended solely for internal corporate use on behalf of its client, Cinergy.

124.    Shpigelman learned of the material, non-public information concerning Duke's offer to acquire Cinergy in the course of his employment at Merrill Lynch. Shpigelman further knew, or was reckless in not knowing, the fact that he owed Merrill Lynch a fiduciary duty to maintain such information in confidence until it was publicly disseminated, and that he owed Cinergy shareholders a duty to abstain from disclosing this information for the purpose of obtaining personal gain.

125.    In breach of these fiduciary duties or similar relationships of trust or confidence owed to Merrill Lynch and Cinergy shareholders, Shpigelman misappropriated material, non-

44

public information about Duke's offer to acquire Cinergy, and, while in possession of this information, communicated this information, directly or indirectly, to Plotkin and Pajcin while expecting to benefit from his disclosure.

126.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about Duke's offer to acquire Cinergy from Shpigelman was material and non-public, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Cinergy securities or tip others so that they could purchase or sell any Cinergy securities while possessing such information.

127.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase Cinergy securities and the profits from those purchases would be shared between them.  As described above and in connection with this agreement, Pajcin purchased Cinergy securities while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

128.    Also in violation of their respective obligations, Plotkin and Pajcin tipped Lopandic and Verinac to trade in Cinergy securities while expecting to benefit from the disclosure.  Plotkin and Pajcin also agreed to share kickbacks received from Lopandic and Verinac for providing this information.

129.    Lopandic and Verinac knew, or were reckless in not knowing, that the information they learned about Duke's offer to acquire Cinergy from Plotkin and Pajcin was material and non-public, and had been misappropriated and/or disclosed in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or

45

sell any Cinergy securities or tip others so that they could purchase or sell any Cinergy securities while possessing such information.

130. Notwithstanding their obligations, Lopandic and Verinac tipped Borac and the Direktanlage Traders to trade in Cinergy securities while expecting to benefit from their disclosure.

131. Borac and the Direktanlage Traders each knew, or was reckless in not knowing, that the information they learned about Duke's offer to acquire Cinergy from Lopandic and Verinac was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any Cinergy securities while possessing such information.

132. Notwithstanding their obligations, as described above, Borac and the Direktanlage Traders purchased Cinergy securities while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

133. By the conduct described above, Defendants Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, Borac, and the Direktanlage Traders directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

134. Shpigelman, Pajcin, and Plotkin are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Pajcin's trading in Cinergy securities. Shpigelman, Pajcin, Plotkin, Lopandic and Verinac, and Borac are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Borac's trading in Cinergy securities. Shpigelman, Pajcin, Plotkin, Lopandic, Verinac and the Direktanlage Traders are jointly and

46

severally liable for the disgorgement of all ill-gotten profits realized through the Direktanlage traders' trading in Cinergy securities.

### COUNT V
**(Trading in LabOne Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Shpigelman, Pajcin, Plotkin, Siegel, Mikhail Plotkin, Lopandic, Verinac, Borac, the Direktanlage Traders, and Anticevic)**

135.    Paragraphs 1 through 134 are realleged and incorporated herein by reference.

136.    Prior to the public announcement of the acquisition of LabOne by Quest on August 8, 2005, information relating to the offer to acquire LabOne was material, non-public information. This information also was considered confidential by Merrill Lynch, and was intended solely for internal corporate use on behalf of its client, Quest.

137.    Shpigelman learned of the material, non-public information concerning Quest's offer to acquire LabOne in the course of his employment at Merrill Lynch. Shpigelman further knew, or was reckless in not knowing, the fact that he owed Merrill Lynch a fiduciary duty to maintain such information in confidence until it was publicly disseminated.

138.    In breach of a fiduciary duty or similar relationship of trust or confidence owed to Merrill Lynch, Shpigelman misappropriated material, non-public information about Quest's offer to acquire LabOne, and, while in possession of this information, communicated this information, directly or indirectly, to Plotkin and Pajcin, while expecting to benefit from his disclosure.

139.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about Quest's offer to acquire LabOne from Shpigelman was material and non-public, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any LabOne securities or tip others so that they could purchase or sell any LabOne securities while possessing such information.

140.     Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase LabOne securities and the profits from those trades would be shared between them. As described above and in connection with this agreement, Pajcin purchased LabOne securities through the Anticevic Saxo Bank Account while in possession of this misappropriated, material, non-public information, as set forth on the annexed Exhibit A, which is incorporated herein by reference.

141.     Also in violation of their respective obligations, Plotkin and Pajcin tipped Siegel, Mikhail Plotkin, Lopandic, and Verinac to trade in LabOne securities while expecting to benefit from the disclosures. Plotkin and Pajcin also agreed to share kickbacks received from Siegel, Mikhail Plotkin, Lopandic, and Verinac for providing this information.

142.     Siegel, Mikhail Plotkin, Lopandic, and Verinac each knew, or was reckless in not knowing, that the information they learned about Quest's offer to acquire LabOne from Plotkin and Pajcin was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any LabOne securities or tip others so that they could purchase or sell any LabOne securities while possessing such information.

143.     Notwithstanding their respective obligations, as described above, Siegel and Mikhail Plotkin purchased LabOne securities while in possession of this misappropriated material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

144.     Notwithstanding their obligations, Lopandic and Verinac tipped Borac and the Direktanlage Traders to trade in LabOne securities while expecting to benefit from their disclosure.

145.    Borac and the Direktanlage Traders knew, or were reckless in not knowing, that the information they learned about Quest's offer to acquire LabOne from Lopandic and Verinac was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any LabOne securities while possessing such information.

146.    Notwithstanding their obligations, as described above, Borac and the Direktanlage Traders purchased LabOne securities while in possession of this misappropriated material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

147.    Anticevic knew, or was reckless in not knowing, that the trading performed by Pajcin in her accounts with her express permission was based upon material, non-public information that had been misappropriated and/or disclosed in violation of a duty of trust or confidence.

148.    By the conduct described above, Defendants Shpigelman, Pajcin, Plotkin, Siegel, Mikhail Plotkin, Lopandic, Verinac, Borac, the Direktanlage Traders, and Anticevic, directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

149.    Shpigelman, Pajcin, Plotkin, and Anticevic are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Pajcin's trading in LabOne securities through the Anticevic Saxo Bank Account.  Shpigelman, Pajcin, Plotkin, and Siegel are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Siegel's trading in LabOne securities.  Shpigelman, Pajcin, Plotkin, and Mikhail Plotkin are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Mikhail Plotkin's trading in

LabOne securities. Shpigelman, Pajcin, Plotkin, Lopandic and Verinac, and Borac are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Borac's trading in LabOne securities. Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, and the Direktanlage Traders are jointly and severally liable for the disgorgement of all ill-gotten profits realized through the Direktanlage Traders' trading in LabOne securities.

## COUNT VI
**(Trading in Reebok Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Shpigelman, Pajcin, Plotkin, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Borac, Sormaz, the Direktanlage Traders, and Anticevic)**

150.    Paragraphs 1 through 149 are realleged and incorporated herein by reference.

151.    Prior to the public announcement of the acquisition of Reebok by Adidas on August 3, 2005, information relating to Adidas' offer to acquire Reebok was material, non-public information. This information also was considered confidential by Merrill Lynch, and was intended solely for internal corporate use on behalf of its client, Adidas.

152.    Shpigelman learned of the material, non-public information concerning Adidas' offer to acquire Reebok in the course of his employment at Merrill Lynch. Shpigelman further knew, or was reckless in not knowing, the fact that he owed Merrill Lynch a fiduciary duty to maintain such information in confidence until it was publicly disseminated.

153.    In breach of a fiduciary duty or similar relationship of trust or confidence owed to Merrill Lynch, Shpigelman misappropriated material, non-public information about Adidas' offer to acquire Reebok, and, while in possession of this information, communicated this information, directly or indirectly, to Plotkin and Pajcin, while expecting to benefit from his disclosure.

50

154.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about Adidas' offer to acquire Reebok from Shpigelman was material and non-public, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Reebok securities or tip others so that they could purchase or sell any Reebok securities while possessing such information.

155.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase Reebok securities and the profits from those trades would be shared between them.  As described above and in connection with this agreement, Pajcin purchased Reebok securities through accounts held in the names of Anticevic and Vujovic while in possession of this misappropriated material, non-public information, as set forth on the annexed Exhibit A, which is incorporated herein by reference.

156.    Also in violation of their respective obligations, Plotkin and Pajcin tipped Siegel, Santana, Mikhail Plotkin, Lopandic, and Verinac to trade in Reebok securities while expecting to benefit from the disclosures.  Plotkin and Pajcin also agreed to share kickbacks received from Siegel, Santana, Mikhail Plotkin, Lopandic, and Verinac for providing this information.

157.    Siegel, Santana, Mikhail Plotkin, Lopandic, and Verinac each knew, or was reckless in not knowing, that the information they learned about Adidas' offer to acquire Reebok from Plotkin and Pajcin was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any Reebok securities or tip others so that they could purchase or sell any Reebok securities while possessing such information.

