UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

)
)                    Civil Action No.
)                    07 Civ. 8538 (RWS)
**E*TRADE FINANCIAL CORP.** )
**SECURITIES LITIGATION** )        **CONSOLIDATED AMENDED CLASS**
)                    **ACTION COMPLAINT FOR**
)                    **VIOLATIONS OF THE FEDERAL**
)                    **SECURITIES LAWS**
)
)                    **JURY TRIAL DEMANDED**
)
)

_____

1.      Plaintiffs Kristen Management Limited, Straxton Properties, Inc., and Javed Fiyaz (sometimes referred to as the "Kristen-Straxton Group"), plaintiff Ira Newman and additional plaintiffs Peter Farah and Andrea Frascaroli (collectively "Plaintiffs") bring this Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") individually and on behalf of all other purchasers of the securities of E*TRADE Financial Corporation (together with its subsidiaries, "E*TRADE" or the "Company") between April 19, 2006 and November 9, 2007, inclusive (the "Class Period"). Such purchasers, along with Plaintiffs, are collectively referred to herein as the "Class." This Complaint is brought against E*TRADE and the Company's Chief Executive Officer ("CEO"), Mitchell H. Caplan ("Caplan"), Chief Financial Officer ("CFO") and Principal Accounting Officer, Robert J. Simmons ("Simmons"), and E*TRADE's Capital Markets Division President and the head of E*TRADE Global Asset Management, Inc. ("EGAM"), Dennis Webb ("Webb") (collectively the "Individual Defendants," and with the Company, "Defendants").

2.      This Complaint is alleged upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters, based upon Plaintiffs' counsel's

investigation, including review of E*TRADE's public filings with the United States Securities and Exchange Commission ("SEC"); wire and press releases published by and regarding E*TRADE; securities analysts' reports and advisories; information available in the media and on the Internet; and interviews of knowledgeable personas, including more than thirty former E*TRADE employees (generally the "Confidential Witnesses" or specifically "CW __"). The allegations of this Complaint include, *inter alia*, information from the following Confidential Witnesses, who held the positions listed below at E*TRADE, that provided them with personal access to the information which they reported:

| CW # | Position | Dates worked at E*TRADE | Source or type of information |
|------|----------|-------------------------|-------------------------------|
| CW1 | High level executive in Correspondent Lending, Wholesale Lending and Credit | Several years prior to the Class Period through approximately June 2006 | Witnessed purchase of highly risky loans, lax risk mitigation, lack of due diligence and risk management following 2004 downsizing. |
| CW2 | Senior executive in Retail Sales | February. 2006 through several months after the Class Period ended | Hired in February 2006 to fix lending losses by increasing organic loans to balance risk Webb was taking on, but saw that such increases could not make a dent in losses. CW2 told defendant Caplan market was turning down when CW2 was hired. Witnessed little or no due diligence on purchased loans, and purchase of very high risk loans (at least 50% risky subprime). Observed the understaffed overworked due diligence dept that only reviewed 1% of purchased loans. |
| CW3 | Mortgage Processing Division manager | October 2006 – February 2007 | Regularly saw constant overvalued properties and appraisals, costly loan closing problems. |
| CW4 | Acquisitions manager, loan audit manager and acting deal manager | Several years prior to the Class Period through mid-May 2007 | Witnessed operations and IT. Saw that only a small percentage of loans were checked in portfolios where all loans were risky; junk loans, data and reporting errors. Attended meetings with defendant Webb where CW4 |

| | | | was told to **not** review entire loan portfolios where the sample reviewed was highly risky. |
|---|---|---|---|
| CW5 | Senior executive in Mortgage Division Business Analysis; and then (after defendant Caplan dissolved the Business Analysis Group in late spring or summer 2006 in Mortgage Finance | March 2006 through a few months after the Class Period ended | Hired in March 2006 to review and restore financial losses incurred in E*TRADE's mortgage division; Witnessed money-losing Total Value Pricing program, non-competitive rates and business losses, losses of value in EGAM's loans, loan application database delays from new system, defendant Caplan's involvement, Webb's purchase of extremely risky products, loans returned to E*TRADE, incorrect booking and placement of $3 billion of purchased loans in wrong portfolio, which defendant Simmons was advised of. |
| CW6 | Due diligence analyst and senior underwriter | January 2005 – July 2006 | Witnessed E*TRADE keep most loans which due diligence identified as bad, Alt-A loans which were highly risky and in reality were sub-prime. 40-50% of loans were bad, with discrepancies from the loan documentation. E*TRADE tried to sell bad loans to Bear Stearns & other sub-prime investors but was unable to sell them. |
| CW7 | High-level executive of E*Trade Capital Markets, reporting to defendant Webb | Many years prior to the Class Period through early 2008 | Occasionally spoke with defendant Caplan, who spoke about money to be made from EGAM. Defendant Caplan worked directly with EGAM & was taking surprising risks in 2005-2006. |
| CW8 | Whole loan trader at EGAM (purchased loan pools from banks and loan companies) | Mid-2003 through December 2005 (shortly before Class Period began) | Purchased Alt-A repackaged loans from banks. Witnessed deterioration in quality of Alt-A loans to "pretty risky." Managed $8 billion portfolio of risky Alt-A loans. Witnessed E*TRADE policy to hold and continue to buy risky loans. |
| CW9 | Wealth Management Advisor | Several years prior to the Class Period through January 2008 | Spoke occasionally with defendant Caplan and attended internal senior management E*TRADE meetings where defendant Caplan spoke. |

| | | | |
|---|---|---|---|
| | | | Advised by executives to push mortgages in 2006 to compensate for losses.  It was common knowledge internally that EGAM was buying "liar loans" and shaky HELOCs (home equity lines of credit). |
| CW10 | High-level compliance executive | Several years prior to the Class Period to 2008 | Confirmed defendant Caplan's involvement with Capital Markets division, from which a "downward spiral" emanated, from 2006 onwards. |
| CW11 | Senior software manager | May 2007 through shortly after the Class Period ended | Attended August 2007 "town hall" internal meeting where defendant Caplan admitted Company was overexposed to subprime and waiting for a "white knight" to rescue them. |
| CW12 | Mortgage product manager | January 2007 – September 2007 | Witnessed inexperienced management, mistakes, months of severe problems, and shut-down of most loan processing due to disastrous attempt to implement change in loan information computer system. |
| CW13 | Operations analyst | February 2006 – mid-2008 | Witnessed August 2007 "town hall" internal meeting, where defendant Caplan acknowledged that E*TRADE took on and wrote some bad mortgages, but was hopeful an outside investment group would provide funds to make things better. Saw defendant Caplan work closely with EGAM. |
| CW14 | Mortgage loan specialist | August 2005 – September 2007 | Attended early December 2006 Arlington, Va. meeting where defendant Caplan told employees that he expected profits to be down and to continue to go down for the next year. |
| CW15 | Director of Whole loan Financing | August 2006 – November 2007 | Witnessed problems with data and delinquency monitoring, overworked staff. |
| CW16 | Loan servicing and operations executive | 2003 – mid-2008 | Witnessed lack of financial controls with mismatched loan data in disarray; systems problems; understaffing impeding ability to sell |

|  |  |  | and review loans; inability to meet information requirements to sell loan portfolio investment to Bank of America; management awareness of risks and lower income. |
|---|---|---|---|

3.      The "source or type of information" set forth in the above chart is not exhaustive but illustative. Further information from Confidential Witnesses is set forth throughout this Complaint, and annotated by source.  The Confidential Witnesses' information corroborates each others' accounts and corroborates information from other sources  received and/or reviewed by Plaintiffs' counsel.

4.      Additional facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth in this Complaint that will be revealed after a reasonable opportunity for discovery.

## INTRODUCTION

5.      E*TRADE offers financial services to retail and institutional customers worldwide, including retail investments and trading, checking, money market and savings accounts, as well as mortgage and home equity loans and consumer loans.

6.      During the Class Period, Defendants portrayed E*TRADE as a successful company stemming from its "laser like" focus on providing Internet-based trading functions and "traditional banking" services to the "mass affluent," certain of E*TRADE's customers with investable assets of $50,000 to $500,000.   However, as a *Wall Street Journal* article reported on August 11, 2007 (late in the Class Period), E*TRADE used its  "massive growth in cash" from its affluent customers to increase the Company's real-estate (mortgage assets) portfolio, such that one might think that the Company was "a mortgage REIT disguised as an online broker."

7.      Throughout the Class Period, Defendants described E*TRADE's mortgage assets as having high credit quality, and being consistently monitored in a disciplined, focused fashion. For instance, during the Company's January 18, 2007 conference call attended by all the Individual Defendants, defendant Caplan stated: "Through focus and discipline, we are building a franchise that can continue to deliver significant organic growth year after year."  During the same call, another Company officer stated "we continued to add high-quality margin and mortgage assets to our portfolio. . . ."  During the same call, defendant Simmons emphasized that "[e]mbedded within our top-line growth was a further improvement in the quality of revenue" and that E*TRADE "grew the balance sheet while adhering to [its] strict discipline with respect to credit quality."  Defendant Simmons also bragged that "average FICO scores, loan to value ratios and debt-to-income ratios either remain constant or improved.  As of December 31st, [2006,] our average FICO score across the portfolio is 737, average loan to values on mortgages 73%, and debt to income averages 30%."

8.      The FICO score is the most widely used credit rating – a number which summarizes a loan applicant's credit risk (that is, the likelihood that the borrower will default). Most lenders use FICO scores to determine whether to approve loans and the interest rate to charge.  The FICO score was created by Fair Isaac Corporation, and is based on reports from credit rating agencies (Experian, Equifax or TransUnion) of a borrower's payment history, amounts owed, credit history length, new credit, and types of credit used.  The highest (and best) possible score is 850, and the lowest is 300.  According to Fair Isaac, the median FICO score in the U.S. is 723, while the average score calculated by Experian (using the Fair Isaac model) is 678.

9.      Later, during the same call, when defendant Caplan referred an analyst's question

6

to defendant Webb, defendant Webb also reiterated "the high FICO scores and low LTVs [loan-to-value ratios] that Rob [Simmons] spoke about earlier." Defendants also attributed the modest increases in loan allowances to greater loan volume, and denied that increased allowances indicated a decrease in credit quality. Moreover, E*TRADE's decreases in loan allowances during portions of the Class Period belied the lack of credit quality of E*TRADE's loan portfolio, and, thus, misled the investing public about the quality of E*TRADE's assets.

10.     In addition to originating loans by lending to its own customers, who were presumably part of E*TRADE's "mass affluent" client group, E*TRADE purchased the overwhelming of its loans from other lenders. In an April 18, 2007 conference call, defendant Caplan stated that FICO scores, LTVs and DTIs (debt-to-income ratios), were "all extremely conservative" and so "whether purchased or originated," shareholders were "protected across the board with respect to underlying credit based on FICO and LTVs and DTIs." Defendant Caplan also asserted that there was "no meaningful difference" between E*TRADE's originated and purchased mortgages.

11.     During the April 18, 2007 conference call, defendant Caplan also boasted: "we have stayed completely disciplined about focusing on what we call prime and really super-prime borrowers."

12.     However, as over a dozen Confidential Witnesses reported, E*TRADE's purchased mortgages were extremely risky, were known to E*TRADE's management at the time they were acquired to be extremely high risk and low quality, and such risky mortgages, which E*TRADE was unable to sell off, comprised the bulk of the Company's loan portfolio. Internally, the Individual Defendants often spoke of the money they expected to make from purchasing, repackaging and selling off these high risk mortgages, exactly the opposite of what

7

Defendants told the investing public E*TRADE was doing during the Class Period.

13. E*TRADE purchased these risky mortgages with such minimal due diligence that it amounted to virtually no due diligence at all, contrary to the monitoring, discipline and conservatism which Defendants publicly boasted about. Confidential Witnesses reported that much of the credit staff charged with performing due diligence on mortgages was terminated well prior to the Class Period, and the few remaining staff members were too overworked and insufficiently experienced to perform the necessary examinations. A Confidential Witness who was a high level executive at E*TRADE reported that only *one percent* of the purchased mortgages were reviewed. The due diligence and monitoring that was performed was so negligible – and/or produced such adverse results – that there was no reasonable basis for Defendants to state that the Company's loan portfolios had high FICO scores and LTVs which protected E*TRADE's investors "across the board." Moreover, even those mortgages acquired by E*TRADE that were reviewed were determined by E*TRADE's reviewers to be extremely high risk. These loans were not only all subprime in nature (thus inherently risky), but the loan files for these mortgages were incomplete, which increased their risk exponentially.

14. Defendants were well aware of the problems and losses E*TRADE's mortgage portfolio was experiencing even before the outset of the Class Period. At least as early as February and March 2006 (just prior to the beginning of the Class Period), Defendants recognized internally that E*TRADE's mortgage business was deteriorating, and scrambled to hire executives to try to review and restore E*TRADE's mortgage losses, and to originate safer mortgages to balance the losses E*TRADE was suffering on the extremely high risk loans it had purchased. In February 2006, Defendants hired a senior executive (CW2) to attempt to "balance the risk" which E*TRADE had assumed with its purchased mortgages. Another executive

(CW5) was hired in March 2006 for similar reasons.  At the time of his hiring in February 2006, CW2 told defendant Caplan that the mortgage market was turning down.  This was not disclosed to E*TRADE shareholders.

15.     Defendants Webb and Caplan directed the purchase of the high risk loans held by E*TRADE.   Defendant Webb was the head of EGAM (*i.e.*, E*TRADE Global Asset Management) – the division that purchased the loans, and defendant Caplan also worked closely with EGAM on loan purchases.  Defendants Caplan and Webb's offices were in close proximity, and they spoke often.  Defendant Caplan and Webb frequently spoke internally of the profits to be made from EGAM's purchase of these extremely high risk loans.  However, to the investing public, defendant Caplan reiterated E*TRADE's conservative approach, involving strict discipline with respect to the credit quality of E*TRADE's loan purchases.

16.     Defendants' knowledge of the poor and further deteriorating quality of E*TRADE's assets, and consequently, its performance and prospects, continued throughout the Class Period.  Approximately midway through the Class Period, in December of 2006, defendant Caplan admitted to E*TRADE employees "confidentially" at a quarterly internal meeting that the Company was experiencing losses and expected more losses in 2007.  Yet, Defendants then went on to make contrary, false, and baseless positive statements to the investing public about E*TRADE's financial condition, its operations, and the quality of its assets.

17.     Problems with the loans E*TRADE had purchased were obvious internally at E*TRADE throughout the Class Period, but not publicly disclosed.  High level Confidential Witnesses reported that E*TRADE's purchased loans were "very high risk."  First, all of the loans E*TRADE purchased were "subprime."  This, however, was only the starting point of the problems with these mortgages.  Knowledgeable Confidential Witnesses indicated that 40% to

50% of these loans had negative discrepancies from the loan documentation and that collateral appraisals were substantially overstated.  These discrepancies rendered these already subprime loans exponentially more highly risky.  Moreover, E*TRADE's attempts to resell purchased loan pools were rejected by hoped-for buyers (such as Bank of America Corporation ("BoA") and Bear Stearns & Co., Inc. ("Bear Stearns")) due to the poor quality of the loans and loan documentation.  Thus, Defendants knew that the quality of these purchased loans was so bad that E*TRADE would be unable to off-load them or earn profit from their purchases.

18.     Moreover, mortgage originators from whom E*TRADE had purchased and was continuing to purchase mortgages during the Class Period were experiencing problems with the quality of their loans.  And yet, E*TRADE continued to tout the high quality of its purchased loan portfolio.  Close to half of E*TRADE's loan pools were purchased from troubled lender National City Corporation ("National City"), although during the Class Period, National City was repeatedly accused of falsifying loan documents by the government and had to take significant write-downs on its loans.  Troubled lenders Countrywide Financial Corporation ("Countrywide"), Opteum, Inc. ("Opteum"), and Fremont General Corporation ("Fremont") also sold significant amounts of loan pools to E*TRADE.  However, Defendants continued to portray E*TRADE as conservative and different from the lenders who were experiencing problems, and Defendants concealed from the investing public the identity of E*TRADE's mortgage originators (which included among them the worst subprime mortgage originators in the United States) until almost the end of the Class Period.  Even then, E*TRADE did not disclose the amount of loan pools E*TRADE had purchased from these problem-ridden originators.

19.     Defendants likewise concealed problems with and the riskiness of the asset-backed securities ("ABS") and collateralized debt obligations ("CDOs") which the Company

held.   SEC Regulation AB defines "asset-backed security" as "a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to the security holders."   Collateralized debt obligations are a type of ABS and structured credit product, constructed from a portfolio of fixed-income assets. CDOs are divided by the issuer into different tranches, with losses applied in reverse order of seniority, so that junior tranches offer higher coupons (interest rates) to compensate for their added default risk.   Second lien securities are securities that are subordinate to and second in ranking behind a senior lien security.

20.   For instance, during the April 18, 2007 call, when asked whether E*TRADE had much in the line of credit exposure on its mortgage-backed securities, defendant Caplan responded, "No.  I think that we're AAA."   However, on September 17, 2007, E*TRADE made a partial disclosure of an impairment on those assets of $100 million to be taken in the final two quarters of fiscal year 2007.  In a second partial disclosure on October 17, 2007, that number was almost doubled to $197 million, to be taken in the third quarter of 2007.  On November 9, 2007, the last day of the Class Period, E*TRADE revealed that its exposure to ABS, CDO and second-lien securities on September 30, 2007 was, in fact, approximately $450 million.

21.   Defendants also participated in material accounting irregularities during the Class Period.  E*TRADE failed to adequately reserve for loan losses, which ultimately forced the Company to take huge charges and increases in loan loss provisions.  The Company also failed to timely record impairments on certain securities, including its mortgage and home equity portfolios, and materially overvalued E*TRADE's securities portfolio, including assets backed by mortgages.   These accounting irregularities resulted in each of E*TRADE's financial

statements issued during the Class Period being materially inaccurate, its reported net income and earnings being materially overstated and its reserves for losses being materially understated.

22.     On November 9, 2007 (the last day of the Class Period), the Company disclosed enormous declines in the value of its problem-ridden, overvalued purchased mortgage portfolio:

> [The Company] has observed continued declines in the fair value of its $3.0 billion asset-backed securities portfolio, predominantly within ABS CDO and second-lien securities.  The total exposure to ABS CDO and second-lien securities at September 30, 2007 was approximately $450 million in amortized cost, including approximately $50 million of "AAA" rated asset-backed CDOs that were downgraded to below investment grade. The Company stated that it expected the declines in fair value to result in further securities write downs in the fourth quarter. . . .
>
> Management believes the additional deterioration observed since September 30 will likely result in write downs that exceed the previous expectations included in the Company's 2007 earnings outlook updated on October 17, and investors should no longer expect these earnings levels to be achieved.  Actual securities-related losses will depend on future market developments, including the potential for future downgrades by rating agencies, which are extremely difficult to predict in this environment. Accordingly, management believes it is no longer beneficial to provide earnings expectations for the remainder of the year.

23.     On November 9, 2007, Defendants also disclosed that on October 17, 2007, the SEC had initiated an informal inquiry into matters related to the Company's loan and securities portfolios.

24.     At the end of the Class Period, when the massive overvaluation of E*TRADE's mortgage loans and asset-backed securities portfolios (and consequently the resulting losses) became public knowledge, E*TRADE experienced an enormous multi-billion dollar "run on the bank" which substantially reduced its customer accounts and cash assets.  The Company also faced investigations, four derivative lawsuits, and concerns about the Company's continued viability.  E*TRADE's post-Class Period 2007 Form 10-K, filed February 28, 2008 admitted that:

> We have incurred significant losses and cannot assure that we will be profitable. We incurred a net loss of $1.4 billion, or $3.40 per share, for the year ended December 31, 2007, due primarily to losses in our home equity loan and asset-backed securities portfolios. We also experienced a substantial diminution of customer assets and accounts as a result of the losses experienced in our institutional business segment. It may require a substantial period of time to restore asset quality at the Bank, rebuild our retail franchise and return to profitability.

*   *   *

> Losses of customers and assets will result in lower revenues in future periods. During November 2007, well-publicized concerns about the Bank's holdings of asset-backed securities led to widespread concerns about our continued viability. From the beginning of this crisis through December 31, 2007 when the situation had stabilized, customers withdrew approximately $5.6 billion of net cash and approximately $12.2 billion of net assets from our bank and brokerage businesses. Many of the accounts that were closed belonged to sophisticated and active customers with large cash and securities balances.

25.     In addition, the Company increased its deliberately understated allowance for loan losses in its home equity portfolio from $31.7 million to $459.2 million.  The Company also had to recognize staggering asset losses and impairments of $2.45 billion.  Part of the impairment in the value of E*TRADE's assets was reflected by E*TRADE's sale of its ABS portfolio (which had a cost basis of $3 billion) to Citadel Investment Group ("Citadel") for the steeply discounted price of $800 million.

26.     As a result of the losses incurred on its risky investments, E*TRADE was also compelled to shore up its capital and customer base by entering into the Citadel transaction (on November 29, 2007).   The Citadel transaction wiped out almost five years of E*TRADE's profits.

27.     Its mortgage-market losses made E*TRADE the S&P 500 index's worst performer in 2007.

28.     During the Class Period, as a result of the material overstatement of E*TRADE's

13

assets, net income and profits, and understatement of its loss reserves, the Individual Defendants reaped millions of dollars in performance based compensation.  The Individual Defendants also sold massive amounts of E*TRADE stock during the Class Period, totaling over $13 million – further evidencing Defendants' *scienter*.   Defendant Caplan's Class Period stock sale proceeds were over $1.7 million, defendant Simmons' were over $5.8 million, and defendant Webb's were over $5.7 million.  In addition, Defendants received huge amounts of incentive compensation, which was based on performance goals which the Company itself described as "aggressive" and "very ambitious."

29.     Many of E*TRADE's top executives (including all the Individual Defendants) were forced to resign at the end of the Class Period in the wake of these revelations.  Defendant Webb departed on November 9, 2007; defendant Caplan was forced to resign as CEO on November 29, 2007 and from E*TRADE's board of directors on December 31, 2007; and defendant Simmons resigned as CFO effective on or before May 9, 2008.  E*TRADE President and Chief Operating Officer ("COO"), R. Jarrett Lilien, and General Counsel and E*TRADE's Corporate Secretary, Arlen Gelbard, were both terminated on April 22, 2008.

30.     After the Class Period, in a February 8, 2008 response to an SEC inquiry, the Company admitted that it reviewed only a "sample" of purchased loans to ensure compliance with the ***originator's*** guidelines and "minimum" credit criteria – consisting of LTV values and FICO scores which were well below those which the Company publicly touted during the Class Period.  This was directly contrary to Defendants' Class Period representations regarding the quality of E*TRADE's loan portfolios and Defendants' conservative approach to acquiring those assets.

31.     The Company also belatedly admitted in February 2008 that it merely

"attempted" to exclude loans with FICO scores under 640, combined loan to value ratios ("CLTVs") above 100% and DTIs above 50%, and acknowledged that some originators required E*TRADE to purchase entire pools without exclusions.  The Company further admitted in this SEC response that its purported loan to value ratios were based on supposed LTVs at the time of origination, not current LTVs, despite declining home prices which would unfavorably impact LTVs, stating: "We do not track *current* LTV/CLTV ratios for the entire loan portfolio."

32.     As a result of Defendants' false and misleading statements and omissions which artificially inflated the price of E*TRADE's securities during the Class Period, Plaintiffs and members of the Class suffered enormous economic losses when partial curative disclosures caused declines in the price of their E*TRADE securities during and at the end of the Class Period.

## JURISDICTION AND VENUE

33.     Jurisdiction is conferred on this Court by Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

34.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, the Company's principal executive offices are located in this District.

35.     In connection with the acts, conduct and other wrongs alleged in this Complaint,

Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, the Internet and the facilities of national securities exchanges.

**PARTIES**

36.     Plaintiff Kristen Management Limited ("KML") purchased E*TRADE Contracts for Difference ("CFDs") securities in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for E*TRADE securities at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about E*TRADE that was misrepresented and omitted during the Class Period was partially and/or fully revealed.  The certification for KML with a detailed listing of transactions is attached hereto as Exhibit A.

37.     Plaintiff Straxton Properties, Inc. ("Straxton") purchased E*Trade CFDs and call options on the Chicago Board of Options in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for E*TRADE securities at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about E*TRADE that was misrepresented and omitted during the Class Period was partially and/or fully revealed.  The certification for Straxton with a detailed listing of transactions is attached hereto as Exhibit B.

38.     Plaintiff Javed Fiyaz ("Fiyaz") purchased E*TRADE CFDs in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for E*TRADE securities at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about E*TRADE that was misrepresented and omitted during the Class Period was partially and/or fully revealed.  The certification with a

detailed listing of transactions for Plaintiff Fiyaz is attached hereto as Exhibit C.

39.    Plaintiff Ira Newman ("Newman") purchased E*TRADE common stock and options in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for E*TRADE securities at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about E*TRADE that was misrepresented and omitted during the Class Period was partially and/or fully revealed.  The certification with a detailed listing of transactions for Plaintiff Newman was submitted in connection with Plaintiff Newman's motion for appointment as Lead Plaintiff. Plaintiffs KML, Straxton and Fiyaz (as the "Kristen-Straxton Group") were designated to serve as Lead Plaintiff, and Plaintiff Newman was designated to serve as Co-Lead Plaintiff by this Court's Order dated July 16, 2008.

40.    Plaintiff Andrea Frascaroli ("Frascaroli") purchased E*TRADE common stock at in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for E*TRADE securities at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about E*TRADE that was misrepresented and omitted during the Class Period was partially and/or fully revealed.  The certification for Plaintiff Frascaroli with a detailed listing of transactions is attached hereto as Exhibit D.

41.    Plaintiff Peter Farah ("Farah") purchased E*TRADE common stock in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for E*TRADE securities at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about E*TRADE that was misrepresented and omitted during the Class Period was partially and/or fully revealed.  The certification of

Plaintiff Farah with a detailed listing of transactions is attached hereto as Exhibit E.

42.     Defendant E*TRADE was originally incorporated in California in 1982, and reincorporated under the laws of the State of Delaware in July 1996.  E*TRADE's principal executive offices are located at 135 East 57th Street, New York, New York.  E*TRADE is a global financing services company offering a wide range of financial services to retail and institutional customers.  According to E*TRADE's 2006 Form 10-K, E*TRADE's retail services consist of investing and trading, banking and lending.  Institutional products include market making, execution services and direct market access.  E*TRADE has numerous subsidiaries, including:

- E*TRADE Bank, a Federally chartered savings bank that provides lending products to retail customers nationwide and deposit accounts insured by the FDIC;

- E*TRADE Capital Markets, LLC, a registered broker-dealer, specialist, market-making firm, which also acts as an agent for institutional customers  (E*Trade Global Asset Management, or "EGAM," was part of the Capital Markets division);

- E*TRADE Clearing, LLC, a clearing firm for E*TRADE's brokerage subsidiaries; and

- E*TRADE Securities, LLC, a registered broker-dealer and provider of brokerage services to both retail and institutional customers.

43.     E*TRADE common stock is currently listed and traded on the National Association of Securities Dealers Automated Quotation system ("NASDAQ") under the symbol "ETFC."  Prior to December 27, 2006, E*TRADE common stock was listed and actively traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."  Both the NYSE and the NASDQ are well-developed, efficient markets for securities

44.     Defendant Mitchell H. Caplan ("Caplan") served as the Company's CEO and as a director of the Company commencing in January 2003, and continuing throughout the Class Period.  He was forced to resign from his CEO position on or about November 29, 2007 (just

after the end of the Class Period), and to resign from the Company's board on December 31, 2008.  Defendant Caplan also was Chairman of the board of directors of ETB Holdings, Inc., the holding company for E*TRADE Bank, and Chairman of the board of directors of E*TRADE Bank.  Defendant Caplan previously served as Vice Chairman of the board of directors, President and CEO of Telebanc Financial Corporation, which was acquired in January of 2000 by E*TRADE.  In 2006, defendant Caplan received $750,000 in salary, $1,724,928 in stock awards, $2,612,943 in option awards, $4,700,000 in non-equity incentive plan compensation, $157,635 in other compensation, and total compensation of $9,945,506.  In 2007, defendant Caplan received $750,000 in salary, $97,061 in stock awards, $165,716 in option awards, $11,058,745 in other compensation, and total compensation of $11,877,400.    During the Class Period, defendant Caplan signed false and misleading SEC filings and knowingly issued numerous false or misleading statements about E*TRADE's financial condition and prospects.  Defendant Caplan sold 72,211 shares of E*TRADE common stock during the Class Period, for proceeds of $1,738,971.

45.    Defendant Robert J. Simmons ("Simmons") was, at all relevant times, the Company's CFO and Principal Accounting Officer.  Defendant Simmons became E*TRADE's CFO in January 2004, and held that position until he was forced to resign effective on or before May 9, 2008.  According to the Company's 2007 proxy statement, Simmons is "co-author of an article addressing financial disclosure issues titled, 'Killing Trickle-Down Investor Relations with Technology.'"  In 2006, defendant Simmons received $500,000 in salary, $374,143 in stock awards, $609,917 in option awards, $1,620,000 in non-equity incentive plan compensation, $53,545 in other compensation, and total compensation of $3,157,605.  In 2007, defendant Simmons received $500,000 in salary, $620,869 in stock awards, $748,839 in option awards,

$8,551 in other compensation, and total compensation of $1,878,259. During the Class Period, defendant Simmons signed false and misleading SEC filings and knowingly issued false or misleading statements about E*TRADE's financial health. Defendant Simmons adopted a plan to sell shares *during* the Class Period (on May 8, 2006) and sold 241,730 shares of E*TRADE common stock during the Class Period, for proceeds of $5,864,512.

46.     Defendant Dennis E. Webb was President of the Company's E*TRADE Capital Markets Division, from January 2005 until his departure on November 9, 2007 (the last day of the Class Period). According to the Company's proxy statements dated April 21, 2006 and April 23, 2007, in this role, defendant Webb oversaw all of the Company's capital markets (formerly referred to as institutional) lines of business, including both equity and fixed income capital markets. Defendant Webb was employed by E*TRADE since 2000. Defendant Webb's responsibilities at E*TRADE included Executive Vice President, Capital Markets – Banking; Asset Liability Manager; Head of Whole Loan Secondary Markets; and President of EGAM. In 2006, defendant Webb received $575,000 in salary, $404,466 in stock awards, $972,477 in option awards, $2,030,000 in non-equity incentive plan compensation, $11,158 in other compensation, and total compensation of $3,993,101. In 2007, defendant Webb received $519,711 in salary, $43,603 in stock awards, $95,902 in option awards, $2,615,135 in other compensation, and total compensation of $3,082,547. During the Class Period, defendant Webb knowingly issued false or misleading statements about E*TRADE's financial health. Defendant Webb sold 229,000 shares of E*TRADE common stock during the Class Period, for proceeds of $5,727,000.

47.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of E*TRADE, were privy to confidential and proprietary non-public information

concerning E*TRADE's operations, finances, financial condition, products, markets and present and future business prospects, via: their direct "hands on" involvement in E*TRADE's business (including EGAM); access to internal corporate documents, conversations and connections with other corporate officers and employees; attendance at frequent management and/or board of directors meetings and committees thereof; attendance at monthly "credit committee" meetings; frequent meetings between defendants Webb and Caplan, in defendant Caplan's office in Virginia; appearances at "town hall" employee meetings; and reports and other information provided to them.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein were misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

48.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of E*TRADE's business.

49.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of E*TRADE's reports, press releases and presentations to securities analysts and the investing public. The Individual Defendants were provided with copies of E*TRADE's misleading reports and press releases prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

50.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, governed by the federal securities laws and registered with the SEC pursuant to the Exchange Act, and was, during the Class period, traded on the NYSE and, after December 27, 2006, on the NASDAQ, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to E*TRADE's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of E*TRADE securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these obligations.

51.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of E*TRADE securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding E*TRADE's business, operations and management and the intrinsic value of E*TRADE securities; (ii) allowed the Individual Defendants to sell over 540,000 shares of their personally-held E*TRADE stock for millions of dollars of gross proceeds; (iii) allowed the Individual Defendants to obtain millions of dollars in performance based compensation based on inaccurate and overstated financial and operating results reported by E*TRADE; and (iv) caused Plaintiffs and other members of the Class to purchase E*TRADE securities (including common stock, CFDs and options) at artificially inflated prices, and to suffer significant economic losses when the truth was partially and fully revealed.

## CLASS ACTION ALLEGATIONS

52.     This action is brought by Plaintiffs as a class action pursuant to Rules 23(a) and

(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased E*TRADE

securities during the period of April 19, 2006 to November 9, 2007 (*i.e.*, the "Class Period") and

who suffered damages thereby (*i.e.,* the "Class").    Excluded from the Class are Defendants;

officers and directors of the Company and members of their immediate families, their legal

representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a

controlling interest.

53.     The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, E*TRADE common stock was actively traded on

the NYSE under the ticker symbol ET until listing was switched to NASDAQ on December 27,

2006 (at market open) to trade under the symbol ETFC.  As of November 5, 2007, there were

approximately 423,750,000 shares E*TRADE common stock outstanding.   While the exact

number of Class members is unknown to the Plaintiffs at this time and can only be ascertained

through appropriate discovery, they believe that there are hundreds or thousands of members in

the Class geographically dispersed throughout the United States and the world.  Record owners

and other members of the Class may be identified from records maintained by the Company or

its transfer agent and other Class members may be notified of the pendency of this action by

mail, and by using the forms and methods for providing notice similar to that customarily used in

securities class actions, including Internet and publication notice and notice to brokerage firms

who held securities and/or traded E*TRADE securities on behalf of their customers during the

Class Period.

54.     Plaintiffs' claims are typical of the claims of the members of the Class as the

claims of all members of the Class arise from, and were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that are complained of herein.

55.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are members of the Class and will rigorously represent the interests of Class members in the same manner as they will represent their own interests.  Plaintiffs know of no conflicts or antagonisms between their individual interests and those of other class members, and Plaintiffs have retained counsel competent and experienced in class and securities litigation.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to disclose material information that, under the circumstances, would render the statements made not false and misleading about the business, operations, and financial condition of the Company;

c.     whether Defendants acted knowingly or recklessly in making materially false and misleading statements or omitting to disclose material information that, under the circumstances, would render the statements made not false and misleading during the Class Period;

d.     whether Defendants engaged in schemes, artifices to defraud and/or manipulative conduct during the Class Period;

e.     whether the market prices of E*TRADE securities were artificially

inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

       f.     whether members of the Class have sustained damages and the proper measure of damages.

57.    Plaintiffs' intend to rely, in part, upon the presumptions of reliance created by the United States Supreme Court in connection with the reliance element of their claims and the claims of the other Class members under Sections 10(b) and 20(a) of the Exchange Act and, therefore, individual questions regarding reliance do not predominate.  In particular, with respect to Defendants' material omissions alleged herein, reliance by Plaintiffs and the other members of the Class is presumed.  With respect to Defendants' affirmative misrepresentations alleged herein, reliance by Plaintiffs and the other members of the Class is presumed under the fraud-on-the-market doctrine, because, at all relevant times, the market for E*TRADE securities was efficient for the following reasons, among others:

       a.    E*TRADE common stock met the requirements for listing, and was listed and actively traded on the NYSE and, after December 27, 2006, the NADAQ, which are both highly efficient markets for securities;

       b.    As a regulated issuer, E*TRADE filed periodic public reports with the SEC and E*TRADE was eligible to file S-3 registration statements;

       c.    E*TRADE regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        d.  E*TRADE was followed by numerous securities analysts and investment market professionals.

58.    As a result of the foregoing, the market for E*TRADE securities rapidly absorbed all publicly material information regarding E*TRADE and that information was reflected in the price of E*TRADE's securities.

59.    Plaintiffs and other members of the Class purchased E*TRADE securities between the time that Defendants made the material misrepresentations and omissions alleged herein and when the truth was finally and fully revealed to the public.

60.    Plaintiffs are thus entitled to a presumption that all purchasers of E*TRADE securities during the Class Period suffered similar injury because they paid inflated prices for their E*TRADE securities in reliance on Defendants' material misrepresentations and/or omissions and/or in reliance on the integrity of the prices for E*TRADE securities, and suffered economic losses when the truth was partially revealed on July 25, 2007, August 16, 2007, September 17, 2007 and November 9, 2007, and the price of E*TRADE common stock and other E*TRADE securities declined in value on those days in direct, proximate and consequential response to such partial corrective revelations.

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## **FACTUAL BACKGROUND**

62.     E*TRADE initially became known as a discount brokerage house which allowed customers to make securities trades electronically over the phone and through E*TRADE's website.  The Company expanded its publicized business identity to include the provision of a range of financial banking services to "value-driven" consumers.  For instance, just prior to the start of the Class Period, the "Business Overview" in E*TRADE's 2005 Form 10-K (filed March 3, 2006) described E*TRADE's business as follows:

> E*TRADE Financial Corporation is a global financial services company, offering a wide range of financial solutions to retail and institutional customers under the brand "E*TRADE FINANCIAL." We strive to create a differentiated franchise by leveraging technology to deliver a compelling combination of product, service and price to the value-driven consumer.

63.     During the Class Period, Defendants continued to foster the impression that E*TRADE's business was primarily generated from banking and trading services directly provided to E*TRADE's customers, and concealed undisclosed risks and the already adverse experience of E*TRADE's true business model, which was to use cash generated from E*TRADE's retail customers to invest in risky mortgage pools and ABS.

64.     Although E*TRADE's filings, such as its 2005 Form 10-K, p. 20, indicated that "while commissions are still reported as the lead category in our income statement because most of our customers begin their relationship with us through trading activity, net interest income has become our leading category of revenue, and we anticipate this trend will continue," investors were not informed from who such net interest income was generated and, therefore, were falsely led to believe it was from the Company's own customers and banking services.

65.     With respect to E*TRADE's mortgage portfolio, Defendants stressed the "conservatism" and diligence employed and referred to the Company's "products" and "organic"

growth (i.e., from E*TRADE-originated mortgages).

66.     However, commencing prior to the start of the Class Period, and continuing throughout the Class Period, the Company purchased bulk mortgages which were extremely risky, which E*TRADE subjected to little or no due diligence, and relied on these extremely high risk products for the Company's purported reported income and financial results.

**Defendants Cut Due Diligence Staff Prior To Class Period, While Increasing Purchases of Highly Risky Mortgages; Lax Due Diligence And Risky Purchases Continue Through the Class Period**

67.     E*TRADE's undisclosed problems with risky purchased mortgages began prior to the Class Period.  A high level lending and credit executive at E*TRADE (CW1) explained that in about 2004, Defendants terminated all but two or three of its previous eleven to twelve experienced credit employees in the then-called "correspondent lending" division which handled the due diligence on incoming purchased mortgages.  At about the same time, the Company doubled the volume of incoming purchased mortgages.

68.     E*TRADE was purchasing blocks or packages of loans, including jumbo and super jumbo loans and other loans, from various lenders, including Countrywide, National City, Opteum, Fremont General, Bear Stearns, Citigroup, Inc. ("Citigroup"), Lehman Brothers, Inc., and other lenders.  E*TRADE could not "carefully manage[]" these loans from approximately 2004 onwards because it had an insufficient number of employees, and of the staff members assigned to review loans, these persons were far less experienced than the experienced credit personnel who were previously terminated. (CW1)  The personnel cut "turned off the safety valve" in E*TRADE's lending departments; and from 2004 onwards, E*TRADE no longer had "experienced conservative mortgage brokers at the top." (CW1)  Moreover, in the 2004 downsizing, the risk management/due diligence mechanisms for reviewing loan quality put into

place by CW1 several years earlier were almost completely removed.  (CW1)

69.     The new environment internally at E*TRADE after 2004 promoted lax risk mitigation.  (CW1)   EGAM traded loans that were bought and sold several times, with little available history to determine whether the loans were "safe."  (CW1)   EGAM was run by defendant Webb and Lance Ullom. (CW1)   The risk management function at Correspondent Lending was defunct beginning in 2004.  New underwriting guidelines approved "liar loans" (loans requiring little or no documentation) and risky home equity lines of credit ("HELOCs"). (CW1)   The overworked, short-staffed remaining operations personnel at E*TRADE could not keep up with reviews in incoming purchased loans.  (CW1)   Although "pre-purchase" reviews were standard practice up to 2004, pre-purchase reviews were no longer performed after E*TRADE dismissed most of its credit personnel in 2004.  (CW1)  Defendant Caplan and other E*TRADE senior executives made additional drastic structural changes in E*TRADE's mortgage division which reduced personnel in approximately late spring or summer 2006 – including eliminating the business analysis group which was charged with restoring losses incurred in E*TRADE's mortgage business.  (CW5)

70.     CW2 stated that the Individual Defendants "were flying high" at E*TRADE. Similarly, CW7 stated that defendant Caplan became "more and more ambitious" in 2005 and 2006, and was "taking risks that made us scratch our heads."   During this period, defendant Webb was defendant Caplan's "number one guy" because defendant Webb's EGAM division was allowing E*TRADE to report significant earnings.  For many years, through approximately late 2006 or early 2007, all defendant Caplan could speak about was how much profit was being generated and could be generated in EGAM—earnings which were well-known within E*TRADE to be founded on the purchase of high risk mortgages.  (CW7, CW9)    CW9

described defendant Webb as "Caplan's golden boy," and reported that Caplan made a "very big deal" about praising defendant Webb's purported successes at senior management and town hall meetings.  However, "the accolades and atta-boys for Webb stopped" in 2007.  (CW9)

71.     CW8, who left E*TRADE just prior to the start of the Class Period, described an environment where the mortgage personnel were overworked (CW8 often worked until 3 in the morning), and purchasing high risk loans was the norm.  Defendant Webb was "infamous" for taking on more risk than called for by the various risk management models employed by E*TRADE and acquiring overly risky assets.  CW8 reported an incident in which he repeatedly recommended to defendant Webb -- for months -- that a mortgage portfolio was insufficiently hedged and exposed to too much risk, and needed to be restructured – but defendant Webb refused to restructure the loan because it would mean "taking a brief monetary loss on the portfolio."  The overall portfolio thus remained materially overvalued and, as a result, E*TRADE ultimately was compelled to take a huge write-down on the value of the portfolio.  CW8 also reported that EGAM ran investment portfolios through standard industry risk metrics programs, such as QRM and Polymath, to determine risk levels.  However, defendant Webb took on additional risk beyond the permissible levels indicated by the risk management program results. (CW8)

72.     Prior to the beginning of the Class Period, Defendants already knew of material overvaluation and losses in value of E*TRADE's portfolios, as well as the accelerating risks and related problems in E*TRADE's purchased mortgage portfolios.  In February 2006, Defendants hired a retail sales senior executive, CW2, to fix E*TRADE's lending losses by increasing "organic" loans (loans originated by E*TRADE to its own customers), to balance the risks defendants Webb and Caplan were taking with high-risk purchased mortgage portfolios.  At the

time CW2 was hired, defendant Caplan and Webb indicated that they wanted CW2 to increase originated mortgages so that the Company could "move risk [the risks from the purchased loan pools] off the balance sheet."  CW2 told defendant Caplan when he was hired that "the market [for mortgages] was starting to turn and less consumers were seeking mortgages." At the time CW2 was hired, E*TRADE's mortgage division was generating $2 billion from originated/organic loans, and E*TRADE's "Capital Markets" division (primarily through EGAM's purchased loans and securitizations) was responsible for $10 billion.  (CW2) Defendants Webb and Caplan wanted more of this $12 billion on E*TRADE's balance sheet to be conservative loans generated directly by E*TRADE, instead of the risky outside loan pools and securitizations purchased by EGAM.  It was quickly apparent, however, that increases in "organic" mortgages could not make a dent in E*TRADE's losses and balance sheet, and that E*TRADE's mortgage portfolio would continue to remain highly risky going into and continuing throughout the Class Period.  (CW2)

73.     Similarly, Defendants hired CW5 to review and restore financial losses incurred in E*TRADE's mortgage division in March 2006, just prior to the beginning of the Class Period.

74.     These, and other CWs witnessed the Company's purchase of excessively risky mortgages and losses resulting therefrom, and the lack of due diligence thereon, throughout the Class Period, as well as Defendants' direct involvement in the Company's purchase of risky loans, and other problems at the Company which were concealed from investors.

75.     For instance, CW2 witnessed little or no due diligence on purchased loans during the Class Period, and observed that the understaffed, overworked due diligence department *only reviewed 1% of purchased loans*.  CW2 also observed E*TRADE's purchase of very high risk loans; at least 50% were risky subprime.  CW2 reported that Webb purchased "very high risk"

loans from National City and Countrywide, and did "little or no due diligence" on these purchased loans. Similarly, CW1 described the loans purchased from Countrywide as "horrible." E*TRADE could not even find the mortgage files or guidelines for these loans.

76.     Likewise, CW5 observed defendant Webb's purchases of extremely risky products (in Webb's role as the head of EGAM), and observed defendant Caplan working closely with EGAM on these loan purchases, and losses of value in EGAM's loans.   Near the end of 2006, however, CW5 saw bad loan pools which E*TRADE desperately tried to pass on to other banks (to the best of the witness's recollection, Chase or CitiGroup), which the banks returned to E*TRADE because the pools were made up of "terrible, low value" below subprime loans.  The returned loan products therefore remained on E*TRADE's books and continued to deteriorate in value.  One such pool which CW5 recalled involved $1 million in losses; another involved $800,000 in losses; and CW5 believed that significant additional returns and losses occurred.

77.     CW2 worked with defendant Webb, because defendant Webb needed the mortgages which CW2 was able to originate from E*TRADE's customers to package (or repackage) with purchased mortgage pools, to improve the appearance of the packages overall and enable E*TRADE to sell them (along with the extremely poor quality loans E*TRADE purchased) to other banks.

78.     CW6, a due diligence analyst and senior underwriter, reported that about 40-50% of E*TRADE's purchased loans were "bad," meaning that they had negative discrepancies from the loan documentation (such as a lower credit score than reported, or a bankruptcy that was not reported).  Although due diligence reported bad loans to management and tried to convince EGAM management to return the bad loans, E*TRADE nonetheless kept most of the loans

which due diligence identified as bad.  E*TRADE tried to sell bad loans to Bear Stearns and other sub-prime investors but was unable to sell them.  (CW6)  Moreover, CW6 asked his managers why E*TRADE kept "bad" problem loans instead of returning the loans to the originators.  The managers replied that EGAM wanted to maintain strong relationships with the loan originators (such as Countrywide), because E*TRADE / EGAM was ***getting great deals*** on the cost of the loan pools.  Thus, rather than return "bad" loans, Defendants retained them in order to protect a steady flow of low cost (but extremely high risk) mortgages flowing from these originators.  This, Defendants knew, or should have known that alone by virtue of the low prices E*TRADE was paying its originators for these loans, that these loans were potentially problematic and required greater review and due diligence.  Instead, Defendants intentionally turned a blind eye to these issues in order to continue with "business as usual" and without regard to the deteriorating quality of E*TRADE's portfolio and the resulting falsity of Defendants' public statements regarding the ***"superprime"*** quality of E*TRADE's portfolio and the conservative approach and "strict discipline" applied to E*TRADE's risk management.

79.     CW6 also explained that although the loans CW6 was reviewing were designated as Alt-A loans, the loans were in reality highly risky sub-prime loans.  Alt-A is short for Alternative A-paper, and means riskier than "prime" but less risky than "subprime."  Alt-A borrowers generally have strong creditworthiness, but the mortgage does not qualify as prime for various reasons, such as reduced documentation or higher-than-prime LTVs.  CW6 further noted that even the loans which due diligence did ***not*** identify as "bad" (because the loans matched the documentation which accompanied them) were still high-risk sub-prime loans.   CW6's supervisor worked directly with EGAM (which Webb was in charge of) to obtain the loans from EGAM and distribute them to CW6 and CW6's colleagues for review.  (CW6)

80.     CW6 further noted that only a small "part" of the purchased loan pools were reviewed.  Moreover, because the loans were "stated" loans, there was no documentation (W2 tax forms) for verifying the information (such as salary) on the loans.

81.     CW4 witnessed operations and IT, and saw that only a small percentage of loans were checked in portfolios where all loans were high risk, junk loans, and observed numerous data and reporting errors and omissions.  After E*TRADE's "correspondent lending" division was closed in early 2004, "pre-purchase" due diligence was discontinued in favor of limited "post-purchase" due diligence.  This resulted in increased risks that E*TRADE would have to keep bad loans, because E*TRADE only had 30 days to identify and return bad loans to the sellers.  (CW4)

82.     Defendants' sampling "due diligence" process was not used to ferret out whole portfolios of bad loans.  CW4 was responsible for running software to choose an "adverse selection sample" of purchased loans with high LTVs and DTIs and ARMS.  The percentage sampled was only about 1% to 10%, depending on the originator.  CW4 reported that in some cases, every loan in the samples he saw was risky.  CW4 brought this up at meetings attended by defendant Webb, at which CW4 asked: "What do you do when they are all high risk?" and "Shouldn't we be reviewing all of the loans in the portfolio?"  CW4 was told "no," and that all the loans should not be reviewed because the stipulation sheet (part of the agreement with the seller of the loans) did not call for a full review.  Other stipulations were that none of the borrowers were more than 30 days late or would default within 90 days.  As a result, only individual loans from *de minimis* samplings were "kicked back" to originators, not entire portfolios of potentially bad loans.

83.     CW4 also observed that E*TRADE did not have adequate resources or

information to thoroughly perform due diligence on purchased bulk second trusts.  Necessary data and updated data were not made available by E*TRADE's servicer for the loans (PNC Bank), and the staff and procedures needed to review the trusts were lacking.  (CW4)

84.     In the third quarter of 2006, CW5 reported that an E*TRADE employee accidentally discovered an incorrect booking and placement of $3 billion of purchased loans in the wrong portfolio (hold to maturity, instead of hold to sale, which would have resulted in the loans being sold within 30 to 60 days).  The mistake had been made back in 2005.  Upon discovery, the loans had to be negatively re-priced.  Defendant Simmons was advised of this costly error.

85.     Understaffing and overwork in operations and IT also resulted in accounting mistakes.  Untrained staff from India loaded data received from originators regarding loans into the wrong fields, and data was sometimes missing all together.  (CW4)

86.     Understaffing and the resulting lack of organized, reliable loan documentation also impeded E*TRADE's ability to resell loans.  In 2007, E*TRADE attempted to sell 16,000 loans to BoA, which E*TRADE would continue to service.  However, the sale fell through because E*TRADE could not meet BoA's loan requirements for accuracy and accurate loan documentation.  No one with correct training was available at E*TRADE to obtain the needed data, and data was "pulled" incorrectly.  Although E*TRADE finally managed to borrow personnel from elsewhere in the Company to pull together accurate data on half (8,000) of the loans, BoA rejected the deal because of the poor condition of the entire portfolio.  (CW16)

**Undisclosed Problems With Generating Loans and Accounting Controls; Undisclosed Computer/Loan Processing and Pricing Problems Cause Losses In Company-Originated Mortgages**

87.    The Company also had numerous (undisclosed) problems with generating new loans, its computer systems, and accounting controls.

88.    CW5 witnessed E*TRADE's money-losing Total Value Pricing program.  This program was created to attract new customers, but amounted to "giving away the store."  Under the Total Value Pricing program, E*TRADE paid virtually all the expenses (e.g., appraisal and closing costs) associated with buying and obtaining a mortgage on a property.   Notwithstanding E*TRADE's efforts to be competitive, E*TRADE's competitors (such as Countrywide) often beat E*TRADE on pricing, resulting in loss of business.  (CW5)

89.    For instance, CW2 was so shocked at how poorly E*TRADE was run that CW2 quit after two weeks, but then stayed on at the request of defendant Caplan and E*TRADE COO Lilien (who also offered CW2 more compensation to stay).   CW2 reported that originated mortgages were taking *three months* to close, which infuriated E*TRADE's customers.  Many of these customers left to find mortgages at cheaper and faster competitors.  E*TRADE was not set up electronically to streamline each mortgage transaction.  Although a new database program was brought in, getting it operational was a lengthy process.  (CW2, CW5)

90.    Similarly, CW5 reported that there was a seven-month delay in installing the new database system that was supposed to streamline mortgage processing, and it was often taking 90 to 100 days for customers to obtain a mortgage from E*TRADE, and that frustrated customers often left mid-process to go to faster competitors.

91.    CW3, a mortgage processing division manager, also regularly observed overvalued properties and appraisals, and costly loan closing problems.  CW3 encountered loans for properties which were over-appraised "all day, every day," while CW3's ten to fourteen person department worked at E*TRADE under "sweatshop" conditions six or seven days a week,

processing loans.  For instance, CW3 recalled that a property in Los Angeles "located right on a major highway" with significant internal water damage was appraised at $1.5 million, which was a "crazy" figure that was hundreds of thousands more than comparable homes in the area, even when home prices in the region were inflated.  CW3 also explained that about 90% of the time, the paperwork needed to fund the loans E*TRADE was originating was incomplete at the property closing.  As a result, E*TRADE had to incur enormous expenses to pay for mortgage customers' hotels until the loan was funded.  CW3 complained to senior management about this practice, but was just told to keep selling mortgages.  Defendant Caplan visited this mortgage group's office (in Pittsburgh) and pushed everyone to keep selling mortgages.  (CW3)    In February 2007, CW3's mortgage group at E*TRADE was closed and moved to India.  (CW3)

92.    In addition, CW12, a mortgage product manager who joined the Company in January 2007, described the Company's botched attempt to change over its core software program which held the financial information regarding E*TRADE's loans.  The Company decided to outsource its computer software system to an Indian Company named Genpact Mortgage Services.  Genpact was supposed to provide outsourced processing of loans, including underwriting, documentation and reporting, and inputting of data.   However, there were numerous implementation problems, which were so severe that E*TRADE's mortgage pipeline slowed from 500 loans per week to 20 loans per week when the old system was cutoff in favor of the Genpact system.  The shutdown was, in part, due to the decision to implement the new system without maintaining the old system as a parallel backup.  The Genpact system resulted in numerous data errors, and the Genpact loan processors and managers "didn't know what they were doing."  These problems persisted for months, and left E*TRADE unable to push loans through the processing system, threatening its in-house mortgage origination business.  (CW12)

None of this was disclosed to the public.

93.     Additional accounting and systems problems were pointed out by a servicing and operations executive.   (CW16)   Information on second mortgages was missing from E*TRADE's accounting system, which lacked fields for second mortgage information.   In addition, portfolio numbers in E*TRADE's database (which CW16 observed) did not match numbers in E*TRADE's accounting system, which did not match information from servicers. Accountants had to try to reconcile three sets of numbers, which were often thousands of dollars off from one another.  (CW16)

**Distress and Mortgage Losses Were Apparent Internally**

94.     CW14 reported that foreclosures were becoming more and more of a problem from September 2006 onwards.  Increasing numbers of E*TRADE employees were required to work on foreclosure issues.  These foreclosure issues were an inevitable consequence of the poor quality of E*TRADE's loan portfolio and provided clear evidence to E*TRADE's management, including Individual Defendants, that E*TRADE's mortgage portfolio was overvalued and misreported in E*TRADE's financial reports.  Foreclosure problems were discussed at weekly management meetings attended by, among other people, the direct report to the Executive Vice President of Credit Risk, who was a direct report to defendant Caplan.  (CW14)

95.     CW9 reported that it was apparent to CW9 the Company was in distress by the end of 2006.  At that time (late 2006), senior management, including defendant Caplan, met with CW9 and emphasized that originating loans and HELOCS was a "priority direction" at E*TRADE, and that CW9 had to start "pushing [CW9]'s clients" to get their mortgages and HELOCs from E-TRADE.   When CW9 asked why E*TRADE was pushing E*TRADE to sell mortgages, CW9 was told that E*TRADE was trying to make some money to "somehow

compensate for losses" because they were "so leveraged out."  (CW9)

96.     By late 2006, E*TRADE became so aggressive in attempting to sell mortgages that CW9 was given a quota, and selling mortgages became part of CW9's compensation/commission package, even though CW9's area was advisory services, not selling mortgages.  (CW9)

97.     CW10 confirmed that E*TRADE was on a "downward spiral" from 2006 onwards, emanating from the Capital Markets division, including EGAM – which was the central group that "made E*TRADE go."  (CW10)

98.     In early December 2006, defendant Caplan told E*TRADE employees "confidentially" at a quarterly internal meeting on the 16th Floor of the Company's Arlington, Virginia offices that the Company was experiencing losses and expected more losses in 2007. The meeting was attended by defendants Caplan, Simmons, and Webb, COO Lilien, and Company employees (including CW14 and CW16) in the lunch area known as the "garage." Defendant Caplan was asked about E*TRADE's profitability, and responded that he "shouldn't be telling you this, and this was strictly confidential," but he "expected profits to be down, and expected profits to be down through the next year."  (CW14, CW16)

99.     By approximately mid-August 2007, at an internal "town hall" meeting for E*TRADE employees led by defendant Caplan, defendant Caplan acknowledged that E*TRADE was overexposed in the subprime market, and was waiting for a "white knight" to rescue the Company.  When asked what he meant by "white knight," defendant Caplan explained that the Company was looking for an investor to "get them out of the mortgage mess."  (CW11, CW13)

**Defendants Fail To Track LTV / CLTV Ratios For E*Trade's Loan Pool**

100.    Despite the fact that Defendants frequently boasted of favorable LTVs and

CLTVs (combined loan to value ratio, used to determine default risk), after the close of the Class Period, in a response letter to the SEC dated January 8, 2008, E*TRADE admitted: "We generally update home value data on nonperforming loans, primarily to assist in making foreclosure decisions and to estimate the allowance for loan losses; ***however, we do not track the current LTV/CLTV ratios for the entire loan portfolio.***"[1]  Therefore, Defendants' Class Period statements regarding favorable LTVs and CLTVs in E*TRADE's mortgage portfolio were materially false and misleading when made.

**Problems Experienced By The Banks Which Sold Mortgages To E*TRADE**
**Corroborate The Poor Quality of E*TRADE's Purchased Mortgages**

101.   As confirmed by certain of the Confidential Witnesses who worked at E*TRADE during the Class Period (including CW1, CW2 and CW5), unbeknownst to investors, E*TRADE was purchasing mortgages from entities such as Countrywide, Opteum, GMAC and National City, which did not meet the "extremely conservative" credit standards which Defendants continued to publicly claim was the policy of E*TRADE.

102.   During the Class Period, adverse information came to light about entities which sold mortgages to E*TRADE (the "Selling Banks"), including the poor credit quality of the Selling Banks' mortgages, and the Selling Banks' questionable mortgage origination practices. This adverse information about the Selling Banks corroborates the CWs information about the poor quality of E*TRADE's purchased mortgages.

103.   Unfortunately, E*TRADE's investors were not made aware of the fact that E*TRADE was purchasing mortgages from Selling Banks with troubled origination and servicing records.  Even late in the Class Period, E*TRADE only made a partial disclosure (on August 16, 2007) of some of the entities from which it was purchasing mortgages (Countrywide,

---

[1] Unless otherwise indicated, emphasis is added.

E-Loan, GMAC, Morgan Stanley, National City and Wells Fargo), without listing critical, material information such as the amounts purchased from each.  This belated disclosure of a partial list failed to mention eleven of the Selling Banks from which E*TRADE was purchasing loans (including Sovereign, Opteum, AmSouth, Fremont, GreenPoint, First Horizon, and Quicken Loan), despite the fact that many of these Selling Banks had disclosed adverse results or conditions reflecting the very poor quality of their loans during the Class Period.  Moreover, E*TRADE's August 16, 2007 Supplemental Disclosure listed BoA, JP Morgan, and UBS, but those entities were not on the list which E*TRADE provided to the SEC on November 15, 2007.

104.    By keeping the investing public unaware of the identity of E*TRADE's Selling Banks, and the extent of their sales of mortgages to E*TRADE, Defendants kept investors from "connecting the dots" between adverse information about the Selling Banks' mortgage businesses, credit quality, underwriting standards and experience, and the undisclosed poor quality of E*TRADE's overvalued loan portfolio.

105.    For instance, Countrywide – which serviced and/or originated $928.878 million (8.347%) of E*TRADE's mortgage lending portfolio – reported significant **nonprime** mortgage loan delinquencies during the Class Period, of 14.41% for 2Q2006,  16.93% for 3Q2006, 19.03% for 4Q2006, 16.67% for 1Q2007, and 23.71% for 2Q2007.  For example, Countrywide's July 24, 2007 press release disclosed that "**delinquencies and defaults** continued to **rise** across **all mortgage product categories**," and that Countrywide incurred increased credit-related costs, **primarily related to its investments in prime home equity loans**"; delinquency rates for Countrywide's prime home equity loans had skyrocketed to approximately 5%;  and subprime delinquencies had soared to almost 24%.

106.    And, alarmingly, commencing early in the Class Period, the underwriting

standards, practices, and truthfulness of National City – which serviced and/or originated **$5.3 billion (47.94%)** of E*TRADE's loan portfolio – came under scrutiny.  The Department of Housing and Urban Development ("HUD") accused National City of improperly submitting 2,071 loans totaling $263 million in mortgages for payment under an FHA program late, with letters attached to many of its submissions falsely vouching that borrowers hadn't missed payments.  *See* "Bad Loans Dumped Into FHA," *Mortgage Daily*, May 3, 2006; "Mortgages Dumped, HUD Says Banks Illegally Sent Bad Loans To FHA, Audits Find," *The Columbus Dispatch*, June 6, 2006.

107.    In August 2006, HUD cited National City for deficiencies related to 20 of 41 loans that HUD had reviewed.  The Office of Inspector General stated that National City failed to verify employment histories and credit references, overstated the assets of applicants, or exceeded acceptable debt-to-income ratios on 20 HUD-backed mortgage loans that went into default in 2004 and 2005.  *See* "National City May Be Fined For Mortgage Problems: Report Shows Lapses In Handling 20 Defaulted Loans," *Columbus Dispatch*, August 12, 2006.

108.    In light of E*TRADE's failure to disclose that it was purchasing close to half of its mortgages from an originator that was falsifying payment and other records of its borrowers, Defendants' representations that E*TRADE's investors were "protected across the board with respect to underlying credit" was unquestionably misleading.

109.    There was still further bad news from National City during the Class Period, reflecting adversely on the quality of the mortgages it originated.  On November 9, 2006, National City revealed that its loss reserves for repurchased loans (loans bought back because they did not meet representations/conditions of sale) exceeded estimates by $18 million.  November 9, 2006 8-K ("National City Revises Third Quarter Earnings").  National City also

revealed that its third quarter credit losses increased to $14 million due to increased housing

delinquencies.  National City 3Q2006 Form 10-Q, filed 11/14/2006, p. 58.

110.    And, on December 22, 2006, *Mortgage Daily* reported that National City had

been once again accused of  preparing false lending documents:

> A bankruptcy trustee seeks to set aside liens held by mortgage lenders including
> Washington Mutual and National City for their alleged negligent underwriting of
> fraudulent loans from a now bankrupt company that bilked 490 investors of $40
> million.
>
> \*          \*          \*
>
> Washington Mutual reportedly holds about 100 of the mortgages, while National
> City holds about 40 of the loans.
>
> \*          \*          \*
>
> **The complaints against the mortgage companies allege they ignored numerous
> warning signs in the lending process and failed to conduct due diligence.** Eager
> to profit, the lawsuit asserted, the lenders ignored red flags concerning the
> mortgage application, the underwriting process and NJ.
>
> In issuing the mortgages, the **lenders knew or should have known that the
> mortgage broker or initial mortgage lender did not adhere to prudent lending
> practices** as described by HUD and FHA and as contractually required by private
> mortgage insurance companies. Among other things, **underwriting deficiencies**
> such as **debt-to-income ratios that exceeded FHA/HUD standards**, **inadequate
> documentation** and the imposition of ineligible or unsupported fees occurred in
> the financing process for a number of the properties.
>
> **The lenders are also accused of violating their own internal guidelines in
> making the loans.**

111.    In addition, on April 30, 2007, National City, announced write-downs and other

charges of $28 million on its unsold, non-conforming loans.

112.    Further, on August 8, 2006, Fremont General – which originated and/or serviced

$230 million (2%) of E*TRADE's portfolio – announced a 43% net income decline, increased

loan repurchases and adverse re-pricing, due in large part to "increased levels of early payment

delinquencies."  Fremont General 8-K, August 8, 2006.  Fremont also indicated that its average

first mortgage FICO score was 624, and LTV was 81% (which were much lower than the credit standards which Defendants claimed that E*TRADE maintained).  Fremont's announcement of somewhat tightened credit standards the following quarter (increasing required FICO scores on first mortgages from 623 to 627, and on second mortgages from 652 to 664) still left Fremont's mortgage credit standards well below E*TRADE's stated standards.  Fremont General 8-K, December 9, 2006.

113.    On March 2, 2007, Fremont reported that it had entered into a agreement with the Federal Deposit Insurance Corporation (the "FDIC") requiring Fremont to cease and desist from (among other things): "Operating with inadequate underwriting criteria"; "Operating without an accurate, rigorous and properly documented methodology concerning its allowance for loan and lease losses"; "Operating with a large volume of poor quality loans"; "Engaging in unsatisfactory lending practices"; and "Making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms."  Fremont Form 12b-25/10-K (March 2, 2007); 8-K (March 5, 2007).

114.    Fremont's substandard lending practices set forth in the FDIC cease and desist order corroborate the credit problems with purchased mortgage portfolios pointed to by the E*TRADE CWs. Moreover, Defendants' concealment of the fact that E*TRADE was purchasing loans from Fremont and similar operators misled E*TRADE's investors as to the quality of E*TRADE's loan portfolio.

115.    In addition, troubled lender GMAC LLC originated over 10.5% of E*TRADE's purchased mortgages.  On March 13, 2007, GMAC LLC's mortgage unit, Residential Capital LLC ("ResCap") announced huge losses of $651 million for 4Q 2006.  The loss reflected "increased reserves related to both higher delinquency and greater loss severity in the nonprime

held for investment loan portfolio, more difficult market conditions for mortgages held for sale, and credit losses related to lending relationships with certain third-party nonprime market participants."  ResCap Form 8-K, March 3, 2007.  In addition, GM agreed to pay a $1 billion settlement to GMAC, relating to GMAC's bad loans to subprime borrowers.  (GM sold a 51% stake in GMAC to private equity firm Cerberus Capital Management LP in 2006.)  *Detroit News*, "GM's Split From GMAC Not Painless," March 14, 2007; *Mortgage Daily*, "Massive Loss at ResCap."  March 13, 2007.

116.   E*TRADE also purchased extremely low quality, high risk loans from Opteum. (CW6)  Notably, according to information in a complaint filed against Opteum by its investors based on interviews of former employees of Opteum, purchasers of loans from Opteum were returning those loans to Opteum *en masse*.  Yet, unlike Opteum's other loan purchasers, who recognized the poor quality and risks associated with its loans, E*TRADE retained the high risk, low quality loans it purchased from Opteum.

117.   E*TRADE continued to conceal the extent of E*TRADE's business and consequent risk related to purchased mortgages throughout the Class Period.  The persistence of this lack of transparency was evidenced when a seasoned analyst asked in a conference call on July 25, 2007:  "[C]an you tell us how much of that [mortgage portfolio] you originated versus how much you bought from third parties?"  As *Business Week* observed in an article dated October 8, 2007, entitled "E*Trade's Subprime Surprise":  "To many, the biggest surprise was that the firm was actually in the mortgage business."

118.   Even the SEC was unable to penetrate E*TRADE's business, asking the Company in a letter in October 2007:  "[T]ell us if you originated the 1st lien mortgages associated with the [Home Equity] loans and subsequently sold those loans, and if so, tell us who

you sold those loans to."

### DEFENDANTS' PRE-CLASS PERIOD STATEMENTS "SET THE STAGE"

**Defendants Represent That E\*TRADE Carefully Monitors Its Mortgage Portfolio**

119.   As noted above, prior to (and during) the Class Period, E\*TRADE publicly portrayed its business as the provision of a range of financial services to "value-driven" consumers.   "Business Overview," 2005 Form 10-K, p. 1.   Defendants listed its customer segments as "Mass Affluent" customers (over $50,000 in account assets), "Active Traders" and "Main Street Investors" (under $50,000 in account assets).   2005 10-K, p. 24.   "Net income" was the lead revenue category.   A note in E\*TRADE's 2005 Form 10-K, p. 20, stated that "while commissions are still reported as the lead category in our income statement because most of our customers begin their relationship with us through trading activity, net interest income has become our leading category of revenue, and we anticipate this trend will continue."   This left the false and misleading impression on investors that this "net income" was related to the Company's own interest-generating products.   It did not spell out that high-risk, purchased mortgages were the real source of interest income revenue.

120.   Prior to the start of the Class Period, Defendants indicated that the directors and senior management of E\*TRADE monitored risks throughout the Company, and that E\*TRADE underwrote loans based on borrowers' creditworthiness and the value of their collateral. E\*TRADE's 2005 10-K states:

> We manage risk through a governance structure involving the Board, senior management and several risk committees.   We use management level risk committees ***to ensure that business decisions are executed with our desired risk profile.***
>
> ***The Corporate Risk Committee, consisting of senior management executives, monitors risks throughout the Company.  In addition to this committee, various departments throughout the Company aid in the identification and management***

46

*of risks.  These departments include internal audit, compliance, finance, legal, treasury, credit and risk management.*

Credit Risk Management

Credit risk is the risk of loss resulting from an adverse change in a borrower's ability to repay their loan.  *Loan and margin advances are underwritten based on the creditworthiness of the borrower and the fair market value of the underlying collateral, taking into consideration any events that may affect the value of that collateral.*  The level of credit risk in an individual loan will vary depending on the credit characteristics of the borrower, the magnitude of the transaction and the quality of the collateral, in addition to the terms of the transaction.  *These risks are monitored at the Bank level by the Credit Risk Management Committee.*

The Credit Risk Management Committee is responsible for the overall credit risk management of the Bank. This committee reports to the Asset Liability Management Committee. The credit risk management process encompasses the entire underwriting and review process from comprehensive credit policies to loan review and regulatory exams.  *The Credit Risk Management Committee reviews detail [sic] risk measurement and modeling results, and monitors the loan audit review process.  We conduct independent reviews of the underwriting process for originated and purchased loans.*  The Credit Risk Management Committee regularly reviews the results of those reviews. In addition, regulatory examiners review and perform detailed tests of our credit underwriting, loan administration and allowance process.

*The Credit Risk Management Committee's duties include monitoring asset quality trends, evaluating market conditions including residential real estate markets, determining the adequacy of the allowance, establishing underwriting standards, approving large credit exposures, approving large portfolio purchases and delegating credit approval authority.*  The Credit Risk Management Committee *uses detailed tracking and analysis* to measure credit performance and routinely reviews and modifies credit policies as appropriate. The section below includes some of the information reviewed by the committee in determining asset quality and the level of adequacy of the allowance.

121.    Defendants also stated that E*TRADE *lowered* its allowance for loan losses on real estate as a percentage of loans receivable from 0.20 ($30,907,000) for FY 2005 from 0.24 ($17,995,000) in FY 2004.  The percentage loss allowance for consumer and other loans receivable increased to 0.80% ($32,379,000) for FY 2005 from 0.72% in FY 2004, and the total loss allowance as a percentage of total loans receivable was *lowered* to 0.32% ($63,286,000) in

FY 2005 from 0.41% ($47,681,000) in FY 2004.  2005 10-K, p. 40.

122.    Defendants further represented that allowances for loan losses were actively

reviewed and adjusted after considering relevant trends and experience, as follows:

### Allowance for Loan Losses

The allowance for loan losses is management's estimate of credit losses inherent in our loan portfolio as of the balance sheet date. The estimate of the allowance for loan losses is based on a variety of factors, *including the composition and quality of the portfolio, delinquency levels and trends, expected losses for the next twelve months, current and historical charge-off and loss experience, current industry charge-off and loss experience, the condition of the real estate market and geographic concentrations within the loan portfolio, the interest rate climate as it affects adjustable-rate loans and general economic conditions.* Determining the adequacy of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain.  Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan losses in future periods. *In general, the allowance for loan losses should be at least equal to twelve months of projected losses for all loan types.*  Management believes this level is representative of probable losses inherent in the loan portfolio at the balance sheet date.  Loan losses are charged and recoveries are credited to the allowance for loan losses.

E*TRADE 2005 10-K/A (filed March 24, 2006), p. 15; 2005 10-K, p. 40.

123.    Defendants also noted that although non-performing assets increased somewhat

($15.9 million), the increase was merely due to increased loan volume (from $7.5 billion to

$15.3 billion) – not from deterioration in portfolio credit quality:

The increase in nonperforming loans has not resulted in significantly higher charge-offs in 2005.  *Our portfolio quality as not shown significant signs of deterioration*; however, the overall level of nonperforming assets has increased as a result of this volume.

E*TRADE 2005 10-K, p. 42.

124.    Defendants also indicated that E*TRADE was shifting to assets with favorable

LTV ratios:

As our loan portfolio shifts to mortgage loans with *loan to value ratios* that

remain consistent or increase over the life of the loan, the level of the allowance to nonperforming assets may decrease.  Real estate loan charge-offs to average outstanding loans were 0.03% compared to 0.34% for non-real estate loan charge-offs.  Real estate loans to total loans receivable, net are 79% for 2005 compared to 64% for 2004.

E*TRADE 2005 10-K, p. 42.

125.    Defendants further stated that they "actively" monitor "loans where a borrower's past credit history casts doubt on the borrower's ability to repay a loan, whether or not the loan is delinquent."  2005 10-K, p. 43.

126.    Defendants also indicated that certain unrealized losses on E*TRADE's asset-backed securities, mortgage-backed securities, bonds and other debt securities were merely "temporary impairments" due to interest rate fluctuations – and did <u>not</u> reflect credit quality deterioration – and that the Company regularly evaluated and reviewed the creditworthiness of the lenders:

> The Company does **not** believe any individual loss as of December 31, 2005 represents an ***other-than-temporary impairment***. The majority of the unrealized losses on mortgage- and asset-backed securities are ***attributable to changes in interest rates and not reflective of deterioration in the credit quality of the issuer and/or securitization.*** Substantially all mortgage-backed securities backed by Federal agencies are "AAA" rated and have unrealized losses due to changes in market interest rates. As market interest rates increase, the fair value of fixed-rate securities will decrease. During 2005, increasing market interest rates caused higher unrealized losses on our fixed-rate securities including mortgage- and asset-backed securities. The Company has the ability and intent to hold these securities until the market value recovers or the securities mature. ***Asset-backed securities, corporate bonds and other debt securities are evaluated by reviewing the credit worthiness of the lender and based on market conditions.  As of December 31, 2005, unrealized losses on mortgage- and asset-backed securities were primarily attributed to rising interest rates and not underlying credit impairment.*** Based on its evaluation, the Company recorded other-than-temporary charges of $38.3 million, $14.0 million and $2.2 million for 2005, 2004 and 2003, respectively, for its asset- and mortgage-backed securities and interest-only securities. Additionally, the Company recognized $2.0 million and $4.4 million of other-than-temporary impairments for 2005 and 2004, respectively, from retained beneficial interests in securitized receivables held by a subsidiary, ETCF Asset Funding Corporation.

E*TRADE 2005 10-K/A, p. 29.  The Company reported that total securities having a fair value of $11,437,437,000 were temporarily impaired with unrealized losses in the amount of $302,386,000.  Out of these totals, MBS were valued at $9,427,521,00, with $260,145,000 of temporary impairments; and ABS were valued at $823,737,000 with $12,372,000 of temporary impairments. *Id*.

127.    Defendants' false and misleading pre-Class Period representations that they were actively monitoring E*TRADE's mortgage portfolio risk, and that credit quality was not impaired (and, in fact, loan losses reserved were overstated and never properly reduced) were active, alive and repeated throughout the Class Period.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS DURING THE CLASS PERIOD**

**First Quarter 2006**

128.    On April 19, 2006, the first day of the Class Period, Defendants issued a press release entitled "E*Trade Financial Corporation Announces Record First Quarter Results; Raises 2006 Earnings Guidance."  The press release trumpeted record 2006 1Q net income of $142 million; record earnings of $0.33 per share (or $0.36 per share excluding $0.03 per share of acquisition-related integration expenses); record total net revenue of $598 million; record enterprise net interest spread of 286 basis points; record net interest income after provision of $315 million; operating margin of 41%; and total client assets of $193 billion.  Defendants also raised E*TRADE's 2006 earnings guidance range to $1.35 - $1.50 per share (from $1.30 - $1.45).  The press release quoted defendant Caplan as stating that:

> Our operational focus and ***financial discipline*** continues to drive increased customer engagement and unlock the full value of our integrated model.  Given the strength of our first quarter results and the growth rates in each of customer cash, credit and assets, we feel comfortable in raising our 2006 earnings outlook

50

today.  Having completed the conversion of Harrisdirect and as we prepare to convert BrownCo in early May, we remain extremely encouraged by the trends we are experiencing with respect to economic attrition from these new customers. We will provide further updates to our earnings outlook in July or as we see necessary.

129.   The press release also listed the following "Other selected highlights from the first quarter of 2006":

- Generated $1.6 billion in organic growth of customer cash and deposits

- Recorded a 58 percent increase in international DARTs year over year

- Increased options trades to 12 percent of U.S. DARTs, up from 11 percent in the fourth quarter and 9 percent in the year ago period

- Deleveraged the balance sheet through the call/redemption of subordinated convertible notes

- Launched the E*TRADE Complete(TM) Protection Guarantee providing complete fraud, bill pay and privacy protection to all customers

- Launched the Intelligent Lending Optimizer

- Introduced the E*TRADE Complete(TM) IRA

- Enhanced investment tools and services available to retail customers including access to free research from industry-leading independent research providers such as Reuters and Standard & Poor's

- Opened a new retail center in Seattle, increasing total center locations to 17 nationwide

"DART" as used in the above (and elsewhere herein) means Daily Average Revenue Trades, a key performance metric used by discount brokers such as E*Trade.  It measures the average number of revenue generating trades executed by customers per day over some given period of time (usually one quarter).

130.   The April 19, 2006 press release also contained the following description of the Company (repeated in numerous Company publications):

About E*TRADE FINANCIAL

The E*TRADE FINANCIAL family of companies provides financial services including trading, investing, banking and lending for Retail and Institutional customers. Securities products and services are offered by E*TRADE Securities

LLC (Member NASD/SIPC). Bank and lending products and services are offered by E*TRADE Bank, a Federal savings bank, Member FDIC, or its subsidiaries.

131.   In the accompanying conference call with analysts, also on April 19, 2006,

defendant Caplan stated that:

> As we look at how the franchise has done, particularly in the past year, it's truly extraordinary.   Through the combination of organic growth initiatives and strategic acquisitions, the franchise has never been stronger.  We have grown total client assets to nearly $200 billion on a base of over 4 million accounts.  Across this increasing customer base, we are now generating meaningful product engagement beyond trading.  ***We are seeing significant organic growth in cash, assets and credit***, as we have created industry-leading functionality for these products.   Through our integrated model, we are benefiting from these dynamics in both our retail and institutional segments.

> As an example, consider the growth in cash alone we've experienced.  Our base increased over 65% in the past year to a record in excess of $30 billion.  While the benefits to our retail segment are apparent, our institutional segment continues to drive greater economics by leveraging this growth to significantly reduce our balance sheet funding costs.   This link between retail and institutional has translated directly into spread expansion and record net interest income for the Company on a consolidated basis.  Similarly, our growth in retail customer assets and trading activity continues to benefit our institutional equities business by providing greater order flow and deeper liquidity for our institutional clients.

> In the last three years, we have worked diligently to position the business to deliver growth and superior financial performance through various market environments.  The results of this past quarter demonstrates [sic] the success of our model.  We generated strong growth in our core business while accelerating that growth through integration of additional assets, cash, credit and trading from our two recent acquisitions.   As we drive further customer engagement from our existing and new customers, we continue to unlock the full value and opportunity of our integrated model. . . .   We delivered growth in all the key drivers of our business.

> As we have executed on our vision of creating an integrated financial services company, we are just beginning to realize the power of our centralized technology, operations and service platform on a global basis.  We are now in a place to leverage our success around customer assets, cash and credit in the U.S. and extend these solutions to our international clients in Canada, Europe and Asia. We continue to see tremendous opportunity to capitalize of the growing mass affluent population in the U.S. where 44 million households remain relatively underserved.   As we move outside the U.S. we believe the opportunity is immense….

132.    During the same call, defendant Simmons stated that:

During the quarter we remained focused and disciplined in executing on our core strategic plan while accelerating that plan through the integration of our recent acquisitions.  This combination not only produced record revenue and earnings, but also record results across many of the key drivers of our business.  First quarter total net revenue increased 43% year-over-year and 25% sequentially to a record $598 million.  Net interest income after provision increased 79% year-over-year and 30% sequentially to a record $315 million.

*      *      *

Rather than originating and selling loans, we have improved the customer experience by putting more origination volume on balance sheet.  This allows us to retain the customer relationship while driving growth in spread-related revenue. The shift away from gain on sale has ***favorably impacted the overall quality of our earnings***.  Our model is designed to generate a growing base of recurring revenue as customers engage in assets, cash and credit solutions.  As witnessed in the first quarter, our model also maintains strong leverage to growth in trading activity.

133.    E*TRADE stock closed at $26.86 on April 19, 2006, up $0.96 (3.63%) from the previous day's close of $25.92.

134.    Defendants' representations on April 19, 2006 were materially false or misleading because, *inter alia*:

a.    The statements regarding "financial discipline," favorable earnings quality, significant organic growth, and "record" growth in net income and all drivers failed to disclose that E*TRADE's loans were highly risky (including a high percentage of loans from originators who were engaging in risky practices), only 1% of loans purchased by E*TRADE were reviewed (CW2), and E*TRADE's net income was heavily reliant on purchases of highly risky ABS and MBS and loan pools.  Defendants were so concerned about these existing risks at the time of these statements that they had recently hired executives to try to balance these risks with originated loans. (CW2, CW5);

b.      In addition, the statements about "financial discipline" and earnings quality were false and misleading because property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1), and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans (CW2, CW6) and every loan reviewed in certain loan samples was risky, but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4);

c.      In addition, the statements about "financial discipline" and earnings quality were false and misleading because, as the Company later admitted in its 2/8/08 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs (key indicators of future loan performance and history) for the entire portfolio; and

d.      E*TRADE's 1Q2006 reported assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments.

135.    On May 9, 2006, E*TRADE filed its Form 10-Q for 1Q2006, ended March 31, 2006.  Similar to the April 19, 2006 press release, the 1Q2006 10-Q touted the Company's

financial highlights, including growth in net income, commission revenue, customer deposits, assets, and receivables and decreased provision for loan losses.

136.    The 1Q2006 10-Q described E*TRADE's "Key Strategy" as follows in the Company overview, at p. 3:

Key Strategy

Our strategy to enhance shareholder value centers on growing and strengthening our retail business and leveraging that growth in our institutional business. We strive to grow our retail business by acquiring, expanding and retaining our relationships with global retail customers.  We offer our retail and institutional customers a suite of investing, trading, cash management and lending products. We plan to grow those relationships by leveraging technology to deliver a compelling combination of product, service and price to the value-driven customer.  We also intend to grow through appropriate and targeted acquisitions which leverage our existing business platform.

As we grow our global customer base and hold more retail customer cash and credit products on balance sheet, we believe that our business will benefit. As our institutional business manages and optimizes our balance sheet on an enterprise-wide basis, we become less dependent on revenue from market-driven customer trading activity, and our income, while still positioned to benefit from a strong equity market, becomes more recurring in nature.   Net interest income has become our leading category of revenue, and we anticipate this trend will continue.

137.    E*TRADE's 1Q2006 10-Q also stated that increases in real estate lending would improve the Company's credit risk profile:

Loans receivable, net represented 41% and 44% of total assets at March 31, 2006 and December 31, 2005, respectively. We anticipate that our mortgage and HELOC portfolios will increase during 2006 *as we focus on real estate lending, which we believe will improve our credit risk profile.*  We anticipate that RV and marine loan balances will decline over time due to the sale of the E*TRADE Consumer Finance Corporation in 2005 and automobile loans will continue to decline due to the exit of the automobile origination business in 2004. Other loans include commercial loans which increased during the three months ended March 31, 2006. . . .

*Id.* p. 18.

138.    The 1Q2006 10-Q, on page 19, indicated that allowances for loan losses

($64,509,000) had remained flat at 0.20% of real estate loans receivable.   In absolute dollar terms, the allowance for loan losses balance increased $12.6 million from the year before (March 31, 2005).   However, Defendants noted: "This increase related primarily to the $6.9 billion increase in the real estate loans receivable portfolio over the same period.  We believe that these increases to the allowance are the result of growth in the loan portfolio and ***do not indicate a decline in overall asset quality***."  *Id.,* p. 20.

139.   Defendants indicated that this allowance reflected a detailed analysis of relevant factors:

> Allowance for Loan Losses
>
> The allowance for loan losses is management's estimate of credit losses inherent in our loan portfolio as of the balance sheet date.  The estimate of the allowance for loan losses is based on a variety of factors, including: the composition and quality of the portfolio; delinquency levels and trends; probable expected losses for the next twelve months; current and historical charge-off and loss experience; current industry charge-off and loss experience; the condition of the real estate market and geographic concentrations within the loan portfolio; the interest rate climate as it affects adjustable-rate loans; and general economic conditions. Determining the adequacy of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain.  Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan losses in future periods.   In general, we believe the allowance for loan losses should be at least equal to twelve months of probable projected losses for all loan types.  We believe this level is representative of probable losses inherent in the loan portfolio at the balance sheet date.

*Id.,* p. 19

140.   The 1Q2006 10-Q also indicated that non-performing loans (90 days past due or on which collection is uncertain) were 0.21% of real estate loans at quarter's end.   *Id.,* p. 19. E*TRADE represented that loans made to borrowers with weak credit histories were carefully monitored even if the loans were not delinquent.   E*TRADE further indicated that serious deterioration had not occurred:

In addition to nonperforming assets in the table above, ***we monitor loans where a borrower's past credit history casts doubt on the borrower's ability to repay a loan, whether or not the loan is delinquent*** ("Special Mention" loans).  Special Mention loans represented $142.0 million and $127.2 million of the total loan portfolio at March 31, 2006 and December 31, 2005, respectively.  These loans are actively monitored, continue to accrue interest and remain a component of the loans receivable balance.  The increase in Special Mention loans was primarily due to an increase in the 30-day delinquency category of mortgage loans. ***Significant migration from this category to more serious delinquency classifications has not occurred.***

*Id.,* at 20.

141.    Defendants' representations on May 9, 2006 were materially false or misleading because, *inter alia*:

a.    The statements regarding the lack of decline in asset quality, small loan provisions, and growth in net income and all drivers failed to disclose that E*TRADE's loan quality was poor, and E*TRADE's net income was heavily reliant on purchases of highly risky ABS and MBS and loan pools.  Defendants were so concerned about existing risks at the time of these statements that, just a few months before, they had hired executives to try to balance its existing risks with originated loans. (CW2. CW5);

b.    In addition, the statements about asset quality, small loan provisions and monitoring were false and misleading because only 1% of purchased loans were reviewed. (CW2), property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1), and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans (CW2, CW6) and every loan reviewed in certain loan samples was risky, but Defendants nonetheless refused to

review or return to the originators the entire loan pools related to these risky samples (CW4);

      c.      In addition, the statements about asset quality, small loan provisions and monitoring were materially false and misleading because, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs for the entire portfolio; and

      d.      E*TRADE's reported 1Q2006 10-Q assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments.

**Second Quarter 2006**

142.    On July 19, 2006, Defendants issued a press release announcing record results for E*TRADE's 2Q2006.  The release reported record net quarterly income of $156 million; record earnings of $0.36 per share; record total net revenue of $611 million; record enterprise net interest spread of 291 basis points; record operating margin of 43 percent; total client assets of $181 billion; $1.7 billion in total deposit growth; and an 82% increase in year-over-year DARTs. Defendants also raised the Company's earnings guidance for a second time in 2006 to a range of $1.42 to $1.52 per share (from the previous range of $1.35 to $1.50).

143.    The press release quoted defendant Caplan as stating:

*The strength of our second quarter results demonstrates the flexibility of our model, particularly amid an environment filled with significant macroeconomic*

58

***uncertainty.*** As retail customers respond to the market environment, they are increasingly looking for value from a broader set of financial solutions. Through our compelling value proposition across investing, trading, banking and lending products, we remain ideally positioned to capitalize on short-term market opportunities and long-term secular growth trends.

144.    On July 19, 2006, E*TRADE also held a conference call with analysts, during which defendant Caplan emphasized that E*TRADE consistently uses a "conservative" approach with respect to both credit and interest rate risks:

> ***One of the things that we have tried to do consistently over these last 17 years -- and we talked a little bit about on the call -- is obviously be conservative with respect to credit, and the same is true with respect to interest rate risk.***
>
> By and large, our position has always been modeled to a flat yield curve, and put ourselves in a position where we are relatively neutral with respect to interest rate risk. So there is no way you are absolutely neutral, but if you think about our business, it is an interesting statistic. If you thought about the bank balance sheet stand-alone, like many bank balance sheets, you would be liability sensitive. When you consolidate and run an enterprise balance sheet, we suddenly become asset sensitive.
>
> ***Clearly what that means is in a rising rate environment it will help us.*** You are basically ***pretty neutral***. Our duration mismatch at this point is about three months. I suspect what you would see is in up 100 you might see an increase of about $40 million in earnings, and up 50 you might see an increase of about half that. That is sort of the range that you might be willing to think about.

145.    During the July 19, 2006 call, defendant Caplan also underlined E*TRADE's ability to achieve stellar results under difficult economic conditions (due to its "value proposition" of focusing on bundled offerings to segmented customer markets, utilizing enhanced on-line tools):

> While our model enjoy [sic] all the leverage and operating benefits during a strong economic environment, ***it is precisely in these volatile macroeconomic conditions that we outperform and stand out in the industry***.
>
> ***While many in the financial services sector struggled in the second quarter, we generated top line growth while reducing total operating expenses.*** This combination translated into another quarter of record earnings and operating margins.

146.   During the same call, defendant Caplan also emphasized E*TRADE's business focus on providing financial services to consumers to increase profitability:

> We believe that the right model was to create complete integration between brokerage and bank, and then to run the entire company off of an integrated technology operations and service platform globally.
>
> \*   \*   \*
>
> With respect to the model, **we realigned our operations and management structure around customer segments**. Further, **we divested or exited non-core businesses**, improving consolidated profit margins and allowing us **to focus on building our core franchise.**
>
> \*   \*   \*
>
> Delivering relevant and timely financial solutions to the **tens of millions of global wealth-building customers will drive organic growth in accounts**, deeper customer engagement, and increased total profitability of the model.

147.   Similarly, E*TRADE COO Lilien stated that: "As we always say, at the center of our business is the global retail customer."

148.   In addition, defendant Caplan stated, in response to questions from securities analyst Campbell Chaney of Sander Morris Harris, that loan growth was being driven by E*TRADE's relationships with customers and on-line customer mortgage tools, and deflected an analyst's question which tried to ascertain how much of E*TRADE's loan growth was organic versus purchased:

> **Q**: Looking at your average home loans quarter-to-quarter, did that come from your Loan Optimizer [an online tool to help customers evaluate mortgage alternatives] or how did you get that growth?
> **Caplan**: Yes, so we're able to continue to grow our loan portfolio both on mortgages, home equity lines of credit and margin.  You saw margin growth.  I think margin was up about $500 million quarter-over-quarter on balance sheet, and about $400 million or $500 million as well in our home loans.  A lot of this is really is we're beginning to engage more and more with our customers.
>
> **Q:** It would be safe to say this was all organic from your existing customers?

**Caplan:** Some of it is organic. Some of it is purchase. But we have made a huge transformation away from being in the traditional sort of mortgage business where you originate and sell, or whether you're purchasing or whatever, and really pushed hard toward the growth of our balance sheet coming from our core retail customers.

149.    E*TRADE's stock closed at $22.41 on July 19, 2006, up from a $20.84 closing the previous day, an increase of 7.53%.

150.    Defendants' representations on July 19, 2006 were materially false or misleading because, *inter alia*:

a.    The statements that the Company was "conservative with respect to credit," and had experienced "record" growth in net income and other drivers, and was "outperforming" the industry failed to disclose that E*TRADE's net income was heavily reliant on purchases of highly risky ABS and MBS and loan pools from the very originators whom Defendants claimed E*TRADE would "outperform."  Defendants were so concerned about the risks of its purchased portfolios at the time of these statements that, months previously, they had hired executives to try to balance these risks with originated loans;  (CW2, CW5)

b.    In addition, the statements that the Company was "conservative with respect to credit" were belied by facts such as that property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1), and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans (CW2, CW6) and every loan reviewed in certain loan samples was risky, but

Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4);

c.    In addition, representations that E*TRADE was "conservative with respect to credit" were materially false and misleading because, as the Company admitted after the close of the Class Period in its February 28, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs for the entire portfolio; and

d.    E*TRADE's reported 2Q2006 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS impairment adjustments.

151.    On August 8, 2006, Defendants filed E*TRADE's 10-Q for the second quarter ended June 30, 2006, reporting the 2Q2006 financial results previously announced on July 19, 2006.

152.    The "Summary Financial Highlights" focused on growth in customer deposits, acquisitions, and on-line customer tools such as a "cash optimizer":

> During the second quarter of 2006, **_we continued to improve our financial performance_**, as both total net revenue and net income increased over 50% when compared to the corresponding period in the prior year.  **_We believe these increases were driven both by our acquisitions of Harris direct and BrownCo as well as by our ability to grow customer cash and deposits, margin receivables and DARTs.  The growth in customer cash and deposits and margin receivables were the primary drivers of our increase in net operating interest income_**, and the growth in DARTs was the primary driver of our increase in commission revenue.  We were able to achieve this growth while increasing our operating margin to 43% in the second quarter of 2006 from 36% when compared to the

same period in the prior year. ***We believe this growth in operating margin reflects increasing efficiencies in our operations.***

Net operating interest income after provision for loan losses increased 71% to $334.3 million for the three months ended June 30, 2006, compared with the same period in 2005.  Net operating interest income benefited from increases in customer cash and deposits coupled with growth in interest-earning assets. Customer cash and deposits, our lowest cost sources of funds, increased $12.0 billion compared to the same period in 2005.  The increase in customer cash and deposits resulted both from our acquisitions, which added $8.0 billion of customer cash and deposits, and from organic growth, which added $4.0 billion.  We believe our organic growth is a result, in part, of the Intelligent Cash Optimizer within E*TRADE Complete, which continues to drive growth in customer cash and deposit balances.  Average enterprise interest-earning assets increased by $12.0 billion compared to the same period in 2005, partially driven by our acquisitions which added $3.9 billion of margin receivables to our balance sheet.

*     *     *

E*TRADE 2Q2006 10Q, p. 6.

153.    In the 2Q2006 10Q, Defendants once again represented that E*TRADE's credit risk would ***improve*** as its real estate loan portfolio increased:

Loans receivable, net increased 7% to $20.9 billion at June 30, 2006 from $19.4 billion at December 31, 2005. We continue to focus our growth in real estate loans while allowing our consumer loans to decline.  ***We anticipate that our mortgage and HELOC portfolios will continue to increase during 2006, and we believe this will improve our credit risk profile.***  We anticipate that recreational vehicle and marine loan balances will continue to decline over time due to the sale of the E*TRADE Consumer Finance Corporation in 2005, and automobile loans will continue to decline due to our exit of the automobile origination business in 2004. Other loans include commercial loans which increased 71% to $151 million during the six months ended June 30, 2006.

E*TRADE 2Q2006 10Q, p. 23.

154.    E*TRADE's 2Q2006 10-Q also indicated that provisions for real estate loan losses as a percentage of receivables had remained flat at 0.20% for 2Q2006 (as well as the previous two quarters ended March 31, 2006 and December 31, 2005).   Although there was a dollar amount increase in the allowance, Defendants stated that this only related to real estate volume, and did ***not*** reflect adversely on credit quality:

During the six months ended June 30, 2006, the allowance for loan losses increased by $3.8 million from the level at December 31, 2005. The increase was primarily due to growth in the real estate loan portfolio. Compared to June 30, 2005, the allowance for loan losses balance increased $11.7 million.  This increase was mainly attributable to an increase of $5.5 billion in the real estate loans receivable portfolio over the same period.  *We believe that these increases to the allowance are the result of growth in the loan portfolio and do not indicate a decline in overall credit quality.*

*Id.,* p. 24.

155.    Defendants also indicated, under the heading "Allowances for Loan Losses," that allowances were based on management's analysis of relevant considerations for individual loans and loan pools:

> The allowance for loan losses is management's estimate of credit losses inherent in our loan portfolio as of the balance sheet date.  The estimate of the allowance for loan losses is based on a variety of factors, including the composition and quality of the portfolio; delinquency levels and trends; probable expected losses for the next twelve months; current and historical charge-off and loss experience; current industry charge-off and loss experience; the condition of the real estate market and geographic concentrations within the loan portfolio; the interest rate climate as it affects adjustable-rate loans; and general economic conditions. Determining the adequacy of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain.  Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan losses in future periods.  In general, we believe the allowance for loan losses should be equal to at least twelve months of probable projected losses for all loan types.  We believe this level is representative of probable losses inherent in the loan portfolio at the balance sheet date.
>
> In determining the allowance for loan losses, we allocate a portion of the allowance to various loan products *based on an analysis of individual loans and pools of loans*.  However, the entire allowance is available to absorb credit losses inherent in the total loan portfolio as of the balance sheet date.

*Id.,* p. 23-24.

156.    E*TRADE's 2Q2006 10-Q also indicated that total non-performing loans as a percentage of gross loans held for investment in 2Q2006 was 0.22%.  Defendants once again insisted that additional allowances did *not* reflect a deterioration in credit quality, anticipated a

*decrease* in loan allowances on real estate loans, and again stated that loans where credit history

might be in doubt were carefully monitored, and that serious delinquencies were not expected:

> During the six months ended June 30, 2006, our nonperforming assets, net increased $14.1 million from $41.2 million at December 31, 2005. The increase is attributed to an increase in nonperforming real estate loans and REO and other repossessed assets, net of $15.9 million, offset by a decrease in nonperforming consumer and other loans of $1.8 million. ***These trends are not the result of a deterioration or improvement in credit quality, but reflective of our targeted growth in real estate loans and the targeted decrease in consumer loans.***
>
> The allowance as a percentage of total nonperforming loans, net decreased 39% during the six months ended June 30, 2006***. As our loan portfolio shifts to mortgage loans, where the risk of charge-off is generally less than the risk of charge-off on a consumer loan, the level of the allowance to nonperforming assets may continue to decrease.***
>
> In addition to nonperforming assets in the table above, ***we monitor loans where a borrower's past credit history casts doubt on the borrower's ability to repay a loan, whether or not the loan is delinquent*** ("Special Mention" loans). Special Mention loans represented $129.3 million and $127.2 million of the total loan portfolio at June 30, 2006 and December 31, 2005, respectively. ***These loans are actively monitored***, continue to accrue interest and remain a component of the loans receivable balance. The increase in Special Mention loans was primarily due to an increase in the 30-day delinquency category of mortgage loans. ***Significant migration from this category to more serious delinquency classifications is not expected to occur."***

*Id.,* p. 25.

157.    Defendants also claimed that they evaluated ABS and MBS in light of various

factors, that this evaluation is utilized for "improvement" where appropriate, and that a decision

to increase these holdings was made based on this evaluation:

> Available-for-sale securities represented 30% and 29% of total assets at June 30, 2006 and December 31, 2005, respectively. Available-for-sale securities increased to $14.7 billion at June 30, 2006, primarily due to the growth in our mortgage-backed and asset-backed securities portfolio. ***We evaluate our available-for-sale securities in light of changing market conditions and other factors and, where appropriate, take steps intended to improve our overall position***. Based on this evaluation, we decided to grow our mortgage-backed and asset-backed securities portfolio during the current period.

*Id.*, p. 26.

158.    Defendants' representations on August 8, 2006 were materially false or misleading because, *inter alia*:

>    a.    The statements regarding continued improvement in financial performance, the lack of decline in asset quality, small loan provisions, and growth in net income and revenue (including attributing net income and revenue growth primarily to acquisitions and customer cash and deposits, etc.) failed to disclose that E*TRADE's loan quality was poor, and E*TRADE's net income was heavily reliant on purchases of highly risky ABS and MBS and loan pools.   Defendants were so concerned about existing risks at the time of these statements that, just a few months before, they had hired executives to try to balance its existing risks with originated loans. (CW2, CW5);

>    b.    In addition, the statements about improvement in financial performance, asset quality, growth in net income and revenue, small loan provisions and monitoring were false and misleading because only 1% of purchased loans were reviewed (CW2), property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1), and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans (CW2, CW6) and every loan reviewed in certain loan samples was risky, but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4);

c.        In addition, the statements about asset quality, small loan provisions and monitoring were materially false and misleading because, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs for the entire portfolio;

d.        The statement "We evaluate our available-for-sale securities in light of changing market conditions" was false and misleading because, inter alia, as the Company admitted after the close of the Class Period in its February 28, 2008 response letter to the SEC, the Company did not track current CLTV/LTVs for the entire portfolio; and

e.        E*TRADE's reported 2Q2006 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments.

**Third Quarter 2006**

159. On October 18, 2006, after the close of the market, Defendants issued a press release entitled "E*TRADE FINANCIAL Corporation Announces Strong Third Quarter Results; Narrows 2006 Earnings Guidance Range," announcing results for E*TRADE's 3Q2006, reporting net income of $153 million, earnings of $0.35 per share, total net revenue of $582 million, record net operating interest income after provision for loan losses of $343 million, enterprise net interest spread of 286 basis points, organic growth of $1.5 billion in total customer cash and deposits, and total retail client assets of $185 billion. Defendants narrowed

67

the 2006 earnings guidance range slightly from $1.45 to $1.50 per share from the previous

range of $1.42 to $1.52 per share.  In the press release, defendant Caplan stated:

> In the third quarter we generated growth in client assets and cash, fueled by
> expanded customer engagement across our suite of value-oriented financial
> solutions.  ***Our success is a testament to our integrated business model, which
> delivers quality results through various market conditions***.  As we expand
> globally by exporting our proven US value proposition to our international
> locations, we are extremely optimistic about the long-term growth potential of the
> franchise.

160.    In the accompanying 3Q2006 earnings conference call on October 18, 2006,

defendant Caplan, in response to questions from securities analysts, including Prashant Bhatia of

Citigroup, made the following positive (but false and misleading) representations regarding the

credit characteristics of E*TRADE's loan portfolio:

> **Caplan:** We have not really relied very much on the credit side of the balance
> sheet.   In the last probably six to nine months, we've made some significant
> changes from an operational perspective around the origination again of credit
> products, so margin, mortgage, key lock, things like that.  ***And one of the thing
> that's pretty – I was pleased with in the quarter is that we were able to grow our
> mortgage originations quarter over quarter by 5%, obviously in a market where
> mortgage originations are declining elsewhere generally speaking in the
> environment.***  And rather than originate mortgages which we have typically sold
> into the secondary market of our customers, we're now keeping the vast majority
> of them on balance sheet. So you saw a significant increase on a percentage basis
> of the numbers.
>
> So I was really quite pleased that what we actually did is we got out of mortgage
> backed securities and replaced those mortgage backed securities in this past
> quarter with mortgage whole loans and home equity lines of credit.  Again, ***credit
> characteristics on average are a 740 FICO score***.  ***LPVs on the first are at about
> 70%;*** LPVs on the key locks and seconds are at about 77 – 78%.  ***I feel really
> good about the credit characteristics*** and frankly the ability to finally be in a
> place where we're starting to really originate again.
>
> *                   *                   *
>
> **Q:** 1 billion dollars.  Okay.  And then in terms of the loan growth, the $2.5 billion,
> how much of that loan growth is purchased versus originated yourselves?
>
> **Caplan:** Do you know what?  I have – let me go to the numbers.  ***The percentage***

*of origination versus purchase is up dramatically and so it's improved hugely.*
So let me wait and go – I don't want to misstate it.  Let me go back to the
numbers and I'll give it to you when we do a follow up call if you'd like.

161.    Defendants' representations on October 18, 2006 were materially false or
misleading because, *inter alia*:

a.    The positive statements concerning the Company's loan portfolio credit
characteristics (including representations regarding credit scores and other characteristics,
and that defendant Caplan "felt good" about these) and strong performance were
materially false and misleading because: E*TRADE failed to effectively disclose that
much of its loan portfolio had been purchased from sellers with questionable origination
practices rather than generated from E*TRADE customers, and failed to disclose that
E*TRADE's net income was heavily reliant on purchases of highly risky ABS and MBS
and loan pools.  Defendants were so concerned about these risks that earlier the same
year, they had hired executives to try to balance these risks with originated loans. (CW2,
CW5)  In addition, originations remained a small percentage of E*TRADE's portfolio;

b.    In addition, the statements about loan portfolio credit characteristics were
false and misleading because only 1% of purchased loans were reviewed (CW2),
property appraisals were constantly grossly overstated, substantially increasing the
riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated
at the same time Defendants increased E*TRADE's purchase of risky loans with
insufficient information (CW1), and defendant Webb was buying pools comprised of at
least 50% risky, subprime loans while the due diligence staff was too overworked and
understaffed to review and verify most of the purchased loans (CW2, CW6) and every
loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to

review or return to the originators the entire loan pools related to these risky samples (CW4);

        c.      In addition, the statements about loan portfolio credit characteristics were materially false and misleading because, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs for the entire portfolio;

        d.      The statements regarding E*TRADE's average loan per value ratios were false and misleading because, *inter alia*, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC, the Company did not track current CLTV/LTVs for the entire portfolio; and

        e.      E*TRADE's reported 3Q2006 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments.

162.    On November 7, 2006, Defendants filed E*TRADE's 20063Q Form 10-Q, which reported financial results as announced on October 18, 2006.  The 10-Q indicated that provisions for loan losses had decreased "3% to $12.5 million and 13% to $33.0 million for the three and nine months ended September 30, 2006, respectively, compared to the same periods in 2005." 2006 3Q 10-Q, p. 12.

163.    E*TRADE's 20063Q 10-Q also indicated that increased mortgage and HELOC loans would improve the Company's credit risk.

Loans receivable, net increased 20% to $23.2 billion at September 30, 2006 from $19.4 billion at December 31, 2005. We continue to focus our growth in real estate loans while allowing our consumer loans to decline. ***We anticipate that our mortgage and HELOC portfolios will continue to increase over time, and we believe this will improve our credit risk profile.*** We anticipate that recreational vehicle and marine loan balances will continue to decline over time due to our sale of the E*TRADE Consumer Finance Corporation in 2005, and automobile loans will continue to decline due to our exit of the automobile origination business in 2004. Other loans include commercial loans which increased 103% to $179.2 million during the nine months ended September 30, 2006.

E*TRADE 3Q2006 10-Q, p. 22.

164.    E*TRADE's 2006 3Q 10-Q also indicated that allowances for loan losses as a percentage of real estate loans receivable had decreased to 0.19% for the 2006 3Q from 0.20% for 2006 2Q, 2006 1Q, and 2005 4Q. *Id.,* p. 23. Once again, Defendants represented that this (low) loan loss allowance reflected the careful monitoring of relevant trends:

**Allowance for Loan Losses**

The allowance for loan losses is management's estimate of credit losses inherent in our loan portfolio as of the balance sheet date. ***The estimate of the allowance for loan losses is based on a variety of factors, including the composition and quality of the portfolio; delinquency levels and trends; probable expected losses for the next twelve months; current and historical charge-off and loss experience; current industry charge-off and loss experience; the condition of the real estate market and geographic concentrations within the loan portfolio; the interest rate climate as it affects adjustable-rate loans; and general economic conditions.***

2006 3Q 10-Q, pp. 22- 23.

165.    E*TRADE's 2006 3Q 10-Q indicated that non-performing assets as a percentage of gross loans held for investment was 0.24%. *Id.,* p. 24. Defendants again indicated that loans are monitored "where a borrower's past credit history casts doubt on the borrower's ability to repay a loan, whether or not the loan is delinquent. . . ." and that "significant migration" from the thirty day past due category "to more serious delinquency classifications is not expected to occur." *Id.,* p. 24.

166.   E*TRADE's common stock closed at $23.63 on November 7, 2006, up 2.47% from the previous day's close of $23.27, and continued to increase another 1.31% the next day, to close at $23.94 on November 8, 2006.

167.   Defendants' representations on November 7, 2006 in the 2006 3Q Form 10-Q were materially false or misleading because, *inter alia*:

      a.    The positive statements concerning the Company's credit risk profile, loan loss allowances, monitoring and delinquencies history and expectations were materially false and misleading because: E*TRADE failed to effectively communicate that most of its loan portfolio had been purchased from sellers with questionable origination practices (such as National City, which was cited by HUD for serious deficiencies in August 2006), rather than generated from E*TRADE customers; E*TRADE was failing to track current LTV/CLTV values which is a key indicator of borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; and E*TRADE failed to disclose other issues with the servicers/originators of E*TRADE's mortgage loan portfolio;

      b.    Statements regarding E*TRADE's net income growth and growth in other drivers failed to disclose that E*TRADE's net income was heavily reliant on purchases of highly risky ABS and MBS and loan pools.  Defendants were so concerned about these risks that earlier the same year, they had hired executives to try to balance these risks

with originated loans.  (CW2, CW5);

c.      In addition, the statements about the Company's credit risk profile, loan loss allowances, monitoring and delinquencies history and expectations were materially false and misleading because only 1% of purchased loans were reviewed (CW2), property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1), and defendant Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans (CW2, CW6) and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4);

d.      More specifically, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs for the entire portfolio; and

e.      E*TRADE's reported 3Q2006 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS impairment adjustments.

**Fourth Quarter 2006**

168.    On November 14, 2006 at a Merrill Lynch Banking & Financial Services
Conference, defendant Caplan represented that a big part of the drive in net income growth was
the Company's focus on mass affluent customers, and that E*TRADE was controlling credit risk
by, among other things, focusing on LTVs:

> [I]f you look at the proof points, and you see the growth in net revenue in these
> last couple of years, it's up, I don't know, 85%. A big part of the driver,
> obviously, is the migration of the mass affluent customer base and then the depth
> of penetration…so as you think about credit risk, fundamentally nothing has
> changed in our business model since about '89 when we first began….[T]here
> was no point in taking any risk, whatsoever…
>
> And when you look at mortgages, the only way that I think we know to control
> credit risk is to focus on three things: average FICO scores and making sure that
> *when you look at your whole portfolio* you look at average median and mode to
> ensure you don't have any outliers, so you focus on the FICO score, *you focus on
> loan to value*, and then finally you look at geographic diversity and try to avoid
> any concentration.

169.    The foregoing statements at the Merrill Lynch conference were false and
misleading because, *inter alia*:

        a.    Defendants were not focusing on "loan to value," and were taking on
credit risk. Property appraisals were constantly grossly overstated, substantially impairing
loan to value ratios, and increasing the riskiness of the loan portfolio (CW3), experienced
conservative brokers were terminated at the same time Defendants increased
E*TRADE's purchase of risky loans with insufficient information (CW1), and Webb was
buying pools comprised of at least 50% risky, subprime loans while the due diligence
staff was too overworked and understaffed to review and verify most of the purchased
loans.  (CW2, CW6);

        b.    Moreover, the statement that E*TRADE was looking "at the whole

portfolio" "focus[ing] on loan to value" was false and misleading because, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions and the Company did not track current CLTV/LTVs for the entire portfolio; and

c.       E*TRADE's net revenue and net income were overstated because Defendants failed to record adequate loan loss provisions and ABS impairment adjustments.

170.    On November 28, 2006, an E*TRADE company representative (upon information and belief, E*TRADE's President, Lilien) spoke at an "FBR [Friedman, Billings, Ramsey] Investor Conference," touting E*TRADE's management of risk and "risk adverse" credit quality:

> Now you'll get the quality of our balance sheet that has also improved quite a lot over the last couple of years . . . .
>
> Now, another thing that people ask a lot about is the credit quality of the balance sheet, especially in the economic environment that we're in today.  ***Traditionally, we have never been interested in credit risk.  And I think that goes like triple for now, because even if you were interested in credit risk, you just don't get paid for taking credit risk today.   But historically and we continue today, we really are risk averse.  Our average FICO scores are very high, creating subprime and <u>superprime</u> basically on balance sheet, low LTVs of loan-to-values***, and then, we make sure that we don't have a geographic mix that puts too much of our loans in any one part of the country.  So, we want to be spread out, and we continue to manage risk that way.
>
> ***So we're running a very low-risk balance sheet*** and I guess, wrapping it all up, we talked about how the models transform the opportunities transformed, the opportunity is global. . . . So basically, great opportunity;, mass affluent.  We haven't even begun to really tap it, but we got great proof points of success already.

171.    Defendants' statements at the November 28, 2006 conference, including their characterization of E*TRADE's loans as "***superprime***," were materially false or misleading for reasons stated with respect to previous representations, and because, *inter alia*, E*TRADE's loan portfolio and balance sheet included significant amounts of high risk loan products (which were not even "prime," much less ***"superprime"***), purchased from originators engaged in risky lending, with minimal due diligence.

172.    On December 13, 2006, defendant Caplan spoke at a Goldman Sachs Financial Services CEO Conference, again lauding the lack of credit risk at E*TRADE:

> Again, the goal is to do this and one of the things that is interesting is we have not changed our philosophy literally since we have started the banks, since I stared in '89 around credit.  We have always been and I believe that a least for our model, it is the right way to think about it, a business I would rather be more leveraged and hold between 5 and 6% Tier 1 capital and be more leveraged and ***take virtually no credit risk***.  So we have therefore focused almost exclusively on mortgage and margin loans.
>
> ***Within mortgage loans, we focus exclusively on what you would define almost a super prime***.  So whether you look at average median or mode across the board, they are in the mid-700, 720, 730 range across all the products and services. ***LTVs are probably way below what are typically industry averages***, you can see we are at 68 or 69% in first lien positions, we are in the mid 70, 76, 77% it is a little high there compared to what we are running now in home equities.
>
> . . . . [F]rom the early days looking at the customer base, I knew, it's high FICO score and I knew they were geographically diverse across the entire United States . . . .

173.    Defendants' statements at the December 13, 2006 conference (including defendant Caplan's characterization of E*TRADE's loans as "almost a super prime") were materially false or misleading for reasons stated as to previous representations, and because, *inter alia*, E*TRADE's loan portfolio and balance sheet included significant amounts of high risk loan products (which were not even prime, much less "superprime"), purchased from originators engaged in risky lending, with minimal due diligence; property appraisals were

constantly grossly overstated, substantially impairing LTVs, and increasing the riskiness of the

loan portfolio (CW3); experienced conservative brokers were terminated at the same time

Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1),

and Webb was buying pools comprised of at least 50% risky, subprime loans while the due

diligence staff was too overworked and understaffed to review and verify most of the purchased

loans.  (CW2, CW6)

**E\*TRADE Offers Positive Earnings Guidance**

174.    On December 14, 2006, Defendants issued a press release entitled "E*TRADE

Financial Corporation Issues 2007 Earnings Guidance And Reports November Activity,"

announcing 2007 earnings guidance of $1.65 to $1.80 per share on total net revenue of between

$2.75 to $3.0 billion (an implied midpoint growth of 15% to 26%).  The press release quoted

defendant Caplan stating:

> Our 2007 earnings guidance showcases the ***true growth potential embedded in
> the franchise***.
>
> We've made investments in operations, service, products and marketing over the
> past three years, providing us with the ***confidence to deliver significant organic
> growth*** in net revenue, net income and segment income in the coming year.

175.    On December 14, 2006, Defendants (including defendants Caplan and Simmons)

also participated in a 2007 Guidance Call.  Defendant Caplan extolled the Company's success,

stating that it had been an "extraordinary year" for E*TRADE, that the Company "achiev[ed]

robust organic growth, particularly in our targeted segments," and that E*TRADE "***is poised to

generate accelerated growth in 2007 and beyond***."  Defendant Caplan added that:

> We have long said that we define ourselves as a growth company based on our
> ability to generate annual revenue growth of 10% to 15%, earnings growth of
> 15% to 20%, with operating margins approaching 50%.  From our current
> inflection point ***the company is positioned to not only meet but exceed those
> growth targets in 2007.***  Based off the current 2006 consensus revenue and

GAAP EPS estimate, the annual guidance we establish today reflects revenue growth of 14 to 24% from the low to high end of the range, GAAP EPS growth of 15 to 26% with an annual operating margin of 47%. Most importantly, we expect to deliver these strong results even as we make additional investments in marketing and service.

176.     E*TRADE COO Lilien added that: "In 2007, we will deliver strong results by growing and retaining our base of mass affluent customers, active traders and customers with both characteristics, these all representing our targeted accounts."

177.     Defendant Simmons then added that: "As a result of our ***disciplined growth in the balance sheet***, we expect to see continued growth in net interest income in 2007, despite our expectations of a fed rate cut and an inverted to relatively flat yield curve."  Defendant Simmons also stated: "We believe this forecast [2007 GAAP EPS range of $1.65 to $1.80] demonstrates the company's ***strong organic revenue and earnings growth capacity.***"  These statements were, as demonstrated above, false because, *inter alia*, the growth of E*TRADE's balance sheet was not the product of ***"disciplined growth,"*** but rather the opposite and, as a result, that balance sheet, unbeknownst to the investing public, contained hundreds of millions of dollars in overvalued loans that required significant write-downs and write-offs.

178.     E*TRADE common stock closed at $22.76 on December 14, 2006, up 0.56% from the previous day's close of $22.41, and continued to increase another 1.89% the following day, to close at $23.19 on December 15, 2008.

179.     Defendants' statements on December 14, 2006, in the 2007 earnings guidance press release and accompanying conference call were materially false and misleading for the reasons stated with respect to previous representations, and because, *inter alia*, Defendants knew that the guidance issued, and statement that E*TRADE was "poised to generate accelerated growth in 2007" and beyond, was false, lacked any reasonable basis in fact, and was

unachievable in light of the significant risks and lack of due diligence regarding E*TRADE's loan portfolio.  Indeed, early the same month (December 2006) when Defendants publicly issued E*TRADE's optimistic 2007 guidance, defendant Caplan internally told employees at a Virginia employee meeting that he expected profits to be down and to continue to go down for the next year. (CW14)  In fact, Defendants knew or recklessly disregarded the fact that E*TRADE's loan portfolio was materially overvalued and required significant, multimillion dollar write-offs and reserves that would adversely affect the Company's stated asset values, net income and profits.

180.   On December 14, 2006, E*TRADE also issued a separate press release announcing that its common stock would be listed on the NASDAQ Global Select Market under the new symbol ETFC starting on December 27, 2006 (at market open).  E*TRADE indicated that it would cease trading on the NYSE and elsewhere under its NYSE symbol ET effective with the market close on Tuesday, December 26, 2006.

**Fiscal 2006 Year-End Results**

181.   On January 18, 2007, Defendants issued a press release entitled "E*TRADE Financial Corporation Announces Fourth Consecutive Year Of Record Results," announcing "record results" for E*TRADE's 2006 4Q and year ended December 31, 2006.  For 2006 4Q, E*TRADE reported net income of $176.7 million, or $0.40 per share, (compared to $129.4 million, or $0.32 per share a year ago) on net revenue of $628.8 million (as compared with $478.9 million in the fourth quarter of fiscal 2005).  For fiscal 2006, E*TRADE announced net income of $628.9 million, or $1.44 per share on total net revenue of $2.4 billion.  Defendant Caplan stated that:

> In 2006 the Company delivered a fourth consecutive year of record results while successfully integrating two key acquisitions and strategically investing in product, service and marketing to strengthen the future performance of the franchise. . . . As a result of this success, **we enter 2007 ideally positioned to**

*capitalize on the secular growth trends of the industry*, and we will continue to seek out targeted investments to build stronger client relationships and drive broader product engagement in the US and abroad.

182.    On January 18, 2007, E*TRADE also hosted a conference call in which defendant Caplan touted the record results for 4Q and FY 2006, and repeated the claim that "Though focus and *discipline*, we are building a franchise that can continue to deliver *significant organic growth year after year*."

183.    During the same call, when asked about a bit of a spike in charge-offs at the same time that E*TRADE was reducing its provision for loan losses, defendant Caplan claimed that E*TRADE was "significantly insulated" from adverse trends due to the high credit quality of E*TRADE's "products" and that charge offs were merely due to "seasoning" of E*TRADE's mortgage portfolio, an analysis which was endorsed by defendant Webb:

> **Caplan**: The other point I would make, and you are right, is that when you look at our charge-offs, they increase from about 17 basis points to about 22 basis points in the quarter. What we believe is that *there are two things happening*. One is sort of the *seasonality* associated with the mortgage product, and more important, I mean the *seasoning of the mortgage portfolio*. So as we've added mortgages and HELOCs, and the other is the seasonality. If you go back and look at the same quarter last year, you typically have a spike in your consumer portfolio in Q4 around seasonality, which typically reverses as you move through Q1. So I think it would be impossible for us to believe that we are not immune, or that we are immune to what's happening on a macro-economic level, and clearly macro-economically credit is getting worse. *I think that we believe that we are significantly insulated, because of the kind of products we have, the way in which we focus on FICO and LPDs and debt to income*. And I think at a high level. I'd tell you that one of the things that we look at is our first lien position mortgages still continue to be about a basis point. Our HELOCs and [inaudible] are somewhere in the neighborhood of anywhere from 6 to 26. So your blended portfolio and net charge-offs from mortgage is about 11 basis points against a reserve out there of still about I don't know, 26. So I think we feel pretty comfortable and where we're seeing a bit more of a spike is in consumer, which I think is driving some of Dennis's decisions. You want to add anything?

> **Webb:** There's not a lot to cover, I think Mitch covered most of it. But just Matt, the one thing I would point to is our allowance. So as of the end of the year, we had $67 million in our allowance, and that again is our expected losses for the next 12 months. And so for '06, you saw actual charge-offs of about $40 million.

We are anticipating in '07 that those losses will increase to about $67 million. And so again, on a run rate basis, absolutely you'll see charge-offs increase, again **due to the growth in the portfolio and the seasoning of the portfolio.**

184.   Also during the January 18, 2007 conference call, E*TRADE's COO, Lilien, touted E*TRADE's addition of "high-quality margin and mortgage assets" to its mortgage lending portfolio:

With respect to lending, this year we launched the Intelligent Lending Optimizer, an online tool that allows customers to evaluate their credit alternatives, including margin and mortgage products. We continue to make substantial strides as we re-engineer our lending origination platform. Realignment of this business will further our ability to originate more first-lien mortgage loans to put on our balance sheet. **During the quarter, we continued to add high-quality margin and mortgage assets to the portfolio, with growth of over $3 billion in the fourth quarter, our loans as a percentage of interest earning assets now stands at 65%, up from 62% at the end of Q4 2005.**

As a measure of continued engagement in the aggregate, total retail client assets have reached record levels. During Q4, we saw net new retail asset inflows from current and new customers of $1.3 billion, while total assets increased by $10 billion to a record $195 billion, along with strong market trends.

185.   Defendant Simmons also claimed during the same call: "Embedded within our top-line growth was a further improvement in the **quality of revenue**," and lauded the Company's "**financial discipline**." Simmons also represented that E*TRADE "grew the balance sheet" while adhering to "strict discipline with respect to credit quality." He indicated that "average FICO scores, loan-to-value ratios and debt-to-income ratios either remained constant or improved" with average FICO scores of 737 and average loan to values on mortgages of 73%:

Looking at the quarter, consolidated net revenue totaled $630 million, up 8% sequentially and 31% year over-year.   Net operating interest income after provision increased $21 million versus the prior period to a record $364 million, growing 50% year-over-year. While maintaining a relatively flat net interest spread quarter-over-quarter, the increase in net interest income was generated through continued growth in the balance sheet with average interest-earning assets up 7%. **We grew the balance sheet while adhering to our strict discipline with respect to credit quality.** This discipline has led us to reduce our exposure to unsecured consumer lending products, **particularly as we build out and**

*expand our mortgage origination platform, which will focus on high-quality first-lien products to hold on balance sheet.* We made the determination to sell roughly $63 million of balances from our credit card portfolio, where the underlying customers had no other relationships with the company, and the risk-adjusted return on these assets was not attractive, given the focus of our model. As a result of selling these balances, our provision was effectively lowered by $4 million, but we realized a $4 million net loss on the sale, making the transaction net neutral to reported revenues.

Examining the growth in our mortgage-related assets, for both the quarter-over-quarter and year-over-year periods, the average FICO scores, loan to value ratios, and debt-to-income ratios either remained constant or improved.  As of December 31st, *our average FICO score across the portfolio is 737, average loan to values on mortgages are 73%,* and debt to income averages 30%.

186.    On January 18, 2007, E*TRADE stock closed at $24.71.

187.    Defendants' representations in the January 18, 2007 press release and accompanying conference call were materially false or misleading for the reasons stated as to previous representations, and because, *inter alia*:

    a.    The positive statements about the Company's "organic growth," "discipline," "high quality assets", etc. were materially false and misleading because: E*TRADE failed to effectively communicate that most of its loan portfolio had been purchased from sellers with questionable origination practices (such as National City, which was cited by HUD for serious deficiencies in August 2006), rather than generated from E*TRADE customers; E*TRADE was failing to track current LTV/CLTV values which is a key indicator of  borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; and E*TRADE failed to disclose other issues

with the servicers/originators of E*TRADE's mortgage loan portfolio;

b.     Statements regarding E*TRADE's net income growth and growth in other drivers failed to disclose that E*TRADE's net income was heavily reliant on purchases of highly risky ABS and MBS and loan pools.  Defendants were so concerned about these risks that earlier the same year, they had hired executives to try to balance these risks with originated loans.  (CW2, CW5);

c.     Moreover, Defendants knew that E*TRADE was not "significantly insulated" or "ideally positioned to capitalize on the secular growth trends of the industry" as claimed, because, *inter alia*, over a month prior to the January 2007 press release (in early December 2006), defendant Caplan internally told employees at a Virginia employee meeting that he expected profits to be down and to continue to go down for the next year. (CW14);

d.     In addition, the statements about Company's "discipline" and "high quality assets" were materially false and misleading because only 1% of purchased loans were reviewed (CW2); property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3); experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1); and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans (CW2, CW6) and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4);

e.      More specifically, as the Company admitted after the close of the Class

Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4),

the Company merely reviewed a "sample" of purchased loans to ensure compliance with

the originator's guidelines and "minimum" credit criteria, some originators required

E*TRADE to purchase entire pools without exclusions, and the Company did not track

current CLTV/LTVs for the entire portfolio; and

f.      E*TRADE's reported 4Q2006 assets, net income and profits were

materially false and overstated because Defendants failed to record adequate loan loss

provisions and ABS and MBS impairment adjustments.

188.   On or about January 24, 2007, defendant Caplan spoke at the Wharton Leadership

Lecture Series, describing how he oversaw a "complete turnaround" of E*TRADE, which had

appeared doomed when defendant Caplan took the helm in 2003.  Defendant Caplan's lecture

glowingly explained that the turn-around was due to defendant Caplan's "laser-like" focus on

"mass affluent" customers and technology.  Defendant Caplan also reiterated unrealistic double-

digit forecasts for 2007, and misleadingly represented that E*TRADE's income was derived

from "traditional banking," minus the cost of bricks and mortar.  An article written about the

lecture stated, in part, the following:

> In just four years, Caplan -- who joined E*Trade as chief banking officer after a
> 2000 merger -- has overseen the complete turnaround of a company that appeared
> doomed once the mania over online stock trading subsided and Wall Street began
> to demand actual profits, not just revenue growth.
>
> . . . . Not only did Caplan slash the company's once-huge advertising budget by
> more than two-thirds, but he also eliminated a lot of high-profile ventures such as
> ATM machines and even a retail store hawking E*Trade merchandise in midtown
> Manhattan. The new management instead emphasized value-oriented banking
> services, using its edge in Internet services, software and technology to offer
> higher returns on deposits and competitive rates on loans. . . .

*In 2007, the now-profitable E\*Trade is forecasting earnings growth in a range of 14% to 24% and revenue gains in the area of 15% to 26%, with annual revenue expected to top $3 billion for the first time*.  Its share price has surged back over $25, more-than an eight-fold increase from its low point. Relocated under Caplan from California's Silicon Valley to New York, E\*Trade employs more than 4,000 people

The 'Mass Affluent'

Strategically, *the key to the turnaround, according to Caplan, has been a laser-like focus on exactly who the potential customers of E\*Trade Financial are and what financial services they are likely to need*, as well as which products are not necessary at all.  Rather than compete for the small pool of very high-wealth customers, he said, E\*Trade seeks a group that Caplan calls the 'mass affluent' -- investors with between $50,000 and $500,000 in liquid assets eager to build wealth.. . . .

E\*Trade Financial is offering those ['mass affluent'] customers 'some combination of price and then functionality by using technology that makes it easier and more integrated and then giving appropriate levels of service,' Caplan said.  Experts note that a key reason for E\*Trade's recent success has been its edge in Internet software and platforms that make it easy for online users to determine how best to weigh their assets between stocks and interest-bearing banking accounts, and then provide the ability to transfer their money in a matter of seconds.

This newer model means that a much smaller share of E\*Trade Financial's revenue comes from rapid, low-commission day trading of stocks; equity trading accounted for 60% to 65% of the firm's revenue at the start of the decade, but just 16% to 17% today, according to Caplan.  Now, more than half of the company's income is the result of net-interest income, *which derives from traditional banking.*

It is not surprising, perhaps, that Caplan drove the company in that direction. From 1989 though 2000, the Brandeis University graduate, with a law degree and an MBA from Atlanta's Emory University, founded and guided TeleBank, which pioneered the art of offering customers better rates by doing business without the high cost of bricks-and-mortar.  Since the Internet was not in wide use in the early 1990s, customers handled transactions over the phone or made deposits through the mail.

"How E\*Trade's Caplan Brokered a Turnaround for a Once-doomed Company,"

http://knowledge.wharton.upenn.edu/article.cfm?articleid=1643.

189.    E*TRADE's stock closed at $24.67 on January 24, 2008, up 3.31% from the previous day's close of $23.88.

190.    Defendant Caplan's statements during his Wharton speech were false and misleading for the reasons stated as to previous statements, and because, *inter alia*:

  a.    Caplan failed to explain that E*TRADE's glowing income figures and projections were based on purchases of risky mortgages, ABS and MBS;

  b.    Caplan knew that E*TRADE would not achieve the glowing income figures and projections stated because in early December 2006 (over a month prior to the January 2007 Wharton Leadership conference), Caplan internally told employees at a Virginia employee meeting that he expected profits to be down and to continue to go down for the next year. (CW14); and

  c.    The statements regarding the key to E*TRADE's turnaround and a "laser-like focus" on E*TRADE's potential customers and attributing more than half of the Company's net income to "traditional banking" were false and misleading because, E*TRADE was reliant on a loan portfolio which was mostly purchased from sellers with questionable origination practices (such as National City, which was cited by HUD for serious deficiencies in August 2006), rather than generated from E*TRADE customers.

**E*TRADE's 2006 10-K Statements re: Credit Risk Management**

191.    On March 1, 2007, Defendants filed E*TRADE's Form 10-K, which reported the 2006 4Q and 2006 annual results previously announced on January 18, 2007.

192.    The 2006 10-K stated that E*TRADE's real estate lending portfolio consisted of $5,724,331,000 in one-to-four family fixed-rate real estate loans, $5,425,627,000 in one-to-four family adjustable-rate real estate loans, and $11,809,069,000 in HELOC, HEIL and other real

estate loans (a total of $22,959,027,000 in real estate loans). *Id.,* p. 59.

193.    The 2006 10-K portrayed E*TRADE as having a sophisticated approach to risk management, through a governance structure involving various boards, senior management and several risk committees:

> As a financial services company, we are exposed to risks in every component of our business. . . .  ***The identification and management of risks are the keys to effective risk management. Our risk management practices support decision-making, improve the success rate for new initiatives and strengthen the organization.  Our goal is to balance risks and rewards through effective risk management.  We do not believe that risks can be completely eliminated; however, we do believe risks can be identified and managed within the Company's risk tolerance.***

> We manage risk through a governance structure involving the various boards, senior management and several risk committees. We use management level risk committees to help ensure that business decisions are executed within our desired risk profile.

> ***The Corporate Risk Committee, consisting of senior management executives, monitors risks throughout the Company. In addition to this committee, various departments throughout the Company aid in the identification and management of risks. These departments include internal audit, compliance, finance, legal, treasury, credit and risk management.***

194.    The foregoing representations were materially false and misleading because, *inter alia*, E*TRADE failed to adhere to its own risk management policies, processes and controls as discussed above and below.

195.    The 2006 10-K further claimed that E*TRADE's mortgage exposure and credit risks were carefully monitored and tracked in detail by its Credit Risk Committee:

> **Credit Risk Management**

> Credit risk is the risk of loss resulting from an adverse change in a borrower's ability to repay their loan. Loan characteristics of the borrower, the magnitude of the transaction and the quality of the collateral, in addition to the terms of the transaction.  ***These risks are monitored at the Bank level by the Credit Risk Committee.***

> The Credit Risk Committee is responsible for the overall credit risk management

of the Bank. This committee reports to the ALCO. *The credit risk management process encompasses the entire underwriting and review process from comprehensive credit policies to loan review and regulatory exams. The Credit Risk Committee reviews detail risk measurement and modeling results, and monitors the loan audit review process. The Company conducts independent reviews of the underwriting process for originated and purchased loans. The Credit Risk Committee regularly reviews the results of those reviews. In addition, regulatory examiners review and perform detailed tests of our credit underwriting, loan administration and allowance process.*

The Credit Risk Committee's duties include *monitoring asset quality trends, evaluating market conditions including residential real estate markets, determining the adequacy of the allowance, establishing underwriting standards, approving large credit exposures, approving large portfolio purchases and delegating credit approval authority. The Credit Risk Committee uses detailed tracking and analysis to measure credit performance and routinely reviews and modifies credit policies as appropriate*. . . .

2006 10-K, pp. 50-51.

196.   E*TRADE's 2006 10-K reported modest increases in loan loss net charge-offs (from $38,411,000 in 2005 to $40,628,000 in 2006) and in loan loss allowances (from $63,286,000 at the end of 2005 to $67,628,000 at the end of 2006). Defendants attributed these increases to "growth in the real estate loan portfolio" and claimed that the charge-offs were "*not* indicative of a decline in credit quality":

During 2006, the allowance for loan losses increased by $4.3 million. The allowance increased approximately $8.5 million *due to growth in the real estate loan portfolio* of $7.5 billion during 2006. This increase was offset by a decrease in consumer loan-related losses of $4.2 million, more specifically in the recreational vehicle and credit card loan portfolios.

The $2.2 million increase in net charge-offs in 2006 was primarily due to higher net charge-offs on the real estate loan portfolio of $10.9 million, offset by a decline in charge-offs for credit card loans of $6.3 million and other consumer loans of $2.4 million. *The increase in real estate charge-offs was due the growth in real estate loans receivable, net and specific events affecting customer behavior during the period and not indicative of a decline in credit quality.* The decrease of credit card charge-offs was due to decline in the size of credit card portfolio during 2006.

E*TRADE 2006 10-K, p. 102.

197.    Defendants' representations in E*TRADE's 2006 10-K were materially false or misleading for the reasons stated as to previous representations, and because, *inter alia*:

a.    The positive statements about the Company's monitoring of credit risks, and asserting that charge offs were not indicative of declining credit quality were materially false and misleading because: E*TRADE failed to effectively communicate that most of its loan portfolio had been purchased from sellers with questionable origination practices (such as National City, which was cited by HUD for serious deficiencies in August 2006), rather than generated from E*TRADE customers; E*TRADE was failing to track current LTV/CLTV values which is a key indicator of borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; and E*TRADE failed to disclose other issues  with the servicers/originators of E*TRADE's mortgage loan portfolio;

b.    In addition, the statements regarding credit risks and credit quality were false and misleading because, *inter alia*, property appraisals were constantly grossly overstated, substantially increasing LTVs and the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time the purchase of risky loans with insufficient records drastically increased (CW1), and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans (CW2,

CW6) and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4); and

c.      E*TRADE's reported 2006 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments.

198.    During the month of March, Defendants also purported to update investors with respect to material events.  On March 13, 2007, Defendants announced E*TRADE's launch of a high-yield checking account.  On March 14, 2007, Defendants released E*TRADE's Monthly Activity Report for February which indicated that: total retail client assets decreased 0.3% (totaling $197.7 billion); end of period margin debt balances increased 0.2% sequentially (to $6.9 billion); and DARTs increased 3.2% percent sequentially to 180,038; and that net new accounts totaled 47,054 ("the highest level of organic growth in at least four years").

199.    Defendants' update announcements were misleading for the reasons discussed above, and because they failed to disclose the high credit risks in E*TRADE's mortgage loan portfolio.

**First Quarter 2007 Results**

200.    On April 18, 2007, Defendants issued a press release entitled "E*TRADE FINANCIAL Corporation Announces First Quarter Earnings of $0.39 Per Share on Record Revenue."  The release reported 2007 1Q (the period ending March 31, 2007) net income of $169.4 million, or $0.39 per share, compared to $142.5 million, or $0.33 per share the previous year; and that total 2007 1Q net revenue increased to a record $645.0 million from $598.3 million in the year ago period; and that E*TRADE's board had authorized a stock repurchase

plan.  Defendant Caplan, touted the results, but lowered 2007 earnings estimates, stating:

> We are extremely pleased with the response to our marketing and service
> investments this past quarter which generated record net new accounts, with
> continued strong growth in our target segments, and record levels of customer
> assets and cash.  The success we are seeing in attracting and retaining high-value
> customers is clearly beneficial to the long-term growth of the franchise.
>
> Although the broad based markets have been strong, ***the recent volatility in the
> macroeconomic environment has affected retail customer behavior and
> engagement levels.  As a result, we are reducing our 2007 earnings estimate to
> better reflect the muted retail environment we are now experiencing as
> compared to our expectations at the end of 2006.***

201.    During the accompanying E*TRADE earnings conference call on April 18, 2007,

defendant Caplan asserted that despite a changing general credit environment, E*TRADE's

"continued strict discipline" with respect to credit significantly mitigated risk to E*TRADE's

balance sheet; that the Company was "exercising prudence" in its guidance; that E*TRADE's

subprime balances were *"de minimis";* and that E*TRADE's "Alt A" portfolio was comprised of

loans to borrowers with high credit scores – and that slightly lower scores were "***de minimis***";

and that E*TRADE was continuing its commitment to the same   "highly risk-averse credit

philosophy, the bank has employed for the last 18 years."  Defendant Caplan also stated that:

> Equally as important, 79% of existing investing customers who opened new
> deposit accounts during the quarter increased their assets quarter over quarter, and
> nearly half of them increased their assets by 20% or more, all driving record asset
> levels, again a benefit of optionality, both for the customer and for the long-term
> franchise. As the data shows, we are building deeper and stronger relationships
> with our customers by offering the right products at the right time. Once
> engagement trends improve to more normal levels, we expect to realize the full
> economic benefit of this growing base of high-quality customers. ***With much
> having been reported about rising delinquencies and default rates among
> subprime asset portfolios, we also recognize that we are operating in a*** changing
> credit environment.  Given our historic and continued strict discipline with
> respect to credit, we believe that the risk to our balance sheet is significantly
> mitigated *compared to financial institutions with a more traditional mix of
> assets*.  We recognize that we are not immune to the current environment, and we
> are anticipating upward trends in delinquencies and charge-offs in our portfolio
> versus last year levels and even versus assumptions when we gave guidance in

December.

To set some context, in 2006, we booked $45 million in provision for loan losses. Embedded in our guidance for 2007 last December, we forecasted an increase in our provisions of 51% to $68 million or to approximately $17 million per quarter, based both on the growth and the seasoning of our portfolio. In the first quarter, we reported $21 million of provision, an extra *$4 million* or $0.005 per share against earnings. We believe that this is the result of what is happening in the broader credit environment. If you annualize these trends, it translates into an additional $0.02 per share provision expense for 2007 over and above what was embedded in our original guidance. *Exercising prudence and for guidance purposes*, we are assuming provision expense of $96 million for the year or quarterly provision expenses of approximately $25 million for the balance of the year. This translates into $0.04 a share per headwind to our original earnings guidance for the year. This number represents a 2% reduction to the mid point of our original guidance and is relatively contained, given the benefit of the credit quality of our portfolio.

Look across our $37 billion loan portfolio, over $26 billion is in one to four-family mortgages and home equity products, $7 billion is margin debt from our investing customers, and the remainder is legacy consumer loans that are in runoff mode. Across the entire mortgage portfolio, *our dollar weighted average FICO score remains at a solid 735. The average loan-to-value ratio is 73%* and the average debt-to-income ratio is 35%, all numbers consistent with this time last year. *In our one to four-family first lien portfolio, the average. FICO is 738, LTV's averaged 68%, and DTI averages 34%.* As we continue to grow our mortgage portfolio throughout this year, growth will tend to be more heavily weighted, 70% in one to four-family first lien products meeting that criteria. In second lien *product, the average FICO is 732, LTV's averaged 79%, with an average DTI of 36%.* Specifically *with respect to subprime loans*, based on the standard industry definition of borrowers with FICO scores of 620 or below, *we hold approximately $50 million of balances, or less than one-fifth of 1% of our $29 billion whole loan portfolio, a de minimis amount.*

Turning now to Alt A loans, our portfolio consists of those which are almost exclusively documentation-related and *not credit-related*. This portfolio is backed by loans with average LTVs of 69%, which also confirms that these borrowers had significant assets with which to make down payments. That portion of the Alt A portfolio, where the FICO was below 700, LTVs are higher than 69% and DTI is above 40, is approximately $167 million or a little over one-half of 1% of our $29 billion whole loan portfolio, *again a de-minimis amount*.

In the aggregate, our Alt A portfolio continues to perform, as we originally modeled for the year. Regardless of asset type, we remain firmly committed to the same highly risk-averse credit philosophy, the bank has employed for the last 18 years.

Without question, like everyone else in the financial services sector, we are facing an environment that is different from the one anticipated even just a few months ago. As a result, we believe it is appropriate at this time to reset expectations for the year recognizing that we will revisit our guidance again, should customer engagement level improve or credit dynamics not prove to be as we currently anticipate, and are projecting today.

Rob will provide the full details of our revised guidance a little later in the call. To be clear, while we are lowering expectations for 2007 **because of market conditions** being worse than expected, we also believe it is important to remain committed to our long-term strategic vision for the business.

202.    In response to a question from a securities analyst regarding an increase in the Company's provisions for loan losses, defendant Caplan reiterated that the Company was focused on "prime" and "really superprime borrowers," that over 99% of E*TRADE's portfolio was **not** subprime or Alt-A products of concern, and that an uptick in charge-offs was attributable to the increased size of the balance sheet:

Q: ... And then could you give us some more color around the uptick in the charge-offs in the quarter? Obviously, you constantly talk about the portfolio and the FICO scores and the LTV's, clearly a healthy portfolio. But would be surprised to see that big of an uptick quarter over quarter, despite what's going on in the subprime world considering how little of subprime business you guys have you have. So give us a sense as to what you're seeing out there and what's —

CAPLAN:  Happy to do it. So as I said, last year we had charge offs as you saw of about $45 billion. We assumed, as I said in the prepared remarks -- what? $45 million, sorry. $45 million. Yes, good point. [LAUGHTER]  And this quarter, as we were really building the guidance for this here, don't forget we have had pretty consistent growth in the balance sheet.   So *under any circumstances, notwithstanding the fact that we have stayed completely disciplined about focusing on what we call prime and really super-prime borrowers, you're going to see an increase in charge-offs just as a result of the increasing balance sheet size.*  We also assumed that, as the balance sheet, which is growing has been growing continues to season, you would see an uptick. So, as *we were modeling for this year last year and then gave guidance in December, we had always assumed that it would go up to the $68 million or about $17 million a quarter.* So in our model we had always presumed that that was going to be the case having nothing to do with a more difficult credit environment in any meaningful way, but simply as a result of both size of the balance sheet and seasoning of the balance sheet.

The incremental difference this quarter that we saw of the $17 million that we have expected to about $21 million we believe is the result of what's happening in the overall credit market, which is this discussion about what's happening in subprime, what's happening in Alt-A, and to the extent it that, more importantly, any of that is bleeding up into the general prime and super-prime market.  Our view I guess going forward is -- and we were trying to be prudent about this -- is that as you looked forward for the rest of this year, we could simply have said, all right, we saw a $4 million unexpected increase.   If you annualize that, it would have been somewhere in the neighborhood of $16 million or $0.02.  But we believe, given what we're seeing and ***what we're trying to prepare for, is the worst case scenario*** absent an absolute mortgage meltdown that you'd see a lost severity trend in the small percentage of our portfolio that we discussed, literally increasing by 50%.  That that's what would drive the increase of the $28 million.

You know, it may not come out to bear, but I guess in our mind, given everything we're seeing, we're better off being prudent around discussing this, and then putting context around the size of the overall balance sheet and ***then making it being clear for the first time ever that when you look at what the market is concerned about in either subprime or [Alt-A], one of them is less than one-fifth of 1% of the overall whole loan balances and the other one is less than 0.5%.  So I feel pretty good when I recognize that over 99% of our whole loan portfolio is, fact in, in those products which have traditionally not been impacted in markets like this.***

203.    In response to another question during the April 18, 2007 call, about where the non-performance was, defendant Caplan again reiterated that it was "a very, very small percentage of our overall portfolio, less than 1%."  Later during the same call, defendant Caplan also asserted that a lot of MBS was "fully hedged":

[I]f we think about our balance sheet, one of the issues is, we consistently wanted to move away from what would be viewed as wholesale funding and mortgage-backed security.

So by example, you will see average MBS quarter-over-quarter was only up a couple of hundred million dollars, and a lot of the growth in mortgage-backed securities which occurred in Q1 were simply a fully hedged-out MBS, as a placeholder, precluding clearing under the bank and replacing it with other assets like margin balances.

204.    During the same conference call, defendant Simmons indicated that half of the reduction in guidance was due to lower DARTs than anticipated, and one third was due to

increased provisions.

205.    The price of E*TRADE common stock declined approximately $1.04 per share (almost 5%) from $22.13 the previous day to close at $21.09 per share on April 18, 2007, but recovered to $22.04 over the next two trading days.

206.    Defendants' April 18, 2007 statements were materially false or misleading for the reasons stated as to previous representations, and because, *inter alia*:

        a.    The positive statements about the Company's focus on prime and "***superprime***" borrowers, "disciplined focus", and lack of risk from over 99% of its portfolio were materially false and misleading because, *inter alia*: E*TRADE failed to effectively communicate that most of its loan portfolio had been purchased from sellers with questionable origination practices (such as National City, which was cited by HUD for serious deficiencies in August 2006), rather than generated from E*TRADE customers; E*TRADE was failing to track current LTV/CLTV values which is a key indicator of  borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; E*TRADE failed to disclose other issues  with the servicers/originators of E*TRADE's mortgage loan portfolio; E*TRADE was failing to adhere to "strict discipline with respect to credit," and much more of the Company's portfolio than indicated was of "subprime" or risky quality;

        b.    Moreover, the statements about the Company's focus on prime and

"*superprime*" borrowers, "disciplined focus", and lack of risk from over 99% of its portfolio were materially false and misleading because over four months prior to the April 2007 press release (in early December 2006), defendant Caplan internally told employees at a Virginia employee meeting that he expected profits to be down and to continue to go down for the next year. (CW14);

       c.     In addition, the statements about the Company's focus on prime and *"superprime"* borrowers, "disciplined focus", and lack of risk from over 99% of its portfolio were materially false and misleading because only 1% of purchased loans were reviewed (CW2); property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3); experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1); and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans  (CW2, CW6) and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4);

       d.     More specifically, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs for the entire portfolio; and

e.      E*TRADE's reported 1Q 2007 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS impairment adjustments.

207.    On May 10, 2007, E*TRADE filed its Form 10-Q for 2007 1Q, which reported the financial results previously announced on April 18, 2007.  The 2007 1Q 10-Q reiterated the "allowance for loan losses" policy in previous filings, and attributed a 2007 1Q increase in net charge-offs to growth in the real estate mortgage portfolio:

> Net charge-offs for the three months ended March 31, 2007 compared to the same period in 2006 increased by $11.9 million. The overall increase was ***primarily due to higher net charge-offs on real estate loans***. The increase in real estate loan charge-offs ***was due to the growth of the portfolio.***  Annualized net charge-offs as a percentage of average loans receivable, net were 0.30% at March 31, 2007 compared to 0.22% at December 31, 2006.

*Id.,* p. 18.

208.    The 2007 1Q 10-Q also reiterated the Company's nonperforming assets policy, and claimed  that E*TRADE's "risk of loss" for nonperforming loans was actually decreasing as the Company shifted to real estate loans from consumer loans:

> During the three months ended March 31, 2007, our nonperforming assets, net increased $48.1 million from $88.2 million at December 31, 2006. The increase was attributed to an increase in nonperforming real estate loans and REO and other repossessed assets, net of $51.0 million, offset by a decrease in nonperforming consumer and other loans of $2.9 million. ***These trends are primarily the result of our targeted growth in real estate loans as well as the seasoning of the real estate loan acquisitions made in prior periods.***
>
> The allowance as a percentage of total nonperforming loans receivable, net decreased from 91% at December 31, 2006 to 59% at March 31, 2007. ***Our total loan portfolio has shifted towards a larger concentration of mortgage loans, where the risk of loss is generally less than the risk of loss on a consumer loan. As such, the total allowance as a percentage of nonperforming assets decreased.***

*Id.,* p. 18.

**Second Quarter 2007**

209. Just one day after Countrywide (which originated 8.347% of E*TRADE's portfolio) issued Countrywide's July 24, 2007 press release announcing that its delinquencies had continued to rise in *all* of its mortgage product categories, including skyrocketing *prime* home equity loan delinquencies of close to 5% as well as soaring subprime loan delinquencies of close to 24%, Defendants issued an E*TRADE press release leaving E*TRADE's guidance unchanged, and defendant Caplan boldly emphasized E*TRADE's "strict discipline" and "improvement" in credit quality, and claimed that E*TRADE's delinquency rates were "1.5%" and "2%."

210. On July 25, 2007, Defendants issued a press release titled "E*TRADE FINANCIAL Corporation Announces Second Quarter Results," which reported the following results and left guidance essentially unchanged:

> E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) today announced results for its second quarter ended June 30, 2007, reporting net income of $159 million, or $0.37 per share, compared to $156 million, or $0.36 per share a year ago. The results in the second quarter of 2007 produced a 39 percent operating margin including approximately $35 million of pre-tax expense, or $0.05 per share, for certain legal and previously disclosed regulatory matters related to the Company's institutional equity business. Excluding the impact of these items, the Company generated earnings of $0.42 per share and achieved a 45 percent operating margin. Total net revenue for the second quarter increased 9 percent year over year to a record $664 million. Net operating interest income after provision for loan losses increased 15 percent year over year to a record $384 million - representing 58 percent of total net revenue. The Company's retail client assets increased to a record $213 billion including growth in total customer cash and deposits of $1.9 billion - a more than six-fold increase versus the year ago period.
>
> ***The Company also narrowed its 2007 pro-forma earnings guidance to a range of $1.58 - $1.72 per share from the previous range of $1.55 - $1.75, leaving the mid-point of $1.65 unchanged.*** This pro-forma range excludes the $0.05 per share of expense for certain legal and regulatory matters realized during the second quarter. Including these expenses, the Company now expects to earn $1.53 - $1.67 per share on a GAAP basis in 2007.

Defendant Caplan commented on these results:

> Our second quarter results demonstrate the strategic and economic success we have achieved through investments in product, service and marketing over the past several years. We delivered record performance in the quarter while improving the overall quality of revenue and earnings through continued growth and engagement led by our high-value, target segment accounts.

211. During Defendants' accompanying July 25, 2007 conference call, defendant Caplan claimed that E*TRADE's loan quality was improving with growth in **"superprime"** loans; that E*TRADE was maintaining "**strict discipline**" with "**respect to risk mitigation, all the way down to the level of the borrower**"; and that E*TRADE's portfolio's borrowers were likely to avoid foreclosure:

> On the assets side of the balance sheet, average interest-earning assets grew $4.8 billion quarter over quarter to approximately $58 billion. Whole loans accounted for $3 billion of the growth and more than 100% of the growth in whole loans was in one to four family prime and **_superprime_** first lien mortgages.

> HELOC and consumer loan balances declined during the quarter, ending lower as a percent of total loans and in absolute dollars. As we managed through the credit environment, **_we have been able to opportunistically improve loan quality in the portfolio with growth in superprime first lien mortgages while maintaining yield, partly the results of a somewhat improved yield curve._** We expect to continue this mix shift towards first lien mortgages for the remainder of this year.

> We also maintained our **strict discipline** with **respect to risk mitigation, all the way down to the level of the borrower**. To the end, average FICO, DTI, and CLTV metrics across the portfolio all remained unchanged quarter over quarter at a **solid 735, 35, and 73% respectively**. While we remain vigilant with respect to our credit risk management, in no way do we assume that will be immune to trends worsened from a macro perspective. We do, however, expect to be less affected on a relative basis, given the relative quality and mix of our assets.

> With respect to our specific credit metrics in the quarter, net charge-offs increased slightly, up $1.5 million from $20.8 billion in the first quarter. Net charge-offs as a percent of average loan receivables declined by one basis points quarter over quarter to 29 basis points. Nonperforming loans increased by $50 million and we increased our quarterly provision by $9 million to $30 million. Provision exceeded charge-offs by nearly $8 million in the quarter, increasing allowance for loan losses to approximately $76 million.

In addition, *the percent of nonperforming loans that charged off in the quarter declined to 19% from 28% in the prior quarter and 26% in the fourth quarter. We believe that given the relatively higher FICO scores and lower DTI levels of the borrowers in our portfolio, these individuals are more likely to be refinanced and avoid foreclosure.*

212.    As the call continued, in response to questions from Matt Snowling, a securities

analyst with Friedman, Billings, Ramsey, defendants Caplan and Simmons emphasized

E*TRADE's purported conservative portfolio and minimal subprime exposure:

**Q:** Given the recent events, Mitch, can you give us a little bit more detail on what your HELOC portfolio looks like in terms of maybe size, delinquencies, how much maybe in the 2006 vintage?

**CAPLAN:** Yes, virtually nothing from the 2006 vintage, which is good news. When you look at the size, it is it is down, it is down and you can see it -- we will give you the specifics.  I cannot remember the specific numbers. I know that it is down to about $4 billion.  What is it --?

**SIMMONS:** It is down $400 million.

**CAPLAN:** About $400 million, so in other words, with what happened is we allowed all the prepayments to just move through and, again, as we have said, literally I think we're giving guidance back in December, one of the things that we said was that we would expect to see maybe a 60 or 65% mix of first lien and about 30% or 35%, 40% coming from HELOCs. Then as we saw and moved through Q1, we said, no, I think we're going to move more in the direction of about 75, 80, 85% of the growth coming in first liens both in Q1 and in Q2. And in fact, we have been closer to 100%. So that is basically where we are. If you look at the size the portfolio, in HELOCs, it's about $12 billion or so. It is down about $400 million quarter-over-quarter. When you look at across [av] median across really the average median, mode, all that stuff, what you see are, again, the same consistent high FICO scores, 730, 740, something like that. *You see DTIs and LTVs that, again, are conservative and are probably significantly better than what you have seen in maybe the general risk industry at-large or in others.*
So my recognition is *I think our LTV's are in the mid to high 70s*, so again, because of that, what we are seeing, one of the reasons I think that notwithstanding we saw a reasonable increase in nonperformings from Q4 into Q1, what you saw read out in actual charge-offs this quarter was down, was down from the 26% to 19% because we're seeing that a lot of these are getting refinanced out and we're just -- *we're getting paydowns on them*, and that is fine. So we're not seeing them read all the way through into charge-offs.

**Q:** What do the delinquencies look like?

**CAPLAN:** Delinquencies are -- let me get you the -- when we do the follow-up calls, I'll give you the exact number, but *I think it is about certainly 1.5%, 2%, sort of in that range*. I think probably definitely below what you are seeing in the industry.

*       *       *

**SIMMONS:**  Let me clarify one other point that was made earlier by Mitch.  It was a question around the vintages and stuff I think if you look at our total book as of the end of this quarter, *you can see that the growth in our loan book came exclusively in one to fours and margin, which are our highest quality loan categories.*  If you look at our consumer and our HELOC book, they were both down.  So the question with respect to vintages, we do not have zero in '06 vintages in our book. We will give you some more details when we file our Q. But just wanted to clarify that the reduction of $400 million related to our HELOC book this quarter and we would expect that sort of trend to continue.

**CAPLAN:**  Right, and I guess I was responding to was what Matt [Drury], who was sitting next to me, was talking about, *which is within the '06 vintage, we have zero in subprime.*  So I think that was the issue that I was responding to and I guess the sheet of paper that I have been seeing.  **So again, our *subprime quarter-over-quarter continued to stay flat and declined a bit.  Then what could be thought of as subprime, I guess, in the '06 vintage is zero at this point.***

213.  In response to additional questions from securities analyst William Tanona regarding nonperforming loans, defendant Caplan claimed that deterioration was not significant, and reiterated the strong credit characteristics of E*TRADE's borrowers:

**Q:** Great, that's helpful. Then I guess on the nonperforming loans, again, can you kind of help us understand exactly where you are seeing those nonperforming loans tick up there in terms of whether it's demographic or what type of loans or what geographies and segments such that we understand it a little bit better?

**CAPLAN:** Yes, we are basically -- *we continue to see low charge-offs in our first liens*, basically one basis point, what we have totally traditionally seen.  The consumer loans are showing charge-offs that are pretty much equal to what they have traditionally shown.  It is just your seeing, obviously, you're coming down the back end of it, so you're not replacing any of the consumer loans.  So to the extent that we are seeing charge-offs, which were, as I said, only up about $1.5 million, the incremental delta is going to be coming through in the form of the HELOCs.  When we look at it, we're not seeing it in terms of any specific geography.  Again, as I said, it is sub-2% in terms of what we're seeing and with total NPLs now in the HELOC portfolio of the $98 million.

**Q:** So there's no kind of specifics between geographies or adjustable rates or anything like that? You're just seeing kind of a broad kind of deterioration, if you will?

**CAPLAN:** Yes, and I'm **not even sure would call it a significant deterioration**. I think that what we saw was the pickup between Q4 and Q1, which we talked to. In Q1 to Q2, we're actually seeing less deterioration in the sense that although your NPLs are growing, we saw a definite decrease in the read through, so if you looked at the NPL in Q4 as the pipeline for Q1, we saw, again, about 26% of those read through. In Q2 what we saw was about 19% read through, so we actually saw a bit of an improvement, which were pleased about. *As we have been working with the subservicers, what we're hearing is because of the underlying credit characteristics, whether it is FICO or DTI or LTV, of the borrower, they are being taken out in the marketplace by other lenders.*

214.   During the July 25, 2007 conference call, defendant Caplan made a partial disclosure that E*TRADE purchased the majority of its mortgage portfolio, and that National City was one of its big providers – but failed to disclose the names of the other providers and failed to disclose that National City originated close to half of E*TRADE's mortgage portfolio. In addition, in response to questions from Prashant Bhatia, the Citigroup securities analyst, defendant Caplan (backed up by E*TRADE COO Lilien) claimed that E*TRADE maintained the quality of purchased loans by buying "seasoned" loans for which E*TRADE could see how the borrower was performing, and by "putting back" to the sellers loans which E*TRADE was uncomfortable with, and that E*TRADE's performance was better than the industry:

**Q:** Just on the mortgage portfolio, I think roughly $32 billion, *can you tell us how much of that you originated versus how much you bought from third parties*?

**CAPLAN:** *We do not -- the answer is -- I don't even think I can break it out.* We have originated, I think, last quarter we had said a relatively small part. Most of it has been bought in the industry. I think some of our big providers are Nat City and others, but we have been originating more than -- each quarter than we have in the prior quarter, I guess, for the past maybe four or five quarters -- and we are continuing to keep more on balance sheet. So we are in a place where I think this past quarter, we probably originated about what -- about one billion?

**LILIEN:** Yes, a little bit more. We kept the highest percentage on balance sheet this quarter that we have in a long time.

**Q: *Okay, so most of the 32 is through third parties it sounds like?***

**CAPLAN:** Yes, absolutely.

**Q:** Okay, now, you know, a lot of talk in the industry, some of the firms are saying looking at FICOs, looking at LTVs, and so on, based on past experience really is not proving all that relevant right now.  I do not know if you are seeing that as well, but how you get comfortable being that you did not originate these loans with the real quality of them?  How do you know that you will not have to see charge-offs and provisionings rise going forward?

**CAPLAN**: Let me address that if I can in two separate answers.  The first is that, by and large, when we buy, we often buy with anywhere from six to 12 months of seasoning.  *So we rarely buy new originations. We're buying stuff that we have seen with some seasoning issues, so we can see how the borrower is performing. We also buy with a look-forward put back for another six to 12 months, so that if we see something that we're uncomfortable with, we put the loan back.  Given that, historically, I think when you look at how we have performed compared to the industry, we have been significantly better.*

So one of the things that we talked about that we obviously hoped to see when we did see the increase in charge-offs and we increased our provisions in Q1 of this year was we're waiting for the report that would come out on the industry and we did maintain our relative outperformance.

So if you looked at what our charge-offs were, they are typically 20 -- somewhere around 40 to 45% better than the industry, usually 20 to 30 basis points better.  We saw exactly that same relationship maintain in Q1 and I think that particularly given what we've seen in charge-offs in Q2 and the lower read through, I feel pretty good about what we have seen so far.

That is the first thing. The second thing is in response to your questions, we did. We obviously took a reserve this quarter of $30 million in excess of the charge-offs, that $22.3 million, so we took a reserve in excess of what the charge-offs were and I think as Rob said in his prepared remarks, we would expect to take those kinds of similar reserves, or theoretically, even a little more, again, expecting that the charge-offs will be less than the reserves as the move through the second half of the year in Q3 and Q4.  But given the shape of the yield curve, given what we are seeing in terms of customer engagement around cash, around DART, around margin, given what we're seeing in terms of controlled expenses, as an offset, *we believed that we were comfortable with the range continuing at the midpoint of $1.65* a then tightening the range $0.03 in either direction.

215.    On the next trading day, July 26, 2007 the price of E*TRADE common stock closed at $19.50 (a decline of approximately 7.4%).

216.    Defendants' representations in the July 25, 2007 release and conference call were materially false or misleading for the reasons stated as to previous representations, and because, *inter alia*:

a.    The positive statements about the Company's "conservatism" and minimal exposure to credit risks were materially false and misleading because, *inter* alia: E*TRADE still failed to effectively communicate that most of its loan portfolio had been purchased from sellers with questionable origination practices – and even avoided precisely answering a question directly on this point; E*TRADE was failing to track current LTV/CLTV values which is a key indicator of borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; and E*TRADE failed to disclose other issues  with the servicers/originators of E*TRADE's mortgage loan portfolio;

b.    The statement that the Company put back loans to sellers which E*TRADE was uncomfortable with was materially false and misleading because, *inter alia*, in fact, E*TRADE generally did ***not*** put problematic loans back to the sellers (CW4), and some originators required E*TRADE to purchase loan pools without exclusion and therefore E*TRADE was not permitted to "put back" these loan pools to the originators;

c.    The statement that the Company reduced risk by buying seasoned loans

where the Company could see how the borrowers were performing (and statements regarding conservatism and lack of deterioration, etc.) were materially false and misleading because, *inter alia*, in fact, E*TRADE performed no or insufficient due diligence on such loans to see how the borrowers were performing; only 1% of purchased loans were reviewed. (CW2), property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1), and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans  (CW2, CW6) and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4);

d.      The partial statements regarding the Company's loan originators were false and misleading because Defendants failed to disclose the identities of its other troubled loan originators and amounts originated by them which were in E*TRADE's portfolio, and failed to disclose the enormous size or proportion of National City's originations for E*TRADE's loan portfolio (which was in fact close to 50% of E*TRADE's portfolio);

e.      The statements about the Company's highly positive guidance were materially false and misleading for all the reasons stated herein and because over seven months prior to Defendants' July 2007 statements (in early December 2006), Caplan internally told employees at a Virginia employee meeting that he expected profits to be

down and to continue to go down for the next year. (CW14);

      f.    Defendants statements about "strict discipline", etc. and specific statements about its LTV and DTI ratios and "consistent high FICO scores" (including statements that DTIs and LTVs were conservative and significantly better that the general industry) were also false and misleading, because, as the Company admitted after the close of the Class Period in its February 8, 2008 response letter to the SEC (confirming the report of CW4), the Company merely reviewed a "sample" of purchased loans to ensure compliance with the originator's guidelines and "minimum" credit criteria, some originators required E*TRADE to purchase entire pools without exclusions, and the Company did not track current CLTV/LTVs for the entire portfolio; and

      g.    E*TRADE's reported 2Q 2007 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments.

**SEC Requests Additional Details Regarding E*TRADE's 2006 10-K**

217.    On July 26, 2007, the SEC issued a letter to E*TRADE requesting additional information and clarification regarding some of the information contained in E*TRADE's 2006 10-K.  The SEC letter requested, among other things, additional disclosures with respect to E*TRADE's underwriting policies for all major types of loans as well as the underwriting policies for those loans including, but not limited to, "loan-to-value ratios," "collateral requirements,"  and "any changes in those policies":

Risk Management
Credit Risk Management, page 50

Please tell us and revise to disclose the underwriting policies for the major types of loans that you originate (e.g. requirements for loan-to-value ratios, collateral requirements, etc.) and whether there have been any changes in those policies

during the periods presented.

218.   The July 26, 2007 SEC letter also requested additional details with respect to

E*TRADE's home equity loan portfolio:

> Balance Sheet Overview
> Allowance for Loan Losses, page 42
>
> We note that "HELOC, HEIL and other" loans represented 45% of gross loans receivable at December 31, 2006.  We also note the related charge-offs and non-performing loans increased significantly during 2006.  Please tell us and revise to discuss the credit quality trends of these loans including, but not limited to:
>
> • the causal factors for the increased charge-offs and non-performing loans;
> • the quantitative impact on the provision for loan losses; and
> • the carrying value of loans where E*Trade is the first and second lien holder.

219.   The SEC's July 26, 2007 letter instructed E*TRADE to submit a written response

to the SEC within ten days.  E*TRADE did not respond until August 31, 2007.

### *Wall Street Journal* Interview – Defendant Caplan Reassures The Market

220.   On August 11, 2007, *The Wall Street Journal* published an article titled

"MarketWatch Weekend Investor: E*Trade Financial: An Online Broker in the Clothing of a

Mortgage REIT?"  The article described analysts' concerns with the build-up of mortgage assets

at E*TRADE, defendant Caplan's confident assertions that performance estimates were

unchanged, and defendant Caplan's denials that mortgages were used to "juice" the Company's

performance:

> With the mortgage market going through an upheaval, you would think Mitch Caplan would be ducking for cover.
>
> ***As the mortgage mess continues to evolve, the company he runs, E*Trade Financial Corp., is clearly in the thick of it, so much so that after reviewing its financial statements, you might think it was a mortgage REIT disguised as an online broker.***

It isn't, of course, but the reinvigoration of E*Trade's stock in 2003, then again in 2005, would appear to coincide with an increase in purchasing mortgages, home-equity loans and other mortgage-related assets. While E*Trade is hardly the only financial-services firm or broker to have mortgage exposure, it appears to be much greater at E*Trade than the likes of Charles Schwab.

Income from interest earned on those assets, the company warns in the risk-factor section of its Securities and Exchange Commission filings, "has become an increasingly important source of our revenue." So important that in 2005 interest income shot ahead of brokerage fees as the top sales generator, steadily edging higher through the second quarter, when it accounted for 58% of revenue, up from 44% in all of 2004.

Most of that is tied to consumer loans, the majority of which are first and second mortgages purchased from others, such as National City Corp. and the mortgage arm of J.P. Morgan Chase, as well as those generated by E*Trade itself. The company also holds a large portfolio of mortgage-backed securities.

Citing the large mortgage portfolio, analyst Prashant Bhatia of Citigroup, who rates E*Trade a "hold," told his clients in a report that the company "has much higher interest-rate risk relative to its peers."

Sean Egan, managing director of Egan-Jones Ratings Co., an independent credit-ratings organization, takes it a step further: "E*Trade is a broker, not an asset holder and therefore the rapid buildup is a concern. The company has moved out of its core expertise and is taking on some risky assets in the process."

Just how risky? Mr. Bhatia and Mr. Egan have both voiced concern that E*Trade isn't well enough reserved to cover mortgage losses. "With problems in the mortgage market," Mr. Egan says, "future mortgage-related earnings are likely to fall." For example, E*Trade's allowance for loan losses fell to 45% of loans that are likely to go bad from 91% in the first six months of this year. Bad loans during the period, meanwhile, rose by 13%. Along those lines, a new risk factor in the company's 10-Q filed Thursday warns that since "a substantial portion of our asset portfolio" is composed of mortgages, "instability in the consumer credit markets and credit trends" may force an increase in the provision for loan losses, which would take a bite out of future results.

***Which gets us back to Mr. Caplan, who appeared to be taking all of this in stride when I caught up to him Friday.*** "We are absolutely, positively not immune to what is happening in the macro market," he says. ***But he disagrees that E*Trade has been using mortgages like steroids to juice his company's performance.*** "Here's where you're not connecting the dots," he says. He then went through a history of the company and explained that in 2003 E*Trade shifted away from commissions as the biggest source of revenue because they didn't appear to be "a long-term sustainable franchise."

*The company went after more affluent customers, using "the massive growth in cash" from them to increase its real-estate portfolio. Sounded good at the time, and Mr. Caplan believes it sounds just as good today. The difference between his company and many other mortgage investors, he says, was that E\*Trade stuck with higher-quality "generic" first mortgages, accepting smaller returns in exchange.*

"Do I worry more about home-equity loans," which are almost the same size as E\*Trade's first-mortgage portfolio? "Of course I do," he says. *But he stresses that earnings estimates for the year haven't changed, a sign of his confidence that E\*Trade won't get blindsided by the mortgage mess.*

Still, going forward, even Mr. Caplan acknowledges that mortgages aren't likely to be the investment they used to be. *Not to worry.* He says he could use the cash to pay down wholesale borrowings or even buy back shares. *Sounds good on paper, but as investors have learned lately, when it comes to anything related to mortgages, it's what happens in practice that counts.*

## Analyst Criticizes E\*TRADE's Disclosures

221.    On August 12, 2007, Citigroup securities analyst, Prashant Bhatia, published a report on E\*TRADE called "Credit Trends Continue to Deteriorate, Disclosure Still Lacking." The report called the Company's disclosures in its most recent 10-Q "short on substance" and stated that "management provided minimal new information on the composition, source, and quality of its $28 billion mortgage portfolio."  The report pointed out that E\*TRADE provided credit scores (FICO & LTV) on its average portfolio rather than on the "tails" of the portfolio, which are more relevant.  The report also pointed out that E\*TRADE's non-performing real estate and special mention loans rose to $561 million, or 30% of the Company's tangible book value, four times higher than a year earlier.  Bhatia noted that, while charge-offs doubled to $30 million, since non-performing loans quadrupled, he believed that charge-offs should be in the $50 to $60 million range or roughly double what E\*TRADE was reporting.  Furthermore, he noted that if meaningful deterioration in the credit quality of the existing portfolio continues, charge-offs could approach the $100 million range.

222.    Citigroup's Bhatia also noted that the Company's unrealized securities losses on its $17 billion available-for-sale securities portfolio rose to $675 million, which is equal to 60% of consensus 2007 earnings estimates.   In addition, he pointed to the troubling fact that the Company's reserve coverage ratio for real estate loans had declined 33% compared to 83% a year earlier.   He found the fact that this ratio would actually be cut in half during a period of major deterioration in the consumer credit environment related to mortgages to be extremely troubling.    He further noted that despite one of the worst housing markets in history, E*TRADE's reserve to total loans was only 0.19%, lower than the 0.20% it had in the previous year.

223.    In response to these negative press and analyst reports, E*TRADE's stock price declined from $17.01 per share on Friday, August 10, 2007, to close at $13.91 on August 15, 2007.

**August 16, 2007 Partial Disclosure And Defendants'**
**Statements That E*TRADE Stock Is Undervalued**

224.    E*TRADE share continued declining on August 16, 2007, falling to an intra day low of $9.93.  To halt this decline, on August 16, 2007, Defendants issued a press release entitled "E*TRADE FINANCIAL Corporation Issues Supplemental Portfolio Disclosure."   Defendants claimed that E*TRADE's stock was undervalued given the "financial strength and performance of the business" as well as the fundamentals of E*TRADE's mortgage loan portfolio including: "high FICO scores," and "low Loan-to-Value ratios":

> E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) released supplemental disclosures today related to the composition and funding sources for its balance sheet. The Company provided a presentation containing additional information to its June 30, 2007 quarterly results, including expanded transparency on the credit quality of its mortgage and securities portfolios.  This presentation can be found at https://investor.etrade.com.  In addition, the Company stated that it has seen ***no material changes to date with respect to the availability, pricing or margin on its***

***wholesale funding sources, including repurchase agreements.*** Management maintains that ***it does not believe that the current market capitalization accurately reflects the financial strength and performance of the business.***

Selected highlights from the presentation include:

•The Company's $15.7 billion first lien mortgage ***portfolio is supported by high FICO scores, low Loan-to-Value ratios (LTV)*** and private mortgage insurance

•All first lien mortgage loans with an 80% or higher LTV are protected by private mortgage insurance

•$9.2 billion, or 74%, of its home equity portfolio is to borrowers with FICO scores of 700 and higher

•$12.6 billion, or 99%, of mortgage-backed securities are rated AAA

•97% of its Asset-backed Securities portfolio is rated investment grade

•Consistent and growing base of retail customer cash

•$10 billion in excess wholesale borrowing capacity from the Federal Home Loan Bank

225.    Also on August 16, 2007, E*TRADE file a "Supplemental Disclosures" with the SEC on a Form 8-K (the "August 16 Supplemental Disclosure")..  The "Executive Summary" of the August 16 Supplemental Disclosure touted E*TRADE's "conservative approach to credit and funds management."   Additionally, the August 16 Supplemental Disclosure contained an abbreviated list of top "sellers/originators," listing Countrywide, E-Loan, E*TRADE, GMAC, Morgan Stanley, National City and Wells Fargo, without stating the amounts involved. *Id.,* p. 15.

226.    The August 16 Supplemental Disclosures contained tables indicating the FICO scores and LTV/CLTV values for each dollar value of unpaid balance (or delinquency) amount under two methods of calculations – the "traditional method" (which "categorizes the entire loan balance at the highest dollar loan-to-value") and E*TRADE's internal Principal At Risk ("PAR")

method (which divides the loan into tranches "as of origination" so that parts of the debt would be recorded at varying LTV/CLTV ratios). The "traditional" method resulted in higher unpaid balance amounts at higher LTV/CLTV levels. Although not designated as "original," the LTV/CLTV ratios and FICO scores given under the traditional approach were historical as of the time of origination rather than current. Nevertheless, Defendants deceptively indicated that the PAR method was more "appropriate."

227.   According to the August 16 Supplemental Disclosures, as of June 30, 2007, the First Lien Portfolio "had an unpaid principal balance of $15.7B and $270MM, or 1.72% in total delinquent loans." Approximately 20% had a FICO score under 700. However, 47.8% of all delinquent loans had FICO scores under 700 (with 12.6% between 659 and 622).

228.   In E*TRADE's Home Equity Portfolio, the portfolio had an unpaid principal balance of "$12.4B and $279MM, or 2.25% in total delinquent loans. $9.2B, or 74%, of portfolio is to borrowers with FICO of 700 and higher." Under the "traditional" approach, $6.0B, or only 48%, of the portfolio had CLTV of 80% or lower. Under PAR, "$8.5B (68%) of portfolio has a CLTV of 80% or below." E*TRADE's Home Equity charts indicated that approximately 25.7% of all borrowers had FICO scores under 700. However, 51.7% of all delinquent loans had FICO scores under 700 (with 16.9% between 659-620). In addition, 28.3% of Home Equity delinquencies had FICO scores under 700 and PAR CLTVs of 80% or more. E*TRADE's August 16, 2008 Supplemental Portfolio Disclosure (data summarized from charts contained therein), Form 8-K (Ex. 99.1).

229.   The August 16 Supplemental Disclosure also provided an Asset-backed Securities Breakdown which stated that "$2.5B, or 81%, of portfolio is rated A or higher. Non-rated and below investment grade securities are $89MM, or 2.9% of portfolio."

230.    Defendants' August 16, 2007 press release and the August 16 Supplemental Disclosure were false and misleading for the reasons stated herein as to other representations and because, *inter alia*:

a.    Neither E*TRADE's "PAR" method nor "traditional" method of accounting for CLTVs and LTVs discussed in the August 16, 2007 Supplemental Disclosure Statement took current real estate values into account, because, as the Company admitted after the close of the Class Period in its February 8, 2007 response letter to the SEC, E*TRADE did not track current CLTV/LTVs for the entire portfolio. As a result, the elaborate tables presented in the August 16, 2007 Supplemental Disclosure Statement understated the risk presented by loans at all levels.   Nor did E*TRADE attempt to account for declines in real estate values in any other manner except on nonperforming loans "primarily to assist in making foreclosure decisions.";

b.    Contrary to Defendants' claim, the "PAR method" was ***not*** a more appropriate method that the traditional method of determining CLTVs and LTVs. Because the PAR method divided loans into tranches and assigned different CLTVs and LTVs to different portions of the loan, the PAR method misleadingly understated CLTVs and LTVs;

c.    The abbreviated list of top "sellers/originators" in the August 16, 2007 Supplemental Disclosure Statement did not state the amounts involved, and failed to list the majority of other servicing/originating entities including Sovereign, AmSouth, Fremont General, GreenPoint, First Horizon, and Quicken Loan which disclosed adverse results and conditions during the Class Period.  (Moreover, E*TRADE's August 16, 2007 Supplemental Disclosure listed Bank of America, JP Morgan, and UBS  even

though those entities were not on the list provided to the SEC on November 15, 2007.);

     d.    On August 16, 2007, Moody's downgraded 691 tranches of 2006 vintage second liens (representing 84% of all second lien deals). Between June 30th and August 31st, there were two issues upgraded (3 bonds for $20M) and twelve issues downgraded (17 bonds for $116M) in the portfolio. All of the downgrades were in the second lien sector. See, E*TRADE's September 17, 2007 8-K (Ex. 99.2), pp. 25, 29. Rather than make appropriate contemporaneous disclosures regarding the impairment of E*TRADE's ABS/Second Mortgage Lien Securities, E*TRADE issued the August 16, 2007 press release on the same day, claiming that E*TRADE's stock was undervalued; and

     e.    Defendants' August 16, 2007 statements that E*TRADE's stock price was undervalued and did not accurately reflect E*TRADE's financial strength and business performance were materially false and misleading because E*TRADE's strength and performance were adversely impacted by numerous undisclosed facts, including that E*TRADE performed no or insufficient due diligence on loans to see how the borrowers were performing; only 1% of purchased loans were reviewed (CW2); property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3); experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1); and defendant Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans  (CW2, CW6) and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4).

231.   Defendants partial disclosures on August 16, 2007, which included Defendants'
continuing misrepresentations and omissions regarding the quality of its loan portfolio and its
conservative risk management approach, had the desired effect, and shares of E*TRADE
common stock rebounded on the NASDAQ, to close on August 17, 2007 at $14.50.

**E*TRADE's Second Quarter 2007 10-Q**

232.   On August 19, 2007, Defendants filed E*TRADE's Form 10-Q reporting the
financial results previously announced for 2Q2007.  The 2Q2007 10-Q once again indicated that
E*TRADE's allowance for loan losses was based on variety of factors including: "***probable
expected losses for the next twelve months***," "delinquency levels and trends," "the condition of
the real estate market and geographic concentrations within the loan portfolio" and "general
economic conditions."  *Id.,* pp. 20-21.  Purportedly based on those factors, Defendants set the
loan loss allowance for E*TRADE's real estate lending portfolio at June 30, 2006 at
$53,644,000, or 0.19% of real estate loans receivable.

233.   E*TRADE's 2Q 2007 10-Q further indicated that increases in charge-offs for
non-performing loans stemmed from the growth and seasoning of E*TRADE's  second real
estate lien loan portfolio:

> During the six months ended June 30, 2007, the allowance for loan losses
> increased by $8.1 million from the level at December 31, 2006.  ***The allowance
> for the real estate loan portfolio increased by $14.2 million, which was due
> primarily to the seasoning of the portfolio and the increased delinquencies and
> charge-offs compared to 2006.***  The consumer loan portfolio decreased by $6.1
> million, mainly a result of the decline in the size of the portfolio.
>
> Net charge-offs for the three and six months ended June 30, 2007 compared to the
> same periods in 2006 increased by $14.7 million and $26.5 million, respectively.
> ***The overall increase was primarily due to higher net charge-offs on second lien
> real estate loans, which was driven by the growth of this portfolio in prior
> periods and subsequent seasoning of that growth in 2007.***  In addition, overall
> pressure in the residential real estate market including slowing home price
> appreciation or depreciation, rising mortgage interest rates and tighter mortgage

lending guidelines across the industry are impacting the mortgage portfolio performance, which could drive additional charge-offs in the future. Annualized net charge-offs as a percentage of average loans receivable, net were 0.29% at June 30, 2007 compared to 0.22% at December 31, 2006.

*Id.,* p. 21.

234.   E*TRADE's 2Q 2007 10-Q, again attributed increases in nonperforming assets to the growth and seasoning of E*TRADE's loan portfolio, and touted a lower risk of loss due to a shift to real estate loans:

> During the six months ended June 30, 2007, our nonperforming assets, net increased $100.1 million from $88.2 million at December 31, 2006. The increase was attributed to an increase in nonperforming real estate loans and REO and other repossessed assets, net of $105.5 million, offset by a decrease in nonperforming consumer and other loans of $5.4 million. ***These trends are primarily the result of our targeted growth in real estate loans as well as the seasoning of the real estate loan acquisitions made in prior periods.***
>
> The allowance as a percentage of total nonperforming loans receivable, net decreased from 91% at December 31, 2006 to 45% at June 30, 2007. ***Our total loan portfolio has shifted towards a larger concentration of first lien real estate loans, where the risk of loss is generally less than the risk of loss on second lien real estate and consumer loans.*** As such, the total allowance as a percentage of nonperforming assets decreased.

*Id.,* p. 21.

235.   E*TRADE's 2Q 2007 10-Q also stated that the value of its ABS (including CDO and second mortgage lien securities) was being monitored for changes in values, and that changes in values during the reporting period ***did <u>not</u> reflect "credit quality"***:

> ***The Company does not believe that any individual unrealized loss as of June 30, 2007 represents an other-than-temporary impairment. The majority of the unrealized losses on mortgage-backed securities are attributable to changes in interest rates and are not reflective of deterioration in the credit quality of the issuer and/or securitization.*** Substantially all mortgage-backed securities backed by U.S. Government sponsored and Federal agencies are "AAA" rated and have unrealized losses due to changes in market interest rates. As market interest rates increase, the fair value of fixed-rate securities will decrease. The Company has the intent and ability to hold these securities until the market value recovers or the securities mature. Municipal bonds, corporate bonds and other debt securities are

evaluated by reviewing the credit-worthiness of the issuer and general market conditions. ***The majority of the asset-backed securities portfolio consisted of "AA" or higher rated securities.*** Based on its evaluation, the Company recorded other-than-temporary impairment charges for its asset-backed securities of $2.8 million and $3.0 million for the three and six months ended June 30, 2007. The Company recorded no impairment charges for the three months ended June 30, 2006 and $0.4 million for the six months ended June 30, 2006, respectively.

*Id.*, p. 44.

236.    Defendants' representations in E*TRADE's 2Q2007 10Q were materially false or misleading for the reasons stated as to previous representations, and because, *inter alia*:

a.    The positive statements about the Company's loans' credit quality were materially false and misleading because, *inter alia*: E*TRADE failed to effectively communicate that most of its loan portfolio had been purchased from sellers with questionable origination practices, rather than generated from E*TRADE customers; E*TRADE was failing to track current LTV/CLTV values which is a key indicator of borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; and E*TRADE failed to disclose other issues with the servicers/originators of E*TRADE's mortgage loan portfolio;

b.    Defendants failed to disclose or indicate that: (1) the Company was experiencing increased delinquencies in its mortgage and home equity portfolios which were not simply attributable to "seasoning," as Defendants claimed; (2) the Company had failed to adequately reserve for loan losses; (3) as such, the Company would be forced to

take $95 million in charge-offs and provision expenses of $245 million a few weeks later;
(4) the Company had failed to timely record impairments on ABS, CDO and second lien
securities, and as a result, such portfolios were materially overvalued; and (5) as a result
of the foregoing, E*TRADE's 2Q 2007 financial results overstated the Company's net
revenue and income;

  c.   Defendants failed to disclose that the Company's performance and
prospects were adversely impacted by numerous undisclosed facts, including that
E*TRADE performed no or insufficient due diligence on loans to see how the borrowers
were performing; only 1% of purchased loans were reviewed (CW2); property appraisals
were constantly grossly overstated, substantially increasing the riskiness of the loan
portfolio (CW3); experienced conservative brokers were terminated at the same time
Defendants increased E*TRADE's purchase of risky loans with insufficient information
(CW1); and Webb was buying pools comprised of at least 50% risky, subprime loans
while the due diligence staff was too overworked and understaffed to review and verify
most of the purchased loans  (CW2, CW6)  and every loan reviewed in certain loan
samples was risky - but Defendants nonetheless refused to review or return to the
originators the entire loan pools related to these risky samples (CW4);

  d.   E*TRADE relied primarily on representations of the sellers (including
National City, E-Loan, and Countrywide) because it performed an analysis on only a
"sample" of the loans to ensure compliance with these guidelines.  Most of E*TRADE's
"due diligence" consisted of reviewing the sellers' underwriting standards and comments;

  e.   Defendants were aware that the "average" FICO and LTV numbers failed
to communicate that a substantial dollar amount of  the assets were not closely aligned

with those averages; and

      f.     E*TRADE's reported 2Q 2007 assets, net income and profits were materially false and overstated because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments.

### *Crain's New York Business* Reports E*TRADE "Represents An Appealingly Solid Bargain"

237.    On August 20, 2007, *Crain's New York Business* published an article, based on representations made by Defendants, which stated that "E*Trade represents an appealingly solid bargain," that was "akin to a large savings bank stuffed with piles of customer deposits and relatively safe mortgages." The Crain's article stated:

> Last week, with even the nation's largest mortgage lender, Countrywide Financial, briefly on the ropes, the 15% five-day drop in E*Trade's shares hardly came as a surprise. ***But bold investors would be wise to peer through all the smoke and take note that after a 38% sell-off in the last month, E*Trade represents an appealingly solid bargain.***
>
> Sure, vast swaths of the residential real estate market are a mess, but E*Trade has a lot of room for error with its hugely profitable method of gathering accounts-- and clients' assets--online. In the second quarter, the Manhattan-based company had $414 million in net income and a cash cushion against loan losses of $30 million.
>
> "Even if it tripled its loan-loss provisions, that wouldn't put a huge dent in its net income," says Patrick O'Shaughnessy, an analyst at Morningstar.
>
> ***Even though E*Trade was likened in a column in The Wall Street Journal last week to a "mortgage REIT disguised as an online broker," the company is really more akin to a large savings bank stuffed with piles of customer deposits and relatively safe mortgages.*** But unlike a bank, E*Trade buys most of them from others. It's unlikely to have its funders run for the hills. Nearly two-thirds of them are really consumers holding checking and savings accounts. And customers' $27 billion in deposits are insured by the FDIC.

238.   The price of E*TRADE common stock increased approximately 12.97% from a closing price of $13.55 per share on August 16, 2007 (the date on which E*TRADE indicated that the stock was undervalued) to a closing price of $15.57 per share on August 21, 2007.

239.   On August 22, 2007, *Forbes.com* published an article entitled "E*TRADE, Ameritrade Merger Talk" which indicated that the companies were "talking to each other about a long discussed merger."

**E*TRADE's Response to the SEC's July 26, 2007 Letter**

240.   On August 31, 2007, E*TRADE finally responded to the SEC's July 26, 2007 letter. E*TRADE's response letter revealed that the minimum FICO score on loans originated by E*TRADE was actually ***620 (one point above subprime)*** with a ***maximum CLTV ratio of 100%***. E*TRADE's response letter set forth the following:

> Risk Management
> Credit Risk Management, page 50
>
> Please tell us and revise to disclose the underwriting policies for the major types of loans that you originate (e.g. requirements for loan-to-value ratios, collateral requirements, etc.) and whether there have been any changes in those policies during the periods presented.
>
> While we do originate a variety of loan types through our retail and wholesale origination channels, these loans do not represent a significant portion of the loans on our balance sheet. The underwriting guidelines for our major originated loan types are summarized below.  There have been no material changes to these guidelines during the periods presented.
>
> Retail Channel

| Underwriting Requirement | First Lien – Full Documentation | | First Lien – Stated Income/Stated Asset | | HELOC /HEIL |
|---|---|---|---|---|---|
| | Non-Conforming | Conforming | Non-Conforming | Conforming | |
| Minimum Credit Score | 620 | 620 | 680 | 680 | 640 |
| Maximum Debt-to-Income | 50% | 40% | 50% | 50% | 50% |
| Maximum CLTV | 100% | 100% | 95% | 95% | 100% |
| No Bankruptcy/ foreclosures | 4+ Years | 4+ Years | 4+ Years | 5+ Years | 5+ Years |

241.   E*TRADE's response to the SEC was not posted on E*TRADE's web site or mentioned in Defendants' press releases or conference calls.

**September 17, 2007 Partial Disclosure**

242.    On September 17, 2007, Defendants issued a press release entitled "E*TRADE
FINANCIAL Corporation Announces Strategic Plan to Better Align Balance Sheet and
Operations with Retail Growth Opportunity; Company Exits Wholesale Mortgage, Restructures
Institutional Brokerage, And Revises 2007 Guidance."    The release revised E*TRADE's
earnings guidance for 2007 significantly downwards (to between $1.05 and $1.15 per share from
a previous range of $1.53 to $1.67), and announced E*TRADE's decision to exit the wholesale
mortgage business.  The press release also announced huge increases in provisions for loan loss
expenses to $245 million for the second half of fiscal 2007, and charge-offs for loan losses of
$95 million, as well as charges reflecting the impairment of mortgage backed assets of $100
million.  The press release further stated that the allowance for loan losses as a percentage of
nonperforming loans was expected to increase to 75%, and that the provision for HELOC loan
losses was increasing to a shocking 100%.

243.    The September 17, 2007  press release stated, in relevant part:

E*TRADE FINANCIAL Corporation (NASDAQ: ETFC) today announced plans
to realign its balance sheet and streamline business operations to focus on its retail
growth opportunity.  ***The Company is exiting or restructuring non-core
businesses that lack a direct and strategic connection with its retail customers.***
The Company is also accelerating plans to shift the composition of its balance
sheet toward retail assets and liabilities and to synchronize balance sheet growth
with customer engagement.  ***In addition, the Company is increasing the
provision for loan losses due to charge-offs expected as a result of the
disturbance in the credit markets. As a result of these actions, E*TRADE
FINANCIAL is revising 2007 earnings guidance to account for higher
provision for loan losses, potential securities impairments, reduced balance
sheet growth and restructuring charges.***  Despite these factors, the Company
confirms that its balance sheet funding sources remain sound and the Company
remains well capitalized based on regulatory standards.

*          *          *

Today's announcement addresses the recent shifts in the global financial markets
and allows us to focus on accelerating plans to further align both our balance

sheet and business operations with our core asset - the retail customer," said Mitchell H. Caplan, Chief Executive Officer, E*TRADE FINANCIAL Corporation. "Growth in our target segment continues at record levels. The actions we have taken better position the franchise for future growth and high quality earnings.

The specific details of the plan, and expected financial implications (all figures are pre-tax, with the exception of EPS and net income), include:

---**Balance sheet growth and composition strategy**. For the foreseeable future, balance sheet growth, if any, will be driven by the continued growth in cash and deposit balances from retail investing and trading customers. Through at least 2008, interest-earning assets will remain relatively flat with third quarter levels, with growth in customer cash and deposits used to replace wholesale fundings. *The Company plans to reduce balances in home equity, consumer loans and securities, replacing these assets as they pay down or mature with margin debt and prime first lien mortgages from retail customers. The planned run-off in home equity loans, consumer loans and securities will reduce both the overall level of risk within the portfolio and expected future loss levels. Through this initiative, the composition of the balance sheet will shift significantly toward retail assets and liabilities, reducing wholesale contributions to revenue and net income. The Company anticipates making this transition in an orderly fashion over the next 18-24 months. Given the expectations for limited balance sheet growth going forward, the capital needs of the overall business will be reduced - creating opportunities in higher return investments such as accelerated share and debt repurchase activity or other initiatives to strengthen the business.*

—**Increased allowance for loan losses.**  Given the significant deterioration in the mortgage market in August and particularly the pace of change in the performance of home equity loans in August, *the Company expects charge-offs of $95 million dollars and total provision expense of $245 million in the second half of 2007. The majority of this provision is expected to be recorded in the third quarter.* With this additional reserve, allowance for loan losses as a percentage of nonperforming loans is expected to increase to *75 percent based on assumptions for the second half of the year, up from 45 percent on June 30, 2007. Within home equity loans, where the Company and the marketplace have seen the most significant stress, the coverage will be approximately 100 percent, up from 51 percent as of June 30, 2007.*

—**Potential for securities impairments**. *Embedded in the Company's modified guidance is an assumed securities impairment of up to $100 million in the second half of 2007. The expected impairments in the guidance are predominantly related to deterioration in the performance of asset-backed securities comprised of second lien loans and CDOs (collateralized debt obligations).*

—*__Exiting and restructuring non-core businesses.__*  **The Company will exit its wholesale mortgage operations** *and will streamline its direct mortgage lending business to focus on its retail franchise.    In addition, the Company will restructure its institutional sales trading business in a manner to better align it with retail activity.* **Total severance, restructuring and other exit charges are estimated to be approximately $32 million, the majority of which will occur in the fourth quarter.**

**As a result of the actions outlined above, the Company is revising its earnings outlook for 2007** to account for 1) higher provision for loan losses; 2) potential securities impairments; 3) slower balance sheet growth and composition expectations; and 4) exit and other restructuring charges. **For the full year 2007, E\*TRADE FINANCIAL expects GAAP net income of between $450 million and $500 million, and earnings per share of between $1.05 and $1.15 per share. This is down from its previous range of $1.53 to $1.67.**

244.    On September 17, 2007, Defendants also issued a Supplemental Disclosure Statement, which purportedly "update[d] the Supplemental Portfolio Disclosure originally released on August 16, 2007, with data as of August 31, 2007."    The "Executive Summary" at the beginning of the September 17, 2007 Supplemental Disclosure Statement touted E\*TRADE's "conservative approach" to credit and funds management, citing the "key points" of high FICO scores, low LTVs anc CLTVs, low delinquencies and high investment portfolio ratings (including high ratings for ABS):

**Executive Summary**

**Our conservative approach to credit and funds management** is demonstrated by the following key points

**First Lien Portfolio**
• As of August 31, 2007, the portfolio had a total unpaid principal balance of $17.0B and  delinquent loans of $338MM, **or 1.98%**
• $17.0B portfolio is supported by **high FICOs, low LTVs,** and private mortgage insurance
• All loans with an 80% or higher LTV are protected by private mortgage insurance

**Home Equity Portfolio**
• As of August 31, 2007, the portfolio had a total unpaid principal balance of $12.6B and delinquent loans of $349MM, **or 2.78%**
• $9.4B, or 75%, of portfolio is to borrowers with **FICOs of 700 and higher**

• $6.1B, or 48%, of portfolio has **CLTV of 80% or lower**

**Investment Securities**
• $16.7B, or 92% of the Investment Securities portfolio is **rated AAA or AA**
• $2.0B, or nearly 100% of the Corporate, Municipal and Preferred Stock portfolio are rated AAA or AA
• $2.7B, or 82%, of the Asset-Backed portfolio is **rated A or higher**

**Balance Sheet Funding Sources**
• Consistent and growing base of retail customer cash
• Thrift charter provides access to FHLB - $13B of additional borrowing capacity
• $250MM of undrawn committed senior secured revolving credit facility
• $432MM of Free Cash (1) as of June 30, 2007
• No material changes to date with respect to wholesale funding availability, pricing or margin, including repurchase agreements

*Id.* at 4-5.  The same positive key points and ratings were repeated and emphasized throughout the September 17, 2007 Supplemental Disclosure Statement. *See, e.g., id.,* pp. 6, 21, 22, 24.

245.   The September 17, 2007 Supplemental Disclosure Statement further touted high ratings and the performance of E*TRADE's "Alt-A" securities:

**Prime Residential First Lien Mortgage Securities (Alt-A):**

• Weighted Average original FICO = 723; LTV = 72%
• No bonds within our Alt-A portfolio have been downgraded
• Recent performance and a continuation of recent performance **will no result in material impairments**

*Id.* at 26.

246.   In addition, after re-emphasizing the high ratings of E*TRADE's ABS portfolio on p. 24 ("$2.7B, or 82%, of ABS portfolio is rated A or higher."; "Non-rated and below investment grade securities are $139MM, or 0.8% of Investment Securities portfolio"), the September 17, 2007 Supplemental Disclosure Statement also reassured: "The net growth in the portfolio quarter-to-date has occurred nearly exclusively in the AA-AAA rating," *Id.* at 25, and downplayed securities issues downgrades. *Id.* ("From June 30th through August 31st, there have been two issues upgraded (3 bonds for $20M) and twelve issues downgraded (17 bonds for

124

$116M) in the portfolio. All of the downgrades have been in the second lien sector and account for all of the increase in the Below Investment Grade (BIG) category.").

247. E*TRADE's September 17, 2007 Supplemental Disclosure Statement also emphasized the Company's "loan risk mitigation discipline," including favorable DTIs, and combined this with a partial disclosure of originators/servicers, as follows, :

**Loan Risk Mitigation Discipline**

- Geographic diversification with no single MSA greater than 10% of mortgage loan portfolio
- Low leveraged borrowers with average debt-to-income ratio of 35% across mortgage portfolio
- No option or negative amortization ARMs
- Top Sellers/Originators of mortgage loan portfolio with 70% of $29.6B in unpaid principal balance from: Bank of America, JPMorgan, Countrywide, Morgan Stanley, E-Loan, National City, E*TRADE, UBS, GMAC, Wells Fargo

*Id.,* p. 19. This was the same partial information regarding the originators/servicers of E*TRADE's loan portfolio contained in the August 16, 2007 disclosures, and did not state the amounts originated or serviced by each entity. Moreover, since E*TRADE was included in the list, investors still were not informed about how much was originated or serviced by E*TRADE versus other entities.

248. The September 17, 2007 Supplemental Disclosure Statement also contained tables of purported FICO and LTV/CLTV values as well as the outstanding principal balances and delinquencies on E*TRADE's first mortgage and home equity portfolios. However, these tables were based on LTV at the time of origination, and failed to disclose the impact of declining real estate values on current LTV/CLTV.

249. The September 17, 2007 Supplemental Disclosure Statement contained some additional information regarding the attributes of E*TRADE's portfolios. For instance, a bar chart on page 9 purported to show the type of documentation for the first lien portfolio. Full doc

and Alt doc loans were lumped together as constituting approximately 50% of the loan documentation, which did not reveal what percentage of the loans fell into each category. The bar chart indicates that about 35% of the documentation was SIVA (Stated Income Verified Assets – meaning that the lender takes the borrowers' word regarding his income without verification), 10% was SISA (Stated Income, Stated Assets), and 5% was NINA (No Income No Assets). A bar chart for the HELOC portfolio documentation similarly lumped "Full doc" and "Alt doc" loans together, and contained a large proportion (about 45%) of stated documentation loans. *Id.,* p. 12. These documentation levels call into question Defendants' prior – and still continuing statements throughout the Class Period about the Company's conservatism, aversion to risk, and the quality of its portfolios.

250. According to the bar chart related to vintages, also on page 9, the 2006 vintage appears to have accounted for at least 35% of all loans, which is contrary to the July 25, 2007 statements by E*TRADE that it focused on seasoned loans.

251. The September 17, 2007 Supplemental Disclosure Statement also stated that ABS CDOs and Commercial Real Estate and Trust Preferred totaled $450 million (2.5% of E*TRADE's total investments), consisting of $244 million (1.2%) rated AA or higher; $149 million (0.8%) rated A; $1 million (0%) rated Below Investment Grade; and $29 million (0.2%) Non-Rated. *Id.,* p. 28. With respect to these securities, E*TRADE reassured that "excess collateralization" existed for the highly-rated bulk of the portfolio, and portrayed future impairment of the lower-rated portion of the portfolio in hypothetical terms:

> Bonds rated ***AA or higher*** are ***adequately supported by excess collateralization***. No impairments in these bonds are expected.
>
> The most immediate risk of impairment for certain lower rated (<AA) CDO bonds will be diversion of cash flow as required under pre-determined performance criteria. The effect of this criteria is to redirect cash flow from lower rated bonds

to higher rated bonds. Continued deterioration **could** lead to future impairments.

*Id.,* p. 28.

252.    The September 17, 2007 Supplemental Disclosure Statement made some partial disclosures about E*TRADE's Second Lien Mortgage Securities portfolio.  It stated that this portfolio totaled $178 million (1% of E*TRADE's portfolio, consisting of: $59 million (0.3%) rated AA or higher; $42 million (0.2%) rated A; $18 million (0.1%) rated BBB or higher; 59 million (0.3%) rated Below Investment Grade; and $0 Non-Rated).  E*TRADE disclosed that the second lien securities portfolio had a "Weighted Average FICO = 682; CLTV = 97%" and predicted impairments of the second lien portfolio: "Cumulative losses to date of 6% to 8% have nearly exceeded initial lifetime expectations of 10%.  Recent performance and a continuation of recent performance will result in substantial impairments."  *Id.,* p. 29.  The characteristics of the second lien portfolio set forth on September 17, 2007 were inconsistent with the high quality nature of the portfolio image that Defendants cultivated throughout the Class Period.  However, Defendants still portrayed the portion of E*TRADE's portfolio which was likely to become impaired as a very tiny portion of E*TRADE's total holdings.

253.    On September 17, 2007, Defendants also participated in a "Business Update Call" with analysts and investors.  Defendant Caplan reassured the market that "we have experienced tremendous growth and record performance in our core retail franchise," and that:

> With a focus on retail liabilities and substantial excess liquidity sources, our balance sheet remains strong, in excess of regulatory well-capitalized levels, and positioned to absorb continued disruptions in the marketplace and within our portfolio.

254.    Defendant Caplan also spoke reassuringly that, based on the quality of its borrowers and the bulk of its loans, E*TRADE still expected to outperform the industry, despite the Company's lowered guidance; and attributed E*TRADE's (still inadequate) increase in loan

loss allowances to "prudence":

The consumer loan portfolio is run-up mode and delinquencies remain within the expected range.  We are not anticipating any significant change in its performance and we expect this portfolio to pay down and shrink at annual pace of approximately 20%, annually.  Given existing reserve against this portfolio, we are not concerned about losses related to the consumer loans.  We are also not concerned about losses from margin debt, as a result of the collateral levels against those loans.  Where we are focusing our attention with respect to whole loans is the mortgage portfolio.  In general, mortgage loan performance weakened through the first half of 2007 and the rate of deterioration increased further in August.

Non-performing mortgage loans have increased by $72 million or 44% since June. To understand what this change will likely mean to our financial performance and ultimately loan loss levels, we examined the characteristics of our delinquencies and non-performing loans in the context of our entire balance sheet.  In our non-performing loan balances, about 40% are first lien mortgages, and about 60% are home equity.   This is important given the significantly different loss characteristics between the two.

In the first lien portfolio with **average FICOs of 738 and loan devalues of 69%,** we have experienced annualized losses between 1 and 2 basis points. In addition, we are protected by private mortgage insurance on balances in excess of 80% of the property value at time of origination.  **As a result of these loss mitigation factors, charge-offs in our first lien portfolio remain relatively low even with growth in non-performing loans.**

That said given the changing credit environment, we assessed future loss expectations assuming higher delinquencies and default rates by stress testing the portfolio on a number of factors.  **Given our geographic dispersion, high FICOs, low LTVs and high owner occupancy levels, we expect that losses in our first lien portfolio will remain relatively low and continue to outperform industry comparables. To be prudent**, we are increasing our allowance for loan losses against first lien mortgages to between 5 and 10 basis points from 2 basis points given the likelihood of continued market deterioration.

The second lien portfolio includes home equity lines of credit and installment loans, and represents approximately 43% of our mortgage loan portfolio, but 60% of the non-performing loans.  This is the portfolio that is driving the increase in loan losses.  Annualized charge-offs in this portfolio have increased from approximately 19 basis points a year ago to 46 basis points in the second quarter and 87 basis points in July.   While this change has significantly exceeded our previous expectation, the level is consistent with the performance of home equity portfolios across US savings institutions.  As a result of the new dynamics of the credit cycle and the trends we have seen in the past 30 and 60 days, we have

increased our focus on additional factors within our loss expectations.

Loan performance in the current credit environment has shown to be less correlated with the typical forecasting factors such FICO. Adjusting for predictive criteria, such as documentation type, occupancy type, CLTV and FICO factors, we have altered our expected loss levels. In addition, we have traditionally assumed a 20% haircut to collateral value at the time of default, including foreclosure costs. For recently defaulted loans, we have observed that home values have depreciated by approximately 15% from original appraised values, nonetheless we are increasing the allowance levels against this portfolio in our revised guidance as a result of the pace and level of deterioration we have seen. Given the current market outlook for home depreciation for 2007 and 2008, we are adjusting our expectations to assume a 30% haircut to the original appraised values.

As a result, we are increasing the allowance for loan losses against our home equity portfolio to approximately $190 million in our revised guidance, taking the coverage ratio to approximately 100% of expected home equity non-performing loans at year-end. In our adjustment, we are assuming higher delinquencies and lower collateral values for the remainder of 2007 and throughout 2008.

Utilizing our enhanced model, we have run various scenario analyses against our entire loan portfolio to create a range of expected losses over the next 12 months. Consistent with our provision policy in our revised guidance, we are increasing the previously expected 70 million of provision in the second half of 2007 by $25 million to match expected charge-offs and an additional 150 million to increase our allowance for loan losses based on 12 months of expected losses. This increases our coverage against first lien mortgages into the range of 5 to 10% from 5% in June, raises coverage against the home equity portfolio to approximately 100% from 51% while allowing coverage in our seasoned and rolling off consumer loan portfolio to move to between 450 and 500% from 626%. All in, allowance for loan loss as a percent of non-performing loans increases to roughly 75% from 45% in June.

Turning now to securities. Our investment portfolio includes $18.2 billion of securities, 13 billion of which is **AAA rated agency mortgage backed securities**, 2 billion is in corporate bonds, municipal bonds and agency preferred stock, and 3.3 billion is in asset backed securities. ***Given the credit quality and underlying collateral of the mortgage backed securities, we do not expect any material impairments from this portfolio.***

Similarly, the corporate muni portfolio is also highly rated with solid collateral and we also do not expect any significant impairments from these holdings. What we are focused on for potential impairments is the ABS portfolio. In general, prepayments have decreased and delinquencies have increased causing us to change the future performance expectation for certain bonds. It is important to

129

understand that within this $3.3 billion asset backed security portfolio, expected delinquencies and cash flow impairments differ significantly based on the performance of the underlying collateral.

The prime residential first lien mortgage securities, which account for 2.2 billion of the 3.3 billion ABS balance continued to perform as expected with very limited losses. ***With an average FICO of 732 and loan devalue of 72%, we do not expect any significant impairments in this portfolio.***

Contrary to expectations, this is also true with the bonds collateralized by sub-prime first lien residential mortgages. We have seen prepayment speed slow in this portfolio as underwriting guidelines have tightened significantly, yet delinquencies in this portfolio of approximately 9% currently continue to ***trend meaningfully lower than the industry average*** of 20 to 25%. To date, the rating agencies have not downgraded any of the bonds in our sub-prime portfolio and we do not expect significant impairment in this portfolio in 2007.

If credit trends worsen, we ***could see some slight erosion*** in these securities later in 2008. Where we do see a higher risk of impairments is in the second lien and CDO securities. The second lien portfolio currently has $77 million that is rated BBB or below, of which $59 million that had originally been investment grade has been downgraded below investment grade.

Aside from second lien, the remaining non-rated and below investment grade rated portfolio totals $80 million. Of this, $54 million is in CDO bonds. Cash flow diversion triggers in these bonds could result in impairment depending on the degree of rating agency downgrades moving forward. ***Bonds rated AA or higher in both the second lien and CDO category are adequately supported by excess collateralization and we don't expect material impairments in these bonds.***

Similar to assessing risk in our whole loans, we ran various scenario analyses to stress test the performance of the securities portfolio. The scenarios range from holding current performance through the end of the year and improving in 2008, to continued deterioration across all categories throughout 2008, which resulted in a range of potential losses. Our best assessment of these scenarios results in potential impairments of $100 million between now and year-end 2007. In 2008, we anticipate that we could see another 50 to 100 million in securities impairments, which would include some deterioration in the single A rated second lien securities.

In conclusion, we have been thoughtful in our approach to accepting the performance of our loan and securities portfolios to make a best estimate of the impact of continued turbulence in the credit market. We remain cognizance of the fact that there is no clear indication of the ultimate magnitude and duration of this credit cycle. While we cannot control the macro environment, we can control the

asset mix and growth of our balance sheet, and that is precisely what we are doing.

255.    Defendant Simmons also reassured investors during the September 17, 2007 business update call that "Tier 1 and risk-based capital remain well above the regulatory thresholds for well-capitalized status, even as we absorb the outlined impairments."

256.    In response to a question about trends during the same call, defendant Caplan admitted that Defendants have been led to believe that "FICO and LTV alone are not significant enough to make judgments in terms of potential loan losses," and that, from April [2007], the Company "assume[d] a deteriorating credit environment."

257.    Defendant Webb also reiterated that E*TRADE's subprime portfolios "were supported by excess collateralization" and that "we do not see impairments there" (except in the 1% of the holdings that were second lien bonds), while admitting that FICO scores "underestimate[] probabilities of default, especially as you get to higher LTV lines."

258.    On September 18, 2007, the price of E*TRADE common stock declined approximately 8% from a closing price of $12.47 on September 17, 2007 to close at $11.47 on September 18, 2007 on a high volume of 32.25 million shares.

259.    Defendants' representations on September 17, 2007 in the press release, Supplemental Disclosure Statement, and accompanying Business Update Call, were materially false or misleading for the reasons stated as to previous representations, and because, *inter alia*:

a.    The positive statements about the Company's loans' credit quality (including that E*TRADE did ***not*** expect significant impairments in portfolios and that only "slight erosion" "could" occur in a portfolio) were materially false and misleading because, *inter alia*: E*TRADE still failed to effectively communicate how much of its loan portfolio had been purchased from sellers with questionable origination practices;

E*TRADE was failing to track current LTV/CLTV values which is a key indicator of borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; and E*TRADE failed to disclose other issues with the servicers/originators of E*TRADE's mortgage loan portfolio;

b.     Defendants failed to disclose or indicate that: (1) the Company was experiencing significant delinquencies and impairments in its ABS, MBS, mortgage and home equity portfolios; (2) the Company had still failed to adequately reserve for loan losses; (3) the Company had failed to timely record impairments on ABS, CDO and second lien securities, and as a result, such portfolios were materially overvalued; and (4) as a result of the foregoing, E*TRADE's net revenue and income were overstated;

c.     Defendants failed to disclose that the Company's performance and prospects were adversely impacted by numerous undisclosed facts, including that E*TRADE performed no or insufficient due diligence on loans to see how the borrowers were performing; only 1% of purchased loans were reviewed (CW2); property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3); experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1); and defendant Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and

verify most of the purchased loans. (CW2, CW6) and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4); and

        d.    As the Company admitted after the close of the Class Period in its February 2, 2008 response letter to the SEC, E*TRADE did not track current CLTV/LTVs for the entire portfolio. As a result, the elaborate tables presented in the September 17, 2007 Supplemental Disclosure Statement understated the risk presented by loans at all levels.

        260.    On October 8, 2007, *Business Week* published an article titled "E*Trade's Subprime Surprise," in which defendant Caplan was interviewed. The article, in relevant part, stated:

> On Sept. 17, E*Trade Financial (ETFC ) CEO Mitch Caplan broke the bad news to Wall Street: The online brokerage would take a hit from the mortgage mess. The damage includes a $245 million expense for loan-loss provisions and up to an additional [sic] $100 million for troubled investments tied primarily to second-lien loans and collateralized debt obligations. The expected changes in the second half of the year forced E*Trade to cut its guidance for annual profits by 31%. But to many, the biggest surprise was that the firm was actually in the mortgage business. I asked Caplan to explain E*Trade's exposure.
>
>           *       *       *
>
> [Q]: One Citigroup analyst says credit trends continue to deteriorate and disclosure at E*Trade is still lacking. He feels that you did not recognize—or at least did not make clear to the market—that you had more exposure to bad credit than you let on.
>
> [Caplan]: One of the things I pride this management team on is disclosure. I think if you look at our monthly metrics and, more important, our quarterly press releases, we give pages and pages of disclosure. ***When you looked at our balance sheet, it was solid and . . . <u>we had very little exposure in areas that were viewed as risk.</u>  I thought we were giving appropriate levels of disclosure.  And then we put out the 100 and added a risk factor because we own mortgages, and people went nuts.***

**The SEC Requests Additional Clarification**

261.    On October 12, 2007, the SEC wrote to defendant Simmons at E*TRADE, asking for disclosure of additional information in E*TRADE's September 30, 2007 Form 10-Q and future 1934 Act filings "in an effort *to provide greater transparency surrounding the risks* related to [E*TRADE's] lending activities (particularly credit risk)."  The SEC asked Defendants to:

- discuss each of your business activities where credit risk arises and explain how you manage and assess loan quality and the related credit risks;

- discuss (quantitatively and qualitatively) the key performance indicators or metrics you use in managing credit risk (e.g. 1st lien and 2nd lien loan distribution by FICO, etc.); and

- provide your proposed disclosures in your correspondence to us.

262.    The SEC's letter also stated that E*TRADE's filings did *not* provide ample information on the Company's significant products (especially lending products), and asked for further information as follows:

> *We do not see (either in this Form 10-Q or in your 2006 Form 10-K) where you have provided an ample discussion of your significant products and services (particularly lending products).*   In light of our comments to you in this letter as well as our letter to you dated July 26, 2007, please address the following in your September 30, 2007 Form 10-Q and future 1934 Act filings (refer to item 101 of Regulation S-K):
>
> • provide a robust discussion of *each* of your products and services [emphasis in original];
>
> • as it relates to your mortgage, home equity and other lending activities, disclose your loan pricing and underwriting practices/standards;
>
> • discuss any significant concentrations in your loan portfolio, particularly concentrations where there is an inherent elevated credit risk (e.g., 2d lien HELOCs and HEILs, etc.); and
>
> • disclose the amount or percentage of total revenue contributed by any class of similar products or services which accounted for 10% or more of consolidated

revenue.

263.    The SEC also stated that after reading E*TRADE's response to the SEC's July 26, 2007 letter, the SEC still had additional questions, and asked E*TRADE to provide: its underwriting policies for purchased HELOC, HEIL and other loans; who E*TRADE purchased the loans from (including quantifying the amount purchased from each seller); whether E*TRADE was the service provider for the loans and for first lien mortgages associated with the loans; whether E*TRADE originated first lien mortgages associated with the loans and sold the loans, and who the loans were sold to; and whether there were quantitative or qualitative differences in E*TRADE's methodology for determining loan loss allowances on originated and purchased loans.

264.    The SEC also requested greater detail on E*TRADE's loan losses, "to allow an investor to understand the credit quality of loans in your portfolio."

265.    The SEC also requested that E*TRADE provide additional disclosures explaining how the $95 million charge offs and total expense provision of $225 million numbers were obtained by providing a discussion of:

- the significant deterioration events that occurred during August 2007;

- how those events resulted in the expected charge-off and provision amounts reported and ***"justify why the amounts should not have been recorded in previous periods"***;

- how E*TRADE "determined the expected amounts noted above are sufficient and larger amounts are not required";

- how the increased charge-offs and increased provision expense impacted the allowance for loan losses and related key metrics (e.g. allowance for loan losses as a percentage of total loans, and the allocation of the allowance to the HELOCs, HEILs and other portfolio, etc.).

266.    The SEC asked E*TRADE to respond to its October 12, 2007 letter within ten

135

days or advise when a response would be provided.  It appears that Defendants did not respond

until November 15, 2007, over a month later.

**E\*TRADE's October 17, 2007 Press Release,**
**Conference Call & Third Quarter 2007 Form 10-Q**

267.    On October 17, 2007, Defendants issued a press release entitled "E\*TRADE

FINANCIAL Corporation Announces Third Quarter Results," announcing results for its third

quarter ended September 30, 2007, with the subtitle:

> Net loss per share of $0.14, including $0.30 of asset-backed securities write
> downs -- Total Net Revenue of $321 million -- Target Segment account growth of
> 16 percent annualized -- Record Total Retail Client Assets of $218 billion -- Total
> Customer Cash and Deposits growth of $1.7 billion to a record $40 billion --
> Record third quarter Daily Average Revenue Trades of 194,000 -- Revised 2007
> earnings guidance to a range of $0.75 to $0.90 per share.

268.    The release announced a 2007 3Q net loss of $58 million, or $0.14 per share,

compared to net income of $153 million, or $0.35 per share in 2006 3Q.  The press release

quoted defendant Caplan indicating that he was "extremely pleased with continued growth

trends" and reassuring investors that E\*TRADE was "working diligently" to manage credit

challenges:

> While **we are extremely pleased with the continued growth trends** we are
> generating throughout the retail business, we are clearly disappointed with the
> overall Company performance as a result of the severe volatility in the credit
> markets.
>
> *        *        *
>
> **We are working diligently to execute our strategic plan to manage through the**
> **credit challenges as quickly as possible** and focus the Company on the
> opportunity and strength of our retail franchise.

269.    The October 17, 2007 press release indicated that: provisions for loan losses had

increased to $187 million; and E\*TRADE's securities write down would be **$197 million** in

2007 3Q, rather  than securities impairment of **"up to $100 million"** in the second half of 2007

and 2008 as previously announced on September 17, 2007.  The October 17, 2007 press release

stated:

> The net loss in the quarter was primarily due to higher provision for loan losses
> and securities write downs in the Company's Institutional segment.  ***Provision for
> loan losses in the quarter increased to $187 million*** principally due to higher
> loan delinquencies and net charge-offs. This increase was consistent with
> previous expectations.  ***Securities write downs in the quarter totaled $197
> million, pre-tax.  This amount was previously forecasted to occur in the second
> half of 2007 and throughout 2008, and was realized instead in the third quarter
> rather than in future periods.***  Total net revenue for the third quarter declined 45
> percent year-over-year to $321million as a result of the higher provision and
> securities write downs.

270.    On October 17, 2007, Defendants also hosted a conference call in which

defendant Caplan partially revealed that delinquencies had increased, but continued to assert that

net losses continued in the range of 1 to 2 basis points because the Company was protected by

excess collateral and low LTVs:

> In our whole loan portfolio, performance trends of mortgage loans, specifically
> within home equity loans, remains challenging but fairly consistent with our
> previously revised expectations. ***Total delinquent mortgage loans increased to
> $769 million, up from $548 million in the second quarter. Non-performing
> mortgage loans, which is the subset of total delinquent loans that are delinquent
> by 90 days or greater, increased to $266 million from $164 million in the second
> quarter.***

> It's important to note that 43% of our non-performing mortgage loans are related
> to one to four family where, despite the delinquencies in these loans, we continue
> to see net losses in the range of 1 to 2 basis points.  ***This is the result of excess
> collateral due to relatively low loan to value ratios*** and mortgage insurance
> coverage on loans with loan to value of greater of 80% at origination.

> Consistent with our revised guidance announcement in September, the provision
> for loan losses was increased significantly quarter-over-quarter to $187 million.
> This increased our blended coverage of non-performing loans to 76%.  Embedded
> in this ratio is coverage of excess of 100% of non-performing loans in the
> categories.

271.    Defendant Caplan stated that E*TRADE determined that it needed to take certain

write-downs when it changed its intent regarding holding the securities to recovery.  In response

to an inquiry from securities analyst, Rich Repetto of Sandler O'Neill, defendant Caplan responded as follows:

> **Q:** On the ABS portfolio and the 197 impairment, could you comment on how they were performing? ***You sold at 50 cents on the dollar.*** The CDOs and second liens is over $600 million from the last disclosure. Could you comment on the background on the writedown?

> **Caplan**: . . . ***We did not sell, so this loss is unrealized loss.*** It's an impairment running through the P&L. ***We did not actually sell the securities.*** When we last spoke, we were specifically circling up as an area of concern with respect to our overall securities portfolio the ABS. We felt extremely uncomfortable obviously with our AAAs, in our agency, and what we looked at in particular against the entire backdrop of the $3 billion in ABS CDOs, and even in the asset-backed securities portfolio, was the CDO composition as well the second lien composition.

> What we had done is, the market is fluid. It's challenging; it keeps moving. We're constantly in a position where we're re-evaluating and refining the forecast. When you looked at that and we came back**, *we made the determination, that we needed obviously to have certain writedowns, but more importantly that we did not want to continue to hold these securities to recovery***.

> As a result of designating them or changing our intent as a management team given all these other facts and circumstances, it doesn't matter whether the securities are cash flowing. What happens is you impair them at that point at market value. What we did in working with our team internally is if there's a mark that's readily available, you use it. If there's not a mark that's readily available, you use market valuation. Across the board they were marked to less than 50 cents on the dollar, and that is across both the CDOs and the second liens. There is a specific breakdown for each of them.

> **Q:** Earlier you were talking about if you had to mark your entire ABS portfolio to market, you were saying $400 million to $450 million seemed like a reasonable market if you went ahead and sold everything today. Can you update us as to where that might have stood at September 30 when you did your analysis?

> **Caplan**: The current mark on the entire ABS portfolio today would be $268 million. Of that $268 million, $137 million relates to below AA and a $131 million relates to AA and AAA, as well as the fact the $268 million is in fact a pre-tax rather than an after-tax number. When you think about the breakdown, the risk is in our minds going forward around the $137 million that relates to anything below AA in the ABS portfolio on a pre-tax basis.

272. In addition, on October 17, 2007, Defendants released a Supplemental

Disclosures Statement.  E*TRADE 8-K (Ex. 99.2).  The "Executive Summary" at the beginning of the October 17, 2008 Supplemental Disclosure Statement again touted E*TRADE's "conservative approach" to credit and funds management, citing the "key points" of high FICO scores, low LTVs and CLTVs, low delinquencies and high investment portfolio ratings (including high ratings for ABS) – similar to the September 17, 2007 Supplemental Disclosures Statement:

> **Executive Summary**
>
> ***Our conservative approach to credit and funds management is demonstrated*** by the following key points:
>
> **First Lien Portfolio**
> • As of September 30, 2007, the portfolio had a total unpaid principal balance of $16.9B and  delinquent loans of $365MM, or 2.16%
> • $16.9B portfolio is supported by high FICOs, low LTVs, and private mortgage insurance
> • All loans with an 80% or higher LTV are protected by private mortgage insurance
>
> **Home Equity Portfolio**
> • As of September 30, 2007, the portfolio had a total unpaid principal balance of $12.4B and delinquent loans of $404MM, or 3.25%
> • $9.3B, or 75%, of portfolio is to borrowers with FICOs of 700 and higher
> • $6.0B, or 48%, of portfolio has CLTV of 80% or lower
>
> **Investment Securities**
> • 16.1B, or 92% of the Investment Securities portfolio is rated AAA or AA
> • $2.0B, or nearly 100% of the Corporate, Municipal and Preferred Stock portfolio are rated AAA or AA
> • $2.6B, or 84%, of the Asset-Backed portfolio is rated A or higher

*Id.* at 4.  The same positive key points and ratings were repeated and emphasized throughout the October 17, 2007 Supplemental Disclosure Statement.  *See, e.g., id.,* pp. 6, 21-29.

273.  E*TRADE's October 17, 2007 Supplemental Disclosure Statement once again failed to provide a complete list of servicing/originating entities, or the amounts purchased from or serviced by entities which had adverse records.

274.   The October 17, 2007 Supplemental Disclosure Statement emphasized, at page 24, that "$2.6 billion, or 84% of ABS is rated A or higher."  E*TRADE indicated on page 24 that the book value of ABS CDO as of September 30, 2007 totaled $354 (2.0%) with $223 million (1.3%) rated AA or higher; $87 million (0.5% ) rated A; $34 million ($0.2%) rated BBB; $0 rated Below Investment Grade; and $10 million (0.1%) Non-Rated.

275.   E*TRADE also indicated, on page 24, that as of September 30, 2008, that the book value of the second lien securities totaled $95 million (0.5%), with $59 million (0.3%) rated AA or higher; $23 million (0.1%) rated BBB and $7 million (0.0%) rated Below Investment Grade.  *Id.,* pp. 25, 29.

276.  Defendants' representations on October 17, 2007 in the press release, conference call and supplemental disclosure statement were materially false and misleading for the same reasons listed as to prior representations, and because, *inter alia*:

a.   Defendants still touted their "conservative approach to credit and funds management," which was false and misleading, because, among other things, E*TRADE still failed to effectively communicate how much of its loan portfolio had been purchased from sellers with questionable origination practices; E*TRADE was failing to track current LTV/CLTV values which is a key indicator of  borrowers' likelihood of default; E*TRADE failed to disclose that its due diligence prior to and after purchasing loans was minimal and was primarily reliant on representations made by originators/servicers, although key originators were engaging in questionable practices that were inconsistent with E*TRADE's representations regarding quality and monitoring; E*TRADE reviewed none to only a small sample of loans prior to acquisition; and E*TRADE failed to disclose other issues   with the servicers/originators of E*TRADE's mortgage loan

portfolio;

b.      Defendants downplayed and failed to disclose the true extent of the significant delinquencies and impairments to E*TRADE's ABS, MBS, mortgage and home equity portfolio;

c.      Defendants still failed to adequately reserve for E*TRADE's loan losses; and the Company failed to timely record sufficient impairments on ABS, CDO and second lien securities, and as a result, such portfolios were materially overvalued, as were E*TRADE's net revenue and income;

d.      Defendants failed to disclose that the Company's performance and prospects were adversely impacted by numerous undisclosed facts, including that E*TRADE performed no or insufficient due diligence on loans to see how the borrowers were performing; only 1% of purchased loans were reviewed (CW2); property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3); experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1); and defendant Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans, (CW2, CW6), and every loan reviewed in certain loan samples was risky - but Defendants nonetheless refused to review or return to the originators the entire loan pools related to these risky samples (CW4); and

e.      E*TRADE's reported 3Q 2007 materially overstated the value of E*TRADE's assets and understated its net loss for the quarter because Defendants failed to record adequate loan loss provisions and ABS and MBS impairment adjustments, and

the Company's guidance for full-year 2007 was materially overstated because E*TRADE's prior quarterly reports had overstated E*TRADE's assets, net income and profits due to Defendants failure to record adequate loan loss provisions and ABS and MBS impairment adjustments in those prior quarters.

277.    On October 17, 2007, the SEC initiated an informal inquiry into matters related to the Company's loan and securities portfolios (disclosed by the Company on November 9, 2007, the last day of the Class Period).

278.    After the partial revelations near the end of the Class Period, the Company's stock price was still artificially inflated, because, among other things, notwithstanding partial adverse disclosures, Defendants continued to portray E*TRADE as conservative and its financial instruments as highly rated and creditworthy, and reassured investors that the Company had sufficient internal controls in place to manage the credit environment and provide reliable guidance.

**The Last Day of the Class Period**
<u>**E*TRADE's November 9, 2007 Disclosures**</u>

279.    On November 9, 2007 (the last day of the Class Period), the Company disclosed enormous declines in the value of its risky purchased mortgage portfolio.  E*TRADE issued a press release on November 9, 2007 entitled "E*TRADE FINANCIAL Addresses the Potential Impact of Recent Downgrades of Asset-Backed Securities," disclosing write downs related to the decline in fair value of E*TRADE's $3 billion asset-backed securities portfolio mainly within ABS (CDO and second liens).  E*TRADE disclosed $450 million of exposure to ABS CDO and second lien securities, including downgrades of previously AAA-rated securities.  E*TRADE further disclosed that it would no longer be providing earnings guidance for the remainder of the year.  The press release stated:

*The Company disclosed that consistent with a series of industry-wide rating agency downgrades of securities after the end of the third quarter, it has observed continued declines in the fair value of its $3.0 billion asset-backed securities portfolio, predominantly within ABS CDO and second-lien securities.* The total exposure to ABS CDO and second-lien securities at September 30, 2007 *was approximately $450 million* in amortized cost, including *approximately $50 million of "AAA" rated asset-backed CDOs that were downgraded to below investment grade*. The Company stated that it expected the declines in fair value to result in further securities write downs in the fourth quarter. The Company expects to remain well capitalized based on regulatory standards.

Management believes the additional deterioration observed since September 30 will likely result in *write downs that exceed the previous expectations* included in the Company's 2007 earnings outlook updated on October 17, and investors should no longer expect these earnings levels to be achieved. Actual securities-related losses will depend on future market developments, including the potential for future downgrades by rating agencies, which are extremely difficult to predict in this environment. *Accordingly, management believes it is no longer beneficial to provide earnings expectations for the remainder of the year.*

280.   On November 9, 2007, E*TRADE also filed its 2007 3Q Form 10-Q, which reported the financial results previously announced on October 17, 2007, increased losses and increased provisions for loan losses:

The operating environment during the third quarter of 2007 was extremely challenging. Losses caused by instability in the residential real estate and credit markets more than offset the considerable growth in our retail segment. Total net revenue for the three months ended September 30, 2007 decreased 45% compared to the same period in the prior year due primarily to an increase to our provision for loan losses of $174.0 million and write downs in our asset-backed securities portfolio of $197.6 million. Net income (loss) declined by 138% from the same quarter in the prior year to a loss of $58.4 million for the third quarter of 2007.

                    *         *         *

EARNINGS OVERVIEW
Net income (loss) decreased 138% to a loss of $58.4 million and 40% to income of $270.1 million for the three and nine months ended September 30, 2007, respectively, compared to the same periods in 2006. The loss for the three months ended September 30, 2007 was due principally to an increase in our provision for loan losses to $186.5 million and write downs of $197.6 million in our asset-backed securities portfolio. These losses in our institutional segment more than offset the increase in net income in our retail segment of $79.2 million to $224.2 million and $87.9 million to $599.8 million for the three and nine months ended September 30, 2007, respectively.

REVENUE

\*      \*      \*

Total net revenue declined by 45% and 9% to $321.2 million and $1.6 billion for the three and nine months ended September 30, 2007, respectively when compared to the same periods in 2006.  This decline was driven by an increase in the provision for loan losses of $174.0 million and $204.8 million for the three and nine months ended September 30, 2007, respectively, as well as write downs in our asset-backed securities portfolio of $197.6 million and $185.5 million for the three and nine months ended September 30, 2007, respectively.

281.    E*TRADE's 3Q 2007 10-Q attributed the increased provision for loan losses to

several factors:

***Provision for loan losses increased to $186.5 million and to $237.8 million for the three and nine months ended September 30, 2007***, respectively, compared to the same periods in 2006.  The increase in the provision for loan losses in the third quarter of 2007 was related primarily to deterioration in the performance of our home equity loan portfolio.  We believe this deterioration was caused by several factors, which are described below.  First, the combined impact of rising mortgage rates and home price depreciation in key markets contributed to the declining performance of our home equity loan portfolio.  Second, concerns that began in the sub-prime mortgage loan market spread to the broader credit markets in the third quarter of 2007 resulting in a significant deterioration in the overall credit markets.  This deterioration led to a dramatic tightening of lending standards across the industry, and general liquidity pressure for many mortgage lenders, some of whom ultimately ceased operations as a result.  The factors described above dramatically reduced the ability of borrowers to refinance their mortgage loans, specifically their home equity loans, therefore drastically increasing the risk of loss once a loan becomes delinquent.  During the third quarter of 2007, we also observed a decline in the percentage of delinquent loans that cure prior to charge-off or foreclosure once they have become delinquent.  We attribute this change in behavior to the factors described above, which have significantly limited borrowers' alternatives to avoid defaulting on their loans.  In addition, because of the decline in value of the homes collateralizing our home equity loans, our ability to recover our investment by foreclosing on the underlying properties has diminished as well.

282.    E*TRADE's 2007 3Q 10-Q also contained the following discussion of the

Company's net losses on its loans and securities:

Gain (Loss) on Loans and Securities, Net

Gain (loss) on loans and securities, net decreased to a loss of $197.1 million and to a loss of $174.4 million for the three and nine months ended September 30,

2007 compared to the same periods in 2006. . . .

The decrease in the total gain (loss) on loans and securities, net during the three months ended September 30, 2007 was due primarily to write downs in our asset-backed securities portfolio totaling $197.6 million. These write downs were primarily confined to securities rated below "AA" in what we believe are the two highest risk categories within our asset-backed portfolio: CDOs and securities collateralized by second lien mortgages. We did not sell any of these securities during the period ended September 30, 2007; however, it is our intent to sell them in future periods in order to reduce our exposure to further deterioration in these asset classes. The write downs were due to both an anticipated deterioration in cash flows and our decision to sell these securities. In either case, the securities were required to be written down to fair market value as of September 30, 2007.

We expect conditions in the residential real estate and credit markets to remain uncertain for the foreseeable future. Due to the inherent leverage within our asset-backed securities, even a slight deterioration in the performance of the underlying loans could result in a significant deterioration in the performance of our asset-backed securities. Therefore, continued deterioration in market conditions would likely cause additional write downs in our securities portfolio, primarily in our asset-backed portfolio.

Subsequent to September 30, 2007, we observed a significant decline in the fair value of our asset-backed securities portfolio, specifically our asset-backed CDO and second-lien securities. Our total exposure to asset-backed CDO and second-lien securities at September 30, 2007 was approximately $450 million in amortized cost.

The declines in fair value followed a series of rating agency downgrades of securities in this sector and occurred after the end of the third quarter. We believe there will likely be additional downgrades by the rating agencies of securities in this sector. *Overall, approximately $208 million of our asset-backed securities were downgraded during the month of October and through November 7, 2007, including approximately $50 million of "AAA" rated asset-backed CDOs that were downgraded to below investment grade.*

*We expect these declines will result in significant write downs to these securities during the fourth quarter; however, we cannot predict the amount for the fourth quarter as the write downs will depend on future market developments, including potential additional downgrades, and the estimated fair values of these securities on December 31, 2007.*

In addition to our asset-backed CDO and second lien portfolio, we hold approximately $2.6 billion in amortized cost in other asset-backed securities, mainly securities backed by prime residential first-lien mortgages. These securities have also declined in fair value subsequent to September 30, 2007;

however, the decline has not been as significant.

283.   The 2007 3Q 10-Q further disclosed that: "On October 17, 2007, the SEC initiated an informal inquiry into matters related to the Company's loan and securities portfolios."

284.   On November 9, 2007, E*TRADE also filed a Form 8-K announcing the departure of Dennis E. Webb, the former division President of E*TRADE Capital Markets.  The 8-K stated that Webb's last day of employment was November 9, 2007.

285.   At the end of the Class Period, when E*TRADE's risky investments in mortgage loans and asset-backed securities and losses therefrom finally became public knowledge, E*TRADE experienced an enormous multi-billion dollar "run on the bank" which substantially diminished customer accounts and assets.

286.   Following the November 9, 2007 disclosures, Citigroup analyst Bhatia raised concerns about the Company's future viability and downgraded E*TRADE to "sell" in a research report entitled: "Bankruptcy Risk Cannot Be Ruled Out-Downgrading To A Sell." Bhatia's report noted the existence of the SEC investigation, and that E*TRADE could fall below "well capitalized" levels and stated: "We estimate that trying to liquidate E*TRADE's loan & ABS portfolio would result in over $5b of losses (more than wiping out tangible equity)."

287.   On Monday, November 12, 2007, E*TRADE's stock declined approximately 58.67%  from a closing price of $8.59 per share on Friday November 9, 2007  to close at $3.55 per share on November 12, 2007 on unusually high volume of  approximately 295,015,700 shares.

### POST CLASS PERIOD ADMISSIONS, DISCLOSURES AND EVENTS

288.   After the close of the Class Period, on November 15, 2007, E*TRADE finally

provided the SEC with a list of originating/servicing entities from which it had purchased whole

mortgage loans, along with the dollar amount and percentage involved.  The list included many

financially troubled entities as well as entities with underwriting standards well short of that

promised to E*TRADE investors:

| Originator/Servicer | Dollar Amount (in Thousands, as of Sept. 30, 2007) | % of Total |
|---|---|---|
| National City | $4,864,089.00 | 43.712% |
| E-Loan | $1,175,057.00 | 10.560% |
| GMAC | $1,170,985.00 | 10.523% |
| Countrywide | $928,878.00 | 8.347% |
| Sovereign | $559,474.00 | 5.028% |
| National City Mortgage Co. | $470,798.00 | 4.231% |
| AmSouth | $425,734.00 | 3.826% |
| USAA | $359,971.00 | 3.235% |
| Fremont | $230,040.00 | 2.067% |
| GreenPoint | $214,164.00 | 1.925% |
| NY Community Bank | $188,420.00 | 1.693% |
| First Horizon | $185,221.00 | 1.665% |
| Macquarie | $149,475.00 | 1.343% |
| Quicken | $106,353.00 | 0.956% |
| Wells Fargo | $54,147.00 | 0.487% |
| Morgan Stanley Credit Corp. | $35,581.00 | 0.320% |
| Wachovia | $9,291.00 | 0.083% |
| **Total** | **$11,127,678.00** | **100.00%** |

** % of total has been added to the original chart.
.

*See* E*TRADE SEC Correspondence dated November 15, 2007.

289.    E*TRADE also provided the following information regarding the vintages and

origination of its mortgage loan portfolio, which revealed that E*TRADE's loans were

overwhelmingly purchased from third parties:

290.

| Acquisition Channel | One- to Four-Family | Home Equity | Total |
|---|---|---|---|
| Purchased from a third party | $14,436,776 | $11,127,678 | $25,564,454 |
| Originated by the Company | 2,420,465 | 1,295,288 | 3,715,753 |
| Total real estate loans | $16,857,241 | $12,422,966 | $29,280,207 |

| Vintage Year | One- to Four-Family | Home Equity | Total |
|---|---|---|---|
| 2003 and prior | $ 1,792,964 | $ 954,464 | $ 2,747,428 |
| 2004 | 1,695,886 | 1,237,537 | 2,933,423 |
| 2005 | 3,082,319 | 2,920,112 | 6,002,431 |
| 2006 | 5,878,965 | 5,760,373 | 11,639,338 |
| 2007 | 4,407,107 | 1,550,480 | 5,957,587 |
| Total real estate loans | $16,857,241 | $12,422,966 | $29,280,207 |

*See id.*, at p. 5.

291.   Moreover, E*TRADE indicated on November 15, 2007 that the Company had very little involvement with the mortgage loans that it purchased.  Most, if not all of the purchased loans, were serviced by other companies:

Tell us if you are the service provider for the loans:

***We are not the service provider for our home equity loan portfolio.***   PNC provides the servicing for our originated home equity loans.  ***Our purchased home equity loans are primarily serviced by the entity who sold us the loans.***

Tell us if you originated the 1st lien mortgages associated with the loans and subsequently sold those loans, and if so, tell us who you sold those loans to:

The substantial majority of our home equity loans were purchased, not originated, ***and we did not purchase the first lien mortgage associated with these home equity loans.***  For the home equity loans we originated, which comprise approximately 10% of our home equity loan portfolio, we did originate some of the first lien mortgage loans associated with those loans.  While we do not specifically track the data requested, we believe that the number of loans that meet this criteria is insignificant.

148

*In addition, please note that approximately 13% of our home equity loans are in a first lien position.*

Tell us if you are the service provider for the 1st lien mortgages associated with the loans:

We are not the service provider for our first lien mortgage portfolio. *GMAC is the primary service provider for our originated first lien mortgage loans.*

Tell us if there are any differences (both qualitative and quantitative) in your methodology for determining the allowance for loan losses on originated loans and purchased loans:

There are no differences in our methodology for determining the allowance for loan losses between originated loans and purchased loans.

292.   On November 29, 2007, defendant Caplan was also forced to resign from E*TRADE.

293.   As a result of the losses incurred on its risky investments, E*TRADE was also compelled to shore up its capital and customer base by entering into the Citadel transaction (on November 29, 2007).   The Citadel transaction wiped out almost five years of E*TRADE's profits.   This transaction significantly increased E*TRADE's corporate debt to $3 billion (from $1.8 billion the previous year).   Citadel provided a $2.5 billion cash infusion in return for substantially all of E*TRADE's ABS portfolio which had a cost basis of $3 billion, plus 84.7 million shares of E*TRADE common stock, plus approximately $1.8 billion in 12 1/2 % E*TRADE springing lien notes at a $481.6 million discount.   The ABS sale component of the Citadel transaction (in which ABS having a cost basis of $3 billion were sold for $800,000) implied a sale price of approximately $0.27 on the dollar.

294.   On December 13, 2007, the SEC requested additional disclosures from E*TRADE related to information contained in E*TRADE's 3Q 2007 10-Q.

295.   On December 14, 2007, still in possession of the knowledge of the truth depth and

severity of E*TRADE's precarious financial viability, defendant Caplan sold another 300,000 E*TRADE shares.

296.    On January 24, 2008, E*TRADE announced fourth quarter and 2007 year-end results.  For the fourth quarter, E*TRADE announced a net loss of $1.7 billion, or $3.98 per share, including a $2.2 billion pre-tax loss on the previously announced sale of the ABS.  In addition, E*TRADE indicated that cumulative losses for the mortgage-market were estimated to be between $1 to $1.5 billion over the next three years.  E*TRADE disclosed that 4.3% of all loans were delinquent thirty or more days. E*TRADE also indicated that allowances for loan losses as a percentage of gross loans receivable was 3.79%. *See* E*TRADE's Form 8-K, dated January 24, 2008 (Ex. 99.1 & 99.2).

297.    E*TRADE's post-Class Period 2007 Form 10-K, filed February 28, 2008 also admitted that, in addition to the multi-billion dollar "run on the bank" set off by E*TRADE's end-of-Class-Period disclosures, the Company also faced investigations, four derivative lawsuits, an SEC inquiry related to the Company's loan and securities portfolios, and concerns about the Company's continued viability:

> "We have incurred significant losses and cannot assure that we will be profitable.
>
> We incurred a net loss of $1.4 billion, or $3.40 per share, for the year ended December 31, 2007, due primarily to losses in our home equity loan and asset-backed securities portfolios. We also experienced a substantial diminution of customer assets and accounts as a result of the losses experienced in our institutional business segment. It may require a substantial period of time to restore asset quality at the Bank, rebuild our retail franchise and return to profitability.
>
> *              *              *
>
> Losses of customers and assets will result in lower revenues in future periods.
>
> During November 2007, well-publicized concerns about the Bank's holdings of asset-backed securities led to widespread concerns about our continued viability.

> From the beginning of this crisis through December 31, 2007 when the situation had stabilized, customers withdrew approximately $5.6 billion of net cash and approximately $12.2 billion of net assets from our bank and brokerage businesses. Many of the accounts that were closed belonged to sophisticated and active customers with large cash and securities balances."

298. Mortgage-market losses made E*Trade the S&P 500 index's worst performer in 2007.

299. Many of E*TRADE's top executives (including all the Individual Defendants) were forced to resign at the end of the Class Period in the wake of this debacle. In addition to defendant Webb's departure on November 9, 2007, defendant Caplan was forced to resign from his CEO position on November 29, 2007 and from E*TRADE's board of directors on December 31, 2007; and E*TRADE's CFO, defendant Simmons, resigned effective on or before May 9, 2008. E*TRADE President and COO Lilien and General Counsel and Corporate Secretary Arlen Gelbard were also both terminated on April 22, 2008.

300. On February 8, 2008, E*TRADE responded to the SEC's December 13, 2007 request. E*TRADE's February 8, 2008 response letter contained detailed information regarding the underwriting standards for E*TRADE's originated and purchased loans. E*TRADE's February 8, 2008 response letter described, *inter alia*, the minimal due diligence process on its purchased loans as follows:

> In addition to our comment above, please revise your future filings to disclose your underwriting policies for purchased loans as described in your response to comment three of our letter dated October 12, 2007. Disclose these policies in a separate section from underwriting policies for originated loans. Provide us with your proposed future disclosure.

> In response to the Staff's comment, in future filings the Company will include a discussion in the Credit Risk Management section of its MD&A substantially to the effect of the following:

> Our underwriting policies for purchased loans focus primarily on ensuring (i) ***adherence to the underwriting policies of the originator*** of the loan and (ii) that

the loans meet certain *minimum* credit criteria.

In order to confirm adherence to the underwriting policies of the originator, *we obtain a copy of the underwriting guidelines used to originate the loans prior to purchase. We perform an analysis on a sample of the loans to ensure compliance with these guidelines, with a focus on: appraisal methodology and type; equity methodology and calculation; debt-to-income methodology and calculation; credit characteristics, including documentation type and credit score; employment and income requirements; and the exception policy of the originator*. To the extent loans do not adhere to the underwriting policies of the originator, they are excluded from the purchase.

When purchasing a portfolio of loans, our strategy is to attempt to exclude loans that we believe have a lower credit quality. We review *a detailed listing of the credit characteristics of the portfolio prior to purchase* and *attempt to exclude* lower credit quality loans. Our review criteria are not static and vary by purchase, but typically focus on *excluding loans in the following categories: FICO scores below 640; combined loan-to-value ratios above 100%; debt-to-income ratios above 50%; and investor property loans.* Even though our strategy focuses on excluding loans with a lower credit quality, we invariably end up purchasing an insignificant amount of loans that do not meet the credit criteria. This typically occurs in a portfolio purchase where the seller of the loans requires the purchaser of the loans to buy all loans in the pool.

301.   As indicated above, E*TRADE's analysis of its purchased loans consisted primarily of reviewing a "listing" of the "credit characteristics of the portfolio" prior to purchase. E*TRADE only performed an independent analysis of a "sample" of the loans.

302.   Moreover, E*TRADE's February 8, 2008 response letter indicated that the Company could not provide *current* LTV ratios for its mortgage backed loan portfolio:

Loan Portfolio

*Please tell us and revise your future filings to clarify whether the LTV/CLTV information presented is reflective of original LTV/CLTV ratios or if it represents current estimated LTV/CLTV ratios. Considering the decline in value of homes collateralizing your home equity loans (as you have stated on page 11, Provision for Loan Losses), it would be beneficial to investors if your disclosure included current estimated LTV/CLTV ratios compared to original LTV/CLTV ratios. Tell us if you analyze this information, at what frequency, and provide such information in a comparable tabular format. Provide us with you proposed future disclosure.*

The LTV/CLTV information presented is reflective of original LTV/CLTV ratios. ***We generally update home value data on nonperforming loans, primarily to assist in making foreclosure decisions and to estimate the allowance for loan losses; however, we do not track the current LTV/CLTV ratios for the entire loan portfolio.***

We will include a footnote the first time LTV/CLTV information appears in the Form 10-K that states **"*LTV/CLTV data is based on LTV/CLTV ratios at the time of loan origination, and has not been updated to reflect changes in property values since that time.*"**

***We do recognize that in the current credit environment, updating the LTV/CLTV ratios for our entire loan portfolio would provide useful information*** for both our internal credit risk management process as well as for our investors. Therefore, we have initiated a project to update this information; however ***we do not anticipate this project being completed in time*** to disclose the results in our Form 10-K for the period ended December 31, 2007.

303.    As of the 2Q 2008, ended June 30, 2008, E*TRADE's loan loss provisions totaled $319 million (compared to $45 for fiscal 2006).  Total allowance for loan losses had increased to $636 million.  Total losses (held on the balance sheet of E*TRADE Bank) expected to result from E*TRADE's home equity portfolio were estimated at $1 to $1.5 billion.

304.    About one year after the close of the Class Period, E*TRADE released ***estimated*** LTV/CLTV numbers in its 3Q 2008 10-Q, filed on November 5, 2008.   The estimated LTV/CLTV numbers were based upon an "enhanced methodology" put into place "during the third quarter of 2008" which enabled E*TRADE to ***estimate*** LTV/CLTV values for the first second and third quarters of fiscal year 2008 as follows:

|  | **LTV/CLTV** | **9/30/2008** | **6/30/2008** | **3/31/2008** |
|---|---|---|---|---|
| **One to Four Family** | | | | |
| Origination | AVG LTV/CLTV | 68.90% | 69% | 70% |
| Current | AVG Est. LTV/CLTV | 84.30% | 82.50% | 77.70% |
|  | **Difference** | **15.40%** | **13.50%** | **7.70%** |
| **HELOC** | | | | |

| | | | | |
|---|---|---|---|---|
| Origination | AVG LTV/CLTV | 79.30% | 79.50% | 79.50% |
| Current | AVG Est. LTV/CLTV | 93.70% | 92.60% | 89.10% |
| | **Difference** | **14.40%** | **13.10%** | **9.60%** |

E*TRADE's 3Q Form 10-Q, filed November 5, 2008, p.33 (chart based on data presented).

305.    The above chart indicates that **current** estimated LTV/CLTV range from **seven to more than ten percentage points higher** than LTV/CLTV at the time of origination (the figures quoted by defendant Caplan during the Class Period).

### LOSS CAUSATION

306.    The market for E*TRADE securities was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and failures to disclose alleged herein, E*TRADE securities traded at artificially inflated prices during the Class Period.  Plaintiffs and the other members of the Class purchased or otherwise acquired E*TRADE securities relying upon market information relating to E*TRADE and the integrity of the market price of E*TRADE securities, thus causing economic loss and the damages complained of herein when the truth and/or the effects thereof were revealed and the artificial inflation was removed from the price of E*TRADE's securities.

307.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and other members of the Class.

308.    But for Defendants' misrepresentation and omissions, which had the effect of overstating shareholders' equity, assets and income, while understating liabilities, Plaintiffs and the other members of the Class would not have purchased E*TRADE's securities at the artificially inflated prices at which they were purchased.

154

309.   Artificial inflation caused by Defendants' false and misleading statements and omissions is, in part, demonstrated by the following stock levels and price movements:

| Date | Closing Price the Previous Day | Closing Price After Statement | % Change From Previous Days' Closing Price | Defendants' Statements |
|---|---|---|---|---|
| 4/19/2006 | $ 25.92 | $ 26.86 | + 3.63% | Press Release & Conference call: Record 1Q2006 results; "financial discipline" |
| 7/19/2006 | $ 20.84 | $ 22.41 | + 7.53% | Press Release & conf. call: Record 2Q2006 results; "Results demonstrate the flexibility of our model . . . amid an environment filled with significant macroeconomic uncertainty"; Defendants emphasize "conservatism with respect to credit risk." |
| 11/7/2006 | $ 23.27 | $ 23.63 | + 1.55% | 3Q2007 10-Q: loan loss allowance decreased |
| 12/14/2006 | $ 22.41 | $ 22.76 | + 1.56% | Press Release: Positive earnings guidance; emphasized "disciplined growth" and "strong organic revenue and earnings growth" |
| 4/18/2007 | $ 21.97 | $ 22.13 | + 0.73% | Press Release: 1Q2007 results; stock repurchase plan; Conference Call: "our historic and continued strict discipline with respect to credit" will "significantly" mitigate credit risk. |
| 5/10/2007 | $ 23.02 | $ 23.37 | + 1.52% | 1Q2007 10-Q & conf. call: allowances remain 0.17%; increases in charge offs attributed to growth in loan portfolio, not increased credit risk: "we have stayed completely disciplined about focusing on what we call prime and really super-prime borrowers, you're going to see an increase in charge-offs just as a result of the increasing balance sheet size" |

310.   On July 25, 2007, the Company partially disclosed that its provision for loan losses rose to $30 million in the quarter, double the level of the year prior.  In reaction to the news, E*TRADE's common stock price dropped $1.41 per share from $20.46 per share on July 25, 2007, to $19.05 per share on July 26, 2007 — a 6.89% one-day drop.  Over the next two

weeks, E*TRADE's common stock price continued to trade lower on concerns over the Company's credit exposure with E*TRADE common stock price near $17 per share on August 10, 2007.   However, Defendants continued to artificially inflate E*TRADE's common stock price with statements such as those in E*TRADE's 2Q 2007 press release on July 25, 2007 emphasizing "record performance . . . while improving the overall quality of revenue and earnings" and statements in the conference call the same day that E*TRADE: "maintained our strict discipline with respect to risk mitigation" and reduced charge offs.

311.   Similarly, in response to press and analyst reports regarding potential problems with E*TRADE's loan portfolio on August 11 and 12, 2007, which resulted in the price of E*TRADE common shares falling from $17.01 per share on August 10, 2007, to a low of $9.92 on August 16, 2007, Defendants caused E*TRADE to file a August 16 Supplemental Disclosure with the SEC and to issue a press release on August 16, 2007.   While these disclosures revealed, for the first time, an abbreviated list of the "top" originators/servicers of E*TRADE's loans, the disclosures did not reveal the amounts involved.   Moreover, the disclosure reasserted Defendants purported conservative approach to credit and funds management and asserted that E*TRADE's "current market capitalization [does not] accurately reflect[] the financial strength and performance of the business," *i.e.*, that E*TRADE's stock price did not reflect the investment value of the Company.   In response, the stock price of E*TRADE's common stock on the NASDAQ rebounded on the overall positive information released by Defendants on August 16, 2007, and the price of E*TRADE shares closed on August 17, 2007 on the NASDAQ at $14.50.

312.   On September 17, 2007, after the close of the market, E*TRADE announced that it was exiting the wholesale mortgage business and revising its 2007 earnings guidance to account for higher provision for loan losses, potential securities impairments, reduced balance

sheet growth and restructuring charges.  The Company announced that for the full year 2007, it expected earnings per share of between $1.05 and $1.15 per share, substantially lower than its previous range of between $1.53 and $1.67 per share.  E*TRADE further announced that it was setting aside $245 million in the second half of the year to cover loan losses.

313.    In reaction to the news, on September 18, 2007, E*TRADE's stock price declined 21 cents to $14 per share, leaving the shares down by almost 50% since reaching its one year high on June 6, 2007.  Intraday, the stock fell to as low as $13.24 per share before paring losses after a surprise 50 basis point interest cut by the Federal Reserve trigged an over 330 point increase in the Dow Jones Industrial Average and the biggest rally in brokerage stocks in more than a year.  E*TRADE was the only one of the 92 financial companies in the Standard & Poor's 500 Index to decline that day.  However, as with other partial disclosures, Defendants continued to artificially inflate the price of E*TRADE's stock with representations regarding their "conservative" approach, "high FICOs, low LTVs and high owner occupancy levels," "loan risk mitigation discipline" and "excess collateralization."

314.    Late on Friday, November 9, 2007, the Company announced that further deterioration in its mortgage-backed securities portfolio would lead to larger than expected write-downs in the fourth quarter of 2007, withdrew its guidance and reported that the SEC had commenced an investigation.  The stock plummeted from $8.59 on November 9, 2007, to $3.55 on Monday, November 12, 2007, a one day drop of 58.67%.  Since July 2007, E*TRADE's stock dropped from over $20 per share to $3.55 per share, representing a cumulative loss of over $8 billion in market capitalization.

315.    As the chart below demonstrates, Class members suffered economic losses from each of the partial curative disclosures made by Defendants during the Class Period.



316.   Since November 9, 2007, E*TRADE common shares and its other securities have not traded above the prices at which Class members purchased those securities prior to November 9, 2007 during the Class Period.  As a result, members of the Class who purchased E*TRADE securities during the Class Period and continue to hold those securities, have sustained economic injury resulting from the decline(s) in the value of E*TRADE securities resulting from the revelations of Defendants' misstatements and/or omissions during the Class Period.

317.   Moreover, members of the Class who purchased E*TRADE securities during the Class Period, and sold such securities after each of the partial disclosures of the risks relating to the quality of E*TRADE's loan portfolio and deteriorating financial condition misrepresented

and/or concealed by Defendants during the Class Period, have suffered economic injury caused by Defendants misrepresentations and/or omissions during the Class Period that were not fully revealed until November 9, 2007, but which were partially revealed in a series of incomplete disclosures beginning on July 25, 2007, and those partial disclosures caused declines in the price of E*TRADE's publicly traded securities and damages to Class members.

318.    Finally, members of the Class who purchased E*TRADE securities during the Class Period, and sold those securities after the end of the Class Period, have suffered economic injury caused by Defendants' misrepresentations and/or omissions during the Class Period that were not fully revealed until November 9, 2007.

319.    Thus, the damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of E*TRADE securities and the subsequent significant decline in the value of E*TRADE securities when Defendants' prior misrepresentations and other fraudulent conduct were partially revealed during the Class Period.

320.    The foregoing allegations describe Plaintiffs' general theory of damages, demonstrate that Plaintiffs' damages were caused by the scheme to defraud as alleged herein, and negate any inference that Plaintiffs' losses were the result of general market conditions or other factors wholly unrelated to Defendants' false and misleading statements alleged herein. Upon further investigation and expert analysis, Plaintiffs may assert that there were additional inflationary or corrective events that caused or contributed to the damages Plaintiffs incurred.

## ADDITIONAL SCIENTER ALLEGATIONS

321.    The majority of E*TRADE's executives had their offices at E*TRADE's Virginia location, and were in frequent communication with one another.  Defendants Caplan and Webb

frequently met in Caplan's office.  (CW8).  Defendants Caplan and Simmons had frequent management meetings with their reports, including E*TRADE's executive vice presidents. (CW1)  (Following these meetings, an email was often circulated that employees should come upstairs if they wanted leftover food from the management meeting. (CW1))    The executive offices were one floor above the EGAM group, which defendant Webb was in charge of.  (CW8)  Both defendants Caplan and Webb worked closely and directly with the EGAM personnel. (CW7, CW8)   Defendant Webb spent all his time with the EGAM group.  (CW7)    Defendant Webb was defendant Caplan's "golden boy," and defendant Caplan frequently discussed defendant Webb's work with EGAM.  (CW9)   Defendant Caplan, along with other E*TRADE executives, made the drastic structural changes in E*TRADE's mortgage division which reduced personnel in approximately late spring or summer 2006.  (CW5)

322.   "Net income" was the lead category of E*TRADE's revenue, and the purchased loans and ABS were the key components of this.   Defendants were well aware of the performance of the Company's key income drivers.

323.   Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding E*TRADE, their control over, and/or receipt and/or modification of E*TRADE's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning E*TRADE, participated in the fraudulent scheme alleged herein.

324.    The Individual Defendants were active, culpable, and primary participants in the fraud by virtue of: (1) their knowledge of (a) the increased risks to which E*TRADE was exposed due to defaults in its subprime mortgage portfolio; and (b) the inflation in the ratings and value accorded debt instruments linked to E*TRADE's subprime mortgage and mortgage-backed securities; (2) their supervision over E*TRADE's employees and actual direction of policies that encouraged the fraud detailed herein; and (3) their association with the Company which made them privy to confidential information concerning the Company.

325.    The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public. The Individual Defendants also knew or recklessly disregarded that the failure to disclose the Company's exposure to subprime mortgages and the overvaluing of mortgage backed debt securities would cause the Company's financial statements to be materially false and misleading, would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to be artificially inflated. The Individual Defendants acted knowingly or in such reckless manner as to constitute fraud and deceit upon Plaintiffs and the other members of the Class.

326.    The Individual Defendants directed, knew about or recklessly disregarded the fraudulent practices implemented under their watch. As officers of the Company, the Individual Defendants knew, through direct knowledge or knowledge learned through the supervisory nature of their positions or recklessly disregarded and failed to disclose, material adverse information; were involved in the decisions concerning subprime mortgages and related securities at the Company; and, made false and misleading statements of material fact.

327.    The Individual Defendants had substantial motivation to participate in the

fraudulent practices alleged herein. Individual Defendants sold suspicious amounts of stock at suspicious times and top prices, during the Class Period. Defendants sold over 540,000 shares of E*TRADE stock that had been held by them during the Class Period, for which they received over $13 million in proceeds, as set forth below:

| Defendant | Date(s) of Class Period Sale(s) | Price Per Share | Total Number of Shares | Class Period Stock Sale Proceeds |
|---|---|---|---|---|
| Caplan | 2/26/2007 | $24.08 (72,211 shares) | 72,211 shares | $1,738,971 |
| Webb | 5/15/2006 | $24.86-$25.03 (145,000 shares) | 229,000 shares | $5,727,000 |
| | 5/16/2006 | $25.06 (55,000 shares) | | |
| | 6/2/2006 | $25.03 (25,000 shares) | | |
| | 9/20/2006 | $25.00 (4,000 shares) | | |
| Simmons | 5/11/2006 | $26.25 (47,243 shares) | 241,730 shares | $5,864,512 |
| | 5/12/2006 | $25.33 (47,243 shares) | | |
| | 5/15/2006 | $24.86 (47,244 shares) | | |
| | 7/24/2006 | $22.35 (25,000 shares) | | |
| | 10/23/2006 | $22.14 (25,000 shares) | | |
| | 1/29/2007 | $23.82 - $23.94 (25,000 shares) | | |
| | 4/23/2007 | $21.65-$21.90 (25,000 shares) | | |
| **Totals:** | | | **542,941** | **$13,330,483** |

328.    In addition, as E*TRADE's Proxy Statement dated April 23, 2007 reveals, the Individual Defendants' compensation was "heavily weighted toward incentives for strong financial performance."  The equity and non-equity (cash) bonus compensation which comprised the bulk of the Individual Defendants' compensation was primarily based on achieving E*TRADE's net revenue growth (over the prior year) and EPS goals.  Moreover, the proxy statement explains that the goals to be achieved in order to obtain substantial incentive compensation were "aggressive" "very ambitious" firm-wide goals.  The Individual Defendants thus had significant incentives to make misleading statements and omit material facts to meet the aggressive performance goals which determined the majority of their personal compensation.

329.    The April 23, 2007 proxy statement  explains the following regarding the Company's compensation philosophy and methodology in 2006 and 2007, and further explains that the Individual Defendants achieved close to the top of the Company's performance targets, which enabled the Individual Defendants to achieve close-to-the-top incentive compensation for 2006:

> *The Company's Compensation Philosophy*
> . . . .
> In general, ***the Company strives to establish a compensation program for executive officers that is heavily weighted toward incentives for strong financial performance***. The primary elements of the compensation program include a base salary, an opportunity to receive payments under the non-equity based performance plan and three possible "tiers" of equity compensation, which include awards of restricted stock and stock options. . . .
>
> The Company strives to establish base salaries that are competitive in the market and to provide moderate benefits and perquisites. . . . .
>
> Beyond this, there is significant variation in incentive pay based on the results of the Company's performance, with individual performance having an influence in all of the Committee's determinations. ***The Company strives to establish aggressive pre-determined performance goals for incentive pay, and if performance goals are met, compensation opportunities are commensurate with performance achieved.  The performance goals are firm-wide goals***, with the

intent to foster a team approach to the management of the business to avoid the risk that decisions could be made to benefit a particular business unit to the cost of the overall enterprise, with business unit and individual performance playing a significant factor in any exercise of negative discretion. . . . .

*Total Compensation Targets for 2006*

Incentive compensation for the Named Executive Officers is administered through a non-equity compensation plan, known as the "Executive Bonus Program" and an equity compensation plan, known as the "2005 Equity Incentive Plan." Each of these plans was ratified and approved by shareholders in 2005 and are performance based compensation programs for purposes of Section 162(m) of the Internal Revenue Code. For 2006, the Compensation Committee and the Board established total maximum target payments under the plans to be: 2.5 percent of the Company's net income for the CEO; 1.75 percent of net income for the President and Chief Operating Officer ("President and COO"); and 1.0 percent of net income for each of the other Named Executive Officers. . . .

In exercising its negative discretion, the Committee set three targets for total compensation for the executive officers based on Company performance.   The three target levels were referred to as the "good," "very good" and "exceptional" levels based on performance against two metrics: earnings per share ("EPS") and net revenue.   These metrics were selected because EPS is the metric that most directly relates to the Company's valuation (with market capitalization generally expressed as a multiple of expected forward earnings per share) and net revenue is the metric that most directly reflects the growth of the business and acceptance of the business strategy by consumers.

The "good", "very good" and "exceptional" performance levels were set based on expected growth levels for earnings per share and net revenue for 2006 over 2005.  ***These growth rates were also generally the basis for the guidance for expected 2006 performance the Company communicated to investors on December 14, 2005***.  Actual performance for 2005 was EPS of $1.12 per share and net revenue was $1.7 billion.  The "good" performance level was set at EPS of $1.25 and net revenue of $2.2 billion, which corresponded to a growth rate of 10 percent in EPS and nearly 30 percent in net revenue.  This also corresponded to the low point of the guidance range (*ie*, EPS of $1.25 and net revenue of $2.2 billion).  The "very good" performance level was set at EPS of $1.33 and net revenue of $2.3 billion, which corresponded to a growth rate of approximately 18 percent in EPS and approximately 35 percent in net revenue.  This corresponded to the midpoint of the guidance range (*ie*, EPS of $1.33 and net revenue of $2.3 billion).  The "exceptional" performance level was set at EPS of $1.43 and net revenue of $2.46 billion, which corresponded to a growth rate of approximately 27 percent in EPS and approximately 44 percent in net revenue.  This was above the high point of the guidance range (ie, EPS of $1.40 and net revenue of $2.4 billion).  Earnings per share ("EPS") was "weighted" to constitute seventy-five

percent of the performance criteria while net revenue (which is determined as the Company's revenue less interest expense) was "weighted" to constitute twenty-five percent of the performance criteria. These levels were chosen to reflect the fact that the Company's valuation is more directly correlated to EPS than revenues. If performance is below the "good" performance level, total compensation for executive officers is targeted to be below the fiftieth percentile of the Comparator Group. At the "good" performance level, the Committee sought to establish total compensation for executive officers at roughly the fiftieth percentile of the Comparator Group. The Committee set compensation at this level because the "good" performance level represented annual growth rates thought to be at least the median level for the comparator group. At the "very good" performance level, total compensation for executive officers would fall at roughly the seventy-fifth percentile of the Comparator Group. Performance at this level was thought to appropriately be at approximately the seventy-fifth percentile of the comparator group. Should performance reach the highest level, called the "exceptional" level, total compensation for executive officers could fall well above the seventy-fifth percentile of the Comparator Group, approaching the ninetieth percentile. As discussed above, performance at the "exceptional" level would represent annual growth of over 25 percent for EPS and over 44 percent for net revenue, which was expected to be well above the seventy-fifth percentile of performance (and approaching the ninetieth percentile) for the Comparator Group. In the event that actual EPS or net revenue performance fell between established target points for two different performance levels, compensation would be awarded at a level that is interpolated to reflect that actual performance fell between the two levels.

   To arrive at a total compensation goal, the Committee utilized both cash compensation instruments (in the form of base salary and non-equity incentive plan payments) and non-cash compensation instruments (in the form of stock option and restricted stock awards). . . .

*Components of Compensation*
   *Base Salary*
   The Company pays a base salary to each of its executive officers, a form of compensation intended to be a sum certain the executive can expect to receive each year. . . . The Committee intends that the most significant aspect of compensation should be in the form of longer term and/or performance-based instruments. In those cases in which the base salary is not at the median, equity and non-equity plan targets are generally adjusted to reach the desired market position at various performance levels.

*Non-Equity Compensation Plan Payments*
   Non-equity compensation plan payments are based on achievement of the annual performance metrics discussed above and are paid out in full on an annual basis. The Company chooses to pay this element of compensation primarily to provide executives an incentive and a reward that takes the form of cash for

achieving performance objectives. In contrast to equity compensation, which has a four year vesting period even if performance objectives are met, payment under the non-equity compensation plan, the award is annual, provided that performance objectives are met. ***For 2006, the Company's performance exceeded the "very good" performance level and nearly met (but did not meet) the very ambitious "exceptional" performance level.*** Thus, the Named Executive Officers received payments under the non-equity compensation plan that, combined with other components of compensation, established total compensation between the "very good" and "exception" [sic] level, approaching the ninetieth percentile of the Comparator Group.

Form DEF 14A, Definitive Proxy Statement (filed April 23, 2007).

330. The proxy statement also discussed the fact that the Company indeed made "Tier I," "Tier II," and "Tier III" grants to the executives, noting for instance, that "[a]s discussed above, the Company's performance in each of the EPS and revenue targets exceeded the 'very good' level, so the Committee did not cancel the 2006 Tier II Grants." *Id.* The proxy statement also explained that the same philosophy applied in 2007:

*Establishing Compensation Targets for 2007*

For 2007, the Compensation Committee followed essentially the same philosophy as it used in 2005 and 2006. Incentive compensation for the Named Executive Officers continues to be administered through the non-equity compensation plan and equity compensation plan discussed above. For purposes of establishing performance targets to satisfy Section 162m, for 2007 (as it did for 2006), the Compensation Committee and the Board established total target payments under the plans to be: 2.5 percent of net income for the CEO; 1.75 percent of net income for the President and COO; and 1.0 percent of net income for each of the other Named Executive Officers.

*Id.*

331. Accordingly, the Individual Defendants would not have received the majority of their 2005 and 2006 compensation if they had provided truthful information to the investing public.

332. Additionally, the Individual Defendants, based on the culture of E*TRADE, knew that failure to perform and meet the expectations of the board of directors and investors, would

result in the loss of their jobs and the valuable emolument that flowed to them from their employment with E*TRADE.  Indeed, upon the truth being finally and fully reveal on and after November 9, 2007, all of the Individual Defendants, as well as E*TRADE's then current President and COO, Lilien, were forced to leave E*TRADE.   Therefore, the Individual Defendants' immediate and real expectation throughout the Class Period was that revelation of E*TRADE's poor quality loans portfolio and the necessity of substantial write-offs -- and consequent losses to E*TRADE -- would cost them their jobs.  This further motivated them to engage in the wrongful scheme and conduct alleged herein.

## **DEFENDANTS  VIOLATED GAAP AND SEC RULES**

333.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1 (November 1978), one of the fundamental objectives of financial reporting is that it provides accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

334.    Generally Accepted Accounting Principles ("GAAP") are the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time, recognized by the accounting profession and the SEC.  SEC Rule 4-01(a) of SEC Regulation S-X provide that "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

335.    Management is responsible for preparing financial statements that conform with

GAAP.  As noted by the AICPA professional standards:

> [F]inancial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . .  Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

336.   During the Class Period, the Defendants represented that E*TRADE's financial statements were prepared in conformity with GAAP.

337.   However, Defendants caused the Company to violate GAAP and SEC rules, to falsely inflate E*TRADE's reported net income, and earnings per share, and book value per share, by, among other things:

a.   Improperly failing to take timely loan loss provisions related to E*TRADE's Loans Receivable;

b.   Improperly understating E*TRADE's allowance for loan losses and not properly reflecting the risk facing the Company, thereby materially inflating E*TRADE's reported earnings, assets and stockholders' equity;

c.   Improperly disregarding the increased risk in ABS and failing to record timely fair value adjustments to the ABS portfolio;

d.   Improperly failing to design and implement adequate internal controls policies designed to ensure E*TRADE's publicly filed reports were in compliance with GAAP, SEC Regulations and E*TRADE's disclosed policies and procedures, allowing defendants to engage in fraudulent and otherwise improper transactions; and

e.   Improperly failing to adhere to publicly stated underwriting procedures

designed to ensure loan quality, thus impairing E*TRADE's ability to control and monitor credit exposure.

**Defendants Failed to Take Timely Or Sufficient Loan Loss Provisions**

338.    As a result of E*TRADE's impaired control and monitoring of its credit exposure, E*TRADE also failed to take adequate loan loss provisions related to its loan receivables. GAAP for recognition of loan losses is addressed by Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies.   SFAS No. 5 provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  SFAS No. 5 Accounting for Contingencies, ¶ 8 (Mar. 1975).

339.    SFAS No. 114, Accounting by Creditors for Impairment of a Loan, provides more specific guidance about the measurement and disclosure of impairment for certain types of loans. Specifically, SFAS No. 114 applies to loans that are identified for evaluation on an individual basis.   Loans are considered impaired when, based on current information and events, it is probable that the creditor will be unable to collect all interest and principal payments due according to the contractual terms of the loan agreement.

340.    For individually impaired loans, SFAS No. 114 provides guidance on the acceptable methods to measure impairment.  Specifically, SFAS No. 114 states that when a loan is impaired, a creditor should measure impairment based on the present value of expected future principal and interest cash flows discounted at the loan's effective interest rate, except that as a practical expedient, a creditor may measure impairment based on a loan's observable market

price or the fair value of collateral, if the loan is collateral dependent.  When developing the estimate of expected future cash flows for a loan, an institution should consider all available information reflecting past events and current conditions, including the effect of existing environmental factors.

341.    SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (i.e., greater than a slight chance) that a loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or a range of loss, or state that such an estimate cannot be made. Paragraph 84 of Statement No. 5 says the conditions for loss accrual "are not intended to be so rigid that they require virtual certainty before a loss is accrued."

342.    In addition, FASB Interpretation No. 14, Reasonable Estimation of the Amount of a Loss, Paragraph 3 states that if the reasonable estimate of a particular loss contingency is a range, an amount shall be accrued for the loss.  When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued.  When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued.

343.    E*TRADE's financial statements, filed in Form 10-K for the year ended December 31, 2006, represented that:

> The estimate of the allowance for loan losses is based on a variety of factors, including the composition and quality of the portfolio; delinquency levels and trends; probable expected losses for the next twelve months; current and historical charge-off and loss experience; current industry charge-off and loss experience; the condition of the real estate market and geographic concentrations within the loan portfolio; the interest rate climate as it affects adjustable-rate loans; and general economic conditions. . . .  In general, we believe the allowance for loan losses should be equal to at least twelve months of probable projected losses for all loan types.  We believe this level is representative of probable losses inherent in the loan portfolio at the balance sheet date.

344.    Throughout the Class Period, however, Defendants knew or recklessly disregarded that based on the composition and quality of the portfolio there was more risk inherent than was reflected in the allowance for loan losses.  For example, E*TRADE's attempts to sell loan pools to other banks in late 2006 were returned by the banks to E*TRADE because they were made up of "terrible, low value" subprime loans, and then sat on E*TRADE's books (CW5); and EGAM management, including defendant Webb and other senior executives refused to return bad "problem" loans (including purported "Alt-A") and stated loans which were in reality highly risky, despite the fact that E*TRADE's diligence personnel implored EGAM to return these high risk loans to their originators (CW6).

345.    E*Trade's allowance for loan losses violated GAAP by understating the likelihood of loss inherent in its HELOC and Alt-A mortgages despite abundant evidence from the Company's operations that these investments were far riskier than the Company represented. According to the FDIC Risk Management Manual of Examination Policies, Section 3.2:

> Management should also consider any factors that are likely to cause estimated losses to differ from historical loss experience, including, but not limited to:
>
> •  Changes in lending policies and procedures, including underwriting, collection, charge-off and recovery practices;
> •  Changes in local and national economic and business conditions;
>
> •  Changes in the volume or type of credit extended;
>
> •  Changes in the experience, ability, and depth of lending management;
>
> •  Changes in the volume and severity of past due, nonaccrual, restructured, or classified loans;
>
> •  Changes in the quality of an institution's loan review system or the degree of oversight by the board of directors; and,
>
> •  The existence of, or changes in the level of, any concentrations of credit.

346.    The Company's increasing risk profile with respect to many of the above factors demonstrates that the Company's loss provisions were far too low and violated GAAP.

347.    The Company's loan loss provisions did not reflect the increase in the riskiness of E*TRADE's mortgage business during the Class Period.  As the below chart compiled from Defendants' public filings demonstrates, Defendants' allowance for loan losses **_decreased_** during most of the Class Period as a percentage of gross loans receivable (or failed to adequately increase).  This resulted in false overstatements of E*TRADE's earnings in violation of FAS No. 5.

**DEFENDANTS RECKLESSLY REDUCE LOAN LOSS PROVISIONS
AS A PERCENT OF NONPERFORMING ASSETS**

E Trade
Financial Corp
(in millions)

| | 31-Dec-2005 | 30-Mar-2006 | 30-Jun-2006 | 30-Sep-2006 | 31-Dec-2006 | 30-Mar-2007 | 30-Jun-2007 | 30-Sep-2007 | 31-Dec-2007 |
|---|---|---|---|---|---|---|---|---|---|
| Total gross loans receivable | $19,488.2 | $19,613.2 | $20,938.8 | $23,284.9 | $26,440.3 | $29,739.6 | $31,559.2 | $32,598.9 | $30,547.0 |
| Allowance for loan losses | 63.3 | 64.5 | 67.1 | 69.9 | 67.6 | 68.0 | 75.7 | 209.0 | 508.2 |
| **Allowance for loan losses as a % of gross loans receivable** | 0.32% | 0.33% | 0.32% | 0.30% | 0.26% | 0.23% | 0.24% | 0.64% | 1.66% |
| **Allowance for loan losses as a % of non performing loans** | 182.62% | 158.40% | 143.98% | 127.00% | 90.52% | 58.68% | 45.34% | 76.24% | 121.44% |
| Nonperforming loans receivable as a % of gross loans receivable | 0.18% | 0.21% | 0.22% | 0.24% | 0.28% | 0.39% | 0.53% | 0.84% | 1.37% |
| Provision for loan losses | $54.0 | $10.2 | $10.3 | $12.5 | $12.0 | $21.2 | $30.0 | $186.5 | $402.4 |

348.    During the Class Period, Defendants were reckless in not increasing loan loss

172

provisions to keep pace with nonperforming assets.  According to E*TRADE's 2006 10-K, "[l]oans are classified as nonperforming when full and timely collection of interest and principal becomes uncertain or when the loans are 90 days past due."  In fact, as the above table reflects, during the Class Period, Defendants recklessly **reduced** the allowance as a percent of nonperforming loans.  For example, at December 31, 2006, Defendants reduced the loan loss allowance to 90.52% from 127.00% from the previous quarter.  Moreover, the allowance for loan losses as a percent of nonperforming loans continued to **decrease** throughout the Class Period.

349.    Defendants also attempted to conceal the insufficiency of E*TRADE's loan loss provisions by utilizing an unusual method of determining LTVs which did not reflect the poor quality of E*TRADE's mortgage receivables portfolio.  E*TRADE's August 16, 2007 Supplemental Disclosure presented tables indicating the distribution of FICO scores and LTV ratios for its first lien and home equity loan mortgage portfolios.  In addition to the actual LTV ratios, which Defendants dubbed the "Traditional Method," the Company also provided a spurious recalculation of the LTV ratios called the "Principal at Risk (PAR) Method." E*TRADE represented that the PAR method was an "internal approach that we believe more appropriately depicts the unpaid principal balance by tranching it against the supporting collateral value at time of origination."

350.    The Company provided an example of the PAR method in order to demonstrate that the traditional method overstated the risk of a given mortgage; in actuality, however, the PAR method understated the mortgages' true credit risk and the Company touted the new method in order to conceal the true credit quality of its mortgage investments.  In the example, a property with a value of $100,000 at origination has a $50,000 first lien, a $45,000 second lien (i.e. home equity loan), and $5,000 borrower equity, a highly leveraged and risky situation by

any objective measure.  The actual LTV of the home equity loan is of course 95% since it is junior obligation to the first mortgage.  According to the spurious PAR method, however, the first $20,000 tranche borrowed has an LTV ratio of less than 80%, the next $10,000 borrowed has an LTV ratio of 70% to 80%, and so on.  Only the final $5,000 borrowed has an LTV greater than 90%, according to E*TRADE's reckoning.

351.   E*TRADE then presented its FICO/LTV analysis using the spurious PAR method.  Under the PAR method, the percentage of the Company's mortgages with an LTV ratio exceeding 80% (that is, the riskiest mortgages where a decline in collateral price could wipe out the borrowers' equity) decreased from 3.1% to 0.4% for first liens and from 51.7% to 31.7% for HELOCs.  The Company therefore distorted the true credit risk of its portfolio of mortgages.

352.   As reflected in the table above, as E*TRADE's loan portfolio became inherently riskier as a result of: (1) failure to conduct adequate due diligence; (2) improper monitoring of its portfolio; and (3) adverse developments related to the real estate market, defendants *decreased* the allowance for loan losses, both as a percentage of gross loans receivable and as a percentage of nonperforming loans.  Accordingly, Defendants violated GAAP, specifically SFAS No. 5, by failing to accrue sufficient loan loss provisions, in a timely fashion, in response to the high probability that E*TRADE had incurred losses during the Class Period.

353.   On November 9, 2007, at the end of the Class Period, E*TRADE increased its provision for loan losses to $186.5 million and to $237.8 million for the three and nine months ended September 30, 2007, respectively. 3Q2007 10-Q. Even the $237.8 million provision for loan losses for the nine months ended September 30, 2007 was insufficient, as the Company was forced to reveal an additional provision in the 4Q2007 of approximately $402 million. "[F]or all of 2007, the Company recognized an increased provision expense totaling $640 million." 1/24/08

Earnings Release. Another increase in loan loss provisions was required for 1Q2008 to $233.9 million. 1Q2008 10-Q.

**Defendants Failed to Record Timely Fair Value**
**Adjustments to Asset-Backed Securities**

354.    Defendants also violated GAAP by failing to timely record fair value adjustments related to E*TRADE's asset-backed securities (ABS), thus overstating E*TRADE's assets, stockholders' equity, and earnings during the Class Period.  GAAP, specifically SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities, requires that mortgage-backed securities be classified as either "held to maturity," "available for sale" or "trading," and applies different accounting principles and reporting requirements to each classification. Securities classified as "trading" must be marked to market each reporting period with the changes in market value reported in the current period as income or loss. "Held to maturity" securities are reported at historical cost. "Available for sale" securities are reported at market value but the changes in their fair value are recorded as direct increases or decreases in stockholders' equity.

355.    SFAS No. 115, specifies that "[i]f the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value . . . and the amount of the write down shall be included in earnings."  This write down results in a new cost basis for the security, which cannot be recovered if the fair value subsequently increases.

356.    In E*TRADE's 2006 10-K, Defendants purported to adhere to SFAS No. 115, stating:

> Our portfolios of mortgage-backed securities and investments are classified into three categories in accordance with SFAS No. 115, Accounting for Certain Investments in Debt and Equity Securities: trading, available-for-sale or held-to-

maturity. None of our mortgage-backed securities or other investments was classified as held-to-maturity during 2006, 2005 and 2004.

357.    Additionally, during the Class Period, E*TRADE represented that it monitored its investments for other-than-temporary impairment.  For example, in E*TRADE's 2006 10-K Defendants asserted the following:

> The Company regularly analyzes certain available-for-sale investments for other-than-temporary impairment when the fair value of the investment is lower than its book value. The Company's methodology for determining impairment involves projecting cash flows relating to each investment and using assumptions as to future prepayment speeds, losses and loss severities over the life of the underlying collateral pool. Assumptions about future performance are derived from actual performance to date and the Company's view on how the collateral will perform in the future. In projecting future performance, the Company incorporates the views of industry analysts, rating agencies and the management of the issuer, along with its own independent analysis of the issuer of the securities, the servicer, the economy and the relevant sector as a whole. If the Company determines impairment is other-than-temporary, it reduces the recorded book value of the investment by the amount of the impairment and recognizes a realized loss on the investment. The Company does not, however, adjust the recorded book value for declines in fair value that it believes are temporary. Management continues to monitor and evaluate these securities closely for impairment that is other-than-temporary.

358.    Defendants also represented that E*TRADE adhered to EITF 99-20, noting that: "Mortgage- and asset-backed securities that both have an unrealized loss and are rated below "AA" by at least half of the agencies that rate the securities, as well as interest-only securities that have unrealized losses . . . . are evaluated for impairment in accordance with Emerging Issues Task Force ("EITF") 99-20, Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets.  Accordingly, when the present value of a security's anticipated cash flows declines below the last periodic estimate, the Company recognizes an impairment charge in the gain on sales of loans and securities, net line item in the consolidated statement of income."

359.    Defendants, however, violated GAAP and their own publicly-stated policies by

deliberately or recklessly ignoring overwhelming negative evidence in failing to timely record fair value adjustments related to E*TRADE's ABS and MBS portfolio during the Class period.

360.    During the Class Period, Defendants dramatically increased the size of E*TRADE's Investment Securities portfolio.  The available-for-sale portion of the total portfolio, the overwhelming bulk of the securities, grew 24%, from $13.234 billion at 1Q2006 to $16.458 billion at 1Q2007; it then grew at an annualized rate of 11% during the following quarter to reach $16.893 billion at 2Q2007.  The largest component of this portfolio was agency MBS, ranging from $9 billion to $11 billion during the Class Period.  The second largest and fastest growing component was ABS.  ABS grew 35% from $1.933 billion at 1Q2006 to $2.608 billion at 1Q2007; it then surged at annualized rate of 65% to $2.958 billion at 2Q2007.

361.    Defendants did not provide information about the contents of E*TRADE's ABS portfolio for the vast majority of the Class Period.  Defendants first partially revealed the composition of the ABS in the August 16, 2007 Supplemental Portfolio Disclosure (an exhibit to an 8-K).  Nevertheless, information about the ABS unrealized losses demonstrates that E*TRADE violated its own publicly disclosed valuation policy by failing to take timely impairment charges to its ABS investment.

362.    In E*TRADE's 2006 10-K, Defendants described the Company's valuation methodology as follows:

> Classification and Valuation of Certain Investments
>
> When possible, the fair value of securities is determined by obtaining quoted market prices.  For illiquid securities, fair value is estimated by obtaining market price quotes on similar liquid securities and adjusting the price to reflect differences.  For securities where market quotes and similar securities are not available, we use discounted cash flows.  We also make estimates about the fair value of investments and the timing for recognizing losses based on market conditions and other factors.  Other-than-temporary impairment is recorded based on management judgment.  Management evaluates securities based on market

conditions and all available information about the issuer or underlying collateral. This information is used to determine if impairment is other-than-temporary. The determination that impairment is other-than-temporary is judgmental. Based on the facts and circumstances, companies could have different conclusions regarding when securities are other-than-temporarily impaired. Impairment of mortgage-backed or asset-backed securities is recognized when management estimates the fair value of a security is less than its amortized cost and if the current present value of estimated cash flows has decreased since the last periodic estimate. If the security meets both criterion [sic], we write the security down to fair value in the current period. We assess securities for impairment at each reported balance sheet date.

363. After the Class Period, in its December 13, 2007 follow up request for additional information about the Company's 3Q2007 10-Q, the SEC specifically asked E*TRADE about its valuation methodology for the ABS (which had by this point been sold to the Citadel hedge fund), stating:

Please tell us whether you changed the method in which you were valuing these securities during the quarter as compared to the prior quarter. If so, please provide us with the following additional information:

• tell us why you changed your valuation methodology;

• provide us with a description of the method used historically;

• provide us with a description of the method used during the current period; and

• tell us whether you would have obtained significantly different results had you continued to use the same methodology historically used (quantify amounts in your response, if possible).

364. The Company responded on February 8, 2008:

The Company did not change the valuation methodology for these securities for any period during 2007. The methodology for valuing securities is a tiered approach, beginning with obtaining market prices for each security from third parties. If it is not possible to obtain market prices for certain securities, the Company attempts to obtain prices for similar securities, again from third parties. If it is not possible to obtain third party prices, either for the exact or a similar security, the Company derives a price using a cash flow model. The models use observable market inputs, if available. If it is not possible to obtain observable market inputs, the inputs are derived from other market inputs and/or historical trends.

During the third quarter of 2007, market prices for our asset-backed securities portfolio became increasingly difficult to obtain from third parties.  As such, the Company was forced to rely more on market prices for similar securities and internal models when valuing securities compared to recent prior quarters.

In addition, please note that the Company sold all of the securities referenced by this disclosure during the fourth quarter of 2007.

365.   The magnitude and duration of the ABS unrealized losses, however, belie E*TRADE stated valuation methodology.   The table below, compiled from the figures in E*TRADE's 10-Qs and 10-K, sets forth the ABS amortized cost, estimated fair value, gross unrealized gains, and gross unrealized losses disaggregated by the length of time the ABS had been in a continuous unrealized loss position.  The table shows that: (1) Defendants improperly took only *de minimis* impairment charges recorded on all asset- and mortgage-backed securities until the truth of their deteriorating value could no longer be concealed, and (2) Defendants also failed to show "unrealized loss" figures approximating the true deterioration in the value of E*TRADE's ABS portfolio.

| in millions | 1Q2006 | 2Q2006 | 3Q2006 | 4Q2006 | 1Q2007 | 2Q2007 | 3Q2007 |
|---|---|---|---|---|---|---|---|
| ABS amortized cost (basically, the historical cost basis of the ABS) | $1,957.44 | $2,071.96 | $2,031.16 | $2,163.54 | $2,629.16 | $3,020.63 | $3,023.27 |
| ABS fair value (per Defendants' representations regarding their model, which did not provide for sufficient writedowns) | 1,933.47 | 2,048.56 | 2,024.94 | 2,161.73 | 2,608.00 | 2,957.96 | 2,755.32 |
| Unrealized loss, less than 1 year (represented to be a function of interest rate, not credit quality) | (11.20) | (12.11) | (3.87) | (2.52) | 18.50 | (51.15) | (231.19) |
| Unrealized loss, greater than 1 year (represented to be a function of interest rate, not credit quality) | (15.36) | (14.93) | (9.16) | (9.22) | (9.60) | (15.04) | (37.18) |
| Unrealized gain | 2.60 | 3.64 | 6.80 | 9.93 | 6.95 | 3.52 | 0.41 |
| **Unrealized loss, net (represented to be a function of interest rate, not credit quality)** | (23.97) | (23.40) | (6.23) | (1.81) | (21.16) | (62.67) | (267.96) |
| **Impairment charge (per quarter)** | $0.40 | $ - | $1.90 | $(0.80) | $0.20 | $2.80 | $159.80 |

366.    The above chart demonstrates the inadequacy of E*TRADE's impairment charges for its ABS and MBS portfolio.  Instead of taking necessary impairment charges (which would flow through to E*TRADE's income statement), Defendants took only ***de minimis*** impairment charges – and recorded larger losses in a category entitled "unrealized loss" (which Defendants attributed to temporary interest rate factors).   This accounting treatment bypassed the income statement and caused E*TRADE's financials, including each 10-Q and 10-K during the Class Period, to falsely overstate the Company's earnings.

367.    For instance, at the end of 1Q2007, E*TRADE booked a ***de minimis*** $200,000 impairment charge on its entire ABS portfolio, which was then valued at $2.608 billion.  At the same time, E*TRADE recorded a "net unrealized loss" for 1Q2007 of $21.16 million, which was approximately 10.7 times greater than net unrealized losses during the previous quarter, $1.81 million.

368.    E*TRADE recorded net "unrealized losses" in its ABS portfolio continuously during the whole Class Period.  A substantial portion of these losses were over one year in duration.  Throughout the entire Class Period, Defendants falsely attributed the "unrealized losses" of E*TRADE's ABS investments to interest rate fluctuations instead of credit quality, stating that the Company "does not believe that any individual unrealized loss . . . represents an other-than-temporary impairment.  The majority of the unrealized losses on mortgage- and asset-backed securities are attributable to changes in interest rates and are not reflective of deterioration in the credit quality of the issuer and/or securitization."  Therefore, according to Defendants, "[n]et unrealized gains and losses in available-for-sale securities are included in shareholders' equity as accumulated other comprehensive income or loss, net of tax."  Treating impairments as "unrealized losses" caused the value of the Company's ABS to be overstated and

falsely overstated the Company's earnings on E*TRADE's financials.

369.   Furthermore, even the "unrealized loss" figures on E*TRADE's investments set forth in Defendants' public filings misrepresented to investors the real losses facing the ABS investments if the Company were unable to hold them to maturity.  Just after the Class Period, Citadel Investment Group purchased E*TRADE's ABS portfolio for $800 million, a price which was only 26 percent of the value which Defendants had placed on the ABS portfolio, purportedly based on market prices for similar securities and sophisticated discounted cash flow models.

370.   The Company did not record material impairment related to its ABS portfolio until 3Q2007.  The 3Q2007 earnings release stated that: "Securities write downs in the quarter totaled $197 million, pre-tax."   The Company's earnings call stated: "specifically the ABS portfolio and the second lien were marked through the A tranche to in the case of CDOs to about $0.53, and about $0.28 in the second liens."  The 3Q2007 10-Q issued on the last day of the Class Period disclosed the following:

> Within our securities portfolio, the asset-backed securities portfolio has the greatest exposure to the current instability in the residential real estate and credit markets. Based on its evaluation, the Company recorded other-than-temporary impairment charges for its asset-backed securities of $159.8 million (1) and $162.7 million for the three and nine months ended September 30, 2007. . . . These charges were primarily confined to securities rated below "AA" in what the Company believes are the two highest risk categories within the asset-backed portfolio: CDOs and securities collateralized by second lien mortgages. . . .  The securities underlying the impairments were written down by an average of 53% of the current face value to an amortized cost of $201.6 million as of September 30, 2007.

**Defendants Failed To Record Loan Allowances in Accordance With**
**GAAP Rules on Credit Risk Exposures and Credit Practices**

371.   As a general rule, lower quality or higher risk loans dictate a higher allowance for loan losses.  According to the AICPA Audit and Accounting Guide: Depository and Lending Institutions ("AAG-DEP"), paragraph 8.06:

*An institution's credit exposure may be affected by external factors*, such as the level of interest rates, unemployment, general economic conditions, real estate values, and trends in particular industries and markets. *Internal factors—such as an institution's underwriting practices, credit practices, training, risk management techniques, familiarity and experience with its loan products and customers, the relative mix and geographic concentration of its loan portfolio and the strength of its internal control—also have a significant effect on an institution's ability to control and monitor its credit exposure.*

372.   Defendants knew or recklessly disregarded that E*TRADE's significant high risk mortgage product holdings, including "stated" loans, risky "Alt-A" loans which were in fact subprime, adjustable rate, interest-only, and high loan-to-value loans, coupled with Defendants' faulty underwriting and due diligence, had a material adverse impact on E*TRADE's credit exposure.   For instance, property appraisals were constantly grossly overstated, substantially increasing the riskiness of the loan portfolio (CW3), experienced conservative brokers were terminated at the same time Defendants increased E*TRADE's purchase of risky loans with insufficient information (CW1), and Webb was buying pools comprised of at least 50% risky, subprime loans while the due diligence staff was too overworked and understaffed to review and verify most of the purchased loans.   (CW2, CW6)   As discussed in detail, *infra*, Defendants also failed to monitor credit risk exposures in accordance with their publicly stated policies. *See, e.g.,* Discussion re: statements in E*TRADE's 2006 10-K.   Defendants thus understated and failed to properly account for E'TRADE's loan loss allowances in accordance with GAAP.   This accounting treatment caused E*TRADE's financials, including each 10-Q and 10-K during the Class Period, to materially overstate the Company's earnings.

**Defendants Failed To Comply With Rules Requiring**
**Further Investigation Of E*TRADE's Investments**

373.   SEC Staff Accounting Bulletin No. 59 ("SAB 59"), Accounting for Noncurrent Marketable Equity Securities, specifies that declines in the value of investments in marketable

securities caused by general market conditions or by specific information pertaining to an industry or an individual company, "require further investigation by management."  SAB 59 further states that: "Acting upon the premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment."

374.    During and even prior to the Class Period, evidence was available regarding the mortgage, CDO and the U.S. sub-prime market industry which required Defendants to carefully investigate when evaluating the value of E*TRADE's investment portfolio.  *See, e.g.,* Kirsten Downey, "Mortgage Delinquencies Seen Rising in 2006; Report: High-Cost Loan Owners Will Struggle With Interest Rates, Debt," *The Washington Post*, December 7, 2005 ("Mortgage delinquencies among homeowners with high-cost loans will rise by 10 to 15 percent in 2006, as borrowers struggle with higher interest rates, high debt levels and higher energy costs amid flattening home prices, a new report from investment analyst Fitch Ratings predicts. Consequently, overall mortgage delinquencies are likely to rise next year, as well, according to the report's authors."); "Mortgage Delinquencies Increasing," *The Los Angeles Times*, February 3, 2006, p. C-2 ("The number of default notices sent to California homeowners rose in the last three months of 2005 as the rate of price increases slowed, a real estate research firm said Thursday.  The delinquency notices serve as an early indicator of possible foreclosures."); Les Christie, "Mortgage Delinquencies Ticking Upward: Subprime And Adjustable Rate Mortgages Are Driving Delinquency Rates Up," *CNNMoney.com*, September 13, 2006 ("Faced with higher mortgage rates and deteriorating housing markets, more Americans are having trouble paying off their mortgages this year, according to the latest quarterly report on delinquencies from the Mortgage Bankers Association released Wednesday.");  Walden Siew, "ANALYSIS-Housing, Car Markets May Spark Credit Crunch," *Reuters*, December 15, 2006 ("Defaults on the riskiest

residential loans, known as subprime mortgage securities, already have pushed the main index of those securities to record lows. . . . Downgrades on subprime mortgage securities are expected to climb to a record 300 by the end of the year, twice as much as last year, and rise even more in 2007, Fitch Ratings said on Thursday.");   Alex Chambers, "Have Wall Street Banks Gone Subprime at the Wrong Time?," *Euromoney.com*, December 1, 2006 (quoting Bear Stearns analyst Sinha: "origination quality slipped over the past 15 months," and "delinquencies are going up at an unprecedented rate" due to credit quality problems**);** Liz Moyer, "Subprime Virus on Wall Street," *Forbes.com*, March 4, 2007 (rising delinquencies reported by several banks, including Countrywide and HSBC; lenders including Fremont are exiting the subprime mortgage business).

375.    Defendants failed to evaluate and timely write down E*TRADE's mortgage portfolio in accordance with SAB 59.

**Defendants had A Duty To Disclose the True financial Condition
and Known Trends and Uncertainties regarding E*Trade But Failed To Do So**

376.    In addition, at all times relevant, 17 C.F.R. § 229.303(a) ("Section 303"), a duly-adopted SEC regulation required the Company in its Form 10-Ks and 10-Qs to:

> provide information as specified in paragraphs (a) (1), (2) and (3) with respect to liquidity, capital resources and results of operations and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations.

Sub-section (a)(3)(ii) of Section 303, in turn, required the Company in each of its Form 10-Ks and 10-Qs to:

> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the

> relationship between costs and revenues (such as known future increases
> in costs of labor or materials or price increases or inventory adjustments),
> the change in the relationship shall be disclosed.

These provisions imposed an affirmative duty on Defendants to disclose both present facts and "known trends or uncertainties" that could have a material impact on E*TRADE's revenue, or income. Defendants completely failed, in violation of their duties under SEC Item 303, to properly or timely disclose any of the relevant facts which later led to the losses of which Plaintiffs complain herein. Based upon the foregoing, Defendants knew or should have known but for their reckless disregard of the facts known to them that E*TRADE's loan portfolio was over valued, and contained extremely poor quality, non-performing loans that required material write downs and loss reserves that, in turn, would have a material adverse impact on E*TRADE's overall financial condition and operations, including but not limited to its revenues, net income and profits that needed to be disclosed in each of E*TRADE's filings with the SEC during the Class Period, but which Defendants failed and omitted to disclose in violation of SEC Item 303.

**<u>NO SAFE HARBOR</u>**

377.     The statutory safe harbor provided for forward-looking statements does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements was made, the speaker knew that the forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of E*TRADE who knew that the statement was false when made.

**COUNT I**

**(For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)**

378.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

379.   During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by: (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements of material fact and/or omitting to state material facts necessary to make the statements not misleading; and (iii) engaging in acts, practices, and a course of business which operated as a fraud and deceit upon the Class.   Defendants also failed to disclose material adverse information in connection with their insider sales of E*TRADE securities.   Defendants also failed to disclose material adverse information in connection with their fiduciary duties as the broker of E*TRADE securities.

380.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

381.   The market for E*TRADE securities was open, well-developed and efficient at all relevant times.   Defendants' dissemination of materially false and misleading statements and omissions of material facts caused E*TRADE securities to trade at artificially inflated prices during the Class Period.   Plaintiffs and other members of the Class were damaged because they acquired E*TRADE securities relying directly or indirectly on Defendants' false and misleading statements and/or omissions, or upon the market's integrity, and would not have purchased or otherwise acquired their E*TRADE securities at the prices they paid, or at all, if they had

known that Defendants' misleading statements and omissions artificially inflated market prices, and because when the truth was revealed, E*TRADE's securities price declined dramatically, directly causing the Class members' losses.

382.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

**(For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

383.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

384.   The Individual Defendants acted as controlling persons of E*TRADE within the meaning of Section 20(a) of the Exchange Act and are liable thereunder.  As senior officers and/or directors of E*TRADE, high-level executives of the Company, "hands on" supervisors, decision-makers and participants in E*TRADE's operations, and owners of E*TRADE stock, the Individual Defendants had the power and authority to influence and control and did influence and control E*TRADE to engage in the wrongful conduct complained of herein.

385.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand trial by jury.

Dated: January 16, 2009

Respectfully submitted,

**BROWER PIVEN**
A Professional Corporation

David A.P. Brower
488 Madison Avenue
Eighth Floor
New York, New York 10017
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

**BROWER PIVEN**
A Professional Corporation
Charles J. Piven
Yelena Trepetin
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300

*Lead Counsel for the Class and Lead Plaintiff Kristen-Straxton Group*

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
Joseph Levi
Elizabeth Berney
39 Broadway – Suite 1601
New York, New York
T: (212) 363-7500
F: (212) 363-7171

***Co-Lead Counsel for the Class and Co-Lead
Plaintiff Ira Newman***

# EXHIBIT A

## PLAINTIFF'S CERTIFICATION

Kristen Management Limited ("Plaintiff"), by its director, Vincent de Cannière, declares that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.      A schedule of Plaintiff's transactions in E*TRADE Financial Corporation securities during the Class Period is attached hereto and adopted by reference herein.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ⎯14⎯ day of January, 2009.      Kristen Management Limited, a BVI company

By:_____
      Vincent de Cannière, Director


Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:   410-332-0030
Facsimile:   410-685-1300
www.browerpiven.com

# Kristen Management Limited
## E*Trade Financial Corporation Securities Litigation
## Schedule of Transactions

| Date | Currency | Company | Type | Shares Per CFDs* | Price |
|---|---|---|---|---|---|
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $25.5777 |
| 6/6/07 | USD | E*Trade | BUY | 340,900 | $25.5594 |
| 6/27/07 | USD | E*Trade | BUY | 250,000 | $22.1484 |
| 6/27/07 | USD | E*Trade | BUY | 250,000 | $22.1086 |
| 7/2/07 | USD | E*Trade | BUY | 100 | $22.1500 |
| 8/1/07 | USD | E*Trade | SELL | 91,000 | $18.0000 |
| 8/6/07 | USD | E*Trade | SELL | 1,000,000 | $15.1151 |
| 8/15/07 | USD | E*Trade | SELL | 250,000 | $14.9811 |

* Contracts For Difference

# EXHIBIT B

## PLAINTIFF'S CERTIFICATION

Straxton Properties Inc. ("Plaintiff"), by its director, Vincent de Cannière, declares that:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.    A schedule of Plaintiff's transactions in E*TRADE Financial Corporation securities during the Class Period is attached hereto and adopted by reference herein.

5.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14 day of January, 2009.        Straxton Properties Inc., a BVI company

By:_____

Vincent de Cannière, Director

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:  410-332-0030
Facsimile:   410-685-1300
www.browerpiven.com

# Straxton Properties Inc.
## E*Trade Financial Corporation Securities Litigation
## Schedule of Transactions

| Date | Currency | Company | Type | Shares Per CFDs* | Price |
|------|----------|---------|------|------------------|-------|
| 5/31/07 | USD | E*Trade | BUY | 100,000 | $23.9844 |
| 5/31/07 | USD | E*Trade | BUY | 200,000 | $24.0443 |
| 5/31/07 | USD | E*Trade | BUY | 200,000 | $24.1125 |
| 5/31/07 | USD | E*Trade | BUY | 250,000 | $23.9812 |
| 5/31/07 | USD | E*Trade | BUY | 250,000 | $23.9989 |
| 6/1/07 | USD | E*Trade | BUY | 50,000 | $24.0084 |
| 6/1/07 | USD | E*Trade | BUY | 50,000 | $24.0500 |
| 6/1/07 | USD | E*Trade | BUY | 50,000 | $24.0500 |
| 6/1/07 | USD | E*Trade | BUY | 100,000 | $23.9492 |
| 6/6/07 | USD | E*Trade | BUY | 250,000 | $24.5046 |
| 6/6/07 | USD | E*Trade | BUY | 250,000 | $24.6821 |
| 6/6/07 | USD | E*Trade | BUY | 250,000 | $24.9186 |
| 6/6/07 | USD | E*Trade | BUY | 275,000 | $25.5859 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $24.5558 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $24.7003 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $24.9947 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $25.1384 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $25.1953 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $25.3298 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $25.7001 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $25.6632 |
| 6/6/07 | USD | E*Trade | BUY | 500,000 | $25.5574 |
| 6/6/07 | USD | E*Trade | BUY | 159,100 | $25.5594 |
| 6/7/07 | USD | E*Trade | BUY | 250,000 | $25.5878 |
| 6/14/07 | USD | E*Trade | BUY | 75,000 | $24.7496 |
| 6/27/07 | USD | E*Trade | BUY | 135,000 | $22.1894 |
| 6/27/07 | USD | E*Trade | BUY | 400,000 | $22.0393 |
| 7/2/07 | USD | E*Trade | BUY | 9,000 | $22.1500 |
| 7/2/07 | USD | E*Trade | BUY | 50,000 | $22.1203 |
| 7/2/07 | USD | E*Trade | BUY | 100,000 | $22.1206 |
| 7/2/07 | USD | E*Trade | BUY | 115,000 | $22.0955 |
| 8/1/07 | USD | E*Trade | SELL | 500,000 | $18.0000 |
| 8/1/07 | USD | E*Trade | SELL | 409,000 | $18.0000 |
| 8/6/07 | USD | E*Trade | SELL | 250,000 | $15.5405 |
| 8/6/07 | USD | E*Trade | SELL | 250,000 | $15.4810 |
| 8/6/07 | USD | E*Trade | SELL | 159,000 | $15.5900 |
| 8/6/07 | USD | E*Trade | SELL | 159,000 | $15.5002 |
| 8/6/07 | USD | E*Trade | SELL | 91,000 | $15.5900 |

* Contracts For Difference

| Date | Currency | Company | Type | Shares Per CFDs | Price |
|------|----------|---------|------|-----------------|-------|
| 8/6/07 | USD | E*Trade | SELL | 91,000 | $15.5002 |
| 8/15/07 | USD | E*Trade | SELL | 250,000 | $15.0141 |
| 8/15/07 | USD | E*Trade | SELL | 250,000 | $14.0005 |
| 8/15/07 | USD | E*Trade | SELL | 250,000 | $14.0000 |
| 8/15/07 | USD | E*Trade | SELL | 159,000 | $15.0097 |
| 8/15/07 | USD | E*Trade | SELL | 159,000 | $14.0025 |
| 8/15/07 | USD | E*Trade | SELL | 159,000 | $14.0011 |
| 8/15/07 | USD | E*Trade | SELL | 91,000 | $15.0097 |
| 8/15/07 | USD | E*Trade | SELL | 91,000 | $14.0025 |
| 8/15/07 | USD | E*Trade | SELL | 91,000 | $14.0011 |
| 8/16/07 | USD | E*Trade | SELL | 500,000 | $10.3126 |
| 8/16/07 | USD | E*Trade | SELL | 500,000 | $10.2646 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $11.1000 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $11.0493 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $10.9514 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $10.3831 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $10.4155 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $11.6102 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $11.3678 |
| 8/16/07 | USD | E*Trade | SELL | 250,000 | $11.8603 |
| 8/16/07 | USD | E*Trade | SELL | 208,000 | $11.2106 |
| 8/16/07 | USD | E*Trade | SELL | 159,000 | $11.9282 |
| 8/16/07 | USD | E*Trade | SELL | 115,000 | $11.0456 |
| 8/16/07 | USD | E*Trade | SELL | 101,100 | $10.8721 |
| 8/16/07 | USD | E*Trade | SELL | 100,000 | $10.6001 |
| 8/16/07 | USD | E*Trade | SELL | 100,000 | $11.8256 |
| 8/16/07 | USD | E*Trade | SELL | 100,000 | $11.8408 |
| 8/16/07 | USD | E*Trade | SELL | 100,000 | $11.9023 |
| 8/16/07 | USD | E*Trade | SELL | 91,000 | $11.9282 |
| 8/16/07 | USD | E*Trade | SELL | 84,000 | $11.8005 |
| 8/16/07 | USD | E*Trade | SELL | 75,000 | $11.8080 |
| 8/16/07 | USD | E*Trade | SELL | 67,000 | $11.0456 |
| 8/16/07 | USD | E*Trade | SELL | 59,000 | $11.9502 |
| 8/16/07 | USD | E*Trade | SELL | 58,000 | $11.8714 |
| 8/16/07 | USD | E*Trade | SELL | 50,000 | $11.8000 |
| 8/16/07 | USD | E*Trade | SELL | 50,000 | $11.0456 |
| 8/16/07 | USD | E*Trade | SELL | 41,000 | $11.9502 |
| 8/16/07 | USD | E*Trade | SELL | 33,000 | $11.2106 |
| 8/16/07 | USD | E*Trade | SELL | 18,000 | $11.0456 |
| 8/16/07 | USD | E*Trade | SELL | 16,000 | $11.8005 |
| 8/16/07 | USD | E*Trade | SELL | 16,000 | $11.8080 |
| 8/16/07 | USD | E*Trade | SELL | 9,000 | $11.8080 |
| 8/16/07 | USD | E*Trade | SELL | 9,000 | $11.2106 |

# Straxton Properties Inc.
## E*Trade Financial Corporation Securities Litigation
## Schedule of Options Transactions

| Date | Currency | Option | Type | Contracts | Price Per Contract |
|------|----------|--------|------|-----------|--------------------|
| 6/27/07 | USD | Call Oct. $25.00 | BUY | 2,000 | $93.00 |

# EXHIBIT C

## PLAINTIFF'S CERTIFICATION

Javed Fiyaz ("Plaintiff") declares that:

1.     Plaintiff has reviewed the complaint and authorized its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.     A schedule of Plaintiff's transactions in E*TRADE Financial Corporation securities during the Class Period is attached hereto and adopted by reference herein.

5.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of January, 2009.

_____
Javed Fiyaz

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: 410-332-0030
Facsimile:   410-685-1300
www.browerpiven.com

# Javed Fiyaz

E*Trade Financial Corporation Securities Litigation
Schedule of Transactions

| Date | Currency | Company | Type | Shares Per CFDs* | Price |
|------|----------|---------|------|------------------|-------|
| 6/18/07 | USD | E*Trade | BUY | 1,000,000 | $24.0701 |
| 7/6/07 | USD | E*Trade | BUY | 200,000 | $22.8298 |
| 7/9/07 | USD | E*Trade | BUY | 800,000 | $23.2206 |
| 7/10/07 | USD | E*Trade | BUY | 455,663 | $22.7245 |
| 7/11/07 | USD | E*Trade | BUY | 400,000 | $22.7125 |
| 7/25/07 | USD | E*Trade | BUY | 500,000 | $20.2233 |
| 8/17/07 | USD | E*Trade | SELL | 1,755,327 | $15.0552 |
| 8/20/07 | USD | E*Trade | SELL | 1,600,336 | $14.5093 |

* Contracts For Difference

# EXHIBIT D

## PLAINTIFF'S CERTIFICATION

Andrea Frascaroli ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.     Plaintiff's transactions in E*TRADE Financial Corporation common stock during the Class Period are set forth on the attached Schedule of Transactions.

5.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court. Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of January, 2009.

Andrea Frascaroli

ATTACHMENT TO CERTIFICATION

**Schedule of Transactions**

E*TRADE Financial Corporation Securities Litigation

Name: Andrea Frascaroli

| # of Common Shares | Purchased (P) / Sold (S) | Price Per Share | Date of Purchase/Sale |
|---|---|---|---|
| 586 | P | $26.10 | 04/25/06 |
| 590 | P | $19.49 | 07/26/07 |
| 1176 | S | $3.60 | 12/27/07 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT E

## PLAINTIFF'S CERTIFICATION

Peter Farah ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4. Plaintiff's transactions in E*TRADE Financial Corporation common stock during the Class Period are set forth on the attached Schedule of Transactions.

5. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court. Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of January, 2009.

Peter Farah

# Peter Farah

## E*Trade Financial Corporation Securities Litigation
## Schedule of Transactions

| Date | Shares Bought | Shares Sold | Price |
|---|---|---|---|
| 10/5/06 | 4,800 | | $24.700 |
| 10/5/06 | | 5,000 | $24.810 |
| 10/5/06 | 100 | | $24.580 |
| 10/5/06 | 100 | | $24.690 |
| 10/18/06 | | 7,000 | $22.980 |
| 10/18/06 | 7,000 | | $22.770 |
| 10/19/06 | 8,000 | | $21.410 |
| 10/20/06 | | 8,000 | $21.730 |
| 12/1/06 | 5,000 | | $23.300 |
| 12/4/06 | | 5,000 | $23.460 |
| 12/5/06 | 5,000 | | $23.100 |
| 12/5/06 | 3,220 | | $23.090 |
| 12/5/06 | | 3,220 | $23.130 |
| 12/6/06 | 5,000 | | $22.950 |
| 12/8/06 | | 5,000 | $23.100 |
| 12/18/06 | 5,000 | | $23.079 |
| 12/18/06 | | 5,000 | $23.350 |
| 12/18/06 | 5,000 | | $23.050 |
| 12/18/06 | | 5,000 | $23.130 |
| 12/20/06 | | 5,000 | $23.260 |
| 12/29/06 | 1,534 | | $22.510 |
| 12/29/06 | | 1,534 | $22.610 |
| 12/29/06 | 10,000 | | $22.430 |
| 12/29/06 | | 4,920 | $22.480 |
| 1/3/07 | | 5,080 | $22.640 |
| 1/19/07 | 1,899 | | $23.840 |
| 1/19/07 | 1,100 | | $23.850 |
| 1/19/07 | 2,001 | | $23.860 |
| 1/19/07 | | 5,000 | $24.060 |
| 1/23/07 | 6,000 | | $23.950 |
| 1/23/07 | 4,000 | | $23.910 |
| 1/24/07 | | 3,023 | $24.140 |
| 1/24/07 | | 1,273 | $24.150 |
| 1/24/07 | | 5,704 | $24.170 |
| 1/25/07 | 6,000 | | $23.980 |
| 1/31/07 | | 6,000 | $24.160 |

| | | | |
|---|---|---|---|
| 2/6/07 | 4,000 | | $24.430 |
| 2/7/07 | | 4,000 | $24.510 |
| 2/9/07 | 5,000 | | $24.300 |
| 2/9/07 | 5,000 | | $24.390 |
| 2/20/07 | | 5,000 | $24.460 |
| 3/13/07 | 5,000 | | $22.250 |
| 3/21/07 | | 5,000 | $22.700 |
| 3/28/07 | 5,000 | | $21.950 |
| 3/28/07 | | 5,000 | $22.160 |
| 3/28/07 | 5,000 | | $21.880 |
| 3/30/07 | | 1,400 | $21.380 |
| 3/30/07 | | 3,300 | $21.390 |
| 3/30/07 | | 300 | $21.395 |
| 3/30/07 | 4,900 | | $21.240 |
| 3/30/07 | | 4,900 | $21.280 |
| 3/30/07 | 4,900 | | $21.220 |
| 3/30/07 | | 4,900 | $21.240 |
| 3/30/07 | 4,900 | | $21.210 |
| 3/30/07 | | 4,900 | $21.250 |
| 4/17/07 | 3,500 | | $21.970 |
| 4/17/07 | | 3,500 | $22.010 |
| 5/4/07 | 5,000 | | $22.350 |
| 5/4/07 | | 5,000 | $22.500 |
| 5/7/07 | 5,000 | | $22.540 |
| 5/9/07 | | 5,000 | $23.030 |
| 5/17/07 | 5,000 | | $22.680 |
| 5/17/07 | | 5,000 | $22.790 |
| 5/21/07 | 5,000 | | $22.650 |
| 5/21/07 | | 5,000 | $22.860 |
| 6/6/07 | | 5,000 | $25.200 |
| 6/15/07 | 5,000 | | $24.440 |
| 6/15/07 | | 200 | $24.250 |
| 6/15/07 | | 400 | $24.220 |
| 6/18/07 | 5,600 | | $24.080 |
| 6/19/07 | 3,000 | | $23.680 |
| 6/19/07 | | 3,000 | $23.730 |
| 6/20/07 | | 5,600 | $24.270 |
| 6/20/07 | 5,600 | | $24.000 |
| 6/21/07 | 3,000 | | $23.280 |
| 6/21/07 | | 3,000 | $23.360 |
| 6/25/07 | 5,000 | | $23.200 |
| 6/25/07 | | 5,000 | $23.280 |

| | | | |
|---|---|---|---|
| 6/26/07 | 5,000 | | $22.410 |
| 6/26/07 | 5,000 | | $22.530 |
| 6/26/07 | | 10,000 | $22.220 |
| 7/2/07 | 5,000 | | $22.060 |
| 7/2/07 | | 5,000 | $22.110 |
| 7/2/07 | 5,000 | | $22.030 |
| 7/2/07 | | 5,000 | $22.090 |
| 7/11/07 | 5,000 | | $22.440 |
| 7/11/07 | | 5,000 | $22.610 |
| 7/13/07 | 4,850 | | $23.120 |
| 7/13/07 | 150 | | $23.110 |
| 7/13/07 | | 5,000 | $23.100 |
| 7/18/07 | 5,000 | | $23.080 |
| 7/18/07 | | 5,000 | $23.190 |
| 7/19/07 | 5,000 | | $22.850 |
| 7/19/07 | | 5,000 | $22.880 |
| 7/26/07 | 10,000 | | $19.220 |
| 7/26/07 | | 10,000 | $19.530 |
| 7/26/07 | 10,000 | | $19.620 |
| 8/1/07 | 10,000 | | $17.915 |
| 8/1/07 | | 14,600 | $16.920 |
| 8/1/07 | | 400 | $16.930 |
| 8/3/07 | | 2,500 | $16.300 |
| 8/3/07 | | 7,500 | $16.890 |
| 8/8/07 | 2,200 | | $17.410 |
| 8/8/07 | 2,800 | | $17.420 |
| 8/14/07 | 5,000 | | $15.350 |
| 8/14/07 | | 10,000 | $14.970 |
| 8/15/07 | | 1,000 | $14.000 |
| 8/16/07 | 5,000 | | $10.540 |
| 8/16/07 | | 5,000 | $10.730 |
| 8/22/07 | 2,000 | | $16.030 |
| 9/7/07 | 5,000 | | $14.650 |
| 9/7/07 | | 5,000 | $14.800 |
| 9/7/07 | 5,000 | | $14.630 |
| 9/7/07 | | 5,000 | $14.650 |
| 9/10/07 | 4,000 | | $14.560 |
| 9/17/07 | 4,000 | | $14.130 |
| 9/17/07 | | 4,000 | $14.220 |
| 9/19/07 | 3,500 | | $14.250 |
| 9/24/07 | | 7,500 | $12.810 |
| 9/25/07 | | 2,000 | $12.000 |

3 of 4

| | | | |
|---|---|---|---|
| 9/28/07 | 5,000 | | $13.100 |
| 10/1/07 | | 5,000 | $13.330 |
| 10/1/07 | 5,000 | | $13.250 |
| 10/1/07 | | 5,000 | $13.300 |
| 10/4/07 | 5,000 | | $12.990 |
| 10/4/07 | | 5,000 | $13.030 |
| 10/19/07 | | 3,000 | $10.840 |
| 11/9/07 | | 1,000 | $8.770 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E*TRADE FINANCIAL CORP.<br>SECURITIES LITIGATION | Civil Action No.<br>07 Civ. 8538 (RWS) |

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2009, I electronically mailed a true and correct copy of the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed January 16, 2009 in the United States District Court for the Southern District of New York, to the following defendants' counsel:

**DAVIS POLK & WARDWELL**
Dennis E. Glazer
Nancy B. Ludmerer
Andrew E. Krause
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4900
Email: dennis.glazer@dpw.com
Email: nancy.ludmerer@dpw.com
Email: andrew.krause@dpw.com

*Counsel for Defendants*
*E*Trade Financial Corporation, Mitchell*
*H. Caplan and Robert J. Simmons*

Executed: January 16, 2009
       New York, New York

                             Eric C. Love
                             Legal Assistant/Not Admitted

                             **BROWER PIVEN**
                              A Professional Corporation
                             488 Madison Avenue
                             New York, New York 10022
                             Telephone: (212) 501-9000
                             Facsimile: (212) 501-0300