UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :
LARRY FREUDENBERG, Individually and                               :
On Behalf of All Others Similarly Situated,                       :
                                                                  :
                              Plaintiff,                          :
                                                                  :        Civil Action No.
                                                                  :
                - against -                                       :
                                                                  :        07 Civ. 8538 (RWS)
                                                                  :
E*TRADE FINANCIAL CORPORATION,                                    :
MITCHELL H. CAPLAN, ROBERT J.                                     :
SIMMONS and DENNIS E. WEBB,                                       :
                                                                  :
                              Defendants.                         :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## CORRECTED REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS


DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone: (212) 450-4000
Fax: (212) 450-3800

*Attorneys for Defendants*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ........................................................................................................ 3

I.  PLAINTIFFS FAIL TO ALLEGE FACTS GIVING RISE TO A STRONG
    INFERENCE OF SCIENTER ....................................................................... 3

    A.  Plaintiffs Fail to Allege Any Motive to Commit Fraud ...................... 4

        1.  Generalized Motives Common to Any For-Profit Enterprise Are
            Insufficient to Demonstrate Scienter ..................................... 4

        2.  The Characteristics of Stock Sales by the Individual Defendants
            During the Class Period Do Not Give Rise to a Strong Inference of
            Scienter ...................................................................... 6

    B.  Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness ........................ 8

    C.  Plaintiffs' Other Arguments Regarding Scienter Fail As A Matter of Law ....... 11

        1.  Plaintiffs Cannot Avoid the Scienter Requirement By Relying On a
            "Core Operations" Theory ................................................... 11

        2.  Resignations of E*TRADE's Executives Do Not Establish Scienter ..... 11

        3.  GAAP Irregularities Do Not Establish Scienter ...................... 12

II. PLAINTIFFS FAIL TO ALLEGE ANY STATEMENTS OR OMISSIONS
    ACTIONABLE UNDER THE FEDERAL SECURITIES LAWS ................. 13

    A.  E*TRADE Had No Duty to Disclose Information Alleged by Plaintiffs to
        Have Been Omitted From Its Disclosures ..................................... 13

    B.  E*TRADE Did Not Misrepresent Any Material Information In Its
        Disclosures ........................................................................ 16

        1.  E*TRADE's "Superprime" Representations Are Not Actionable .......... 16

        2.  E*TRADE's Statements Regarding Discipline, Quality, and
            Growth Are Not Actionable ................................................ 17

        3.  E*TRADE's Statements Regarding Loan Loss Reserves Are Not
            Actionable ...................................................................... 19

i

C.     The Alleged Statements By the Individual Defendants Are Not Actionable ..... 19

III.    THE CLASS PERIOD SHOULD END ON SEPTEMBER 17, 2007 OR OCTOBER 17, 2007 AT THE LATEST ...................................................................... 20

A.     Plaintiffs Fail to Plead Loss Causation With Respect to the November 9, 2007 Statement.................................................................................................... 21

B.     Plaintiffs Are Judicially Estopped from Asserting Concealment After September 2007 ............................................................................................... 23

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

PAGE

**Cases**

380544 Canada Inc. v. Aspen Tech., Inc., 544 F. Supp. 2d 199 (S.D.N.Y. 2008) ...................... 11

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)...................................................................................... 1

ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ...................................... 3

Catton v. Defense Tech. Sys., Inc., No. 05 Civ. 6954, 2006 U.S. Dist. LEXIS 205
    (S.D.N.Y. Jan. 3, 2006)........................................................................................................ 21

Ciresi v. Citicorp, 782 F. Supp. 8191 (S.D.N.Y. 1991), aff'd, 956 F.2d 1161 (2d Cir.
    1992) .................................................................................................................................... 19

City of Brockton Ret. Sys. v. Shaw Group Inc., 540 F. Supp. 2d 464 (S.D.N.Y. 2008). ......... 9, 11

Cosmas v. Hasset, 886 F.2d 8 (2d Cir. 1989) ............................................................................. 11

Decker v. Massey-Ferguson, Ltd., 681 F.2d 111 (2d Cir. 1982)................................................. 10

Elliott Assocs., L.P. v. Covance, Inc., 00 Civ. 4115, 2000 U.S. Dist. LEXIS 17099
    (S.D.N.Y. Nov. 28, 2000) .................................................................................................... 20

Galin v. Goldfischer, No. 03 Civ. 9019, 2008 U.S. Dist. LEXIS 106603 (S.D.N.Y. Dec.
    31, 2008) .............................................................................................................................. 25

Ganino v. Citizens Utils Co., 228 F.3d 154 (2d Cir. 2000) ........................................................ 14

Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753 (7th Cir. 2007)................................................ 8

In re Am. Express Co. Sec. Litig., No. 02 Civ 5533, 2008 U.S. Dist. LEXIS 74372
    (S.D.N.Y. Sept. 26, 2008).................................................................................................... 12

In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474 (S.D.N.Y.
    2004) .................................................................................................................................... 11

In re Authentidate Holding Corp. Sec. Litig., No. 05 Civ. 5323, 2009 U.S. Dist. LEXIS
    23462 (S.D.N.Y. Mar. 23, 2009) ......................................................................................... 15

In re BISYS Sec. Litig., 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................. 12

In re Ceridian Corp. Sec. Litig., 542 F. 3d 240 (8th Cir. 2008)................................................. 12

In re CIT Group, Inc. Secs. Litig., 349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................. 19

In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044 (C.D. Cal. 2008).............. 9

In re Dell Inc. Sec. Litig., 591 F. Supp. 2d 877 (W.D. Tex. 2008)................................................ 12

In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 4616 (S.D.N.Y. 2008) ................................. 12

In re Downey Sec. Litig., CV 08-3261, 2009 U.S. Dist. LEXIS 25007 (C.D. Cal. Mar. 18,
    2009) ....................................................................................................................................... 17

In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897, 2006 U.S. Dist. LEXIS 4988
    (S.D.N.Y. Feb. 10, 2006), rev'd in part on other grounds by Teamsters Local 445
    Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 197 (2d Cir. 2008)...... 10, 11

In re Emex Corp. Sec. Litig., No. 01 Civ. 4886, 2002 U.S. Dist. LEXIS 17528 (S.D.N.Y.
    Sept., 18, 2002) ...................................................................................................................... 20

In re Enron Corp., 349 B.R. 96 (Bankr. S.D.N.Y. 2006).........................................................23-24

In re FoxHollow Techs., Inc. Sec. Litig., No. C 06-4595, 2008 U.S. Dist. LEXIS 52363
    (N.D. Cal. May 27, 2008) ......................................................................................................... 8

In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574 (S.D.N.Y. 2007) ........................... 7

In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................. 11

In re JP Morgan Chase Sec. Litig., No. 02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948
    (S.D.N.Y. Mar. 29, 2007), aff'd sub nom. ECA & Local 134 IBEW Joint Pension Tr.
    of Chi. v. JP Morgan Chase Co., 553 F.3d 187 (2d Cir. 2009) ............................................. 13

In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................. 4, 19

In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546 (S.D.N.Y. 2008) .......................... 22

In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483, 2007 U.S. Dist. LEXIS 60298
    (S.D.N.Y. Aug. 10, 2007) ....................................................................................................... 24

In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................... 6, 7, 19

In re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d 527 (S.D.N.Y. 2007).......................................... 20

In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247 (S.D.N.Y. 2008).......................... 11

In re Vivendi Universal, S.A. Sec. Litig., 605 F. Supp. 2d 596 (S.D.N.Y. 2009) ....................... 22

In re Worldcom, Inc. Sec. Litig., 352 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................... 11

In re Xerox Corp. Sec. Litig., 165 F. Supp. 2d 208 (D. Conn. 2001).......................................... 11

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ....................................................................... 5, 12

Kunica v. St. Jean Financial, Inc., 233 B.R. 46 (S.D.N.Y. 1999)................................... 25

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005)....................................... 20

Leykin v. AT&T Corp., 423 F. Supp. 2d 229 (S.D.N.Y. 2006), aff'd, 216 Fed. Appx 14
    (2d Cir. 2007)....................................................................................................... 20

