UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-11-10
```

LARRY FREUDENBERG, Individually and
On Behalf of All Others Similarly
Situated,

                    Plaintiff,                    07 Civ. 8538

        -against-                                 OPINION

E*TRADE FINANCIAL CORPORATION,
MITCHELL H. CAPLAN, ROBERT J.
SIMMONS and DENNIS E. WEBB,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        BROWER PIVEN
        488 Madison Avenue, 8th Floor
        New York, NY  10022
        By:  David A.P. Brower, Esq.

        LEVI & KORSINSKY, LLP
        30 Broad Street, 15th Floor
        New York, NY
        By:  Eduard Korsinsky, Esq.

        Attorneys for Defendants

        DAVIS POLK & WARDWELL LLP
        450 Lexington Avenue
        New York, NY  10017
        By:  Amelia T.R. Starr, Esq.

**Sweet, D.J.**

Defendants E*TRADE Financial Corporation
("E*TRADE" or the "Company"), CEO Mitchell H. Caplan
("Caplan"), CFO Robert J. Simmons ("Simmons") and Capital
Markets Division ("EGAM") President Dennis E. Webb ("Webb")
(collectively, the "Individual Defendants") have moved to
dismiss the Consolidated Amended Class Action Complaint for
Violations of the Federal Securities Laws (the "Complaint")[1]
pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of
Civil Procedure and the Private Securities Litigation
Reform Act of 995 (the "PSLRA"), 15 U.S.C. §§ 78u-4 et seq.
Based upon the conclusions set forth below, the motion is
denied.

By the Fall of 2007, the collapse of the subprime
mortgage and the housing markets and the decline in the
housing market were widely recognized.  At the close of the
third quarter in October 2007, many of the world's largest
financial institutions announced their first in a wave of
crippling write-downs of mortgage-related assets, including
$11 billion by Citigroup, $10 billion by UBS and $8 billion
by Merrill Lynch.  UBS Posts Fresh $10bn Write-Down, BBC

---

[1]     Paragraph references (¶) are those set forth in the Complaint.

1

News, Dec. 10, 2007);  Remarks of Senator Barack Obama:
Our Common Stake in America's Prosperity (Sept. 17, 2007),
available at
http://www.barackobama.com/2007/09/17/remarks of senator ba
rack obam 24.php (indicating the connection between
corporation's risky investments in the subprime mortgage
market and the financial crisis).  Class actions alleging
securities act violations have followed particularly in
this district, of which this case is one.  See, also,
Kreysar et al v. Syron et al, No. 09-CV-832 (MGC); In Re
The Bear Stearns Companies, Inc. Sec. Litig., No. 08-CV-
2793 (RWS); In Re Lehman Bros. Holdings, Inc., No. 08-CV-
8869 (DLC); In Re Fannie Mae Sec. Litig., No. 08-CV-7831
(PAC); In Re Moody's Corp. Sec. Litig., No. 07-CV-08375
(GBD); In Re Morgan Stanley ERISA Litig., No. 07-CV-11285
(DAB).


        Defendants, including the Defendants in this
action, urge that the losses incurred were the result of a
"worldwide economic catastrophe" (Def's Memo in Support of
Mot. to Dismiss ("MTD") at 1) and that the complaints set
forth a case of fraud by hindsight rather than the
violation of the securities laws.


2

Because the issue in this action is what the Defendants knew and when they knew it, a securities violation has been adequately alleged.

## I.    PRIOR PROCEEDINGS

A class action complaint was filed by Larry Freudenberg on October 2, 2007, alleging violations of the securities laws by the Defendants.  Additional related complaints were thereafter filed.  An order consolidating the actions and appointing lead plaintiff and counsel was filed on July 17, 2008.  The consolidated amended class action complaint (the "Complaint") was filed on January 20, 2009.

The instant motion to dismiss the Complaint was heard on September 9, 2009.

## II.   THE COMPLAINT

According to the Complaint, the Defendants misrepresented the operation of E*TRADE's most important business sector, EGAM, and the Company's financial condition throughout the Class Period and thereby violated

3

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5.

E*TRADE was originally an Internet discount brokerage firm. ¶¶ 42, 62. Discount brokerage yields steady and safe returns, but opportunities for growth are limited. By the beginning of the Class Period, EGAM had aggressively expanded into the highly profitable mortgage business. ¶¶ 66-67. Although Defendants represented that E*TRADE's mortgage business focused on "organic" loans, originating its own mortgages for its "mass affluent" brokerage customers, EGAM was actually purchasing large mortgage pool from other originators. ¶¶ 6, 62-66, 72, 101-18. As a result, internally, EGAM was recognized as E*TRADE's most profitable division. ¶¶ 12, 70. However, by the beginning of the Class Period, the era of safely purchasing such mortgages was at an end. Nevertheless, to continue its stream of income from its most profitable segment, Defendants acquired huge quantities of loans from the nation's worst subprime and below subprime mortgage originators ¶¶ 70-72, 74, and failed to publicly disclose that they had changed E*TRADE's business model from conservative investments in high quality loans to

4

purchasing extremely high risk, facially low quality
instruments. ¶¶ 17-18. Thus, throughout the Class Period,
Defendants represented to the public that E*TRADE continued
to follow conservative loan origination and acquisition
practices, when, in fact, Defendants had consciously
decided to secretly sacrifice safety for profits.

To mislead investors about the investment risk of
E*TRADE, Defendants represented that the Company's business
was generated organically from its traditional trading and
banking services to E*TRADE customers, ¶¶ 65, 72, 131, 146-
48, 160, 174-177, 182, that Defendants used discipline and
conservatism in its risk management and monitoring of its
loan portfolio, see ¶¶ 7, 10, 11, 13, 65, 68, 144-48, 160,
170, 174-77, 193, 225-29, and, to distinguish E*TRADE from
the troubled lenders who were already experiencing severe
problems, see, e.g., ¶¶ 209, 212, that E*TRADE's portfolio
of mortgage loans was "superprime." ¶¶ 11, 170-73, 185,
202, 211.

In fact, unable to organically generate
significant numbers of its own mortgages, ¶¶ 88-93, in
disregard of E*TRADE's own stated underwriting practices,
¶¶ 74-83, at the direction of the Individual Defendants,

5

who oversaw E*TRADE's investments and financial reporting,
Defendants used cash generated from its retail businesses
to purchase high-risk asset-backed securities and pools of
mortgages("MBS" and "ABS"), ¶¶ 62-63, from problem-ridden
originators, such as Countrywide, Opteum, GMAC, and
National City. ¶¶ 18, 68, 78-79, 101-18, 209, 214, 225,
288. While publicly characterizing the loans in its
portfolio as "superprime," these loans were subprime or
below subprime and did not meet E*TRADE's claimed
"extremely conservative" credit standards. Id. See also
¶¶ 12, 70. To facilitate the steady influx of these low
quality loans, Defendants decimated E*TRADE's due diligence
apparatus by firing most mortgage loan and credit review
personnel, ¶¶ 13, 67-68, 300, and all but eliminated any
pre- or post-purchase review of these loan pools. ¶¶ 69,
81.

         The Individual Defendants were alleged to have
been fully aware of E*TRADE's risks and adverse
consequences of this strategy. Even E*TRADE's de minimis
review during the Class Period of only 1% of its bulk
mortgages purchases demonstrated the extreme poor quality
of those loans. ¶¶ 11, 13, 17, 75-82, 170-73, 202, 211.
Indeed, 40% to 50% of sampled loans had negative

discrepancies, such as unreported bankruptcies and overstated appraisals. ¶¶ 17, 78, 91. When one Confidential Witness ("CW") asked why E*TRADE kept "bad" problem loans instead of returning the loans to their originators – as E*TRADE had the right to do for a grace period after the purchases – he was told by E*TRADE management that EGAM wanted to maintain its relationships with the loan originators because it was "getting great deals" on these loans. ¶ 78. Defendants knowingly retained bad loans to protect the steady flow of these lowcost (and low-quality) mortgages. Id.

By the beginning of the Class Period, Defendants spoke to new hires of their internal concerns with the excessive, unbalanced risks E*TRADE was taking. ¶¶ 14, 72. In December 2006, Caplan "confidentially" admitted to employees that the Company was experiencing losses and expected more losses in 2007, ¶¶ 16, 98, but Defendants made the opposite representations to the public. ¶¶ 174-77, 181-85. Contrary to Defendants' public statements regarding the impeccable AAA credit rating of the securities in E*TRADE's investment portfolio, see ¶¶ 20, 22, 224, 235, 244, 246, 254, 271-72, 279, 282, E*TRADE's overexposure to subprime mortgages was discussed among E*TRADE's senior

management and led Caplan to internally voice hope that a
"white knight" would rescue E*TRADE. ¶¶ 94-99. Defendants
also knew that E*TRADE's mortgages were of very low quality
because E*TRADE's attempts to resell purchased loan pools
to other financial institutions failed because of the
"terrible, low value," below subprime, quality of the loans
and loan documentation. ¶¶ 17, 76, 86. Consequently,
E*TRADE was forced to retain these knowingly impaired, low
quality mortgages. See ¶ 81; see also ¶ 84.

            To conceal the high risk nature and deterioration
of E*TRADE's portfolio, ¶¶ 21, 122-23, 138-40, 154-56, 164-
65, 220-22, 243, Defendants ignored Generally Accepted
Accounting Principles ("GAAP") and SEC financial reporting
and accounting rules, regulations and guidance, by, inter
alia, failing to adequately reserve for loan losses,
failing to timely record securities' impairments, and
overvaluing E*TRADE's securities portfolio, thereby
rendering E*TRADE's financial statements to be materially
inaccurate, reported net income and earnings to be
materially overstated, and loss reserves to be materially
understated. ¶¶ 21, 22, 333-37. Indeed, throughout the
Class Period, as the mortgage crisis was reverberating
across the country, E*TRADE actually reduced its reserve

                              8

coverage ratio from 83% to just 33% as well as its reserve
as a percentage of total loans from 0.20% to 0.19%, ¶¶ 220-
22, thereby artificially reducing E*TRADE's allowance for
losses when actual losses were increasing. Id.

On July 25, 2007, the Company partially disclosed
that its provision for loan losses rose to $30 million in
the quarter, double the level of the prior year. ¶ 310. In
reaction, E*TRADE's shares suffered a one-day drop of
6.89%. Id. However, Defendants blunted this disclosure by
reasserting the Company's "conservative approach" to credit
and funds management. Id. On September 17, 2007, in another
partial disclosure, E*TRADE announced that it was exiting
the wholesale mortgage business, had revised its 2007
earnings guidance and set aside $245 million in the second
half of the year to cover loan losses. ¶¶ 20, 312-13. In
response, E*TRADE's stock price declined further, leaving
the shares down by almost 50% from their 2007 high.
However, Defendants held back the full truth and continued
to falsely represent E*TRADE's "conservative" approach,
"high FICOs, low LTVs [loan-to-value ratio] and high owner
occupancy levels," "loan risk mitigation discipline," and
"excess collateralization." Id.

On the last day of the Class Period, November 9, 2007, the magnitude of the undisclosed risks of E*TRADE's foray into mortgage investments was finally revealed: $450 million of exposure in its $3 billion ABS portfolio; a $204.8 million increase in loan loss provisions; write-downs in ABS of $185.5 million; expected additional significant write-downs in 4Q2007; an SEC informal inquiry into E*TRADE's loan and securities portfolio; and Webb's departure. ¶¶ 22-24, 279-87. Shortly thereafter, on November 29, 2007, Caplan was forced out as CEO. ¶¶ 29, 299. As a result of these disclosures, E*TRADE's stock suffered a one-day decline on the next trading day of 58.67%. ¶¶ 287, 314.

E*TRADE also experienced an $18 billion "run on the bank" by bread-and butter brokerage customers, who closed their E*TRADE accounts because of their concerns about the Company's capitalization and continued viability, ¶¶ 24-25, 285-86, which threatened E*TRADE's continued existence. E*TRADE finished 2007 as that year's worst performing stock in the S&P 500 index, after it was forced to finally acknowledge astounding asset losses and impairments of $2.45 billion for the year ended December 31, 2007 and reported a net loss of $1.4 billion, or $3.40

per share, due primarily to losses in home equity loan and asset-backed securities portfolios. ¶ 25-27. Part of that impairment reflected E*TRADE's sale of its ABS portfolio (which had a cost basis of $3 billion) to Citadel Investment Group for the steeply discounted price of $800 million. ¶¶ 25, 293. This transaction also significantly increased E*TRADE's corporate debt to $3 billion (from $1.8 billion the previous year). ¶¶ 26, 293. While investors lost billions of dollars as a result of Defendants' misstatements regarding E*TRADE's business and overstatements of its assets, net income and profits, the Individual Defendants are alleged to have realized over $13 million from sales of their E*TRADE stock holdings, ¶¶ 28, 44-46, and millions more in incentive compensation for allegedly meeting performance goals. Id.

