UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LARRY FREUDENBERG, Individually and
On Behalf of All Others Similarly Situated,

                Plaintiff,

       - against -

E*TRADE FINANCIAL CORPORATION,
MITCHELL H. CAPLAN, ROBERT J.
SIMMONS and DENNIS E. WEBB,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

07 Civ. 8538 (JPO) (MHD)

**JOINT DECLARATION OF DAVID A.P. BROWER AND EDUARD KORSINSKY IN
SUPPORT OF PLAINTIFFS' MOTIONS FOR FINAL CERTIFICATION OF
SETTLEMENT CLASS, FINAL APPROVAL OF CLASS NOTICE, FINAL APPROVAL
OF THE PROPOSED SETTLEMENT, FINAL APPROVAL OF THE PROPOSED PLAN
OF ALLOCATION AND PLAINTIFFS' COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

David A.P. Brower and Eduard Korsinsky hereby declare under penalty of perjury as

follows:

      1.      David A.P. Brower is a Managing Director of the law firm of Brower Piven, A

Professional Corporation ("Brower Piven"). Eduard Korsinsky is a partner of the law firm of

Levi & Korsinsky, LLP ("Levi & Korsinsky"). We were appointed Lead Counsel and Co-Lead

Counsel, respectively, in this Action for Plaintiffs and the proposed Settlement Class ("Plaintiffs'

Counsel").[1]

---

[1] Capitalized terms not otherwise defined have the meaning set forth in the parties' Stipulation of
Settlement dated May 17, 2012 ("Stipulation"). The Stipulation is attached as Exhibit 1 to the Declaration
of Brian C. Kerr dated May 17, 2012 in support of Plaintiffs' Motion for: (1) Preliminary Approval of
Settlement; (2) Certification of the Class for Purposes of Settlement; (3) Approval of Notice to the Class;

2.      We submit this Joint Declaration pursuant to Rule 23 of the Federal Rules of Civil Procedure in support of Plaintiffs' motions for (a) final certification of the Settlement Class; (b) final approval of the forms and methods for providing notice to the Settlement Class; (c) final approval of the proposed Settlement; and (d) final approval of the proposed Plan Of Allocation. This Joint Declaration is also submitted in support of Plaintiffs' Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses.

3.      We have worked actively on this litigation since its inception. As such, we have personal knowledge of the matters described below and are competent to testify thereto.

## PRELIMINARY STATEMENT

4.      This case has been vigorously litigated from its commencement on October 2, 2007 through agreement on the final form of the Stipulation and the associated exhibits on May 17, 2012. The Settlement represents an excellent recovery for E*TRADE securities purchasers who were at a substantial risk of receiving a smaller recovery or, indeed, no recovery at all, through continued litigation.  At every stage of the Action, counsel for Defendants asserted aggressive defenses and expressed the belief that the Settlement Class could not prevail on the claims asserted, that a class would not be certified, and that Plaintiffs could not prove or recover damages in the magnitude that they sought.  The Settlement was not achieved until Plaintiffs, among other things: (a) conducted an extensive factual investigation; (b) prepared a 189-page amended complaint; (c) defeated a lengthy and difficult motion to dismiss; (d) reviewed and analyzed over 16 million pages of documents produced though discovery, including from Defendants and third-parties, such as mortgage originators and E*TRADE's auditors; (e) consulted with experts on accounting and damages; and (f) prepared for and attended multiple

and (4) Scheduling of a Final Approval Hearing. Dkt. No. 126.   Unless otherwise indicated, the definitions used in the Stipulation are the same as those used herein.

mediation sessions, as well as participated in numerous informal discussions between the parties without the mediator.

5.    Plaintiffs believe that this Settlement represents an excellent result for the Settlement Class, especially given the procedural and factual circumstances of the Action. Substantial investigation, motion practice, discovery, meetings with consultants, and legal research informed Plaintiffs that, while they believed their case was meritorious, it had weaknesses that had to be carefully evaluated in determining what course was in the best interests of the Settlement Class – *i.e.,* whether to settle and on what terms, or continue to litigate.

6.    As set forth in further detail below, despite the fact that Plaintiffs' allegations and claims were supported by legal authority and the evidence discovered to date, this Action presented many uncertainties with respect to Plaintiffs' ability to ultimately prevail or recover more than provided by the Settlement.  These risks included, but were not limited to, prevailing on a litigated motion for class certification; amassing sufficient evidence through discovery to defeat Defendants' inevitable motions for summary judgment; demonstrating, by a preponderance of the evidence to the trier of fact, that Defendants made misrepresentations of fact and did so with the requisite state of mind; and credibly demonstrating the amount of damages caused by the alleged misleading statements.

7.    In addition to the factual and legal obstacles to success on the merits was the certainty that further litigation would require the expenditure of enormous amounts of time and expense to complete merits and expert discovery, litigate pretrial motions, try the case and succeed on the ultimate appellate proceedings that would have followed the trial no matter what the verdict might have been.  Weighed against these risks was the achievement of a $79 million

cash settlement that assures damaged Settlement Class Members will receive a significant recovery in the immediate future without the risks of non-recovery posed by continued litigation.

8.      In accordance with the Court's June 12, 2012 Order Granting Preliminary Approval of Settlement, Granting Conditional Class Certification, and Providing for Notice ("Preliminary Approval Order"), over 232,000 Settlement Notices were mailed to potential Settlement Class Members beginning on July 3, 2012, and the Summary Notice was published three separate times over *PRNewswire* on July 9, 16, and 23, 2012. *See* Declaration of Jose Fraga, Senior Director for GCG, Inc. ("GCG"), dated August 9, 2012, the Court-appointed Claims Administrator in this case, annexed hereto as Exhibit A ("Fraga Declaration" or "Fraga Decl.") at ¶¶2-5, 7-9. The Stipulation (and its exhibits), the Notice, and a Proof of Claim and Release form were posted on the Claims Administrator's website.   Fraga Decl. at ¶7. Both notices described the Settlement, the Plan of Allocation, the maximum amount of attorneys' fees and litigation expenses that Plaintiffs' Counsel would seek, Settlement Class Members' rights; and the procedures and deadlines for exercising those rights.   Thus, the notice program fully complied with the Court's Preliminary Approval Order and was the best notice practicable under the circumstances and met the requirements of Fed. R. Civ. P. 23(c), (e), and (h), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and due process.

9.      In response to the extensive notice program, no objections have yet been received and only one request for exclusion has been received as of August 10, 2012.[2]

10.      We also believe that the Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court.   The Plan proposes to allocate the net proceeds of the

---

[2]   The deadline to opt out and file objections is September 10, 2012. Accordingly, we intend to file additional papers prior to the final "fairness" hearing scheduled for October 11, 2012 to address all objections and opt outs as necessary.

Settlement to eligible Settlement Class Member claimants depending on which of the E*TRADE securities they acquired (*e.g.,* common stock, options or other types of securities); when they acquired and/or sold those securities; and the different amounts of estimated recoverable damages, if any, for each security for the period in which those securities were purchased and held. The Plan of Allocation was developed with assistance from Plaintiffs' consulting expert on damages, John C. Hammerslough. The proposed Plan of Allocation reflects Plaintiffs' best possible damages scenarios and, therefore, is both fair and equitable.

11. Finally, we submit that the requested fee of 33 1/3% of the Settlement Fund, or approximately $26,333,333, should be approved as fair and reasonable. The requested fee is consistent with awards made in other, similar securities class action cases under either the percentage-of-the-recovery or lodestar multiplier methodologies used by the courts in making such awards. The requested fee is also appropriate to compensate Plaintiffs' Counsel for, *inter alia*, the high amount of individual Settlement Class Members' damages recovered in the Action, the contingent nature of Plaintiffs' Counsel's representation, the quality of that representation, and the risk undertaken at inception. *See* Declaration of Professor Geoffrey Miller, dated August 10, 2012, *passim*, annexed hereto as Exhibit B ("Miller Declaration" or "Miller Decl.").

## FACTUAL BACKGROUND

### Procedural History

12. The first of these related securities fraud class actions was filed on October 2, 2007. *See Freudenberg v. E*TRADE Financial Corp., et al.*, No. 07 Civ. 8538 (Dkt. No. 1). Plaintiff asserted securities fraud claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 on behalf of a proposed class of those who acquired E*TRADE common stock between December 14, 2006 and September 25, 2007. That

complaint was filed shortly after E*TRADE announced that the Company was exiting the wholesale mortgage business, revising 2007 earnings guidance downwards, and setting aside $245 million for second half year loan losses. Plaintiff alleged that E*TRADE and certain of its officers defrauded investors by failing to disclose that the Company's securities portfolio (which included assets backed by mortgages) was materially overvalued, and that it was experiencing a rise in delinquency rates in its mortgage and home equity portfolios.

13.    As required by the PSLRA, on October 2, 2007, plaintiff Freudenberg published notice over a national business-oriented wire service (*Business Wire*) advising members of the proposed class that a securities class action was filed and that investors had 60 days (until December 3, 2007) in which to move for appointment as lead plaintiff. *See* 15 U.S.C. § 78u-4 (a)(3)(A)(i).

14.    Following the filing of the *Freudenberg* action, four additional complaints were filed in this District.[3] These cases were originally assigned to the Hon. Robert W. Sweet.

**The Lead Plaintiff Process**

15.    On December 3, 2007, motions for appointment of lead plaintiff and lead counsel were filed by six movants: (a) State Teachers Retirement System of Ohio ("Ohio") (Dkt. No. 7); (b) The Kristen-Straxton Group, represented by Brower Piven (Dkt. No. 11); (c) Skandia Life Insurance Company Ltd. ("Skandia") (Dkt. No. 16); (d) the "Institutional Investor Group" (consisting    of    the    Mississippi    Public    Employees'    Retirement    System,    AFA

---

[3] *See Boston v. E*TRADE Financial Corp., et al.*, No. 07 Civ. 8808 (filed on Oct. 12, 2007) (Dkt. No. 1); *Thulman v. E*TRADE Financial Corp., et al.*, No. 07 Civ 9651 (filed on Oct. 26, 2007) (Dkt. No. 1); *Davidson v. E*TRADE Financial Corp., et al.*, No. 07 Civ. 10400 (filed on Nov. 16, 2007) (Dkt. No. 1); *Ferenc v. E*TRADE Financial Corp., et al.*, No. 07 Civ. 10540 (filed on Nov. 21, 2006) (Dkt. No. 1). An individual opt-out action was also filed, *Tate v. E*TRADE Financial Corp., et al.*, No. 08 Civ. 7296 (filed on Aug. 18, 2008) (Dkt. No. 1) ("Tate Action"), which was stayed (following a letter from Lead Counsel) and consolidated with *Freudenberg* pending the class certification determination. *See* Dkt No. 11 on *Tate* docket.

Livförsäkringsaktiebolag, AFA Sjukförsäkringsaktiebolag, AFA Trygghetsförsäkringsaktiebolag and Kollektivavtalsstiftelsen TSL) (Dkt. No. 20); (e) "First Derivative Plaintiffs" (consisting of First Derivative Traders LP and Robert and Jessica Grant) (Dkt. No. 22); and (f) Ira Newman (Dkt. No. 23).

16.     On December 7, 2007, the Court set a date to hear oral argument on the lead plaintiff motions for January 16, 2008 at 12:00 p.m. before Judge Robert W. Sweet. Dkt. No. 27.

17.     On December 20, 2007, Skandia, Ohio, and The Kristen-Straxton Group filed Memoranda of Law in Opposition to the motions of the other lead plaintiff movants. Dkt. Nos. 28, 31 and 37, respectively.

18.     On December 20, 2007, the First Derivative Plaintiffs and the Institutional Investor Group withdrew their motions for appointment of lead plaintiff. Dkt. Nos. 35 and 36, respectively.

19.     On January 7, 2008, Skandia, Ohio and The Kristen-Straxton Group filed reply memoranda in further support of their motions for appointment of lead plaintiff. Dkt. Nos. 41, 43 and 46, respectively.

20.     On January 16, 2008, the Court held a hearing on the motions by Skandia, Ohio, The Kristen-Straxton Group, and Ira Newman for appointment of lead plaintiff.  After lengthy argument, Judge Sweet took the motions under advisement.

21.     On July 7, 2008, The Kristen-Straxton Group filed a Notice of Supplemental Authority in support of its motion for appointment as lead plaintiff. Dkt. No. 57.

22.     On July 9, 2008, Ohio filed a Response to The Kristen-Straxton Group's Notice of Supplemental Authority. Dkt. No. 58.

23.     On July 17, 2008, Judge Sweet issued an order appointing The Kristen-Straxton Group as Lead Plaintiff and Ira Newman as Co-Lead Plaintiff, and appointing Brower Piven as Lead Counsel and Levi & Korsinsky as Co-Lead Counsel (as defined above, collectively "Plaintiffs' Counsel").  The Court also ordered that the case proceed under the first-filed caption: *Freudenberg v. E*TRADE Fin. Corp.*, Civil Action No. 07 Civ. 8538 (JPO) (MHD). Dkt No. 59.

**Factual Investigation**

24.     Plaintiffs could not conduct formal discovery prior to a ruling on a motion to dismiss the complaint due to the PSLRA stay. 15 U.S.C. § 78u-4(b)(3)(B). Therefore, following the Court's July 17, 2008 appointment of lead plaintiffs and lead counsel, Plaintiffs' Counsel undertook an extensive investigation of the claims in the Action, including retaining outside investigators.  The investigation focused on identifying former employees of E*TRADE and others with personal knowledge of the events at E*TRADE during the Settlement Class Period. Over several months, numerous interviews were conducted by Plaintiffs' investigators.  A number of witnesses provided useful information or pointed to other sources which, in turn, were contacted, from whom information was obtained ultimately to be incorporated into the amended complaint.

