# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

LARRY FREUDENBERG, Individually and
On Behalf of All Others Similarly Situated,

                 Plaintiff,

- against -

E*TRADE FINANCIAL CORPORATION,
MITCHELL H. CAPLAN, ROBERT J.
SIMMONS and DENNIS E. WEBB,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Civil Action No.

07 Civ. 8538 (JPO) (MHD)

# DECLARATION OF JOHN C. HAMMERSLOUGH

I, JOHN C. HAMMERSLOUGH, hereby declare and state as follows:

## INTRODUCTION

    1.    I was initially retained in 2007 by plaintiffs' counsel in the above captioned consolidated class action (the "Action") as an expert regarding market impact, materiality, and damages. My qualifications and experience are set forth in Exhibit A hereto. In connection with work performed on behalf of plaintiffs' counsel, I personally performed that work and I am personally familiar with the matters set forth herein.

    2.    I have been engaged in various aspects of the securities industry for more than 40 years. For the past 25 years, I have devoted most of my time to providing litigation support services in litigation such as this Action, initially as an individual and more recently as Managing Director of John C. Hammerslough, LLC. As part of my

activities, I have performed services similar to those requested by Counsel as set forth below in hundreds of similar actions both through submission of affidavits and testimony in court relating to issues involving market impact, materiality and/or damages. I have been qualified by courts as an expert on such matters.

3. Plaintiffs' counsel has asked me to estimate (a) the likely range of per share damages, assuming complete success by Plaintiffs and the entire Class in the litigation on all issues of liability, that could reasonably be offered and likely recoverable by Class members at trial, and based on that calculation, assuming a 100% claims rate, the percentage recovery of individual Class member's recoverable damages represented by the $79,000,000 Settlement Amount; and (b) the amount of the recovery to Class members likely to submit claims for payment and the percentage of claiming Class members' recoverable damages that will recover based on the $79,000,000 Settlement Amount.

## SUMMARY OF OPINIONS

4. In forming my opinions, I have reviewed public filings of E*TRADE Financial Corporation ("E*TRADE" or the "Company"); price history of E*TRADE's common stock; analyst reports about the Company; the complaints filed by plaintiffs; various pleadings and statements filed by the parties to the action; rulings of the Court; information about quarterly institutional holdings of E*TRADE's stock; and the iShares Dow Jones US Brokers-Dealers Index ("iShares").

5. Based on my analysis set forth below, I estimate that, assuming Plaintiffs were completely successful on all issues of liability and damages for the entire Class at

trial, and assuming every potential Class member submitted a claim after trial representing every damaged share in the Class, aggregate recoverable Class wide damages would be approximately $559 million. Thus, the $79,000,000 Settlement represents approximately 14.1% of Class members' most likely recovery after trial assuming complete success on all issues of liability and damages and a 100% Class claim rate.

6. Based on my analysis set forth below, I estimate that, given the parameters of the Class, that Class members holding approximately 80.4% of the damaged shares will submit claims. Therefore, I estimate that claiming Class members will actually recover from the Settlement (before fees and expenses) approximately 17.6% of their most likely recovery (or $449.4 million) after trial assuming success on all issues of liability and damages.

## BACKGROUND

7. The Class Period in this Action is April 19, 2006 to November 9, 2007.

8. E*TRADE is a publicly-traded company that, during the Class Period, offered financial services to retail and institutional customers worldwide, including retail investments and trading, checking, money market and savings accounts, as well as mortgage and home equity loans and consumer loans. ¶5.[1] According to E*TRADE's 2006 Form 10-K, E*TRADE's retail services consist of investing and trading, banking

---

[1] Unless otherwise noted, "¶__" refers to paragraphs of Plaintiffs' Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, dated January 16, 2009.

and lending; institutional products include market making, execution services and direct market access. ¶42.

