
NERA
ECONOMIC CONSULTING

24 July 2012



# Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review
## Settlements bigger, but fewer

By Dr. Renzo Comolli, Dr. Ron Miller, Dr. John Montgomery, and Svetlana Starykh

Insight in Economics™



The pace of "standard" filings and the total value of potential claims are rising compared with the last three years.

# Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review

Settlements bigger, but fewer

By Dr. Renzo Comolli, Dr. Ron Miller, Dr. John Montgomery, and Svetlana Starykh

24 July 2012

### Mid-2012 Highlights in Filings

- Filings on track to be as high or higher than in any of the last three years
- Merger objection suits continue to be a large proportion of filings
- No new filings with accounting codefendants

### New Analysis of Motions

- Of the cases that settled, 90% had a motion to dismiss filed and 42% had motion for class certification filed
- Settlements amounts depend on the litigation stage at which settlement is reached

### Mid-2012 Highlights in Settlements

- Settlement pace slowing down markedly
- Average settlement amounts rebound to levels close to the all-time high

## Introduction and Summary[1]

Securities class actions filed in Federal court have continued to be filed at their historical pace so far in 2012, but their composition has changed significantly. Last year, a wave of filings against Chinese companies, often involving reverse mergers, made the news. This year, those cases have greatly decreased in number. Merger objection cases continue to be a major portion of total filings, as they have since 2010.

The targets of litigation have been changing. Financial sector firms' share of filings in 2012 is smaller than it has been since 2005 while filings in the technology and health care sectors have risen. Accounting firms had frequently been named as codefendants in securities class actions in the past and had figured prominently in some of the largest settlements. However, since 2010 there have been relatively few accounting firms named and so far this year there have been none at all.

While filings have continued at their typical rate, settlements have not kept pace. The rate of settlements this year is on track to make 2012 the slowest year for settlement activity since 1999 and many of the settlements that have been reached do not include monetary compensation for investors.

Although the number of cases settled this year is low, the cases that have settled are relatively big ones. The average settlement value is more than double last year's level and higher than the recent historical average.

We also report newly-compiled statistics on the settlement value by status of the motions filed in those cases.  Among other things, we find that most settlements occur after a motion to dismiss has been filed but before a motion for class certification has been decided.

## Trends in Filings[2]

### Rate of Filings

Federal filings of securities class actions are keeping up with the average pace since the passage of the Private Securities Litigation Reform Act (PSLRA) in 1995. In the first half of this year, 116 such actions were filed. At this pace, there will be 232 class actions filed in 2012 as a whole; for comparison, on average, 217 class actions were filed annually, between 1996 and 2011.[3] Although the number of class actions since 1996 has fluctuated from year to year, the longer-term average has remained substantially stable over time. See Figure 1.

Figure 1.  **Federal Filings**
January 1996 – June 2012



In contrast, the number of companies listed in the US has decreased markedly, by about 43% since 1996. Thus, the average company listed in the US is significantly more likely to be the target of a securities class action now than it was in 1996. See Figure 2.

Figure 2. **Federal Filings and Number of Companies Listed in United States**
January 1996 – June 2012



Note: Number of companies listed in US is from Meridian Securities Markets.

## Filings by Type

Filings for the first half of 2012 included 26 merger objection cases and 83 cases alleging the violation of at least one of the following: Section 10b of the Securities and Exchange Act (including Rule 10b-5), Section 11, or Section 12 of the Securities Act. Credit crisis cases are becoming rarer as the events of 2008 fade into the past.[4] Only four credit crisis-related cases have been filed so far in 2012. See Figures 3 and 4.

Figure 3.  **Federal Filings by Type of Case**
January 2005 – June 2012



*Merger objection cases*

There continued to be a relatively large number of merger and acquisition objection cases (merger objection cases) in recent years. Merger objection cases first represented an important component of federal filings in 2010, when they amounted to 31% of filings. These cases are brought on behalf of shareholders of a target company in a merger or acquisition, and typically rest on allegations that the directors of the target company breached their fiduciary duty to shareholders either by accepting a price for the shares that was too low or by providing insufficient disclosures about the value of the deal. These cases differ in many ways from the more traditional securities class actions, including legal aspects, dismissal rates, settlement amounts, and the speed with which they are typically resolved. Some of these differences are discussed below.

The merger objection cases differ in another important way from other recent waves of securities litigation such as IPO laddering, options backdating, credit crisis-related cases, and Chinese reverse mergers. To generalize, these earlier waves of litigation originated with particular actions, or alleged actions, of issuers that ended soon after the litigation began, either because of the litigation itself or because of the end of the underlying issue. Because of that quick end to the source of the litigation issue, a defined pool of companies that could be sued was created and the wave ended naturally when the pool was exhausted. Not so for the merger objection cases, where the litigated issues could potentially relate to any merger or acquisition. As such, the merger objection cases may continue indefinitely, in the absence of substantial changes in the legal environment, their number fluctuating with market cycles in M&A activity.

The decline in the number of companies listed in the US, discussed above, may be contributing to the shift towards less traditional types of securities class actions, such as merger objection cases. The reduction in traditional targets may give plaintiffs' firms an incentive to innovate in the kinds of cases that they bring.

It is also worth noting that the merger objection cases depicted in figure 3 are only the federal securities class action cases. Many more merger objection cases are filed in state courts or as derivative actions. In fact, almost three times as many deals have been the target of state class actions as have been subject to federal securities class actions.[5]

*Rule 10b-5, Section 11, and Section 12*
Class actions alleging violations of Rule 10b-5, Section 11, and/or Section 12 historically have represented a large majority of federal securities class actions filed and are sometimes viewed as the "standard" type of securities class action.[6] Figure 4 depicts such cases for the period 2005 to today. These "standard" filings peaked in 2008 with the credit crisis. So far this year, 83 such securities class actions have been filed. If filings continue at this pace, by the end of the year, 166 class actions will have been filed—more than in any of the last three years, but well below the 2008 peak.

Figure 4.   **Federal Filings Alleging Violation of Any of: Rule 10b-5, Section 11, or Section 12**
By Filing Year; January 2005 – June 2012



New filings in 2012 also represent a larger total dollar volume of potential claims than in the last few years. We gauge potential claims with NERA's investor losses measure. This is a proxy for the aggregate amount that investors lost from buying the defendant's stock during the class period relative to investing in the broader market; it is also a rough proxy for the size of plaintiffs' potential claims. Aggregate investor losses are simply total investor losses across all cases for which investor losses are computed.[7] At their current rate of accumulation, aggregate investor losses by the end of 2012 would be larger than those in any of the previous three years. See Figure 5. Aggregate investor losses are up not only because the number of cases has grown but also because investor losses for a typical case has grown. The median investor losses in the first six months of 2012 have been more than twice the median investor losses in 2010 or 2011. See Figure 6.

Figure 5. **Aggregate Investor Losses for Federal Filings with Alleged Violations of Rule 10b-5, Section 11, or Section 12**
By Filing Year; January 2005 – June 2012



Figure 6. **Median Investor Losses for Federal Filings with Alleged Violations of Rule 10b-5, Section 11, or Section 12**
By Filing Year; January 2005 – June 2012



## Filings by Issuer's Country of Domicile[8]

Last year, the big story for securities class action filings was the wave of cases involving Chinese companies listed in the US. This wave of litigation also has been referred to as the "Chinese reverse merger litigation" because of the way many such companies were listed in the US.[9]

This year, the number of these cases has dropped dramatically. Only 10 cases against Chinese companies listed in the US have been filed so far in 2012, less than half of the 2011 filing rate. See Figure 7. The reduced pace of filings against Chinese companies has at least two potential explanations. First, requirements for listing in the US through the reverse merger process have been tightened.[10] Second, the flurry of filings against Chinese companies may have made US listings less attractive for Chinese companies, because of increased potential legal costs.

Figure 7.  **Number of Federal Filings Against Chinese Companies**
January 2008 – June 2012



**Filing Year**

The number of cases filed against all foreign-domiciled companies is decreasing too, due to the decrease in filings against Chinese companies. See Figure 8. With the fall in filings against Chinese issuers, the rate of securities class actions filings against foreign companies listed in the US has now reverted to a level only slightly above the rate for US companies. In the first half of 2012, the proportion of securities class actions involving foreign companies was approximately the same as the proportion of foreign companies among issuers. See Figure 9.

Figure 8.  **Filings by Company Domicile and Year**
January 2008 – June 2012



Note: Companies with principal executive offices in China are included in the totals for Asia.

Figure 9.  **Foreign Domiciled Companies: Share of Filings and Share of All Companies Listed in United States**
January 2008 – June 2012

Note: Companies with principal executive offices in China are included in the counts of foreign companies.
Listings data are from Meridian Securities Markets. 2008 – 2011 data are as of respective year end, 2012 data are as of April.

**Filings by Circuit**

Filings remain concentrated in two circuits: the Second (encompassing New York, Connecticut, and Vermont), and the Ninth (including California, Washington, and certain other Western states and territories). However, in the first half of 2012 the balance between these two circuits was substantially different from that in previous years.

