CAB8KRIC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  THE KRISTEN-STRAXTON GROUP,
   et al.,
4
                   Plaintiffs,
5
               v.                          07 Cv. 8538 (JPO)
6
   E*TRADE FINANCIAL CORPORATION,
7  et al.,

8                  Defendants.

9  ------------------------------x

10                                    October 11, 2012
                                      3:20 p.m.
11
   Before:
12
                       HON. J. PAUL OETKEN
13
                                      District Judge
14
                          APPEARANCES
15
   BROWER PIVEN
16      Attorneys for Plaintiffs
   BY:  DAVID A.P. BROWER
17      CHARLES J. PIVEN
        BRIAN C. KERR
18
   LEVI KORSINSKY LLP
19      Attorneys for Plaintiffs
   BY:  EDUARD KORINSKY
20      SHANNON L. HOPKINS

21 DAVIS POLK & WARDWELL LLP
        Attorneys for Defendants
22 BY:  AMELIA T.R. STARR
        BRYAN McARDLE
23

24

25

CAB8KRIC

1                           APPEARANCES (CONT'D)

2    DANIEL KUZNICKI
          Attorney for Objector Leon I. Behar
3
     CHRIS ANDREWS
4         Objector Appearing Pro Se

5    SHUSTAK FROST & PARTNERS
          Attorneys for Tate Plaintiffs
6    BY:  STUART KAGEN

7    AMIR M. STARK
          Attorney for Objector Ventris
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAB8KRIC

1           (Case called)

2           THE DEPUTY CLERK:  Starting with the plaintiffs, can I

3    have all counsel state their appearance for the record and who

4    you're representing if not yourself.

5           MR. BROWER:  Good afternoon, your Honor.  David Brower

6    representing the lead plaintiff.

7           THE COURT:  Good afternoon.

8           MR. KERR:  Brian Kerr, also lead plaintiffs, your

9    Honor.

10          MR. PIVEN:  Charles Piven, also lead plaintiffs.

11          MR. KORSINSKY:  Eduard Korsinsky for lead plaintiffs.

12          MS. HOPKINS:  Good afternoon.  Shannon Hopkins, also

13   for lead plaintiffs.

14          MS. STARR:  Amelia Starr from Davis Polk & Wardwell on

15   behalf of defendants.

16          MR. McARDLE:  Bryan McArdle from Davis Polk, also

17   defendants.

18          MR. ANDREWS:  Good afternoon.  Chris Andrews, pro se.

19          MR. BEHAR:  Leon Behar, objector.

20          MR. KUZNICKI:  Daniel Kuznicki, on behalf of objector

21   Leon Behar.

22          MR. KAGEN:  Stuart Kagen on behalf of plaintiffs in

23   the Tate action that was stayed pending class certification in

24   this matter.

25          THE COURT:  All right.  Anyone else?

CAB8KRIC

1          Are there any other objectors here, anyone who has

2     filed an objection or is interested in objecting?

3          MR. STARK:  Amir Stark, and I represent objector

4     Ventris.  That matter has been resolved with lead counsel.

5     Thank you, your Honor.

6          THE COURT:  We are here for a fairness hearing.  I had

7     preliminarily approved the settlement and set this date as the

8     fairness hearing for this settlement.  I have in front of me

9     filings in support of a settlement, as well as the

10     certification of the class that will be a part of that proposed

11     settlement, as well as a motion for attorneys' fees of

12     essentially a third of the total amount of the settlement filed

13     on behalf of plaintiffs' counsel.

14          Before I turn it over to counsel, I want to make sure

15     I have everything I should have.  I did receive, I think, four

16     written objections.  One is an objection with respect to

17     attorneys' fees filed by Mr. Ventris, and I believe that issue,

18     based on further filings, has been resolved.  You all can

19     correct me in a minute if I am wrong.  An objection filed by

20     Paul Liles.  An objection filed by Mr. Leon Behar.

21          Is it Behar?

22          MR. BEHAR:  Behar.

23          THE COURT:  And an objection filed by Mr. Andrews,

24     Chris Andrews.

25          Are there any other written objections that I should

CAB8KRIC

1    have received?

2         Hearing none, I will assume that there are not, and I

3    will turn it over to Mr. Brower.

4         MR. BROWER:  Yes, your Honor.

5         Your Honor, I am going to suggest a format this

6    afternoon, and of course we will do it any way the Court wants.

7    As the Court knows, there are essentially three motions; we

8    filed them as three separate motions.  One is with respect to

9    the notice of certification of the settlement class, the second

10   is with respect to the settlement and the plan of allocation,

11   the third is with respect to the request for attorneys' fees

12   and reimbursement of litigation expenses.

13        I would propose, your Honor, that I address each

14   motion in order, and after being done with each motion, that

15   the objectors who have objected to the different aspects of

16   those three motions be allowed to speak, we respond to them,

17   and the Court ask any questions it has on those issues, and

18   then move on, so that we keep the issues more tightly bound to

19   how they have been raised.

20        If that is satisfactory to the Court, I will proceed

21   with the notice and the settlement class.

22        THE COURT:  I think that's fine.

23        MR. BROWER:  Pursuant to your Honor's preliminary

24   approval order, notice has been distributed as directed.  The

25   notice was in the form approved by the Court.  Notice provided

CAB8KRIC

1   all of the requisite information required by the Private

2   Securities Litigation Reform Act of 1995, which I will now

3   refer to as the PSLRA for the rest of the day.  It provided the

4   cover information that's specifically required, and there are

5   formulas in the PSLRA for how they are to be set forth.  It

6   also included the additional information the PSLRA required.

7          Further, the entire plan of allocation was set forth

8   in the plan of allocation so the class members could calculate

9   their damages based on that formula.  To the extent that they

10  could not know, as the cases recognize in the last filing we

11  provided to your Honor yesterday, the cases talk about it's

12  only conjecture how much you would actually receive and that

13  the notice only requires a formula be there, the amount of the

14  settlement be there, the amount of the attorneys' fees being

15  requested, at the upper limit, which of course is exactly what

16  the notice provided.  So all the information was there.

17         In turn, I will give you the final numbers that we now

18  have from the claims administrator.  276,815 notice packets

19  have been sent to potential class members.  Of those claims, we

20  have as of Tuesday, October 9, received 12,958 claims.  There

21  is still at least three weeks left before the claims deadline.

22  I am informed by the claims administrator the institutional

23  claims, which typically come in late, are starting to come in

24  now so the number is rising very quickly.  The number is now up

25  to 393 million shares represented by those claims.  That

CAB8KRIC

1   doesn't mean all 393 million shares are entitled to a recovery,

2   but that's the gross number of shares represented by all

3   claims, whether they are eligible or not, as of today, as of

4   this morning.

5         Of the notices that were sent out, we have received

6   six requests for exclusion.  That equals, as your Honor knows,

7   .0001 percent of the class members, potential class members

8   that received notice.  By any measure, that's an infinitesimal

9   number compared to the number of notices, particularly given

10  the large number of shares involved here and the large number

11  of shares in the float.

12        THE COURT:  The notice period, remind me, is it a

13  little over a year?  It's '06 to '07?

14        MR. BROWER:  It's approximately a year.  The class

15  period is April 19, 2006, to November 9, 2007.  So slightly

16  more than a year.

17        In addition to the exclusions, just to put them in

18  context, one of the exclusions -- and we provided all the

19  exclusions to your Honor in my supplemental declaration that

20  was filed some weeks ago -- one of them says, I'm not a class

21  member.  We will take him at his word.  Two of them are from

22  the Tate plaintiffs, who we will discuss at the very end of the

23  hearing, who had a pending action of their own that's been

24  stayed since almost the time the action was filed back in 2007.

25        THE COURT:  What court is that in?

CAB8KRIC

1          MR. BROWER:  Before you.

2          So, basically, we have three real opt outs out of

3    276,000-some-odd notices that went out.

4          In addition, your Honor, we have four objections out

5    of those notices.  As your Honor knows from the papers that

6    have been submitted, and we will address them as it comes up,

7    two of those four objectors have no standing to object as a

8    matter of law.  So we would submit that you have less than

9    one-thousandth of one percent in objections.  Again, that's a

10   de minimis number under all of the case law.

11         That's our report with respect to the notice.

12         I will address the settlement class very quickly.  We

13   put before your Honor all of the requirements of Rules 23(a)

14   and 23(b)(3) with respect to why the class here meets all of

15   the requirements for certification under Rule 23.  There has

16   been no objection filed to certification of the settlement

17   class that your Honor preliminarily certified in connection

18   with preliminary approval of the settlement.  We would submit

19   no reason has arisen and luckily nothing the Supreme Court has

20   done in the last week changes anything that has happened with

21   respect to certification of a class in a securities case, and

22   therefore we would submit the class should be finally certified

23   as well in connection with the settlement.

24         Leaving that, the objection of Mr. Liles is an

25   objection that goes to the notice.  Mr. Liles is not here.  As

CAB8KRIC

1    your Honor knows, and I do apologize for the lateness of the

2    filing you received, you received it yesterday, I gather it was

3    filed in the early hours of the morning.

4         THE COURT:  You ruined my law clerk's evening.

5         MR. BROWER:  So I gathered.  I assume your Honor is

6    now seeing that filing.

7         THE COURT:  Yes.

8         MR. BROWER:  The matters covered by it didn't start

9    till late Sunday afternoon.  Monday was a holiday.  Tuesday Mr.

10   Liles filed a new objection with supplemental arguments.  So we

11   got it to you as fast as we could.  We got it to you in the wee

12   hours of Tuesday.

13        THE COURT:  As I see, the argument made by that motion

14   is squarely rejected by the Second Circuit in the *In re*

15   *American International Group, Inc. Securities Litigation* case.

16        MR. BROWER:  That's correct.  As well, your Honor,

17   there was a case in which Mr. Liles himself, the *Motorola* case,

18   made exactly the same objection recently, and the *Motorola*

19   court rejected it outright before the Second Circuit got to it

20   this year.  And, by the way, the statute itself is

21   crystal-clear.

22        THE COURT:  I agree.

23        MR. BROWER:  So that's with respect to the notice and

24   therefore we would -- by the way, we would also still press

25   that Mr. Liles has no standing.  He sold all of his shares

CAB8KRIC

1    before the first partial disclosure that's alleged in this

2    case, and under *Dura Pharmaceutical*, the Supreme Court has made

3    it crystal-clear that unless you held the shares at the time of

4    a curative disclosure that relates to the fraud alleged in the

5    action, you have no claim as a matter of law under the federal

6    securities laws because you cannot demonstrate loss causation

7    or damages.

8         Since Mr. Liles sold all of his shares in June of

9    2007, before the first disclosure, which was on July 25, 2007,

10   Mr. Liles has no claim.  Since he has no claim, Mr. Liles has

11   no financial interest in the settlement whatsoever.  We have

12   provided your Honor with a legion of cases that discuss the

13   fact that, where an objector has no financial interest in the

14   outcome of his or her objection, that objector has no standing,

15   even though they are a class member, that objector has no

16   standing whatsoever to object to the settlement.  You actually

17   have to have a financial interest.

18        We cited some cases in the last brief, your Honor,

19   although these were in the first response, that in order to

20   call the jurisdiction of the court for an objection, you need

21   to have standing, and Mr. Liles lacked standing because he has

22   no damage, and therefore he is not going to recover under the

23   plan of allocation because he has no damage; he received zero

24   by virtue of selling when he did.  There are no objections to

25   the plan of allocation before the Court, certainly no timely

CAB8KRIC

1    ones, and, therefore, your Honor, the second reason to reject

2    Mr. Liles, in addition to the lack of merit to his claim, is he

3    has no standing.