158.    Notwithstanding their respective obligations, as described above, Siegel, Santana, Mikhail Plotkin, and Lopandic each purchased Reebok securities in their respective accounts while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

159.    Also in violation of their obligation, Lopandic and Verinac tipped Borac, Sormaz, and the Direktanlage Traders to trade in Reebok while expecting to benefit from their disclosure.

160.    Borac, Sormaz, and the Direktanlage Traders each knew, or was reckless in not knowing, that the information they learned about Adidas' offer to acquire Reebok from Lopandic and Verianc was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any Reebok securities while possessing such information.

161.    Notwithstanding their respective obligations, as described above, Borac, Sormaz, and the Direktanlage Traders each purchased Reebok securities while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

162.    Anticevic and Vujovic each knew, or was reckless in not knowing, that the trading performed by Pajcin in their respective accounts with their express permission was based upon material, non-public information that had been misappropriated and/or disclosed in violation of a duty of trust or confidence.

163.    By the conduct described above, Defendants Shpigelman, Pajcin, Plotkin, Santana, Siegel, Mikhail Plotkin, Lopandic, Verinac, Borac, Sormaz, Anticevic, Vujovic, and the Direktanlage Traders directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

164.    Shpigelman, Pajcin, Plotkin, and Anticevic are jointly and severally liable for the disgorgement of all profits realized through Pajcin's trading in Reebok securities through the Anticevic CyberTrader Account and the Anticevic Saxo Bank Account. Shpigelman, Pajcin, Plotkin, and Vujovic are jointly and severally liable for the disgorgement of all profits realized through Pajcin's trading in Reebok securities through the Vujovic Account. Shpigelman, Pajcin, Plotkin, and Lopandic are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Lopandic's trading in Reebok securities. Shpigelman, Pajcin, Plotkin, Lopandic and Verinac, and Sormaz are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Sormaz' trading in Reebok securities. Shpigelman, Pajcin, Plotkin, Lopandic and Verinac, and Borac are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Borac's trading in Reebok securities. Shpigelman, Pajcin, Plotkin, Lopandic, Verinac, and the Direktanlage Traders are jointly and severally liable for the disgorgement of all ill-gotten profits realized through the Direktanlage Traders trading in Reebok securities. Shpigelman, Pajcin, Plotkin and Siegel are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Siegel's trading in Reebok securities. Shpigelman, Pajcin, Plotkin and Santana are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Santana's trading in Reebok securities. Shpigelman, Pajcin, Plotkin and Mikhail Plotkin are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Mikhail Plotkin's trading in Reebok securities.

## COUNT VII
**(Trading in Celgene Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Shpigelman, Pajcin, Plotkin, Siegel, Santana, Lopandic, Verinac, Borac, Sormaz, the Direktanlage Traders, and Anticevic)**

165.    Paragraphs 1 through 164 are realleged and incorporated herein by reference.

166.    The existence of negotiations concerning a potential transaction involving Celgene during the summer of 2005 was material, non-public information. This information was also considered confidential by Merrill Lynch, and was intended solely for internal corporate use on behalf of its client, Celgene.

167.    Shpigelman learned of the material, non-public information concerning a potential transaction involving Celgene in the course of his employment at Merrill Lynch. Shpigelman further knew, or was reckless in not knowing, the fact that he owed Merrill Lynch a fiduciary duty to maintain such information in confidence until it was publicly disseminated, and that he owed Celgene shareholders a duty to abstain from disclosing this information for the purpose of obtaining personal gain.

168.    In breach of these fiduciary duties or similar relationships of trust or confidence owed to Merrill Lynch, and Celgene shareholders, Shpigelman misappropriated material, non-public information about the potential transaction involving Celgene, and, while in possession of this information, communicated this information, directly or indirectly, to Plotkin and Pajcin while expecting to benefit from his disclosure.

169.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about Celgene from Shpigelman was material and non-public, and had been misappropriated by Shpigelman and/or disclosed to them in violation of a duty of trust or confidence, and that they could not purchase or sell any Celgene securities or tip others so that they could purchase or sell any Celgene securities while possessing such information.

54

170.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase Celgene securities and the profits from those purchases would be shared between them. As described above and in connection with this agreement Pajcin purchased Celgene securities through an account held in the name of Anticevic while in possession of this misappropriated, material, non-public information, as set forth on the annexed Exhibit A, which is incorporated herein by reference.

171.    Also in violation of their respective obligations, Plotkin and Pajcin tipped Siegel, Santana, Lopandic, and Verinac to trade in Celgene securities while expecting to benefit from the disclosures. Plotkin and Pajcin also agreed to share kickbacks received from Siegel, Santana, Lopandic, and Verinac for providing this information.

172.    Siegel, Santana, Lopandic, and Verinac each knew, or was reckless in not knowing, that the information they learned about Celgene from Plotkin and Pajcin was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any Celgene securities or tip others so that they could purchase or sell any Celgene securities while possessing such information.

173.    Notwithstanding their respective obligations, Siegel, Santana, and Lopandic each purchased Celgene securities in their respective accounts while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

174.    Also in violation of their obligations, Lopandic and Verinac tipped Borac, Sormaz, and the Direktanlage Traders to trade in Celgene while expecting to benefit from their disclosure.

55

175.    Borac, Sormaz, and the Direktanlage Traders each knew, or was reckless in not knowing, that the information they learned about Celgene from Lopandic and Verinac was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any Celgene securities while possessing such information.

176.    Notwithstanding their respective obligations, Borac, Sormaz, and the Direktanlage Traders each purchased Celgene securities in their respective accounts while in possession of this misappropriated, material, non-public information as set forth on the annexed Exhibit A, which is incorporated herein by reference.

177.    Anticevic knew, or was reckless in not knowing, that the trading performed by Pajcin in her accounts with her express permission was based upon material, non-public information that had been misappropriated and/or disclosed in violation of a duty of trust or confidence.

178.    By the conduct described above, Defendants Shpigelman, Pajcin, Plotkin, Santana, Siegel, Lopandic, Verinac, Borac, Sormaz and the Direktanlage Traders, and Anticevic, directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

179.    Shpigelman, Pajcin, Plotkin, and Anticevic are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Pajcin's trading in Celgene securities through the Anticevic Saxo Bank Account. Shpigelman, Pajcin, Plotkin, and Lopandic, are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Lopandic's trading in Celgene securities. Shpigelman, Pajcin, Plotkin, Lopandic, Verinac and the Direktanlage Traders are jointly and severally liable for the disgorgement of all ill-gotten

profits realized through the Direktanlage Traders' trading in Celgene securities. Shpigelman, Pajcin, Plotkin, Lopandic and Verinac, and Sormaz are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Sormaz' trading in Celgene securities. Shpigelman, Pajcin, Plotkin, Lopandic and Verinac, and Borac are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Borac's trading in Celgene securities. Shpigelman, Pajcin, Plotkin and Siegel are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Siegel's trading in Celgene securities. Shpigelman, Pajcin, Plotkin and Santana are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Santana's trading in Celgene securities.

## COUNT VIII
### (BusinessWeek Related Trading from November 2004 through March 2005 in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Shuster, Plotkin, Pajcin, Lopandic, Verinac, and the Direktanlage Traders)

180.    Paragraphs 1 through 179 are realleged and incorporated herein by reference.

181.    Prior to the public release of BusinessWeek's "Inside Wall Street" column, the contents of the "Inside Wall Street" column are material, non-public information and are the property of BusinessWeek. This information is also considered confidential by Quad and by BusinessWeek's owner and publisher, McGraw-Hill.

182.    Shuster learned of the contents of the upcoming "Inside Wall Street" column in the course of his employment at Quad and through misappropriation of confidential property and information from Quad after the termination of his employment. Shuster further knew, or was reckless in not knowing, the fact that he owed Quad, and through Quad, McGraw-Hill, a fiduciary duty to maintain such information in confidence until it became publicly available.

183.    In breach of a fiduciary duty or similar relationship of trust or confidence owed to Quad, and through Quad to BusinessWeek's owner and publisher, McGraw-Hill, Shuster

57

misappropriated material, non-public information concerning the contents of the "Inside Wall Street" column with respect to the following companies: TheStreet.Com, Biolase, Curis, SIPEX, Alltel, Cornell, Spectrum, Arbitron, IMAX, and Impax. Shuster communicated this information, directly or indirectly, to Plotkin and Pajcin, while expecting to benefit from his disclosures.

184.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about the contents of the "Inside Wall Street" column with respect to TheStreet.Com, Biolase, Curis, SIPEX, Alltel, Cornell, Spectrum, Arbitron, IMAX and Impax from Shuster was material and non-public, and had been misappropriated by Shuster, and that they could not purchase or sell any of the securities in these companies or tip others so that they could purchase or sell any of these securities while possessing such information.