Manavazian v. ATec Group, Inc., 160 F. Supp. 2d 468 (E.D.N.Y. 2001)................... 18

Medis Inv. Group v. Medis Tech., Ltd., 586 F. Supp. 2d 136 (S.D.N.Y. 2008), aff'd, No.
    08-4486-cv, 2009 U.S. App. LEXIS 16006 (2d Cir. 2009)................................... 11

Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588 (7th Cir. 2006), vacated on other
    grounds, 551 U.S. 308 (2007).............................................................................19

Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702 (7th Cir. 2007), vacated on other
    grounds, 551 U.S. 308 (2007).............................................................................8

Morales v. Quintel Entertainment, Inc., 294 F.3d 115 (2d Cir. 2001)......................... 14

Nolte v. Capital One Fin. Corp., 390 F.3d 311 (4th Cir. 2004) ................................... 17

Schleicher v. Wendt, 529 F. Supp. 2d 959 (S.D. Ind. 2007) ........................................ 8

Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246 (10th Cir. 1997) ..................... 19

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 363 (5th Cir. 2004)................... 19

Stichting v. Schreiber, 407 F.3d 34 (2d Cir. 2005)....................................................... 24

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) .................................... 3, 8, 11

Winer Family Trust v. Queen, 503 F.3d 319 (3d Cir. 2007) ......................................... 19

Zucco Partners, LLC v. Digimarc Corp., No. 06-35758, 2009 U.S. App. LEXIS 7025 (9th
    Cir. 2009) ............................................................................................................. 12

## Statutes and Rules

15 U.S.C. § 78u-4 ........................................................................................................ 1

17 C.F.R. § 229.303(a),................................................................................................ 15

Fed. R. Civ. P. 9(b) ...................................................................................................... 1

Fed. R. Civ. P. 12(b)(6)................................................................................................ 1

Defendants E*TRADE Financial Corporation ("E*TRADE" or the "Company"), Mitchell H. Caplan, Robert J. Simmons, and Dennis E. Webb (collectively, the "Individual Defendants") respectfully submit this reply memorandum of law in further support of their motion to dismiss the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §§ 78u-4 et seq.

## PRELIMINARY STATEMENT

Plaintiffs would have this Court ignore the recent global economic crisis and simply infer that, because E*TRADE's stock price fell dramatically in 2007, the cause of the drop must have been fraud. Instead, as prescribed by the Supreme Court, this Court must determine whether Plaintiffs' allegations are "plausible" by conducting a "context-specific" review and drawing on its "experience and common sense." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). "Common sense" dictates that, like nearly every other financial entity in the world, E*TRADE was blindsided by the credit crisis and suffered accordingly. A "context-specific" review suggests that the loss of value in E*TRADE's mortgage-related holdings was the result not of Defendants' fraud, but instead the inevitable outcome of macro-economic trends that have impacted us all. What defies "common sense" is Plaintiffs' over-the-top assertion that E*TRADE, unlike the rest of the industry, should have foreseen its 2007 mortgage-related losses.

This overarching deficiency translates into specific deficiencies in the Complaint. First, Plaintiffs cannot allege facts establishing a "strong inference" of scienter. This is not surprising, as Plaintiffs cannot identify any motive for E*TRADE or its executives to commit securities fraud. For example, Plaintiffs allege that individuals at E*TRADE authorized the purchase of

mortgage-related assets knowing that the assets would lose value. But, this runs squarely into the indisputable fact that all three of the Individual Defendants had substantial E*TRADE shareholdings throughout the Class Period, and at least one of them actually increased his holdings. If the Individual Defendants knew that E*TRADE was about to suffer massive losses, that would not have been the case. Nor do Plaintiffs make any specific allegations which, if proven, would demonstrate that any of the Individual Defendants consciously or recklessly disregarded facts that were contrary to those in E*TRADE's public statements. Instead, Plaintiffs rest on vague statements by unidentified "confidential witnesses" and the dubious proposition that because mortgages were important to E*TRADE's business, Defendants must have known that those assets were destined to lose value. Plaintiffs' other arguments – that resignations of the Individual Defendants and alleged violations of Generally Accepted Accounting Principles ("GAAP") somehow establish scienter when the other allegations cannot – are last-ditch efforts that fail as a matter of law.

Second, Plaintiffs have been unable to identify any statements which are actionable under the securities laws. Plaintiffs' inability in this regard is evidenced by their failure to challenge Defendants' arguments with respect to the allegedly fraudulent statements by the Individual Defendants, including only three by Mr. Webb. The items listed in the Complaint are either too vague or amount to little more than puffery; they are not concrete statements of verifiable fact. Those few statements which Plaintiffs do identify with sufficient specificity and which relate to knowable facts are indisputably correct, and Plaintiffs can attack them only by distorting what the statements actually say. Faced with these deficiencies, Plaintiffs resort to inventing new disclosure requirements and then contending that E*TRADE's disclosures did not comply with such requirements. Failure to comply with imaginary rules is not fraud.

2

Third, Plaintiffs cannot plead a securities law violation because they cannot allege loss causation. Similar to the problem Plaintiffs face in connection with scienter, they cannot explain why E*TRADE's losses are attributable to the purported fraudulent disclosures, rather than the pervasive economic collapse. This failure is particularly evident with respect to Plaintiffs' allegations that the Class Period should extend until November 9, 2009 – when it is undisputed that the risks relating to E*TRADE's mortgage-related asset portfolio were publicly disclosed in August 2007, and again in September and October 2007. Indeed, even Plaintiffs admit in prior filings before this Court that the facts underlying the alleged fraud were "revealed" by September 2007. Thus, no previously concealed risk materialized on November 9, and Plaintiffs have no basis to allege loss causation in connection with E*TRADE's statements on that date.

For these and the additional reasons discussed below, the Complaint should be dismissed.

## ARGUMENT

## I.    PLAINTIFFS FAIL TO ALLEGE FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

Plaintiffs have failed to plead the requisite "facts that give rise to a strong inference of intent." (Defs. Mem. 23.) While Plaintiffs' brief gives the impression that the Supreme Court's decision in Tellabs relaxed the pleading requirement with respect to scienter (Pls. Mem. 31-34), just the opposite is true. The Tellabs Court heightened the pleading requirement by holding that, in order to survive a motion to dismiss, an inference of scienter "must be more than merely 'reasonable' or 'permissible'" but "strong in light of other explanations." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007); see also ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) (dismissing complaint after conducting a comparative analysis of explanations unnecessary prior to Tellabs). Plaintiffs do not meet this heightened standard.

Here, an inference of scienter is not "strong" in light of the most sensible alternative

explanation that, like nearly every other financial institution in the world, E*TRADE believed that its mortgage-related assets, which carried strong ratings and FICO scores above subprime levels, were quality assets that should maintain their value. Likewise, it is not plausible to infer that E*TRADE perpetrated fraud by acquiring risky assets that it knew would lose value in order to keep the Company's earnings high. If that were the goal, then E*TRADE should have sold its mortgage-related assets earlier in 2007 when the market was still strong to avoid losses. The only plausible reason for Defendants' failure to do so is that they did not know the value of their assets would decrease. This undermines Plaintiffs' entire theory of scienter. See In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 389 n.14 (E.D.N.Y. 2003) ("The absence of any apparent economic rationale for plaintiffs' theory of the case weakens the inference of scienter.")

None of the arguments in the opposition brief renders an inference of scienter more plausible than competing alternatives. The discussion of Plaintiffs' scienter arguments below is divided into three sections. First, Plaintiffs have not and cannot allege any facts suggesting that E*TRADE and the Individual Defendants had a motive to commit securities fraud. Second, given the absence of motive allegations, Plaintiffs cannot meet the alternative test of alleging that Defendants made false statements with a knowing or reckless intent. Third, Plaintiffs' scattershot theories of scienter based on a "core operations" theory, resignations of E*TRADE executives, and alleged GAAP violations cannot save their Complaint.