## III. THE 12(B)6 STANDARD

Motions to dismiss are generally viewed with disfavor. Teachers' Ret. Sys. of LA v. A.C.L.N., Ltd., No. 01-CV-11814, 2003 WL 21058090, at *10 (S.D.N.Y. May 12, 2003). "When considering a motion to dismiss, the complaint is liberally construed, accepting all factual allegations

11

in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." In re Tommy Hilfiger Sec. Litig., No. 04-CV-7678, 2007 U.S. Dist. LEXIS 55088, at *5 (S.D.N.Y. July 20, 2007) (internal quotation marks and citations omitted). A complaint need only allege "enough factual matter (taken as true)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007) (emphasis added; citation omitted). The pleading need only contain "[f]actual allegations. . . [sufficient] to raise a right to relief above the speculative level." Id. at 556. As here, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1940-41 (2009).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949. For elements of claims subject to Rule 8(a), Twombly requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity

of pleading required under Fed. R. Civ. P. 9(b). See id. at
1954.

Under Section 10(b) of the Exchange Act, 15
U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b), a
plaintiff must plead six elements: (1) a material
misrepresentation or omission; (2) scienter; (3) a
connection between the misrepresentation or omission and
purchase or sale of a security; (4) reliance; (5) economic
loss; and (6) loss causation. Heller v. Goldin
Restructuring Fund, L.P., 590 F. Supp. 2d 603, 613
(S.D.N.Y. 2008) (citations omitted). The heightened
pleading standard under the Private Securities Litigation
Reform Act of 1995 ("PSLRA") and Tellabs v. Makor Issues &
Rights, Ltd., 551 U.S. 308 (2007), applies only to the
element of scienter; all other elements of a §10(b) claim
are governed by traditional pleading standards under Fed.
R. Civ. P. 8(a) or 9(b). See In re PXRE Group, Ltd. Sec.
Litig., 600 F. Supp. 2d 510, 528-29 (S.D.N.Y. 2009). Rule
9(b) requires that the complaint "(1) specify the
statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the
statement were made, and (4) explain why the statements
were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d

Cir. 2004) (internal citations and quotation marks

omitted). A plaintiff is not required to plead evidence.

See Skydell v. Ares-Serono S.A., 892 F. Supp. 498, 501

(S.D.N.Y. 1995).

## IV.   THE COMPLAINT HAS ALLEGED MATERIAL MISSTATEMENTS AND OMISSIONS

Rule 10b-5(b) prohibits "mak[ing] any untrue

statement of material fact or . . . omit[ting] to state a

material fact necessary in order to make the statements

made, in light of the circumstances under which they were

made, not misleading." 17 C.F.R. §240.10b-5. "[O]nce

corporate officers undertake to make statements, they are

obligated to speak truthfully and to make such additional

disclosures as are necessary to avoid rendering the

statements made misleading." In re Par Pharm., Inc. Sec.

Litig., 733 F. Supp. 668, 675 (S.D.N.Y. 1990). See also Va.

Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1098 n.7 (when

a company chooses to speak, "there can be no question that

the statement [it] do[es] make carrie[s] with it no option

to deceive"); In re Marsh & McLennan Cos., Inc. Sec.

Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006)

("corporations have a duty to disclose all facts necessary

14

to ensure the completeness and accuracy of their public statements"). If a company, like E*TRADE here (¶¶ 2, 128-278), "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." In re Van Der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (internal quotation marks and citation omitted) rejected the holding in In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367 (S.D.N.Y. 2004) that a company is not required to disclose adverse information regarding its sources of revenues. Id. at 378.  See Van Der Moolen, 405 F. Supp. 2d at 400.  A statement is misleading if a reasonable investor would have received a false impression from the statement. Par Pharm., 733 F. Supp. at 677. Moreover:

> [S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead . . .

McMahan & Co. v. Wherehouse Ent., Inc., 900 F.2d 576, 579 (2d Cir. 1990). The purpose of the disclosure requirements

is "to inform, not to challenge the reader's critical wits." Va. Bankshares, 501 U.S. at 1097.

Regulation S-K, Item 303, required E*TRADE to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Furthermore, the SEC Division of Corporation Finance, on December 1, 2005, set forth accounting and disclosure requirements to address concerns regarding increased risky loan originations, as follows:

Disclosures about Residential Loan Products

• The types of residential mortgage loans held and the underwriting standards used to originate these loans are important to an understanding of a registrant's financial condition and results of operations . . . detailed information about certain loan products may be needed in order to provide a complete picture of the portfolio's credit risk . . .

• Describe the significant terms of each type of residential mortgage loan product offered, including underwriting standards used for each product, maximum loan-to-value ratios and how credit management monitors and analyzes key features, such as loan-to-value ratios and negative amortization, and changes from period to period.

16

- Disclose the approximate amount (or percentage) of loans originated during the period and loans as of the end of the reporting period that relate to each type of residential mortgage loan product.

- Disclose the approximate amount . . . of off-balance sheet loans with retained credit risk which relate to each type of residential mortgage loan product . . .

- Disclose the approximate amount (or percentage) of residential mortgage loans as of the end of the reporting period with loan-to-value ratios above 100%. . .

- Describe risk mitigation transactions used to reduce credit risk exposure, such as insurance arrangements, credit default agreements or credit derivatives.

- Explain any limitations of your credit risk mitigation strategies . . .

- Disclose trends related to residential mortgage loans with features that may result in higher credit risk that are reasonably likely to have a material favorable or unfavorable impact on net interest income after the provision for loan loss . . .

Current Accounting and Disclosure Issues in the Division of

Corporation Finance, Dec. 1, 2005, at 56-57, available at

http://www.sec.gov/divisions/corpfin/acctdis120105.pdf.

SEC rules, regulations, and advisories confirm that

Defendants omitted material information concerning
E*TRADE's mortgage loans.[2]

A misrepresentation or omission is material when
a reasonable investor would attach importance to it in
making an investment decision. See <u>Va. Bankshares v.
Sandberg</u>, 501 U.S. 1083, 1090 (1991); <u>Basic, Inc. v.
Levinson</u>, 485 U.S. 224, 231-32 (1988) ("there must be a
substantial likelihood that the disclosure of the omitted
fact would have been viewed by the reasonable investor as
having significantly altered the 'total mix' of information
made available"). The materiality requirement poses a very
low burden; "a complaint may not properly be
dismissed . . . on the ground that the alleged
misstatements or omissions are not material unless they are
so obviously unimportant to a reasonable investor that
reasonable minds could not differ on the question of their
importance." <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154,
162 (2nd Cir. 2000). Thus, the trier of fact usually

---

[2]    The December 2005 SEC Guidance provides "persuasive guidance" for
evaluating E*TRADE's omissions. <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d
154, 163 (2nd Cir. 2000). See also <u>Skidmore v. Swift & Co.</u>, 323 U.S.
134, 140 (1944) ("rulings, interpretations and opinions. . . constitute
a body of experience and informed judgment to which courts and
litigants may properly resort for guidance").

decides the issue of materiality.[3]

Material facts include not only information
disclosing financial results, "but also facts which affect
the probable future of the company and those which may
affect the desire of investors to buy, sell, or hold the
company's securities." Klein v. PDG Remediation, 937 F.
Supp. 323, 327 (S.D.N.Y. 1996) (citation omitted). A
material omission is actionable "[e]ven if, [Defendants]
were not able to quantify the exact impact of the defect at
the time of the filing [the Company's SEC report]." Simon
v. Am. Power Conversion Corp., 945 F. Supp. 416, 431
(D.R.I. 1996). Furthermore, material misrepresentations
include those "concern[ing] a segment or other portion of
the registrant's business that has been identified as
playing a significant role in the registrant's operations
or profitability." SEC Staff Accounting Bulletin ("SAB")
No. 99, 64 Fed. Reg. 45150, 45152 (1999) ("SAB 99"; Pl.'s
Mem. In Opp'n, Ex D). SAB 99's "non-exhaustive list of
factors . . . [is] persuasive guidance for evaluating the

---

[3] See Basic, 485 U.S. at 240 (materiality is inherently an intensely
"fact-specific inquiry" that "depends on the significance the
reasonable investor would place on the withheld or misrepresented
information"); In re Warnaco Group Inc. Opinion Sec. Litig., 388 F.
Supp. 2d 307, 313 (S.D.N.Y. 2005) (materiality "may be characterized as
a mixed question of law and fact, and is generally inappropriate for
determination at the pleading stage" (citation omitted)).

19

materiality of an alleged misrepresentation." Ganino, 228

F.3d at 163 (citations omitted). As Defendants concede,

"the largest assets (by a wide margin) on [E*TRADE's]

quarterly balance sheets were [mortgage] loans and MBS."

MTD at 18.

### a. "Superprime" and Related Allegations of Misrepresentations And Omissions Were Actionable And Material

The Defendants made repeated misrepresentations

that E*TRADE's loans were "superprime," ¶¶ 170, 202, 211.

Such statements misled investors regarding the nature of

E*TRADE's loans and exposure to subprime and mortgage risk

- i.e., the fundamental nature of its most important

business segment. See, e.g., In re MoneyGram Int'l, Inc.

Sec. Litig., No. 08-CV-883, 2009 WL 1451582, at *22 (D.

Minn. May 20, 2009) ("concealment of specific information

related to the Portfolio's subprime exposure and contents"

may mislead investor); In re Countrywide Fin. Corp. Sec.

Litig., 588 F. Supp. 2d 1132, 1146 (C.D. Cal. 2008)

(misleading definition of subprime made statements about

"subprime" operations "inherently misleading to

investors"). The Defendants' MTD also does not address

Defendants' statements that E*TRADE was buying seasoned loans so it could see how the borrower was performing and was putting back problem loans, see, e.g., ¶ 214, which were false and misleading because Defendants deliberately refused to return bad loans to subprime lenders so that E*TRADE could continue to purchase high risk loans at low prices. ¶¶ 78, 81-82, 216(b).

Defendants are alleged to have misrepresented the quality of the borrowers and loans held on E*TRADE's balance sheet as "superprime" (i.e., even less risky than "prime"). ¶¶ 11, 170-73, 202, 211. Defendants also repeatedly understated E*TRADE's exposure to its subprime and other problem loans. See, e.g., ¶ 202 (Caplan's assurance that E*TRADE's exposure to "what the market is concerned about in either subprime or [Alt-A], one of them is less than one-fifth of 1% of the overall whole loan balances and the other one is less than 0.5%"); ¶ 212 (Caplan's statement: "within the '06 vintage, we have zero in subprime"). It is alleged that high-risk loans constituted substantial portions of E*TRADE's portfolio. ¶¶ 279-82, 288-90.

21

Moreover, Defendants supported the "superprime" designation by speaking of "conservative" and favorable LTVs, FICO scores and debt-to-income ratios (DTIs), and by professing that E*TRADE's holdings compared favorably to others in the industry. See, e.g., ¶¶ 144, 170 ("we really are risk averse. Our average FICO scores are very high, creating subprime and superprime basically on balance sheet, low LTVs of loan-to-values"), 172, 212. In December 2006, Caplan spoke to investors about "tak[ing] virtually no credit risk," and claimed: "Within mortgage loans, we focus exclusively on what you would define almost as superprime. So whether you look at average median or mode across the board, they are in the mid-700, 720, 730 range across all the products and services. LTVs are probably way below what are typically industry averages. . . ." ¶ 172. See also ¶ 212 ("You see DTIs and LTVs that, again, are conservative and are probably significantly better than what you have seen in maybe the general risk industry at-large or in others"). Defendants also spoke of E*TRADE's "focus on loan to value," ¶ 168, and the "high" credit quality and "strict discipline with respect to credit quality" of its holdings. See, e.g., ¶¶ 185, 211.