25.     The factual investigation also included an extensive analysis of the huge volume of publicly available information about E*TRADE. As a large financial institution, E*TRADE drew considerable attention from the financial press and investment analysts. Among other things, Plaintiffs obtained and reviewed E*TRADE's numerous SEC filings, multiple press releases, news reports, and analyst reports relevant to the claims and defenses. Plaintiffs' Counsel analyzed this and other extensive information for incorporation into an amended complaint.

26.    Plaintiffs' Counsel also initiated contact and conferred extensively during this period with consulting experts in forensic accounting, banking, mortgage-backed securities and market analysis.   The underlying factual issues in this case concern subprime and related mortgages, structured financing (in particular, asset-backed securities such as CDOs) and other financial instruments, and whether Defendants' statements regarding these assets were materially false and misleading and omitted material information, and the proper accounting for such instruments.   In addition, Plaintiffs' Counsel was aware from the beginning of these proceedings that Defendants likely would claim that the collapse in the financial and credit markets generally, and the mortgage and mortgage-related securities sector in particular, caused investor losses rather than any wrongdoing on Defendants' part.   Thus, Plaintiffs' Counsel were aware that pleading and ultimately proving loss causation and damages would feature prominently in this litigation and require expert input at the outset.

**Procedural History**

27.    On August 5, 2008, the Court issued a Pretrial Order directing the parties to discuss settlement, pretrial discovery and all preliminary matters.   Dkt. No. 63.   The Court also set a Scheduling Conference for November 5, 2008 in the event the parties were unable to resolve the Action for them to discuss with the Court settlement, contemplated motions, stipulating facts and arranging a plan and schedule for all discovery, resolving anticipated discovery issues, and setting a time for trial.   Dkt. No. 65.

28.    On August 8, 2008, Plaintiffs' Counsel wrote a letter to Defendants' Counsel asking to set up a time to discuss scheduling issues in response to the Court's August 5, 2008 Order. Discussions between the parties followed.

29.      On August 22, 2008, Plaintiffs submitted a Stipulation and [Proposed] Order to the Court regarding the scheduling for the filing of an amended complaint and any briefing on a motion to dismiss.

30.      On September 4, 2008, the Court issued a Scheduling Order requiring Plaintiffs to file and serve a consolidated amended complaint on or before December 30, 2008, for Defendants to answer, move or otherwise respond to the consolidated amended complaint on March 16, 2009, for Plaintiffs to oppose any motion to dismiss by June 1, 2009, and for Defendants to reply to Plaintiffs' opposition by July 31, 2009. Dkt. No. 65.

31.      On September 11, 2008, Plaintiffs wrote a letter to the Court objecting to the Stipulation and Order between the parties to the *Tate* Action, dated September 5, 2008, which was submitted to the Court without any notice to Plaintiffs.

32.      On September 15, 2008, Defendants replied to Plaintiffs' September 11, 2008 letter, agreeing that the *Tate* Action should either be consolidated or stayed until resolution of the class certification issue in this Action.

33.      On September 19, 2008, Plaintiffs wrote a letter to the Court because the Court determined to treat Plaintiffs' Counsel's letter of September 11, 2008 as a motion, and submitted a Stipulation and [Proposed] Order providing that the *Tate* Action be stayed and consolidated with the Action, pending a class certification determination. The Court entered the Order on September 22, 2008.  Dkt. No. 11 on *Tate* docket.

34.      On October 31, 2008, Defendants submitted a letter to Judge Sweet requesting on behalf of all parties that the Court cancel the pretrial conference scheduled for November 5, 2008 because Defendants' time to move, answer or otherwise respond to an amended complaint due to be filed no later than December 30, 2008 had not commenced and was not due to be filed with

the Court until March 16, 2009.  Thus, pursuant to the PSLRA, all discovery was stayed, and on November 3, 2008, the Court cancelled the pretrial conference.  Dkt No. 66.

35.    On January 5, 2009, the Court entered an Order revising and superseding the September 4, 2009 Scheduling Order requiring Plaintiffs to file and serve a consolidated amended complaint on or before January 16, 2009, for Defendants to answer, move or otherwise respond to the consolidated amended complaint on April 2, 2009, for Plaintiffs to oppose any motion to dismiss by June 18, 2009 and for Defendants to reply to Plaintiffs' opposition by August 17, 2009.  Dkt No. 67.

**The Amended Complaint**

36.    On January 16, 2009, Plaintiffs filed their 189-page, 385 paragraph Consolidated Amended Complaint ("Amended Complaint").  Dkt. No. 68.  The Amended Complaint is based on Plaintiffs' Counsel's extensive review of E*TRADE's SEC filings, the results of interviews of former E*TRADE employees conducted by Plaintiffs' Counsel and their private investigators, and the Company's press releases, as well as other pertinent documents.   The Amended Complaint alleged that E*TRADE and three of its top officers, Mitchell Caplan (former Chief Executive Officer), Robert Simmons (former Chief Financial Officer), and Dennis Webb (former head of E*TRADE's capital markets division) violated Section 10(b) of the Exchange Act and Rule 10b-5 by materially misleading persons who invested in E*TRADE securities from April 19, 2006 through November 9, 2007, ultimately causing them substantial damages.

37.    In sum, Plaintiffs' Amended Complaint alleged that E*TRADE was originally an internet discount brokerage firm that yielded steady and safe returns.  Because opportunities for growth were limited, Defendants aggressively expanded into the highly profitable mortgage business by the beginning of the Class Period.  During that time, however, Defendants told

investors that E*TRADE's mortgage business focused on "organic" loans, originating its own mortgages for its "mass affluent" brokerage customers, when in fact E*TRADE (through its E*TRADE Global Asset Management ("EGAM") subsidiary) was actually purchasing large mortgage pools from other originators – at a time when routinely purchasing "safe" mortgages was becoming increasingly difficult (if not impossible). To continue its stream of income from EGAM (one of E*TRADE's business segments), Defendants acquired huge quantities of loans from the nation's worst subprime and below-subprime mortgage originators, without telling investors that they had changed E*TRADE's business model from conservative investments in high quality loans to purchasing extremely high-risk, facially low quality debt instruments. When accurate information about the Company and its mortgage business became public, E*TRADE's stock price declined.

38.     As alleged in detail in the Amended Complaint, Plaintiffs claim that E*TRADE's public statements during the Class Period were materially false and misleading because:

- Defendants described the Company's portfolio of mortgage loans as "*superprime*" to distinguish E*TRADE from troubled lenders who were experiencing severe financial problems, when in fact E*TRADE itself was exposed to significant subprime and mortgage risk. *See, e.g.*, Amended Complaint at ¶¶168, 170, 172, 185, 202, 212.

- Defendants represented that the Company's lending business was generated "*organically*" from its traditional trading and banking services to E*TRADE customers even though the Company was purchasing *billions* of dollars of loans from financially troubled lenders (such as Countrywide Financial Corporation), thereby misleading investors about the Company's investment strategy and risk. *See, e.g.*, Amended Complaint at ¶¶131, 160, 185, 289-90.

- Defendants told investors that E*TRADE used "*discipline*" and "*conservatism*" in its risk management and monitoring of its loan portfolio when, in fact, Defendants had consciously decided to secretly sacrifice safety for profits. *See, e.g.*, Amended Complaint at ¶¶67, 68, 71, 82, 91, 185, 202, 211.

- Defendants *decimated E*TRADE's due diligence procedures* to facilitate the steady influx of high-risk asset-backed securities and pools of mortgages from

problem-ridden originators, firing mortgage loan and credit review personnel, and all but eliminating any pre- or post-purchase review of these loan pools – in disregard of the Company's own stated underwriting practices, and without disclosing such facts to investors. *See, e.g.,* Amended Complaint at ¶¶13, 30-31, 75, 81-82, 120, 65-86, 300-01, 344.

- Defendants misrepresented and omitted material information concerning the quality and risks associated with the Company's investment portfolio of asset-backed securities ("ABS"), mortgage-backed securities ("MBS"), and collateralized debt obligations ("CDO"). *See, e.g.,* Amended Complaint at ¶¶20, 203, 235, 244.

- Defendants concealed the high risk nature and deterioration of E*TRADE's loan portfolio by violating Generally Accepted Accounting Principles ("GAAP"), including: failing to adequately reserve for loan losses; failing to timely record securities' impairments; and overvaluing E*TRADE's securities portfolio. *See, e.g.,* Amended Complaint at ¶¶21, 25, 138-40, 154-56, 164-65, 196, 220-22, 243, 280-81.

39.   The Amended Complaint further alleges that by the end of the Class Period, the magnitude of the undisclosed risks of E*TRADE's foray into mortgage investments was revealed: $450 million of exposure in its $3 billion ABS portfolio; an increase of $204.8 million in loan loss provisions; write-downs in ABS of $185.5 million; expected additional significant write-downs in the fourth quarter of 2007; a SEC inquiry into E*TRADE's loan and securities portfolio; and the departure of Webb. Caplan was also sacked shortly thereafter.

40.   The Amended Complaint further alleges that the losses of Plaintiffs and other investors were caused by Defendants' fraud.  Specifically, Plaintiffs allege that the price of E*TRADE's stock declined in several steps between July and November 2007 on news released by E*TRADE or others suggesting that the previously undisclosed risks to E*TRADE associated with exposure to mortgage loans and real estate securities had indeed materialized.

41.   Plaintiffs allege that the damage resulting from these undisclosed risks was not the result of unforeseen events that befell E*TRADE unexpectedly, but, instead, was the result of

Defendants' knowing disregard for E*TRADE's stated risk management and underwriting processes in order to expand at all costs E*TRADE's mortgage business.

**The Motion to Dismiss**

42.     On April 2, 2009, Defendants moved to dismiss the Amended Complaint and noticed a hearing date on their motion for September 9, 2009 before Judge Sweet. Dkt. No. 72. In their motion to dismiss, Defendants argued that: (1) Plaintiffs' first cause of action under Section 10(b) of the Exchange Act failed as a matter of law because Plaintiffs failed to plead any actionable misstatements or omissions, failed to plead scienter with particularity and failed to plead loss causation; and (2) Plaintiffs' second cause of action for alleged violation of Section 20(a) of the Exchange Act failed as a matter of law because Plaintiffs did not plead a primary violation of the Exchange Act.  In particular, Defendants argued that Plaintiffs only alleged general statements regarding fiscal discipline, earnings, and asset quality, which were not actionable because they were mere "puffery."  Further, Defendants argued that the Company did not misrepresent the riskiness of its mortgage portfolio because the Company did not have a duty to describe its assets in pejorative terms and all available material information about the assets was disclosed. In terms of scienter, Defendants argued that Plaintiffs had not alleged any basis for a motive because the sales of stock did not give rise to a strong inference of scienter; the other allegations of motive were too generalized; the GAAP violations were insufficient; the confidential witnesses did not support Plaintiffs' allegations; and Plaintiffs' allegations showed "fraud by hindsight" and bad business decisions, not fraud. Defendants also attempted to argue that they were victims of the worldwide economic catastrophe.  Additionally, Defendants argued that Plaintiffs could not plead loss causation with respect to any of the disclosures and that the Class Period should close on September 17, 2007 or October 17, 2007, not November 9, 2007.

Moreover, Defendants claimed that Plaintiffs failed to allege facts to support a claim for scheme liability or for control person liability.

43.     On July 2, 2009, Plaintiffs filed their memorandum of law in opposition to Defendants' motion to dismiss. Dkt. No. 79.  In their opposition, Plaintiffs argued that: (1) Defendants knowingly misled investors about the quality of E*TRADE's loan portfolio and lending practices by falsely telling investors that, among other things, E*TRADE's lending practices were "conservative" and that the Company's loans were of "super-prime" quality when, in fact, E*TRADE was purchasing massive quantities of high-risk subprime loans from known national subprime lenders; and (2) Defendants' purchases of high-risk, low quality loans caused E*TRADE's losses, not the general condition of the economy.  As to scienter, Plaintiffs argued that the Complaint alleged that Defendants were aware of acts and/or had access to information contrary to their public statements, as corroborated by reliable confidential witnesses. Moreover, Plaintiffs argued that they adequately alleged scienter by pointing to the fact that the statements concerned a "core" operation, that Defendants violated GAAP, the individual defendants' resigned at the end of the Class Period, and there were concrete benefits to both the Company and the individual defendants.  Additionally, Plaintiffs argued that loss causation was adequately pleaded for a Class Period ending on November 9, 2007 by pointing to the series of partial disclosures.

44.     On August 31, 2009, Defendants filed their reply memorandum of law in support of their motion to dismiss (Dkt. No. 81), and an amended reply memorandum on September 2, 2009 to correct a minor typographical mistake (Dkt. No. 83).

45.     On May 11, 2010, Judge Sweet issued a lengthy opinion denying in its entirety Defendants' motion to dismiss the Amended Complaint.  Dkt. No. 84.

**Discovery**

46.     Between May 11 and May 17, 2010, Plaintiffs' Counsel discussed the Fed. R. Civ. P. 26(f) conference and planned for a meeting with Defendants' Counsel.

47.     On May 17, 2010, pursuant to Fed. R. Civ. P. 26(f) and Court Order, Plaintiffs' Counsel and Defendants' Counsel began discussing their Rule 26(f) submission to the Court. Plaintiffs' Counsel met separately to discuss the submission and provided a first draft of a proposed case management order ("CMO") to Defendants' Counsel by email on May 18, 2010.

48.     On May 18, 2010, the Court issued an order requiring Defendants to answer the Amended Complaint by June 25, 2010.  Dkt. No. 85.

49.     Defendants' Counsel provided a counter proposal to Plaintiffs' CMO by email on May 21, 2010.

50.     Counsel for the parties then met and conferred telephonically on May 25, 2010 to discuss their respective positions. Counsel also set a follow-up meet-and-confer call for the following afternoon. That same day, Plaintiffs' Counsel provided Defendants' Counsel with a counter-proposal.