9. As the Plaintiffs allege E*TRADE was originally an internet discount brokerage firm that yielded steady and safe returns. ¶¶ 42, 62. Because opportunities for growth were limited, the Defendants expanded into the highly profitable mortgage business by the beginning of the Class Period. ¶ 66. During that time, however, Defendants told investors that E*TRADE's mortgage business focused on "organic" loans, originating its own mortgages for its "mass affluent" brokerage customers, when in fact E*TRADE (through its subsidiary E*TRADE Global Asset Management, Inc. ("EGAM")) was actually purchasing large mortgage pools from other originators – at a time when routinely purchasing "safe" mortgages was becoming increasingly difficult. ¶¶ 6, 62-66, 72, 101-18. To continue its stream of income from EGAM (E*TRADE's most profitable business segment), Defendants acquired large quantities of loans from the nation's worst subprime and below subprime mortgage originators, without telling investors that they had changed E*TRADE's business model from conservative investments in high quality loans to purchasing high risk, facially low quality debt instruments. ¶¶ 18, 68, 78-79, 101-18, 209, 214, 225, 288. When accurate information about the Company and its mortgage business became public, E*TRADE's stock price declined.

10. The Plaintiffs allege that E*TRADE's public statements during the Class Period were materially false and misleading because:

- Defendants described the Company's portfolio of mortgage loans as "superprime" to distinguish E*TRADE from troubled lenders who were experiencing severe financial problems, when in fact E*TRADE itself was exposed to significant subprime and mortgage risk.[2]

- Defendants represented that the Company's lending business was generated "organically" from its traditional trading and banking services to E*TRADE customers even though the Company was purchasing billions of dollars of loans from financially troubled lenders (such as Countrywide Financial Corporation), thereby misleading investors about the Company's investment risk.[3]

- Defendants told investors that E*TRADE used "discipline" and "conservatism" in its risk management and monitoring of its loan portfolio when, in fact, defendants had decided to secretly sacrifice safety for profits.[4]

---

[2] E.g., ¶ 168 (Merrill Lynch Banking & Financial Services Conference, dated November 14, 2006); ¶ 170 (Friedman, Billings, Ramsey Investor Conference, November 28, 2006); ¶ 172 (Goldman Sachs Financial Services CEO Conference, dated December 13, 2006); ¶ 185 (E*TRADE Q4 2006 Earnings Call, dated January 18, 2007); ¶ 202 (E*TRADE Q1 2007 Earnings Call, dated April 18, 2007); ¶ 211 (E*TRADE Q2 2007 Earnings Call, dated July 25, 2007); ¶ 212 (E*TRADE Q2 2007 Earnings Call, dated July 25, 2007).

[3] E.g., ¶ 131 (*TRADE Q1 2006 Earnings Call, dated April 19, 2006); ¶ 160 (E*TRADE Q3 2006 Earnings Call, dated October 18, 2006); ¶185 (E*TRADE Q4 2006 Earnings Call, dated January 18, 2007).

[4] E.g., ¶ 185 (E*TRADE Q4 2006 Earnings Call, dated January 18, 2007); ¶ 202 (E*TRADE Q1 2007 Earnings Call, dated April 18, 2007); ¶ 211 (E*TRADE Q2 2007

5

- Defendants decimated E*TRADE's due diligence procedures to facilitate the steady influx of high-risk asset-backed securities and pools of mortgages from problem-ridden originators, firing mortgage loan and credit review personnel, and all but eliminating any pre- or post-purchase review of these loan pools – in disregard of the Company's own stated underwriting practices, and without disclosing such facts to investors.[5]

- Defendants misrepresented and omitted material information concerning the quality and risks associated with the Company's investment portfolio of asset-backed securities ("ABS"), mortgage-backed securities ("MBS"), and collateralized debt obligations ("CDO").[6]

- Defendants concealed the high risk nature and deterioration of E*TRADE's loan portfolio by violating Generally Accepted Accounting Principles ("GAAP"), including: failing to adequately reserve for loan losses; failing to timely record securities' impairments; and overvaluing E*TRADE's securities portfolio.[7]

11. This is not a restatement case or one in which Defendants filed a Form 8-K disclosing a single piece of adverse information that cured a previous misrepresentation or omission. Here, Plaintiffs allege there were a string of disclosures

---

Earnings Call, dated July 25, 2007).