During the first half of this year, filings in the Second Circuit have been made at a higher pace than in any recent year except 2008. Filings in the Ninth Circuit, by contrast, have decreased substantially. At their current pace, there will be only 30 filings in the Ninth Circuit this year, which would be the lowest total since the passage of the PSLRA in 1995. See Figure 10.

Figure 10.   **Federal Filings by Circuit and Year**
January 2008 – June 2012



## Filings by Sector

In 2008 and 2009, with the fallout from the credit crisis, filings of securities class actions against companies in the financial sector reached a peak, amounting to nearly half of all securities class actions. The share of filings against companies in the financial sector has declined since then. The decline continued in the first half of this year, in which financial companies represented only 11% of issuers subject to securities class actions. See Figure 11. These figures refer to companies named as primary defendants; companies in the financial sector also have been named as codefendants. Including codefendants, the fraction of cases involving a financial company is 19%, the lowest percentage since at least 2005. See Figure 12.

Figure 11. **Filings by Sector and Year**
January 2008 – June 2012



Note: This analysis is based on the FactSet Research Systems, Inc. economic sector classification.
Some of the FactSet economic sectors are combined for presentation.

Figure 12.  **Federal Cases in which Financial Institutions Are Named Defendants**
January 2005 – June 2012



The share of securities class actions with a defendant in the electronic technology and technology services or health technology and services industries has continued to increase, reaching 22% and 23%, respectively. The share of securities class action filings against issuers in the energy and non-energy minerals sector also has grown.

*Accounting codefendants are becoming rare*

Historically, a substantial fraction of securities class actions included an accounting firm as a codefendant. Over 2005-2009, 12% of cases had accounting codefendants; during 2010-2011, that percentage fell to 4%. So far this year, not a single newly filed federal securities class action has included an accounting codefendant. See Figure 13.

This dramatic change may be the result of changes in the legal environment. The Supreme Court's 2011 decision in *Janus* limited the ability of plaintiffs to sue parties not directly responsible for misstatements. Commentators have noted that, as a result of this decision, auditors may be liable only for statements made in their audit opinion.[11] Further, this decision comes after the Court's 2008 decision in *Stoneridge* limiting scheme liability. The cumulative effect appears to have made accounting firms relatively unattractive targets for securities class action litigation.

Despite the virtual disappearance of accounting codefendants, accounting allegations against any defendant are still a common feature in newly filed cases; in 2012, 26% of securities class action filings included allegations of accounting violations. See portion labeled "Accounting" in Figure 14.

Figure 13.  **Percentage of Federal Filings in Which an Accounting Firm is a Codefendant**
January 2005 – June 2012



## Allegations

NERA reviews complaints in securities class action filings to evaluate trends in the types of allegations that are made. Figure 14 contains the percentages of filings with allegations in different categories.[12]

So far in 2012, allegations related to product defects and operational shortcomings (other than financial) have been the most prevalent, having been made in almost 45% of complaints. Allegations related to earnings guidance, breach of fiduciary duty (typical in the merger objection cases), and accounting were each made in more than a quarter of the complaints filed.

Figure 14.   **Allegations in Federal Filings**
January 2008 – June 2012



The fraction of securities class actions alleging violations of Rule 10b-5 that also allege insider sales has continued to decrease in 2012 and has reached a new low since we started tracking these data in 2005.[13] Only 14% of the class actions alleging violations of Rule 10b-5 have alleged insider sales in the first half of 2012. See Figure 15.

Figure 15.   **Percentage of Federal Filings Alleging Violations of Rule 10b-5 with Insider Sales Allegations**
By Filing Year; January 2005 – June 2012



## Time to File

For Rule 10b-5 cases, we define "time to file" as the time from the end of the alleged class period to the date of filing of the first complaint. The average time to file has been decreasing since 2009. In the first half of 2012, it took 107 days, on average, for a complaint to be filed. This is down from a high of 224 days in 2009 and from 120 days in 2011. See Figure 16.

The median time to file was 49 days in the first half of 2012, meaning that half of the complaints were filed within 49 days. Unlike the average time to file, the median time to file is longer than in 2011, when it was only 27 days.

Figure 16. **Time to File**
Filings Alleging Violation of Rule 10b-5
January 2007 – June 2012



This analysis excludes cases where the alleged class period could not be unambiguously determined.

## Analysis of Motions

In an important addition to NERA's analysis of class actions, we have now collected data on motions and their resolutions, for federal securities class actions filed and settled in 2000 or later.[14] Specifically, we have collected data on motions to dismiss, motions for class certification, and motions for summary judgment. These data allow new insight into the process of the litigation of securities class actions and the relation between developments in litigation and the settlement that is ultimately reached. In this section we report on our first analysis based on the status of motions.

Motions to dismiss had at least been filed in the vast majority—nearly 90%—of the cases that settled: the remaining cases settled before any such motion had been filed. In almost 22% of cases where a motion to dismiss had been filed, settlement was reached before the court reached a decision on the motion.

Next we turn to the resolutions of the motion to dismiss. The most frequent decision on the motion to dismiss was a partial grant/partial denial, at 35% of cases filed, followed by complete denial for 28% of cases. A motion to dismiss was granted in 10% of cases that ultimately settled.[15] It is important to note that our data on resolutions are based on the status of the case at the time of settlement—for example, some cases that have been dismissed still reach settlement. These dismissals were likely either without prejudice or under appeal at the time of settlement; had these cases not settled, there was a chance the cases would be refiled or the dismissals would be reversed. As a result of our focus on settled cases, our data do not include the many cases which terminated with a dismissal, without a settlement. See Figure 17 for more details.

Figure 17.  **Filing and Resolutions of Motions to Dismiss**
Cases Filed and Settled January 2000 – June 2012



Most cases that settle do so before a motion for class certification is filed—58% of settled cases fall into this category. Of the settled cases for which a motion for class certification had been filed, 46% settled before the motion was resolved. A further 45% of the cases with a class certification motion end up with a certified class. See Figure 18 for more details.



Figure 18.   **Filing and Resolutions of Motions for Class Certification**
Cases Filed and Settled January 2000 – June 2012



While most cases reach settlement before any decision on class certification, the cases that reach this point provide a measure of the overall speed of the legal process. For those cases in which the motion of class certification was eventually decided, the decision came within three years of the original file date of the complaint for almost three quarters of the cases. See Figure 19. It is possible that, with the Supreme Court having granted *certiorari* in *Amgen*, the speed with which a decision on the motion of class certification is reached will slow down, at least until *Amgen* is decided.

Figure 19.   **Time From Complaint Filing to Class Certification Decision**
Cases Filed and Settled January 2000 – June 2012



Motions for summary judgment had been filed by defendants in only 11% of the cases that ultimately settled. See Figure 20 for details on the outcomes when cases settled after defendants filed such a motion. A very small number of motions for summary judgment were filed by plaintiffs.

Figure 20.  **Filing and Resolutions of Defendants' Motions for Summary Judgment**
Cases Filed and Settled January 2000 – June 2012



Unsurprisingly, the status of motions at the time of settlements affects typical settlement values. For example, for cases settled 2008 through 2012, the median settlement value is $9.1 million. For cases in which a class was certified at the time of settlement, the median settlement is $16.5 million, over the same period. In general, however, the relationship between settlement values and motion status at the time of settlement is complicated. Strategic considerations for both parties to the litigation can have an important influence on the stage at which a settlement occurs. Different kinds of cases are likely to settle at different points in the process, making simple comparisons across all cases difficult. Despite this difficulty, NERA research has found that there are statistically robust relationships between motion status and ultimate settlement values, when other case characteristics are taken into account. It is beyond the scope of this paper to provide details on this research.

## Trends in Case Resolutions

The typical securities class action takes several years to reach a final resolution, and some take a decade or more. Only a small fraction of securities class actions go to trial (see below), while the large majority of them are settled or dismissed.[16]

To analyze resolutions, we focus on annual "cohorts" of cases filed in different years. The 2001 cohort is the most recent one for which all cases have been resolved. For that cohort, 35% of cases were ultimately dismissed and 65% ultimately settled. For the next five annual cohorts, spanning the years 2002-2006, more than 94% of cases have been resolved. Results for these more recent cohorts indicate that the dismissal rate may be increasing. Indeed, for each annual cohort from 2003 to 2006, the dismissal rate has been 43% or more. These figures will ultimately change somewhat, because some cases are not yet resolved and other cases that have been dismissed may see reversals on appeal or be filed again (for cases dismissed without prejudice). Nonetheless, the evidence so far suggests that these more recent annual cohorts will ultimately see a higher dismissal rate than had been seen in earlier years. See Figure 21.

A larger proportion of cases in the 2007-2012 cohorts await resolution. It is too early to know the exact dismissal rate for cases filed in these recent years. That said, the preliminary data, as shown in the chart, suggest a continuing higher dismissal rate.

Figure 21. **Status of Cases as Percentage of Federal Filings**
By Filing Year; January 2000 – June 2012



Note: Analysis excludes IPO laddering, merger objection cases, and verdicts. Dismissals may include dismissals without prejudice and dismissals under appeal.