4           That done, your Honor, I can move on to the

5    settlement.

6           First of all, I want to say we are extremely proud to

7    present this settlement to the Court.  It's $79 million in

8    cash.  It's an extremely large, very good settlement,

9    particularly in light of what was a very complex, difficult

10   case, involving financial instruments that the people who

11   created them still don't understand precisely how they work.

12   There is litigation all over the country over these securities

13   between large investment houses.  There has been litigation by

14   shareholders, some successful, some unsuccessful.  We

15   considered this one among the most successful.

16          We have put before your Honor an extensive briefing,

17   and I don't want to go through it.  You have a very lengthy

18   declaration from myself, your Honor.  You have supplemental

19   materials.  I am going to just touch on some of the high points

20   and then answer any questions the Court has.

21          We have put before your Honor the fact that we meet

22   each and every one of *The City of Detroit v. Grinnell* factors.

23   I am going to quickly go through the factors.

24          The complexity, expense and likely duration of the

25   litigation.  This is unquestionably a complex case just by its

CAB8KRIC

1  nature when you only review the complaint and Judge Sweet's

2  opinion denying the motion to dismiss and one sees immediately

3  how complex and difficult these legal issues were.  And as I

4  pointed out to your Honor in the papers, one of the things that

5  the courts don't always talk about is the fluid nature of

6  claims under the federal securities laws.  I have been doing

7  this for now 30 years, and in the first 25 of those years, if

8  there were four Supreme Court cases that impacted the private

9  enforcement with the federal securities laws, it would probably

10  be a lot.  In the last five years, there have been at least

11  seven landmark Supreme Court cases in the private enforcement

12  of federal securities law area, all of which materially changed

13  what people believed for the prior 30 years was in fact the

14  law.  And one of the difficulties one has in these cases is

15  that the law does keep changing in an area where, when you

16  start a case you have certain expectations, and then when you

17  get to the end of the case, those expectations may have to be

18  very much changed.

19          The likely duration.  There was no doubt, your Honor,

20  that the case would have gone on for many, many more months.

21  Once the discovery was over, there would have been expert

22  discovery.  The expert discovery would have been complex.  As

23  you can see from the objections and the objection responses and

24  the additional materials we received, you can only imagine what

25  the defendants, the kind of experts they would have retained,

CAB8KRIC

 1   i.e., experts would have been confronting plaintiffs' experts,

 2   the kind of difficulty, complexity and duration that the expert

 3   discovery would have involved in this case to get through that.

 4             THE COURT:  Fact discovery was completed?

 5             MR. BROWER:  No, your Honor.  We had completed the

 6   documentary side.  There were some motions out there before the

 7   magistrate judge about some discovery disputes over documents,

 8   but the documentary discovery was essentially complete.  You

 9   never know if it's completely complete.  You find out when you

10   take depositions sometimes there are some more documents you

11   would like.

12             THE COURT:  There were a couple of depositions.  Mr.

13   Caplan's deposition happened?

14             MR. BROWER:  Mr. Caplan, and I am forgetting his name.

15   Mr. Caplan and the person who ran EGAM, Mr. Webb, were deposed.

16   We viewed them as the primary defendants and the people most

17   knowledgeable about what happened at E*TRADE during that period

18   of time.  Those two gentlemen were deposed.

19             One of the objectors has raised the issue that they

20   were deposed after the memorandum of understanding was

21   executed.  What I pointed out to your Honor in my declaration

22   yesterday was, first of all, there is a plethora of cases that

23   say, if the whole case was confirmatory discovery, that's OK,

24   as long as plaintiffs have enough information in their hands,

25   which is a different *Grinnell* factor, to make an informed

CAB8KRIC

1    decision over whether or not to settle.

2              Of course, most of the discovery and all the

3    documentary discovery we have done, which involved the review,

4    organization and distillation of 16 million pages of documents,

5    which was complete, in order for us to be prepared for the

6    mediation and to come forward with evidence at the mediation to

7    show our position versus the defendants' position in the

8    negotiation, that was complete.  And we did take the

9    depositions of Mr. Caplan and Mr. Webb in order to confirm the

10   things that we had learned from the documents and see if we can

11   find something new.  We didn't find anything new.

12             What I will tell the Court, the practical reality, and

13   believe it or not this happened to me once in my experience

14   doing this kind of thing, even with an MOU, or even a

15   stipulation of settlement, had something been discovered in the

16   confirmatory discovery, plaintiffs' counsel as fiduciaries of

17   the class would have been honor-bound to walk away from the

18   settlement.  And the defendants might have argued you're bound

19   by what you signed, but luckily in a class action, if that

20   happens, the court steps in between plaintiffs' counsel and

21   defendants' counsel.  Since plaintiffs' counsel would not have

22   been able to recommend the settlement, which is another

23   *Grinnell* factor, it's very unlikely the court, once we told the

24   court the reason we couldn't recommend the settlement, which is

25   something new and important had been uncovered in confirmatory

CAB8KRIC

1    discovery, we would have been honor-bound to tell the court,

2    the court would have understood what the situation is, and it's

3    very unlikely that the court could then approve a class action

4    settlement under Rule 23(e).

5           So the fact that the depositions were done in a

6    confirmatory stage makes no difference whatsoever and the case

7    law supports us on that.  We cited to your Honor four, five

8    cases.  We can probably cite a lot more.

9           In terms of duration, I was up to the end of

10   discovery.  Then there would have been summary judgment

11   motions.  They would have been lengthy and difficult I assure

12   the Court.  Following that, there would have been the usual

13   pretrial motions in limine.  There would have been a trial.

14   The trial would have taken several weeks.  Irrespective of the

15   outcome of the trial, I have never seen a securities fraud

16   action that's gone to trial where lengthy appeals have not

17   followed, and with sometimes very surprising and for plaintiffs

18   unfortunate outcomes.

19          So, your Honor, to make it simple, the first *Grinnell*

20   factor is easily met.

21          The reaction of the class.  I have talked about the

22   numbers.  We have two objectors with standing, two objectors

23   without standing.  One of the two objectors with standing has

24   withdrawn his objection.  So we have one objector with

25   standing.  You also have very de minimis, as the cases talk

CAB8KRIC

1   about, de minimis objectors and very de minimis opt outs, given

2   the situation that two of the six are people who have been

3   trying to litigate their case from day one.  I would suggest

4   that, clearly, under the cases we provided to your Honor, the

5   small number militates very strongly in favor of approval of

6   the settlement.

7          The stage of the proceedings and the amount of

8   discovery.  We have discussed that.  Plaintiffs' counsel had

9   what they needed to go into those negotiations and to negotiate

10  from a position of strength and to wrench the $79 million out

11  of the defendants with a very experienced mediator.  We believe

12  that issue is done.

13         The risks of establishing liability.  It's a 10b-5

14  case.  Scienter is a requirement.  I am not going to go through

15  all of the elements of a 10b-5 case.  I think your Honor saw,

16  with respect to some of the arguments that were raised

17  regarding the estimated amount of plaintiffs' maximum damages

18  at trial, that questions like loss causation were going to be

19  very, very hotly disputed, and whether plaintiffs survived on

20  the loss causation issue down the road or whether the loss

21  causation issue diminished the amount of damages to the extent

22  that it would have been a pure victory is a serious risk that

23  plaintiffs faced.

24         On the question of liability, your Honor, Judge

25  Sweet's opinion itself makes it clear and the briefs that were

CAB8KRIC

1    filed in support of that make it very clear this would have

2    been a very hotly disputed case on the facts.  Basically, the

3    defendants would argue, and I am not here to carry their water

4    because if you deny the settlement we are going to go back into

5    litigation, but I can summarize Mr. Webb and Mr. Caplan's

6    arguments that they articulated for us in discovery.  They were

7    taken by surprise by the financial crisis, they claim, just as

8    everybody else was.  That they believed they had undertaken

9    very high-grade mortgage assets, that they were very careful

10   and had done everything they needed to do, and were doing

11   nothing different than what was the industry standard at the

12   time, that they saw no red flags, and that they were just taken

13   by surprise like, they claim, so many other institutions, and,

14   indeed, the country was taken by surprise by what happened in

15   the mortgage crisis.

16          Fighting that argument to a jury, who has lived

17   through the financial crisis, is no easy matter these days.

18   There is hardly a person in this country who can sit in a jury

19   box who has not been themselves taken by surprise somehow by

20   the financial crisis that started in 2007, and to some great

21   extent is still with us today.  That's the biggest risk we

22   faced at trial in terms of liability.  And then proving that

23   these defendants knew the mortgage assets they had were

24   substandard, two very difficult hurdles we would need to

25   overcome had the case gone to trial.  We believe the risks of

CAB8KRIC

1   liability strongly support plaintiffs' *Grinnell* factor.

2           Additionally, your Honor, establishing damages.  You

3   can see from the arguments that went back and forth with

4   objectors that arguments about damages can become very

5   convoluted, very complex and very difficult, and explaining

6   them to laypersons like a jury could become very, very

7   difficult.  The damages portion of any case always comes down

8   to a battle of experts.  I have no doubt that defendants would

9   have hired among the best experts in the country to take

10  defense side on these kind of issues, companies like NERA, lots

11  of the companies that provide expert services that are cited in

12  Mr. Hammerslough's declaration who write about these issues all

13  the time and do testify about these issues.  And we would have

14  seen a complex argument about not only whether there were any

15  damages, which I assure you the defendants would have argued

16  there are none, because none were caused by the revelation of a

17  prior misrepresentation but all were the result of new adverse

18  information timely disclosed, which is the position of the

19  defendants, but the amounts would have been very deeply in

20  dispute.

21          I would like to touch on one of the things that came

22  up in Mr. Liles most recent filing, which we provided to your

23  Honor.  Mr. Liles suggested, because we recite defendants'

24  position on why they would win, which I think we are required

25  to do under this *Grinnell* factor, that somehow we adopt it.  We

CAB8KRIC

1    don't adopt it.  But at the same time, we don't adopt

2    Mr. Andrews' argument on damage, which is you take the amount

3    of the price on April 1, 2006, and you look at the price of

4    E*TRADE stock on November 13, 2007, and whatever that amount

5    is, you add it up, multiply it by the number of shares, and

6    that's your damage.

7            Your Honor, I wish it were so.  It's not even close to

8    being so.  The Supreme Court made very clear intra-partial

9    disclosure drops and the price of the stock will be treated by

10   the courts as nothing more than normal market movement, not

11   recoverable in a securities fraud action.

12           Second, you can't take the whole drop.  As

13   Mr. Hammerslough's supplemental declaration goes into detail ad

14   nauseam, I agree, but he also now cites all of the authorities,

15   the learned texts on these issues, FOMA, which is the

16   fraud-on-the-market doctrine, and all the other statistical

17   articles that deal with calculating damages in securities cases

18   so the Court can have it before it the background to this and

19   the peer-reviewed articles.

20           What you have, your Honor, is when you have a drop in

21   the price of the stock in a federal securities case, assuming

22   you can show there was a prior misrepresentation, and somehow

23   that prior misrepresentation or omission was cured by that

24   disclosure somehow, that there is a connection, under *Lentell*

25   *v. Merrill Lynch* you have got to show a connection, it's got to

CAB8KRIC

1    be in the zone of risk.  Then you have to look at the drop.

2    Let's say the drop is a dollar.  You then have to go back and

3    look at the announcement and you have got to see what other

4    information is in the announcement.  Because the courts have

5    held, even before *Dura*, you don't get the whole drop if there

6    is other information, and there may be a whole bunch of other

7    negative information in any given disclosure that isn't cured.