185.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would trade in the securities of TheStreet.Com, Biolase, Curis, SIPEX, Alltel, Cornell, Spectrum, Arbitron, IMAX, and Impax based on the information provided by Shuster relating to the contents of the "Inside Wall Street" column, and that the profits from those purchases would be shared between them. As described above and in connection with this agreement Pajcin purchased these securities while in possession of misappropriated, material, non-public information, as set forth on the annexed Exhibit B, which is incorporated herein by reference.

186.    Also in violation of their respective obligations, Plotkin and Pajcin agreed to and did tip Lopandic and Verinac to trade in the securities of TheStreet.com, Biolase, Curis, Spectrum, Cornell, SIPEX, Arbitron, and Impax while expecting to benefit from their disclosures. Plotkin and Pajcin also agreed to share kickbacks received from Lopandic and Verinac for providing this information.

187.    Lopandic and Verinac knew, or were reckless in not knowing, that the information they learned about the contents of the "Inside Wall Street" column with respect to TheStreet.com, Biolase, Curis, Cornell, SIPEX, Arbitron and Impax from Plotkin and Pajcin on the occasions described above was material and non-public, and had been misappropriated, and that they could not purchase or sell any of these securities while possessing such information.

188.    Notwithstanding their obligations, Lopandic and Verinac tipped the Direktanlage Traders to trade in the securities of TheStreet.com, Biolase, Curis, Spectrum, Cornell, SIPEX, Arbitron, and Impax on the occasions described above while expecting to benefit from their disclosures.

189.    The Direktanlage Traders knew, or were reckless in not knowing, that the information they learned about the contents of the "Inside Wall Street" column with respect to TheStreet.com, Biolase, Curis, Spectrum, Cornell, SIPEX, Arbitron, and Impax from Lopandic and Verinac was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence and that they could not purchase or sell any of these securities while possessing such information.

190.    Notwithstanding their obligations, the Direktanlage Traders purchased the securities of TheStreet.com, Biolase, Curis, Spectrum, Cornell, SIPEX, Arbitron, and Impax while in possession of the misappropriated, material, non-public information as set forth on the annexed Exhibit B, which is incorporated herein by reference.

191.    By the conduct described above, Defendants Shuster, Plotkin, Pajcin, Lopandic, Verinac, and the Direktanlage Traders directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

59

192.    Shuster, Pajcin, and Plotkin are jointly and severally liable for the disgorgement

of all ill-gotten profits realized through Pajcin's trading in the securities of TheStreet.Com,

Biolase, Curis, SIPEX, Alltel, Cornell, Spectrum, Arbitron, IMAX, and Impax.  Shuster, Pajcin,

Plotkin, Lopandic, Verinac, and the Direktanlage Traders are jointly and severally liable for the

disgorgement of all ill-gotten profits realized through the Direktanlage Traders' trading in the

securities of TheStreet.com, Biolase, Curis, Spectrum, Cornell, SIPEX, Arbitron, and Impax.

## COUNT IX
**(BusinessWeek Related Trading from June 2005 through September 2005 in Violation of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Renteria,
Pajcin, Plotkin, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Borac, the
Direktanlage Traders, and Anticevic)**

193.    Paragraphs 1 through 192 are realleged and incorporated herein by reference.

194.    Prior to the public release of BusinessWeek's "Inside Wall Street" column, the

contents of the "Inside Wall Street" column are material, non-public information and are the

property of BusinessWeek.  This information is also considered confidential by Quad and by

BusinessWeek's owner and publisher, McGraw-Hill.

195.    Renteria learned of the contents of the upcoming "Inside Wall Street" column in

the course of his employment at Quad.  Renteria further knew, or was reckless in not knowing,

the fact that he owed Quad, and through Quad, McGraw-Hill, a fiduciary duty to maintain such

information in confidence until it became publicly available.

196.    In breach of a fiduciary duty or similar relationship of trust or confidence owed to

Quad, and through Quad to BusinessWeek's owner and publisher, McGraw-Hill, Renteria

misappropriated material, non-public information concerning the contents of the "Inside Wall

Street" column with respect to the following companies: Perficient, PriceSmart, Alaska

Communications, Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom,

60

Spectrum, Symbol, and Check Point. Renteria communicated this information, except for the information relating to Check Point, directly or indirectly, to Plotkin and Pajcin, while expecting to benefit from his disclosures, and communicated the information relating to Check Point directly or indirectly to Plotkin while expecting to benefit from his disclosure.

197.    Plotkin and Pajcin knew, or were reckless in not knowing that the information they learned about the contents of the "Inside Wall Street" column with respect to Perficient, PriceSmart, Alaska Communications, Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom, Spectrum, and Symbol from Renteria was material and non-public, and had been misappropriated by Renteria in breach of a duty of trust or confidence, and that they could not purchase or sell any of the securities in these companies or tip others so that they could purchase or sell any of these securities while possessing such information. Plotkin, in turn, knew, or was reckless in not knowing, that the information he learned about the contents of the "Inside Wall Street" column with respect to Check Point from Renteria was material and non-public, and had been misappropriated by Renteria in breach of a duty of trust or confidence, and that he could not purchase or sell any of the securities in these companies or tip others so that they could purchase or sell any of these securities while possessing such information.

198.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase the securities of Fedex, Mikohn Gaming, Polycom, Spectrum, and Symbol, and that the profits from those purchases would be shared between them. As described above and in connection with this agreement, Pajcin purchased the securities of Fedex, Mikohn Gaming, Polycom and Spectrum through accounts held in Anticevic's name, and purchased the securities of Symbol through accounts held in the name of Anticevic and Vujovic while in possession of

61

this misappropriated, material, non-public information as set forth on the annexed Exhibit B, which is incorporated herein by reference.

199.    Also in violation of their respective obligations, Pajcin and Plotkin tipped: (1) Siegel to trade in the securities of Perficient, Alaska Communications, Casual Male, FedEx, Energy Conservation, Mikohn Gaming, Polycom, and Spectrum; (2) Santana to trade in the securities of Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom, Spectrum, and Symbol; (3) Mikhail Plotkin to trade in the securities of Perficient and Alaska Communications; (4) Lopandic and Verinac to trade in the securities of Casual Male, Energy Conversion, FedEx, Mikohn Gaming, Perficient, PriceSmart, and Spectrum, while expecting to benefit from their disclosures.  In violation of his obligation, Plotkin tipped Mikhail Plotkin to trade in the securities of Check Point while expecting to benefit from his disclosure.  Plotkin and Pajcin arranged to share kickbacks with Siegel, Santana, Mikhail Plotkin, Lopandic, and Verinac in exchange for providing this information.

200.    Siegel knew, or was reckless in not knowing, that the information he learned about the contents of the "Inside Wall Street" column with respect to Perficient, Alaska Communications, Casual Male, FedEx, Energy Conservation, Mikohn Gaming, Polycom, and Spectrum from Plotkin and Pajcin was material and non-public, and had been misappropriated in breach of a fiduciary duty or similar duty of trust or confidence, and that he could not purchase or sell any of these securities while possessing such information.

201.    Notwithstanding his obligation, as described above, Siegel purchased the securities of Perficient, Alaska Communications, Casual Male, FedEx, Energy Conservation, Mikohn Gaming, Polycom, and Spectrum securities while in possession of this misappropriated,

material, non-public information as set forth on Exhibit B, which is incorporated herein by reference.

202.    Santana knew, or was reckless in not knowing, that the information he learned about the contents of the "Inside Wall Street" column with respect to Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom, Spectrum, and Symbol from Plotkin and Pajcin was material and non-public, and had been misappropriated in breach of a fiduciary duty or similar duty of trust or confidence, and that he could not purchase or sell any of these securities while possessing such information.

203.    Notwithstanding his obligation, as described above, Santana purchased the securities of Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom, Spectrum, and Symbol securities while in possession of this misappropriated, material, non-public information as set forth on Exhibit B, which is incorporated herein by reference.

204.    Mikhail Plotkin knew, or was reckless in not knowing, that the information he learned about the contents of the "Inside Wall Street" column with respect to Perficient and Alaska Communications from Plotkin and Pajcin and with respect to Check Point from Plotkin was material and non-public, and had been misappropriated in breach of a fiduciary duty or similar duty of trust or confidence, and that he could not purchase or sell any of these securities while possessing such information.

205.    Notwithstanding his obligation, as described above, Mikhail Plotkin purchased the securities of Perficient, Alaska Communications, and Check Point while in possession of the misappropriated, material, non-public information as set forth on Exhibit B, which is incorporated herein by reference.

206.    Lopandic and Verinac knew, or were reckless in not knowing, that the information they learned about the contents of the "Inside Wall Street" column with respect to Casual Male, Energy Conversion, FedEx, Mikohn Gaming, Perficient, PriceSmart, and Spectrum from Plotkin and Pajcin was material and non-public, and had been misappropriated in breach of a fiduciary duty or similar duty of trust or confidence, and that they could not purchase or sell any of these securities while possessing such information.