### A.    Plaintiffs Fail to Allege Any Motive to Commit Fraud

Plaintiffs fail to allege how Defendants stood to achieve any concrete or personal benefit from the alleged fraud (Defs. Mem. 24-28); their opposition brief does not cure this infirmity.

1.    Generalized Motives Common to Any For-Profit Enterprise Are
      Insufficient to Demonstrate Scienter

4

Plaintiffs do not address Defendants' argument that allegations concerning the desire to maintain the appearance of profitability, a system of incentive-based compensation, and the goal of prolonging employment are too generalized to support a strong inference of scienter. (Defs. Mem. 24-25.) Accordingly, Plaintiffs have conceded this point.

In the alternative, Plaintiffs argue that "particularized corporate motives" and "excessive performance compensation" can support an inference of scienter based on motive. (Pls. Mem. 42.) Both of these arguments fail. First, the only "particularized" motive identified is a desire to bolster E*TRADE's business, which allegedly "depended on a reputation for conservatism and safety." (Id.) But the fact that a company enjoys a reputation as "reliable" or "safe" in no way constitutes a "particularized corporate motive." The four cases cited by Plaintiffs are distinguishable because they involved corporations that were motivated to increase their value in connection with public stock or rights offerings – unique events that present opportunities for significant profit. (Pls. Mem. 42, n.66.) There was no such unique event here.

Second, Plaintiffs' compensation argument should be rejected as inconsistent with well-settled law, including Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001), in which the Second Circuit held that scienter cannot be based on a motivation to inflate stock price in order to increase executive compensation. Instead of offering contrary authority, Plaintiffs point to two decisions in which suspicious timing and unusual size (relative to prior years) of particularized compensation packages were considered in a scienter analysis. (Pls. Mem. 42 n.65.) Such cases are easily distinguishable, as Plaintiffs here do not focus on specific compensation packages, but instead merely allege that E*TRADE's incentive-based compensation philosophy is flawed. (Compl. ¶¶ 329-331.) This is precisely the type of generalized allegation that will not support a strong inference of scienter. (Defs. Mem. 24-25.)

2.    The Characteristics of Stock Sales by the Individual Defendants During the Class Period Do Not Give Rise to a Strong Inference of Scienter

The small number of alleged stock sales by the Individual Defendants fails to support a strong inference of scienter.  (Defs. Mem. 25-28.)  Instead of confronting Defendants' arguments, Plaintiffs sidestep controlling authority and focus on irrelevant facts.  For example, even though courts typically focus on profits garnered from the relevant sales and the percentage of overall holdings sold (Defs. Mem. 26 n.21.), Plaintiffs rely on gross proceeds in an attempt to portray the sales as something more than routine transactions.[1]

Plaintiffs' contentions regarding Mr. Caplan's stock sales are particularly weak.  Plaintiffs do not contest that Mr. Caplan sold stock on only one day during the Class Period or that, on that same day, he acquired more shares than he sold – meaning that Mr. Caplan increased his holdings during the Class Period.  Instead, Plaintiffs argue that this increase establishes scienter because Mr. Caplan "may well have" acquired the shares because he believed he could "hide, dispose of or somehow eventually balance" undisclosed risks in E*TRADE's business and eventually sell his shares for a profit.  (Pls. Mem. 42.)  But Plaintiffs have not alleged that Mr. Caplan held such a belief, nor have they explained why, if he did, Mr. Caplan would choose to increase his holdings by such a small amount (i.e., less than 2%), rather than attempting to reap larger profits.  The far more compelling inference is that Mr. Caplan acquired the shares because his options were about to expire two days later.  (Defs. Mem. 26.)

The case cited by Plaintiffs in support of this argument, In re Refco, Inc. Sec. Litig., highlights the fundamental flaw in Plaintiffs' scienter argument.  (Pls. Mem. 41.)  In Refco, the

---

[1] Plaintiffs criticize Defendants' calculation methodology but fail to advance their own calculation as to the percentages of stock sold by the Individual Defendants.  (Pls. Mem. 41 n.63.)  Moreover, Plaintiffs provide no cases that question, let alone overturn, the decisions of the Second Circuit and this Court that employed the same approach Defendants use.  (Defs. Mem. 27 n.24.)

court made clear that "one does not buy seats on a sinking ship," but that is precisely what Plaintiffs have alleged here.  503 F. Supp. 2d 611, 647 (S.D.N.Y. 2007).  If Defendants knew that their mortgage-related assets were likely to lose value, they would have ceased making purchases and sold the assets they already had.  That they did neither is fatal to Plaintiffs' claim.

Plaintiffs also argue that Defendants failed to "demonstrate lack of scienter" because Mr. Caplan acquired the shares "at no cost to him." (Pls. Mem. 41.)  This argument is inaccurate (Mr. Caplan paid the option exercise price) and irrelevant, and Plaintiffs cite no case law in support of it.  Moreover, Plaintiffs forget that they, not Defendants, bear the burden of pleading.

Plaintiffs' arguments regarding stock sales by Messrs. Simmons and Webb are likewise flawed.  First, Plaintiffs focus on gross proceeds and do not, as required, allege the amount of profits garnered from the sales.  (Defs. Mem. at 26 n.21.)  Second, Plaintiffs do not distinguish the cases cited by Defendants that have rejected an inference of scienter based on sales of stock that were greater, on a percentage-of-holdings basis, than those by Messrs. Simmons or Webb. (Defs Mem. 28.)  Third, Plaintiffs are wrong in their argument that the stock sales by Messrs. Simmons and Webb support an inference of scienter because the trading plans pursuant to which the sales were made were adopted after the start of the Class Period.  (Pls. Mem. 41.)

Indeed, Plaintiffs mischaracterize the only case within the Second Circuit that they cite in support of this argument.  (Pls. Mem. 41 n. 62.)  In In re IAC/InterActiveCorp Sec. Litig., the court dismissed insider trading claims against a defendant who sold stock pursuant to a plan adopted after the start of the class period, explaining that because the "sales were part of a periodic divestment plan, the timing and amount of the sales do not raise a strong inference of scienter."  478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007).  Although the court also found that the

plaintiffs had not sufficiently alleged insider knowledge at the time of the adoption of the plan, the existence of the plan by itself was sufficient ground for dismissal.  <u>Id.</u>

## B.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness

Having failed to allege a motive to perpetrate fraud, Plaintiffs must meet a heightened standard to establish a strong inference of scienter based on conscious misbehavior or recklessness.  (Defs. Mem. 28-29.)  They fail to do so.  Instead, Plaintiffs rely on vague and disjointed allegations by inherently unreliable sources in an attempt to cobble together a plausible explanation for a fraud that did not occur.  Even considered in aggregate, Plaintiffs' allegations fall far short of the heightened pleading requirement announced in <u>Tellabs</u>.

As an initial matter, courts have explained that, in light of <u>Tellabs</u>, "[i]t is hard to see how information from anonymous sources could be deemed compelling."  <u>Higginbotham v. Baxter Int'l, Inc.</u>, 495 F.3d 753, 757 (7th Cir. 2007).  Indeed, "[p]erhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist."  <u>Id.</u>

Although Plaintiffs are not barred from using such allegations, they should be discounted, and the discount usually "will be steep."[2]  <u>Id.</u>  This is particularly true where, as here, Plaintiffs rely solely on confidential sources to sustain their claims.  <u>See, e.g.</u>, <u>In re FoxHollow Techs., Inc. Sec. Litig.</u>, No. C 06-4595, 2008 U.S. Dist. Lexis 52363 (N.D. Cal. May 27, 2008) (dismissing complaint and holding that confidential witness allegations lacked corroborating details sufficient to allege scienter); <u>cf.</u> <u>Schleicher v. Wendt</u>, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) (denying motion to dismiss where plaintiffs "[had] not relied solely on … confidential

---

[2] Plaintiffs' assertion that <u>Higginbotham</u> was "essentially overruled" by <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 513 F.3d 702, 711-12 (7th Cir. 2007), <u>vacated on other grounds</u>, 551 U.S. 308 (2007) (Pls. Mem. 32, n. 40) is wrong.  The <u>Tellabs</u> remand decision distinguished <u>Higginbotham</u> on its facts but did not cast doubt on the basic principles regarding confidential witnesses set forth therein.

witnesses"). Thus, Plaintiffs' reliance on In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044 (C.D. Cal. 2008), to support its use of confidential witnesses is misplaced. (Pls. Mem. 32-33.) Countrywide is distinguishable because plaintiffs there, unlike here, offered statements by named witnesses in addition to those by confidential informants.