However, the Complaint has alleged that E\*TRADE's
loan portfolio was far from "superprime," high quality or
conservative and did not have the LTV/CLTV (current loan-
to-value ratios), DTI, and FICO values claimed by
Defendants. Many of E\*TRADE's loans are alleged not to
qualify even as "prime" - much less as "superprime." ¶¶ 2,
13, 17-18, 69-86, 102-18, 170-73, 240, 372. Many of
E\*TRADE's loans were reduced loans or no documentation
loans ("liar loans"), which made them automatically sub-
prime. ¶¶ 69, 79-80.11. Near the end of the Class Period,
50% of the loans in E\*TRADE's First Lien Portfolio and 45%
in the home equity line of credit ("HELOC") Portfolio did
not verify borrowers' income, assets or both. In addition,
an undisclosed portion of the remaining loans were "Alt-A"
loans, which were not "superprime." ¶ 249. An E\*TRADE due
diligence analyst and underwriter estimated that 40% to 50%
of E\*TRADE's purchased loans had negative discrepancies in
loan documentation (lower credit scores than reported, or
unreported bankruptcies). ¶ 78. A former E\*TRADE loan audit
and acquisitions manager (CW4) reported seeing loan pools
where every sampled loan was highly risky in terms of LTVs,
DTIs and ARMs (adjustable-rate mortgages). ¶ 82.
Nonetheless, when CW4 brought this up at meetings attended
by Webb, CW4 was told not to review the rest of the high

23

risk portfolios, and these portfolios remained with E*TRADE. ¶ 82. It is alleged that the loans E*TRADE's acquired had far lower scores than E*TRADE claimed, see, e.g., ¶ 112 (Fremont's August 2006 admission that its average FICO score was 624, and LTV was 81% - much lower than the credit standards claimed by Defendants). When E*TRADE tried to re-sell loan pools to other banks, the purchasing banks returned them because they were comprised of "terrible, low value" below subprime loans. ¶ 76. See also ¶ 344 (Webb and other senior executives refused to return problem loans to their originators despite being implored to do so by due diligence personnel); ¶ 372. According to the Complaint, Defendants knew exactly what types of loans were in E*TRADE's portfolios.

On July 26, 2007, the SEC requested additional disclosures regarding E*TRADE's loan underwriting policies, LTV and collateral requirements and policy charges. ¶ 217. On August 16, 2007, E*TRADE disclosed that 20% of loans in the First Lien Portfolio and approximately 26% of loans in the HELOC Portfolio had FICO scores below 700, and that using "traditional" LTV/CLTV ratios, only 48% of the HELOC portfolio had a CLTV of 80% or lower which the Defendants asserted was not an appropriate ratio. ¶¶ 227-28.

On November 15, 2007, six days after the Class
Period, E\*TRADE admitted, in response to an SEC inquiry,
that its LTV/CLTV data was based on the time of loan
origination, and was not updated to reflect property value
changes and additional debt assumed by borrowers. ¶ 302.
E\*TRADE further belatedly admitted that it had merely
"attempted" to exclude loans to borrowers with FICO scores
under 640, CLTVs above 100% and DTIs below 50%, and
acknowledged that some originators required E\*TRADE to
purchase entire pools without exclusion. ¶¶ 31, 300.
Moreover, estimated figures (released the following year)
revealed that current estimated LTV/CLTVs averaged 84.30%
for 1-to-4 family mortgages and 93.70% for HELOCs. ¶ 304

        "The Second Circuit has explicitly recognized
that plaintiffs may rel[y] on post-class period
[statements] to confirm what a defendant should have known
during the class period." Lapin v. Goldman Sachs Group,
Inc., 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (internal
quotation marks and citations omitted). See also In re
Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158,
181 (S.D.N.Y. 2003) (post-class period articles can be used
to establish awareness of falsity of class period

statements; the opposite result would reward defendant for successful concealment).

Failure of the Defendants to disclose that LTV/CLTVs were based on over-stated appraisals and were not updated is alleged to be material and evidenced by Defendants' repeated public statements about LTV/CLTVs during the Class Period, ¶¶ 168, 170, 172, 185, 201, 212, 214, 224-28, 244, 248, 252, 254, 257, 272; the SEC's request to E*TRADE to provide information as to LTV/CLTVs and updates, ¶¶ 217, 261-262, 302; and E*TRADE's post-Class Period admission to the SEC that updating LTV/CLTV ratios "would provide useful information for both our internal credit risk management process as well as for our investors." ¶302.

Because Plaintiffs have alleged that Defendants made false statements with regards to the important segment of its business at issue in this suit which reasonable investors would have taken into account when making investment decision, they have sufficiently pled that those statements were misleading and material.

**b.    Statements Regarding Organic Origination And Organic Growth Are Alleged To Be False And/Or Materially Misleading**

The Defendants are alleged to have repeatedly emphasized "organic" growth and origination to mislead investors into believing that the bulk of E*TRADE's business and loans were originated by E*TRADE. See, e.g., ¶ 131 ("we are seeing significant organic growth in cash, assets and credit"); ¶ 160 ("the percentage of origination versus purchase is up dramatically"). See also ¶¶ 65, 132, 146, 148, 174-77, 182, 185 (Simmons' statement: "We grew the balance sheet while adhering to our strict discipline with respect to credit quality . . . particularly as we build out and expand our mortgage origination platform, which will focus on high-quality first-lien products to hold on the balance sheet").

According to the Complaint, organic loans were a minimal portion of E*TRADE's holdings. Near the beginning of the Class Period, only $2 billion (or 16.7%) out of $12 billion was generated organically, ¶ 72, and that percentage declined throughout the Class Period. Defendants are alleged to have misled investors to believe that loans purchased were as good as the high quality originated by

27

stating, "whether purchased or originated," shareholders were "protected across the board with respect to underlying credit based on FICO and LTVs and DTIs," and that there was "no meaningful difference" between E*TRADE's originated and purchased mortgages. ¶ 10.

Defendants also are alleged to have lied to investors when asked directly about organic origination. On July 19, 2006, an analyst asked for the source for the growth in E*TRADE's "average home loans" and if "[i]t would be safe to say this was all organic [loan growth] from your existing customers?," Caplan's response gave investors the impression that E*TRADE'S percentage of organic loans was larger than the miniscule actual percentage: "[s]ome of it is organic. Some of it is purchase. But we have made a huge transformation . . . and really pushed hard toward the growth of our balance sheet coming from our core retail customers." ¶ 148. See also ¶ 160 (analyst question: "in terms of the loan growth, the $2.5 billion, how much of that loan growth is purchased versus originated yourselves?" and Caplan's response: "[t]he percentage of origination versus purchase is up dramatically and so it's improved hugely.") These statements are alleged to be misleading. See Kaltman v. Key Energy Servs., Inc., 447 F.

Supp. 2d 648, 661-62 (W.D. Tex. 2006) (company "is in an excellent financial position" and has ability to execute "plan for organic growth" are actionable); Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 320 (D.R.I. 2004) ("I see an even stronger organic growth story as we move forward because our businesses have gained a lot of momentum" was materially misleading); Manavazian v. ATec Group, Inc., 160 F. Supp. 2d 468, 480-81 (E.D.N.Y. 2001) (statements that business scheme was "framework" for "organic growth" and "blueprint" for "hyper-growth"; and company was "poised for future growth" and occupied a "strategic position in the technology industry" were actionable). Shortly after the Class Period (after originated loans had supposedly increased, according to Defendants' statements), it is alleged that E*TRADE revealed in response to an SEC request that only $3.7 billion, or less than 13%, of E*TRADE's $29.3 billion in mortgage loans were self generated. ¶ 290.

Because Plaintiffs have pled that Defendants made statements about the origin of E*TRADE's mortgage loans that misrepresented to investors the quality of those loans, they have sufficiently alleged that these statements were materially misleading.

c.    "Discipline" Misrepresentations Are Material and
      Actionable

Defendants' statements about "discipline," are
alleged to have fundamentally misstated the most
significant aspect of E*TRADE's most important business
sector. Defendants' statements that "[w]e grew the balance
sheet while adhering to our strict discipline with respect
to credit quality," ¶ 185; "we have stayed completely
disciplined about focusing on what we call prime and really
superprime borrowers," ¶ 202; and "[w]e also maintained
strict discipline with respect to risk mitigation, all the
way down to the level of the borrower," ¶ 211, are alleged
to be false and misleading in light of, inter alia, facts
that while Defendants increased purchases of risky loans,
only 1% of purchased loans were reviewed, appraisals were
overstated, experienced loan review personnel were
terminated, remaining loan reviewers were too overworked
and inexperienced to review more than a de minimis
percentage of the purchased loans, CLTVs were not tracked,
and Defendants refused to review or return loan pools when
problematic loans were found from small samplings. ¶¶ 67-
86, 187(d), 206(c), 216(f).

As the Supreme Court in <u>Va. Bankshares</u> stated:

> It is no answer to argue . . . that the quoted
> statement . . . did not express a reason in
> dollars and cents, but focused instead on the
> "indefinite and unverifiable" term, "high" value,
> [] like the similar claim that the merger's terms
> were "fair" . . . The objection ignores the fact
> that such conclusory terms in a commercial
> context are reasonably understood to rest on a
> factual basis that justifies them as accurate,
> the absence of which renders them misleading.
> Provable facts either furnish good reasons to
> make a conclusory commercial judgment, or they
> count against it, and expressions of such
> judgments can be uttered with knowledge of truth
> or falsity just like more definite
> statements . . . .

501 U.S. at 1093.

Even if statements about "discipline," etc.,
might not be actionable in another context, it is claimed
that the glaring disparity between E*TRADE's operations and
Defendants' statements makes the statements actionable
here. See, e.g., <u>Countrywide</u>, 588 F. Supp. 2d at 1144
("where a company's essential operations were so at odds
with the company's public statements[,] . . . many
statements that would not be actionable in the vast
majority of cases are rendered cognizable to the securities
laws"). Unlike in <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F.

Supp. 2d 595 (S.D.N.Y. 2005), cited by Defendants,

Defendants' statements here were not mere "generalizations

regarding . . . fiscal discipline." Id. at 633. Instead,

Defendants specifically spoke of discipline with respect to

particular items and borrowers. See, e.g., ¶ 202 ("we have

stayed completely disciplined about focusing on what we

call prime and really superprime borrowers"). "[P]laintiffs

offer [defendant]'s statements that it observed standards

of high-quality credit and underwriting, and set those

statements against detailed allegations of practices that

utterly failed to meet those standards." In re New Century,

588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008). See also

Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 1992)

(representing that "lending practices are 'conservative'"

and "collateralization is 'adequate'" is actionable if

"omit[ting] certain facts contradicting these

representations").

Because the statements Plaintiffs allege were

misleading related to the fundamental nature of E*TRADE's

most important business sector and are belied by detailed

allegations directly contradicting the assertions of

"discipline" with regard to investment in prime and

superprime loans, these statements are actionable and
material.

### d.   Material Information Regarding, Inter Alia, Risks, Underwriting Practices and Originator Identity Was Omitted

"[A]s a mortgage lender . . . underwriting
practices would be among the most important information
looked to by investors." Countrywide, 588 F. Supp. 2d at
1185 (citation omitted). Here, Defendants' disclosure that
"net interest income has become our leading category of
revenue," ¶ 136, that loans and MBS were the largest
assets, and that E*TRADE anticipated increasing its
mortgage portfolios, ¶ 137, without investors that
E*TRADE's "leading category of revenue" was largely
comprised of high-risk loans, purchased from barrel-
scraping subprime lenders with no, or virtually no, due
diligence, without tracking current CLTVs. ¶¶ 282, 298-90,
296, 302.

The SEC's October 12, 2007 letter stated that
E*TRADE's SEC filings did not provide ample information on
E*TRADE's significant products (especially lending

products), and requested additional disclosures "to provide greater transparency surrounding the risks related to [E*TRADE's] lending activities (particularly credit risk)," and sought information on charge offs, underwriting policies, and loan originators. ¶¶ 261-65.