51.     In advance of the meet-and-confer call on the afternoon of May 26, 2010, Defendants' Counsel provided a second counter proposal. Plaintiffs' Counsel discussed Defendants' proposed changes in advance of the meet-and-confer call. After the meet-and-confer call with Defendants, Plaintiffs' Counsel provided, among other changes discussed during the call, additional language to afford the Parties the ability to seek additional discovery after the discovery deadline, if necessary. Plaintiffs' Counsel and Defendants' Counsel had a follow-up call late that afternoon to finalize their proposed CMO.

52.     On the morning of May 27, 2010, Defendants circulated a near final draft of the proposed CMO. Counsel for the Parties met and conferred telephonically throughout the day to work through their respective positions and reached a compromise and finalized the CMO.

53.     On May 28, 2010, Plaintiffs filed the proposed CMO with the Court and submitted a letter to the Court with the proposed CMO.

54.     On June 3, 2010, the Court entered the proposed CMO and requested that the Parties submit a proposed protective order to govern confidential discovery information by July 12, 2010.  Dkt. No. 86.

55.     On June 25, 2010, Defendants filed their answer to Plaintiffs' Amended Complaint.  Dkt. No. 87.

56.     After lengthy negotiations and multiple drafts and counter-drafts, on July 12, 2010, the parties entered into a Stipulated Protective Order, which was submitted to the Court for approval by facsimile that day and so ordered on July 16, 2010.  Dkt. No. 88.

57.     On July 23, 2010, the Parties exchanged Disclosure Statements pursuant to Fed. R. Civ. P. 26(a)(1).

58.     On July 27, 2010, Defendants wrote a letter to Plaintiffs asking them to name the "current and former employees" of the 24 different companies that are likely to have discoverable information that Plaintiffs listed in their Rule 26 disclosures.

59.     On July 30, 2010, Defendants and Plaintiff exchanged their first requests for production of documents.

60.     On August 25, 2010, Defendants served their first set of interrogatories on Plaintiffs concerning the identification of the confidential witnesses described in the Amended Complaint.

61.     On August 30, 2010, the Parties served their responses and objections to each other's first requests for production of documents.

62.     On September 24, 2010, Plaintiffs wrote a letter to Defendants to address an issue discussed during a September 15, 2010 meet-and-confer regarding the production of documents memorializing interviews of confidential witnesses that were referenced in Plaintiffs' Rule 26 disclosures.  Plaintiffs indicated that they did not intend to offer the documents in Plaintiffs' possession, custody, or control memorializing interviews of confidential witnesses to support Plaintiffs' claims or defenses and, therefore, were not required to produce those documents.

63.     Also, on September 24, 2010, Plaintiffs served their responses and objections to Defendants' first set of interrogatories.

64.     On September 27, 2010, Defendants wrote a letter to Plaintiffs requesting that Plaintiffs identify the 16 individuals that Plaintiffs stated were confidential witnesses in the Amended Complaint and identify which witness number (as so defined in the Amended Complaint) each represents.

65.     During November and December 2010, Plaintiffs' Counsel served subpoenas on approximately 31 third-parties that were believed to have information relevant to Plaintiffs' claims, including numerous counterparts with which E*TRADE transacted during the relevant time period (including PNC Bank, Countrywide Financial, Macquarie, First Tennessee Bank, Quicken Loans, Ally Bank, Bimini Capital Management, Citadel, LLC, Evercore Partners, Inc., Bank of America, Corp., Barclays PLC, E-Loan, Inc., Citigroup, Inc., New York Community Bancorp, Inc., Signature Group Holdings, Sovereign Bancorp, Inc., Wells Fargo, UBS AG, AmSouth Bancorporation, Morgan Stanley & Co., Inc., United Services Automobile Association, GreenPoint Financial Corporation, First Horizon National, and JP Morgan

Securities LLC), E*TRADE's auditors (Deloitte LLP), and McKinsey & Company, Inc. (which consulted E*TRADE in connection with evaluating, analyzing, and assessing E*TRADE's mortgage business). After objections and responses to the subpoenas, letters back and forth, and meet-and-confers with many of these third-parties and/or their counsel, more than four million pages of documents were ultimately produced to Plaintiffs by third-parties.

66.    Over the course of more than one year, the Parties met and conferred regarding various disputes concerning the scope of Defendants' document production, including, among other things, the relevant period for which to search for relevant documents, the custodians selected, the methods Defendants used to search for responsive documents, the locations searched, the search terms used for electronic evidence, disclosures relating to confidential witnesses, and the timing of a Fed. R. Civ. P. 30(b)(6) deposition.

67.    On September 15, 2010, September 16, 2010 and November 10, 2010, counsel for the Parties held telephonic meetings in which counsel met and conferred regarding the Parties' respective first requests for the production of documents and their respective objections thereto.

68.    On November 10, 2010, Plaintiffs sent a letter to Defendants memorializing the September 15, 2010, September 16, 2010 and November 10, 2010 telephonic meetings and responding to Defendants' letter of September 27, 2010 regarding Plaintiffs' response and objections to the first set of interrogatories of Defendants E*TRADE, Mitchell H. Caplan, Robert J. Simmons, and Dennis E. Webb. In addressing Defendants' letter, Plaintiffs stated that Defendants were already provided with a full list of current or former employees or agents of E*TRADE who were interviewed in drafting the Amended Complaint and declined to identify which ones served as the confidential witnesses.

69.    On November 22, 2010, Plaintiffs produced documents for Peter Farah, Andrea Frascaroli, and Ira Newman in response to Defendants' First Request for Production of Documents.

70.    On November 23, 2010, Defendants sent a letter to Plaintiffs in response to Plaintiffs' letter of November 10, 2010 agreeing in many respects with Plaintiffs' descriptions of the Parties' negotiations, clearing up certain issues, providing positions on several issues, and disagreeing with Plaintiffs' views regarding the identities of the confidential witnesses.

71.    On December 2, 2010, Plaintiffs produced documents for Kristin Management Limited, Straxton Properties, and Javed Fiyaz in response to Defendants' First Request for Production of Documents.

72.    On December 14, 2010, Plaintiffs submitted a letter brief to the Court requesting an informal conference for the Court to decide a discovery issue that the Parties could not resolve after several rounds of discussion – namely, the issue of the appropriate "relevant time period" for Defendants' production of documents.

73.    On December 17, 2010, Defendants submitted a responsive letter to the Court arguing that they should not be required to produce documents before the first day of the alleged Class Period (i.e., April 19, 2006). Defendants also raised a second issue with the Court – i.e., whether Plaintiffs must be compelled to identify the confidential sources cited in their Amended Complaint from the full list of 30 sources previously provided to Defendants in Plaintiffs' Rule 26(a)(1) disclosures.

74.    On January 3, 2011, the Court converted Plaintiffs' letter brief into a motion to compel (Dkt No. 97), and the Parties submitted supplemental letters on January 4, 7, and 11 2011. Plaintiffs further discussed the reasons Defendants should be compelled to produce certain

pre-Class Period documents as well as certain post-Class Period documents, and the reasons that Plaintiffs should not be required to identify the confidential witnesses cited in the Amended Complaint.

75.     On January 10, 2011, the Court issued an order on the Parties' motions to compel (which was entered on the docket on January 13, 2011), requiring Defendants to produce documents as requested by Plaintiffs starting from January 1, 2005 (15.5 months before the start of the Class Period) and requiring Plaintiffs to identify the 16 confidential witnesses cited in their Amended Complaint.  Dkt Nos. 100, 102.

76.     In light of the ongoing discovery disputes, the Parties negotiated and submitted Case Management Order No. 2 to extend all discovery and pretrial deadlines by 60 days on January 12, 2011, which was so ordered by the Court on January 18, 2011.  Dkt. No. 101.

77.     On January 14, 2011, Defendants sent a letter to the Court stating that they believed the handwritten endorsement (the January 10, 2011 order) appeared inaccurate on the docket entry, and asked for a revision of the docket entry.

78.     On January 14, 2011, Plaintiffs responded to Defendants' letter explaining that the Parties disagreed regarding the interpretation of the Court's handwritten endorsement and set forth the basis of their understanding.

79.     On January 18, 2011, the Court ordered that the docket entry regarding the January 10, 2011 order be corrected.

80.     Thereafter, the Parties met and conferred regarding the scope of the Court's January 10 Order but could not reach agreement on the particular categories of documents encompassed by the January 10 Order.

81.    On January 25, 2011, Plaintiffs wrote a letter to Defendants requesting that they produce a privilege log.

82.    On January 26, 2011, Plaintiffs wrote a letter to the Court, requesting clarification of its January 10 Order.

83.    On January 31, 2011, Defendants wrote a letter to the Court in response to Plaintiffs' January 26, 2011 letter, stating that Plaintiffs misconstrued what Defendants offered to search for and produce in response to the January 10, 2011 order.

84.    On February 3, 2011, Plaintiffs wrote a letter to the Court in reply to Defendants' January 31, 2011 letter further explaining their position on what Defendants should be compelled to produce in response to the January 10, 2011 order.

85.    Also, on February 3, 2011, Plaintiffs wrote to Defendants requesting that they produce charts showing E*TRADE's organizational structure and the employee reporting relationships for all of them.

86.    On February 3, 2011, Defendants wrote a letter to Plaintiffs responding to Plaintiffs' January 25, 2011 letter confirming that certain documents and portions of documents were being withheld from production on the basis of privilege and that a privilege log would be produced. The letter also clarified some issues related to redactions in Defendants' documents.

87.    On February 15, 2011, the Court converted Plaintiffs' January 26 letter into a motion to compel.  Dkt. No. 103.

88.    Also on February 15, 2011, Plaintiffs' Counsel emailed Defendants' Counsel requesting that they notify Plaintiffs when they propose to begin producing a privilege/redaction log, and to confirm that it will be done on a rolling basis.

89.     While the matter was pending, the Parties continued to meet-and-confer regarding various discovery issues arising from responses and objections served in connection with their respective discovery requests. During the course of the meet-and-confer sessions, Plaintiffs identified additional issues with respect to the methods and search criteria Defendants used to search for responsive documents.

90.     On February 18, 2011, Plaintiffs sent a letter to Defendants following up on a conversation from January 20, 2011 regarding document production status. Additionally, Plaintiffs requested a meet and confer in the next week to discuss a number of document production issues.

91.     Also, on February 18, 2011, Plaintiffs served their first request of interrogatories to Defendants. These interrogatories sought information concerning the individuals who were responsible for: the Company's origination or acquisition of loans, mortgage backed securities, asset backed securities, or collateralized debt obligations; developing, approving and monitoring compliance with E*TRADE's policies concerning the origination or acquisition of loans, mortgage backed securities, asset backed securities, or collateralized debt obligations; drafting, providing information, editing or approving Defendants' public statements; valuation of loans, mortgage backed securities, asset backed securities, or collateralized debt obligations; conducting due diligence; determining accounting reserves for loans, mortgage backed securities, asset backed securities, or collateralized debt obligations; selecting or approving third-parties from which E*TRADE acquired loans, mortgage backed securities, asset backed securities, or collateralized debt obligations; and monitoring the performance of E*TRADE's portfolio. The interrogatories also sought information on third-parties with which E*TRADE transacted;

compensation for the individual defendants; transactions in E*TRADE securities by or on behalf of the individual defendants; documents that misled investors; and any joint defense agreement.

92.     On February 18, 2011, Plaintiffs also served their second request for production of documents to Defendants.   These document requests sought recordings of meetings; recordings of public statements; documents concerning SCI Connections; documents responsive to the first request of documents for the 16 confidential witnesses; documents related to any investigations; and documents regarding McKinsey.

93.     On February 18, 2011, Plaintiffs also served their notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6) seeking a person most knowledgeable to testify about the processes and procedures used by E*TRADE to: select third-parties from which E*TRADE acquired loans, mortgage backed securities, asset backed securities, and collateralized debt obligations; approve the acquisition of loans, mortgage backed securities, asset backed securities, and collateralized debt obligations; originate loans, mortgage backed securities, asset backed securities, and collateralized debt obligations; conduct due diligence concerning the acquisition of loans, mortgage backed securities, asset backed securities, and collateralized debt obligations; and monitor compliance with such procedures.   Plaintiffs also sought a person most knowledgeable about the organizational structure and lines of reporting at E*TRADE; processes and procedures used to monitor the performance of E*TRADE's portfolios of loans, mortgage backed securities, asset backed securities, and collateralized debt obligations; and processes and procedures used to analyze and determine the value of E*TRADE's portfolios.

94.     Further, on February 18, 2011, Defendants served their second set of interrogatories on Plaintiffs, seeking the identity of all persons who have knowledge about certain allegations in the Amended Complaint; asking for the basis for certain allegations related

to the third-party entities E*TRADE transacted with; requesting information on Plaintiffs' transactions in E*TRADE securities and broker information; seeking the identity of any former E*TRADE employees Plaintiffs communicated with; requesting information concerning reliance on certain statements; seeking information on the details of the interviews with the confidential witnesses; asking for damage calculations; and requesting information on any other class actions Plaintiffs were involved in.

95.   On February 23, 2011, Defendants responded to Plaintiffs' February 3, 2011 letter and stated that they had produced organizational charts and provided the Bates ranges.

96.   On March 16, 2011, Plaintiffs wrote a letter to Defendants following up on the March 1, 2011 telephone call during which the parties discussed the issues raised in Plaintiffs' February 18, 2011 letter.

97.   On March 21, 2011, Defendants provided their responses and objections to Plaintiffs' second request for the production of documents and E*TRADE's responses and objections to Plaintiffs' Notice of Deposition pursuant to Fed. R. Civ. P. 30(b)(6). Defendants also wrote a letter to Plaintiffs stating that they would provide Defendants' responses and objections to Plaintiffs' first set of interrogatories at the end of the week. Also, Defendants stated that they had substantially completed their production of documents in response to Plaintiffs' first request for the production of documents, and would be available to meet-and-confer regarding the schedule for responding to Plaintiffs' second request for the production of documents.