[5] E.g., ¶¶ 136-40 (E*TRADE Form 10Q for Q1 2006, dated May 9, 2006).

[6] E.g., ¶¶ 20, 203 (E*TRADE Q1 2007 Earnings Call, dated April 18, 2007); ¶ 235 (E*TRADE Form 10Q for 2Q 2007, dated August 19, 2007); ¶ 244 (E*TRADE Form 8K attaching September 17, 2007 press release, dated September 18, 2007).

[7] See ¶¶ 333-376.

6

beginning in July 2007 that revealed previously omitted problems at the Company.

12.  For example, on July 25, 2007, E*TRADE issued a press release titled "E*TRADE FINANCIAL Corporation Announces Second Quarter Results," which reported quarterly results and left guidance essentially unchanged ("The Company also narrowed its 2007 pro-forma earnings guidance to a range of $1.58 - $1.72 per share from the previous range of $1.55 - $1.75, leaving the mid-point of $1.65 unchanged."). In addition, during a conference call on July 25 in connection with the earnings announcement, E*TRADE acknowledged that it had purchased the majority of its mortgage portfolio, that National City was one of its big providers, and that its provision for loan losses rose to $30 million in the quarter, which was double the level of the prior year. ¶¶ 210-14, 310. In response, E*TRADE's stock dropped 6.89%. ¶ 215, 310..

13.  On Saturday August 11, 2007, The Wall Street Journal published an article titled "MarketWatch Weekend Investor: E*Trade Financial: An Online Broker in the Clothing of a Mortgage REIT?" ¶ 220. The article described analysts' concerns with the build-up of mortgage assets at E*TRADE:

> As the mortgage mess continues to evolve, the company he runs, E*Trade Financial Corp., is clearly in the thick of it, so much so that after reviewing its financial statements, you might think it was a mortgage REIT disguised as an online broker.
>
> It isn't, of course, but the reinvigoration of E*Trade's stock in 2003, then again in 2005, would appear to coincide with an increase in purchasing mortgages, home- equity loans and other mortgage-related assets. While E*Trade is hardly the only financial-services firm or broker to have mortgage exposure, it appears to be much greater at E*Trade than the likes of Charles Schwab.

14.   Then on Sunday August 12, 2007, Citigroup securities analyst, Prashant Bhatia, published a report on E*TRADE called "Credit Trends Continue to Deteriorate, Disclosure Still Lacking." ¶¶ 221-22. The report called the Company's disclosures in its most recent 10-Q "short on substance" and stated that "management provided minimal new information on the composition, source, and quality of its $28 billion mortgage portfolio." The report pointed out that E*TRADE provided credit scores (FICO & LTV) on its average portfolio rather than on the "tails" of the portfolio, which are more relevant. The report also pointed out that E*TRADE's non-performing real estate and special mention loans rose to $561 million, or 30% of the Company's tangible book value, four times higher than a year earlier. Bhatia noted that, while charge-offs doubled to $30 million, since non-performing loans quadrupled, he believed that charge-offs should be in the $50 to $60 million range or roughly double what E*TRADE was reporting. Furthermore, he noted that if meaningful deterioration in the credit quality of the existing portfolio continues, charge-offs could approach the $100 million range.

15.   Following this news concerning potential problems with E*TRADE's loan portfolio, the price of E*TRADE stock declined on August 13, 2007 (the first trading day after the news was released on August 11 and August 12, 2007). The share price of E*TRADE's stock fell from a close of $17.01 to $16.09. ¶¶ 223, 311.