An alternate way to look at dismissal rates is to examine the percentage of cases dismissed by year of resolution, rather than year of filing as above. Between 2000 and the first half of 2012, dismissed cases have been between 37% and 55% of the cases resolved. That percentage is 48%-55% in 2009-2012, subject to the same disclaimers about dismissals without prejudice and possible appeals. See Figure 22.

**Figure 22.    Status of Cases as Percentage of Federal Filings**
By Year of Resolution; January 2000 – June 2012



Note: Analysis excludes IPO laddering, merger objection cases, and verdicts. Dismissals may include dismissals without prejudice and dismissals under appeal.

The preceding discussion of case resolutions does not include the resolution of merger objection cases. Merger objection cases usually resolve quickly. Merger objections that are filed as federal securities class actions tend to be voluntarily dismissed relatively often because plaintiffs often elect to participate in the settlement of a parallel action filed in state court. Of the merger objection cases filed as federal securities class actions since the beginning of 2010, 6% settled, 34% were voluntarily dismissed because of the settlement in a parallel state action, 21% were dismissed, and 39% were pending as of June 30, 2012.

# Trends in Settlements

## Number of Settlements[17]

Settlements have been proceeding at an unusually slow pace so far this year. If the current pace continues for the whole year, settlement activity will be at its lowest level since 1999, with only 98 cases settled.

The overall number of settlements did not show a significant slowdown in 2011: there were 123 settlements in 2011, which is in line with the historical average. However, closer examination reveals that settlement activity had already started changing dramatically last year. A large portion of the 2011 settlements involved merger objection cases. Settlements are one more respect in which merger objection cases differ from other securities class actions. Merger objection cases have typically settled only for additional disclosures to investors and fees to plaintiffs' lawyers, with neither monetary compensation to investors nor changes to the terms of merger. Over 2010-2012, 89% of merger objection cases have fallen into this category. If we exclude such merger objection cases, the number of settlements in 2011 was the lowest since the passage of PSLRA in 1995.

In the first six months of 2012, only 31 settlements yielded monetary compensation to investors. If settlements were to continue at this pace for the rest of the year, then by the end of 2012 there would be even fewer such settlements than in 2011, setting a new post-PSLRA low record. See Figure 23.

Figure 23.   **Number of Settlements**
By Settlement Year; January 1996 – June 2012



Note: Analysis excludes IPO laddering cases and settlements without details. Merger objection settlements with payment to class or changes to terms of the merger are included in other settlements.

## Settlement Amounts

The average value of a settlement in the first half of 2012 was $71 million, a sharp rise from the average value of $46 million over the period 2005-2011.[18] See Figure 24. However, a handful of the very largest settlements often influences the annual average settlement. For the first six months of 2012, the average settlement value has been substantially increased by the $1.01 billion settlement in *In Re American International Group, Inc. Securities Litigation* ("AIG settlement"). The AIG settlement is composed of four tranches, three of which had been previously approved and the fourth of which was approved this year.

Figure 24.    **Average Settlement Value**
January 1996 – June 2012



Note: Settlements include 309 IPO laddering cases in 2009. Settlements exclude merger objection cases.

Figure 25 contains average settlements excluding those above $1 billion and the IPO laddering cases. Under these restrictions (which exclude the AIG settlement), this year's average settlement amount is $41 million, rebounding from last year's $31 million to levels close to the record levels of 2009 and 2010.

Another way to look at the typical settlement value is to examine median settlements: medians are more robust to extreme observations than are averages.[19] The median settlement amount in the first six months of 2012 was $7.9 million, approximately the same as in 2011 and consistent with pre-credit crisis levels. See Figure 26.

So far this year, there have been four "mega-settlements" over $100 million—a record high 14% of all settlements. Most settlements, however, are much more modest than the mega-settlements that dominate the news. Of cases that settled in the first half of this year, 52% have settled for less than $10 million. That percentage is in line with historical observations since at least 2005 (apart from 2010). See Figure 27.

Figure 25.  **Average Settlement Value, Excluding Settlements over $1 Billion**
January 1996 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.  For list of excluded settlements over $1 billion see Table 1.

Figure 26.   **Median Settlement Value**
January 1996 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.

Figure 27.   **Distribution of Settlement Values**
January 2008 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.

Table 1 presents the top 10 securities class action settlements of all time. The AIG settlement already appeared on our list last year, but reached final approval this year with the approval of the fourth tranche. The AIG settlement is one of only two settlements on the list after 2008; the other is Enron, which only completely settled in 2010, though both cases are based on much older events.

Table 1.  **Top 10 Securities Class Action Settlements (As of June 30, 2012)**

| | | | | Settlements with Co-Defendants, if Any, that Were | | | |
| | | | | Financial Institutions | | Accounting Firms | |
| Ranking | Company | Settlement Year | Total Settlement Year Value ($MM) | Value ($MM) | Percent | Value ($MM) | Percent |
|---|---|---|---|---|---|---|---|
| 1 | Enron Corp.[1] | 2010 | $7,242 | $6,903 | 95% | $73 | 1% |
| 2 | WorldCom, Inc.[2] | 2005 | $6,158 | $6,004 | 98% | $65 | 1% |
| 3 | Cendant Corp.[3] | 2000 | $3,692 | $342 | 9% | $467 | 13% |
| 4 | Tyco International, Ltd. | 2007 | $3,200 | $0 | 0% | $225 | 7% |
| 5 | AOL Time Warner Inc. | 2006 | $2,650 | $0 | 0% | $100 | 4% |
| 6 | Nortel Networks (I) | 2006 | $1,143 | $0 | 0% | $0 | 0% |
| 7 | Royal Ahold, NV | 2006 | $1,100 | $0 | 0% | $0 | 0% |
| 8 | Nortel Networks (II) | 2006 | $1,074 | $0 | 0% | $0 | 0% |
| 9 | McKesson HBOC Inc. | 2008 | $1,043 | $10 | 1% | $73 | 7% |
| 10 | American International Group, Inc. | 2012 | $1,010 | $0 | 0% | $98 | 10% |
| **Total** | | | **$28,311** | **$13,259** | **47%** | **$1,099** | **4%** |

Notes: For this summary table only, tentative and partial settlements are included for comparison, and "Settlement Year" in this table represents the year in which the last settlement—whether partial or final—had the first fairness hearing. For partial tentative settlements "Settlement Year" is the year in which this settlement was announced.

[1]  The fairness hearing for the last tentative partial settlement, with Goldman Sachs, was held on February 4, 2010.

[2]  The settlement value incorporates a $1.6 million settlement in the MCI WorldCom TARGETS case.

[3]  The settlement value incorporates a $374 million settlement amount in the Cendant PRIDES I and PRIDES II cases. Settlement in the Cendant PRIDES I case was a non-cash settlement valued at $341.5 million. The settlement value also incorporates 50% of December 29, 2007 separate settlement of claims of Cendant and certain former HFS officers against E&Y. Under the terms of the Cendant Settlement, the Class is entitled to 50% of Cendant's net recovery from E&Y. The additional recovery to the class is $131,750,000.

The aggregate amount of settlements approved in the first six months of this year exceeds $2 billion. See Figure 28. This amount includes just over $1 billion for the AIG settlement. If settlements were to continue at the current pace for the rest of the year, aggregate settlements by year end would be substantially higher than last year. This result, though, is largely driven by the AIG settlement; if we exclude AIG and extrapolate only the other settlements to the end of the year, then by year end the aggregate settlements could be as low as last year. In large part, the low aggregate settlement value to date this year reflects the small number of settlements as documented at the beginning of this section.

Figure 28.  **Aggregate Settlement Value**
By Settlement Year; January 1996 – June 2012



Note: Settlements exclude Merger Objection cases. Excluding the 2010 Enron settlement, aggregate settlement value for that year was $4.3 billion.

## Investor Losses versus Settlements

Historically, "investor losses" have been a powerful predictor of settlement size. As noted above, NERA's investor losses variable is a proxy for the aggregate amount that investors lost from buying the defendant's stock rather than investing in the broader market during the alleged class period. Investor losses can explain more than half of the variance in the settlement values in our database.[20]

In general, settlement sizes grow as investor losses grow, but the relationship is not linear. In particular, settlement size tends to rise less than proportionately, so small cases typically settle for a higher fraction of investor losses (i.e., more cents on the dollar) than larger cases. For example, cases with investor losses below $20 million on average settle for 37.3% of investor losses, while cases with investor losses over $10 billion settle for an average of 2.2% percent of investor losses. See Figure 29.

Figure 29. **Settlement Value as a Percentage of Investor Losses**
By Level of Investor Losses; January 1996 – June 2012



Note that the investor losses variable is not a measure of damages since *any* stock that underperforms the S&P 500 would have "investor losses" over the period of underperformance; rather it is a rough proxy for the relative size of investors' potential claims. Thus, our findings on the ratio of settlement to investor losses should not be interpreted as the share of damages recovered in settlement but rather as the recovery compared to a rough measure of the "size" of the case.