8         For instance, you might give out a piece of

9    information that says, we have been lying about X, and, by the

10   way, our earnings are going to be Y, and Y may have nothing to

11   do with X.  And you can maybe recover some amount for X once

12   it's tweezed out of the drop, but you get nothing for Y because

13   Y is simply the timely disclosure of new adverse information,

14   and both of them are reflected in the drop of the price of the

15   stock, and under, of course, the efficient market doctrine

16   quickly absorbed into the market within a few hours, if not a

17   day.

18        So the problem with damages there is always a risk at

19   trial because what always happens is the defendants come in,

20   and even the smart defendants' experts will come in and say,

21   yes, some of the drop could be attributable to X, but it's much

22   less than plaintiffs' expert says.  And at that point you have

23   two experts arguing opinion on the witness stand, and how a

24   jury reacts to that is anyone's guess, and it's an enormous

25   risk to plaintiffs' counsel that the jury accepts the

CAB8KRIC

```
 1    defendants' weighting of the importance of a piece of

 2    disclosure in a multiple disclosure announcement.

 3           THE COURT:  I take the point about the risk, both of

 4    establishing liability and damages, and I agree you have to to

 5    some extent sort of make the case the defendants would make, if

 6    the case proceeded, in order to satisfy the *Grinnell* factors.

 7           I don't know if you were planning to address Mr.

 8    Behar's objection, but one of the things that I was left with

 9    some confusion about was his point about, looking at your

10    declarations, plaintiffs' declarations, he says that

11    essentially the settlement gives something like 10 cents or 14

12    cents per share on what should be $1.96 per share in damages,

13    whereas you say something much higher than that.

14           MR. BROWER:  I don't think that's Mr. Behar's

15    objection, first of all, I think that's Mr. Liles, but I can

16    explain.

17           Let me start with what Mr. Hammerslough did because

18    what Mr. Hammerslough did was an estimate that we asked be done

19    for the purpose of looking at factor number nine, which was not

20    the risks of litigation.

21           THE COURT:  Right.

22           MR. BROWER:  Factor number nine says, compare the

23    amount of the settlement to the best likely recovery at trial

24    in order to weigh whether the settlement is so small compared

25    to the likely result that it's somehow facially unfair.
```

CAB8KRIC

1                So Mr. Hammerslough did an analysis for us of what

2     would be the reasonable maximum likely amount of damages that

3     could be presented to a trier of fact and survive a Daubert

4     challenge to win at trial.  And what he came up with was $544

5     million.  And the way he got to the $544 million is he

6     calculated -- there were 310 million holder shares.  A holder

7     share would be a share purchased during the class period and

8     held to the November 12 announcement.  He then multiplied that

9     number by 8 percent.  Well, that number came to $607 million

10    and change.  He then reduced that number by 8 percent.  The 8

11    percent reduction, which nobody complained about, had to do

12    with there were shares purchased before the class period, many

13    shares.  There were 6 billion shares that changed hands during

14    the class period.  There were many shares purchased before the

15    class period.  Some of those shares get sold after the first

16    disclosure, but some of those shares may not get sold until

17    after the third disclosure.  So that they don't receive each of

18    the damage elements of the $1.96.

19                THE COURT:  That explains the 8 percent.

20                MR. BROWER:  Right.  That explains the 8 percent.

21                So you reduce the 607, which is $1.96 times 310

22    million, that's where you get 607.  You reduce it by 8 percent

23    and you get 544 million.  Those are the maximum damages that

24    could be recovered at trial.

25                Then all Mr. Hammerslough did is divide 79 million by

CAB8KRIC

1    544 million and you get 14.1 percent.  That's the percentage of

2    the maximum recoverable damages, assuming complete victory on

3    liability, every issue of damage, loss causation, amount of

4    damage, as well as a 100 percent claims rate after trial,

5    assuming you win all your appeals and everything else, and the

6    defendants are unable to rebut the presumption of reliance as

7    individual class members, which is something that is going on

8    in front of another judge in this courthouse in a case where

9    they had a very significant class victory and now the

10   defendants are deposing all the class members to rebut the

11   presumption individually.  So they still don't have a judgment

12   after three years.  After all that, you get 14.1 percent, the

13   maximum damages that the settlement represents to the maximum

14   damages.  That's what *Grinnell*'s factor number nine provides.

15        So that's what Mr. Behar is saying, absolutely right,

16   it's 14.9 percent of the maximum damages.  So I am not sure

17   after that what the question is.  We didn't recover 50 percent

18   of the maximum recoverable damages.  What we did put before

19   your Honor is a lot of statistics from third party data that

20   shows that, on the average, the typical recovery in cases like

21   this in 2011 was between 2.1 and 2.7 percent.  This is 14.1

22   percent, doing the same math that Mr. Hammerslough did,

23   rendering the same calculation.  Some of the numbers go a

24   little higher.  From 1996 to 2011, 3.3 percent was the median

25   recovery of damages.  And all of this comes from the

CAB8KRIC

Cornerstone research report that's cited by Professor Miller in

his declaration.  The amount has been lower in financial crisis

cases, those percents have been lower in the financial crisis

cases.

THE COURT:  If it's 14.1 percent, that's a good number

for this kind of case.  I thought what he was arguing is that

it's much, much less than 14.1 percent, but we will hear from

him.

MR. BROWER:  I don't know how.  What I understood Mr.

Behar's complaint was that he didn't understand -- the

stipulation of settlement, plan of allocution, all make

perfectly clear the defendants have no interest in this pot

ever again, they're gone, and that every dollar either gets

paid in fees and expenses up front, and then every dollar gets

distributed to the class.  The way we read Mr. Behar's

objection is he read it as like a claims-made settlement where

each person will get 14.1 percent of their recognized loss, and

if enough people don't claim -- Mr. Hammerslough also estimated

a claims made because we think that's important, but Mr.

Hammerslough also described what his estimate of the

claims-made rate will be, where here it happens to be very high

because this is a highly held institutional stock.  I believe

it's 82 or 83 percent of the shares.  He expects claims to be

83 percent, which is very high in a securities case, because

this was so heavily institutionally owned.  But what I

CAB8KRIC

1    understood them rejecting is as though this were some kind of

2    claims-made settlement where each person will get 14.1 of the

3    recognized loss, and therefore since 100 percent of the people

4    will never claim, because it never happens, whatever is left

5    over will somehow go somewhere, disappear.

6           THE COURT:  Let's not spend too much time on it now

7    because we haven't heard from him.  I don't have much time.  I

8    am supposed to do a guilty plea in half an hour.  I would like

9    you to assume I have read everything in your papers and

10   highlight what you need to highlight.

11          MR. BROWER:  The only thing I need to highlight on the

12   settlement, your Honor, since I am pretty much done with it,

13   unless there are questions, is the result here is not real good

14   for a securities case; the result here is extremely good.  We

15   are talking about typically settlements in the 2.1 to 3.3

16   range, maybe even as high as 5.1 going back some years.  What

17   you have here is 14.1 percent so you're talking about three or

18   four times more than the normal median settlement in cases like

19   this, and it's a financial crisis case where those cases tend

20   to have a lower end, so we happen to be on the higher end of

21   actual recovery.  Given that, we would submit that the

22   settlement is fair, reasonable and adequate.

23          I am not going to address the objections until I hear

24   them.  I think we have addressed everything that's been raised.

25   What I can say about objections is, given the law of

CAB8KRIC

1    objections, it's very clear that objections that are "I want

2    more" aren't really objections.  Objections that you could have

3    gotten more, without some evidence that there was more to be

4    gotten, simply don't work.

5           On the question of ability to pay, which is one of the

6    *Grinnell* factors, we covered it extensively in our supplemental

7    brief and Mr. Hammerslough covered it extensively in his.  The

8    fact of the matter is the company made a significant

9    contribution to the settlement, quickly disclosed it because it

10   was material enough that they had to immediately disclose it.

11   We got most of the insurance coverage that was available.  The

12   insurance coverage was a wasting asset and the individual

13   defendants were required to agree to the settlement in order

14   for the directors' and officers' insurance policies, which are

15   the lion's share of the recovery here, to pay out.  These are

16   not Bill Gates who founded E*TRADE.  These are professional

17   managers who got salaries and stock options and that kind of

18   thing and to jeopardize a $79 million cash settlement to

19   extract punishment in some small amount from individual

20   defendants, as the cases talk about, makes no sense.  That's

21   not good judgment on behalf of class counsel.

22          Finally, with respect to the settlement, I will stop

23   there.  I had something else in mind, but it's not important.

24          THE COURT:  I do feel pretty comfortable with the

25   *Grinnell* factors.

CAB8KRIC

1          MR. BROWER:  I remember.  Collusion, lack of

2     collusion.  The settlements have to be procedurally fair and

3     they have to be substantively fair.  The *Grinnell* factors cover

4     substantive fairness.  Procedurally, your Honor, this was a

5     hard-fought negotiation.  There is no collusion.  It's

6     nonsense.  It's frankly insulting, and maybe it started

7     permeating out of our papers as much as we tried to tone it

8     down.  It's nonsense.  Defense counsel is here and is happy to

9     discuss it, E*TRADE representatives are here, and you have a

10    declaration from probably the leading mediator of securities

11    cases in the country, former Judge Layn Phillips, who oversaw

12    these negotiations, and he outright rejects any concept that

13    there was collusion between plaintiffs and defendants.

14    Frankly, Ms. Starr and I who respect each other continue to

15    fight over stuff to this day, and we fought all the way through

16    this.  So there was no collusion, not a hint of it, and there

17    is no evidence to the contrary.

18          I would like to point out none of the objectors

19    adduced any evidence of anything in the face of sworn

20    declarations from everyone supporting plaintiffs' position.

21          THE COURT:  OK.

22          MR. BROWER:  I will turn it to the objectors.

23          THE COURT:  I think we will turn it over to the

24    objectors.

25          MR. BROWER:  There are no objections to the plan of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CAB8KRIC

 1   allocation.  There is no timely objection.  It meets all the

 2   requirements.  It's fair, reasonable and adequate.

 3            THE COURT:  The Ventris objection relates to the way

 4   fees are taken out.

 5            MR. BROWER:  Correct.

 6            THE COURT:  That's now been addressed.

 7            MR. BROWER:  As our explanation explained, Mr. Stark's

 8   colleague Mr. Felblock, who is the person who signed the

 9   objection on behalf of the Ventris family, we listened to his

10   objection.  We learned about your Honor's decision, and it's

11   now a couple weeks ago, in another case, where the structure

12   was sort of an all-in payment to the plaintiffs' lawyers.  It

13   was a different kind of case than this is, and these kinds of

14   cases are typically are fees plus expenses, but we looked at

15   your Honor's decision, we listened to the arguments, we looked

16   at the totality of the situation, and we restructured the fees.

17   It's approximately $555,000 in expenses.  We are going to take

18   that off the top.  That will reduce the gross settlement fund

19   by that amount.  And then we are asking for the fees as

20   one-third of what is left of the balance.  I gather that's

21   satisfactory to Mr. Ventris and his counsel, and he is here to

22   say yes or no.

23            MS. STARR:  If defendants could be heard very briefly.

24            THE COURT:  Sure.

25            MR. BROWER:  I would like to speak to fees after the

CAB8KRIC

1    objectors are heard.

2            THE COURT:  Sure.

3            MS. STARR:  Amelia Starr for E*TRADE from Davis Polk.

4            We are only speaking to the fairness of the

5    settlement.  Obviously, we have no role to play in connection

6    with fees or the plan of allocation.

7            THE COURT:  You all agreed not to object to a certain

8    percentage I guess.