207.    Notwithstanding their obligations, Lopandic and Verinac tipped Borac to trade in the securities of Perficient, PriceSmart, FedEx, and Mikohn Gaming, expecting to benefit from their disclosures.

208.    Borac knew, or was reckless in not knowing, that the information he learned about the contents of the "Inside Wall Street" column with respect to Perficient, PriceSmart, FedEx, and Mikohn Gaming from Lopandic and Verinac was material and non-public, and had been misappropriated in breach of a fiduciary duty or similar duty of trust or confidence, and that he could not purchase or sell any of these securities while possessing such information.

209.    Notwithstanding his obligation, as described above, Borac purchased the securities of Perficient, PriceSmart, FedEx, and Mikohn Gaming while in possession of the misappropriated, material, non-public information as set forth on Exhibit B, which is incorporated herein by reference.

210.    In addition, notwithstanding their obligation, Lopandic and Verinac tipped the Direktanlage Traders to trade in Casual Male, Energy Conversion, Mikohn Gaming, and Spectrum, expecting to benefit from their disclosures.

211.    The Direktanlage Traders knew, or were reckless in not knowing, that the information they learned about the contents of the "Inside Wall Street" column with respect to

64

Casual Male, Energy Conversion, Mikohn Gaming, and Spectrum from Lopandic and Verinac

was material and non-public, and had been misappropriated in breach of a fiduciary duty or

similar duty of trust or confidence, and that they could not purchase or sell any of these securities

while possessing such information.

212.    Notwithstanding their obligation, as described above, the Direktanlage Traders

purchased the securities of Casual Male, Energy Conversion, Mikohn Gaming, and Spectrum

securities while in possession of the misappropriated, material, non-public information as set

forth on Exhibit B, which is incorporated herein by reference.

213.    Anticevic and Vujovic knew, or were reckless in not knowing, that the trading

performed by Pajcin in their respective accounts with their express permission was based upon

material, non-public information that had been misappropriated and/or disclosed in violation of a

fiduciary duty or similar duty of trust or confidence.

214.    By the conduct described above, Defendants Renteria, Plotkin, Pajcin, Siegel,

Santana, Mikhail Plotkin, Lopandic, Verinac, Borac and the Direktanlage Traders, Anticevic and

Vujovic, directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

215.    Renteria, Pajcin, Plotkin, and Anticevic are jointly and severally liable for the

disgorgement of all ill-gotten profits realized through Pajcin's trading in the securities of FedEx,

Mikohn Gaming, Polycom, Spectrum and Symbol through the accounts held in Anticevic's

name.  Renteria, Pajcin, Plotkin, and Vujovic are jointly and severally liable for the

disgorgement of all ill-gotten profits realized through Pajcin's trading in the securities of Symbol

through the Vujovic Account.  Renteria, Pajcin, Plotkin, and Siegel are jointly and severally

liable for the disgorgement of all ill-gotten profits realized through Siegel's trading in the

securities of Perficient, Alaska Communications, Casual Male, FedEx, Energy Conservation, Mikohn Gaming, Polycom and Spectrum.  Renteria, Pajcin, Plotkin, and Santana are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Santana's trading in the securities of Casual Male, FedEx, Energy Conversion, Mikohn Gaming, Polycom, Spectrum and Symbol.  Renteria, Pajcin, Plotkin, and Mikhail Plotkin are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Mikhail Plotkin's trading in the securities of Perficient and Alaska Communications.  Renteria, Pajcin, Plotkin, Lopandic and Verinac, and Borac are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Borac's trading in the securities of Perficient, PriceSmart, FedEx and Mikohn Gaming.  Renteria, Pajcin, Plotkin, Lopandic, Verinac, and the Direktanlage Traders are jointly and severally liable for the disgorgement of all ill-gotten profits realized through the Direktanlage Traders' trading in the securities of Casual Male, Energy Conversion, Mikohn Gaming and Spectrum.  Renteria, Plotkin, and Mikhail Plotkin are jointly and severally liable for the disgorgement of all ill-gotten profits realized through Mikhail Plotkin's trading in the securities of Check Point.

## COUNT X
**(Trading in Bristol-Myers Securities in Violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendants Smith, Plotkin, Pajcin, Siegel, Anticevic, and Mikhail Plotkin)**

216.    Paragraphs 1 through 215 are realleged and incorporated herein by reference.

217.    Pursuant to Rule 6(e)(2) of the Federal Rules of Criminal Procedure, the oath of secrecy taken by federal grand jurors and the charges given by the judge to grand jurors, grand jurors are obligated to maintain the secrecy of grand jury proceedings, and are prohibited from disclosing matters occurring before a grand jury other than under the specific circumstances set forth in Rule 6(e)(2) of the Federal Rules of Criminal Procedure.

218.    Smith learned of matters occurring before a federal grand jury through his service as a grand juror, and, accordingly, was bound by Rule 6(e)(2) of the Federal Rules of Criminal Procedure, his oath, and/or the judge's charges to not disclose this information under any circumstance other than those set forth in Rule 6(e)(2) of the Federal Rules of Criminal Procedure. Smith knew, or was reckless in not knowing, the fact that he owed the United States Government a fiduciary duty to maintain such information in confidence pursuant to these terms.

219.    In breach of a fiduciary duty or similar relationship of trust or confidence owed to the United States Government, Smith misappropriated material, non-public information about matters occurring before the grand jury concerning Bristol-Myers by communicating this information, directly or indirectly, to Plotkin and Pajcin, while expecting to benefit from his disclosure.

220.    Plotkin and Pajcin knew, or were reckless in not knowing, that the information they learned about Bristol-Myers from Smith was material and non-public, and had been misappropriated and/or disclosed to them in violation of a fiduciary duty or similar relationship of trust or confidence, and that they could not purchase or sell any Bristol-Myers securities or tip others so that they could purchase or sell any Bristol-Myers securities while possessing such information.

221.    Notwithstanding their respective obligations, Plotkin and Pajcin agreed that Pajcin would purchase and sell Bristol-Myers securities and the profits from those trades would be shared between them. As described above and in connection with this agreement, Pajcin purchased and sold Bristol-Myers securities through an account in his name and through an account in the name of Anticevic while in possession of this misappropriated material, non-

public information, as set forth on the annexed Exhibit C, which is incorporated herein by reference.

222.    Also in violation of their respective obligations, Plotkin and Pajcin tipped Mikhail Plotkin and Siegel to trade in Bristol-Myers securities while expecting to benefit from the disclosures.  Plotkin and Pajcin also agreed to share kickbacks received from Mikhail Plotkin and Siegel for providing this information.

223.    Mikhail Plotkin and Siegel knew, or were reckless in not knowing, that the information they learned about Bristol-Myers from Plotkin and Pajcin was material and non-public, and had been misappropriated and/or disclosed in violation of a duty of trust or confidence, and that they could not purchase or sell any Bristol-Myers securities while possessing such information.

224.    Notwithstanding their respective obligations, as described above, Siegel and Mikhail Plotkin purchased and sold the securities of Bristol-Myers while in possession of this misappropriated, material, non-public information as set forth on Exhibit C, which is incorporated herein by reference.

225.    Anticevic knew, or was reckless in not knowing, that the trading performed by Pajcin in her accounts with her express permission was based upon material, non-public information that had been misappropriated and/or disclosed in violation of a duty of trust or confidence.

226.    By the conduct described above, Defendants Smith, Plotkin, Pajcin, Siegel, Anticevic, and Mikhail Plotkin directly or indirectly, violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

227.    Smith, Plotkin, and Pajcin are jointly and severally liable for the disgorgement of any ill-gotten profits realized through Pajcin's trading in Bristol-Myers securities through the Pajcin Account.  Smith, Plotkin, Pajcin, and Anticevic are jointly and severally liable for the disgorgement of any ill-gotten profits realized through Pajcin's trading in Bristol-Myers securities through the Anticevic Saxo Bank Account.  Smith, Plotkin, Pajcin, and Mikhail Plotkin are jointly and severally liable for the disgorgement of any ill-gotten profits realized through Mikhail Plotkin's trading in Bristol-Myers securities.  Smith, Plotkin, Pajcin, and Siegel are jointly and severally liable for the disgorgement of any ill-gotten profits realized through Siegel's trading in Bristol-Myers securities.

## COUNT XI
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as to Defendant Smith)**

228.    Paragraphs 1 through 227 are realleged and incorporated herein by reference.

229.    In or about mid to late-2004, Smith provided Pajcin with money for the purpose of funding the Insider Trading Schemes.  Pajcin, Plotkin, and Smith agreed that in return for providing this money, Smith would receive a percentage of Pajcin's trading profits related to Smith's contribution to the Insider Trading Schemes.