To survive a motion to dismiss, Plaintiffs must allege information provided by the confidential witness from which one could infer knowledge or recklessness on the part of a defendant. See City of Brockton Ret. Sys. v. Shaw Group Inc., 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008). Plaintiffs fail to show that each confidential witness "knew or [had] reason to know anything" regarding the Individual Defendants' knowledge (or lack thereof) about the specific mortgage issues discussed in the Complaint.[3] Id. at 473-74.

Plaintiffs' allegations regarding Mr. Webb exemplify Plaintiffs' failure to state a claim. Based on the informants, Plaintiffs allege that Mr. Webb directed loan purchases (which is unsurprising given they allege that Mr. Webb ran the E*TRADE division charged with purchasing loans) and gave instructions to employees on how to conduct due diligence. (Pls. Mem. 35-36.) These allegations, however, are not nearly enough to establish scienter. In order to survive a motion to dismiss, the informants would need to identify specific facts which, if proven, would demonstrate that Mr. Webb actually knew the mortgage assets were being misrepresented to the public. Instead, all the informants can manage is an allegation that Mr. Webb was involved with the business. See Brockton, 540 F. Supp. 2d at 473-74 ("It is not

---

[3] Plaintiffs attempt to overcome this infirmity by arguing that because the confidential witnesses were "executives," they were in a position to understand the business decisions of the Individual Defendants. (Pls. Mem. 34 n.47.) This argument should be rejected for two reasons. First, the Complaint makes clear that not all of Plaintiffs' confidential witnesses were in fact executives. (Compl. ¶2 (describing several confidential witnesses as processing managers, underwriters, traders, and software and operations analysts).) Second, Plaintiffs do not allege facts showing that even so-called "executive" confidential witnesses – in a company the size and breadth of E*TRADE – had the types of relationships with the Individual Defendants that would involve discussions of strategy or business judgment. (Defs. Mem. 33-35.)

enough for a post-Tellabs plaintiff to allege that, because executives . . . were 'closely involved' in [a business], one can strongly infer" that they were "furnished with information that would have allowed them to discern that the financial data was wrong."); see In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897, 2006 U.S. Dist. LEXIS 4988, at *28-*29 (S.D.N.Y. Feb. 10, 2006), rev'd in part on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 197 (2d Cir. 2008).[4]  But this allegation is insufficient, and the claims against Mr. Webb should be dismissed.

　　　　Plaintiffs' scienter allegations regarding Mr. Simmons are similarly inadequate. Plaintiffs contend that Mr. Simmons had "first-hand involvement" in the alleged fraud based on (i) a report to Mr. Simmons of an isolated accounting mistake; (ii) the fact that Mr. Simmons was in "frequent communication" with other executives and their reports; (iii) involvement in loan purchases by Mr. Webb and Mr. Caplan (but not Mr. Simmons); (iv) and Mr. Simmons' presence at a meeting of unspecified date and time during which Mr. Caplan is alleged to have made a vague statement regarding future profits.  (Pls. Mem. 36.)  Taken together, these allegations do not come close to establishing a strong inference of scienter.

　　　　Finally, Plaintiffs assert that Mr. Caplan's alleged statement regarding future profits creates an inference of scienter when combined with allegations of mismanagement, such as his personnel decisions and Mr. Webb's decision not to restructure a particular portfolio.  (Pls. Mem. 32.)  At best, these allegations amount to an "amalgam of suggestions" that do not support a

---

[4] Plaintiffs also advance allegations against Mr. Webb that at most amount to alleged mismanagement.  For example, CW4, CW6 and CW8 allege that Webb adhered to E*TRADE's policy of reviewing samples of loan pools (Compl. ¶¶81-82), kept loan pools that he believed were "great deals" overall (Compl. ¶¶78-79), and took on unacceptable risks (Compl. ¶71).  These claims are not actionable.  See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982) (rejecting complaint pleading a 10(b) violation based on mismanagement); see also Defs. Mem. 29-31.

strong inference of scienter, as required by <u>Tellabs</u>.[5]  <u>See</u> <u>Brockton</u>, 540 F. Supp. 2d at 475.

###   C.     Plaintiffs' Other Arguments Regarding Scienter Fail As A Matter of Law

   1.    <u>Plaintiffs Cannot Avoid the Scienter Requirement By Relying On a "Core Operations" Theory</u>

Plaintiffs try to remedy their deficient scienter allegations by invoking the "core

operations" theory (Pls. Mem. 37).  Plaintiffs claim they can avoid the scienter requirement

altogether by alleging that E*TRADE's misstatements concerned an important part of the

Company's business.  That is not the law.  Courts have rejected inferences of scienter based on

the core operations theory when plaintiffs fail to plead additional facts to support a strong

inference of scienter.[6]  Thus, Plaintiffs' argument regarding core operations should be rejected.

   2.    <u>Resignations of E*TRADE's Executives Do Not Establish Scienter</u>

Plaintiffs argue that scienter may be inferred because the "most cogent explanation" for

---

[5] Plaintiffs argue that failing to demonstrate scienter for each of the Individual Defendants is not fatal to their claims because, in the alternative, a showing of corporate scienter based on E*TRADE's desire to retain customers will suffice.  (Pls. Mem. 42.)  Plaintiffs are wrong.  Intent is necessarily derived from some "corporate official[] sufficiently knowledgeable about the company to know" that alleged misstatements were false when made. <u>Dynex</u>, 531 F.3d at 195-96 (internal quotations omitted); <u>cf.</u> <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (attributing knowledge of vice chairman, vice president and managing director to corporate defendant).  Plaintiffs fail to allege any knowledge imputable to E*TRADE that may serve as the Company's "collective knowledge and intent."  <u>In re Take-Two Interactive Sec. Litig.</u>, 551 F. Supp. 2d 247, 281 (S.D.N.Y. 2008); <u>see also</u> <u>In re Worldcom, Inc. Sec. Litig.</u>, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) (noting that corporate acts are "simply the acts of all of its employees operating within the scope of their employment").

[6] <u>See, e.g.</u>, <u>Medis Investor Group v. Medis Tech., Ltd.</u>, 586 F. Supp. 2d 136, 147 (S.D.N.Y. 2008), <u>aff'd</u>, No. 08-4486-cv, 2009 U.S. App. LEXIS 16006 (2d Cir. 2009) (rejecting core operations theory "absent specific allegations that [defendant] had access to contradictory information"; <u>see also</u> <u>380544 Canada Inc. v. Aspen Tech., Inc.</u>, 544 F. Supp. 2d 199, 225 (S.D.N.Y. 2008) (plaintiffs must allege that facts contrary to the company's public disclosures were available to, and ignored by, defendants).