Moreover, Defendants' failed to disclose the identities of E*TRADE's loan originators, see ¶¶ 10, 18, 78, 101-18, 160, 170-73, 185, 195, 209, 214, 225, 240, 288-91, 300, and amounts they originated. They are alleged to have concealed from investors that the bulk of E*TRADE's loans were purchased from troubled subprime lenders such as National City, GMAC, Countrywide, Opteum, Inc. and Fremont General -- who had become notorious for poor underwriting standards, illegal practices, government investigations, delinquencies, and the mortgage crisis. ¶¶ 18, 78, 101-118, 209, 214, 225, 288. Plaintiffs have not conceded that E*TRADE disclosed the identity of 74% of its originators in August 2007, as set forth in MTD at 19 n.15 (citing ¶¶ 224-29). According to the Plaintiffs, Defendants' August 16, 2007 Supplemental Disclosure listed E*TRADE as among the originators of 74% of its loans and did not "stat[e] the amounts involved." ¶ 225. By including E*TRADE in the list, Defendants made it impossible to determine the proportion

34

of loans purchased from other firms. The identity of
E*TRADE's originators was not made available until late in
the Class Period, when investors and the SEC demanded more
information. See ¶¶ 214, 217, 261-63 (SEC request for
amount purchased from each originator). On July 25, 2007,
Caplan merely mentioned "Nat City and [unidentified]
others" as originators in response to an analyst inquiry –
while at the same time reassuring investors that E*TRADE
was itself originating and keeping more self-originated
loans on its balance sheet in each quarter. ¶ 214. A
partial disclosure on August 16, 2007 only listed some of
the originators and omitted the amounts purchased from
them. ¶¶ 103, 225. E*TRADE's partial disclosure on
September 17, 2007 only listed the same limited information
as in August. ¶247. According to the Plaintiffs, a full
list with amounts was not made public until November 15,
2007 (six days after the Class Period ended), in response
to an SEC inquiry. ¶ 288.


     From early in the Class Period, National City
(which alone originated close to half of E*TRADE's loans)
was repeatedly accused by the government of falsifying
documents and had to take huge write-downs. ¶¶ 18, 106-11.
Fremont's substandard lending practices were the subject of

an FDIC "cease and desist" order during the Class Period. ¶¶ 112-14. Countrywide (which originated or serviced 8.34% of E*TRADE's mortgage portfolio) had reported significant non-prime as well as skyrocketing subprime delinquencies from early in the Class Period. ¶¶ 105, 209. CW2, a former E*TRADE senior executive reported that Webb purchased "very high risk" loans from National City and Countrywide; at least 50% were actually subprime. ¶ 75. The importance of such information is also evidenced by: the SEC's demands for this information, ¶¶ 217-19, 261-65; Defendants' attempts to conceal this information by misleadingly claiming that E*TRADE's loans were "superprime," ¶¶ 31, 170, 202, 211, by avoiding questions on origination amounts, ¶ 214; and analysts' requests for the information. ¶ 214 (questions about how much of mortgage portfolio was originated versus purchased, and how Defendants assured purchased loans' quality).

It is the position of the Plaintiffs that these omissions were material and that the omitted information was important to investors.

According to the Plaintiffs, the Defendants repeatedly represented to investors that E*TRADE's mortgage

36

assets were of high credit quality, consistently monitored in a disciplined, focused fashion. See, e.g., ¶¶ 3, 211 (Caplan's claim that E*TRADE was maintaining "strict discipline" with "respect to risk mitigation, all the way down to the level of the borrower"). These statements are alleged to be materially false in view of E*TRADE's allegedly virtually non-existent due diligence when purchasing high-risk mortgage loans from infamous originators. ¶¶ 13, 30-31, 120, 65-86, 300, 344. Severe undisclosed problems with purported due diligence included: massive cutting of loan and credit review personnel, ¶¶ 13, 65-86, 300, 344; eliminating pre-purchase due diligence, ¶¶ 69, 81; reviewing (postpurchase) only a 1% sample of purchased loans with insufficient review time, ¶¶ 13, 30, 75, 81, 82, 300-01; reviewing only samples for compliance with the originator's "minimum" criteria, ¶ 30; purchasing Countrywide loans without mortgage files or guidelines, ¶ 75; purchasing entire loan pools from which E*TRADE was prohibited from excluding problem loans, ¶ 31; merely "attempting" to exclude loans with poor FICO, CLTV and DTIs and looking at scores at the time of origination, rather than at the time of purchase, ¶ 31; and failing to conduct further review of loans where the 1% due diligence sample

37

indicated severe problems with the loan documents and
underwriting. ¶¶ 13, 78-82.

The loan pools purchased by E*TRADE were so poor
that even inadequate due diligence efforts revealed
significant numbers of problem and high-risk loans which
when reported to Defendants or other senior management,
were ignored and the purchase of more high risk loans from
the same sources were directed. A former E*TRADE due
diligence analyst and senior underwriter, CW6, reported
that 40-50% of E*TRADE's purchased loans had negative loan
documentation discrepancies (i.e., unreported bankruptcies
or lower credit scores than reported), but despite the fact
that these discrepancies were reported to management,
Defendants refused to return most of these loans, which
they had a right to do. When CW6 asked why, E*TRADE's
managers said that E*TRADE kept bad loans to maintain
relationships with loan originators, which were giving
E*TRADE "great deals" on these loans. ¶ 78. Webb also
purchased portfolios even though risk metrics programs
results showed that the portfolios were riskier than
permissible levels. ¶ 71.

In light of the allegations of E*TRADE's
deficient due diligence practices in conjunction with
Defendants' representations to investors that the Company
invested in and closely monitored its high quality mortgage
assets, Plaintiffs have sufficiently pled that Defendants
omitted material information with regard to risk.

### e.   **Loan Loss Reserves Were Materially Misrepresented**

Defendants represented that the loan loss
allowance was based on careful monitoring of the quality of
the portfolio and other relevant conditions, and
misleadingly represented that loan loss allowances should
be equal to at least 12 months of probable projected loan
losses. See ¶¶ 155, 164-65. See also ¶¶ 21, 25, 220-22.
However, it is alleged that Defendants left the loan loss
allowance at 0.20% of receivables in May and August 2006,
¶¶ 138-40, 154-56, and then decreased both the loan loss
allowance and the reserve coverage ratio, ¶¶ 220-22, even
though the mortgage crisis was already reverberating across
the country, and E*TRADE was acquiring more and more loans
from unreliable originators with virtually no due
diligence. These inadequate reserves ultimately forced
E*TRADE to finally start increasing loan loss provisions in

September 17, 2007, near the end of the Class Period.
¶ 243. Despite the high risks of E*TRADE's purchased loans,
Defendants claimed that absolute dollar increases in loan
loss provisions were "the result of growth in the loan
portfolio" and are not indicative of a decline in overall
asset quality," a representation alleged to be false,
¶¶ 138, 154, 196.

Because Defendants' allegedly false statements
regarding loan loss reserves were with regards to the value
of the Company's assets and the security of investing with
the Company, they are alleged to be material.

### f.  MBS and ABS Misrepresentations And Omissions Were Material

Defendants are alleged to have misrepresented and
omitted material information concerning the quality and
risks associated with E*TRADE's investment portfolio of
ABS, MBS and CDOs, and failure to disclose that E*TRADE was
experiencing significant impairments in ABS and MBS. During
an April 18, 2007 conference call, Caplan reassured
investors and denied credit exposure, stating that a lot of
the growth in Q1 MBS was "simply a fully hedged-out MBS, as
a placeholder." ¶ 203. Also during the call, when asked

40

whether E*TRADE had much in the line of credit exposure on
its MBS, Caplan responded, "No. I think that we're AAA."
¶ 20. Defendants also continued to assure the market of the
Company's high quality MBS and ABS portfolio; continued to
understate exposure to risk; and continued to promote the
"conservative approach to credit and funds management."
See, e.g., ¶¶ 224, 229, 244, 246, 272.

It is alleged that both prior to and throughout
the Class Period, Defendants mischaracterized ABS portfolio
losses as merely temporary. ¶¶ 25-26, 126, 234. For
instance, E*TRADE's 2Q 2007 10-Q, filed August 20, 2007,
stated: "The Company does not believe that any individual
unrealized loss as of June 30, 2007 represents an other-
than-temporary impairment. The majority of the unrealized
losses on mortgagebacked securities are attributable to
changes in interest rates and are not reflective of
deterioration in the credit quality of the issuer and/or
securitization." However, right after the Class Period (on
November 29, 2007), E*TRADE was forced to sell its ABS
portfolio for approximately 27 cents on the dollar. ¶¶ 25-
26, 293, 369.

It is alleged that at the same time, as reported
by the CWs, Caplan was speaking internally about the need
to compensate for losses; the fact that E*TRADE was "so
leveraged out"; E*TRADE's over-exposure in the subprime
market; the search for a "white knight" to rescue the
Company from its "mortgage mess"; and Caplan's expectation
that profits would go down and remain down. ¶¶ 94-99. On
September 17, 2007, E*TRADE made a partial disclosure of an
impairment on MBS of $100 million to be taken in the final
two quarters of fiscal year 2007. ¶¶ 20, 242. In a second
partial disclosure on October 17, 2007, that number was
almost doubled to $197 million, to be taken in the third
quarter of 2007. ¶¶ 20, 270. On November 9, 2007, the last
day of the Class Period, E*TRADE revealed that its exposure
to ABS, CDO and second-lien securities on September 30,
2007 was, in fact, approximately $450 million, ¶¶ 20, 279,
282,23 19.6 million more than E*TRADE's net income for 2005
(which was $430.4 million, see Def. Ex. 3 (Dkt. No. 74-4))
and almost 72% of E*TRADE's net income for 2006 (which was
$628.9 million for 2006, see ¶ 181).

The allegations referred to above are adequate to
identify the statements alleged to be misleading, and the
information alleged to be material which was omitted. The

42

state of the knowledge of the Defendants remains as a
triable issue.

## V.    THE INADEQUACY OF THE ALLEGATIONS HAS NOT BEEN
ESTABLISHED

The MTD has set forth defenses which at this
pleading stage do not require the dismissal of the
Complaint.

### a.    Misrepresentations Were Not Mere "Puffery"

Defendants have contended that the alleged
misstatements were "mere puffery" and, therefore, not
actionable. However, misstatements regarding risk
management, discipline, monitoring and credit quality are
not "puffery" where, as alleged here, they were
"misrepresentations of existing facts." Novak v. Kasaks,
216 F.3d 311, 315 (2d Cir. 2000) (statements that inventory
situation was "in good shape" or "under control" when
defendants knew the contrary was true were false and
misleading) (citation omitted). See also In re Xerox Corp.
Sec. Litig., 165 F. Supp. 2d 208, 218 (D. Conn. 2001)
(plaintiffs' allegations "go beyond claims of mere puffery"
because defendants "made specific statements,

43

including . . . those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation"). In Countrywide, 588 F. Supp. 2d 1132, mortgage loan origination and quality allegations - remarkably similar to those alleged against E*TRADE – were held to be actionable because:

> the [complaint] adequately alleges that Countrywide's practices so departed from its public statements that even "high quality" became materially false or misleading; . . . [T]o apply the puffery rule to such allegations would deny that "high quality" has any meaning.

Id. at 1144 (citations omitted).

In citing City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC, 423 F. Supp. 2d 348 (S.D.N.Y. 2006), for their "puffery" argument, Defendants omit its findings that statements that wholesale banking remained a "sound business" and would continue to be a "growth proposition"; that defendants had "made appropriate, in fact, very conservative, we feel, provisions"; and that defendants were "very happy with the present situation" and had "already implemented measures to re-focus the business and reduce its risk profile" were actionable, because "these were not mere rosy predictions. Instead, they were directed at Abbey's then-existing financial condition and made at a time when defendants were

44

aware or should have been aware of contrary information."
Id. at 359-60. The dismissal of part of the statements in
Abbey was due to the fact that those statements were not
contradicted by sufficient particularized information. Id.
at 357-58. The same statements can be actionable, where, as
here, the statements are belied by conditions internally
known by defendants. Novak, 216 F.3d at 315. Thus, In re JP
Morgan Chase Securities Litig., 363 F. Supp. 2d 595
(S.D.N.Y. 2005), cited by Defendants, is also inapposite,
because the statements touting risk management were not, as
here, juxtaposed against detailed factual descriptions of
the Company's woefully inadequate or non-existent credit
risk procedures.  See id. at 633.


        The MTD contends that the Complaint challenges
"statements regarding the 'lack of decline in asset
quality.'" MTD at 13 n.9. The Complaint challenges
Defendants' actual statements such as: "We believe that
these increases to the allowance [for loan losses in the
real estate loans receivable portfolio] are the result of
growth in the loan portfolio and do not indicate a decline
in overall asset quality." ¶¶ 138, 154. "Quality" in this
context is not an amorphous concept. Defendants denied that
E*TRADE's real estate loan portfolio had become more risky

45

- even though it is alleged that the risks had increased.