98.   On March 21, 2011, Plaintiffs served their responses and objections to Defendants' second set of interrogatories.

99.   On March 25, 2011, Defendants served their responses and objections to Plaintiffs' first set of interrogatories.

100.   On March 28, 2011, Defendants wrote a letter to Plaintiffs in response to Plaintiffs' March 16 and March 22, 2011 letters.  The letter addressed the delay in providing responses to Plaintiffs' first set of interrogatories, Plaintiffs' deposition notice, Plaintiffs' second request for production of documents, and the March 1, 2011 meet-and-confer.

101.   On April 12, 2011, Plaintiffs sent a letter to Defendants inquiring whether Defendants would be providing all responsive documents concerning SCI Connections (which provided a collateral review of the loans that were purchased by E*TRADE) and explaining SCI Connections' relationship to E*TRADE.

102.   Also, on April 12, 2011, Plaintiffs sent a letter to Defendants asking Defendants to confirm whether E*TRADE's Corporate Finance Group and EGAM's Pricing and Credit Committees had shared electronic file locations and whether those shared locations were searched for responsive documents.

103.   On April 13, 2011, Defendants produced a privilege log.

104.   On April 14, 2011, Plaintiffs sent a letter to Defendants asking Defendants to respond to Plaintiffs' previous letters and to confirm whether they will be providing all responsive documents concerning SCI Connections and whether E*TRADE's Corporate Finance Group and EGAM's Pricing and Credit Committees had shared electronic file locations and whether those shared locations were searched for responsive documents.

105.   In light of the continuing discovery disputes, in early April 2011, the parties met and conferred regarding an amendment to Case Management Order No. 2 to extend the discovery and pretrial deadlines and setting the deadline for completing merits discovery for July

8, 2011.  The Court entered the parties' proposed Case Management Order No. 3 on April 15, 2011.  Dkt. No. 104.

106.    On April 20, 2012, Defendants sent a letter to Plaintiffs to address various issues related to discovery.  Specifically, Defendants stated they would produce documents related to SCI Connections, that the Corporate Finance Group did not maintain a single shared file location, that documents from the Corporate Finance Group did not contain responsive or non-duplicative documents, and that documents maintained by the Pricing and Credit Committees would have been captured in their searches. Defendants also confirmed that none of the individual defendants had any emails in their personal accounts that were responsive to any document requests that had not already been produced.

107.    The parties were ultimately unable to reach agreement on a number of discovery issues including, among other things: Plaintiffs' January 26, 2011 pending motion to compel; Defendants' failure to produce documents for certain custodians requested by Plaintiffs; Defendants' failure to produce certain electronically-stored information; Defendants' failure to produce certain categories of requested documents; Defendants' failure to use appropriate search terms to locate responsive documents; Defendants' failure to produce a witness for a Rule 30(b)(6) deposition; and Defendants' failure to provide a privilege log on a rolling basis.

108.    Thus, on May 3, 2011, Plaintiffs wrote a letter to the Court summarizing the various document disputes detailed above. Defendants submitted a letter in response to Plaintiffs' May 3 letter to the Court on May 20, 2011 setting forth their positions on the various issues, and Plaintiffs submitted a supplemental letter in response to Defendants' May 20 letter to the Court on May 25, 2011.

109.   On May 6, 2011, Judge Sweet referred this Action to Magistrate Judge Michael H. Dolinger for purposes of deciding pretrial matters, "including scheduling, discovery, non-dispositive [and] pretrial motions." Dkt No. 105.

110.   On May 18, 2011, Defendants served supplemental responses and objections to Plaintiffs' first set of interrogatories.

111.   Magistrate Judge Dolinger held a hearing on the Parties' discovery disputes on May 26, 2011. Dkt. No. 108.  After lengthy oral argument, the Court ordered Defendants to, among other things: (a) produce documents beginning from January 1, 2005 relevant to Plaintiffs' claims (rather than just starting at the beginning of the Class Period, as Defendants argued); (b) perform searches from certain additional custodians' emails; (c) provide Plaintiffs' Counsel with the list of search terms they used to search for relevant documents; and (d) perform searches on a sample of custodians' local "C" drives to determine whether any relevant documents existed on those drives.  Ultimately, Defendants produced an additional 6,837,331 pages of documents following Judge Sweet's order granting Plaintiffs' motion to compel on January 10, 2011.

112.   On May 27, 2011, Defendants sent Plaintiffs a list of the search terms used in connection with Defendants' document review and production. Defendants requested a meet and confer to discuss the various issues addressed at the May 26 hearing and to discuss modifying Case Management Order No. 3.

113.   During June 2011, the parties met and conferred regarding Magistrate Judge Dolinger's May 26, 2011 ruling.

114.   On June 15, 2011, Plaintiffs sent a letter to Defendants asking when a witness would be available for a Rule 30(b)(6) deposition.

115.   Also, on June 15, 2011, Plaintiffs sent a letter to Defendants regarding Defendants' production of documents from E*TRADE's internal instant messaging system and asking why there was a deficiency in the production.

116.   Additionally, on June 15, 2011, Plaintiffs provided Defendants, by letter, with additional information on two confidential witnesses to simplify the search for their documents.

117.   On June 16, 2011, Plaintiffs wrote a letter to Defendants concerning the use of keyword search terms and asked for a number of questions to be answered. Plaintiffs also noted that Defendants' search terms were unworkable and provided their own list of terms.

118.   Also, on June 16, 2011, Plaintiffs wrote a letter to Defendants requesting a meet and confer to discuss which requests Defendants should respond to for the entire relevant time period.

119.   Additionally, on June 16, 2011, Plaintiffs wrote a letter to Defendants requesting that Defendants search the "C" drives of certain custodians.

120.   On June 16, 2011, Plaintiffs served their second set of interrogatories to Defendants concerning information about the computers used by the custodians for whom documents were produced.

121.   On June 20, 2011, Defendants wrote a letter to Plaintiffs in response to letters dated June 15 and 16 and to address other discovery-related issues. Defendants proposed relevant time periods and search terms for two confidential witnesses.  Defendants also stated they would make a Rule 30(b)(6) witness available upon completion of document discovery.  Further, Defendants provided the missing instant messages.  Additionally, Defendants asked to discuss an extension of the discovery deadline.

122.   On June 28, 2011, Plaintiffs sent a letter to Defendants asking that they search the hard drives of five specific individuals.

123.   On June 30, 2011, Defendants submitted a letter to Magistrate Judge Dolinger requesting a one-month stay of discovery while the parties attempted to resolve their discovery issues.   On July 5, 2011, Plaintiffs wrote to the Court providing detailed explanations on the various discovery disputes.

124.   The Court endorsed Defendants' June 30, 2011 letter on July 9, 2011 extending the deadline for document production and document negotiations to August 10, 2011.  Dkt No. 110.

125.   The parties continued to meet-and-confer during July and early August 2011.

126.   On July 12, 2011, Defendants wrote a letter to Plaintiffs in response to Plaintiffs' June 28, 2011 letter regarding local hard drives, asking Plaintiffs to select an additional three custodians to search because certain requested hard drives were not available.

127.   On July 18, 2011, Defendants served their responses and objections to Plaintiffs' second set of interrogatories.

128.   On July 19, 2011, Defendants wrote a letter to Plaintiffs in response to Plaintiffs' letters dated June 16, 2011 and July 5, 2011, and to follow up on issues discussed during the June 28, 2011 meet and confer. Defendants addressed their June 3 and June 20 discovery proposals for documents pre-dating the Class Period and documents relating to confidential witnesses, and their discovery process to date, including pre-review testing and analysis of search terms, responses to Plaintiffs' questions, and analysis of additional search terms.

129.    On August 5, 2011, Defendants wrote to Plaintiffs to provide an update regarding the testing of local hard drives. Defendants further asked Plaintiffs to provide a list of three additional individuals whose hard drives should be searched.

130.    On August 10, 2011, Defendants reported back to the Court on four remaining discovery issues concerning the scope of document production pre-dating the Class Period, confidential sources, search terms, and the utility of searching local hard drives.

131.    On August 10, 2011, Plaintiffs also sent a letter to Defendants requesting a meet and confer concerning Defendants' responses and objections to Plaintiffs' second set of interrogatories.

132.    Also, on August 10, 2011, Plaintiffs sent a letter to the Court explaining that certain discovery issues had not been resolved, and although another meet and confer had been set, it was essential to have a hearing on the discovery issues still pending.

133.    Magistrate Judge Dolinger then set a hearing for September 7, 2011.  Dkt. No. 111.

134.    On September 7, 2011, Magistrate Judge Dolinger held a hearing on a number of discovery issues, including the scope of document production pre-dating the Class Period, search terms for certain confidential witnesses, and search terms and the utility of searching local hard drives.   After another lengthy hearing, the Court ordered Plaintiffs to narrow their list of additional search terms and to take a Rule 30(b)(6) deposition to assess E*TRADE's policies and practices for maintaining and preserving documents on hard drives.

135.    On September 8, 2011, Plaintiffs wrote a letter to Defendants to provide 20 search terms, as required by Magistrate Judge Dolinger's ruling on September 7, 2011.

136.   Also, on September 8, 2011, Plaintiffs wrote a letter to Defendants to provide a response to Defendants' proposals on searches for confidential witnesses.

137.   On September 8, 2011, Defendants wrote a letter to Plaintiffs explaining that certain documents Defendants stated had been produced previously were not actually produced, and producing those documents.

138.   On September 9, 2011, Plaintiffs wrote a letter to the Court clarifying the reasons that further production of certain documents would be appropriate based on the review of documents produced by Defendants the day before.

139.   On September 12, 2011, Defendants wrote a letter to the Court in response to Plaintiffs' September 9, 2011 letter, requesting the Court deny Plaintiffs' request to impose additional requirements for document review and production beyond those set forth at the September 7, 2011 hearing.

140.   On September 17, 2011, Defendants wrote a letter to Plaintiffs in response to the Plaintiffs' three letters, dated September 8, 2011. Defendants agreed to add Plaintiffs' proposed additional search terms, agreed to all of Plaintiffs' counter-proposals relating to the confidential witnesses with limited exceptions, and agreed to add six out of ten additional custodians for the pre-Class Period document search.

141.   The case was re-assigned to United States District Judge J. Paul Oetken on September 30, 2011.

142.   On October 12, 2011, Defendants wrote a letter to Plaintiffs regarding their responses to Plaintiffs' three letters dated September 8, 2011 and to follow up on issues discussed during the September 29, 2011 meet and confer.  In the letter, Defendants provided their update proposals regarding three categories of outstanding document discovery.

**The Settlement Negotiations and Proposed Settlement**

143.   Beginning in August 2011, the Parties engaged in vigorous, good faith, arm's-length settlement negotiations. The Parties had several discussions in August 2011 concerning a potential resolution of the Action – particularly given the procedural posture of the case and the amount of additional (costly) discovery that was about to be undertaken by the parties.

144.   After several telephone calls between counsel, the Parties discussed using an experienced mediator. The Parties agreed to use the Honorable Layn Phillips (Ret.). Judge Phillips is a former United States Attorney and United States District Court Judge in Oklahoma, and more recently a litigation partner at Irell & Manella LLP in Newport Beach, California. Judge Phillips has developed a national reputation for successfully mediating large, complex business cases, and in particular securities fraud actions.  Given Judge Phillips' busy schedule, the mediation was not scheduled to take place until October 5, 2011.  The parties agreed to follow Judge Phillips' protocol regarding the exchange of mediation statements and other materials.

145.   Preparation of Plaintiffs' mediation statement required Plaintiffs' Counsel to marshal and organize the information they had gleaned from the millions of pages of documents they had reviewed and encapsulate that mass of information into a clear, concise and cogent "story" as substantiated by the evidence for the purpose of presenting Plaintiffs' case on the merits as it had developed to that point in time.

146.   Another key issue Plaintiffs needed to address at the outset of settlement discussions was damages.  Accordingly, together with consulting experts, Plaintiffs marshaled massive amounts of information concerning E*TRADE's stock price movements and public

disclosures.  Plaintiffs also commissioned a damages and loss causation study from Dr. Blaine F. Nye and the Stanford Consulting Group.

147.   In conjunction with Plaintiffs' consulting experts, Plaintiffs' Counsel analyzed potential damages through a series of event studies, which required a determination of the dates on which there were statistically significant price declines in E*TRADE stock.  Those dates were examined to determine whether any significant disclosure had been made by E*TRADE or a third-party relating to the subject matter of the Amended Complaint.  The actual price decline on each date deemed to be relevant was then adjusted to account for stock price fluctuations in an index composed of other comparable financial stocks.  These adjustments typically resulted in lower damages because stock prices, especially in the financial sector, were declining rapidly in 2007.

148.   In conjunction with our consulting experts, estimates were made of the actual number of "damaged" shares – i.e., the number of E*TRADE shares purchased during the Settlement Class Period that may have sustained damages caused by one or more "corrective disclosures" that allegedly revealed at least part of the true extent of E*TRADE's exposure to subprime loans and related assets.

149.   On September 23, 2011, Defendants submitted a letter to Magistrate Judge Dolinger requesting a continuance of discovery pending the outcome of the parties' ongoing settlement discussions.

150.   On September 26, 2011, the parties exchanged mediation statements (and voluminous exhibits, which totaled hundreds of pages).  Upon receipt of Defendants' mediation statement and supporting materials, Plaintiffs' Counsel immediately began their analysis and the work of de-constructing Defendants' arguments in preparation for the mediation itself.

151.   Plaintiffs' Counsel, having received the analysis of potential damages and the theories of damages from their damages' consultant, discussed Plaintiffs' damages analysis with Defendants' counsel.  Not surprisingly, Defendants' Counsel informed Plaintiffs' Counsel that their own damages analysis showed a significantly lower amount but Defendants' Counsel declined to share their number or analysis with Plaintiffs' Counsel at that time.