16.   Over the next few months, the truth concerning E*TRADE's mortgage business was further revealed to the market. On October 17, 2007, Defendants issued a press release entitled "E*TRADE FINANCIAL Corporation Announces Third Quarter Results," announcing results for its third quarter ended September 30, 2007. ¶¶ 267-69. The release announced that provisions for loan losses had increased to $187 million

8

and that E*TRADE's securities write down would be $197 million in 3Q07. In addition, on October 17, 2007, Defendants issued a "Supplemental Disclosure Statement" in which it reported its first loss in five years and slashed its 2007 forecast because of rising costs for bad debt. ¶ 272. (The loss was $58.5 million, or 14 cents per share, compared with a profit of $153.2 million, or 35 cents per share, a year earlier. ¶ 268.) The Company's shares fell from a close of $12.47 on October 17, 2007 to a close of $11.47 on October 18, 2007 in response to the news.

17.  Then, at 4:44 pm on Friday November 9, 2007 (after the market close), Defendants issued a press release entitled "E*TRADE FINANCIAL Addresses the Potential Impact of Recent Downgrades of Asset-Backed Securities," disclosing write downs related to the decline in fair value of E*TRADE's $3 billion asset-backed securities portfolio mainly within ABS (CDO and second liens). Defendants revealed $450 million of additional losses in the Company's MBS portfolio, asset-backed CDO, and second-lien securities exposure, as well as larger write-downs. ¶ 279. As a result, E*TRADE disclosed that it would no longer be providing earnings guidance for the remainder of the year. ¶ 279. The Company's stock declined 58.67% (from $8.59 to $3.55 per share on Monday, November 12, 2007). ¶ 287, 314.[8]

18.  For the purpose of conducting my analysis of damages, I have taken the foregoing facts alleged by Plaintiffs as true and assumed that Plaintiffs would be able to prove each of these facts, as well as prove the requisite state of mind of the Defendants to prevail on these claims.

---

[8] There were additional declines alleged in the Complaint, but based on my analysis, I have concluded that they were not caused by the disclosure of previously omitted material information.

9

## ANALYSIS OF DAMAGES

19. In estimating compensable damages in a federal securities fraud action, several factors must apply to any analysis. First, under <u>Dura Pharmaceutical, Inc. v. Broudo</u>, 544 U.S. 336 (2005), recoverable losses are limited to those losses foreseeably caused upon the revelation of a previously misrepresented or undisclosed fact or risk. Second, it follows, that recoverable damages are limited to only those losses "caused" by a prior actionable misrepresentation or omission. Third, in any given announcement, there can be, at least, two types of information: information that corrects a prior misrepresentation or omission; and the timely revelation of new information. While these two types of information often overlap, each can, and must be segregated in calculating damages for a securities fraud as only the first form of information can "cause" a loss under <u>Dura</u>.

20. Further, in analyzing a price movement for the purposes of estimating compensable damages, the effect of non-firm specific micro- or macro-economic market factors that may affect the price of a security such as non-actionable industry-wide price movements on the day of an announcement, must be isolated and removed.

21. In assessing damages resulting from the fraud in this Action the key question, therefore, must be answered is how much of the drop in response to the various announcements was attributable to corrective information versus so-called confounding facts (such as other, new timely disclosed adverse information contained in

10

the same announcement), and overall non-firm specific micro- and macro-economic market conditions.

22. My analysis is intended to address the second prong of that equation, i.e., the range of damages Plaintiffs would have offered to survive a <u>Daubert</u> motion and credibly present to a jury taking into account non-firm specific and confounding factors.

23. The first step in my analysis is to remove from the amount of the decline some non-company specific micro- or macroeconomic events on the day of the subject decline related to non-actionable matters. I used the iShares Dow-Jones US Brokers-Dealers Index to remove such effects ("iShares").

24. There were many macroeconomic cross-currents and innumerable sources of publicly available information during the relevant period that impacted E*TRADE's securities prices and would need to be accounted for (and appropriately discounted) to present a defensible damages analysis to a trier of fact. Review not only of price movement, but the content and context of disclosures alleged to have been partially curative during the Class period is necessary to conduct this analysis.