Median investor losses for settled cases have been steadily increasing since the passage of the PSLRA, from $64 million for settlements in 1996 to $497 million in 2011. They appear to have skyrocketed in the first half of 2012, exceeding $1 billion. However, this figure is based on a relatively small number of settlements and as such may not represent a trend that will continue for the rest of the year. The median ratio of settlement to investor losses has reached a new post-PSLRA low at 1.2%, but that is unsurprising given that investor losses are high and (as explained above) settlements typically grow less than proportionally to investor losses. See Figure 30.

Figure 30.   **Median Investor Losses and Median Ratio of Settlement to Investor Losses**
By Settlement Year; January 1996 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.

## Plaintiffs' Attorneys' Fees and Expenses

The settlement values that we report include plaintiffs' attorneys' fees and expenses in addition to the amounts ultimately paid to the class. In Figure 31, fees and expenses as a proportion of settlement value for settlements finalized from 1996 through June 2012, excluding merger objection cases, are shown. Typically, the proportion of a settlement taken by fees and expenses declines as the settlement size rises. For settlements below $5 million, for example, median plaintiffs' attorneys' fees are 33% of the settlement amount; while for settlements of over $500 million, median fees fall to 11%. Median plaintiff expense ratios fall over this settlement value range as well, as seen in Figure 31.

Figure 31.   **Median Plaintiffs' Attorneys' Fees and Expenses, by Size of Settlement**
January 1996 – June 2012



We have also analyzed trends in plaintiffs' attorneys' fees over time. Median fees for all settlements other than merger objections cases during the first half of this year have represented 20% of the settlement value—a small decrease since last year. See Figure 32. The general downward time trend in the fee percentage is explained, at least in part, by the fact that cases have been getting bigger over time, and that, as documented above, bigger cases typically have lower fee percentages.

Figure 32.   **Median Plaintiffs' Attorneys' Fees, by Year**
For Settlement Values Greater Than or Equal to $25M; January 1996 – June 2012



Note: Analysis excludes merger objection cases.

We report the fees for merger objection cases separately. For the merger objection cases that settled at the federal level since 2005 with no payment to investors, plaintiffs' attorneys' fees have been below $1 million in 68% of the cases. See Figure 33. For the merger objection cases that were voluntarily dismissed because a parallel state action settled, plaintiffs' attorneys' fees in the parallel state action have been below $1 million in 71% of the cases.

Figure 33.   **Distribution of Plaintiffs' Attorneys' Fees and Expenses in Merger Objection Settlements**
With No Payment to Investors; January 2005 – June 2012



Note: Cases filed and settled January 2005 - June 2012. For merger objections voluntarily dismissed at federal level, attorneys' fees and expenses refer to the settlement in the parallel state merger objection case, when such settlement exists.

Aggregate plaintiffs' attorneys' fees and expenses for all federal settlements have been $414 million in the first six months of this year. See Figure 34. If fees and expenses were to continue at this pace, they would be noticeably higher than last year, but still the second lowest since 2004. Fees and expenses for the first six months of this year include $143 million for the AIG settlement. If the AIG fees and expenses are excluded, and if the remainder were to continue at the same pace for the rest of the year, aggregate fees and expenses for 2012 would end up being similar to the aggregate level for 2011.

Figure 34.  **Aggregate Plaintiffs' Attorneys Fees and Expenses**
January 1996 – June 2012



These fees are calculated for federal securities class actions only. As such, they do not include fees and expenses for merger objection cases filed in state court or as derivative actions, which may be lucrative for plaintiffs' law firms. One example is *In Re Southern Peru Copper*, a case in Delaware Chancery Court that yielded a well-publicized award of $285 million to plaintiffs' attorneys.

## Characteristics of Settled Cases

One of the policy goals of the PSLRA was to increase the participation of institutions as lead plaintiffs in securities class actions, and in that respect it has been a success. The proportion of settled cases with an institutional lead plaintiff rose sharply between 1996 and 2010, as did the fraction of such settlements in which the institutional lead plaintiff was a public pension plan, *peaking* at 71% and 40%, respectively. The trend of increasing institutional participation appears to have leveled off in the last two or three years. The fraction of lead plaintiffs that are public pension plans has remained at or near 40% since 2009. During the first half of 2012, the total fraction of institutional lead plaintiffs has been 65%—a little below the 2009 and 2010 levels. See Figure 35.

NERA's research on factors explaining the amounts for which cases have settled historically finds that, on average, institutional lead plaintiff participation is associated with larger settlements.

**Figure 35.** **Percentage of Settlements with an Institutional Lead Plaintiff**
Cases Filed and Settled; January 1996 – June 2012



A "blow-up" provision typically permits a settlement to be invalidated if more than a certain proportion of the class opts out. These provisions have become an increasingly common feature of settlement agreements in recent years. In 2012, the proportion of settlements with such provisions increased to 40% of all settlements, continuing an upward trend. See Figure 36.

Figure 36.  **Percentage of Settlements with a "Blow-Up" Provision
(Settlements with Available Settlement Notice)**
Cases Filed and Settled; January 1996 – June 2012



"Tag-along" derivative actions associated with securities class actions have been proliferating over
the last ten years. Over the period 2007-2010, more than 60% of securities class actions had parallel
derivative suits. This year and last, the trend toward such derivative actions appears to have reversed. In
2012, the proportion of cases with a parallel derivative action (among those that settled) has declined to
50%. See Figure 37.

Figure 37.  **Percentage of Settled Cases with a Parallel Derivative Action**
Cases Filed and Settled; January 1997 – June 2012



Note: We excluded cases filed and settled in 1996 because there was only one case and it had a derivative action.

## Trials

Few securities class actions proceed to trial, though those that do tend to attract a great deal of attention. Fewer still get all the way to a verdict. So it is not surprising that there have been no trials or verdicts so far in 2012 that we know of. Since the passage of the PSLRA in late 1995, there have been only 30 securities class action trials, as compared to a total of over 3,909 filings. Figure 38 summarized the status of cases that have gone to trial and Table 2 provides details.

Figure 38. **Status of 30 Securities Class Actions**
**That Went to Trial After PSLRA**
As of June 30, 2012



Table 2.   **Thirty Securities Class Actions That Went to Trial after PSLRA**

| Case (1) | Federal Circuit (2) | File Year (3) | Trial Year[1] (4) |
|---|---|---|---|
| **I. Verdict for Defendants (11)** | | | |
| 1   American Mutual Funds (Fee Litigation)[2] | 9 | 2004 | 2009 |
| 2   American Pacific Corp.[3] | 9 | 1993 | 1997 |
| 3   BankAtlantic Bancorp, Inc.[4] | 11 | 2007 | 2011 |
| 4   Biogen Inc. | 1 | 1994 | 1998 |
| 5   Everex Systems Inc.[5] | 9 | 1992 | 2002 |
| 6   Garment Capitol Associates | 2 | 1996 | 2000 |
| 7   Health Management, Inc. | 2 | 1996 | 1999 |
| 8   JDS Uniphase Corp. | 9 | 2002 | 2007 |
| 9   NAI Technologies, Inc. | 2 | 1994 | 1996 |
| 10  Thane International, Inc.[6] | 9 | 2003 | 2009 |
| 11  Tricord Systems, Inc. | 8 | 1994 | 1997 |
| **II. Verdict for Plaintiffs (7)** | | | |
| 1   Apollo Group, Inc.[7] | 9 | 2004 | 2010 |
| 2   Claghorn / Scorpion Technologies, Inc. | 9 | 1998 | 2002 |
| 3   Computer Associates International, Inc. | 2 | 1991 | 2000 |
| 4   Helionetics, Inc. | 9 | 1994 | 2000 |
| 5   Homestore.com, Inc.[8] | 9 | 2001 | 2011 |
| 6   Real Estate Associates, LP | 9 | 1998 | 2002 |
| 7   U.S. Banknote Corp.[9] | 2 | 1994 | 1997 |
| **III. Mixed Verdict (5)** | | | |
| 1   Clarent Corp.[10] | 9 | 2001 | 2005 |
| 2   Digitran Systems, Inc.[11] | 10 | 1993 | 1996 |
| 3   ICN Pharmaceuticals, Inc.[12] | 2 | 1987 | 1996 |
| 4   Household International, Inc.[13] | 7 | 2002 | 2009 |
| 5   Vivendi Universal, S.A.[14] | 2 | 2002 | 2010 |
| **IV. Settled During Trial[15] (6)** | | | |
| 1   AT&T | 3 | 2000 | 2004 |
| 2   First Union National Bank / First Union Securities / Cypres Funds | 11 | 2000 | 2003 |
| 3   Globalstar Telecommunications, Ltd. | 2 | 2001 | 2005 |
| 4   Heartland High-Yield / Short Duration High Yield Municipal Bond Funds | 7 | 2000 | 2005 |
| 5   WorldCom | 2 | 2002 | 2005 |
| 6   Safety-Kleen Corp. (Bondholders Litigation)[16] | 4 | 2000 | 2005 |
| **V. Default Judgment (1)** | | | |
| 1   Equisure Inc.[17] | 8 | 1997 | 1998 |

Notes: Until otherwise noted, all these cases went to a jury trial. Data are from case dockets. Cases within each group presented in alphabetical order.