9            MS. STARR:  That's correct, your Honor.

10           So with respect to the settlement, defendants agree,

11   we believe that the settlement is fair, reasonable and

12   adequate.  It indeed was the product of a very hard-fought

13   litigation and a very hard-fought negotiation.  We put in a

14   very brief submission that any suggestion of collusion here,

15   improper behavior, kickbacks, is absolutely untrue.  Counsel

16   behaved in a professional manner and both strongly advocated

17   for their client.

18           While my client does not make any admission of

19   liability, and indeed continues to maintain that we did nothing

20   wrong and there were no violations of the securities laws here,

21   it nonetheless was determined to be in my client's best

22   interests to settle the case in order to avoid all the various

23   inconveniences and risks that go with litigation.  So we would

24   ask your Honor to approve the settlement as fair and

25   reasonable.

CAB8KRIC

```
 1              I would like to just point out the question of the
 2    reasonableness and fairness of the settlement is a separate
 3    question from the fee question and the plan of allocation.  So
 4    if your Honor is inclined to approve the settlement, but
 5    perhaps has other questions about the other issues, your Honor
 6    would be empowered to approve the settlement and then put over
 7    the fee issue for another day.
 8              THE COURT:  The plan of allocation is part of the
 9    settlement.
10              MS. STARR:  The plan of allocation is separate from
11    the settlement.  The Court could approve the settlement as fair
12    and, for example, reject the plan of allocation and require a
13    new one to be submitted, as well as the fees.
14              THE COURT:  Right.  The settlement being basically the
15    total amount.
16              MS. STARR:  That's correct.
17              THE COURT:  Understood.  OK.
18              MS. STARR:  Thank you, your Honor.
19              THE COURT:  Thank you, Ms. Starr.
20              I guess I would like to hear from any of the
21    objectors.  Who wants to go first?
22              MR. KUZNICKI:  My name is Daniel Kuznicki.  I am
23    speaking on behalf of the objector Leon Behar who is
24    represented by our firm Leon Behar P.C.
25              THE COURT:  Is it a law firm?
```

CAB8KRIC

1          MR. KUZNICKI:  Yes.

2          Under Federal Rules of Civil Procedure, under Rule 23,

3     class counsel basically has a duty to fairly and adequately

4     represent the interest of the class.  And one of the things

5     that concerns us, or concerns my client, is when you read the

6     materials, when you read the declarations, when you even listen

7     to the oral argument of class counsel, you hear a lot of things

8     that are just going towards why getting this done makes sense,

9     but he never even acknowledged the strength of his case, he

10    never even identified the fact that there's some serious

11    substantial harms perpetrated against the class.

12         In fact, he gave three key points as to why the

13    settlement should go through and be approved:  Because of the

14    difficulty, because of the complexity, and because of the

15    duration.  Those three key points, which constantly find

16    themselves throughout all the papers that were filed in support

17    of the settlement, are not really things that would be the

18    concern of any plaintiff.  A plaintiff is not concerned about

19    the duration or the complexity or difficulty when he is looking

20    at a settlement that's akin to a bankruptcy settlement.  Taking

21    a couple of cents on the dollar, after losing hundreds of

22    thousands of dollars based on defendants' wrongful conduct, is

23    something that a counsel would espouse, an attorney who wants

24    his fees, who is very happy with the substantial amount of

25    those fees, would advocate and say, look, we don't want to

CAB8KRIC

1    fight any longer, or we don't want to take a chance that we

2    won't get anything, and we don't want to output any more

3    expenses.

4            THE COURT:  Considering risk, you're factoring in

5    various things.  There is a risk that the Supreme Court decides

6    a 10b-5 case.  That brings it down to maybe 60 percent.  Then

7    there is risk that you lose on loss causation.  It brings it

8    down to 40 percent.  Then there is a risk that you lose on

9    scienter.  There are all these things that cut down the

10   likelihood that you're actually going to get 100 cents on the

11   dollar.  Then there is the fact that it gets tied up in another

12   two years of litigation, and then two years of appeal.  And

13   then you have to factor in the time, value and money; you don't

14   get anything for six years.  And when you all come down to it,

15   the determination is whether the plaintiffs' counsel, as a

16   fiduciary, is reasonably making an assessment of sort what is

17   good enough, after factoring in all of those risks, delays,

18   etc.

19           MR. KUZNICKI:  Absolutely.

20           THE COURT:  They are not saying they have no case.

21           MR. KUZNICKI:  What I am suggesting is slightly

22   different.  I am suggesting that class counsel's expert, Mr.

23   Hammerslough, when you review his damage assessment, which was

24   prepared, by the way, once the settlement was on the table,

25   rings of an analysis that's really, instead of highlighting a

CAB8KRIC

1    case in light of the allegations, in light of the motion to

2    dismiss that was denied, and in light of the actual damages, it

3    rings of a very, very conservative estimate that's really set

4    forth to foster the settlement.  If this settlement was denied

5    and class counsel didn't have this option, the story would be

6    very different.  If it had to justify its case again, without

7    the possibility of pocketing money in the immediate future, it

8    would sound very, very different.

9            In fact, there's other things that smack of

10   insincerity and disingenuity, which is really what concerns us.

11   Class counsel says that when it took the depositions, it was

12   totally acceptable.  There is actually already this precedent

13   in other cases that party depositions can be conducted even

14   once a settlement is reached just as confirmatory.  And he says

15   we would be honor-bound and have a fiduciary duty to reject the

16   settlement if we found out anything else.

17           The truth is is that it wasn't confirmatory.  There

18   was nothing learned or they were looking to learn in those

19   depositions.  In fact, if you look at the points that were

20   highlighted, they are a mockery.  They didn't know which

21   specific loans were being approved, and they were reviewing one

22   percent of them.  These are directors and officers.  Of course

23   they weren't reviewing them.  And for class counsel to put that

24   in his highlighting of what they would use as a defense is

25   selecting the weakest of their points and pretending that any

CAB8KRIC

1   court would give any credibility to it, which is kind of a

2   joke, and it's also really disrespectful to the class.

3           In fact, when you talk about actually honor-bound and

4   fiduciary, that's exactly what the E*TRADE directors and

5   officers had.  They were honor-bound, they had a fiduciary

6   duty, and they breached that.  And they didn't care, because

7   when somebody has the opportunity to make substantial amounts

8   of money in the immediate future, we kind of hesitate or we

9   scrutinize their activities to a much higher regard.  So just

10  relying on the fact of trust and honor, I have no doubt that

11  class counsel is a very, very good attorney, that he pursued

12  this very diligently up and to a point, but up and to the point

13  where his interests became adverse to the class.

14          Actually, as an aside, the objectors that it is

15  determined that they lack standing, we would like to

16  incorporate their objections into our own so they remain

17  relevant because we agree with much of the content that was

18  contained within those objections.

19          Another indication that I believe demonstrates that

20  class counsel is not fully pushing for the interests of the

21  class is his opening statement today, and even his opening

22  statement in a supplemental declaration.  He says your Honor

23  should consider the fact that it was a very small percentage of

24  opt outs, a very small percentage of objectors.  How many

25  objectors typically show up at a fairness hearing?  What

CAB8KRIC

percentage is normal for any securities litigation?  There is

no indication that it even matters.

          Furthermore, approval from silence isn't approval.

How many times have any of us received a notice of settlement

in the mail, what are you going to do?  You're getting pennies

on the dollar.  The reason why it's certified as a class

because it's inefficient for individuals to pursue it

themselves.  So they just have to rely on class counsel's

responsibility in keeping within the federal rules.

          The real issue here is, basically, and I know that

class counsel pointed out that saying we want more money is not

sufficient, but it's not that the class just wants more money.

It's that the class has lost hundreds of millions, if not

billions, and the only person who stands or the only group that

stands to reap the benefits at the moment is defendants and

class counsel.

          Further evidence of disingenuity is the fact that

class counsel discussed that the instruments that we are

dealing with are not understood by anybody.  E*TRADE themselves

are involved in highly complex, all the current litigation

that's going on right now in light of the financial collapse in

2008.  It does not mitigate the fact that E*TRADE represented

that it was not involved in the subprime loans.  It does not

mitigate the fact that there was misinformation or there was

material information that they disclosed internally, that has

CAB8KRIC

been actually presented to the Court, that we know they

presented information relating to their own directors and

officers, and they withheld that information for many months.

           The fact that there was an industrywide collapse is

not relevant to the fact that they were not supposed to be

involved in that industry.  They were actually not part of that

industry.  If you want to discount the fact that the market

itself went down 50 percent or find a proper discount, that's

one thing.  But to just pretend that they were otherwise

susceptible to the bulk of the damages that were sustained is

really just disingenuous.

           Further evidence of disingenuity is class counsel

filed a supplementary declaration yesterday.  In that

declaration class counsel says that it was compelled to file it

because there were subsequent objections that were not timely

filed and felt the need to respond.  In fact, it highlights the

Liles objection, which it says wasn't going to get before the

Court anyway, and Mr. Liles should not have filed it because

Mr. Liles must think that the rules don't apply to him.  So

class counsel took it upon itself to bring it before the Court

and then use it as a straw man to further introduce material

that it was not allowed to introduce.  It was beyond October 4.

If class counsel wished to say further information, it should

have made a motion to the Court to ask if it could file any

supplementary papers.

CAB8KRIC

1          To get to the issue of collusion.  Nobody doubts or

2     nobody really entertains that plaintiffs' and defendants'

3     counsel would have ever had a side deal in this case.  Nobody

4     thinks that there is literal collusion.  The issue, again, is

5     the conflict of interest that came up.  The issue that comes

6     about in this instance is that defendants' counsel and class

7     counsel, at a certain point, when it was getting close to a

8     settlement, their interest aligned as opposed to being

9     adversarial.  And that's what smacks throughout all these

10    papers.  Throughout all these arguments you get the point where

11    instead of representing the class, class counsel began to

12    represent themselves, and by doing so, they are incidentally

13    representing the interests of the defendants.

14         To get to the heart of our objection, aside from

15    everything that was just said, according to the rules, class

16    counsel is responsible for providing us with a figure of an

17    average price per share recovery.  The average price per share

18    recovery being 14-1/2 cents.  Class counsel also provided us

19    with figures of how many shares involved the approximate damage

20    shares.  Yet when we do the math and we start putting together

21    the approximate or the estimated amount of damage shares, and

22    we multiply it by the average figure, we are told that we are

23    mixing apples and oranges.  If we can't use their figure, which

24    is the average recovery that they are telling us we should

25    expect -- and granted, I understand what an average is.  You

CAB8KRIC

1    have to take diverse numbers, you have to combine them, and

2    then divide it by the amount of numbers that participated.  It

3    doesn't mean that any one individual is getting that amount.

4    But that's the whole idea of an average.  You should be able to

5    take the average amount and multiply it by the amount of shares

6    and see how it works out.

7         To try to argue that we are missing the boat by doing

8    that is further evidence of the insincerity.  I mean, don't say

9    that you put that figure there because the federal rules

10   require you to include it to give the class a sense of what the

11   expected damages or the recovered damages will be, and then

12   say, but it doesn't mean anything, we can't rely on that

13   figure, in fact, we have to start playing statistics one way or

14   another.  Statistics are a very funny thing.  They are kind of

15   like scripture.  Anyone can quote them to make them anything

16   that they want, especially with attorneys, we are not

17   mathematicians.  The problem is to do it at the expense of the

18   class is unacceptable.  To start out by telling me that one

19   fraction of one percent objected and that means something, to

20   tell me that one fraction of one percent abstained or withdrew

21   from it, that means something, it just shows that we are trying

22   to pull a fast one over the class, we are trying to pull a fast

23   one over the Court, and get them to kind of yield and say,

24   those numbers, that sounds compelling.