230.    Smith knew, or was reckless in not knowing, that the money he contributed to Pajcin was being used to engage in unlawful insider trading and that Smith's share of profits was to come from such unlawful trading.

231.    As described above and in connection with this agreement, Pajcin unlawfully traded various securities as set forth on the annexed Exhibits A, B, and C, which are incorporated herein by reference.

232.    By the conduct described above, Defendant Smith directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a judgment:

### I.

Permanently restraining and enjoining each of the Defendants, Anticevic, Pajcin, Plotkin, Shpigelman, Shuster, Renteria, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Sormaz, Borac, Dilber, Krsic, and Smith, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder;

### II.

Permanently restraining and enjoining Defendants Shpigelman, Pajcin, and Plotkin, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 14(e) of the Exchange Act, and Rule 14e-3 thereunder;

### III.

Permanently restraining and enjoining Defendants Anticevic, Pajcin, Plotkin, Siegel, Mikhail Plotkin, and Smith, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction

by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act;

## IV.

Directing Defendant Anticevic and each of her financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with her, to repatriate the proceeds of all the unlawful trading set forth herein, including, but not limited to proceeds residing in the Anticevic Saxo Bank Account, and/or in Account #945302193853 at LBIE, as well as the Anticevic Direktanlage Account;

## V.

Directing Defendant Lopandic and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, to repatriate the proceeds of all the unlawful trading set forth herein, including, but not limited to proceeds residing in the Lopandic Account, and/or in Account #945302193853 at LBIE, as well as the Borac Direktanlage Account and the Krsic Direktanlage Account, on which Lopandic was a co-signatory;

## VI.

Directing Defendant Borac and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, to repatriate the proceeds of all the unlawful trading set forth herein, including, but not limited to proceeds residing in the Borac Account, and/or in Account #945302193853 at LBIE, as well as the Borac Direktanlage Account;

**VII.**

Directing Defendant Sormaz and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, to repatriate the proceeds of all the unlawful trading set forth herein, including, but not limited to proceeds residing in the Sormaz Account, and/or in Account #945302193853 at LBIE, as well as the Sormaz Direktanlage Account;

**VIII.**

Directing Defendant Dilber and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, to repatriate the proceeds of all the unlawful trading set forth herein, including, but not limited to proceeds residing in the Dilber Direktanlage Account;

**IX.**

Directing Defendant Krsic and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, to repatriate the proceeds of all the unlawful trading set forth herein, including, but not limited to proceeds residing in the Krsic Direktanlage Account;

**X.**

Directing Defendant Verinac and each of his financial and brokerage institutions, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, to repatriate the proceeds of all the unlawful trading set forth herein, including, but not limited to proceeds residing in the Dilber Direktanlage Account, on which Verinac was a co-signatory;

## XI.

Ordering Defendants Anticevic, Pajcin, Plotkin, Shpigelman, Shuster, Renteria, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Sormaz, Borac, Dilber, Krsic, and Smith to disgorge all profits realized from all the unlawful trading set forth herein, plus prejudgment interest;

## XII.

Ordering Defendants Anticevic, Pajcin, Plotkin, Shpigelman, Shuster, Renteria, Siegel, Santana, Vujovic, Mikhail Plotkin, Lopandic, Verinac, Sormaz, Borac, Dilber, Krsic, and Smith to pay civil monetary penalties pursuant to Section 21A and/or Section 21(d)(3) of the Exchange Act; and ordering Defendants Anticevic, Pajcin, Plotkin, Siegel, Mikhail Plotkin, and Smith to

pay civil monetary penalties pursuant to Section 20(c) of the Securities Act; and

## XIII.

Granting such other relief as this Court may deem just and appropriate.

Dated: New York, New York
      August 30, 2006

 

Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Northeast Regional Office
3 World Financial Center, Room 4300
New York, New York 10281
(212) 336-1020

Of Counsel:

David Rosenfeld
David A. Markowitz
Scott L. Black
Sanjay Wadhwa
Brenda Wai Ming Chang
Mona Akhtar
Wendy Griffin

Exhibit A
Defendants' Trading in Connection With Non-Public Merrill Lynch Mergers and Acquisitions Deals

| Name | Date | Action | Symbol | Description |
|------|------|--------|--------|-------------|
| David Pajcin | 1/26/05 - 1/27/05 | Buy | G | 38 buy transactions were placed to purchase a total of 346 call options and 3,000 shares |
| | 1/27/2005 | Announcement | G | P&G acquiring Gillette |
| David Pajcin | 1/28/2005 | Sell | G | 28 sell transactions were placed to sell all 346 call options and all 3,000 shares |
| Direktanlage Traders | 1/27/2005 | Buy | G | 13 buy transactions were placed to purchase a total of 13,719 shares |
| | 1/27/2005 | Announcement | G | P&G acquiring Gillette |
| Direktanlage Traders | 1/28/2005 | Sell | G | A series of sell transactions was placed to sell all 13,719 shares |
| David Pajcin | 2/17/2005 | Buy | ELAB | 65 buy transactions were placed to purchase a total of 50 call options and 21,000 shares |
| | 2/21/2005 | Announcement | ELAB | Novartis to Buy Hexal, Eon Labs for $8.3 Billion Cash |
| David Pajcin | 2/22/2005 | Sell | ELAB | 30 sell transactions were placed to sell all 50 call options and all 21,000 shares |
| Direktanlage Traders | 2/17/2005 | Buy | ELAB | 15 buy transactions were placed to purchase a total of 25,003 shares |
| | 2/21/2005 | Announcement | ELAB | Novartis to Buy Hexal, Eon Labs for $8.3 Billion Cash |
| Direktanlage Traders | 2/22/2005 | Sell | ELAB | 34 sell transactions were placed to sell all 25,003 shares |
| David Pajcin | 5/4/05 - 5/6/05 | Buy | CIN | 29 buy transactions were placed to purchase a total of 645 call options and 2,000 shares |
| | 5/9/2005 | Announcement | CIN | Duke Energy Agrees to Acquire Cinergy |
| David Pajcin | 5/9/2005 | Sell | CIN | 24 sell transactions were placed to sell all 645 call options and all 2,000 shares |
| Direktanlage Traders | 5/4/05 - 5/6/05 | Buy | CIN | 24 buy transactions were placed to purchase a total of 22,727 shares |
| | 5/9/2005 | Announcement | CIN | Duke Energy Agrees to Acquire Cinergy |
| Direktanlage Traders | 5/9/2005 | Sell | CIN | 22 sell transactions were placed to sell all 22,727 shares |
| Ilja Borac | 5/6/2005 | Buy | CIN | 3 buy transactions were placed to purchase 15,000 shares |
| | 5/9/2005 | Announcement | CIN | Duke Energy Agrees to Acquire Cinergy |
| Ilja Borac | 5/9/2005 | Sell | CIN | 3 sell transactions were placed to sell all 15,000 shares |
| Sonja Anticevic | 8/1/05 - 8/2/05 | Buy | RBK | 33 buy transactions were placed to purchase a total of 1,997 call options and 240 shares |
| | 8/3/2005 | Announcement | RBK | Adidas to Acquire Reebok |
| Sonja Anticevic | 8/3/2005 | Sell | RBK | 30 sell transactions were placed to sell all 1,997 call options and all 240 shares |
| Henry Siegel | 8/1/05 - 8/2/05 | Buy | RBK | 48 buy transactions were placed to purchase a total of 1,180 call options and 8,000 shares |
| | 8/3/2005 | Announcement | RBK | Adidas to Acquire Reebok |
| Henry Siegel | 8/3/2005 | Sell | RBK | 60 sell transactions were placed to sell all 1,180 call options and all 8,000 shares |
| Elvis Santana | 8/1/05 - 8/2/05 | Buy | RBK | 6 buy transactions were placed to purchase a total of 465 call options and 520 shares |
| | 8/3/2005 | Announcement | RBK | Adidas to Acquire Reebok |
| Elvis Santana | 8/3/2005 | Sell | RBK | 13 sell transactions were placed to sell all 465 call options and all 520 shares |
| Direktanlage Traders | 8/2/2005 | Buy | RBK | 1 buy transaction was placed to purchase a total of 7,545 shares |
| | 8/3/2005 | Announcement | RBK | Adidas to Acquire Reebok |
| Direktanlage Traders | 8/3/2005 | Sell | RBK | 1 sell transaction was placed to sell all 7,545 shares |
| Monika Vujovic | 8/1/2005 | Buy | RBK | 5 buy transactions were placed to purchase a total of 455 call options |
| | 8/3/2005 | Announcement | RBK | Adidas to Acquire Reebok |
| Monika Vujovic | 8/3/2005 | Sell | RBK | 3 sell transactions were placed to sell all 455 call options |
| Mikhail & Marina Plotkin | 8/2/2005 | Buy | RBK | 3 buy transactions were placed to purchase a total of 60 call options and 120 shares |
| | 8/3/2005 | Announcement | RBK | Adidas to Acquire Reebok |