The cases cited by Plaintiffs (Pls. Mem. 37, n.53) are distinguishable because, unlike here, the plaintiffs in those cases had sufficiently alleged that management had access to, and ignored, facts regarding the alleged fraud. <u>See</u> <u>Cosmas v. Hasset</u>, 886 F.2d 8, 13 (2d Cir. 1989) (holding that management must have known that a contract representing 80% of a company's business was not viable); <u>In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.</u>, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (requiring plaintiffs who rely on "core operations" theory to establish that defendant had or should have had knowledge of specific "critical" facts contradicting alleged misstatements); <u>In re Xerox Corp. Sec. Litig.</u>, 165 F. Supp. 2d 208, 223 (D. Conn. 2001) (finding sufficient facts pleaded to indicate that management must have been aware of how restructuring was affecting its business).

the resignations of E*TRADE's executives is that they were involved in the alleged fraud.  (Pls. Mem. 38.)  In reality, the resignations do not support a strong inference of scienter because Plaintiffs have not alleged facts linking them to the alleged fraud.  See In re BISYS Sec. Litig., 397 F. Supp. 2d 430 (S.D.N.Y. 2005); see also In re Ceridian Corp. Sec. Litig., 542 F. 3d 240, 248-49 (8th Cir. 2008) (holding that absent "particular facts giving rise to a strong inference of fraud," the more compelling inference is that executives resigned for other reasons); see also In re Dell Inc. Sec. Litig., 591 F. Supp. 2d 877 (W.D. Tex. 2008) (resignation of CEO and CFO did not indicate fraud).[7]  The far more compelling inference is that the Individual Defendants, who were tasked with achieving profitability, resigned as a result of E*TRADE's poor performance.

### 3.    GAAP Irregularities Do Not Establish Scienter

Plaintiffs fail to plead scienter based on Defendants' alleged violations of GAAP provisions (Pls. Mem. 38) because they provide no other evidence of fraudulent intent.  See In re Doral Fin. Corp. Sec. Litig., 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (holding that GAAP violations only support an inference of scienter when coupled with evidence of fraudulent intent); see also In re Am. Express Co. Sec. Litig., No. 02 Civ 5533, 2008 U.S. Dist. LEXIS 74372, at *20-*21 (S.D.N.Y. Sept. 26, 2008).  Thus, Plaintiffs' allegations are insufficient.

Moreover, Plaintiffs' arguments should be rejected because they have not alleged that Defendants failed to comply with a GAAP-based disclosure requirement that is "not seriously disputed."  Kalnit, 264 F.3d at 143.  Indeed, as discussed in Section II infra, Defendants were not required to provide additional details about their subprime (or other mortgage) holdings, as

---

[7] Plaintiffs' cited authority involved resignations that were accompanied by "additional highly unusual and suspicious facts."  (Pls. Mem. 38).  That was not the case here, where the executives – as would be expected – resigned after E*TRADE announced significant losses.  See, e.g., Zucco Partners, LLC v. Digimarc Corp., No. 06-35758, 2009 U.S. App. LEXIS 7025 at *48-49 (9th Cir. 2009) (no inference of scienter based on resignations that occurred close in time to company's issuing a restatement of its financials).

evidenced by Plaintiffs' inability to identify banks or other financial institutions that separately disclosed their subprime exposure prior to the third quarter of 2007.

The fact that E*TRADE received clean audit opinions on its financial statements and has never been required to restate them undercuts any suggestion it violated GAAP, let alone that its disclosures were made with bad intent.  (Defs. Mem. 36.)  See also In re JP Morgan Chase Sec. Litig., No. 02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948, at *39-*40 (S.D.N.Y. Mar. 29, 2007), aff'd sub nom. ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187 (2d Cir. 2009) (no finding of intent where restatement was not required).

## II.     PLAINTIFFS FAIL TO ALLEGE ANY STATEMENTS OR OMISSIONS ACTIONABLE UNDER THE FEDERAL SECURITIES LAWS

### A.     E*TRADE Had No Duty to Disclose Information Alleged by Plaintiffs to Have Been Omitted From Its Disclosures

E*TRADE's disclosures were consistent with the federal securities laws and provided the public with a complete and accurate picture of the Company's financial condition.  (Defs. Mem. 4-9.)  As the credit crisis unfolded, E*TRADE increased the frequency and level of detail of disclosures about its mortgage-related holdings.  (Defs. Mem. 6-9, 17-18.)  Indeed, E*TRADE announced large increases in loan loss provisions and impairment charges in September 2007, before other financial institutions spoke.  (Compl. ¶ 242; Defs. Mem. 3, 40.)  Plaintiffs cannot challenge this history.  Instead, they invent disclosure requirements and then contend that E*TRADE did not comply with them.  (Pls. Mem. 9.)  Even assuming E*TRADE did not make the disclosures Plaintiffs complain about (and to a great extent it did), failure to comply with non-existent disclosure "requirements" is not securities fraud.

First, Plaintiffs contend that SEC guidance mandated disclosure of additional information about E*TRADE's mortgage-related holdings, including due diligence and underwriting

standards, credit characteristics, and potential risks. (Pls. Mem. 9-10, 14-15, 17-22.) Plaintiffs

refer to the guidance published by the SEC Division of Corporation Finance ("Corp. Fin.

Division") on December 1, 2005 as "accounting and disclosure requirements" that mandate the

disclosure of certain items that Plaintiffs list. (Pls. Mem. 9.) But this guidance is not a

"requirement" and provides only that more detailed information about certain loan products

"may be needed;" moreover, the specific items that Plaintiffs list are, according to the SEC,

"disclosure examples . . . for use . . . as appropriate."[8] (Pls. Mem. 9; Item 303 at 56.)

Far from being "dispositive" as Plaintiffs contend (Pls. Mem. 9), such guidance "lacks any

binding precedential force on the federal courts." Morales v. Quintel Entertainment, Inc., 249

F.3d 115, 129 (2d Cir. 2001) (explaining that interpretive letters, which are more persuasive than

guidance because they are officially sanctioned by the SEC, are not binding).[9]

        A telling example of Plaintiffs' invention of disclosure requirements is their argument

that E*TRADE should have disclosed updated loan-to-value ("LTVs") and combined-loan-to-

value ("CLTVs") ratios for its mortgages. (Pls. Mem. 14-15.) There is no requirement for such

disclosure. Notably, Plaintiffs do not allege that E*TRADE failed to disclose LTVs or CLTVs;

E*TRADE did so, even though there was no requirement to disclose even that much

---

[8] The non-binding nature of the guidelines is confirmed by the Corp. Fin. Division, which instructs that its statements of guidance "are not rules, regulations, or statements of the Commission" and "should not be relied upon as definitive." (Reply Declaration of Amelia T.R. Starr, dated August 28, 2009 ("Starr Reply Decl.") Ex. 1 (SEC Website, "Compliance and Disclosure Interpretations").) Despite the non-binding nature of the guidelines, E*TRADE's public disclosures included much of the information described therein. (Defs. Mem. 6.)

[9] Plaintiffs cite Ganino v. Citizens Utils Co., 228 F.3d 154, 163 (2d Cir. 2000) – which involved SEC Staff Accounting Bulletin ("SAB") No. 99 – for the proposition that the December 2005 guidance provides "persuasive guidance" for evaluating E*TRADE's omissions. (Pls. Mem. 10.) However, the sentence before the phrase cited by Plaintiffs (which Plaintiffs omit from their brief) provides that "SAB No. 99 does not carry with it force of law." Ganino, 228 F.3d at 163. The court in Ganino rejected "a formulaic approach to assessing the materiality of an alleged misrepresentation," id. at 162-63, and cautioned that "[m]ateriality is determined in light of the circumstances existing at the time the alleged misstatement occurred," Ganino, 228 F.3d at 165 (citations omitted) – precisely the analysis set forth in Defendants' motion to dismiss. (Defs. Mem. 17-20.)

information.[10]  Plaintiffs' efforts to manufacture disclosure requirements demonstrate that the

essence of their Complaint is that E*TRADE should have employed more rigorous due diligence

and underwriting standards – a claim for mismanagement, not securities fraud.

Second, Plaintiffs contend that E*TRADE failed to comply with Regulation S-K, Item

303, which requires disclosure of "any known trends or uncertainties" that have or may have a

material impact on operations."  (Pls. Mem. 9.)  The instructions for Item 303 state that

disclosure is required only for specific, known data.[11]  Plaintiffs have not alleged such

knowledge.  See, e.g., In re Authentidate Holding Corp. Sec. Litig., No. 05 Civ. 5323, 2009 U.S.

Dist. LEXIS 23462 (S.D.N.Y. Mar. 23, 2009).  The Company's lack of knowledge that its assets

would lose value is supported by the disclosure E*TRADE did make under Item 303 once the

impact of the credit crisis became clear.  (See Defs. Mem. 8.)