See, e.g., ¶¶ 67-69, 74-75 (Defendants had drastically
reduced due diligence); ¶¶ 68-69, 76-78 (Defendants were
purchasing high-risk loans from unreliable originators);
¶¶ 72-73, 76-77 (Defendants' concerns and attempt to
"balance" existing risks). Similarly, the MTD challenges
the phrase "loan portfolio credit characteristics," MTD at
13, n.9 -- but Caplan's actual statement (¶ 160)
concerns specific "credit characteristics" - FICO scores
and LTVs - which are alleged to have been misrepresented.
See ¶ 302 (admission that Defendants did not update LTVs
after origination); ¶ 91 (overappraisals, which would
artificially understate LTVs).

        Defendants' statements such as "[w]e are seeing
significant organic growth in cash, assets and credit,"
¶ 131, are alleged to misrepresent existing facts - that
the vast majority of E*TRADE's loans were purchased from
questionable outside lenders rather than puffery. Novak,
216 F.3d at 315. See also Abbey, 423 F. Supp. 2d at 360-61
(bank business was sound and would continue to be a "growth
proposition" was not a mere rosy prediction). "Organic
growth" was also actionable because it was represented by
Defendants to be the focus of E*TRADE's business. See,

e.g., In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 507-08 (S.D.N.Y. 2009) (statement that Moody's was an independent body publishing ratings accurately and impartially was not "puffery" because independence was a cornerstone of Moody's business).

Defendants' other growth statements, such as "we enter 2007 ideally positioned to capitalize on secular growth trends in the industry," ¶ 181, are alleged to be statements of current condition and contradicted then-existing internal distress at E*TRADE and Caplan's December 2006 admission to employees that he expected profits to be down then and throughout 2007. ¶¶ 95-98. For instance, in In re Computer Associates Class Action Securities Litigation, 75 F. Supp. 2d 68 (E.D.N.Y. 1999), the court found actionable that the company had falsely portrayed itself as a "booming company which was experiencing and would continue to experience rapidly rising sales and profits on its core products and new product offerings, and as a company whose order pipeline was 'strong.'" Id. at 71. In Manavazian v. Atec Group, 160 F. Supp. 2d 468 (E.D.N.Y. 2001), it was not puffery when the company stated that it was "poised for future growth," occupied a "strategic position in the technology industry" and that it was

"positioned . . . for dramatic revenue and earnings growth
model was 'still on track.'" Id. at 473-74. See also Lapin
v. Goldman Sachs Group, 506 F. Supp. 2d 221, 239 (S.D.N.Y.
2006) (statement that "integrity and honesty are at the
heart of our business," held actionable).

Because the misstatements regarding risk
management, discipline, monitoring and credit quality are
"misrepresentations of existing facts" Novak, 216 F.3d at
315, that would have misled a reasonable investor, see San
Leandro Emergency Med. Group Profit Sharing Plan v. Philip
Morris Cos., 75 F3d 801, 811 (2d Cir. 1996), they are
actionable.

## b.   Present Knowledge Is Alleged Rather Than "Fraud by Hindsight"

Defendants' "fraud by hindsight" arguments, MTD
at 15-17, 29-30, mischaracterize the Complaint. See, e.g.,
Xerox, 165 F. Supp. 2d, 208, 218 (D. Conn. 2001) (fraud by
hindsight "argument fails to properly characterize the []
complaint," which alleged that defendants made fraudulent
statements simultaneously with their knowledge of problems
resulting from the restructuring). As alleged in the

Complaint, this is not a case of "failure to predict"
riskiness or future mortgage market downturns but and
instance where loans were internally known to be of poor
quality, inadequately reviewed, improperly described and
highly risky at the time they were purchased. ¶¶ 67-77.
This case differs from Denny v. Barber, 576 F.2d 465 (2d
Cir. 1978), cited by Defendants, where the plaintiff failed
to allege contemporaneous facts indicating the falsity of
the defendants' statements and instead "simply seized upon
disclosures made in later annual reports and alleged that
they should have been made in earlier ones." Id. at 470. It
is not "fraud by hindsight" when statements related to a
loan's existing quality and risks were false and misleading
when made. See Hall v. The Children's Place Retail Stores,
Inc., 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) (rejecting
"fraud by hindsight" argument where undisclosed breaches of
license agreement, which placed agreement at risk of being
terminated, allegedly existed at the time of
misstatements). Defendants' case citations also confirm
that misstatements of existing fact are not mere fraud by
hindsight. See, e.g., In re Tower Auto Sec. Litig., 483 F.
Supp. 2d 327, 342 (S.D.N.Y. 2007) (a statement is false and
misleading where it is adequately alleged "that Defendants
had access to facts contrary to the alleged statement").

49

The cases which Defendants tout as in the context of the
current financial crisis, see, e.g., In re 2007 Novastar
Fin., Inc., Sec. Litig., No. 07-CV-0139, 2008 WL 2354367
(W.D. Mo. June 4, 2008), are inapposite in that they fail
to compare false or misleading statements with
contemporaneous information. See id., at *2-3. Moreover,
Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F.
Supp. 2d 210 (S.D.N.Y. 2008), upheld scienter with respect
to a second fund because certain defendants were "closely
connected such that they would have had access to the
information" which contradicted their representations. Id.
at 229.

The Complaint sets forth that Defendants
knowingly and/or recklessly purchased high-risk loan pools
and ABS with inadequate due diligence, ¶¶ 67-69, 74-75,
while contemporaneously assuring investors to the contrary.
Defendants stated that E*TRADE's mortgage loans were
"superprime," ¶¶ 170-73, 202, 211, when it is alleged that
numerous contemporaneous facts, such as negative
discrepancies in loan documentation, ¶ 78, returns of loan
pools sold by E*TRADE because they were comprised of below
subprime loans, ¶ 76, and subsequent admissions that LTVs
were not updated, ¶ 302, established the falsity of the

50

representation. See, e.g., In re New Century, 588 F. Supp.
2d 1206, 1228 (C.D. Cal 2008) (upholding complaint alleging
misrepresentations as to loan quality). The "current
financial crisis" is not necessarily an absolute defense if
it is alleged that defendants have misled the public as to
the quality of their holdings.  Defendants have sought to
attribute E*TRADE's difficulties to "industry-wide"
downgrades and "macro-economic" trends, also experienced by
financial institutions Citigroup, UBS, and Merrill Lynch
(MTD at 1, n.1).  However, these institutions are also
defendants in securities fraud class actions in this
District.  See In re UBS AG Sec. Litig., No. 07-CV-11225
(RJS); In re Citigroup Inc. Sec. Litig., No. 07-CV-09901
(SHS); In re Merrill Lynch & Co. Sec., Derivative and ERISA
Litig., No. 07-CV-9633 (JSR) (lawsuit alleged that Merrill
failed to properly disclose its exposure to subprime ABSA
CDOs; settled in February 2009 for $475 million after
motions to dismiss were briefed).


          In light of the foregoing allegations, Plaintiffs
have sufficiently pled that Defendants had present
knowledge of the risk, and have not merely pled fraud-by-
hindsight.

### c.   More Than Mismanagement Has Been Alleged

Santa Fe Industries, Inc. v. Green, 430 U.S. 462,
476 (1977) established that where the conduct involves
deception related to the mismanagement – and not
mismanagement alone - the claims are actionable under the
federal securities laws. See id. at 465-474.   The "mere
fact that the conduct . . . arguably constitutes
mismanagement will not preclude a claim . . . if the
defendant made a statement of material fact wholly
inconsistent with known existing mismanagement or failed to
disclose a specific material fact resulting from that
mismanagement." In re Donna Karan Int'l Sec. Litig., No.
97-CV-2011, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14,
1998). Here it is alleged not that Defendants merely made
bad business decisions or mismanaged the Company, but
rather that Defendants misled the public about E*TRADE's
business, operations, and value of its loan portfolio. ¶¶
98-100, 279-83, 288-90, 300-02. See, e.g., In re Wells
Fargo Sec. Litig., 12 F.3d 922, 927 (9th Cir. 1993)
("deliberate failure to recognize problem loans, thus
understating the [loan loss reserve], constituted an
actionable omission or misrepresentation of existing
fact . . . cannot be dismissed as a mere matter of internal

mismanagement"). Defendants' minimal due diligence and reckless loan origination practices here were not merely "bad business decisions" but alleged to establish the falsity of Defendants' assurances to the market. See, e.g., In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (loan origination practices raised strong inference that "actual loan quality was lower than the borrower's FICO score and LTV ratio suggested because Countrywide misrepresented how lax its verification practices became").

Defendants' citations in support of their "mismanagement" argument establish that § 10(b) prohibits fraud rather than mismanagement. See MTD at 30-31. Decker v. Massey-Ferguson, Ltd., 681 F.2d 111 (2d Cir. 1982), where there was full disclosure of relevant financial data, makes clear that "deception" is actionable. See id. at 115. Unlike Decker, Defendants' misrepresentations and omissions here prevented E*TRADE's shareholders from obtaining accurate information concerning the Company's financial status. In Lerner v. FNB Rochester Corp., 841 F. Supp. 97, 101 (W.D.N.Y. 1993), plaintiffs failed to allege any specific, contemporaneous facts in support of their claims. Id. at 101-02.  Acito v. IMCERA Group, 47 F.3d 47 (2d Cir.

1995) concerned the materiality of omissions related to
relatively minor aspects of the company's businesses and
was a pure mismanagement case because there was no duty to
disclose. Id. at 52-53.

Because Plaintiffs allege that Defendants
intentionally misled the public, rather than simply making
bad business decisions, Plaintiffs have pled more than mere
mismanagement.

### d.    Allegations Of Knowing Falsity Defeat The PSLRA Or "Bespeaks Caution" Defense

The PSLRA's safe harbor protects only those
forward looking statements that are "identified" as such
and "accompanied by meaningful cautionary statements
identifying important factors that could cause actual
results to differ materially from those in the forward-
looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Even
where the safe harbor is triggered, it does not protect
statements made with actual knowledge of falsity, as
alleged here. See 15 U.S.C. § 78u-5(c)(1)(B). Defendants
cannot be immunized for knowingly false statements even if
they include some warnings: As the Honorable Milton Pollack

54

explained, the law provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." In re Prudential Sec. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996). Additionally, risk disclosures will not insulate Defendants from liability where the risk allegedly disclosed has already occurred. See Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"). The factual issue as to whether the risk has transpired does not make the allegations of the Complaint inadequate. The Defendants' general statements that loan losses and securities impairments "could be affected by market risks and were subject to change," MTD at 18, do not insulate them from liability for their specific misstatements and omissions. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 1992) ("if a defendant characterizes loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud"). Moreover, Defendants' misleading Class Period statements are alleged to have contradicted, and thus, nullified any risk disclosures.

See, e.g., Lapin v. Goldman Sachs Group, 506 F. Supp. 2d
221, 238 (S.D.N.Y. 2006)(plaintiffs sufficiently pled that
defendants' multiple disclosures did not counterbalance
defendants' misleading statements); In re Credit Suisse-AOL
Sec. Litig., 465 F. Supp. 2d 34, 50 n.17 (D. Mass. 2006)
(fact that defendants continued to publish optimistic
assessments of the company's financial position was "akin
to a statement that the reader need not worry much about
the generic risk disclosures that appeared from time to
time").[4]

        Because Defendants are alleged to have made
knowingly false statements they are not protected by the
PSLRA safe harbor provision.  Additionally their risk
disclosures were insufficient to counterbalance their
allegedly misleading statements.


### e.   Loan Loss Allowances Are Not Projections

---

[4]     In N.Y. Cmty. Bancorp Inc. Secs. Litig., 448 F. Supp. 2d 446
(E.D.N.Y. 2006), cited by Defendants, defendants "frankly disclosed"
specific potential downside interest-rate volatility figures. Id. at
479-80. "In this light, the [defendants' statements] concerning the
company's risk-aversion to interest rate increases were permissible."
Id. (emphasis added). Such "frank disclosures" were not made here.
Defendants are alleged not to have provided critical data needed for
E*TRADE's investors to draw their own conclusions.

Defendants' argument that "loan loss allowances
and securities impairments were projections about future
performance," MTD at 36, misstates GAAP and SEC disclosure
requirements, which provide that "allowances for loan
losses should be based on past events and current economic
conditions."[5] In Atlas v. Accredited Home Lenders Holding
Co., 556 F. Supp. 2d 1142 (S.D. Cal. 2008), a mortgage
lender's reduction of its loan loss reserves when credit
quality was decreasing (just like E*TRADE did) was held to
violate GAAP and be materially false and misleading. Id. at
1150, 1156. Defendants' sole support for their proposition
that E*TRADE's loan loss reserve was a "projection[] about
future performance," is dictum from a state derivative
case, analyzing the business judgment rule, which notes the
unremarkable notion that loan loss reserves involve some
discretion. MTD at 37 (quoting In re Countrywide Fin. Corp.