152.   On October 5, 2011, the parties conducted a one-day mediation under the supervision of Judge Phillips.  The October 5, 2011 mediation was attended by Defendants' and Plaintiffs' counsel, representatives from E*TRADE, and representatives and/or counsel from E*TRADE's 12 directors' and officers' ("D&O") primary and excess insurance carriers.  During the mediation, it quickly became apparent that the Parties' settlement positions were very far apart and that neither side was prepared to make a substantial concession.  Given the distance between the Parties regarding liability and damages, and the Parties' sharp disagreement regarding the likelihood of Plaintiffs' success on the merits, the mediation ended with little movement by either Plaintiffs or Defendants.

153.   Following the October 5, 2011 mediation, Plaintiffs' and Defendants' lead attorneys continued to have informal discussions to determine whether a framework for further, potentially more successful, settlement negotiations was possible.

154.   On October 10, 2011, Plaintiffs' Counsel sent a formal, written settlement demand to Defendants' Counsel and requested a response from Defendants by October 19, 2011 at 5 p.m., which they agreed to extend twice to November 7, 2011 and then November 11, 2011, in light of ongoing discussions between Defendants and their insurance carriers.

155.   On November 7, 2011, Counsel for the Parties and a representative of E*TRADE's D&O carriers held a second face-to-face mediation at Davis Polk's offices – but

this time without Judge Phillips.  While the Parties made some progress in narrowing the gap, they were still far apart and faced substantial resistance from Defendants.  They later agreed, however, to have a third face-to-face mediation – this time with Judge Phillips again.

156.   On November 15, 2011, Defendants submitted another letter to Magistrate Judge Dolinger requesting a continuance of discovery pending the outcome of the Parties' ongoing settlement discussions.  That same day, the Court issued an order granting a stay of discovery until December 7, 2011 in order for the Parties to continue to explore a resolution of the Action. *See* Dkt. No. 117.

157.   Pursuant to that order, on December 7, 2011 Defendants' Counsel submitted a letter providing the Court with a status on the Parties' settlement discussions, and requesting a further stay of discovery in light of the upcoming mediation then scheduled for December 17, 2011.

158.   Throughout December 2011, Plaintiffs' Counsel had further discussions with Defendants' Counsel regarding the Parties' positions in an attempt to make further progress prior to the December 17, 2011 mediation.

159.   On Saturday, December 17, 2011, the parties conducted their third face-to-face mediation (and second under the supervision of Judge Phillips).  By the end of the day, the Parties reached an agreement on the amount of the proposed Settlement and negotiated the terms of a memorandum of understanding ("MOU"), which they executed that same day.  The MOU provided for E*TRADE and its D&O carriers to pay the Settlement Class $79 million in cash; that Defendants would stipulate to certification of the Settlement Class; that the parties would exchange reciprocal releases to be negotiated as part of their actual settlement agreement; satisfactory completion of certain confirmatory discovery; and that the Settlement would be

subject to negotiation of a formal settlement agreement and, ultimately, final approval by the Court.

160.    Based on the analysis of Plaintiffs' damages consultant, if approved, the $79 million recovery represents an estimated recovery of 14.1 percent of the amount of individual Settlement Class Members' most likely recoverable damages at trial assuming complete success on all issues of liability and damages and a 100% claims rate. *See* Declaration of John C. Hammerslough, dated August 9, 2012, annexed hereto as Exhibit C ("Hammerslough Declaration" or "Hammerslough Decl.").

161.    On December 21, 2011, the Court held a teleconference during which counsel for the parties informed the Court that they had resolved the Action memorialized in the MOU. Counsel for the parties also informed the Court that the upcoming months would be spent drafting the final Settlement papers and conducting additional discovery in order to confirm the fairness of the proposed Settlement.

162.    On January 30, 2012, Plaintiffs' Counsel took the deposition of defendant Caplan and on February 2, 2012, Plaintiffs' Counsel deposed defendant Webb. These depositions are further discussed below.

163.    Throughout the ensuing months, the parties vigorously negotiated the terms of the Stipulation and the accompanying exhibits (*e.g.*, the Notice and Summary Notice). Numerous drafts were exchanged. One particularly important issue in the negotiations was the scope of the proposed release. Among other things, Defendants wanted the release language to include not only Settlement Class Members, but also their heirs, assigns, etc. Plaintiffs' position was that the scope of the release had to be limited to such persons only to the extent that they inherited or otherwise acquired E*TRADE securities from a Settlement Class Member that were purchased

during the Settlement Class Period.  The parties ultimately agreed to so tailor the release. *See* Stipulation at §1.22.

164.    On April 20, 2012, Magistrate Judge Dolinger set a conference for April 25, 2012 to discuss the Parties' progress towards confirming and finalizing the proposed Settlement.

165.    On April 25, 2012, counsel for the Parties appeared before Magistrate Judge Dolinger to provide a status on the progress of the Settlement. At the April 25 status conference, the Parties confirmed that post-MOU discovery was complete and that Plaintiffs' Counsel intended to move for preliminary approval of the proposed Settlement.

166.    On May 17, 2012, the Parties executed a formal Stipulation of Settlement. As detailed above, this Settlement was reached only after Plaintiffs' Counsel: (i) conducted extensive factual investigations into the events and circumstances underlying the claims in the Amended Complaint, which uncovered substantial information about the Company and its business practices that formed the basis of Plaintiffs' detailed and particularized Amended Complaint; (ii) interviewed numerous witnesses with knowledge of the facts pled in the Amended Complaint; (iii) obtained and reviewed filings with SEC, as well as press releases, analyst reports, and other relevant public documents; (iv) thoroughly researched the law related to the claims against Defendants, as well as supplemented that research as the law in the area of securities litigation evolved quickly in the course of this case; (v) briefed an opposition to the motion to dismiss filed by Defendants; (vi) briefed motions to compel; (vii) reviewed more than 16 million pages of documents produced by Defendants, their external auditors, and other third-parties; (viii) deposed key witnesses; and (ix) consulted with experts in the fields of accounting, the securities markets, and damages.  Further, the Settlement was reached only after two failed

mediations and extensive direct discussions between counsel for the Parties themselves as well as counsel for Defendants' D&O insurance carriers.

**Preliminary Approval**

167.   Plaintiffs filed their Motion for Preliminary Approval of the proposed Settlement on May 17, 2012.  Dkt Nos. 123-26.

168.   On June 12, 2012, the Court held a hearing on the preliminary approval of the proposed Settlement.   Pursuant to Fed. R. Civ. P. 23(e), the Court entered its Preliminary Approval Order on June 12, 2012.  Dkt. No. 129.  Pursuant to the Preliminary Approval Order, the Court (a) preliminarily certified the Settlement Class consisting of all those who purchased E*TRADE securities between April 19, 2006 and November 9, 2007, both dates inclusive; (b) approved the forms, methods and timing for providing the Notice, the Summary Publication Notice and the Proof of Claim form to Settlement Class Members; (c) appointed GCG as the claims administrator; (d) set the deadlines for Settlement Class Members to request exclusion from the Settlement Class, object to the Settlement, Plan of Allocation and/or Plaintiffs' Counsel's request for an award of attorneys' fees and reimbursement of expenses and/or to personally appear or appear through counsel; (e) scheduling the final fairness hearing for 3:00 p.m. on October 11, 2012 ("Settlement Hearing"); and (f) set the deadlines for the submission of papers in support of, and opposition to, the matters that will be heard at the Settlement Hearing.

**Notice to the Class**

169.   As demonstrated by the Fraga Declaration, the notice program directed by the Court has been fully completed.  Over 232,000 copies of the detailed Notice were mailed to potential Settlement Class Members and Summary Publication Notice was disseminated over *PRNewswire* on three separate occasions.

170.    Specifically, on July 3, 2012, the Claims Administrator caused the Notice and Proof of Claim to be mailed to all Class members who could be identified with reasonable effort. Toward that end, on or about June 28, 2012, GCG received from E*TRADE's stock transfer agent (American Stock Transfer and Trust Company LLC) the names and addresses of 2,146 record holders of E*TRADE securities between April 19, 2006 and November 9, 2007. GCG entered these names and addresses into the GCG database created for this Action. Claim Packets were disseminated to the 2,146 record holders by first class mail on July 3, 2012. Fraga Decl. at ¶¶3-4.

171.    As in most securities class actions, many Class Members are beneficial purchasers whose securities are held in "street name" – *i.e.*, the securities are purchased by brokerage firms, banks, institutions and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers.  GCG also maintains a proprietary database with the names and addresses of 2,109 of the largest and most common U.S. nominees ("Nominee Database").  Page six of the Notice, under the heading "Special Notice to Securities Brokers and Other Nominees," directed all those who purchased E*TRADE securities during the Settlement Class Period for the beneficial interest of a person or organization other than themselves, within seven (7) days of receipt of the Notice, to either (a) provide to the Claims Administrator the name and last known address of each person or organization for whom or which they purchased E*TRADE securities during such time period or (b) request additional copies of the Notice and the Proof of Claim form, which would be provided to them free of charge, and within seven (7) days mail the Notice and Proof of Claim form directly to the beneficial owners. Accordingly, on July 3, 2012, GCG caused Claim Packets to be mailed to the 2,109 names and addresses in its Nominee Database. Fraga Decl. at ¶5.

172.    GCG established a toll-free "Interactive Voice Response" system to accommodate potential claimants. This system became operational on or about July 3, 2012. As of August 8, 2012, GCG has received a total of 639 calls, out of which 313 potential claimants left messages and/or requests to speak with GCG administrators for assistance. All of the requests for a return phone call were responded to in a timely manner. Fraga Decl. at ¶6.

173.    Pursuant to the Preliminary Order, GCG Communications, the media division of GCG, had the Summary Notice sent out over *PRNewswire* on July 9, 16, and 23, 2012. GCG also caused a copy of the Notice, Proof of Claim and Stipulation to be posted on its website on July 3, 2012. Fraga Decl. at ¶7.

174.    As of August 9, 2012, GCG has received 223,548 names and addresses of potential Class Members from individuals or from brokerage firms, banks, institutions and other nominees, in the form of computer disks, emails, labels, lists, etc., requesting that Claim Packets be mailed to these individuals.   Also, GCG has received requests from brokers and other nominee holders for 3,976 Claim Packets to be forwarded to their customers. All such requests were complied with in a timely manner. Fraga Decl. at ¶8.

175.    In the aggregate, 232,313 Claim Packets (including 509 Claim Packets that were re-mailed to updated addresses provided to GCG by the United States Postal Service), were promptly disseminated to potential Class Members by first class mail. Fraga Decl. at ¶9.

176.    All objections to the Settlement, the Plan of Allocation and the Fee Request and requests for exclusion from the Class are required to be filed no later than September 10, 2012.

177.    As of the date of this Declaration, there are no objections concerning the Settlement, the Plan of Allocation, or request for attorneys' fee and expenses, and only one request for exclusion has been received from a putative Settlement Class Member.

**Claims Processing**

178.   In order to receive a share of the distribution of the proceeds from the Settlement, a member of the Settlement Class must be an "Authorized Claimant." An Authorized Claimant is a Class member who: (a) purchased or otherwise acquired E*TRADE securities during the Class Period, (b) meets the further qualifications set out below, and (c) submits a valid and properly documented Proof of Claim form that accompanies the Notice in a timely manner as set out in the Notice.

179.   Settlement Class members will be able to substantiate their claims with any of the following forms of evidence: brokerage firm confirmation slips; monthly account statements; or such other third-party documents that Plaintiffs' Counsel and Defendants' counsel, in their discretion, mutually agree are sufficiently reliable and verifiable.

180.   As discussed above, with each copy of the Notice disseminated to potential members of the Settlement Class, a copy of the Proof of Claim in the form approved by the Court was included. As provided by the Preliminary Approval Order, the deadline for submitting Proofs of Claim is October 31, 2012.

181.   Additionally, it is the experience of Plaintiffs' Counsel and the Claims Administrator that members of similar classes do not submit proofs of claim until (and, often, shortly after) the claims filing deadline. Further, such deadline may be extended by the Court.

## THE RESULTS ACHIEVED

182.   The Settlement Amount of $79 million is a substantial recovery for Class Members, representing, *at a minimum*, approximately 14.1% of the most likely amount of damages that Plaintiffs would have sought at trial. *See* Hammerslough Decl., Exhibit C at ¶34.

183.    Plaintiffs' damages consultant estimates that the maximum recoverable damages, assuming complete success on all issues of liability and damages, a 100% claim rate, and collectability of a judgment, are approximately $559 million.  *Id.* at ¶¶31-34.  Therefore, the $79,000,000 Settlement Amount, assuming a 100% claim rate, represents a recovery of approximately 14.1% of Plaintiffs' expert's current estimate of the amount of damages that could most likely be achieved for Settlement Class Members in the Action assuming recovery by the entire Settlement Class for the entire Settlement Class Period.  *See id.*  As demonstrated in the Settlement Memorandum (§III.C.8), that percentage already falls well above the typical recovery range of settlements in federal securities class actions.

184.    Moreover, in a securities class action, even after success on the merits at trial, a claims process would be required to fix Defendants' actual liability to each Settlement Class Member.  It is a well-known fact that in class actions all class members who have a right to make a claim do not.  Based on the analysis of Plaintiffs' damages consultant, it is estimated that Settlement Class Members with approximately 80.4% of the damaged shares that would be eligible to make claims will, in fact, make claims.  Hammerslough Decl. ¶¶35-39.  Based on Plaintiffs' expert's estimated range of aggregate damages recoverable at trial by the Class of approximately $559 million, and a 80.4% claim rate, Mr. Hammerslough estimates that claims with aggregate compensable losses of approximately $449.4 million will be received. Based on the $79,000,000 Settlement Amount and this 80.4% claim rate, the Settlement generates, before fees and expenses, a recovery of approximately 17.6% of Settlement Class Members' compensable damages.  *See id.*  The results achieved therefore are excellent, if not exceptional.