25. As set forth above, Plaintiffs allege that there were four curative disclosures:

26. On July 25, 2007 the Company announced quarterly results. It also revealed that mortgages had been procured by E*TRADE from National City. The full extent of problems at National City was probably unknown at the time. The stock declined from $20.46 to $19.05, or $1.41. The iShares declined approximately 2.8 percent. Therefore the adjusted decline from this disclosure is estimated to be approximately $0.84 per share. Based on my experience and judgment, I believe that

11

allocating 20 percent of that decline to curative information in the July 25 disclosure is appropriate. Thus, I estimate damages related to this disclosure to be approximately $0.17 per share.

27.     On August 13, 2007, the market reacted to external comment critical of E*TRADE from The Wall Street Journal (published on Saturday August 11, 2007) and Citigroup (published on Sunday August 12, 2007). The stock declined from $17.01 to $16.09, or $0.92 per share. The iShares were down 1.3 percent. The adjusted decline from this disclosure is therefore $0.70 per share. Moreover, because the information was based on analysts and journalist analysis in external sources, which are generally considered less reliable than company disclosures in press releases or public filings. Further, an allocation between (a) new, timely revealed information contained in the August 11 and 12 disclosures and information corrective of prior misstatements, and (b) factual and opinion information in the August 11 and 12 disclosures as only factual information can be curative. Based on my experience and judgment, I estimate that of the 5.4 percent decline in response to the August 11 and 12 disclosures, approximately 50 percent of that decline can be attributed to curative information in those disclosures. Thus, I estimate damages related to these disclosures to be approximately $0.35 per share.

28.     On October 18, 2007, the market reacted to E*TRADE's after-market announcement on October 17 of the Company's third quarter results. They were unexpectedly bad and most of the negative surprise came from write downs of mortgages. The E*TRADE's stock price declined from $12.47 to $11.47, or $1.00 per share. The iShares were down 0.8 percent. Therefore, the adjusted decline is $.90 per

share. Once again, it is reasonable to assume that some of the decline was due to random market action and that a portion of the decline was due to recent, timely disclosed new events such as downgrades by rating agencies. Further, much of the information disclosed on October 17 confirmed the loan loss provisions and securities impairments that E*TRADE had previously forecast on September 17, which resulted in an increase in E*TRADE's share price. Based on my experience and judgment, I believe that approximately 25 percent of the decline on October 18 was attributable to curative information in the October 17 disclosure. Thus I estimate damages related to this disclosure to be approximately $0.22 per share.

29.    On November 12, 2007 (which was the first trading day after E*TRADE's after-market disclosure on November 9), the market price of E*TRADE shares reacted to the Company's disclosures regarding the impact of recent downgrades of its asset backed securities. The stock price declined from $8.59 to $3.55, or $5.04 per share. iShares were down 1.7 percent so the adjusted decline is $4.89 per share. The disclosure on November 9 was, in part, the result of well-publicized, worsening industry-wide problems that had occurred during E*TRADE's third fiscal quarter, which required E*TRADE to take additional, unforeseen write-downs for that period and to withdraw its guidance. Therefore, a portion of the November 12 decline was attributable to outside forces that occurred during the third quarter and could not be actionable. Further, the November 9 disclosure addressed items that had only arisen after the close of the third quarter – items about which E*TRADE had made no previous statements – and therefore could not be deemed corrective of any prior misstatement. Moreover, a significant amount of the information in the November 9 disclosures that related to

13

issues which are the subject of allegations in Plaintiffs' Complaint had already been addressed or warned of in E*TRADE's September 17 and October 17 disclosures, and merely provided additional detail regarding subjects, trends and risk about which the market was already aware. Based on my experience and judgment, I estimate that approximately 75 percent of the decline on November 12 was attributable to previously disclosed risks and post-second quarter further deterioration of the condition of E*TRADE's portfolio, which would not be actionable, and approximately 25 percent to new corrective information regarding the Company's mortgage backed securities impacting its then current and prospective financial condition and investment quality which would be recoverable. Therefore, I estimate damages related to this disclosure to be approximately $1.22 per share.