**Table 2 Notes Continued:**

[1]   Trial Year shows the year in which the trial began or, when there are relevant post-trial developments (such as a ruling on an appeal or a re-trial), the most recent such development.

[2]   Judgment for defendants entered 12/28/09 after a 7/28/09-8/7/09 bench trial.

[3]   On 11/27/95 the US District Court granted in part the Company's motion for summary judgment ruling that the Company had not violated the federal securities laws in relation to disclosure concerning the Company's agreements with Thiokol. The remaining claims, which related to allegedly misleading or inadequate disclosures regarding Halotron, were the subject of a jury trial that began in December 1995 and ended on 1/17/96. The jury reached a unanimous verdict that neither the Company nor its directors and officers made misleading or inadequate statements regarding Halotron. Verdict was appealed, but on 6/5/97 affirmed by the 9th Circuit Court of Appeals.

[4]   On 11/18/10 the jury returned a verdict in the plaintiffs' favor, finding seven of the statements to have been false, and awarding damages of $2.41 per share. On 4/25/11 the jury verdict was set aside by the court in a post-trial ruling. Judge opinion granted the defendants' motion for judgment as a matter of law and indicated that she will enter judgment in defendants' favor following remaining procedural issues.

[5]   1998 verdict for defendants was reversed and remanded by the 9th Circuit Court of Appeals; 2002 retrial again yielded a verdict for defendants.

[6]   On 6/10/05 bench trial verdict dismissed the case. Thereafter, plaintiffs filed a notice of appeal from the trial verdict in favor of the defendants. On 11/26/07, the US Court of Appeals of the 9th Circuit issued an Opinion reversing and remanding the action back to District Court with instructions to enter judgment in favor of the plaintiffs, to address loss causation, and to conduct further proceedings consistent with this opinion. On 12/5/08 the defendants filed a Motion for Judgment On Loss Causation and a Motion for Judgment On Lack Of Control Person Liability And Good Faith Defenses. On 3/17/09, the Court granted the defendants' Motion for Judgment On Loss Causation but denied the Motion for Judgment On Lack Of Control Person Liability And Good Faith Defenses. Final Judgment on behalf of the defendants was entered on 3/25/09.

[7]   On 1/16/08 a federal jury found Apollo Group Inc. and certain former officers liable for securities fraud and ordered them to pay approximately $280 million to shareholders. On 8/8/08 the District Court overturned the jury verdict; Federal Judge James A. Teilborg's order vacated the judgment and entered judgment in defendants' favor. Following the dismissal, a notice of appeal was filed on 8/29/08. On 6/23/10 the United States Court of Appeals for the 9th Circuit reversed the District Court's post-trial ruling and remanded the case with instructions that the District Court enter judgment in accordance with the jury's verdict.

[8]   On 1/25/11, a civil jury trial commenced against the sole remaining defendant in the case – Stuart H. Wolff, the company's former Chairman and CEO. On 2/24/11 a Central District of California rendered a verdict on behalf of plaintiffs. The jury found that the defendant, Stuart H. Wolff, had violated the federal securities laws in connection with a series of statements the company made in 2001. All other defendants had previously settled or been dismissed.

[9]   Judge subsequently vacated the jury verdict and approved a settlement.

[10]   Chairman of Clarent liable; Ernst & Young not liable.

[11]   A 9/30/96-10/24/96 jury trial resulted in a mixed verdict, with liability for Digitran Systems, Inc. and its former president, but not liable verdict for other individual defendants and the auditor, Grant Thornton.

[12]   Hung jury.

[13]   The jury found in favor of the defendants with respect to 23 of the alleged misstatements, but in favor of the plaintiffs with respect to 17 other statements.

[14]   The trial started 10/5/09. On 1/29/10 the jury returned a verdict against the company on all 57 of the plaintiffs' claims. However, the jury also found that the two individual defendants, (former CEO Jean-Marie Messier and former CFO Guillaume Hannezo) were not liable.

[15]   At least one defendant settled after the trial began, but prior to judgment.

[16]   Some director-defendants settled during the trial. Default judgment against CEO and CFO who failed to show up for trial.

[17]   Default judgment against Equisure Inc. which failed to show up for trial.

# Notes

[1] This edition of NERA's research on recent trends in shareholder class action litigation expands on previous work by our colleagues Lucy Allen, Elaine Buckberg, Frederick C. Dunbar, Todd Foster, Vinita M. Juneja, Denise Neumann Martin, Jordan Milev, Robert Patton, Stephanie Plancich, and David I. Tabak. We gratefully acknowledge their contribution to previous editions as well as this current version. The authors also thank Lucy Allen for helpful comments on this version. In addition, we thank Carlos Soto, Nicole Roman, and other researchers in NERA's Securities and Finance Practice for their valuable assistance with this paper. These individuals receive credit for improving this paper; all errors and omissions are ours. Data for this report are collected from multiple sources, including complaints, case dockets, RiskMetrics Group/Securities Class Action Services (SCAS), Dow Jones Factiva, Bloomberg Finance L.P., FactSet Research Systems, Inc., SEC filings, and the public press.

[2] NERA tracks class actions filed in federal court and involving alleged violations of the federal securities laws. If multiple such actions are filed against the same defendant, are related to the same allegations, and are in the same circuit, we treat them as a single filing. However, multiple actions filed in different circuits are treated as separate filings. If cases filed in different circuits are consolidated, we revise our count to reflect that consolidation. Therefore, our count for a particular year may change over time. Different assumptions for consolidating filings would likely lead to counts that are directionally similar but may, in certain circumstances, lead observers to draw a different conclusion about short-term trends in filings.

[3] This average excludes the IPO laddering cases.

[4] We have classified cases as credit crisis-related based on the allegations in the complaint. The category includes cases with allegations related to subprime mortgages, mortgage-backed securities, and auction rate securities, as well as some other cases alleged to involve the credit crisis. Our categorization is intended to provide a useful picture of trends in litigation but is not based on detailed analysis of any particular case.

[5] This figure refers to deals announced between 2010 and 2011 for $100 million or more, completed by February 29, 2012, with a US public company as target, and challenged by December 31, 2011. Data from a proprietary NERA database.

[6] The merger objection cases form the largest group of federal securities class actions not involving such alleged violations.

[7] We do not compute investor losses for all cases included in this publication. For instance, class actions in which buyers of common stock are not alleged to have been damaged are not included.

[8] Our normal approach to geographical classification is to use the country of domicile for the issuing company. Many of the defendant Chinese companies, however, obtained their US listing through a reverse merger and, consequently, report a US domicile. For this reason, we have also tracked companies with their principal executive offices in China.

[9] Approximately 63% of the Chinese companies targeted by a securities class action in the period 2010-2012 were listed in the US through reverse mergers.

[10] See, for example, Xueqing Linda Ji and Hunter Qiu, "Weighing Reverse Mergers for Private Chinese Cos," Law360, June 25, 2012.

[11] See, for example, Gwyn Quillen and Amy June, "Clarifying Accountants' Secondary Liability," Law360, August 8, 2011.

[12] In earlier editions of NERA's "Recent Trends in Securities Class Action Litigation," we displayed this information differently. The percentage corresponding to each category is now computed as the number of complaints making an allegation in that category as a percentage of the total number of complaints filed; in earlier editions, it was computed as a percentage of the total number of allegations in any category. In other words, we have changed the denominator from total number of allegations to total number of cases. The change in methodology can lead to different results because complaints often make multiple allegations.

[13] We have updated this analysis so that the fraction is computed only over cases alleging violation of Rule 10b-5.

[14] Cases for which investor losses cannot be calculated are excluded. The largest excluded groups are the IPO laddering cases and the merger objection cases.

[15] Thus, it is not that only 10% of cases are dismissed; it is that 10% of settled cases in which a motion to dismiss had been filed, had been dismissed at the time of settlement.

[16] The dismissed category includes several outcomes: cases with granted motion to dismiss granted, denied motion for class certification, granted motion for summary judgment filed by defendant, and cases that were voluntarily dismissed. Motions to dismiss that are only partially granted are not included in the dismissed category.

[17] Unless otherwise noted, tentative settlements (those yet to receive court approval) and partial settlements (those covering some but not all non-dismissed defendants) are not included in our settlement statistics. We define "Settlement Year" as the year of the first court hearing related to the fairness of the entire settlement or the last partial settlement.

[18] Because merger objection cases typically settle for no monetary compensation to investors, we exclude all merger objection settlements from the analysis of settlement values.

[19] The median settlement value for a year is the level that half of all settlements that year exceeded and half fell below.

[20] Technically, the investor losses variable explains more than half of the variance in the logarithm of settlement size. Investor losses over the class period are measured relative to the S&P 500, using a proportional decay trading model to estimate the number of affected shares of common stock. We measure investor losses only if the proposed class period is at least two days. Our sample includes more than 1,000 post-PSLRA settlements.