25         But what is not compelling is that we are basically

CAB8KRIC

1     cowering.  It's in the best interests of the class to proceed

2     to trial.  It's in the best interests of the class to finish

3     discovery, finish factual discovery, to actually look into the

4     full scope of liability and the potential damages and not have

5     it by a partial expert, again, whose credentials aren't

6     impeachable.  But, nevertheless, it's the timing.  It is when

7     we are bringing that person in to ask him to evaluate what the

8     potential damages are and whose interests is he serving?

9              When a drug company sponsors a study to determine the

10    efficacy of one of their drugs, we don't trust the results.  We

11    don't trust that, if they say it's good, it must be good, they

12    must be impartial.  Whether or not you can show me precedent

13    that it's acceptable or other courts have accepted it doesn't

14    change the fact that it demands further scrutiny, it demands

15    further investigation.  The fact that the numbers are being

16    played around just to serve their concern demands further

17    scrutiny.  And it is our position, and I think it's evident

18    from the content of the objections, it's evident from the

19    behavior of counsel, that this settlement should be rejected

20    and further investigation and further determination is

21    required.

22              THE COURT:  Thank you.

23              MR. BROWER:  Could I respond to these things?

24              THE COURT:  I was thinking of doing all the objections

25    and then respond together.

CAB8KRIC

1          MR. BROWER:  I think it would be easier if I --

2          MR. KUZNICKI:  One last thing.

3          THE COURT:  Sure.

4          MR. KUZNICKI:  With respect to attorneys' fees, the

5     question of fairness or legitimate percentages cannot be

6     addressed without first addressing the fairness and the

7     legitimacy of the actual settlement and how much work they did.

8     No one ever told us what the initial settlement figures were

9     when they were rejected.  When the parties went into mediation

10    at the behest of the court, and their proposals, this is all

11    confidential.  In fact, the judge that gave us an affirmation,

12    who basically said that the parties acted in good faith, even

13    told us that all of that information is privileged and

14    confidential and it's not going to be released.  But we don't

15    even know what the starting point of the negotiations was.  We

16    don't know whether there was actually any movement forward or

17    there was any progress made or that class counsel has done any

18    favor to the parties.  All we know is, in light of the damages,

19    at this point they are content and they know they can't get any

20    better without having to go any further.

21          With that, we also firmly reject to the proposed

22    attorneys' fees.

23          THE COURT:  Thank you.

24          MR. BROWER:  I think it would be easier to do it point

25    by point before the points get lost in the air.

CAB8KRIC

1          Let me start with, he said some courts have done this.

2     Every court has done this.  It's what the Federal Rules of

3     Civil Procedure and every decision under the class action rules

4     require.  That's what we are doing here right now.

5          He complains that we spent time in our brief on

6     analyzing the complexity, duration and expense of the case.  I

7     don't sit on the Second Circuit.  The Second Circuit requires

8     that the factors be considered.  That's *Grinnell* factor number

9     one.  If Mr. Behar doesn't like it, he should take it up with

10    Congress.  Of course we have to analyze those issues.  We

11    thought we fairly analyzed those issues.  We laid out facts

12    with declarations, facts.

13         The same is true for the risks of litigation.  They

14    are two of the *Grinnell* factors.  Again, we just showed that

15    the standard for approval of the settlement is met here.  Mr.

16    Behar doesn't like the standard.  It is what it is.

17         He says, how many objectors ever object to

18    settlements?  I point your Honor to footnote number 12 in the

19    objection response on page 9.  There are cases where 15 percent

20    of the class has objected, 15 percent.  There are cases where

21    half the class has objected to settlements.  We have a long

22    footnote with a lot more objectors than we have here, and the

23    cases that preceded in the brief explain, where you have

24    objections like this, of this nature, in the number that are

25    presented here, that the de minimis amount of them by

CAB8KRIC

1    themselves show the settlement is fair, reasonable and

2    adequate.

3            I might add this is a class that as Mr. Hammerslough,

4    who is now an undisputed expert according to Mr. Behar's

5    associate, has told the Court, there is 83 percent -- I forget

6    the number -- there is a huge institutional holding in this

7    company.  That's true.  When this case was first filed and

8    there was a contest for lead counsel and lead plaintiff in the

9    case, two state pension plans came forward to seek to be lead

10   plaintiff in this case, Mississippi and Ohio.  What happened is

11   they lost.  They didn't have as large of losses as our clients

12   who are the lead plaintiffs, but they still had tens upon tens

13   of millions in losses.  You will notice they have not opted out

14   nor have they objected to the settlement.

15           What it tells you is that sophisticated institutions

16   that are often participants in securities class actions, and

17   both Ohio and Mississippi are often the lead plaintiff in

18   securities class actions these days, have stead quiet to this

19   one, which suggests that they perfectly approve of it, and we

20   will be filing their claims along with other class members.

21   The institutional nature of the class here, the large

22   institutional nature alone tells you there is nothing wrong

23   with it.

24           He mentions that I said you can walk away from the

25   settlement.  I meant to say there is a case called *M/A-COM*

CAB8KRIC

1     several years ago in the District of Massachusetts?  It's a

2     case where we blew a settlement because something came up after

3     the stipulation of settlement was signed, and we went to the

4     court and said we can no longer recommend it, and we walked

5     away from the settlement.  So it does happen.  It's not that

6     the confirmatory discovery wasn't serious.  And of course the

7     case law supports us on this.

8          He tells us what the class wants.  Well, apparently

9     99.99998 percent of the class has nothing to say about the

10    settlement other than to submit over 300 million shares worth

11    of claims so far with a month left to go on the claims period.

12         Mr. Hammerslough was retained, as his supplemental

13    declaration indicates, before the mediation of the settlement

14    to assist plaintiffs' counsel with damages and negotiation with

15    defense counsel.  So the idea that he did this solely for the

16    purpose of the settlement papers just isn't true.  He had been

17    involved much, much longer, including before any number was put

18    on the table.

19         Let me wrap up with the 0.145 on the cover of the

20    notice versus the 14.1 percent.  Simply, they are different

21    numbers.  I can't help what Congress did.  I don't know what

22    they were thinking when they decided what should be on the

23    cover of the notice.  But what they did, and I have my

24    well-worn PSLRA with a paperclip holding it together, the PSLRA

25    requires three things be disclosed in connection with a

CAB8KRIC

1   settlement, and I am referring to 78u-4(e)(7), disclosure of

2   the settlement terms to class members.  Then it says, in any

3   proposed final settlement or partial settlement published, you

4   shall put on the cover of the notice -- which I have a copy of

5   the notice in my hand.  The information they want listed

6   actually takes up more than one page these days if you want it

7   in a print somebody can read.  It says (a) statement of

8   plaintiffs' recovery, the amount of the settlement proposed to

9   be distributed to the parties to the action determined in the

10  aggregate and on an average per share basis.

11          So you have the aggregate, $79 million.  Then you have

12  to take what that amount is as an average on a per share basis.

13  That's not a damage number by any stretch of the imagination.

14  And if somebody advising the committee in Congress that wrote

15  this statute thought that was going to tell class members what

16  their damages were or what their actual recovery would be was

17  deeply misled and should have had a plaintiff's lawyer sitting

18  there to advise them.

19          Let's look at what the notice provided with respect to

20  that.  Statement of plaintiffs' recovery.  It goes on to say

21  that 79 million.  Second sentence, based on plaintiffs'

22  counsel's estimate of the number of shares of stock that may

23  have been damaged by the alleged fraud, and assuming that all

24  of those shares participate in the settlement, plaintiffs

25  estimate that the average recovery would be approximately 0.145

CAB8KRIC

 1    cents per share.  It goes on to say, the recovery from the

 2    fund, however, will depend on a number of variables, including

 3    the number of shares of E*TRADE securities you purchased, the

 4    timing of your purchase or sales, the number and amount of

 5    claims actually filed, and the estimate of recoverable losses

 6    based on the analysis of plaintiffs' damages consultant.

 7    Please look at the plan of allocation is the next sentence.

 8              I don't know what else you can tell people.

 9              Then what Congress did, just to make it absolutely

10    clear that the cover number is not your damages number, the

11    next thing Congress tells you to do is statement of outcome of

12    the case, next paragraph.  If the settlement parties agree on

13    the average amount of damages per share.  Now Congress used the

14    damages.  The statement of average per share recovery never

15    uses the word damages.  The next paragraph now says, if there

16    is agreement on the amount of damages, disclose the agreement.

17    If there is no agreement on the amount of damages, describe the

18    disagreement.  But it doesn't say describe who thinks how much

19    and what.  And believe me, if Congress wanted to, they knew how

20    to say put both parties' sides in here.

21              THE COURT:  This goes to your response to Liles.

22              MR. BROWER:  No.  Mr. Behar was complaining about the

23    14 cents on the cover, and somehow it's not right, and somehow

24    we are playing musical chairs in the brief between what happens

25    to just be a coincidence here, that the average per share --

CAB8KRIC

1    which, by the way, is a lot more shares than Mr. Hammerslough

2    used for doing damages, and I will touch on that in one

3    minute -- that the average per share that the settlement

4    represents, which is what the cover number requires, has

5    nothing whatsoever to do with what percentage class members

6    will receive of the maximum recoverable damages that plaintiffs

7    believe they can recover at trial.  They are two different

8    numbers.  I have been on a lot of cases where those numbers are

9    enormously divergent.  Here it happens to be .145 and 14.1.  It

10   happens to be very close.  It's a coincidence.  It's a

11   mathematical coincidence.  Those numbers often have no relation

12   to each other.

13          Here is the reason why.  The purpose of this provision

14   was to tell people the settlement sticks.  There is no

15   question.  If you look at the legislative history, Congress

16   wanted this disclosure in order to drum up objections so that

17   you show how little the settlement is that people will be

18   getting, the kind of thing Mr. Behar's associate keeps saying.

19   It's little pennies on the dollar.  They wanted you to tell the

20   class it's pennies on the dollar so class members would take

21   action.

22          In order to live up to the spirit of it, what Mr.

23   Hammerslough did is not just take the 310 million holder

24   shares, but Mr. Hammerslough double counted shares that changed

25   hands after each of the partial disclosures.  Because the same

CAB8KRIC

1    share could have changed hands four times and had been damaged

2    four separate times.  So, for instance, you own the share up to

3    the first disclosure in July, you get damaged a little.  You

4    sell it.  You don't have $1.96 in damage, you have 17 cents in

5    damage, but you sell the share.  You sell the share, someone

6    new buys the share.  He holds it till the next disclosure in

7    August.  He now gets hit for another 35 cents a share,

8    different 35 cents.  He still doesn't get $1.96 unless he holds

9    it to the end.

10          Mr. Hammerslough counted every time that share got hit

11   and added it to the 310 million, which resulted in the cover

12   number going way down and showing people it's a very small

13   number.  The reason he did that is to be in the spirit and be

14   very conservative in terms of telling people how much they will

15   recover, because as we showed you in the papers, if he used the

16   310, it would be 24 cents on the dollar.  It would have been an

17   average of 24 cents, which would have been truly misleading

18   because no one is likely to get 24 cents, none of our estimates

19   show that; it would be very unlikely, particularly as the

20   claims are coming in exactly as Mr. Hammerslough explained.

21          Obviously, the attorneys' fees argument is simply the

22   minute plaintiffs' counsel reach a settlement and work hard on

23   the case, they are in conflict with the class because they

24   might want to be paid for it.  The Supreme Court got rid of

25   that in *Railroad v. Ticonic* and *Pettus*, *Boeing v. van Gemert*.

CAB8KRIC

This issue has been dealt with a thousand times.  Plaintiffs'
counsel are entitled to be reasonably compensated for getting a
settlement.

There was one other point he made and I just want to
touch it.