Exhibit A
Defendants' Trading in Connection With Non-Public Merrill Lynch Mergers and Acquisitions Deals

| Name | Date | Action | Ticker | Description |
|---|---|---|---|---|
| Mikhail & Marina Plotkin | 8/3/2005 | Sell | RBK | 7 sell transactions were placed to sell 60 call options and all 120 shares |
| Ilja Borac | 8/1/05 - 8/3/05 | Buy | RBK | 9 buy transactions were placed to purchase a total of 50,000 shares |
| Ilja Borac | 8/3/2005 | Announcement | RBK | **Adidas to Acquire Reebok** |
| Ilja Borac | 8/3/2005 | Sell | RBK | 9 sell transactions were placed to sell all 50,000 shares |
| Zoran Sormaz | 8/1/05 - 8/3/05 | Buy | RBK | 6 buy transactions were placed to purchase a total of 40,000 shares |
| Zoran Sormaz | 8/3/2005 | Announcement | RBK | **Adidas to Acquire Reebok** |
| Zoran Sormaz | 8/3/2005 | Sell | RBK | 6 sell transactions were placed to sell all 40,000 shares |
| Perica Lopandic | 8/1/05 - 8/2/05 | Buy | RBK | 7 buy transactions were placed to purchase a total of 55,000 shares |
| Perica Lopandic | 8/3/2005 | Announcement | RBK | **Adidas to Acquire Reebok** |
| Perica Lopandic | 8/3/05 - 8/15/05 | Sell | RBK | 7 sell transactions were placed to sell all 55,000 shares |
| DirektanIage Traders | 5/23/05 - 6/3/05 | Buy | LABS | 183 buy transactions were placed to purchase a total of 42,765 shares |
| DirektanIage Traders | 6/6/05 - 6/7/05 | Sell | LABS | 206 sell transactions were placed to sell all 42,765 shares |
| | 8/8/2005 | Announcement | | **Quest to Acquire LabOne** |
| Sonja Anticevic | 6/3/2005 | Buy | LABS | 2 buy transactions were placed to purchase a total of 2,300 shares |
| Sonja Anticevic | 6/9/2005 | Sell | LABS | 2 sell transactions were placed to sell all 2,300 shares |
| | 8/8/2005 | Announcement | | **Quest to Acquire LabOne** |
| Henry Siegel | 6/3/2005 | Buy | LABS | 9 buy transactions were placed to purchase a total of 9,500 shares |
| Henry Siegel | 6/6/2005 | Sell | LABS | 12 sell transactions were placed to sell all 9,500 shares |
| | 8/8/2005 | Announcement | | **Quest to Acquire LabOne** |
| Ilija Siegel | 5/25/05-6/1/2005 | Buy | LABS | 8 buy transactions were placed to purchase a total of 8,400 shares |
| Ilja Borac | 6/6/2005 | Sell | LABS | 8 sell transactions were placed to sell a total of 8,400 shares |
| | 8/8/2005 | Announcement | | **Quest to Acquire LabOne** |
| Mikhail Plotkin | 5/31/2005-6/3/2005 | Buy | QLGH (LabOne) | 14 buy transactions were placed to purchase a total of 140 call options |
| Mikhail Plotkin | 6/6/2005-8/8/2005 | Sell | QLGH (LabOne) | 12 sell transactions were placed to sell all 140 call options |
| | 8/8/2005 | Announcement | | **Quest to Acquire LabOne** |
| Sonja Anticevic | 7/13/2005-7/22/2005 | Buy | LQHH,JK/CELG | 25 buy transactions were placed to purchase a total of 578 call options and 150 shares |
| Sonja Anticevic | 7/15/2005-7/28/2005 | Sell | LQHH,JK/CELG | 18 sell transactions were placed to sell all 578 call options and 150 shares |
| Henry Siegel | 7/15/2005-7/22/2005 | Buy | LQHH,JK | 39 buy transactions were placed to purchase a total of 670 call options |
| Henry Siegel | 7/28/2005-8/01/2005 | Sell | LQHH,JK | 34 sell transactions were placed to sell a total of 650 call options |
| Elvis Santana | 7/15/2005-7/22/2005 | Buy | LQHH,JK | 4 buy transactions were placed to purchase a total of 310 call options |
| Elvis Santana | 7/27/2005-7/28/2005 | Sell | LQHH,JK | 19 sell transactions were placed to sell all 310 call options |
| Ilja Borac | 7/21/2005-7/33/2005 | Buy | CELG | 8 buy transactions were placed to purchase a total of 40,000 shares |
| Ilja Borac | 7/19/2005-7/25/2005 | Sell | CELG | 8 sell transactions were placed to sell all 40,000 shares |
| Zoran Sormaz | 7/21/2005-7/22/2005 | Buy | CELG | 3 buy transactions were placed to purchase a total of 15,000 shares |
| Zoran Sormaz | 7/27/2005-8/2/2005 | Sell | CELG | 3 sell transactions were placed to sell all 15,000 shares |
| Perica Lopandic | 7/15/2005-7/27/2005 | Buy | CELG | 6 buy transactions were placed to purchase a total of 40,000 shares |
| Perica Lopandic | 7/21/2005-7/27/2005 | Sell | CELG | 6 sell transactions were placed to sell all 40,000 shares |

Exhibit A

Defendants' Trading in Connection With Non-Public Merrill Lynch Mergers and Acquisitions Deals

| | | | |
|---|---|---|---|
| Direktanlage Traders | 7/15/2005-7/22/2005 | Buy | CELG | 3 buy transactions were placed to purchase a total of 13,000 shares |
| Direktanlage Traders | 7/18/2005-7/25/2005 | Sell | CELG | 2 sell transactions were placed to sell all 13,000 shares |

Exhibit B
Defendants' Trading in Connection With Non-Public Business Week Contents

| Name | Date | Action | Symbol | Description |
|------|------|--------|--------|-------------|
| David Pajcin | 12/16/2004 | Buy To Open | ATAL | 14 buy transactions were placed to purchase a total of 370 call options |
| David Pajcin | 12/17/2004 | Inside Wall Street | | Alltel: Expecting a Call |
| David Pajcin | 12/17/2004 | Sell To Close | ATAK | 4 sell transactions were placed to sell all 370 call options |
| David Pajcin | 1/20/2005 | Buy | ARB | 9 buy transactions were placed to purchase a total of 3,500 shares |
| David Pajcin | 1/21/2005 | Inside Wall Street | | The Dutch may tune in Arbitron |
| David Pajcin | 1/21/2005 | Sell | ARB | 5 sell transactions were placed to sell all 3,500 shares |
| Direktanlage Traders | 1/20/2005 | Buy | ARB | 2 buy transactions were placed to purchase a total of 18,400 shares |
| Direktanlage Traders | 1/21/2005 | Inside Wall Street | | The Dutch may tune in Arbitron |
| Direktanlage Traders | 1/21/05 - 1/25/05 | Sell | ARB | 4 sell transactions were placed to sell all 18,400 shares |
| David Pajcin | 11/18/2004 | Buy | BLTIE | 12 buy transactions were placed to purchase a total of 6,000 shares |
| David Pajcin | 11/19/2004 | Inside Wall Street | | Will More Dentists Ask for Biolase Drills? |
| David Pajcin | 11/19/2004 | Sell | BLTIE | 13 sell transactions were placed to sell all 6,000 shares |
| Direktanlage Traders | 11/18/2004 | Buy | BLTIE | 1 buy transaction was placed to purchase 76,000 shares |
| Direktanlage Traders | 11/19/2004 | Inside Wall Street | | Will More Dentists Ask for Biolase Drills? |
| Direktanlage Traders | 11/19/04 - 11/23/04 | Sell | BLTIE | 3 sell transactions were placed to sell all 76,000 shares |
| Henry Siegel | 6/16/2005 | Buy | CMRG | 3 buy transactions were placed to purchase a total of 21,000 shares |
| Henry Siegel | 6/17/2005 | Inside Wall Street | | The Big and Tall Stride Into Casual Male |
| Henry Siegel | 6/17/2005 | Sell | CMRG | 11 sell transactions were placed to sell all 21,000 shares |
| Elvis Santana | 6/16/2005 | Buy | CMRG | 3 buy transactions were placed to purchase a total of 2,035 shares |
| Elvis Santana | 6/17/2005 | Inside Wall Street | | The Big and Tall Stride Into Casual Male |
| Elvis Santana | 6/17/2005 | Sell | CMRG | 1 sell transaction was placed to sell all 2,035 shares |
| Direktanlage Traders | 6/16/2005 | Buy | CMRG | 2 buy transactions were placed to purchase a total of 40,200 shares |
| Direktanlage Traders | 6/17/2005 | Inside Wall Street | | The Big and Tall Stride Into Casual Male |
| Direktanlage Traders | 6/17/2005 | Sell | CMRG | 2 sell transactions were placed to sell all 40,200 shares |
| David Pajcin | 12/2/2004 | Buy | CRIS | 27 buy transactions were placed to purchase a total of 10,000 shares |
| David Pajcin | 12/3/2004 | Inside Wall Street | | Rich Suitors May Come Courting Curis |
| David Pajcin | 12/2/2004* | Sell | CRIS | *In after hours trading, a total of 12 sell transactions were placed to sell all 10,000 shares |