Third, Plaintiffs argue that data allegedly omitted from E*TRADE's disclosures,

including information regarding potential risks, due diligence, credit characteristics (e.g., CLTVs

and LTVs), and the identity of originators, was material because the SEC requested those details

in later comment letters.  (Pls. Mem. 14-15, 17-18.)  Plaintiffs cite no supportive case law.  This

is not surprising because comment letters have no bearing on materiality.  Such letters are a

routine part of the dialogue between the SEC and public filers, which was robust in the case of

E*TRADE, which submitted many of its disclosures to the SEC for review before filing them

---

[10] Plaintiffs' suggestion that E*TRADE's LTVs and CLTVs were misrepresented as relating to a post-origination period is unsupportable.  Indeed, the contrary is true.  See, e.g., August 16, 2007 disclosure 9 specifying that certain loan metrics were calculated by using "the supporting collateral value at time of origination."  (Starr Reply Decl. Ex. 2 (Aug. 16, 2007 Supp'l Portfolio Disclosure) at 9.)  Furthermore, given this disclosure, Plaintiffs' argument that E*TRADE did not "admit" until November 2007 that its LTV/CLTV data was based on the time of loan origination (Pls. Mem. 14) is incorrect.

[11] See 17 C.F.R. § 229.303(a), Instruction 3 ("[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition").

publicly.  Comment letters are meant to improve future disclosures by providing "filers with

comments on filings where they believe the filing could be improved or enhanced . . . [and] do

not constitute an official expression of the Commission's views."  Securities and Exchange

Commission, Comment Letters (June 10, 2005), http://www.sec.gov/answers/commentletters.

htm.[12]  (Starr Reply Decl. Ex. 3 (SEC Website, "Comment Letters").)  Plaintiffs' reliance on

comment letters, like their other attempts to invent disclosure requirements, should be rejected.

> **B.    E\*TRADE Did Not Misrepresent Any Material Information In Its Disclosures**

> 1.    E\*TRADE's "Superprime" Representations Are Not Actionable

Plaintiffs' argument that E\*TRADE misrepresented that its loans were "superprime" and

understated its subprime exposure (Pls. Mem. 11) is a red herring and should be rejected.

When concerns began to arise about subprime loans, E\*TRADE disclosed in May 2007

that it had de minimis exposure to subprime (i.e., less than one-fifth of one percent of its loan

portfolio) and noted that it defined subprime as "[loans to] borrowers with FICO scores less than

620 at the time of origination."  (Declaration of Amelia T.R. Starr dated April 1, 2009 [Dkt.

#74]("Starr Decl.") Ex. 6 (2007 2Q 10Q) at 16-17.)  This information was true and consistent

with later disclosures, including those Plaintiffs incorrectly assert were corrective, like the

statement that 20% of E\*TRADE's first lien loans and 26% of its home equity lines of credit had

FICO scores below 700, and that it attempted to exclude loans to borrowers with FICO scores

under 640 from purchased pools of loans.  (Pls. Mem. 14.)  Plaintiffs' confusion is further

---

[12] According to James Atkinson, a Branch Chief within the Corporation Finance Division, the SEC reviews all publicly traded companies' compliance with the Sarbanes-Oxley Act every three years, and while large companies might see such reviews more frequently, "they should not take it as a sign of trouble or suspicion by the SEC."  Melissa Klein Aguilar and Matt Kelly, Compliance Weekly, SEC Tips on Comment Letters (May 30, 2007), http://www.complianceweek.com /article/3383/sec-tips-on-comment-letters-paulson-markets-plan.  (Starr Reply Decl. Ex. 4 ("SEC Tips on Comment Letters," Compliance Week, May 30, 2007).)

evidenced by their assertion that reduced or no documentation loans (some of which can be categorized as between "prime" and "subprime", or "Alt-A") are "automatically sub-prime," even though, as Plaintiffs elsewhere concede, the guidance cited for that proposition says only that such loans are not "prime." (Pls. Mem. 13 & n. 11).

It is precisely because terms such as "Alt-A" and "subprime" may be misinterpreted by investors that the law does not mandate the type of disclosures Plaintiffs would require. As a general matter, "subprime lenders are discouraged from publicly reporting the size of their subprime portfolios because given that 'there is no standard industry-wide approach to the definitions of either 'subprime' or 'program' . . . the reported information will not be entirely comparable from one institution to the next, leading to potential misinterpretation of the data by the public." Nolte v. Capital One Fin. Corp., 390 F.3d 311, 317 (4th Cir. 2004).[13]

The real problem is that Plaintiffs define certain assets as "subprime" when E*TRADE did not. Given that E*TRADE clearly explained what assets it defined as "subprime," the issue is not that its disclosures were inaccurate but that Plaintiffs disagree with E*TRADE's definition. That difference may be the subject of debate, but it is not the basis of a securities law violation.

2.    E*TRADE's Statements Regarding Discipline, Quality, and Growth Are Not Actionable

Plaintiffs argue that E*TRADE's statements about "organic growth" were misleading because "organic loans were a minimal portion of E*TRADE's holdings." (Pls. Mem. 15.) This

---

[13] See also (Starr Reply Decl. Ex. 5 (Truth in Lending Part III; Final rule; official staff commentary, 73 Fed. Reg. 44,522, 44,533 (Jul. 30, 2008)) (explaining that "there is not a uniform definition of the prime or subprime market, or of a prime or subprime loan").) It is worth noting that E*TRADE's definition of subprime was consistent with industry standards. See In re Downey Sec. Litig., CV 08-3261, 2009 U.S. Dist. LEXIS 25007, at *17-*18 (C.D. Cal. Mar. 18, 2009) (explaining that defining "subprime borrowers as including only those with a FICO score below 620 . . . appears to be widely used in the mortgage industry") (citing Scott Frame, et al., A Snapshot of Mortgage Conditions with an Emphasis on Subprime Mortgage Performance, at 2 (August 27, 2008) ("A subprime mortgage is one made to a borrower with a poor credit history (e.g., a FICO score below 620).")

argument is based on Plaintiffs' arbitrary view that the 16.7% of the loans in E*TRADE's

portfolio that E*TRADE originated (based on Plaintiffs' own calculations) is "minimal."  More

fundamentally, prior to August 2007, E*TRADE had not represented the relative percentages of

loans it originated versus those that it purchased.[14]  Thus, contrary to Plaintiffs' contention,

E*TRADE did not "lie" to investors when Caplan stated that "some" of the loans were

originated and "some" purchased and that the Company had "made a huge transformation" and

"really pushed hard" to increase its originations.[15]  (Pls. Mem. 15.)  Because Plaintiffs have not

alleged that underwriting standards differed between purchased and organic loans, any alleged

misrepresentation would have been immaterial, especially prior to the onset of the credit crisis.[16]

Plaintiffs' assertions about E*TRADE's other "growth" statements – and statements

regarding risk management, discipline, monitoring, and credit quality – fare no better.  (Pls.

Mem. 22-24.)  Plaintiffs argue that such statements are actionable as "misrepresentations of

existing facts" (Pls. Mem. 22) – but then cite no "existing facts" and instead focus on allegations

of mismanagement.  (Pls. Mem. 23.)  Moreover, Plaintiffs' theory rests on an economically

---

[14] When, in August 2007, E*TRADE did compare loans originated with loans purchased, its disclosure was accurate and complete.  (See Starr Reply Decl. Ex. 6 (Letter from Arlen W. Gelbard to Hugh West, Aug. 31, 2007) ("While we do originate a variety of loan types through our retail and wholesale origination channels, these loans do not represent a significant portion of the loans on our balance sheet.").)

[15] Plaintiffs cite to Mr. Caplan's statements during an October 18, 2006 conference call that "the percentage of origination versus purchase is up dramatically" but do not cite to a prior statement, made during the same call, that "we were able to grow our mortgage originations quarter over quarter by 5%."  (Pls. Mem. 15; Compl. ¶ 160.) Thus, not only did Mr. Caplan not make any statements about the percentage of E*TRADE's loans that were originated relative to those purchased, but he quantified precisely the extent to which originations had increased.