Deriv. Litig., 554 F. Supp. 2d 1044, 1070 (C.D. Cal.
2008)).

Therefore Defendants' argument that "loan loss
allowances and securities impairments were projections
about future performance" fails as a matter of law.

---

[5]     Current Accounting and Disclosure Issues in the Division of
Corporation Finance, Dec. 1, 2005, available at
http://www.sec.gov/divisions/corpfin/acctdis120105.pdf, at 52.

**f.    The Liability Of Individual Defendants For The Class Period Statements Is Adequately Alleged**

The Complaint specifically alleges the time, place and content of each Individual Defendant's material misrepresentations and omissions. Caplan, Simmons and Webb are all liable for each of the false and misleading statements made during the Class Period. Caplan was quoted in press releases. ¶¶ 143, 159,174, 181, 198, 200, 209-10, 243, 268. Each made false and misleading statements during conference calls and/or conferences. Caplan: ¶¶ 7, 9-11, 20-31, 144-46, 148, 160, 168, 172, 175, 182-83, 188, 201-03, 211-14, 220, 253-54, 256, 270-71; Simmons: ¶¶ 132, 177, 185, 204, 212, 255; Webb: ¶¶9, 183, 257. Caplan and Simmons both signed[6] and certified E*TRADE's 10-K and 10Qs which contained false and misleading statements. ¶¶ 135-40, 151-57, 162-65, 207-08, 191-93, 195-96. Webb necessarily

---

[6]    "[T]hose who sign the documents (even if there are no facts showing they were involved in the preparation) can be held liable as a primary violator of § 10(b) for making a false statement." In re Petco Animal Supplies Inc. Sec. Litig., No. 05-CV-0823, 2005 WL 5957816, at *15 (S.D. Cal. Aug. 1, 2005) (citation omitted). See also In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 163 (D. Mass. 2002) ("It is well established . . . that each defendant may be held responsible for the false and misleading statements contained in the financial statements he signed [under §10(b)]").

supplied false and misleading information concerning EGAM

(which he headed), contained in E*TRADE's filings.[7]


Senior officers may also be held liable for

statements made by others. See, e.g., In re Scholastic

Corp. Sec. Litig., 252 F.3d 63, 75-76 (2d Cir. 2001) (vice

president for finance and investor relations responsible

for company's communications with investors who had access

to internal data may be liable for false and misleading

statements even though they were not publicly attributable

to him); SEC v. First Jersey Sec., Inc., 101 F.3d 1450,

1471 (2d Cir. 1996) ("Primary liability may be imposed not

only on persons who made fraudulent misrepresentations but

also on those who had knowledge of the fraud and assisted

in its perpetration.") (internal quotation marks and

citation omitted). Further, each of the Individual

Defendants is liable for the others' statements made at

---

[7]     See SEC v. Wolfson, 539 F.3d 1249, 1261 (10th Cir. 2008) ("That
the filings were issued in Fl0's name, and that [defendant] himself did
not sign, certify, or physically file the documents, is not
dispositive. The relevant question is only whether he can fairly be
said to have caused Fl0 to make the relevant statements, and whether he
knew or should have known that the statements would reach investors");
Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000)
("participation or intricate involvement in the preparation of
fraudulent statements is grounds for primary liability even though that
participation might not lead to the actor's actual making of the
statements"); McNamara v. Bre-X Minerals Ltd., 57 F. Supp. 2d 396, 429
(E.D. Tex. 1999) ("if a defendant played a 'significant role' in
preparing a false statement actually uttered by another, primary
liability will lie").

conference calls in which they participated. "[A] high
ranking company official cannot sit quietly at a conference
with analysts, knowing that another official is making
false statements and hope to escape liability for those
statements. If nothing else, the [] official is at fault
for a material omission in failing to correct such
statements in that context." In re SmarTalk, 124 F. Supp.
2d 527, 543 (S.D. Ohio 2000). See also Barrie v.
Intervoice-Brite, Inc., 409 F.3d 653, 656 (5th Cir. 2005).
See ¶¶ 9, 182-85, 187, 253-57, 259.


          The Individual Defendants are also alleged to be
liable under the "group-pleading doctrine,"[8] which permits a
plaintiff, "for pleading purposes only, to rely on a
presumption that statements in prospectuses, registration
statements, annual reports, press releases, or other group-
published information, are the collective work of those
individuals with direct involvement in the everyday

---

[8]      Individual Defendants were each "individuals with direct
involvement in the everyday business" of E*TRADE. See, e.g., ¶¶ 44-46
(enumerating the Individual Defendants' particular roles and their
involvement with the everyday business of E*TRADE). See In re Pfizer
Inc. Sec. Litig., 584 F. Supp. 2d 621, 638 (S.D.N.Y. 2008) ("Plaintiffs
allege that all of the Individual Defendants . . . were directly
involved with the day-to-day operations of the company, and that all
participated in drafting, reviewing, approving, ratifying, and/or
disseminating the [] financial statements and press releases during the
Class Period . . . these allegations are sufficient"). See also In re
Oxford Health Plans, Inc. Sec. Litig., 187  F.R.D. 133, 142 (S.D.N.Y.
1999).

60

business of the company." In re BISYS Sec. Litig., 397 F.
Supp. 2d 430, 438 (S.D.N.Y. 2005) (internal quotations and
citations omitted). See also In re Refco, Inc. Sec. Litig.,
503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (same).

In light of the allegations against the
Individual Defendants for having made or being otherwise
liable misleading statements, they have been adequately
impleaded in the Complaint.

## VI.   PLAINTIFFS ADEQUATELY ALLEGED SCIENTER

The requisite state of mind in 10b-5 claims is
"intent to deceive, manipulate, or defraud." Tellabs, Inc.
v. Makor Issues & Rights Ltd., 551 U.S. 308, 319
(2007)(citation omitted). The Second Circuit has provided
at least five non-exclusive examples of how a plaintiff may
adequately plead scienter – namely, allegations that the
defendants: "(1) benefited in a concrete and personal way
from the purported fraud; (2) engaged in deliberately
illegal behavior; (3) knew facts or had access to
information suggesting that their public statements were
not accurate; or (4) failed to check information they had a
duty to monitor," Novak v. Kasaks, 216 F.3d 300, 311 (2d

61

Cir. 2000) (internal cross references omitted), or (5)
"ignored obvious signs of fraud." Id. at 308. See also
Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir.
1996) ("An egregious refusal to see the obvious, or to
investigate the doubtful, may . . . give rise to an
inference of recklessness.") (internal citations and
quotations omitted); Heller v. Goldin Restructuring Fund,
590 F. Supp. 2d 603, 619 (S.D.N.Y. 2008)(same). The inquiry
on scienter "is whether all of the facts alleged, taken
collectively, give rise to a strong inference of scienter,
not whether any individual allegation, scrutinized in
isolation, meets that standard." Tellabs, 551 U.S. at 323
(underlined emphasis omitted). "The inference that the
defendant acted with scienter need not be irrefutable,
i.e., of the 'smoking-gun' genre, or even the 'most
plausible of competing inferences.'" Tellabs, 551 U.S. at
324 (internal citations omitted). An inference "at least as
likely as competing inferences" warrants recovery. Id. at
324 n.5. See also City of Brockton Ret. Sys. v. Shaw Group
Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (the
'tie . . . goes to the plaintiff'").

         The Defendants have contended that two CWs'
accounts that Caplan told employees in early December 2006

that E*TRADE was experiencing losses and expected more
losses in 2007, ¶ 98, were "too vague to support a strong
inference of scienter," MTD at 34, without viewing these
allegations collectively with, e.g., Caplan's hiring of CW2
and CW5 to try to balance high mortgage risks, ¶¶ 72-73,
followed by Caplan's drastic reductions in the loan review
staff, ¶ 75, and Webb's refusal to restructure risky loan
portfolios because EGAM would realize the loss. ¶ 71.

Information from confidential witnesses can be
relied upon "provided [the confidential witnesses] are
described . . . with sufficient particularity to support
the probability that a person in the position occupied by
the source would possess the information alleged." Novak,
216 F.3d at 314. Plaintiffs have pled with particularity
the knowledgeable positions occupied by each of the CWs,
¶ 2, many of whom had first-hand interactions with the
Defendants concerning the matters alleged in the Complaint.
See, e.g., ¶ 71 (CW8 repeatedly recommended to Webb for
months that a mortgage portfolio was insufficiently hedged
and needed to be restructured, but Webb refused because it
would mean taking a loss on the portfolio); ¶ 76 (CW5
observed Webb's purchases of extremely risky products, and
observed Caplan working closely with EGAM on these

purchases, and losses of value in EGAM's loans); ¶ 82 ("CW4 reported that in some cases, every loan in the samples he saw was risky." CW4, in a meeting attended by Webb, asked: "What do you do when they are all high risk?" and "Shouldn't we be reviewing all of the loans in the portfolio?" CW4 was told "no," and that all the loans should not be reviewed); ¶ 89 (CW2 was so shocked at how poorly E*TRADE was run that CW2 quit after two weeks, but stayed at Caplan's and COO Lilien's request); ¶ 98 (In early December 2006, Caplan told E*TRADE employees (including CW14 and CW16) "confidentially," in a meeting attended by Simmons, Webb, and Lilien, that E*TRADE was experiencing losses and expected more losses in 2007); ¶ 99 (CW11 and CW13 attended internal town hall meeting where Caplan acknowledged that E*TRADE was overexposed in the subprime market and was waiting for a "white knight" to "get them out of the mortgage mess").

As in Countrywide, "Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards." 554 F. Supp. 2d at 1058. The fact that this case involves "[c]orroboration from multiple

sources also supports an inference of a scienter." Id. at
1058 (citing Makor Issues & Rights, Ltd v. Tellabs, Inc.,
513 F.3d 702, 712 (7th Cir. 2008)). The CWs here also
"emanate from several geographic areas" and "span different
levels of the Company hierarchy" which further support a
scienter finding. Id. at 1058-69.  A comprehensive survey
of employees is not needed at the pleading stage. Id. at
1059 n.10 (rejecting defense argument that plaintiffs only
used 14 "former mostly low-level employees out of more than
50,000 in 600 offices").

CW6's reports to management of huge numbers of
loans with negative discrepancies, questions to management
as to why it was keeping bad loans, responses from
management that E*TRADE wanted to maintain strong
relationships with originators, and reports that E*TRADE
was unable to sell bad loans to Bear Stearns or others,
¶ 78, allege the type of back and forth that could
establish top management's involvement and knowledge,
particularly when combined with all the other reports of
Defendants' direct involvement in EGAM. ¶¶ 67-118.

Moreover, in accordance with Supreme Court's
instruction in Tellabs, CWs' information must be viewed

65

together. CW3's allegations regarding Caplan's visit to
CW3's offices to push employees to originate more mortgages
together with CW9's report of Caplan's attempt to push CW9
to sell more mortgages, during which Caplan told CW9 that
E*TRADE was trying to "somehow compensate for losses"
because they were "so leveraged out", ¶ 95, together with
numerous other reports of Caplan's and other Defendants'
direct involvement and knowledge, see, e.g., ¶¶ 72-73, 75-
78, 82, 84, 89, 98-99.47, constitute adequate allegations
of scienter.

Plaintiffs have plead that Defendants "knew facts
or had access to information suggesting that their public
statements were not accurate." Novak, 216 F.3d at 311. Such
"allegations alone are enough to satisfy the pleading
requirement for scienter." Heller, 590 F. Supp. 2d at 622
(defendants' knowledge of undercapitalization that
contradicted their public statements alone satisfied
scienter).

The cases cited by Defendants, MTD at 33, are
distinguishable. In Steinberg v. Ericsson LM Tel. Co., No.
07-CV-9615, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10,
2008), and In re DRDGold Ltd., 472 F. Supp. 2d 562, 572

(S.D.N.Y. 2007), the complaints did not identify any
conversation where information was provided to Defendants
that was contrary to public statements. Further, in
Steinberg, the three witnesses claimed no contact with
Defendants, or even the headquarters where the fraud
occurred. 2008 WL 5170640, at *13. Here, the Complaint
makes reference to sixteen CWs, who provide accounts of
what they told Defendants, what Defendants knew, and/or
what was discussed internally that is alleged to be
contrary to Class Period statements.