## THE STRENGTHS AND WEAKNESSES OF THE CASE

185.    While Plaintiffs are confident in the strength of their case, Defendants were just as confident that Plaintiffs would not succeed on the merits. It can be said, however, without gainsay that Plaintiffs faced considerable risks to success in this Action. In achieving the Settlement, Plaintiffs' Counsel carefully considered numerous factors, including the complexity, expense and delay inherent in continued prosecution of the Action through the pretrial, trial and appeal phases; Plaintiffs' difficult burden of proof on such issues as falsity, materiality, scienter, causation, and damages; the risks of obtaining and maintaining the class throughout the litigation; the uncertainties of the outcome of a trial before a jury; the likelihood and vagaries of appellate proceedings in an environment where the law governing the federal securities law claims continues to be in flux; the maximum amount Plaintiffs could reasonably expect to recover at trial; the delay that would likely be incurred in obtaining a recovery for the class; the limited sources of payment available to respond to any judgment in the Action against the Defendants; and the substantial and immediate monetary benefit provided by the Settlement to the Settlement Class.  Plaintiffs evaluated these factors only after extensive factual investigation and legal analysis that enabled Plaintiffs to assess the strengths and weaknesses of their claims. Armed with this information, Plaintiffs' Counsel were prepared to engage in extensive arm's-length negotiations, which eventually led to the Settlement presently before this Court.

186.    Based on all these factors, as well as the extensive experience of Plaintiffs' Counsel in the litigation of securities class actions, Plaintiffs' Counsel submit that the Settlement, which provides a very substantial recovery to the Settlement Class members, is far more beneficial than any of the realistic alternatives offered by continued litigation of the Action, and is, therefore, fair, reasonable and adequate.

**The Risks of Establishing Liability**

187.  As a result of Plaintiffs' factual and legal research and analysis, as well as the Settlement negotiations, Plaintiffs are able to identify many of the arguments and issues that would likely have been raised in the course of continued litigation against the Defendants. Although Plaintiffs' Counsel would forcefully argue the merits of their claims at trial, and Plaintiffs still believe ultimate victory would have been theirs, Defendants could have offered potentially effective arguments of their own in their defense to Plaintiffs' claims.

188.  Several important factors figured prominently in Plaintiffs' decision to accept the proposed Settlement on behalf of themselves and the Class.  First and foremost of these considerations was the substantial, and immediate, financial benefit to the Settlement Class of the $79,000,000 Settlement.  So, even if Plaintiffs achieved their best case (or even near best case) theoretical recovery, that would be premised entirely upon the assumptions that (i) Plaintiffs prevail in proving their case for each member of the Class for the entire Class Period, (ii) the jury awards the full amount of damages sought by Plaintiffs, and (iii) each and every eligible Class member files a valid Proof of Claim.  Accordingly, as reasonable counsel with fiduciary obligations to the Class they represent, Plaintiffs' Counsel discounted the amount they sought in settlement to reflect the realistic risks of recovering less than the full amount of estimated class-wide damages or, indeed, recovering nothing at all.

189.  The most significant procedural risk Plaintiffs faced was that the Court had not yet certified the class.  Absent this Settlement, Defendants would likely have vigorously opposed class certification.  While Plaintiffs believe that their motion to certify the Class would have been granted (and survived any attempts at a Fed. R. Civ. P. 23(f) appeal), Plaintiffs recognized the real risk that the Court might not certify a class at all and, even if it did, might certify a smaller

class than the one proposed, increasing the risk of no recovery for some, potentially large, segments of the Settlement Class.

190.   On the merits, at trial, Plaintiffs would have attempted to establish liability based on the alleged misrepresentations concerning, among other things, E*TRADE's lending and underwriting practices, loan quality and the Company's then current financial condition, disseminated to the investing public in Company press releases, investor conference calls, and quarterly or annual filings with the SEC. Plaintiffs would have attempted to show that these alleged misrepresentations and incomplete statements were material, were made knowingly or recklessly, and artificially inflated the price of E*TRADE securities throughout the Class Period. All of these issues were sharply disputed, with Defendants consistently denying wrongdoing and liability.

191.   The most serious of these risks was Plaintiffs' burden to establish actionable misstatements, that each of the Defendants acted with scienter (*i.e.*, proof of actual knowledge or reckless conduct), and that any losses Plaintiffs and the Class suffered were the result of Defendants' fraud, rather than, as Defendants argued, the "massive, market-wide economic" downturn.   This task is further complicated by the fact that most fact witnesses would be predominantly Defendants' employees and agents, who could obviously be expected to be hostile to Plaintiffs' case.   Indeed, it is the rare securities fraud action where a defendant or a corporation's employee admits liability. As a result, Plaintiffs would have to establish their case primarily through circumstantial evidence. Reliance on circumstantial evidence to prove Plaintiffs' claims, however, entails risks of its own, particularly as Defendants would offer alternative inferences that could be drawn from that same evidence that the jury might choose to adopt.

192.   Here, for instance, Plaintiffs' Counsel deposed the two key E*TRADE officers at the center of this Action:  the individual defendants Caplan and Webb.  The results of those depositions demonstrate the difficulty Plaintiffs potentially faced in demonstrating Defendants' scienter here.  Defendant Caplan was E*TRADE's Class Period chief executive officer and primary spokesperson.  Mr. Caplan testified about E*TRADE's acquisition of Telebanc and how the Company began to increase the size of its loan portfolio, E*TRADE's purchase of first-lien position residential mortgages, and then its decision to start purchasing second-lien mortgages. Mr. Caplan explained the process by which the Company started acquiring the second-lien mortgages. Mr. Caplan also explained how he would calculate the value of the impaired mortgage assets, the development the underwriting guidelines and the process for adhering to those guidelines when purchasing loans, including that a certain percentage of loans were required to be reviewed in detail for compliance with the guidelines.  He also explained that the broader institutional group, consisting of defendant Webb and his team, decided which loans to acquire.  Mr. Caplan testified that he did not provide any instruction in deciding what specific loans to purchase, and that he spoke infrequently with Mr. Webb about the specific entities that were selling E*TRADE the loans.

193.   Mr. Caplan testified regarding E*TRADE's purchase of stated-income loans, but explained that he was not responsible for approving the purchase of those loans, or monitoring whether the stated-income loans were within the Company's underwriting guidelines.  He also testified about the purchase of high loan-to-value second liens.  Mr. Caplan explained that during the first quarter of 2007, E*TRADE began seeing signs of increased delinquencies in the loan portfolio, and in July 2007, he began seeing delinquencies in the securities portfolio.  Mr. Caplan was asked about the consequences of these delinquencies, and he stated that in July 2007,

E*TRADE increased its first-lien position and reduced its second-lien position.  Mr. Caplan also discussed his reliance on FICO scores to evaluate the quality of the Company's loan portfolio and that he was led to believe that those scores were within guidelines at the time the loans were purchased.  Finally, Mr. Caplan made it clear that he was not responsible for the day-to-day monitoring of loan quality and that EGAM was only one of E*TRADE's businesses; that he traveled extensively for E*TRADE and relied heavily on his subordinates to report current financial issues or problems to him; and that his role as CEO was for overall Company-wide policy matters.  Presumably Mr. Caplan would have held to this position throughout the litigation and, if the jury accepted his description of his role and state of knowledge, it would have made proving Mr. Caplan's scienter at trial very difficult.

194.    Defendant Webb was E*TRADE's President of Capital Markets and President of E*TRADE Global Asset Management (*i.e.*, "EGAM").   During his deposition, Mr. Webb explained that his duties included purchasing and investing all of the assets for E*TRADE Bank and managing E*TRADE's proprietary money market funds.  He was also responsible for E*TRADE's market-making functions and was the head of E*TRADE's Institutional Sales & Trading.  Mr. Webb explained the process of purchasing loan pools from various entities, including the guidelines as to FICO score, property type, documentation, type of product, whether it was an ARM, or fixed rate mortgage, collateral type, etc.  Mr. Webb testified about the policies regarding the counterparties – who E*TRADE was allowed to conduct transactions with and what level of authority was allowed for any type of exception.

195.    Mr. Webb testified that he not aware of any problems (specifically with respect to poor underwriting standards) with any of E*TRADE's counterparties.  Mr. Webb testified that in the summer of 2007, Defendants became aware that Countrywide had delinquency issues in

some of its portfolios, but they understood that it was not part of the portfolio that E*TRADE was purchasing. He also testified that he did not recall anything specific about National City's problems, and at the time of any of Defendants' statements, E*TRADE personnel did not believe they would be affected by anything going on with National City. In terms of sampled loans, Mr. Webb testified that if there were any problems with the sampled loans, E*TRADE would increase its sampling, and if management was not happy with the results from the sampled loans, the transaction would either be cancelled, or, more likely, any problem loans would be kicked out. Mr. Webb noted that E*TRADE became more aggressive in 2007 in kicking out loans. Mr. Webb testified that he believed that E*TRADE bought high quality assets that were expected to perform well.

196.   In terms of due diligence, Mr. Webb testified that he believed that the due diligence department reviewed a sample of loans of between 1-10%. The due diligence department would report exceptions, and Mr. Webb's group would meet with other management to discuss put-backs to the sellers. Mr. Webb did note that there were occasions where the loans with exceptions were still kept, but he believed that to be a small number. Mr. Webb testified that he did not believe E*TRADE became exposed to subprime loans -- only one or two percent of the portfolio was what he considered subprime. He claimed that he viewed E*TRADE's portfolio as conservative, including relative to other institutions in the same business. Mr. Webb also did not recall any concerns with compliance with E*TRADE's set guidelines and believed that the purchases of loan pools were made in compliance of all risk lines with few exceptions. Mr. Webb explained that at the end of the Class Period, the stock declined because E*TRADE had an outflow of cash, there was volatility in overall markets, and there were increasing

delinquencies in the portfolio and the market. He indicated that while E*TRADE may have ultimately misestimated the level of impairments, there was no fraud.

197.   In sum, Mr. Webb's testimony would present a version of events where E*TRADE and its management were victims of an unprecedented, unforeseen collapse of the financial markets in general and the mortgage markets in particular. That in acquiring the loans at issue, E*TRADE had followed standard, conservative underwriting policies and that those policies had led to significant annual profits until the market unexpectedly crashed. Thus, Mr. Webb's testimony at trial would seek to portray honest company management who were victims of larger economic forces over which they had no control and could not protect against. While Plaintiffs' Counsel believe that documentary and other testimonial evidence would rebut (or, at least, certainly undercut) this version of what happened to E*TRADE during and at the end of the Class Period, ultimately if the trier of fact accepted Mr. Webb's version, Plaintiffs could easily have lost this Action on the merits.

**The Risks of Establishing Damages**

198.   Further, even if Plaintiffs prevailed in establishing falsity and scienter, Plaintiffs were required to prove loss causation (*i.e.*, that Defendants' misconduct caused the damages claimed). While Plaintiffs believe they could overcome any arguments or defenses based on causation and damages, there is certainly no assurance that the jury would agree with Plaintiffs' arguments.

199.   Proof of damages would also have been extremely complex and involve considerable risk for Plaintiffs. Proof of damages and causation in a "fraud-on-the-market" case like this entails a degree of complexity and sophistication that, in itself, is a risk to Plaintiffs' ability to carry their burden of proving damages at trial. More specifically, Defendants were

expected to advance, primarily through expert testimony, a "negative causation" argument – *i.e.*, any losses were caused by external factors unrelated to the alleged misrepresentations or omissions – that Defendants would have asserted would dramatically reduce or eliminate recoverable damages.

200.   Indeed, based on insights gleamed from the mediation process, as well as Plaintiffs' Counsel's experience in open-market securities cases of this type, Plaintiffs believe it is likely Defendants would have argued that all of the drops in E*TRADE's share prices, except the November drop, were no more than normal fluctuations in price.  Further, Defendants would likely have claimed that most of the Company's mortgage-backed portfolio had similar characteristics to rated asset-backed pools of mortgages, which were highly rated up until August 2007, when the ratings agencies began a massive, across-the-board downgrade of mortgage-backed securities.  They would thus argue that regardless of their internal analysis, Defendants had a right to rely on rating agency views of similar securities, and the declines in E*TRADE's stock prices during the Class Period was caused by changes in analysis by these external agencies that were timely disclosed when they occurred.  Defendants would also, no doubt, argue that they notified shareholders as soon as the reduced value of mortgage-based assets was known.  In particular, they would point to the disclosures E*TRADE made on September 17, 2007 and claim that those disclosures (which actually caused the price of E*TRADE stock to increase) put the market (and, therefore, all Class Members) on notice that there were potentially major problems with E*TRADE's portfolio of mortgage-based securities; thus, they would argue the risks to E*TRADE of those securities was disclosed before November 9, 2007 and that none of the decline in price on November 9, 2007 (the end of the Class Period) was attributable to the

revelation of any previously undisclosed risks or corrections of any previously misrepresented information.

201.    Plaintiffs, on the other hand, would respond with expert testimony that any attempt by Defendants to disaggregate the causes for the decline in E*TRADE's value would fail.   Further, Plaintiffs would argue (and their experts would confirm) that the amount of damages presented already took into account any extraneous or non-actionable price movements and that their damages analysis was distilled down to only those amounts resulting from information curing prior misstatements. *See* Hammerslough Decl. at ¶¶19-30.  At best, however, the issue of damages would have degenerated into a "battle of experts."   In the end, Plaintiffs were at risk that the jury might not resolve the "battle of experts" over causation and damages in favor of the Class.  Whose experts the jury would believe is a risk not practically measurable in advance of trial.

**Risk of Non-Recoverability**

202.    The amount of the Settlement must be considered in the context of the *collectability* of a greater judgment.  The Settlement is being paid primarily from available D&O insurance coverage.   Those policies, however, are wasting policies that pay for the cost of defense as well as for any future finding of liability or a settlement.   Here, had the Action continued, the amount of available insurance to pay a recovery would have continued to diminish. Absent available insurance coverage, the ability to collect on any judgment equal to or greater than the Settlement Amount was, under current circumstances, very highly questionable and a very significant risk to continued litigation

203.    As discussed in detail above, in August 2011, counsel for the parties commenced settlement discussions, which continued on a regular basis until they entered into the Stipulation.