30. Thus, under Dura, the highest possible amount of damages any Class member could recover if the case went to trial and Plaintiffs were completely successful on all issues of both liability and damages for the entire Class is $1.96 per share ($0.17 + $0.35 + $0.22 + $1.22).

## DIMENSIONS OF THE CLASS

31. Based on an analysis of shares outstanding at the beginning of the Class Period, there were 450 million shares of E*TRADE common stock available for trading during the Class Period, i.e. the "float," and approximately 3.2 billion shares changed hands during the Class Period. Based on the float, the number of institutional and insider shares, the volume in E*TRADE stock during the Class Period and various indicators of trading velocity and volatility, it is my estimate that there were an aggregate of approximately 310 million shares of E*TRADE stock purchased during the Class

Period and held through the end of the Class Period. These are the total maximum number of "damaged shares" in the Class.

32. Based on this estimate of 310 million damaged shares, Class-wide damages would equal, assuming a 100 percent post-trial claim rate, approximately $607.6 million.

33. In addition, I believe that aggregate damages should be reduced by 8 percent to eliminate damages to shares that were not held through all four alleged corrective disclosures and, therefore, not fully impacted for the purposes of recovering damages by the cumulative effect of all four price declines.

34. Based on this calculation. I estimate that aggregate recoverable Class-wide damages are, assuming a 100% post-trial claim rate, approximately $559 million. Accordingly, the $79 million Settlement represents 14.1 percent of the damages the Class would likely recover at trial.

## CLASS CLAIMS RATE

35. It is my experience that the prospective claims rate is a factor that courts generally consider in determining the fairness, reasonableness and adequacy of a proposed class action settlement. As set forth below, some fraction of eligible claimants actually file claims.

36. Of those damages shares, I have estimated that approximately 83.87 percent of the damages shares were purchased and held by institutions and that approximately 16.13 percent of the damages shares were purchased and held by non-institutional investors.

37. I believe, based on my own experience and consultation with experts in claims administration, and after a review of the dimensions of the Class in this matter, it is appropriate to assume that 90 percent of institutional shares and 30 percent of non-institutional shares will claim. Therefore, I estimate that owners of approximately 229.3 million shares, or 80.4 percent of the estimated damaged shares, will file claims.

38. Using damages estimates above of $559 million, I estimate that *claiming* Class members will recover approximately 17.6 percent off their most likely recovery at trial, assuming Plaintiffs succeeded on all issues of liability and damages.

39. It should be noted there is no definitive study of claims rates and rates may vary greatly. However, I have been advised by counsel in numerous cases where I have conducted similar estimates of claims rates that my estimates have proven reasonably accurate, if not conservative, following the completion of claims administration in those actions. However, I caution that my past success in rendering such calculations is not a guarantee that my current calculations will ultimately be correct.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this, the 9 day of August, 2012, at Weston, Connecticut.

_____
John C. Hammerslough

EXHIBIT A

# Curriculum Vitae of John C. Hammerslough

1. Mr. Hammerslough graduated from Brown University in 1950 and subsequently pursued graduate studies in mathematics at New York University.

2. For more than 40 years he has been actively engaged in various phases of the securities business as a Registered Investment Adviser, Securities Analyst and Registered Representative.

3. His principal activity has been the application of computerized analysis to the selection and valuation of securities including options to purchase securities. His work in this regard was the subject of a feature article in The New York Times, and received considerable publicity in investment publications including Barrons.

4. With computerized analysis as an important part of his activities, he has been engaged in many aspects of the securities business. His activities have included investment research, corporate finance, securities valuation, portfolio management and litigation support services.

5. In 1963, he founded Charles, Carroll & Co., Inc., registered investment advisers and publishers of The Hammer Report, one of the first computerized investment advisory services.

6. In 1966, he joined Shields & Co. as Director of Computer Research. His group operated the first computer at a Wall Street firm dedicated solely to investment research. He created computerized analysis for use by both institutional and retail clients of the firm; managed a mutual fund; assisted the corporate finance department in evaluating underwritings, private placements and mergers; developed securities valuation techniques used by Shields & Co. analysts; assisted institutional clients in developing computer research; assisted the trading department in developing clients; and developed portfolio management techniques and strategies.