## About NERA

NERA Economic Consulting (**www.nera.com**) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For half a century, NERA's economists have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real world industry experience to bear on issues arising from competition, regulation, public policy, strategy, finance, and litigation.

NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. With its main office in New York City, NERA serves clients from more than 20 offices across North America, Europe, and Asia Pacific.

## Contacts

For further information, please contact:

**Dr. Renzo Comolli**
Senior Consultant
+1 212 345 6025
renzo.comolli@nera.com

**Dr. Ron Miller**
Vice President
+1 212 345 3141
ronald.miller@nera.com

**Dr. John Montgomery**
Senior Vice President
+1 212 345 5411
john.montgomery@nera.com

**Svetlana Starykh**
Senior Consultant
+1 212 345 8931
svetlana.starykh@nera.com

*The opinions expressed herein do not necessarily represent the views of NERA Economic Consulting or any other NERA consultant.*



# NERA
ECONOMIC CONSULTING



Visit **www.nera.com** to learn
more about our practice areas
and global offices.

© Copyright 2012
National Economic Research
Associates, Inc.


All rights reserved.
Printed in the USA.

# *CAFA Notice Requirements for Class Action Settlements*

## Federation of Defense & Corporate Counsel
## 2010 Winter Meeting

Andrew B. Downs
Bullivant Houser Bailey PC
601 California Street, Suite 1800
San Francisco, CA  94108-2823
415.352.2716, andy.downs@bullivant.com

DISCLAIMER:  The statements and views expressed in this paper are those of the author alone and do not necessarily represent the views of his employer or clients.

©2010, The Federation of Defense & Corporate Counsel, Andrew B. Downs

11980477.1

## Speaker Biography

*Andrew B. Downs* is a shareholder in the firm of Bullivant Houser Bailey PC, primarily resident in its San Francisco office and is also the Shareholder in Charge of Bullivant's Las Vegas office. Admitted in both California and Nevada, he practices throughout both states with an emphasis upon the defense of complex coverage and bad faith litigation, including class actions and multi-district litigation. Mr. Downs has handled the defense of multiple class actions with hard damages in excess of $100,000,000. Currently a Vice Chair of the Federation's Extra-Contractual Liability Section, Mr. Downs is a former Chair of the Federation's Property Insurance Section and is also a former Chair of the Property Insurance Law Committee of the Tort, Trial & Insurance Practice Section of the ABA. A frequent author and speaker, Mr. Downs is one of the Editors of the *Property Insurance Litigator's Handbook* published by the American Bar Association in 2007 and is a member of the Conference Committee for the 2009 and 2010 Claims Conferences sponsored by the Property Loss Research Bureau and the Liability Insurance Research Bureau. He is a 1983 graduate of the University of California Los Angeles School of Law and a 1980 graduate of The Johns Hopkins University.

## INTRODUCTION

In an effort to curb abuses of the class action process by the plaintiffs' bar, Congress passed the Class Action Fairness Act in 2005. Along with expanding federal subject matter jurisdiction over class actions, CAFA sought to limit abuses in settlements of class actions, particularly those in which attorneys fees and payments to representative class plaintiffs consumed a disproportionate amount of the economic value of the settlement.

This paper addresses the settlement aspects of CAFA, with particular attention to the actions which counsel for the settling defendant needs to take, in particular the notice requirements.

## THE STATUTORY SCHEME

The provisions of CAFA, Pub. L 109-2, 119 Stat 4, are scattered throughout Title 28 of the United States Code. The provisions relating to settlements are contained in Chapter 114, 28 U.S.C. §§ 1711 through 1715. CAFA applies only to class actions filed in, or removed to, federal court.[1]

The notice requirements appear in section 1715. Special requirements apply when the settling defendant is a depository institution or an affiliate of a depository institution.

## WHY NOTICE MATTERS

The giving of notice under CAFA is a prerequisite to the approval of a class action settlement by a federal court. A court cannot enter an order giving final approval to the settlement until 90 days after the CAFA notice is given.[2]

In addition, a class member who failed to opt out of the settlement may choose not to be bound by a settlement if the necessary CAFA notice to regulators was not given, even though the class member did receive notice of the settlement.[3]

CAFA Notice Requirements
Page 1

## NOTICE PROCEDURES FOR NON-DEPOSITORY INSTITUTION DEFENDANTS

### 1.    Who is Entitled to Notice?

In all instances, notice should be given to the Attorney General of the United States.  In addition, notice needs to be given to an appropriate state official.  If there is a state regulator with primary regulatory or supervisory authority over the settling defendant, such as a Commissioner of Insurance, Commissioner of Corporations, etc., notice should go to that individual.  If there is no primary state regulator, then notice should be given to the state Attorney General.

The more difficult question is "Which states?"  The text of CAFA provides little guidance, simply stating " . . . who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person"[4]  As of November 15, 2009, there had yet to be any published opinions interpreting this provision of CAFA.   The legislative history suggests that the applicable states are any states in which a class member resides.[5] This means that the settling defendant needs to know where the class members reside.   Also, as discussed below, where feasible, the settling defendant needs to give each regulator a list of the class members in his or her jurisdiction.  If the class definition is not state-specific and the locations of class members cannot be determined by other means (such as only those states in which the defendant's conduct had an effect), the best course of action is to give notice to the regulator or Attorney General in all 50 states.  The legislative history contemplates that where there are class members resident in a state, but the defendant does not do business there and thus is not subject to regulation there, that notice for that state would go to the state attorney general.

### 2.    Content of the Notice

The notice (which can be either in pleading form or letter form, personal and client preferences vary) must contain the following:

- A copy of the complaint and all exhibits (this material may be posted on the internet at the discretion of the settling party).

- Notice of any scheduled hearings (be they the Preliminary Approval Hearing, the Final Approval Hearing or any other hearings) in the class action.

CAFA Notice Requirements
Page 2

- A copy of the proposed or final (depending on the procedural posture of the case) notice to the class members. Ordinarily this notice is given by the representative plaintiffs; the settling defendant needs to include a copy.

- The proposed or final settlement agreement.

- Any contemporaneous agreement between plaintiffs' counsel and the settling defendants.

- The proposed final judgment or dismissal.

- *If feasible*, the names of the class members who reside in each state and the proportionate share of the claims of such members to the entire settlement. If not, estimates of the number of class members and their share of the settlement need to be provided for each state.

- Any written judicial opinion relating to the settlement.

If technically feasible, the best practice is to take advantage of the option to post the complaint and exhibits on the internet. You can use a secure password protected site, so long as the URL, and the log in and password are included in the body of the notice. One advantage to doing it this way is that the applicable regulators have to work harder to obtain a copy of the complaint. If the included Settlement Agreement is sufficiently straight forward, the regulator's staff may not bother to go to the internet to obtain the complaint. Regardless of how above board the settlement may be, the less attention there is from "interested" third-parties, the more likely the settlement is to be approved.

3.    **Special Rules for Depository Institutions**

If your client is a "depository institution," there are different rules. A Federal depository institution is a federally chartered bank, a holding company for a federally chartered bank, a foreign bank or a non-depository institution subsidiary of any of them. A state depository institution is any state regulated institution so defined in the Federal Deposit Insurance Act.[6]

Where the settling defendant is a federal depository institution, notice need only be given to the person who has primary federal regulatory or supervisory responsibility, provided that some or all of the

CAFA Notice Requirements
Page 3

matters alleged in the class action are the subject of regulation or supervision by that person.

When a state depository institution is involved, the notice is to be given to the State Bank Supervisor as defined in the Federal Deposit Insurance Act of the state in which the defendant is incorporated or chartered, again provided that the matters alleged are subject to regulation or supervision, *and also to* the appropriate federal official.   No notice is required to other states, even if class members live there.[7]

### 4.    <u>Timing of the Notice</u>

CAFA requires that the notice be sent "no later than 10 days after a proposed settlement of a class action is filed in court."[8]   What neither the statute, nor an judicial decision to date has explained is when the proposed settlement is deemed filed in court.   Is it when the plaintiffs file their motion for preliminary approval, or is it only after the court has granted preliminary approval.

Depending on the calendars in the particular district and the court's willingness to shorten time, there may be several weeks between the date a preliminary approval motion is filed and the hearing date.   The prudent approach, honored in the breach in the author's experience, is to serve the notice within ten days of the date on which the plaintiffs file their motion for preliminary approval.

This requirement can be problematic in several respects.   First, the defendants may not possess the complete list of likely class members needed for the CAFA notice to regulators.   As soon as a settlement has been agreed to, defense counsel should commence requesting that list from putative class counsel and also using its own resources should begin to compile one.   Do not rely solely upon the plaintiffs.   Counsel who waits until after the preliminary approval motion has been filed to begin to draft the CAFA notice and to obtain the list of class members will have considerable difficulty meeting the ten day requirement.   The silver lining is that there is no statutory sanction for a failure to satisfy that deadline so long as the Final Approval Hearing is at least 90 days after the CAFA notice is given.