The thing about the depositions.  He concedes that
apparently Mr. Caplan and Mr. Webb would not know if the loans
were no good.  He has no evidence of any of the things he said
about what Mr. Caplan and Mr. Webb or anybody at E*TRADE did.
He has no evidence whatsoever, and he certainly hasn't
proffered any.  But the fact of the matter is under the Supreme
Court's decision *Janus*, we had better have gotten something out
of people like Mr. Caplan or Mr. Webb because only speakers can
be sued and only people who control the company statements can
be sued.  So the bookkeeper in the back room, who may know
something is going on and isn't sharing it with the executives
who actually sign the 10-Ks or approve their issuance, you
don't have a 10b-5 claim anymore under *Janus*.

THE COURT:  You're also suing the company itself.

MR. BROWER:  Yes.  But in order to sue the company,
under Second Circuit law and Supreme Court law, you must pin on
the individual who had power over the statements of the
company.  It's not good enough to have the accountant
downstairs in the basement, who is scratching his head and he
thinks something is wrong, unless he runs upstairs and passes

CAB8KRIC

 1   that information up to an executive, because the law requires

 2   someone who controls the company's statements had to know an

 3   act with scienter, not simply somewhere in the company there

 4   was a memo that was written by some low level guy that nobody

 5   ever saw.  It's not good enough anymore, and I'm not sure it

 6   was ever good enough.

 7        Finally, the idea that he apparently has offered his

 8   representation to all the other pro se objectors, people who

 9   aren't here, I have never seen that before.  It's very

10   interesting.  I doubt they have retainer agreements as required

11   by New York law.  I don't think it's really effective.  But

12   your Honor will make that decision.  More importantly, I guess,

13   your Honor, he is offering to represent them because as a

14   matter of law, even when you use your own associate to

15   represent you in an objection, the law is very clear you can't

16   get paid for it.

17        THE COURT:  He is not offering to represent them.  He

18   is just adopting their objections.

19        MR. BROWER:  I understand.  I don't think you can do

20   that at the hearing.

21        THE COURT:  Since they don't have standing, and they

22   filed objections, I think the objections don't exist and there

23   is nothing to adopt.  If he comes in today, I guess you can

24   argue it's an untimely objection because he is now

25   retroactively adopting it.

CAB8KRIC

1          MR. BROWER:  By the way, being criticized for giving

2     your Honor a supplemental pleading that didn't make it to the

3     ECF because Mr. Liles didn't file it on the ECF, if he had

4     filed it with the pro se office, it will probably show up on

5     the ECF three or four days or a week from now.  That's how it

6     works down there.  We thought your Honor was entitled to see

7     everything these people had to say.

8          THE COURT:  OK.  Did you want to respond to something?

9     We have got to move on though so I will just give you a couple

10    of minutes.

11         MR. KUZNICKI:  I think it should be quite evident that

12    class counsel has basically just misstated much of my message,

13    that I offered to represent the entire class or all the

14    objectors by adopting their statement, yet he conceded that he

15    knew that is not what I meant.

16         Then he goes on to say that Mr. Hammerslough gave a

17    very conservative estimate of the plaintiffs' recovery per

18    share by offering an average of 14-1/2 cents per share, and he

19    was just being very conservative in the spirit of the rules.

20    Yet he said, if he had given the real number, 24, 25 cents,

21    that wouldn't have been correct because it wouldn't have been

22    anywhere close to what the recovery will actually be.  So which

23    one is it?  Is his expert being extremely conservative or is

24    his expert selecting the proper number?  To call it

25    conservative, yet say you couldn't offer another number because

CAB8KRIC

1   it would have been misleading and deceptive is smoke and

2   mirrors.

3          Mr. Behar's objection that I put forward never, ever

4   compared the 14.1 percent, which class counsel is saying they

5   are recovering, and the .145 or 14-1/2 cents per share.  That

6   was never put in there.  It's again smoke and mirrors.  It's

7   here to misdirect you and confuse you.  The point was very,

8   very simple.  14-1/2 cents per share being the average, $1.96

9   being the expert total compensable damages.  Just look at that.

10  $1.96 per share, 14-1/2 cents per share recovery.  Is that

11  14-1/2 percent?  No, it's actually half of that approximately.

12         Further evidence of the disingenuity, class counsel

13  says that I am misunderstanding or believing that the cover

14  number that he had to put here based on federal rules is not

15  the damages number.  Whoever argued it was the damages number?

16  If anything, you would argue that I am misunderstanding it as

17  the recovery number, but certainly not the damages number.  And

18  he just kept saying it to show how far-fetched my understanding

19  and comprehension of the facts are.

20         The Hammerslough declaration, again, further evidence,

21  I didn't say he wasn't retained early on.  I said that the

22  declaration was offered and crafted to buttress his arguments.

23  To respond and say, we hired Mr. Hammerslough early on in the

24  proceedings, neither was alleged or asserted by objector's

25  counsel, it's all misdirection.  The fact that it keeps coming

CAB8KRIC

```
 1    up, to try to couch things one way and then admit to sort of
 2    know that it's not what it means, but it's just for the art of
 3    litigation, that's totally unacceptable, and it really calls
 4    into question class counsel's intentions.
 5              THE COURT:  Thank you.
 6              Counsel for Mr. Ventris, for the Ventris family, do
 7    you want to put anything on the record?
 8              MR. STARK:  The only thing I would like to put on the
 9    record is that we agree with Mr. Brower's rendition of the
10    situation and how it is rectified by lead class counsel.
11              THE COURT:  So based on that, is it fair to say that
12    objection is withdrawn?
13              MR. STARK:  Yes, it is.
14              THE COURT:  Thank you.
15              The Liles objection, no one is here on the Liles
16    objection, right?
17              Mr. Andrews is here.  I do have your submission.  Is
18    there anything you wanted to add to that today?
19              MR. ANDREWS:  10 seconds, please.
20              THE COURT:  Sure.
21              MR. STARK:  May I have a second to confer with Mr.
22    Brower?
23              THE COURT:  Sure.
24              MR. ANDREWS:  Good afternoon, Judge.
25              THE COURT:  Good afternoon.
```

CAB8KRIC

1            MR. ANDREWS:  It seems there is a conflict with me

2      here today.  I don't have standing, which is the only thing Mr.

3      Brower got right in this whole fee submission.

4            THE COURT:  So you agree you don't have standing.

5            MR. ANDREWS:  I may not have standing, but that's what

6      he says.

7            THE COURT:  Do you have standing?

8            MR. ANDREWS:  I don't know.  You're the judge.

9            THE COURT:  Apparently, you purchased the relevant

10     securities and sold them in the same day and made a profit.

11           MR. ANDREWS:  Correct.

12           THE COURT:  So you're not injured by any of the

13     challenged conduct, is that fair to say.

14           MR. ANDREWS:  I said that I incurred commissions, and

15     I thought maybe they should be included.  And that's something

16     you have to rule on.  If the plan of allocation isn't correct,

17     then you might say, we are going to change the allocation, add

18     this, this and this.

19           THE COURT:  If you were not injured, you didn't lose

20     any money based on the alleged misrepresentations, I don't

21     think you have standing as a matter of law.

22           MR. ANDREWS:  OK.  So anything I say or wrote in my

23     objection can't be used in your decision.

24           THE COURT:  Technically you don't have standing to

25     object.  I did read it.

CAB8KRIC

1          MR. ANDREWS:  So anything I say today won't really

2     have an impact on your decision one way or the other.

3          THE COURT:  If you don't have standing, then that's

4     right.

5          MR. ANDREWS:  I am requesting that my objection not be

6     incorporated into Mr. Behar's objection in any way, shape or

7     form.

8          THE COURT:  OK.

9          MR. ANDREWS:  Period.  Under no circumstances.

10          I got dragged down here thinking I am going to be an

11     expert for them, and they obviously don't need me, and I am not

12     giving them the information for free that can contradict Mr.

13     Brower that this settlement is not fair.  If I even give you

14     the information verbally, you can't even use it.  So the

15     question is, why would I even give it out?  I'd rather see Mr.

16     Brower get $26 million than see Mr. Behar get another penny of

17     his loss.

18          THE COURT:  OK.

19          MR. ANDREWS:  I don't appreciate being dragged 600

20     miles for nothing.

21          MR. KUZNICKI:  For the record, class counsel actually

22     has submitted e-mails in his supplemental declaration where Mr.

23     Behar basically disclaimed any association.  There is no

24     agreement or anything to that effect requesting Mr. Andrews'

25     production.

CAB8KRIC

1          THE COURT:  It is what it is.  My understanding of the

2     law is that Mr. Andrews does not have standing because he

3     wasn't actually injured by the relevant conduct and he wouldn't

4     have standing to make an objection.  In any event, in the event

5     that I would consider those objections, I would not find merit

6     to the objections.

7          Any other objections?

8          MR. KAGEN:  Not an objection.  Stuart Kagen for the

9     Tate plaintiffs.

10          THE COURT:  So this is the stayed action?

11          MR. KAGEN:  Yes.

12          MR. BROWER:  Could I give your Honor just two seconds?

13     You came to the case late.  What happened is after the lead

14     plaintiff proceedings were over, and they took some time

15     because Ohio --

16          THE COURT:  It was with Judge Sweet.

17          MR. BROWER:  There were big fights over that one

18     between the institutions.  The Tate plaintiffs filed a separate

19     action.

20          THE COURT:  Right.

21          MR. BROWER:  An order got issued somehow consolidating

22     the cases for all purposes.  It shouldn't have and Judge Sweet

23     pulled it back.  And a new order was entered that basically

24     stayed their case.  And the purpose of it, since it was drafted

25     by plaintiffs and defendants, the purpose of it was to

CAB8KRIC

1    essentially stay that case, put it to the side until the class

2    action was resolved.  At that point, the Tate plaintiffs would

3    have the option of opting out or participating in whatever

4    settlement or verdict occurred.  And the Tate plaintiffs, for

5    the record, the two plaintiffs did indeed opt out, did timely

6    and properly opt out.

7            THE COURT:  So they have opted out.

8            MR. BROWER:  They have indeed opted out.  The concern

9    is, because of the consolidation order, a dismissal of the

10   action under the main civ number would inadvertently dismiss

11   the Tate complaint.

12           THE COURT:  In any event, if they have opted out --

13           MR. KAGEN:  Just to be specific about the matter, that

14   is correct, when Judge Sweet had the matter, he consolidated

15   the Tate action with the main class action and stayed it,

16   actually, according to the order, pending the class

17   certification determination.  The reason we are here today is

18   because determination is ongoing.  It was stipulated and agreed

19   to by all sides and so ordered by the court.  There was no

20   proceeding left in place for the resolution of the matter post

21   the certification of the class.

22           So I am here on behalf of the Tate plaintiffs for two

23   reasons.  First, we have conferred, I believe, with counsel for

24   both plaintiffs and defendants and have agreement with them, I

25   believe, that they agree that our case should not be stayed

CAB8KRIC

```
 1    post successful certification of this class, should that be the
 2    order and decision of this Court.
 3            THE COURT:  Your clients are just individuals, right?
 4            MR. KAGEN:  Yes.
 5            THE COURT:  They would be part of the class but for
 6    the opt out.
 7            MR. KAGEN:  Yes.  They individually sued and they
 8    properly opted out.  In addition, as I mentioned, Judge Sweet
 9    previously ordered it stayed and there is no statement about
10    lifting the stay post certification of the class.  So we just
11    want to be sure, and we have had stipulations from all counsel,
12    that our case should no longer be stayed.  We don't have to
13    move or request court relief officially.  We have agreement.
14    We would like the Court to note that that is our position,
15    perhaps so order it, so there is no question that our case can
16    proceed and that the stay is lifted, assuming that class
17    certification is ordered by the Court.
18            THE COURT:  And there is no objection by plaintiffs or
19    defendants?
20            MR. KAGEN:  We have conferred.
21            MS. STARR:  Assuming the settlement is approved and
22    becomes final, either upon expiration of the time to appeal or
23    the end of all appeals, we would agree that Mr. Tate could
24    pursue his action individually.  He has properly opted out.
25            THE COURT:  OK.  That makes sense.  I had forgotten
```

CAB8KRIC

1    about the stayed action, but I do vaguely recall it now.