Exhibit B
Defendants' Trading in Connection With Non-Public Business Week Contents

| | | | | |
|---|---|---|---|---|
| Direktanlage Traders | 12/2/2004 | Buy | CRIS | 1 buy transactions were placed to purchase a total of 155,065 shares |
| | **12/3/2004** | **Inside Wall Street** | | **Rich Suitors May Come Courting Curis** |
| Direktanlage Traders | 12/3/04 - 12/6/04 | Sell | CRIS | 2 sell transactions were placed to sell all 155,065 shares |
| David Pajcin | 1/6/2005 | Buy | CRN | 12 buy transactions were placed to purchase a total of 8,300 shares |
| | **1/7/2005** | **Inside Wall Street** | | **Cornell may be Poised for a Breakout** |
| David Pajcin | 1/7/2005 | Sell | CRN | 5 sell transactions were placed to sell all 8,300 shares |
| Direktanlage Traders | 1/6/2005 | Buy | CRN | 30 buy transactions were placed to purchase a total of 26,900 shares |
| | **1/7/2005** | **Inside Wall Street** | | **Cornell may be Poised for a Breakout** |
| Direktanlage Traders | 1/7/05 - 1/10/05 | Sell | CRN | 24 sell transactions were placed to sell all 26,900 shares |
| Henry Siegel | 6/23/2005 | Buy | ENER | 10 buy transactions were placed to purchase a total of 9,000 shares |
| | **6/24/2005** | **Inside Wall Street** | | **Getting Juiced at Energy** |
| Henry Siegel | 6/24/2005 | Sell | ENER | 6 sell transactions were placed to sell all 9,000 shares |
| Elvis Santana | 6/23/2005 | Buy | ENER | 8 buy transactions were placed to purchase a total of 3,235 shares |
| | **6/24/2005** | **Inside Wall Street** | | **Getting Juiced at Energy** |
| Elvis Santana | 6/24/2005 | Sell | ENER | 8 sell transactions were placed to sell all 3,235 shares |
| Direktanlage Traders | 6/23/2005 | Buy | ENER | 1 buy transaction was placed to purchase a total of 22,053 shares |
| | **6/24/2005** | **Inside Wall Street** | | **Getting Juiced at Energy** |
| Direktanlage Traders | 6/24/2005 | Sell | ENER | 1 sell transaction was placed to sell all 22,053 shares |
| Henry Siegel | 6/16/2005 | Buy To Open | FDXGQ | 2 buy transactions were placed to purchase a total of 130 call options |
| | **6/17/2005** | **Inside Wall Street** | | **FedEx: All Set for Takeoff** |
| Henry Siegel | 6/17/2005 | Sell To Close | FDXGQ | 5 sell transactions were placed to sell all 130 call options |
| Elvis Santana | 6/16/2005 | Buy To Open | FDXGQ | 4 buy transactions were placed to purchase a total of 50 call options |
| | **6/17/2005** | **Inside Wall Street** | | **FedEx: All Set for Takeoff** |
| Elvis Santana | 6/17/2005 | Sell To Close | FDXGQ | 8 sell transactions were placed to sell all 50 call options |
| Ilja Borac | 6/16/2005 | Buy | FDX | 2 buy transactions were placed to purchase a total of 2,200 shares |
| | **6/17/2005** | **Inside Wall Street** | | **FedEx: All Set for Takeoff** |
| Ilja Borac | 6/17/2005 | Sell | FDX | 2 sell transactions were placed to sell all 2,200 shares |

Exhibit B
Defendants' Trading in Connection With Non-Public Business Week Contents

| Name | Date | Buy/Sell | Ticker | Details |
|---|---|---|---|---|
| Sonja Anticevic | 6/16/2005 | Buy — Inside Wall Street — FedEx: All Set for Takeoff | FDX | 12 buy transactions were placed to purchase a total of 8,000 shares |
| Sonja Anticevic | 6/17/2005 | Sell | FDX | 12 sell transactions were placed to sell all 8,000 shares |
| David Pajcin | 2/3/2005 | Buy — Inside Wall Street — Breathtaking at Imax | IMAX | 63 buy transactions were placed to purchase a total of 21,000 shares |
| David Pajcin | 2/3/2005* | Sell | IMAX | *In after hours trading, a total of 21 sell transactions were placed to sell all 21,000 shares |
| David Pajcin | 3/3/2005 | Buy — Inside Wall Street — The Allure of Impax | IPXL | 69 buy transactions were placed to purchase a total of 11,500 shares |
| David Pajcin | 3/3/05 - 3/4/05 | Sell | IPXL | *In after hours trading on 3/3/05 and during normal trading hours on 3/4/05, a total of 35 sell transactions were placed to sell all 11,500 shares |
| Direktanlage Traders | 3/3/2005 | Buy — Inside Wall Street — The Allure of Impax | IPXL | 1 buy transaction was placed to purchase a total of 24,000 shares |
| Direktanlage Traders | 3/4/2005 | Sell | IPXL | 1 sell transaction was placed to sell all 24,000 shares |
| Henry Siegel | 6/30/2005 | Buy — Inside Wall Street — Two Slot-Machine Giants: A "Prelude to a Kiss?" | PGIC | 12 buy transactions were placed to purchase a total of 24,000 shares |
| Henry Siegel | 7/1/05 - 7/8/05 | Sell | PGIC | 17 sell transactions were placed to sell all 24,000 shares |
| Sonja Anticevic | 6/30/2005 | Buy — Inside Wall Street — Two Slot-Machine Giants: A "Prelude to a Kiss?" | PGIC | 7 buy transactions were placed to purchase a total of 5,336 shares |
| Sonja Anticevic | 6/30/2005* | Sell | PGIC | *In after hours trading, a total of 8 sell transactions were placed to sell all 5,336 shares |
| Elvis Santana | 6/30/2005 | Buy — Inside Wall Street — Two Slot-Machine Giants: A "Prelude to a Kiss?" | PGIC | 3 buy transactions were placed to purchase a total of 5,300 shares |
| Elvis Santana | 7/1/2005 | Sell | PGIC | 14 sell transactions were placed to sell all 5,300 shares |
| Ilja Borac | 6/30/2005 | Buy — Inside Wall Street — Two Slot-Machine Giants: A "Prelude to a Kiss?" | PGIC | 12 buy transactions were placed to purchase a total of 8,900 shares |
| Ilja Borac | 7/1/2005 | Sell | PGIC | 12 sell transactions were placed to sell all 8,900 shares |
| Direktanlage Traders | 6/30/2005 | Buy | PGIC | 1 buy transaction was placed to purchase a total of 7,000 shares |

Exhibit B
Defendants' Trading in Connection With Non-Public Business Week Contents

| Name | Date | Inside Wall Street | Symbol | Two Slot-Machine Giants: A "Prelude to a Kiss?" |
|---|---|---|---|---|
| Direktanlage Traders | 7/1/2005 | Sell | PGIC | 1 sell transaction is placed to sell all 7,000 shares |
| Henry Siegel | 7/7/2005 | Buy | PLCM | **Polycom's Video Conference Picture is Improving**<br>4 buy transactions were placed to purchase a total of 10,000 shares |
| Henry Siegel | 7/8/2005 | Sell | PLCM | **Polycom's Video Conference Picture is Improving**<br>7 sell transactions were placed to sell all 10,000 shares |
| Sonja Anticevic | 7/7/2005 | Buy | PLCM | **Polycom's Video Conference Picture is Improving**<br>19 buy transactions were placed to purchase a total of 16,091 shares |
| Sonja Anticevic | 7/7/05* - 7/8/05 | Sell | PLCM | *In after hours trading on 7/7/05 and during normal trading hours on 7/8/05, a total of 11 sell transactions were placed to sell all 16,091 shares |
| Elvis Santana | 7/7/2005 | Buy | PLCM | **Polycom's Video Conference Picture is Improving**<br>1 buy transaction was placed to purchase a total of 5,500 shares |
| Elvis Santana | 7/8/2005 | Sell | PLCM | 23 sell transactions were placed to sell all 5,500 shares |
| Sonja Anticevic | 7/28/2005 | Buy | SBL | **Symbol Looks Vulnerable**<br>27 buy transactions were placed to purchase a total of 36,500 shares |
| Sonja Anticevic | 7/29/2005 | Sell | SBL | 14 sell transactions were placed to sell all 36,500 shares |
| Monika Vujovic | 7/28/2005 | Buy | SBL | **Symbol Looks Vulnerable**<br>2 buy transactions were placed to purchase a total of 45 call options |
| Monika Vujovic | 7/29/2005 | Sell | SBL | 2 sell transactions were placed to sell all 45 call options |
| Elvis Santana | 7/28/2005 | Buy | SBL | **Symbol Looks Vulnerable**<br>10 buy transactions were placed to purchase a total of 7,450 shares |
| Elvis Santana | 7/29/2005 | Sell | SBL | 1 sell transaction was placed to sell all 7,450 shares |
| David Pajcin | 12/9/2004 | Buy | SIPXE | **Suddenly, Sipex Looks Ripe for Buyout**<br>23 buy transactions were placed to purchase a total of 8,500 shares |
| David Pajcin | 12/9/2004* | Sell | SIPXE | *In after hours trading, a total of 11 sell transactions were placed to sell all 8,500 shares |
| Direktanlage Traders | 12/9/2004 | Buy | SIPX | **Suddenly, Sipex Looks Ripe for Buyout**<br>1 transaction was placed to purchase a total of 80,000 shares |