[16] The cases cited by Plaintiffs in support of their argument that statements regarding "organic growth" are actionable are inapposite.  (Pls. Mem. 16.)  For example, in Manavazian v. ATec Group, Inc., the only case cited by Plaintiffs within this jurisdiction, defendants announced a new structure that would provide the framework for organic growth.  160 F. Supp. 2d 468, 480 (E.D.N.Y. 2001).  The court held that such a statement was actionable because it was made with awareness of an adverse business trend that made it misleading, and because the allegations involved more than expressions of general optimism resulting from a history of strong earnings.  Id. at 481.  Here, E*TRADE did not unveil a plan for organic growth but merely stated that it was experiencing, and expected to continue experiencing, organic growth, based on the Company's recent history of organic growth.

18

irrational basis –that E*TRADE persisted in purchasing assets that it knew would lose value. This infirmity is fatal to Plaintiffs' claims.  (See supra Section I (citing Keyspan and Refco).)

3.    E*TRADE's Statements Regarding Loan Loss Reserves Are Not Actionable

Plaintiffs cite no case law in support of their argument that E*TRADE's statements regarding loan loss reserves are actionable, instead alleging in conclusory fashion that E*TRADE kept its reserves "artificially low."  (Pls. Mem. 20.)  Although statements regarding loan loss reserves may be actionable if E*TRADE knew them to be false, as discussed in Section I supra, that was not the case.  At best, Plaintiffs allege "a failure on the part of defendants to correctly gauge the adequacy of the loan loss reserves," which is not a securities law violation.[17]

**C.    The Alleged Statements By the Individual Defendants Are Not Actionable**

Plaintiffs do not even attempt to challenge Defendants' arguments as to why each of the statements attributed to the three Individual Defendants is non-actionable.  (Defs. Mem. 20-23.) Instead of addressing the statements, including only three by Mr. Webb and a handful by Mr. Simmons, Plaintiffs argue that the individuals are liable for statements of the Company (and each other) based on the "group pleading" doctrine.  (Pls. Mem. 29-31.)  Notably, the three Circuit Courts that have considered whether the "group pleading" doctrine has survived the PSLRA have held that it has not,[18] although the Second Circuit has yet to address the issue.

---

[17] In re CIT Group, Inc. Secs. Litig., 349 F. Supp. 2d 685, 689-90 (S.D.N.Y. 2004) (citations and quotations omitted); see also Ciresi v. Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991), aff'd, 956 F.2d 1161 (2d Cir. 1992) ("the claim that the defendants did not plan their loan reserves properly is essentially a claim that defendants mismanaged the company . . . [which is] not actionable under section 10(b) of the federal securities laws.").

[18] See Winer Family Trust v. Queen, 503 F.3d 319, 335-37 (3d Cir. 2007); Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363-65 (5th Cir. 2004); Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602-03 (7th Circ. 2006), vacated on other grounds, 551 U.S. 308 (2007); but cf. Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1254 (10th Cir. 1997) (applying the group-pleading doctrine without taking into account the PSLRA)

19

Even if the "group pleading" doctrine does survive, it does not apply when Plaintiffs do not plead the detailed roles of each of the defendants. In re Emex Corp. Sec. Litig., No. 01 Civ. 4886, 2002 U.S. Dist. LEXIS 17528, at *7-*9 (S.D.N.Y. Sept. 18, 2002). Further, despite Plaintiffs' assertions (Pls. Mem. 30), the Individual Defendants are not liable for oral statements made by one another. See Elliott Assocs., L.P. v. Covance, Inc., 00 Civ. 4115, 2000 U.S. Dist. LEXIS 17099, at *38 (S.D.N.Y. Nov. 28, 2000) ("group pleading" applies to group-published documents, not oral statements). Thus, the claims against the Individual Defendants fail.[19]

## III.  THE CLASS PERIOD SHOULD END ON SEPTEMBER 17, 2007 OR OCTOBER 17, 2007 AT THE LATEST

Plaintiffs' opposition brief does not overcome Plaintiffs' inability to allege facts to support the claim that Defendants' actions, and not the worldwide economic collapse, caused any losses they may have suffered.[20] Accordingly, Plaintiffs fail to plead loss causation, and their claims should be dismissed on this basis alone.[21]

---

[19] Plaintiffs' arguments regarding control person liability (Pls. Mem. 50) do not save their claims against the Individual Defendants. Plaintiffs have not pled sufficient facts to support this theory, particularly with respect to Mr. Webb, who managed one division of E*TRADE, spoke infrequently to the public, and was not responsible for preparing, approving, or signing E*TRADE's public disclosures. (Defs. Mem. 41-43.) Similarly, Plaintiffs have failed to state a claim for scheme liability. (Defs. Mem. 41.) Plaintiffs concede as much by their failure to address Defendants' arguments on this issue.

[20] In that regard, Plaintiffs assertions that E*TRADE's stock plummeted in 2007 are made in a vacuum. For example, Plaintiffs allege that E*TRADE's stock dropped $16.45 from the beginning of July through November 12, 2007. (Compl. ¶ 314.) However, E*TRADE's stock price movement was consistent with that of other financial institutions and companies involved in the mortgage business during the same time. For example, during the same time period, Countrywide's stock decreased by $23.54, Citigroup's by $18.07, Thornburg Mortgage's by $17.36, and Washington Mutual's by $22.32. (See Starr Reply Decl. Exs. 7(a) (Stock Quotations, Countrywide), 7(b) (Stock Quotations, Citigroup), 7(c) (Stock Quotations, Thornburg) and 7(d) (Stock Quotations, Wash. Mutual).)

[21] See, e.g., Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." (internal quotations omitted)); In re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d 527, 548 (S.D.N.Y. 2007) (dismissing Section 10(b) claim where "market forces other than the alleged misconduct at least contributed to, if not entirely caused, the fall in [defendant's] stock prices"); Leykin v. AT&T Corp., 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006), aff'd, 216 Fed. Appx 14 (2d Cir. 2007) ("[Plaintiffs do] not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide

**A.    Plaintiffs Fail to Plead Loss Causation With Respect to the November 9, 2007 Statement**

Even if Plaintiffs had adequately pled loss causation as a general matter (which they have not), the Class Period should close prior to November 9, 2007 because E*TRADE's disclosures on that day did not amount to a "foreseeable materialization of concealed risk."  (Pls. Mem. 43.)[22]  The collapse of the mortgage industry was not "foreseeable" because, if it had been, so many major financial institutions would not have fell victim to it.  Moreover, of E*TRADE's three disclosures on November 9, 2007 that Plaintiffs identify as a basis for loss causation (Compl. ¶ 314), none represents the materialization of a concealed risk.

First, E*TRADE's disclosure that "further deterioration" in its mortgage-backed securities portfolio would lead to "larger than expected" fourth quarter write-downs (Compl. ¶ 314) did not reveal any information that previously had been concealed.  It is undisputed that E*TRADE disclosed problems in its securities portfolio beginning in the summer of 2007.  For example, E*TRADE added a risk factor in its disclosures regarding its mortgage-related assets in August 2007, and it announced severe loan losses and securities impairments in September 2007. (Defs. Mem. 37.)  Then, in October 2007, the Company announced that the securities impairments it previously had forecasted to occur during an eighteen-month period instead would be realized in the third quarter of 2007.  (Defs. Mem. 37-38.)  Based on these disclosures, which Plaintiffs do not address, any argument that the risk of large losses in E*TRADE's mortgage-backed securities portfolio did not "materialize" until November 9, 2007 is not

---

Internet stock collapse."); <u>Catton v. Defense Tech. Sys., Inc.</u>, No. 05 Civ. 6954, 2006 U.S. Dist. LEXIS 205 (S.D.N.Y. Jan. 3, 2006) (dismissing claim for failure to link alleged misconduct to lower stock price).