While publicly claiming that E*TRADE's business
was conservative, involving strict underwriting and loan
purchasing discipline with respect to loan portfolio credit
quality, Defendants frequently spoke internally about money
to be made from their purchased high risk loans, ¶¶ 15, 70;
acknowledged the high risk nature of the loans – and, in
fact, hired executives in a desperate attempt to "balance"
these risks, ¶¶ 14, 72, 73; and admitted that E*TRADE was
experiencing and expected more losses. ¶ 16. CWs reported
insufficiently hedged mortgage portfolios directly to Webb,
who refused to reduce the risk. ¶ 71. These meetings, where
the problems at issue were directly discussed with
Defendants, evidence scienter. See, e.g., Akerman v.

Arotech Corp., 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009)
(upholding scienter based on meetings with defendants "to
discuss the difficulties"); In re Moody's Sec Corp. Litig.,
599 F. Supp. 2d 493, 515 (finding scienter when defendant
made statements revealing that he knew the company's
ratings were compromised).


          Caplan and Webb also directed the purchase of
E*TRADE's facially high risk loans from problemridden
originators with minimal to no due diligence. ¶¶ 15, 18,
74-86. Webb ran EGAM, which purchased the risky loans under
his direction. ¶¶ 69, 71. Caplan made the drastic
structural changes in E*TRADE's mortgage division which
included eliminating staff charged with reviewing and
monitoring loans. ¶¶ 67-69, 71, 347. Webb and Caplan both
worked closely and directly with EGAM personnel. ¶ 347.
Moreover, additional direct conversations with Individual
Defendants, meetings at which Individual Defendants were
present, and visits by Individual Defendants to EGAM
demonstrate their access to and actual knowledge of facts
which contradicted their public statements. See ¶ 82
(Webb's instruction to CW4 to stop reviews of loan pools
containing poor quality samples). See also ¶¶ 91, 95. In
addition, E*TRADE's inability to sell its troubled loans to

other institutions because the loans were so "terrible," ¶¶ 76, 78, is alleged to have provided Defendants with obvious knowledge of their quality. The Plaintiffs have alleged that Defendants were aware of E*TRADE's true condition and that their public statements were materially false and misleading.

Simmons' first-hand involvement is adequately pled. Errors in valuing a loan portfolio of $3 billion dollars, which needed to be downwardly repriced, was reported directly to Simmons. ¶ 84. All of E*TRADE's executives are alleged to have been in frequent communication with one another and their reports. ¶ 321. Simmons is alleged to have been also present at the early December 2006 meeting where Caplan discussed present and future losses, ¶ 98, but nonetheless, made contradictory assurances to investors on December 14, 2006. See, e.g., ¶ 177 ("As a result of our disciplined growth in the balance sheet, we expect to see continued growth in net interest income in 2007"). Simmons' other reassurances to investors throughout the Class Period regarding the key issues in this case, ¶¶ 132, 185, 212, 255, and his responsibilities as E*TRADE's chief financial and accounting officer, further evidence his scienter. See

Countrywide, 588 F. Supp. 2d at 1195 (the "only plausible
alternative inference to a strong inference of scienter as
to [COO whose primary job was to oversee company's
operations, and who publicly stated that certain loans were
'all high FICO'] is gross recklessness. That inference is
less compelling than one of actual knowledge or intent.");
In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324
F. Supp. 2d 474, 491 (S.D.N.Y. 2004) ("Key corporate
officers should not be allowed to make important false
financial statements knowingly or recklessly, yet still
shield themselves from liability to investors simply by
failing to be involved in the preparation of those
statements") (citation omitted); Hubbard v. BankAtlantic
Bancorp, Inc., No. 07-CV-61543, Order, at 7 n.6 (S.D. Fla.
May 11, 2009) (finding scienter based on position as CFO
because his job would be to monitor loan loss reserves and
therefore he either knew or was reckless in not knowing
that the loss reserves were materially understated) (Pl's
Mem. In Opp'n, Ex. B).

It is also alleged that Defendants' misstatements
concerned a "core" operation - EGAM's mortgage-based
investments which E*TRADE depended upon for much of its
financial results establish scienter. See, e.g., In re JP

Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 628

(S.D.N.Y. 2005) (information at the core of a company's

business "may be properly ascribable to senior officers")

(citation omitted); Makor, 513 F.3d at 711 ("it is

exceedingly unlikely" that CEO "was unaware of the problems

of his company's two major products and merely repeating

lies fed to him by other executives"); In re Complete Mgmt.

Inc. Sec. Litig., 153 F. Supp. 2d 314, 325-326 (S.D.N.Y.

2001) (courts reasonably assume "that principal managers []

are aware of matters central to that business's operation")

(citing cases).

    E*TRADE admitted after the Class Period, its

exposure to ABS, CDO and second-lien securities on

September 30, 2007 was, in fact, approximately $450

million, ¶¶ 20, 279, 282, which, for example, was $19.6

million more than E*TRADE's entire net income for 2005.

Courts have recognized that the magnitude of write-offs

alleged to be the subject of the misstatements supports a

strong inference of scienter. See In re Scholastic Corp

Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001).[9]

---

[9]    See also Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000)
(agreeing that the magnitude of write-offs involved "renders less
credible" defendants' argument that they acted without scienter); Atlas
Air Worldwide Holdings Inc, Sec. Litig., 324 F. Supp. 2d 474, 489
(S.D.N.Y. 2004)("the mere fact that the company had to make a large

71

"GAAP violations, when coupled with evidence of

fraudulent intent" provide evidence of scienter. SEC v. DCI

Telecomms., 122 F. Supp. 2d 495, 500 (S.D.N.Y. 2000).[10] As

set forth in the Complaint, ¶¶ 333-76, it is alleged that

Defendants violated numerous GAAP provisions, including

SFAS 5 and 114, with respect to, for example, loan loss

provisions and ABS adjustments. Incredibly, as Defendants

added high-risk loans to the balance sheet, their loan loss

provisions decreased. See, e.g., ¶¶ 220-21, 347. Moreover,

Defendants adopted a novel proprietary method of

---

correction is some evidence of scienter"); Florida State Bd. of Admin.
v. Green Tree Fin. Corp., 270 F.3d 645, 666 (8th Cir. 2001) ("[T]he
sheer size of the [] write-down adds to the inference that the
defendants must have been aware the problem was brewing"); Rehm v.
Eagle Fin. Corp., 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more
serious the error, the less believable are defendants' protests that
they were completely unaware of [the Company's] true financial status
and the stronger the inference that defendants must have known about
the discrepancy.").

[10]    See also Scholastic, 252 F.3d at 77 (actions contrary to
expressed accounting policy "can form the basis for proof of
recklessness"; scienter evidenced by a delay before taking special
charge for returns despite statements that management gave considerable
attention to monitoring returns); In re Daou Sys. Inc, 411 F.3d 1006,
1016 (9th Cir. 2005); Lewin v. Lipper Convertibles, L.P., No. 03-CV-
1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (repeated GAAP
violations can provide strong scienter inference). Indeed, Defendants'
own case citation states that "[s]ignificant GAAP violations, described
with particularity, may provide 'powerful indirect evidence of
scienter.'" Countrywide, 554 F. Supp. 2d at 1069 (MTD at 37). Although
Countrywide found that inadequately pleaded loan loss reserves
allegations were insufficient to independently evidence scienter, the
court noted that low reserves followed by a drastic increase in
reserves is "suggestive" of scienter, "especially given that riskier
loans may require greater reserves."
554 F. Supp. 2d at 1070.

calculating mortgage risk that understated the amount of
loan loss reserves required. ¶¶ 349-51.

Although personal pecuniary motive is not
required to plead scienter, see Tellabs 551 U.S. at 325,
Defendants' stock sales also support an inference of
scienter. See In re EVCI Colls. Holding Corp. Sec. Litig.,
469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006) ("Scienter can be
alleged in two ways: by pleading facts that evidence
conscious misbehavior or recklessness or by pleading facts
that evidence defendant's motive and opportunity to commit
fraud"). "[M]otive is adequately alleged where the
plaintiffs allege that the defendants sold their own shares
while at the same time misrepresenting corporate
performance in order to inflate stock prices." In re Refco,
Inc. Sec. Litig., 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007),
See also id. at 645 (concealing information to drive up
demand for shares, which would result in purchases of
shares from which defendants would be compensated, was "a
concrete benefit," and was sufficient to show motive)
(citation omitted). "The Second Circuit has held that
motive is adequately alleged where the defendants who made
false statements inflating the value of shares 'sold tens
of thousands of shares during the period that the allegedly

73

defrauded customers were purchasing them.'" Id. at 646
(citation omitted).

It is alleged that Simmons and Webb's knowledge
of the fraud and access to information belying their public
statements, establishing scienter. In addition, the stock
sales during the Class Period by Webb (229,000 shares for
$5,727,000) and Simmons (241,730 shares for $5,864,512)
provides further evidence of their scienter. Simmons' and
Webb's Rule 10b5-1 trading plans - adopted during the Class
Period - to dispose of significant amounts of stock during
the Class Period may evidence scienter. A Rule 10b5-1
trading plan may give rise to an inference of scienter
because "a clever insider might 'maximize' their gain from
knowledge of an impending price drop over an extended
amount of time, and seek to disguise their conduct with a
10b5-1 plan." See In re Immucor Inc. Sec. Litig., No. 05-
CV-2276, 2006 WL 3000133, at *18 n.8 (N.D. Ga. Oct. 4,
2006). Here, it is alleged that Defendants were already
aware of the Company's mortgage exposure time bombs at the
time Simmons and Webb adopted their trading plans, ¶¶ 14,
67-99. Further, "[T]he existence of a Rule 10b5-1 Trading
Plan is an affirmative defense that must be pled and
proved." Malin v. XL Cap. Ltd., 499 F. Supp. 2d 117, 156

74

(D. Conn. 2007) (citing 17 C.F.R. § 240.10b5-1(c)(1)(i)).
And, as the Court noted in EVCI, "The fact that there might
be an innocent explanation for the timing of [defendant]'s
sale is not enough to defeat the inference of scienter that
arises from plaintiffs' well-pleaded allegations -- which,
as defendants keep forgetting, I must accept as true for
purposes of this motion to dismiss." In re ECVI Colleges
Holding Corp. Sec. Litig., 469 F. Supp. 2d 88, 100
(S.D.N.Y. 2006). Trading plans are not a cognizable defense
to scienter allegations on a motion to dismiss where, as
here, they were adopted during the Class Period. See
Central Laborers' Pension Fund v. Integrated Elec. Servs.
Inc., 497 F.3d 546, 554 (5th Cir. 2007) (rejecting
defendant's attempt to use 10b5-1 plan as a "non-suspicious
explanation" because defendant entered into plan during the
class period); In re Biogen Idec, Inc. Sec. Litig., No. 05-
10400, 2008 WL 4810045, at *14 (D. Mass. Oct. 25, 2007)
("The attempt to use such trading plans as a non-suspicious
explanation is undermined . . . when such plans are entered
into during the Class Period"). Defendants' arguments and
case citations regarding Simmons' and Webb's trading plans
are inapposite. In re Bausch & Lomb, Inc. Sec. Litig., 592
F. Supp. 2d 323, 344 (W.D.N.Y. 2008) (no indication of when
plan was adopted); Metzler Inv. GMBH v. Corinthian

Colleges, Inc., 540 F.3d 1049, 1067 n.11 (9th Cir. 2008)

(same); In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp.

2d 574, 604 (S.D.N.Y. 2007) (plaintiffs failed to specify

defendants' knowledge at time plan was adopted); Teachers'

Ret. Sys. of LA v. Hunter, 477 F.3d 162, 185 (4th Cir.

2007) (no trading plan mentioned); In re Vantive Corp. Sec.

Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) (same).

Teachers and Vantive discuss the length of the class period

- but never relate class period length to a trading plan.

Moreover, the Ninth Circuit's opinion as to what is an

"unusually long" class period has no relevance in the

Second Circuit. The sole case Defendants cite in the Second

Circuit.  Malin, involved a 24-month class period - five

months longer than the present case, and also refused to

consider the trading plan as a defense to scienter. 499 F.

Supp. 2d at 156.


Caplan's direct knowledge and access to

information are sufficiently alleged to establish scienter.