These negotiations were conducted face-to-face and by telephone and were conducted among Plaintiffs' Counsel and Defendants' Counsel, as well as counsel for E*TRADE's D&O insurance carriers. At the outset, Plaintiffs' Counsel understood that E*TRADE was not likely to be in a financial position to make a substantial contribution to a settlement. Besides being forced to effectuate a 1-for-10 reverse stock split on June 2, 2010 to maintain its listing on the NASDAQ and, currently, pre-split, trading at less than $1.00 per share, according to E*TRADE's Form 10Q for the period ended March 31, 2012 ("March 31, 2012 10Q"), E*TRADE continues to deal with the effects of the recent credit crisis and recession: net operating interest income declined $24.8 million (i.e., 8%), total non-interest income declined $22.5 million (i.e., 10%), and total net revenues declined $47.3 million (i.e., 9%), compared to the same period in 2011. See March 31, 2012 10Q at 7. And more recently, on July 19, 2012, E*TRADE announced results for the second quarter of 2012, with net income declining an additional $23 million (from $63 million to $40 million), and total net revenues declining from $489 million to $452 million. E*TRADE also reported GAAP EPS of $0.14 and operating EPS of $0.10, which was $0.01 below consensus. Perhaps more troubling, however, is E*TRADE's recent announcement that it needs to shrink its bank balance sheet by $5-$10 billion to boost the holding company's Tier 1 leverage now under the scrutiny of regulators. As a result, some analysts have lowered estimates for the second time this month. See "ETFC: Penny miss, but deleveraging plans more troubling," BGB Securities Incorporated, dated July 20, 2012.

204.    Adding to the obstacles facing Plaintiffs in settling this Action is the fact that E*TRADE has 12 consecutive layers of D&O insurance coverage underwritten by different carriers. At the beginning of the Settlement negotiations, there was approximately $95 million of insurance coverage still available to fund the Settlement because the first two layers had been

spent defending the suit. The third layer initially refused to surrender its entire policy. As a result, the remaining layers were under no obligation to even engage in settlement negotiations because, until a preceding layer is exhausted, the next layer of coverage is not triggered. Moreover, to reach the $79 million Settlement amount, additional funds from the next seven layers were necessary to fund the Settlement. Plaintiffs' Counsel believe their ability to ultimately obtain payment from the tenth layer of insurance coverage prior to summary judgment speaks volumes of their skills as negotiators, which has inured to the benefit of the Settlement Class.

**Other Risks**

205. Plaintiffs' Counsel also considered the substantial time and expense that would be involved in continuing to prosecute the Action through trial and the inevitable post-trial motions and appellate proceedings. Simply completing the pre-trial proceedings would have involved considerable additional discovery, including resolving the issues still outstanding after more than a year of contentious negotiations; taking dozens of depositions; defense of the depositions of Plaintiffs and other investors; preparation of complex expert reports and discovery of the expert witnesses; the negotiation and completion of a complex and voluminous pre-trial order; and extensive briefing on motions for summary judgment, motions to strike experts and other motions *in limine* likely to be made by Plaintiffs and by Defendants. Given the complex nature of the case and the numerous persons with knowledge of discreet aspects of the case, trial of the Action would be extremely complex and likely take weeks to complete. By way of example, the recent Vivendi securities class action fraud trial before Judge Richard Holwell (Ret.) (which involved a similarly lengthy class period) began in October 2009 and lasted four months, including three weeks of jury deliberations; the post-trial claims processing has still not

commenced; no judgment has yet been entered 2.5 years after the verdict; and lengthy appellate proceedings are a certainty.

* * *

206.   In sum, through many months of analysis and negotiation, the parties compromised their differences and reached the agreement that is embodied in the Stipulation. In view of the $79,000,000 Settlement that has been recovered for the Settlement Class, the sharply contested factual and legal issues (both as to liability and damages), and the uncertainties and enormous costs and delays inherent in continuing the litigation, we believe the Settlement to be an excellent result and urge its approval by the Court.

THE PLAN OF ALLOCATION

207.   As set forth in the Notice, Plaintiffs' Counsel prepared the Plan of Allocation (in consultation with an expert) for the distribution of the proceeds of the Settlement. The objective of the proposed Plan of Allocation is to distribute equitably the net proceeds of the Settlement to those Settlement Class Members who suffered losses as a result of the alleged misrepresentations and omissions. Thus, the proposed division of the proceeds of the Settlement among claiming Settlement Class Members is based upon the formula that results in Plaintiffs' best possible damages assuming success on the merits for all claims of the Settlement Class Members at the various different junctures during the Settlement Class Period. Since the proposed allocation reflects the best possible damages theory that Plaintiffs believe could have been proffered at trial, Plaintiffs' Counsel submits that the Plan of Allocation is eminently fair, reasonable, and equitable.

208.   The Plan of Allocation, which is fully set forth in Section IX of the Notice, *see* Fraga Decl. Ex.A, provides for the calculation of "Recognized Losses" for those Settlement

55

Class Members who file timely and properly completed Proof of Claim forms ("Authorized Claimants").  In sum, the calculation of Recognized Loss, which is step-by-step set forth in the Notice, is based on the dates of purchase of E*TRADE securities and sales, if any, during the Settlement Class Period, with caps on the per share Recognized Loss based on the price declines following the four alleged partially curative disclosures. Settlement Class Members will be eligible to participate in the distribution only to the extent they had a net loss on their overall transactions in E*TRADE securities during the Settlement Class Period.  If a Settlement Class Member had a net gain from his/her overall transactions in E*TRADE securities during the Settlement Class Period, the value of the Recognized Claim will be zero.  If a Settlement Class Member suffered a net loss on his/her/its overall transactions in E*TRADE securities during the Settlement Class Period, but that loss was less than the Recognized Claim, then the Recognized Claim shall be limited to the amount of the actual loss.

209.    For purposes of determining whether a Settlement Class Member had a net gain or suffered a net loss from his/her overall transactions in E*TRADE securities that will receive payment under the Plan of Allocation during the Settlement Class Period, the Claims Administrator shall: (i) for each E*TRADE security, total the amount paid for those securities purchased during the Settlement Class Period by the claimant ("Total Purchase Amount"); (ii) for each E*TRADE security, match any sales of those securities purchased during the Settlement Class Period first against the Settlement Class Member's opening position in such security (the proceeds of those sales will not be considered for purposes of calculating gains or losses); (iii) for each E*TRADE security, total the amount received for sales of the remaining E*TRADE securities sold during the Settlement Class Period ("Sales Proceeds"); and (iv) ascribe a $3.55 per common share holding value for the number of shares of E*TRADE securities purchased

during the Settlement Class Period and still held at the end of the Settlement Class Period
("Holding Value"). The Holding Value is based upon the closing price of E*TRADE securities
on November 12, 2007 – the first full trading day after the end of the Settlement Class Period.
The difference between (i) the Total Purchase Amount and the (ii) sum of the Sales Proceeds and
Holding Value will be deemed a Settlement Class Member's net gain or net loss on his/her
overall transactions in E*TRADE securities during the Settlement Class Period.

210.     In the event that a Settlement Class Member made more than one purchase or sale
of a particular E*TRADE security, all purchases and sales shall be matched on a First-In-First-
Out ("FIFO") basis. Settlement Class Period sales will be matched first against any particular
E*TRADE security held at the beginning of the Settlement Class Period and then against
purchases during the Settlement Class Period in chronological order. For all purposes, the
transaction date and not the settlement date shall be used as the date for determining eligibility to
file a claim. Acquisitions through gifts and transfers of securities are not eligible. The covering
purchase of a "short" sale is not an eligible purchase. No distributions will be made to
Authorized Claimants who would otherwise receive a distribution of less than $10.00.

211.     Finally, under the Plan of Allocation, each Authorized Claimant shall be paid the
percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Loss bears
to the total of the Recognized Loss of all Authorized Claimants (*i.e.*, on a *pro rata* basis).
Additionally, under the Plan of Allocation, the total recovery from transactions in put and call
options cannot exceed 5% of the amount to be distributed to Settlement Class Members.

212.     Settlement Class Members who do not file acceptable Proofs of Claim will not
share in the settlement proceeds. Settlement Class Members who do not file an acceptable Proof
of Claim will nevertheless be bound by the judgment and the Settlement. Distributions will be

made to Authorized Claimants after all claims have been processed and after the Court approves the final calculations and distributions to be made to Settlement Class Members.

213.    Although the deadline has not yet passed, Plaintiffs' Counsel has not received any objections to the Plan of Allocation to date.  If any objections are received by the September 10, 2012 deadline, Plaintiffs' Counsel will address any additional issues resulting from the objections in reply papers to be submitted prior to the Settlement Hearing.

214.    In sum, the Notice disseminated to Settlement Class Members details the Plan of Allocation at great length and the estimated impact on individual claiming Settlement Class Members.  Settlement Class Members have the opportunity to object or otherwise express their views concerning the Plan of Allocation to the Court.

## PLAINTIFFS' COUNSEL'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES

### The Requested Fee is Fair and Reasonable

215.    The work undertaken by Plaintiffs' Counsel in prosecuting this case and arriving at this Settlement in the face of substantial risks has been time-consuming and challenging.  The litigation settled only after Plaintiffs' Counsel overcame multiple legal and factual challenges and was nearing completion of a massive discovery program.  To do so, over more than four years, Plaintiffs' Counsel performed a wide range of tasks necessitated by the complexity of both the underlying facts presented by this case and the sophisticated legal issues that naturally arise under the federal securities laws.  These efforts included, among other things, conducting extensive factual investigations into the events and circumstances underlying the claims in the Amended Complaint, which uncovered substantial information about the Company and its mortgage business and lending and underwriting practices that form the basis of Plaintiffs' detailed and particularized Amended Complaint; interviewing numerous witnesses with

knowledge of the facts pled in the Amended Complaint; obtaining and reviewing filings with the SEC, as well as press releases, analyst reports, and other relevant documents; thoroughly researching the law relevant to the claims against Defendants; briefing an opposition to motion to dismiss filed by Defendants; briefing motions to compel; propounding and responding to voluminous discovery request; and reviewing over 16 million pages of documents obtained from Defendants and third-parties; consulting with experts in accounting, securities and damages; conferring repeatedly over the course of the litigation with counsel for Defendants to resolve various disputes; working with their experts to assess and calculate recoverable damages; negotiating the Settlement; developing the Plan of Allocation; preparing the Stipulation with its accompanying exhibits; and drafting all preliminary and final settlement papers presented to the Court to effectuate the Settlement.

216.    For their extensive efforts expended on behalf of the Settlement Class, Plaintiffs' Counsel is applying for compensation to be calculated on a percentage basis. As set forth in the accompanying Fee Memorandum, the percentage method for awarding attorneys' fees in this Action is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. The percentage method is also supported by public policy, has been recognized as appropriate by the United States Supreme Court in common fund cases, is the authorized method under the PSLRA, and represents the overwhelming current trend in the Second Circuit as well as in the other Circuits.

217.    Based on the result achieved for the Settlement Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation,

Plaintiffs' Counsel submit that a fee equal to one-third of the $79 million recovered for the Settlement Class ($26.33 million) is justified and should be approved. As discussed in the Fee Memorandum, a 33.33% fee is both within the range of the percentages typically awarded in securities class actions in this Circuit and the range typically agreed to in private contingent litigation.

218. Moreover, as described in the Fee Memorandum, the requested fee is not only fair and reasonable under the percentage approach but a lodestar/multiplier analysis also confirms the reasonableness of the fee. Annexed hereto as Exhibits D and E to this Declaration are the individual firm declarations of Plaintiffs' Counsel. Each of those declarations set forth the identity and level of each attorney and professional at each of those firms who worked on this Action, each of their current billing rates and the number of hours each devoted to this Action. Based upon these declarations, the total hourly charges of Plaintiffs' Counsel in this Action, on a current basis (*i.e.*, their "lodestars"), is $16,435,905.00 on 39,976.82 hours of time. On an hourly basis, therefore, the requested fee of $26,333,333.33 is equivalent to a relatively modest multiplier of 1.6 of the collective time charges of Plaintiffs' Counsel.

219. Plaintiffs' Counsel maintained daily control and monitoring of the work performed by lawyers on this case. While we, the senior attorneys at our respective firms, personally devoted substantial time to this case, other experienced attorneys at our respective firms undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels. Throughout the Action, Plaintiffs' Counsel allocated work assignments among the attorneys at our firms to avoid unnecessary duplication of effort with the goal of providing efficient, low-cost representation to the Settlement Class.

220.   The biographies for attorneys who devoted substantial time to the prosecution of the Action for Plaintiffs' Counsel are included in their firm resumes, which are attached as exhibits thereto.

221.   Plaintiffs' Counsel's billing rates are consistent with rates charged in the communities in which they practice and in the New York legal community. Plaintiffs' Counsel's rates are commensurate with (and, indeed, lower than) rates charged by attorneys of comparable skill, reputation and experience who specialize in the defense of securities fraud litigation. *See* Mill Decl. ¶¶41-58. For example, in a recent bankruptcy court fee application in the *Pinnacle Airlines* proceedings, the rates for partners and counsel at Davis Polk ranged from $925 to $950 (with Amelia T.R. Starr, the mid-level Davis Polk partner who had day-to-day responsibility for defending this Action, billing at $950 per hour) and rates for associates ranging from $475 (for first year associates) to $750 (for associates admitted in 2009). *See In re Pinnacle Airlines Corp.*, Case No. 12-11343 (REG) (Bankr. Ct. S.D.N.Y.), Monthly Fee Statement Of Davis Polk & Wardwell LLP For Professional Services And Disbursements For The Period Of June 1, 2012 Through June 30, 2012, dated July 20, 2012. Indeed, as discussed in the Miller Declaration submitted herewith, the median billing rate for litigation partners at New York City law firms that typically defend securities class action cases is now estimated at approximately $1,000 per hour, with more senior partners billing at $1,200 per hour and more. *See also* Miller Decl. ¶¶48-55.