7. In 1970, he left Shields and continued his work as a securities analyst with several brokerage firms. Using the computer as a fulcrum for analysis, he provided research services to a number of institutional clients including General Electric Pension Trust, Harvard University, David L. Babson & Co. and Putnam Management Co. His research activities included fundamental analysis of securities; technical analysis of stock price movements; analysis of price volatility, and research relating to option and warrant prices and strategies.

8. In 1975, he became affiliated with what ultimately evolved into the Probe Group of companies. The Probe Group was a group of related companies engaged in providing research and counsel to industry, government and investment organizations. The Probe Group provided expert testimony and/or advice to counsel, including damage analyses and securities valuations, in numerous securities cases.

9. Since 1982, he has devoted a substantial portion of his time to litigation support services. He has provided advice and/or testimony in more than a thousand matters involving securities and alleged violations of securities laws. Mr. Hammerslough has provided expert services which include among other things valuation of securities, analysis and estimation of damages, fairness opinions, negotiation of settlements, analysis of securities brokerage operations, and document research and searches.

10. The securities cases Mr. Hammerslough has participated in include Akerman v. Oryx; Caesar v. Merrill Lynch; Kassover v. Dwight; In re Viatron Securities Litigation; Elster v. Alexander; In re Ramada Inns Securities Litigation; O'Rourke v. Healthdyne; In re Revlon Securities Litigation; In re Amsted Securities Litigation; Kamerman v. Steinberg; In re Anderson Clayton Securities Litigation; Joseph v. Shell Oil,; Gelopter v. Bressler.

11. Mr. Hammerslough has provided expert services in numerous other securities cases including those involving Amity Bank, BankAmerica, Bergen Brunswig, Continental Illinois, Cannon Group, Colonial Bancorp, Executive Telecard, Figgie International, Financial Corporation of America, First City Bancorporation of Texas, First Jersey Securities, Gibralter Financial, Ideal Basic Industries, Interfirst, Interactive Technologies, Jones & Vining, Levitz Furniture, Lyphomed, MCorp, Maxxam, Mohawk Data Sciences, Oracle Systems, People Express, People's

Heritage Bancorporration; Salton Products, Sithe Energy, Southmark, Spectravideo, Tseng Laboratories, VICORP Restaurants, BancOne and Zayre.

12. Mr. Hammerslough has testified at trial in Winkler v. NRD Mining , TDA Trading Corp, v. Carlson, Elster v. Alexander and Pennsylvaniia Funds  v. Inyx.

13. Mr. Hammerslough has valued warrants or stock options in matters involving Warner Communications, AM International, Texas International, United States Surgical , Candela Laser, E.F. Hutton and Vestron Inc., York Research Corporation, Phillips Van Heusen, Alcoa,  and Mattel.

14. Mr. Hammerslough has provided expert services in numerous matters involving transactions including mergers and acquisitions and disposition of corporate assets. Included in these matters are those involving Amax Gold, AXA Financial, Brylane, Castle & Cooke, Cincinnatti Milacron, Delco Remy, Delias, DLJ Direct, Donna Karan, Emerging Communications, Enron, Hayes-Lemerz, Minimed, Levitz Furniture, Northeast Utilities, PCOrder.Com C.B Richard Ellis, Shell Oil, Spanlink, Wachovia Bank, Westfield America, Vicorp, and Willis Corroon. Furthermore, Mr. Hammerslough has provided expert services in matters involving corporate governance including matters involving Sterling Commerce, Rational Software, Charter Communications, and Healthsouth Corporation.

15. Mr. Hammerslough has provided analysis and opinion relating to efficiency of the market in individual securities on numerous occasions.

16. Mr. Hammerslough has provided expert services in ERISA Class Action Litigation involving the allegedly imprudent investment of 401(k) assets in employer stock. Such matters included cases involving Conseco, St. Paul, Lucent Sprint, Motorola and Guidant.