Second, depending on the level of organization of plaintiffs' counsel, the various notices that need to be attached to the CAFA notice may not be ready.   Prudent plaintiffs' counsel will have those notices ready and incorporated in their preliminary approval moving papers.   But there are times when artificial deadlines are imposed for the filing of

preliminary approval motions, which result in incomplete initial submissions.

Third, *each* settling defendant (or group commonly represented) has to give the CAFA notice. The prudent defense attorney will work with the attorneys for the other settling defendants to create a common form of notice, class membership database and plan for service of the notices.

## 5.   **Supplemental Notices**

Although not mandated by CAFA, it is prudent for the settling party to give supplemental notice if there is a change in the terms of the settlement or the procedural posture of the case after the initial notice is given. It is also prudent to give notice of the final approval hearing date once that date is set.

## CONCLUSION

The CAFA settlement notice is a necessary part of the settlement of any class action subject to CAFA. It is also the one part of the settlement process that the settling defendants cannot delegate to the plaintiffs.

The statute leaves some procedural questions unanswered. Thus far, the courts have not answered them.

## <u>Appendix – Text of 28 U.S.C. § 1715 (as of November 15, 2009)</u>

### § 1715. Notifications to appropriate Federal and State officials

**(a) Definitions.--**

    **(1)**    **Appropriate Federal official.**--In this section, the term "appropriate Federal official" means--

        **(A)**    the Attorney General of the United States; or

        **(B)**    in any case in which the defendant is a Federal depository institution, a State depository institution, a depository institution holding company, a foreign bank, or a nondepository institution subsidiary of the foregoing (as such terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

    **(2)**    **Appropriate State official.**--In this section, the term "appropriate State official" means the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person. If there is no primary regulator, supervisor, or licensing authority, or the matters alleged in the class action are not subject to regulation or supervision by that person, then the appropriate State official shall be the State attorney general.

**(b) In general.**--Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of--

    **(1)** a copy of the complaint and any materials filed with the complaint and any amended complaints (except such materials shall not be required to be served if such materials are made

electronically available through the Internet and such service includes notice of how to electronically access such material);

**(2)** notice of any scheduled judicial hearing in the class action;

**(3)** any proposed or final notification to class members of--

**(A)(i)** the members' rights to request exclusion from the class action; or

**(ii)** if no right to request exclusion exists, a statement that no such right exists; and

**(B)** a proposed settlement of a class action;

**(4)** any proposed or final class action settlement;

**(5)** any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants;

**(6)** any final judgment or notice of dismissal;

**(7)(A)** if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or

**(B)** if the provision of information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement; and

**(8)** any written judicial opinion relating to the materials described under subparagraphs (3) through (6).

**(c) Depository institutions notification.**--

**(1) Federal and other depository institutions.**--In any case in which the defendant is a Federal depository institution, a depository institution holding company, a foreign bank, or a non-depository institution subsidiary of the foregoing, the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the person who has the primary Federal

CAFA Notice Requirements
Page 7

regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

**(2) State depository institutions.**--In any case in which the defendant is a State depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the State bank supervisor (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)) of the State in which the defendant is incorporated or chartered, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate Federal official.

**(d) Final approval.**--An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b).

**(e) Noncompliance if notice not provided.**--

**(1) In general.**--A class member may refuse to comply with and may choose not to be bound by a settlement agreement or consent decree in a class action if the class member demonstrates that the notice required under subsection (b) has not been provided.

**(2) Limitation.**--A class member may not refuse to comply with or to be bound by a settlement agreement or consent decree under paragraph (1) if the notice required under subsection (b) was directed to the appropriate Federal official and to either the State attorney general or the person that has primary regulatory, supervisory, or licensing authority over the defendant.

**(3) Application of rights.**--The rights created by this subsection shall apply only to class members or any person acting on a class member's behalf, and shall not be construed to limit any other rights affecting a class member's participation in the settlement.

**(f) Rule of construction.**--Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials.

**Endnotes**

---

[1] 28 U.S.C. § 1711(2).
[2] 28 U.S.C. § 1715(d).
[3] 28 U.S.C. § 1715(e)(1).
[4] 28 U.S.C. § 1715(a)(2).
[5] U.S. Senate Report 109-14, February 28, 2005.  A copy is available at
http://www.classactionprofessor.com/CAFA_leghist/Senate_report_109-14.pdf
[6] 12 U.S.C. § 1813.
[7] U.S. Senate Report 109-14, February 28, 2005, p. 34.
[8] 28 U.S.C. § 1715(b).

11980477.1

Yahoo! My Yahoo! Mail

**YAHOO!** FINANCE   Welcome, Guest [Sign Out, My Account]

Search the Web [        ]  [ Search ]
Finance Home - Help

EDGAR Online

AdChoices

Reach goals beyond your goals.

Get there faster with a Two-Year Achiever CD.
Raise your rate. Boost your deposit.
1.25% APY CD  [Open a CD today]

CIT Bank
Member FDIC

Quotes & Info

Enter Symbol(s): [        ] [ GO ] Symbol Lookup | Financial Search
e.g. YHOO, ^DJI

ETFC > SEC Filings for ETFC > Form 10-K on 23-Feb-2012

All Recent SEC Filings

Show all filings for E TRADE FINANCIAL CORP | Request a Trial to NEW EDGAR Online Pro

## Form 10-K for E TRADE FINANCIAL CORP

23-Feb-2012

## Annual Report

### ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion should be read in conjunction with the consolidated financial statements and the related notes that appear elsewhere in this document.

### GLOSSARY OF TERMS

In analyzing and discussing our business, we utilize certain metrics, ratios and other terms that are defined in the Glossary of Terms, which is located at the end of Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

### OVERVIEW

**Strategy**

Our core business is our trading and investing customer franchise. Building on the strengths of this franchise, our growth strategy is focused on:

☐ Strengthening our overall financial and franchise position. We are focused on strengthening our overall capital structure and continuing to mitigate credit losses in our loan portfolio. We are also focused on positioning the Company for future growth and maintaining disciplined expense management.

☐ Improving our market position in our retail brokerage business. We plan to grow our customer base by continuing to increase our sales force, focus on long-term investing and develop innovative products and services.

☐ Accelerating the growth of our corporate services and market making businesses. Our corporate services and market making businesses enhance our strategy by allowing us to realize additional economic benefit from our retail brokerage business.

☐ Enhancing our position with long-term investors. We believe growing our investing and retirement products and services is key to our long term success. Our primary focus is to expand the reach of our brand along with the awareness of our products to this key customer segment.

☐ Optimizing the value of our bank franchise. Our retail brokerage business generates a significant amount of customer cash and we plan to continue to utilize our bank to optimize the value of these customer deposits.

**Key Factors Affecting Financial Performance**

Our financial performance is affected by a number of factors outside of our control, including:

☐ customer demand for financial products and services;

☐ weakness or strength of the residential real estate and credit markets;

☐ performance, volume and volatility of the equity and capital markets;

☐ customer perception of the financial strength of our franchise;

☐ market demand and liquidity in the secondary market for mortgage loans and securities;

☐ market demand and liquidity in the wholesale borrowings market, including securities sold under agreements to repurchase;

☐ our ability to obtain regulatory approval to move capital from our bank to our parent company; and

☐ changes to the rules and regulations governing the financial services industry.

---

### Table of Contents

In addition to the items noted above, our success in the future will depend upon, among other things:

☐ continuing our success in the acquisition, growth and retention of trading customers;

☐ our ability to generate meaningful growth in the long-term investing customer group;

☐ our ability to assess and manage credit risk;

☐ our ability to generate capital sufficient to meet our operating needs at both our bank and our parent company;

☐ our ability to assess and manage interest rate risk; and

Summary of E TRADE FINANCIAL CORP - Yahoo! Finance

☐ disciplined expense control and improved operational efficiency.

Management monitors a number of metrics in evaluating the Company's performance. The most significant of these are shown in the table and discussed in the text below:

| | 2011 | As of or For the Year Ended December 31, 2010 | 2009 | Variance 2011 vs. 2010 |
|---|---|---|---|---|
| Customer Activity Metrics:(1) | | | | |
| DARTs | 157,475 | 150,532 | 179,183 | 5 % |
| Average commission per trade | $ 11.01 | $ 11.21 | $ 11.33 | (2 )% |
| Margin receivables (dollars in billions) | $ 4.8 | $ 5.1 | $ 3.7 | (6 )% |
| End of period brokerage accounts | 2,783,012 | 2,684,311 | 2,630,079 | 4 % |
| Net new brokerage accounts | 98,701 | 54,232 | 114,273 | * |
| Customer assets (dollars in billions) | $ 172.4 | $ 176.2 | $ 150.5 | (2 )% |
| Net new brokerage assets (dollars in billions) | $ 9.7 | $ 8.1 | $ 7.2 | * |
| Brokerage related cash (dollars in billions) | $ 27.7 | $ 24.5 | $ 20.4 | 13 % |
| Company Financial Metrics: | | | | |
| Corporate cash (dollars in millions) | $ 484.4 | $ 470.5 | $ 393.2 | 3 % |
| E*TRADE Financial Tier I leverage ratio | 5.7 % | 3.6 % | N/A | 2.1 % |
| E*TRADE Financial Tier I common ratio | 9.4 % | 4.8 % | N/A | 4.6 % |
| E*TRADE Bank Tier I capital ratio | 7.8 % | 7.3 % | 6.7 % | 0.5 % |
| Special mention loan delinquencies (dollars in millions) | $ 467.1 | $ 589.4 | $ 804.5 | (21 )% |
| Allowance for loan losses (dollars in millions) | $ 822.8 | $ 1,031.2 | $ 1,182.7 | (20 )% |
| Enterprise net interest spread | 2.79 % | 2.91 % | 2.72 % | (0.12 )% |
| Enterprise interest-earning assets (average dollars in billions) | $ 42.7 | $ 41.1 | $ 44.5 | 4 % |

* Percentage not meaningful.