2    Regardless of whether it was consolidated or not, it appears

3    that it wasn't meant to be consolidated in the sense of being

4    dismissed in the way that the main action is dismissed, and I

5    agree that it should no longer be stayed with the approval of

6    this class action and settlement.

7            So that is so ordered.  That case will no longer be

8    stayed.  And what I would like in your case is if you could

9    just give me a status report within 30 days as to what you

10   propose should happen next in the case and the status of any

11   settlement discussions with your clients and what has happened

12   and what has yet to happen in the Tate action.

13           MR. KAGEN:  I don't believe anything has happened in

14   the Tate action because of the court's order staying the matter

15   pending determination of the class certification motion.

16           THE COURT:  Is there an answer?

17           MR. KAGEN:  The entire proceeding has been stayed.

18           THE COURT:  So you weren't even subject to the motion

19   to dismiss that Judge Sweet decided.

20           MR. KAGEN:  No, your Honor.  The class action began in

21   or about July of 2008.  The Tates filed their action in or

22   about August of 2008 subsequently.

23           THE COURT:  I would still like a letter in 30 days

24   just telling me what should happen next.  Maybe it's just a

25   timetable for a motion or an answer.  I don't know if it's law

CAB8KRIC

1    of the case if it was consolidated when Judge Sweet denied the

2    motion to dismiss.  In any event, I am not going to resolve any

3    of that today.  You can address that in your letter, perhaps

4    next is an answer on the part of defendants, and then we will

5    move forward with the case.  But just confer with counsel for

6    defendants and submit a letter to me indicating what counsel's

7    proposals are for how the case should move forward and when

8    there should be either a conference or discovery deadline,

9    answer.

10            MR. KAGEN:  One last thing.  It's the Tate plaintiffs'

11   position that regardless of the determination of the class

12   certification, nothing decided herein would affect either their

13   claims or their right to proceed individually, as they have

14   previously filed.

15            THE COURT:  I don't think it affects it as a matter of

16   law of the case because it's a different case.  But it might

17   affect it in some other way, in terms of a decision that then

18   becomes collateral estoppel, something like that could affect

19   it, but I don't think the claims would be extinguished in as

20   much as they have opted out.

21            MR. KAGEN:  I understand the Court's position.  We

22   don't necessarily agree with the collateral estoppel issue.

23            THE COURT:  I am just not deciding it either way now.

24   I just don't want to bind myself to some ruling when I haven't

25   had briefing or time to think about it.  Your point is on the

CAB8KRIC

1    record and it is what it is.  It's fairly made.

2            I think that addresses all the objections.  We haven't

3    really talked about attorneys' fees.  I think I only have one

4    or two questions about attorneys' fees.

5            MR. BROWER:  Let me go back to the podium.

6            THE COURT:  I think I am going to resolve the class

7    certification and settlement approval today, but I think I am

8    going to take some time on the attorneys' fees because,

9    frankly, I haven't had a chance to go through all the

10   attorneys' fees submissions.  The one thing I wanted to ask

11   you, I know your position is that essentially it amounts to,

12   when you compare the lodestar to the total percentage recovery,

13   you get a 1.6 multiplier.

14           MR. BROWER:  It's actually lower now.  In this

15   circuit, clearly, you can do either a percentage or a lodestar.

16           THE COURT:  The main question I had is a simple

17   question, which is the lodestar calculation, what is in the

18   record before me?  Did you submit time sheets?  Is there a

19   declaration?

20           MR. BROWER:  Your Honor has declarations from both

21   lead counsel firms.  Within those declarations, there are

22   summaries of every person who worked on the case, each of their

23   current billing rates, which is the proper Second Circuit

24   approach to use current billable rates at the time that the fee

25   application is made, what that multiplies out to based on the

CAB8KRIC

1    number of hours each of those persons worked, and there are

2    summaries of what work was performed by those firms, the two

3    firms, which are Brower Piven and Levi Korsinsky.  But also, of

4    course, you have the master joint declaration, which also

5    addresses attorneys' fees at the end, which are also sworn to

6    by Mr. Korsinsky and I.  So together you have essentially three

7    declarations on the fees.

8             THE COURT:  And you have hourly rates in there?

9             MR. BROWER:  Every hourly rate.  And you have

10   Professor Miller of the NYU law school submitted a declaration

11   in support of attorneys' fees, where he has compared the

12   billable rates of the attorneys who worked on this case and the

13   number of hours that were put in to the case and the kinds of

14   assignments and work that was performed in the case, and he has

15   opined with respect to at least -- he certainly can't make the

16   decision for your Honor, and we don't suggest anything of the

17   kind, but he certainly gives your Honor comparisons that show,

18   for instance, my billable rate, which I believe is the highest

19   of everybody among the plaintiffs' lawyers, is --

20            THE COURT:  Is it higher than the Davis Polk partners?

21            MR. BROWER:  The senior partner who negotiated part of

22   the settlement, we can't find his rate other than from five or

23   six years ago when it was $800 an hour then.  It may have gone

24   up.

25            THE COURT:  Here is my question about your rate, the

CAB8KRIC

1    two plaintiffs' firms' rates.  Do either firms have, and I

2    don't know if you get into this in the declaration, if you do,

3    I apologize, but do you have clients that you bill by the hour?

4    Because there is a sense in which it is an illusory thing if

5    all of your clients are contingent clients.

6            MR. BROWER:  I agree.  I can't speak for Levi

7    Korsinsky.  I can speak for Brower Piven.  Brower Piven does in

8    fact represent hourly clients.  It is set forth both in the

9    initial declaration that was submitted with the original papers

10   with some detail, and it was also addressed in some detail in

11   answering Mr. Andrews' questions, as he posed them, about how

12   we did this and how we did that, and whether we duplicated time

13   and whether we spent the time well and whether our rates are OK

14   and all that.  He argued all those things.

15           We answered them all in the supplemental Brower

16   declaration that you received along with the objection

17   response, and among the things we point out is that Brower

18   Piven has represented real estate investors, all sorts of

19   people, and we have always billed those clients at the same

20   hourly rates that we used for contingent work, that we don't

21   have a fancy contingent up rate and charge hourly clients a

22   lower rate.  And in my career, I have represented directors of

23   public companies.  I have represented a Harvard law professor

24   who is the trustee of a gigantic oil company in Brazil.  I have

25   represented all sorts of people, in all sorts of complex

CAB8KRIC

1    matters, and I have always billed them at whatever my then

2    current billable rate is.  And that's our policy at Brower

3    Piven today, and we do in fact get hourly people come through

4    the door and talk to us about doing work, and sometimes we

5    represent them and sometimes we tell them they would do better

6    elsewhere.  So the answer to that is it is not illusory.

7           On the other hand, the rates are comparable or lower

8    to the rates that the hourly firms that are on the other side

9    of us bill, clearly.  We have given a lot of evidence that the

10   billing rates are now between 1,000, and the last time somebody

11   could get a study done, which is about a year ago, and $1200 an

12   hour for attorneys with my experience and the experience of my

13   senior partners.  Big firms are charging almost $500 an hour

14   for first year associates now.  That's significantly higher

15   than we charge.

16          THE COURT:  First year associates make more than

17   federal judges these days.

18          MR. BROWER:  I don't know if they make more or they

19   billed it more.  But certainly the rates are quite high.  We

20   have to go tit for tat and have to fight back or we can't

21   recover at all.

22          On attorneys' fees, as you know, I don't think there

23   really is a serious objection to the attorneys' fees.  All of

24   the comments about attorneys' fees you will see in any of the

25   objections were, because there are complaints about the

CAB8KRIC

1    settlement or complaints about the notice, you should punish

2    plaintiffs' counsel and not give them fees or you should reduce

3    their fees.  Those were the nature of those kinds of

4    objections.  No one has come forward with a factual objection

5    to any of the fees, or for that matter, the request for

6    reimbursement of expenses.  You could see that from the

7    objections.  There is no direct objection to attorneys' fees,

8    other than the Ventris objection which we dealt with.

9              In addition, the expenses were much lower.  The

10   proposed expenses in the notice turned out to be a third lower

11   than we actually applied for.  No one objected to the expenses

12   we paid.  We were very frugal in pursuing this case.

13             With respect to the amount of the fees, while not

14   hugely so, even the fees we are requesting are smaller than the

15   amount we had put in the notice.  And I think your Honor sees

16   the nature of the objections to what was in the notice, and I

17   would submit there is really no real objection or cognizable

18   objection to the request for attorneys' fees.  Again, it is

19   about 1.58 or 59, which had we just come in on a lodestar

20   analysis would be a very modest multiplier in a complex

21   securities case that has been litigated for over four years,

22   done on a completely contingent basis, where plaintiffs'

23   counsel put up a lot of money up front to litigate the case and

24   took a lot of risks with respect to the settlement.

25             THE COURT:  Thank you.

CAB8KRIC

1          You're standing up again.  Did you want to talk about

2     fees?

3          MR. KUZNICKI:  Yes.

4          THE COURT:  Briefly.

5          Actually, before you do, the other plaintiffs' firm,

6     can you give me any information about the fee structure similar

7     to the question that I asked Mr. Brower?

8          MR. KORSINSKY:  We have three offices and 18 attorneys

9     in Washington, D.C., New York and Connecticut.  For the most

10    part we do contingency work, but there are lawyers in our firm

11    who have taken on regular billing work, and the policy is very

12    similar to Brower Piven's policy, where whatever hourly rate we

13    charge for contingent clients we charge for hourly rate

14    clients, but I do say that the hourly clients that we have

15    taken on in the last couple of years have been rather limited.

16    The attorneys, including myself, over the years, earlier in our

17    careers we represented hourly clients.  Many of the attorneys

18    that work for us have come from larger firms, where they are

19    quite surprised to see the hourly rates relative to what they

20    were billing before they came to us.  For the most part, I

21    think that every attorney that came from the large firms, their

22    hourly rates have been reduced.

23         THE COURT:  Thank you.

24         Mr. Kuznicki.

25         MR. KUZNICKI:  I would just like to add that we do

CAB8KRIC

1    seriously object to the award of the attorneys' fees of

2    $26.333333 million, in light of the actual recovery and work

3    that was done.  Especially without any submission before the

4    Court of what the original negotiations looked like and that

5    they are still concealed, we don't know what offers were on the

6    table early on in the mediation.  We do not know actually any

7    number that was actually required or increased by counsel's

8    extra efforts over the many years.  In fact, at the moment we

9    think that the only group that's interested in settling this

10   matter is class counsel because of the fees that they are going

11   to get.  We believe that if plaintiffs are giving up 95 percent

12   of the compensable damages, it's not much of an achievement for

13   class counsel to obtain and essentially walk away with a third

14   of that, which is only significant because of the substantial

15   damages that were actually perpetrated on the class.  It seems

16   quite ludicrous and an injustice for them to walk away with a

17   third without actually having accomplished much for the class.

18              THE COURT:  Thank you.

19              MR. KAGEN:  Just one quick housekeeping matter.  I

20   noticed in the prior order the Tate action was stayed until

21   determination of class certification motion, which I understand

22   is not going to happen today.

23              THE COURT:  I am going to rule on the class

24   certification motion.