Exhibit B
Defendants' Trading in Connection With Non-Public Business Week Contents

| | Date | Buy/Sell | Ticker | Note |
|---|---|---|---|---|
| Direktanlage Traders | 12/9/04* - 12/13/04 | Sell | SIPX | *In after hours trading on 12/9/04 and during normal trading hours thereafter, a total of 3 sell transactions were placed to sell all 80,000 shares |
| David Pajcin | 1/13/2005 | Buy | SPPI | 23 buy transactions were placed to purchase a total of 17,000 shares |
| | 1/14/2005 | Inside Wall Street | | Curing Spectrum's Headaches |
| David Pajcin | 1/13/05* - 1/14/05 | Sell | SPPI | *In after hours trading on 1/13/05 and during normal trading hours on 1/14/05, a total of 33 sell transactions were placed to sell all 17,000 shares |
| Direktanlage Traders | 1/13/2005 | Buy | SPPI | 37 buy transactions were placed to purchase a total of 78,000 shares |
| | 1/14/2005 | Inside Wall Street | | Curing Spectrum's Headaches |
| Direktanlage Traders | 1/14/05 - 1/25/05 | Sell | SPPI | 79 sell transactions were placed to sell all 78,000 shares |
| Henry Siegel | 7/14/2005 | Buy | SPPI | 13 buy transactions were placed to purchase a total of 67,500 shares |
| | 7/15/2005 | Inside Wall Street | | Spectrum's Cancer Drugs Could Be Winners |
| Henry Siegel | 7/14/2005* - 7/19/05 | Sell | SPPI | *In after hours trading on 7/14/05 and thereafter, a total of 27 sell transactions were placed to sell all 67,500 shares |
| Sonja Anticevic | 7/14/2005 | Buy | SPPI | 13 buy transactions were placed to purchase a total of 16,400 shares |
| | 7/15/2005 | Inside Wall Street | | Spectrum's Cancer Drugs Could Be Winners |
| Sonja Anticevic | 7/14/05* - 7/15/05 | Sell | SPPI | *In after hours trading on 7/14/05 and thereafter, a total of 8 sell transactions were placed to sell all 16,400 shares |
| Elvis Santana | 7/14/2005 | Buy | SPPI | 3 buy transactions were placed to purchase a total of 9,200 shares |
| | 7/15/2005 | Inside Wall Street | | Spectrum's Cancer Drugs Could Be Winners |
| Elvis Santana | 7/14/2005* | Sell | SPPI | *In after hours trading, a total of 15 sell transactions were placed to sell all 9,200 shares |
| Direktanlage Traders | 7/14/05 - 7/15/05* | Buy | SPPI | *During normal trading hours on 7/14/05 and in early trading hours on 7/15/05, 2 buy transactions were placed to purchase a total of 13,700 shares |
| | 7/15/2005 | Inside Wall Street | | Spectrum's Cancer Drugs Could Be Winners |
| Direktanlage Traders | 7/15/2005 | Sell | SPPI | 1 buy transaction was placed to sell all 13,700 shares |
| David Pajcin | 11/18/2004 | Buy | TSCM | 6 buy transactions were place to purchase a total of 6,000 shares |
| | 11/19/2004 | Inside Wall Street | | Why a Suitor May Click on TheStreet.com |

Exhibit B
Defendants' Trading in Connection With Non-Public Business Week Contents

| | | | | |
|---|---|---|---|---|
| David Pajcin | 11/19/2004 | Sell | TSCM | 10 sell transactions were placed to sell all 6,000 shares |
| Direktanlage Traders | 11/18/2004 | Buy | TSCM | 1 buy transaction was placed to purchase a total of 500 shares |
| | 11/19/2004 | Inside Wall Street | | Why a Suitor May Click on TheStreet.com |
| Direktanlage Traders | 11/19/2004 | Sell | TSCM | 1 sell transaction was placed to sell all 500 shares |
| Henry Siegel | 6/9/2005 | Buy | PRFT | 4 buy transactions were placed to purchase a total of 10,000 shares |
| | 6/10/2005 | Inside Wall Street | | Happy Surprises at Perficient |
| Henry Siegel | 6/10/2005 | Sell | PRFT | 2 sell transactions were placed to sell all 10,000 shares |
| Mikhail Plotkin | 6/9/2005 | Buy | PRFT | 4 buy transactions were placed to purchase a total of 4,500 shares |
| | 6/10/2005 | Inside Wall Street | | Happy Surprises at Perficient |
| Mikhail Plotkin | 6/10/2005 | Sell | PRFT | 16 sell transactions were placed to sell all 4,500 shares |
| Ilja Borac | 6/9/2005 | Buy | PRFT | 2 buy transactions were placed to purchase a total of 2,345 shares |
| | 6/10/2005 | Inside Wall Street | | Happy Surprises at Perficient |
| Ilja Borac | 6/10/2005 | Sell | PRFT | 2 sell transactions were placed to sell all 2,345 shares |
| Henry Siegel | 6/16/2005 | Buy | ALSK | 3 buy transactions were placed to purchase a total of 10,000 shares |
| | 6/17/2005 | Inside Wall Street | | Heading North to Alaska Communications |
| Henry Siegel | 6/17/2005 | Sell | ALSK | 2 sell transactions were placed to sell all 10,000 shares |
| Mikhail Plotkin | 6/16/2005 | Buy | ALSK | 7 buy transactions were placed to purchase a total of 4,000 shares |
| | 6/17/2005 | Inside Wall Street | | Heading North to Alaska Communications |
| Mikhail Plotkin | 6/17/2005 | Sell | ALSK | 11 sell transactions were placed to sell all 4,000 shares |
| Mikhail Plotkin | 9/29/2005 | Buy | CHKP | 1 buy transaction was placed to purchase a total of 215 shares |
| | 9/30/2005 | Inside Wall Street | | Check Out Check Point |
| Mikhail Plotkin | 9/30/2005 | Sell | CHKP | 1 sell transaction was placed to sell all 215 shares |
| Ilja Borac | 6/9/2005 | Buy | PSMT | 1 buy transaction was placed to purchase a total of 5,000 shares |
| | 6/10/2005 | Inside Wall Street | | PriceSmart May Be For Sale. Will Wal-Mart Go Shopping? |
| Ilja Borac | 6/10/2005 | Sell | PSMT | 1 sell transaction was placed to sell all 5,000 shares |

Exhibit C

Defendants' Trading in Connection With Bristol Myers Squibb Grand Jury Proceedings

| Name | Date | Action | Symbol | Description |
|---|---|---|---|---|
| David Pajcin | 3/18/2005 | Sell Short | BMY | 9 short sell transactions were placed to sell all 8,800 shares |
| David Pajcin | 3/22/2005 | Buy To Cover | BMY | 9 buy transactions were placed to purchase a total of 8,800 shares |
| | | | | |
| Anticevic Foreign | 6/9/2005 | Sell Short | BMY | 6 short sell transactions were placed to sell all 10,500 shares |
| Anticevic Foreign | 6/14/2005 | Buy To Cover | BMY | 6 buy transactions were placed to purchase a total of 10,500 shares |
| | 6/15/2005 | Announcement | | **BMY Announces Agreement with U.S.** |
| | | | | |
| Mikhail Plotkin | 6/10/2005 | Buy To Open | .BMYUE | 2 buy transactions were placed to purchase a total of 50 put options |
| Mikhail Plotkin | 6/14/2005 | Sell To Close | .BMYUE | 3 sell transactions were placed to sell all 50 put options |
| | 6/15/2005 | Announcement | | **BMY Announces Agreement with U.S.** |
| | | | | |
| Henry Siegel | 6/10/2005 | Bought | .BMYUE | 4 buy transactions were placed to purchase a total of 200 put options |
| Henry Siegel | 6/14/2005 | Sold | .BMYUE | 1 sell transaction was placed to sell all 200 put options |
| | 6/15/2005 | Announcement | | **BMY Announces Agreement with U.S.** |