[22] Plaintiffs' argument that a "corrective disclosure" is not required to plead loss causation and that "materialization of risk" is the standard that applies confuses the analysis and mischaracterizes Defendants' motion to dismiss.  (Pls. Mem. 43-44.)  Defendants always acknowledged that the materialization of risk standard is applicable (Defs. Mem. 38); a review of the November 9, 2007 disclosures shows that none meets this standard.

21

credible.  See In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (disclosure of already public news cannot constitute correction for loss causation purposes).

Moreover, the disclosure of additional impairments was not a revelation of a concealed risk because the impairments were based on new information, i.e., a series of industry-wide rating agency downgrades after the close of the third quarter that caused a decline in the value of the mortgage-backed securities that E*TRADE held.  (Defs. Mem. 39.)  Plaintiffs' only attempt to rebut this argument is by citing to a case that is wholly inapposite.  (Pls. Mem. 47.)  In In re Vivendi Universal, S.A. Sec. Litig., the court explained that a ratings agency downgrade of the creditworthiness of a company could reveal the risk of deteriorating liquidity of that company if it previously had concealed its liquidity condition.  605 F. Supp. 2d 586, 592, 598 (S.D.N.Y. 2009).  Here, in contrast, the ratings agencies downgraded the ratings of the securities that E*TRADE held in its portfolio.  (Pls. Mem. 47.)  Plaintiffs do not allege (nor could they) that E*TRADE knew about the downgrades in advance, nor that E*TRADE possessed any information about the issuers of the securities that would have forewarned of the downgrades.

Second, E*TRADE's withdrawal of earnings guidance cannot serve as a basis for loss causation.  E*TRADE began to issue cautionary disclosures about the potential impact on its earnings of subprime problems in April 2007, when the Company first lowered its guidance. (Compl. ¶ 200.)  As the subprime concerns spread to other asset classes, E*TRADE continued to issue cautionary disclosures (Defs. Mem. 6-9), including further lowering guidance in September and again (significantly) in October.  (Compl. ¶ 242, 267.)  Based on this pattern, it was unsurprising when E*TRADE announced in November that – after many of the securities it held had been downgraded – it no longer could issue meaningful guidance.

Third, the announcement that the SEC commenced an informal inquiry into matters

related to E*TRADE's loan and securities portfolios does not represent the materialization of a concealed risk. As discussed above, E*TRADE had informed the market of its significant exposure to the mortgage crisis many times prior to November 9, 2007. Moreover, an article published by the Wall Street Journal on August 11, 2007 expressed concern that E*TRADE was "clearly in the thick of . . . the mortgage mess," as well as doubt that the Company had sufficient reserves to cover losses from the purchase of "risky" assets. (Compl. ¶ 220; see Starr Reply Decl. Ex. 8 ("MarketWatch Weekend Investor: E*TRADE Financial," Wall Street Journal, Aug. 11, 2007).) Thus, even if some risk did materialize on November 9, 2007, it was not concealed after August 11.[23] The cases cited by Plaintiffs are inapposite because none involves a situation where, as here, alleged risks were revealed prior to the disclosure of an SEC investigation.

### B.    Plaintiffs Are Judicially Estopped from Asserting Concealment After September 2007

Plaintiffs do not and cannot deny that Counsel for Lead Plaintiffs represented to this Court in September 2008 that "the events giving rise to the claims in all of the subject actions were revealed in September 2007." (Defs. Mem. 40.) Counsel's goal was to demonstrate that the Tate plaintiffs purchased E*TRADE securities after the critical events were revealed. While Plaintiffs now attempt to walk away from this statement, including by claiming that they made a mistake (Pls. Mem. 49, n.74), they are judicially estopped from doing so.

First, Lead Counsel's statement that the relevant events were "revealed" in September 2007 cannot be reconciled with Plaintiffs' position that Defendants concealed much of E*TRADE's investment risk up until November 9, 2007. (Pls. Mem. 45.) See In re Enron

---

[23] This is also evidenced by the numerous disclosures regarding risks associated with E*TRADE that Plaintiffs describe in an earlier submission to this Court (see Starr Reply Decl. Ex. 9 (Dec. 20, 2007  Mem. in Support of Motion to Consolidate) at 16-17), as described in Section III(B) infra.

Corp., 349 B.R. 96, 104-05 & n.4 (Bankr. S.D.N.Y. 2006).  Nor was this statement a "mistake."

(Pls. Mem. 49, n.74.)  Lead Plaintiffs made the same concession in their motion to be appointed

as lead plaintiffs, in order to counter the argument that, because they had sold their securities on

August 20, 2007, their claims were inadequate.  (Starr Reply Decl. Ex. 9 (Mem. in Support of

Motion to Consolidate, Freudenberg v. E*TRADE Financial Corp., No. 07-cv-8538 [Dkt. #37],

dated Dec. 20, 2007) at 15-17.)  After pointing to a host of "adverse partial disclosures" in

August 2007, they urged: "The law does not require that investors wait until all information is

finally disclosed to have a claim for securities fraud, . . . thus [Lead Plaintiffs] were not required

to wait until September 17, 2007 to have a claim common to those who did."  (Starr Reply Decl.

Ex. 9 (Dec. 20, 2007  Mem. in Support of Motion to Consolidate) at 17 (emphasis added).)

Second, contrary to Plaintiffs' assertions (Pls. Mem. 49), judicial estoppel may apply

where, as here, the two statements are made in different phases of the same proceeding.  See

Stichting v. Schreiber, 407 F.3d 34, 45 (2d Cir. 2005) (assuming arguendo that judicial estoppel

could apply where prior position was taken in an earlier proceeding of one case); cf. In re

Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483, 2007 U.S. Dist. LEXIS 60298 (S.D.N.Y.

Aug. 10, 2007) (distinguishing facts where inconsistent positions were both made during the

discovery phase, rather than in separate phases of a case).  Moreover, the September 2008 letter

in which Lead Counsel made his statement had the effect of staying a separate case and resulted

in a corresponding Order being entered on that case's docket.  (Defs. Mem. 40-41.)

Third, the statements by Lead Plaintiffs and their Counsel were implicitly adopted by the

Court when the Court, respectively, appointed Lead Plaintiffs and so-ordered the stipulation

staying the Tate action.  The Court ordered the results for which Lead Plaintiffs advocated, and

they cannot now abandon the factual arguments that led to that result.  See, e.g., Galin v.

Goldfischer, No. 03 Civ. 9019, 2008 U.S. Dist. LEXIS 106603, at *32 (S.D.N.Y. Dec. 31, 2008)

(Sweet, J.); see also Kunica v. St. Jean Financial, Inc., 233 B.R. 46, 59 (S.D.N.Y. 1999) (citing

with approval case holding that "adoption" element of judicial estoppel argument was satisfied

by so-ordered stipulation); (Defs. Mem. at 40).[24]

## CONCLUSION

For the foregoing reasons, Defendants request that the Complaint be dismissed for failure

to state a claim upon which relief may be granted.  Given that the initial pleadings in this action

were filed more than a year ago and that Plaintiffs have had ample time to investigate their

allegations, Defendants respectfully request that the dismissal be with prejudice.

Dated:    New York, New York
      September 2, 2009

              DAVIS POLK & WARDWELL LLP

              By:   /s/ Amelia T.R. Starr
                      Amelia T.R. Starr

              Dennis E. Glazer (DG2289)
              Amelia T.R. Starr (AS2286)
              Nancy B. Ludmerer (NL4309)
              Edward N. Moss (EM8224)
              Andrew E. Krause (AK8270)
              450 Lexington Avenue
              New York, New York  10017
              (212) 450-4000

              *Attorneys for Defendants*

---

[24] Plaintiffs' argument that Defendants are barred from asserting judicial estoppel because they had "unclean hands" is meritless.  (Pls. Mem. 49.)  Indeed, the contrary is true.  Lead Counsel filed his September 2008 letter with the Court after Defendants encouraged him to resolve this matter by agreement with the Tate plaintiffs. He thereby engaged in unnecessary motion practice − and took a position directly at odds with his position here.