In addition, Caplan sold 72,211 shares during the Class

Period, for proceeds of $1,738,971. ¶ 327. Even if Caplan

made this sale to cover the exercise price and taxes for

options that were expiring, as Defendants argue, MTD at 26,

Caplan acquired shares at no cost to him, which does not

demonstrate lack of scienter. Where a defendant may have believed that he could eventually sell his shares at a profit by continuing to hide the fraud or by resolving undisclosed problems without the public learning of the true facts, courts refuse to hold that defendants' stock purchases were inconsistent with fraud. See Refco, 503 F. Supp. 2d at 646-47 (rejecting argument that defendants' stock purchases of stock were inconsistent with fraud, because defendants might have believed that uncollectible receivables could be hidden indefinitely or disposed of and that company's stock would accordingly continue to rise).

Because Plaintiffs have alleged that Defendants were aware of or had access to information contrary to their public statements, that the misstatements concerned E*TRADE's core operations, that Defendants violated GAAP provisions, and that Defendants benefited from the from the misrepresentations through stock sale, Plaintiffs have adequately pled scienter.

## VII. LOSS CAUSATION IS ADEQUATELY PLED

In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), the Supreme Court explained that the pleading

rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." Id. at 346-47 (citations omitted). There is no heightened standard for pleading loss causation. See In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008). For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005).

A "corrective disclosure" is not required under this Court's post-Dura case law. In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss") (analyzing Second Circuit cases). A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices. Id. at

307. See also Heller, 590 F. Supp. 2d at 624 (loss
causation satisfied by allegations that plaintiff's loss
was caused by foreseeable materialization of concealed risk
of fund's undercapitalization). Here, the materialization
of concealed risks and information regarding the quality of
E*TRADE's mortgage investments sufficed to plead loss
causation. See Emergent Cap. Inv. Mgmt., LLC v. Stonepath
Group, Inc., 343 F. 3d 189, 198-99 (2d Cir. 2003) (cited
with approval in Dura, 544 U.S. at 344-45).

Moreover, neither the Supreme Court in Dura, nor
any other court addressing the loss causation pleading
standard require a corrective disclosure be a "mirror
image" tantamount to a confession of fraud. Because
corporate wrongdoers rarely admit that they committed
fraud, "it cannot ordinarily be said that a drop in the
value of a security is 'caused' by the misstatements or
omissions made about it, as opposed to the underlying
circumstance that is concealed or misstated." Lentell v.
Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005).
Thus, the "relevant truth" required under Dura is not that
a fraud was committed per se, but that the "truth" about
the company's underlying condition, when revealed, causes
the "economic loss."

Further, partial disclosures can satisfy the loss causation requirement. See Dura, 544 U.S. at 342 (loss causation met where shares sold after "the relevant truth begins to leak out.") See also In re Vivendi Universal, S.A. Sec. Litig., 605 F. Supp. 2d 586, 599-60 (S.D.N.Y. 2009) (same). It is also "clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events." Bristol Myers, 586 F. Supp. 2d at 165.

Here it is alleged that E*TRADE partially disclosed a $30 million increased provision for loan losses on July 25, 2007, but continued to emphasize "record performance," improved revenue and earnings quality, strict discipline regarding risk mitigation and reduced charge offs, resulting in a $1.41 per share partial stock price decline. ¶ 310. Likewise, on September 17, 2007, E*TRADE partially disclosed that it was exiting the wholesale mortgage business, revising 2007 earnings guidance downwards, and setting aside $245 million for second half year loan losses, but continued to falsely promote its "conservative approach," "high FICOs, low LTVs and high owner occupancy levels," "loan risk mitigation discipline"

and "excess collateralization," resulting in a $0.12 per share partial stock price decline. ¶¶ 311-13. The alleged disclosures in the Complaint each reflected the partial "materialization[s] of the concealed risk[s]," Lentell, 396 F.3d at 173, and are directly linked to alleged previous misrepresentations and/or omissions and to resulting declines in E*TRADE's stock price. See, e.g., ¶¶ 306-20. Defendants' false and misleading statements are alleged to have caused the price of E*TRADE stock to be artificially inflated, ¶ 309; and E*TRADE's partial and end-of-Class Period disclosures caused the stock to decline, ¶¶ 311-18, and investors' substantial losses.¶¶ 36-41; Complaint, Exs. A-E. However, Defendants' reassurances to investors and incomplete, partial disclosures did not reveal the full truth about the risks and true performance of E*TRADE's portfolio.

On November 9, 2007, the last day of the Class Period, E*TRADE revealed $450 million of additional losses in its MBS portfolio, asset-backed CDO and second-lien securities exposure, and larger write-downs; withdrew guidance; and announced that the SEC had commenced an investigation which it is alleged resulted in a 58.67% one day drop in share price, and a multi-billion dollar "run on

the bank" by E*TRADE customers, resulting from the public

learning of the scope and severity of E*TRADE's risky

investments and losses. ¶¶ 279-87, 314. The market's

reaction to the disclosures evidences Defendants'

concealment of much of the Company's investment risk up

until the end of the Class Period. Plaintiffs here have

clearly pleaded that the "share price fell significantly

after the truth became known." Dura, 544 U.S. at 347.


Defendants' contention that the November 9, 2007

stock price drop was due to "new events" rather than a

corrective disclosure, MTD at 39, constitutes an issue of

fact at this juncture and is not supported by the

allegations of the Complaint. Moreover, according to the

Plaintiffs, the circumstances which Defendants characterize

"new events" (such as the SEC investigation and ratings

downgrades) actually corrected misstatements and/or

materialized concealed risks, concerning, e.g., Defendants'

purchase of risky loan pools, inadequate due diligence, and

failure to record timely balance sheets adjustments. See In

re Bradley Pharms., Inc. Sec. Litig., 421 F. Supp. 2d 822,

828-29 (D.N.J. 2006) (announcement of an informal SEC

inquiry at the end of the class period that did not

disclose the reason for the inquiry, but resulted in

82

significant stock price drop, was sufficient to connect that price drop to the improprieties that triggered the SEC inquiry, even though the nature of the improprieties was revealed later).

A number of "[o]ther courts have found that similar allegations of significant stock drops in response to announced SEC investigations are sufficient to plead loss causation under the framework established by Dura and its progeny." In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) (collecting cases). In Take-Two, a 7.5% drop in share price in response to an announcement that the SEC was "conducting an informal non-public investigation into certain stock option grants made by the Company" sufficed to plead loss causation. Id. at 282. The price drop here in response to a relevant SEC investigation was eight times larger, and pleads loss causation. Moreover, the SEC investigation was linked to the purportedly fraudulent misconduct, and thus was "akin to a corrective disclosure," Bristol Myers, 586 F. Supp. 2d at 165, and was not merely "'bad news' followed by a stock price decline." Id. at 164.

The other item which Defendants characterized as a "new" development, namely, declines in the value of E*TRADE's securities "consistent with" rating agency securities downgrades, ¶ 279, simply reflected a correction of the previous inaccurate ratings stemming from Defendants' successful misstatement and omissions regarding the inherent risks of E*TRADE' high-risk portfolio. In re Vivendi Universal, S.A., Sec. Litig., 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009)("A ratings downgrade reveals the risk of deteriorating liquidity . . . if the company had previously concealed its liquidity condition . . . by making false or misleading statements, these events may be sufficiently related to the fraud to qualify as materializations of the risk").

Defendants have not established at this stage in the action that the risks which materialized here were unforeseeable as a matter of law. To prove that a loss-inducing event was foreseeable, Plaintiffs merely need to "establish that the risk of the event occurring 'was within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor.'" Id. (quoting Lentell, 396 F.3d at 173). SEC investigations and

rating agency downgrades were within the concealed "zone of risk" emanating from E*TRADE's practices.

In light of the allegations set forth in the Complaint and recounted above, Plaintiffs have sufficiently pled loss causation.

## VIII.  THE BROWER LETTER DOES NOT REQUIRE A SHORTENED CLASS PERIOD

The Defendants have contended that Plaintiffs' lead attorney's September 11, 2008 letter (the "Brower Letter," MTD, Ex. 15) requires the Plaintiffs to end the Class Period on September 17, 2007 having stated that the events giving rise to the action were revealed in September 2007, MTD at 40.  Judicial estoppel applies when a "clearly inconsistent position" has been adopted by the court in a prior proceeding, Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 57 (S.D.N.Y. 1999).

The Court did not "adopt" a position that was clearly inconsistent with the Complaint. The Brower Letter sought relief which was unrelated to, and did not depend upon the date the Class Period ended. Nor did the September 22, 2008 so-ordered stipulation of all parties explicitly

or implicitly adopt a position that Defendants' revelations were all made in September 2007. The Brower Letter complained that, after lead counsel was appointed here, Defendants violated a prior Court-ordered stipulation consolidating all subsequently filed related cases (the August 28, 2008 "Consolidation Order") by entering into a secret, partial consolidation stipulation with another plaintiff group (the "Tate" plaintiffs), that was presented to the Court without advising Court-appointed lead counsel. The Tate action was thereupon stayed. The Brower Letter's reference to Defendants' September 2007 revelations had no impact on either Defendants' subsequent agreement or the Court's endorsement of that agreement to vacate the Tate Stipulation or the Court's reform of the record. See Brower Letter (MTD Ex. 15, at 1, basing request to stay the Tate action on the Consolidation Order); MTD. Ex. 16 (Sept. 22, 2008 Stipulation, at 2, whereas clause, referencing the Court's Consolidation Order as the basis for the stay relief). See also Johnston v. Arbitrium (Cayman Islands) Handels AG, 198 F.3d 342, 346 (2d Cir. 1999) ("[c]ollateral estoppel . . . bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment") (citation omitted).

Also, judicial estoppel does not apply here
because the allegedly "inconsistent" position was taken in
the current proceeding, and this Court had already
determined – after full briefing and argument – the Class
Period at issue. "[T]he Second Circuit has consistently
required as a prerequisite that the inconsistent position
be taken in a 'prior preceding,' . . . Because their prior
motion was . . . part of the current proceeding, judicial
estoppel cannot apply." In re Omnicom Group, Inc. Sec.
Litig., No. 02-CV-4483, 2007 WL 2376170, at *6 (S.D.N.Y.
Aug. 10, 2007).

This Court's July 16, 2008 decision (Dkt. No. 59)
appointed lead plaintiffs and counsel for a class period
ending on November 9, 2007. Id. at 1. As the decision
noted, five initial complaints were filed here – three were
filed in October 2007 alleging a September 25, 2007 class
period end date, and two were filed in November 2007
alleging a November 9, 2007 class period end date. Id. at
3. The Brower Letter mistakenly referenced the September
date used in the first three complaints. Moreover, the
Complaint supersedes any earlier statements in a letter
regarding this case. See Dluhos v. Floating & Abandoned

Vessel, 162 F.3d 63, 68 (2d Cir. 1998) ("[i]t is well
established that an amended complaint [] supersedes the
original, and renders it of no legal effect"); County of
Riverside v. McLaughlin, 500 U.S. 44, 48 (1991) (second
amended complaint is the operative pleading).

## IX.   CONTROL PERSON LIABILITY IS ADEQUATELY ALLEGED

As set forth above, Plaintiffs have alleged
primary violations of §10(b) by E*TRADE. "To survive a
motion to dismiss under Section 20(a) of the Exchange Act,
a plaintiff need only plead facts which support a
reasonable inference that [defendants] had the potential
power to influence and direct the activities of the primary
violator." In re Adelphia Comm'ns Corp. Sec. & Deriv.
Litig., 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005) (rejecting
argument that John Rigas could not be a control person
because he was not a company officer) (internal citations
and quotation marks omitted). See also CompuDyne Corp. v.
Shane, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("control
requires only the ability to direct the actions of the
controlled person, and not the active exercise thereof").

Defendants have not challenged the fact that Simmons and Caplan are "controlling persons." Plaintiffs have also sufficiently alleged that Webb was a "controlling person." Webb oversaw all of the Company's capital markets endeavors and held multiple officer posts at E*TRADE and EGAM. ¶ 46. As CWs reported, Webb led and directly participated in E*TRADE's purchase of extremely risky loans and mortgage pools and the repackaging of these products. ¶¶ 76-77. Significantly, contrary to Defendants' argument that Webb had no involvement with issuing statements, MTD at 42, Webb spoke directly to investors during conference calls. See, e.g., ¶ 183.

## X.   CONCLUSION

In light of the foregoing authorities and conclusions, Defendants' motion to dismiss is denied.

It is so ordered.

New York, New York
May /0 , 2010

ROBERT W. SWEET
U.S.D.J.