222.   The rates for the partners who worked on this case range from $725 to $925 per hour (with a median rate of $795), and the rates for the associates who worked on the case range from $320 to $650 per hour, with a blended rate of $443, which is notably lower than the rate of first year litigation associates at Davis Polk.

223.   The resulting lodestar for Plaintiffs' Counsel, which excludes all time incurred in connection with the request for attorneys' fees and reimbursement of expenses, is $16,435,905.00.  The total requested fee of one-third of the Settlement Fund, therefore, yields a 1.6 multiplier and is fair and reasonable based upon the significant risk of the litigation, the results achieved, the lack of governmental assistance, the time devoted to the Action, the reputation of counsel, awards in similar cases, and the quality of representation by Plaintiffs' Counsel in achieving the excellent Settlement before the Court.  Indeed, as discussed in the Fee Memorandum, when using a lodestar/multiplier cross-check, courts have routinely awarded fee requests with far larger lodestar multipliers in securities fraud class actions.  *See* Miller Decl. ¶77 n.42.

### The *Goldberger/Grinnell* Factors Support The Requested Fee Award

224.   Plaintiffs' Counsel prosecuted this case on a contingency basis, committed their own resources, and litigated it for more than four years without any compensation or guarantee of success.  As set forth in detail above, at the outset, each of the attorneys representing Plaintiffs understood they were embarking on a difficult, complex, expensive, and lengthy litigation. Plaintiffs' Counsel understood that Defendants would (and, in fact, did) retain a highly experienced large corporate defense firm to mount a vigorous defense, and that there was no guarantee of ever being compensated for the anticipated enormous investment of time and money the case would require.

225.   As the statistics set forth in the Miller Declaration demonstrate, undertaking a federal securities action on a contingency is, itself, a high risk endeavor, with a majority of such cases being dismissed at the pleading stage.  Moreover, as a "credit crisis" case, Plaintiffs' Counsel undertook even greater risks as such cases have now proven historically to resolve for

much lower percentages of recoverable damages than federal securities class actions involving other industries. Furthermore, as discussed in the Fee Memorandum and the Miller declaration, the law governing federal securities cases remains in constant flux and prior assumptions as to the state of the law have been swept away in several recent Supreme Court cases. Plaintiffs' Counsel understood full-well that the ground upon which this Action was based could disappear as a result of any one of the several Supreme Court cases that were argued and decided during the pendency of this Action or of those to which the Court has recently granted certiorari.

226.    There are numerous cases in which Plaintiffs' Counsel, in contingent fee cases such as this, after expenditures of thousands of hours, have received no compensation whatsoever. Counsel know from personal experience that despite the most vigorous and competent of efforts, a law firm's success in contingent litigation such as this is never assured – and that many able plaintiffs' law firms have suffered major defeats after years of litigation (and after expending tens of millions of dollars of time and money) without receiving any compensation at all for their efforts. However, Defendants and their counsel know that Plaintiffs' Counsel, who include leading members of the Plaintiffs' bar, are prepared and willing to go to trial, which permits meaningful settlement in actions such as this.

227.    Notwithstanding the tremendous risks faced in pursuing this Action, Plaintiffs' Counsel undertook this Action on a fully contingent basis. Had Plaintiffs not prevailed or achieved a favorable settlement in the Action, Plaintiffs' Counsel would have sustained a substantial financial loss. Nevertheless, Plaintiffs' Counsel devoted more than 39,000 hours of time and advanced approximately $550,000 in out-of-pocket expenses to prosecute this Action. Clearly, Plaintiffs' Counsel undertook a significant risk to represent the Settlement Class here.

228.   It would also be wrong to ignore the responsibility undertaken by Plaintiffs' Counsel in agreeing to represent the Class in the Action in terms of foregoing other potential employment during the litigation to assure sufficient resources were dedicated to the prosecution of this Action. Another factor is the attorney's loss of the use of the money invested during the course of the litigation. Attorneys representing hourly fee-paying clients are paid immediately, with the money available for investment and the creation of additional revenues.  Such additional revenues are not available to the contingent fee attorney.   Lawsuits such as this Action are exceedingly expensive to litigate.   Outsiders often focus on the gross fees awarded but ignore that those fees are used to fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal, state, and local authorities, and, when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee award might suggest.

229.   The expertise and experience of Plaintiffs' Counsel is another important factor in setting a fair fee.  As demonstrated by Plaintiffs' Counsel's firm resumes, attached as exhibits to the attached individual firm declarations, the attorneys at Plaintiffs' Counsel's, Brower Piven and Levi & Korsinsky, are experienced and skilled practitioners in the securities litigation field and have a successful track record in securities cases throughout the country – including within this Circuit.

230.   The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Plaintiffs were opposed in this case by very skilled and highly-respected counsel.  Defendants were represented by Davis Polk & Wardwell, one of the most prestigious law firms in the world.  This prominent defense firm spared no effort or expense in the defense of their clients.  In the face of this

knowledgeable and formidable defense, Plaintiffs' Counsel were nonetheless able to develop a case that was sufficiently strong to persuade the Settling Defendants to settle on terms quite favorable to the Settlement Class.

231.   Moreover, Plaintiffs' Counsel achieved this outstanding Settlement through their own skill, effort, and initiative.   Plaintiffs' Counsel received no outside or governmental assistance.  Plaintiffs' Counsel developed the facts necessary to successfully survive Defendants' motion to dismiss and prevail on several motions to compel to obtain valuable discovery used to prosecute Plaintiffs' case.   Plaintiffs' Counsel achieved this result without expending unnecessary time and expenses, or burdening the Court with unnecessary collateral motion practice.

232.   Plaintiffs' Counsel's fee request is also well within the range of awards typically granted for cases that have been contested for this length of time.[4]   In private contingent litigation, plaintiffs' attorneys generally undertake representation for fees of one third (1/3) to 40% of the potential recovery, plus expenses.   Courts in this Circuit and elsewhere have routinely awarded 33.33% of a class action recovery in attorneys' fees. *See* Fee Memorandum, § A.3.d; Miller Declaration at Exs. B and C.

233.   Likewise, Plaintiffs' Counsel are seeking an award that would represent a 1.6 multiplier of their lodestar.   Such multipliers are usually awarded to compensate successful plaintiffs' attorneys for the contingent nature of the their fee arrangement, the long delay in payment, the responsibilities and risks undertaken in complex class action litigation and the incentivizing nature of such success awards to assure prosecution of claims of small investors to vindicate the federal securities laws.  Multipliers of between 3 and 4.5 times plaintiffs' attorneys'

---

[4] Awards of attorneys' fees that have been approved in other similar securities class action cases have been compiled and discussed in Plaintiffs' Counsel's accompanying Fee Memorandum.

lodestar are common in this Circuit in securities actions.  *See* Fee Memorandum, at §A.4; Miller

Declaration ¶77 n.42.  Thus, the requested fee is well within the amount of awards in similar

cases whether analyzed under the percentage-of-the-recovery method of the lodestar/multiplier

method.

234.    As to the reaction of class members to the request, as set forth above, more than

232,000 copies of the Notice have been mailed to potential Settlement Class Members.  Fraga

Decl. at ¶9.  In addition, the Summary Publication Notice was disseminated on *PRNewswire* on

three separate occasions.  *Id.* at ¶7. The Notices described Plaintiffs' Counsel's intention to apply

to the Court for an award of attorneys' fees not to exceed 33.33% of the Gross Settlement Fund

and reimbursement of expenses not to exceed $750,000.  The deadline to object to Plaintiffs'

Counsel's fee request is September 10, 2012, but to date, no Settlement Class Member has

objected to either of those requests.

235.    Finally, for decades, the United States Supreme Court (and countless lower

courts) have repeatedly and consistently recognized that the public has a strong interest in having

experienced and able counsel be incentivized to undertake the risky task, on a contingent basis,

of privately enforcing the federal securities laws and related regulations designed to protect

investors from the pernicious effects of false and misleading statements made in connection with

the issuance or subsequent purchase or sale of publicly-traded securities.  *See, e.g.*, *Bateman*

*Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions

provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary

supplement to [SEC] action.'") (citation omitted).  Indeed, as Congress recognized in passing the

PSLRA, private securities litigation is an indispensable tool with which defrauded investors can

recover their losses without having to rely on government action. Such private lawsuits promote

public and global confidence in our capital markets, deter future wrongdoing, and help to guarantee that corporate officers, auditors, directors, lawyers, and others properly perform their jobs.

236.    The importance of this public policy is particularly evident in this case. Government authorities (including the SEC) have brought only a handful of securities law enforcement actions against financial institutions and related entities in the wake of the subprime crisis, notwithstanding that private lawsuits and investigative journalism have disclosed (and, indeed, almost daily continue to disclose) improper conduct (and misleading public statements) at various financial companies leading up to, continuing throughout the crisis, and even continuing into this day.  Here, the SEC has not filed a complaint against any of the Defendants – yet Plaintiffs' Counsel has recovered $79 million on behalf of E*TRADE investors.   Such recoveries – and the complex and prolonged litigation necessary to achieve them – are only possible if plaintiffs' counsel is ultimately compensated with fees commensurate with the magnitude of their successes.

\* \* \*

237.    Based upon all of the foregoing, and for the reasons set forth in the Fee Memorandum, Plaintiffs' Counsel submit that the request for an award of one-third (33.33%) of the Settlement Fund is fair and reasonable and should be granted.

**PLAINTIFFS COUNSEL'S APPLICATION FOR REIMBURSEMENT OF EXPENSES**

238.    Plaintiffs' Counsel also request $554,950.23 as reimbursement of their out-of-pocket litigation expenses reasonably and necessarily incurred by them in the prosecution of this Action.

239.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, an award of expenses would not compensate them for the loss of the use of those funds advanced to prosecute this Action.  Thus, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

240.    The following chart details the expenses incurred by Plaintiffs' Counsel by category:

| | |
|---|---|
| Reproduction/Printing | $99,228.18 |
| Special Supplies | $5,962.13 |
| Express Mail/Messenger/Postage | $1,899.72 |
| Computer Research/Pacer/Lexis/Westlaw | $28,370.53 |
| Travel/Meals/Hotels | $15,060.98 |
| Long Distance Telephone/Telecopier/Data | $6,939.72 |
| Experts | $81,580.00 |
| Computer Document Review (License & Consulting Fees, Software & Hardware, Maintenance & Rental) | $154,179.18 |
| Private Investigators | $60,545.60 |
| Process Service/Subpoena/Filing Fees | $4,441.79 |
| Outside Litigation Support | $52,911.25 |
| Class Action Notice Costs | $429.13 |
| Court Reporters | $2,502.02 |
| Mediator | $40,900.00 |
| TOTAL | $554,950.23 |

241.    The foregoing summary of expenses incurred in the prosecution of the Action are described in further detail by the firm that paid or incurred such expenses in the individual firm declarations. *See* Exhibits D and E.

242.    As the above chart indicates, the expenses incurred by Plaintiffs' Counsel are the types typically and necessarily incurred in modern complex business litigation and the types that courts routinely reimburse in securities and antitrust class actions.  These expenses include the cost of experts and consultants; computer research; photocopying; telephone, postal and express mail charges; hand delivery charges; filing and witness fees; charges for transcripts; costs associated with the equipment, hardware, software and maintenance charges for the electronic document organization and coding platform; the mediator's fees; and other similar case-related costs.  *See* Fee Memorandum at §III.B.

243.    Moreover, the requested reimbursement of expenses is significantly less than the limit of Plaintiffs' Counsel's prospective requests of $750,000 set forth in the Notices. Nevertheless, as of the date of this Declaration, there are no objections to that higher potential requested reimbursement of those expenses disclosed to Settlement Class Members.

## REIMBURSEMENT OF NOTICE AND ADMINISTRATION COSTS

244.    Plaintiffs are also seeking approval of the reimbursement of the cost of the notice program and administration of the Settlement incurred or charged by the Court-appointed Claims Administrator, GCG.  Those charges include the costs of printing, postage, reimbursement of banks, brokerage firms and other nominees for providing the names and addresses of potential Settlement Class Member in response to the dissemination of the Notice and Summary Publication Notice; the fees and out-of-pocket expenses of GCG in processing claims and responding to inquiries from potential Claimants; and other expenses incurred to date in the

administration of the Settlement.  Those expenses continue to be incurred, and will continue to be incurred until completion of the administration process.

245.    Accordingly, Plaintiffs' Counsel requests approval to make an interim payment to GCG of $249,924.84 in connection with costs already incurred in providing notice and the administration services.  GCG's detailed statement, dated July 27, 2012, is annexed hereto as Exhibit F.  Plaintiffs' Counsel has reviewed GCG's billings and believes they are commercially competitive, consistent with Plaintiffs' Counsel's negotiated agreement with GCG, and were reasonably and necessarily incurred.  This amount will be deducted from the Settlement Fund as provided in the Stipulation.

## CONCLUSION

Based on all the factors discussed above, as well as our extensive experience in the litigation of securities class actions, we believe that the proposed Settlement, which provides a substantial recovery to the Settlement Class, is fair, reasonable, and adequate, and should be approved; that the Plan of Allocation of the net proceeds of the Settlement is fair and equitable and should be approved; and that Plaintiffs' Counsel's requested award of attorneys' fees and reimbursement of litigation expenses are fair and reasonable and should be granted.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information and belief.

Executed this 10th day of August, 2012 at New York, NY.

_____          _____
David A.P. Brower                                         Eduard Korsinsky

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2012, I served true and correct copies of the foregoing Joint Declaration of David A.P. Brower and Eduard Korsinsky in Support of Plaintiffs' Motions for Final Certification of Settlement Class, Final Approval of Class Notice, Final Approval of the Proposed Settlement, Final Approval of the Proposed Plan of Allocation and Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses on Defendants' counsel by causing copies to be sent by the ECF system and by electronic mail to:

Dennis Glazer
Amelia T.R. Starr
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017

_/s/ David A.P. Brower_
David A.P. Brower