(1) The year ended December 31, 2009 presented has been updated to exclude international local market trading.

**Customer Activity Metrics**

☐ DARTs are the predominant driver of commissions revenue from our customers.

☐ Average commission per trade is an indicator of changes in our customer mix, product mix and/or product pricing.

☐ Margin receivables represent credit extended to customers to finance their purchases of securities by borrowing against securities they own. Margin receivables are a key driver of net operating interest income.

☐ End of period brokerage accounts and net new brokerage accounts are indicators of our ability to attract and retain brokerage customers.

Table of Contents
☐ Changes in customer assets are an indicator of the value of our relationship with the customer. An increase in customer assets generally indicates that the use of our products and services by existing and new customers is expanding. Changes in this metric are also driven by changes in the valuations of our customers' underlying securities.

☐ Net new brokerage assets are total inflows to all new and existing brokerage accounts less total outflows from all closed and existing brokerage accounts and are a general indicator of the use of our products and services by existing and new brokerage customers.

☐ Customer cash and deposits, particularly brokerage related cash, are an indicator of a deepening engagement with our customers and are a key driver of net operating interest income.

**Company Financial Metrics**

☐ Corporate cash is an indicator of the liquidity at the parent company. It is the primary source of capital above and beyond the capital deployed in our regulated subsidiaries.

☐ E*TRADE Financial Tier I leverage ratio is Tier I capital divided by average total assets for the holding company for leverage capital purposes. E*TRADE Financial Tier I common ratio is Tier I capital less elements of Tier I capital that are not in the form of common equity, such as trust preferred securities, divided by total risk-weighted assets for the holding company. The Tier I leverage and Tier I common ratios are non-GAAP measures as the holding company is not held to these capital requirements. See Liquidity and Capital Resources for a reconciliation of these non-GAAP measures to the comparable GAAP measures.

☐ E*TRADE Bank Tier I capital ratio is Tier I capital divided by adjusted total assets for E*TRADE Bank and is an indication of E*TRADE Bank's capital adequacy.

☐ Special mention loan delinquencies are loans 30-89 days past due and are an indicator of the expected trend for charge-offs in future periods as these loans have a greater propensity to migrate into nonaccrual status and ultimately charge-off.

☐ Allowance for loan losses is an estimate of probable losses inherent in the loan portfolio as of the balance sheet date and is typically equal to management's forecast of loan losses in the twelve months following the balance sheet date as well as the forecasted losses, including economic concessions to borrowers, over the estimated remaining life of loans modified as troubled debt restructurings ("TDR"). See Summary of Critical Accounting Policies and Estimates for a discussion of the estimates and assumptions used in the allowance for loan losses.

☐ Enterprise interest-earning assets, in conjunction with our enterprise net interest spread, are indicators of our ability to generate net operating interest income.

**Significant Events in 2011**

**Enhancements to Our Trading and Investing Products and Services**

☐ We continued to grow our sales force, increasing our financial consultant team by 42% in 2011, as we continued to focus on engagement with long-term and retirement investors, as well as corporate clients;

☐ We developed E*TRADE 360, a fully dynamic and customizable online investing dashboard now available to all customers.

☐ We developed a newly redesigned public website featuring simplified navigation, personalization based on objectives and experience levels, and enhanced content.

Table of Contents
☐ We launched the E*TRADE Community, which utilizes social media to offer customers a platform to interact with one another and share ideas and strategies with other E*TRADE customers;

☐ We added several new features to our E*TRADE Pro platform, including new options strategies (multi-legged orders), expanded CNBC content and logarithmic charts;

☐ We introduced a suite of sophisticated Options Tools designed to help traders quickly and easily identify and analyze potential investment opportunities;

☐ We provided E*TRADE Securities' customers with access to the AIG public offering, advocating for retail investors to have access to initial public offerings and other offerings typically limited to institutional investors;

☐ We launched a number of enhancements for Mobile Pro, including mobile check deposit capability for Apple iPhone ☐ and AndroidTM;

☐ We introduced weekly options on select stocks, indexes and ETFs;

☐ We expanded tools, education and research offerings in the Bond Resource Center;

☐ We continued to expand our free investor education offerings across a number of channels including online videos, live and on-demand web seminars, and live events;

☐ We strengthened our retirement offering with Rollover Specialists as well as Certified Retirement Planning Counselors added in nearly every branch, and expanded educational resources with additional videos and seminars, commentary, planning checklists, Rollover Quiz, IRA selection tools and upgraded Tax Center;

☐ We enhanced our customer service offering with 24/7 online chat capabilities, an e-mail platform available to prospects, and an enhanced online service center;

☐ We launched portfolio margin accounts, which provide sophisticated traders with additional tools to manage risk and leverage capital;

☐ We introduced unified managed account advisory services to long-term investors seeking professional money management services with an investment of $250,000 or more; and

☐ We expanded our corporate services client base by bringing on 46 new clients and continued to execute our strategy to service both private and public companies as a foundation for future retail brokerage account growth.

**Market Recognition**

☐ Our corporate services business received top ratings in overall satisfaction and loyalty among broker plan administrators by Group Five, an independent consulting and research firm, in its 2011 Stock Plan Administration Benchmarking Study; and

☐ Our customer service team was awarded the 2011 International Service Excellence Award in the Contact Center category, based on a proven display of excellence, professionalism and outstanding service achievement.

**Issuance and Extinguishment of Senior Notes**

☐ During the year, we issued an aggregate principal amount of $435 million in 6 3/4% senior notes due May 2016 ("2016 Notes"). We used the proceeds to redeem all of the outstanding 7 3/8% senior notes due September 2013 ("2013 Notes"), including paying the associated redemption premium, accrued interest and related fees and expenses.

**Conversions of Convertible Debentures**

☐ During the year, a total of $660.9 million in convertible debentures were converted into 63.9 million shares of common stock, increasing shareholders' equity by $661 million.

Table of Contents

**Legal Settlements for the Auction Rate Securities and Freudenberg Matters**

☐ We reached a settlement with the Colorado Division of Securities and the NASAA whereby E*TRADE Securities LLC offered to purchase auction rate securities from eligible investors who purchased those securities through E*TRADE Securities LLC. We recorded a reserve of $48 million in connection with this settlement. We also entered into a memorandum of understanding to settle the Freudenberg Action, which resulted in the recording of a net reserve of $10.8 million as of December 31, 2011.

**EARNINGS OVERVIEW**

**2011 Compared to 2010**

We generated net income of $156.7 million, or $0.54 per diluted share, on total net revenue of $2.0 billion for the year ended December 31, 2011. Commissions, fees and service charges, principal transactions and other revenue decreased 2% to $711.3 million for the year ended December 31, 2011 compared to 2010, which was driven primarily by the elimination of all account activity fees, which took effect in the second quarter of 2010. In addition, gains on loans and securities, net and net impairment decreased 18% to $105.3 million for the year ended December 31, 2011 compared to 2010.

Provision for loan losses declined 43% to $440.6 million for the year ended December 31, 2011 compared to 2010, driven by improving credit trends and loan portfolio run-off. Total operating expenses increased 8% to $1.2 billion for the year ended December 31, 2011 compared to 2010. This increase was driven primarily by increases in advertising and market development expense, FDIC insurance premiums and other operating expenses during the year ended December 31, 2011.

The following sections describe in detail the changes in key operating factors and other changes and events that affected net revenue, provision for loan losses, operating expense, other income (expense) and income tax expense (benefit).

Revenue

The components of revenue and the resulting variances are as follows (dollars in millions):

| | Year Ended December 31, | | Variance 2011 vs. 2010 | |
| | 2011 | 2010 | Amount | % |
|---|---|---|---|---|
| Net operating interest income | $ 1,220.0 | $ 1,226.3 | $ (6.3) | (1)% |
| Commissions | 436.2 | 431.0 | 5.2 | 1% |
| Fees and service charges | 130.4 | 142.4 | (12.0) | (8)% |
| Principal transactions | 105.4 | 103.4 | 2.0 | 2% |
| Gains on loans and securities, net | 120.2 | 166.2 | (46.0) | (28)% |