25              MR. KAGEN:  I want to understand, with regard to the

CAB8KRIC

1    30-day time, that should run from now, that the Tate action is

2    no longer stayed?

3          THE COURT:  The Tate action is no longer stayed as of

4    a few minutes from now when I rule on the class certification.

5    Do you need more than 30 days?

6          MR. KAGEN:  No.  I just wanted to clarify that.

7          THE COURT:  You have a separate case number, right?

8    The Tate action has actually a separate number?

9          MR. KAGEN:  I don't know the answer to that question.

10          MS. STARR:  I think he does have a separate number.

11    But in any event, I don't think the 30 days should start to run

12    until the decision on class certification is final.  While your

13    Honor sounds like you are about to issue one, the time for

14    appeal hasn't run, and so in our view the stay should not be

15    lifted until the time for appeal has expired.

16          MR. KAGEN:  That was our understanding.  We have no

17    objection.

18          THE COURT:  That's fine.

19          MR. KAGEN:  I just want to make clear when we need to

20    write the letter.  If I understand what Ms. Starr said, our

21    time does not begin as of today.

22          THE COURT:  I guess it's 30 days for the time you

23    appeal and then 30 days from that is when I would want the

24    letter.

25          MR. KAGEN:  If I can try to state that accurately, 30

CAB8KRIC

```
 1    days from the time that defendants' time to appeal has lapsed,

 2    our time will begin to write a letter to the Court with regard

 3    to our action.

 4               THE COURT:  Yes.  The stay is actually lifted 30 days

 5    after the ruling on the motion for class certification.

 6               MS. STARR:  That's correct, unless someone appeals.

 7               MR. KAGEN:  I just wanted to know for timing.

 8               MR. BROWER:  On the comment of Mr. Behar's associate,

 9    the joint declaration we provided should make it perfectly

10    clear there was never a penny on the table before the first

11    mediation, and I will represent to the Court there was never a

12    penny on the table before the first mediation.  As the

13    declaration makes clear, the first mediation turned into a

14    plaintiff walk-out.  So to the extent he is concerned about at

15    what point in time the numbers rose from zero to 79 million,

16    it's within that period of time between the first mediation and

17    the December mediation, the last mediation, if he needed that

18    timing.  I think beyond that, you're going to make negotiations

19    in class actions impossible if the parties are going to be

20    sharing with the public the back and forth negotiations.

21               MR. KUZNICKI:  I am not suggesting that the number

22    offered by defendants or that they started with an offer on the

23    table.  What I am suggesting is that we would like to know and

24    it would be quite informative to see the first number or any

25    number that was actually first suggested and what kind of
```

CAB8KRIC

inquiries were brought about by counsel's efforts.  I am not

suggesting that defendants came in and were willing to give

money from day one.  What we are suggesting is what was the

first offer made by defendants' counsel, monetary offer, not

their first zero but the gross, without any disclosure on how

the mediation actually proceeded, what the submissions were to

the mediator.  We have no evidence or no basis to know what

their efforts brought about.  So it would be quite informative

for them to open it up or disclose it.  Let's see what actually

transpired and we can see what kind of work was done.  To get a

third of a number that was basically pennies to defendants and

was no big achievement on behalf of plaintiffs on the class, we

object strongly.

THE COURT:  OK.  Is there any final comment anybody

wants to make before I rule on the class certification and the

settlement?

Well, I am prepared to rule.  I am going to grant the

motion for class certification for approval of the settlement.

This action is brought by Larry Freudenberg as the

individual named plaintiff on behalf of other similarly

situated and represents a class of investors, a class running

from April 2006 to November 2007.  The defendants are E*TRADE

Financial Corporation, Mitchell Caplan, Robert Simmons, and

Dennis Webb, and their 10b-5 claims and related claims against

those defendants.

CAB8KRIC

1          I find, first of all, that the class is properly

2     certified as a class action under Rule 23(a) and 23(b)(3)

3     because I find that, first of all, the members of the

4     settlement class are so numerous that joinder of all members is

5     impracticable.  There are questions of law, in fact, that are

6     common to the settlement class.  The claims and defenses of the

7     representative parties are typical of the settlement class, and

8     the representative parties fairly and adequately protect the

9     interests of the settlement class, and in fact have done so.

10          I also find that the action satisfies the requirements

11    of Federal Rule of Civil Procedure 23(b)(3) in that there are

12    questions of law in fact common to settlement class members

13    that predominate over questions effecting only individual

14    members and that class action is superior to other available

15    methods for the fair and efficient adjudication of the

16    controversy.

17          In order to approve a settlement in a class action

18    such as this, I need to find that the settlement is fair,

19    reasonable and adequate.  In finding whether the settlement is

20    fair, I must look first to procedural fairness and also to

21    substantive fairness.  With respect to procedural fairness, I

22    conclude that the settlement of this case does meet the

23    requirements of procedural fairness.  I don't believe there was

24    collusion.  I think the record reflects that it was a

25    hard-fought case.  I think the parties did not come to a

CAB8KRIC

1    collusive settlement, but came to an arm's-length settlement

2    based on a reasonable assessment of the factors that I am about

3    to identify.

4         With respect to substantive fairness, the Court looks

5    to the factors set forth in the *Grinnell* case, and I find that

6    the bulk of those factors weigh in favor of approval of the

7    settlement.

8         First is the complexity, expense and likely duration

9    of the litigation.  As counsel for plaintiffs has adequately

10   demonstrated, these kinds of claims are complex.  Discovery is

11   voluminous.  The case started in 2007.  It's gone on for

12   several years.  Obviously, the case in some sense didn't get

13   that far because we didn't even get to a lot of depositions.

14   Nevertheless, it's a complex case, and as I will get to in a

15   minute, there are risks associated with the legal complexity of

16   the case.

17        Second, the reaction of the class to the settlement.

18   It is true that there are some objectors, obviously, and

19   counsel for Mr. Behar makes a fair point that the fact that

20   there is a fairly small number of opt outs and objectors

21   doesn't necessarily mean that you know the reaction of the

22   whole class.  Sometimes people get these things in the mail and

23   don't notice them.  Nevertheless, I think in a case like this,

24   where there are a significant number of institutional class

25   members, who have a real significant stake in the alleged

CAB8KRIC

1    losses here, the fact that none of those class members has

2    either opted out or objected is really significant, and I think

3    goes to what is likely a fairly sophisticated assessment of the

4    risks of the case and what is ultimately a reasonable

5    settlement based on all the factors and risks and the

6    complexity of the types of claims involved.

7            The third factor is the stage of the proceedings and

8    the amount of discovery completed.  That is, on the one hand,

9    the plaintiffs survived a hard-fought motion to dismiss with a

10   90 page opinion by Judge Sweet, and there has been a lot of

11   discovery in terms of documentary discovery.  There hasn't been

12   a lot of discovery in terms of experts and in terms of

13   depositions.  Nevertheless, this is a factor that is sort of in

14   equipoise, I would say, because there has been a significant

15   amount of discovery, though not anywhere near probably 90

16   percent of the ultimate discovery if the case were to go trial.

17           Fourth, the risks of establishing the liability, and

18   fifth, the risks of establishing damages.  For the reasons

19   outlined in the papers and also highlighted by counsel today, I

20   think there are real risks in a case like this.  There are

21   risks with respect to changing law.  There are risks always in

22   a 10b-5 case with respect to things like scienter.  There are

23   risks with respect to establishing materiality, loss causation,

24   and other issues in securities cases, and I think that the sort

25   of discount that plaintiffs are willing to make on behalf of

CAB8KRIC

1    the class in a case like this is reasonably related to the

2    assessment of those types of risks.

3        Six is the risks of maintaining the class action

4    through the trial.  I think that is a factor that is sort of in

5    equipoise.  I think there is a fairly good chance that this

6    would have been maintained as a class action.  Nevertheless,

7    there are always risks with respect to maintaining it all the

8    way through trial.

9        Seven is the ability of defendants to withstand a

10   greater judgment.  That is a significant factor here because if

11   you look at the stock of E*TRADE, it's taken a big hit since

12   2007.  Ultimately, I think it would be able to withstand a

13   greater judgment, but there is a limit to its ability.

14       Eight is the range of reasonableness of the settlement

15   fund in light of the best possible recovery.  And here

16   plaintiffs have made a fairly good showing that it's somewhere

17   in the range of 14 percent of what is a reasonable expectation

18   of a large settlement in the event of a plaintiffs' victory at

19   trial.  That is not a bad number given the risks that I have

20   mentioned and given the timing of the bird in the hand of the

21   settlement recovery.

22       And ninth is the range of reasonableness of the

23   settlement fund to a possible recovery in light of all the

24   attendant risks of litigation.  For the same reasons I

25   mentioned before, that is a fairly good number here.

CAB8KRIC

1          For all these reasons, I conclude that the settlement

2     is reasonable, fair and adequate, and I am going to approve the

3     settlement.  I am going to take under advisement the issue of

4     attorneys' fees because I haven't really had a chance to look

5     through everything.  In any event, that is a separate

6     assessment that I will make.  But the parties will be receiving

7     in short order a written order confirming that for the reasons

8     stated from the bench, class certification is granted and the

9     settlement is approved.

10          Anything else we need to cover?

11          MR. BROWER:  Two housekeeping matters.  First, a small

12    one.  We ask that your Honor also put on the record that the

13    class representatives for the settlement class are not

14    Mr. Freudenberg.  This is a PSLRA case.  Mr. Freudenberg

15    disappeared after the lead plaintiffs were appointed.  The

16    order we provided your Honor -- we provided your Honor with a

17    form order; we can provide you with an updated one -- lists the

18    Kristen-Straxton Group and the other named plaintiffs who are

19    actually the current plaintiffs in the action.  They are set

20    forth in the proposed form of order and judgment that the

21    parties agreed to under the class certification section.

22          THE COURT:  Yes.

23          MR. BROWER:  So there is no misunderstanding that Mr.

24    Freudenberg is the class representative.

25          THE COURT:  I just got that from the caption.  That's

CAB8KRIC

1    right.  The plaintiffs at the current stage of the litigation

2    are, as reflected in the proposed order, Kristen Management

3    Limited, Straxton Properties, Javed Fiyaz, Ira Newman, Peter

4    Farah, and Andrea Frascaroli.

5              MR. KUZNICKI:  Would your Honor permit us to put in an

6    additional submission with respect to our position on the

7    attorneys' fees?

8              THE COURT:  What's that?

9              MR. KUZNICKI:  Would we be permitted to make an

10   additional submission with respect to our position on

11   attorneys' fees?

12             THE COURT:  I don't think it's timely at this point.

13             MR. KUZNICKI:  That's why I am asking.

14             THE COURT:  No.  Because I am going to be ruling on it

15   shortly.

16             MR. BROWER:  The other housekeeping issue is if you

17   would address, if you're prepared to, the plan of allocation,

18   which as Ms. Starr pointed out, the stipulation provides it's

19   separate from the settlement.

20             THE COURT:  I approved the plan of allocation.  I

21   think it is a reasonable plan of allocation.  You can criticize

22   almost any theory of allocation, but I think it is a fairly

23   reasonable and sophisticated way to allocate the loss.

24             The other thing I should say is, with respect to the

25   objectors, I didn't say this explicitly, there were four

CAB8KRIC

1    objections.  The Ventris objection has been withdrawn based on

2    changes with respect to how attorneys' fees are taken out of

3    the fund.  With respect to the Andrews and Liles objections, I

4    find that the objectors lack standing.  I also find that in any

5    event, if they had standing, those objections lack merit and

6    they are overruled.  And I also conclude that the Behar

7    objections are overruled based on the factors that I have gone

8    through, the *Grinnell* factors.

9              Anything else?

10             All right.  Thank you very much.

11             (Adjourned)